# EXHIBIT A

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

   -and-

HANNAH ROSS
(hannah@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
SCOTT R. FOGLIETTA
(scott.foglietta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:   (212) 554-1400
Fax:   (212) 554-1444

*Counsel for Plaintiff Ohio Public Employees
Retirement System*

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>      v.<br><br>META PLATFORMS, INC. f/k/a FACEBOOK, INC., MARK ZUCKERBERG, DAVID M. WEHNER, and NICK CLEGG,<br><br>        Defendants. | Case No. 3:21-cv-08812<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Ohio Public Employees Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Meta Platforms, Inc. f/k/a Facebook, Inc. ("Facebook" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning Facebook; and (iv) other public information regarding the Company, including testimony provided by a Facebook whistleblower during an October 5, 2021 hearing before the United States Senate Sub-Committee on Consumer Protection, Product Safety, and Data Security.

## I. INTRODUCTION

1. This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired shares of Facebook Class A common stock between April 29, 2021 and October 21, 2021, inclusive (the "Class Period"). The claims asserted herein are alleged against Facebook and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2. This matter arises from an egregious breach of public trust by Facebook, which knowingly exploited its most vulnerable users—including children throughout the world—in order to drive corporate profits. At the same time, Defendants repeatedly misrepresented to investors and the public that use of Facebook's products does not harm children, that the Company takes aggressive and effective measures to stop the spread of harmful content, and that Facebook applies its standards of behavior equally to all users. Facebook investors recently learned the truth when former Facebook employee turned whistleblower, Frances Haugen, came forward with internal documents showing that Defendants were aware that Facebook's platforms facilitate dissention, illegal activity, and violent extremism, and cause significant harm to users, especially children, but

Facebook refused to correct these issues. All told, these disclosures erased more than $100 billion in shareholder value and subjected Facebook to immense reputational harm.

3. Facebook operates the world's largest family of social networks, enabling more than three billion users worldwide to connect and share content through mobile devices, personal computers, and virtual reality headsets. The Company's products include its flagship social networking platform, Facebook, which allows people around the world to connect, share, discover, and communicate with each other on personal computers and mobile devices. Facebook's other products include: Instagram, a community for sharing photos, videos, and private messages; Facebook Messenger, a messaging application for people to connect with friends, family, groups, and businesses across platforms and devices; and WhatsApp, a messaging application used by people and businesses to communicate. The Company generated the vast majority of its $86 billion in revenue in 2020 by selling advertisement placements to marketers which Facebook then pushes to its users across its platforms.

4. Throughout the Class Period, the Company repeatedly assured investors that it has "the most robust set of content policies out there" and touted the aggressive steps it takes to ensure the safety and security of its users by preventing misinformation and harmful content from spreading through its platforms. Facebook also stated that it was committed to keeping people safe and assured investors that it enforces its content policies evenly across all users. These and similar statements made throughout the Class Period were false.

5. Thousands of recently leaked internal Facebook documents paint a remarkably different picture. Those documents show that Defendants were acutely aware that the products and systems central to Facebook's business are riddled with flaws that sow dissention, facilitate illegal activity and violent extremism, and cause significant harm to users, but Facebook lacks the will or ability to correct them. Despite this knowledge, Facebook opted to maximize its profits at the expense of the safety of its users and the broader public, exposing Facebook to serious reputational, legal, and financial harm. Moreover, Facebook has taken significant steps to attract pre-teens to its products, which the Company viewed as "a valuable but untapped audience," despite knowing that those products have a toxic effect on the well-being of their most vulnerable

users, particularly teenage girls. Defendants also knew that Facebook's user metrics were unreliable and artificially inflated and that the number of duplicate accounts created by users comprised a greater proportion of Facebook's active users than the Company represented. As a result of Defendants' misrepresentations, shares of Facebook common stock traded at artificially inflated prices during the Class Period.

6.      The truth began to emerge on September 13, 2021, when *The Wall Street Journal* published the first of a series of articles, referred to as "The Facebook Files." Those articles, citing a trove of internal Company documents obtained from a whistleblower, later revealed as Frances Haugen, demonstrated the extent to which Facebook knows its platforms contain flaws that cause significant harm to users, but which the Company makes minimal or ineffectual efforts to address. Specifically, the September 13 article reported that, despite the Company's public assurances that Facebook applies its standards of behavior equally to all users, the Company has exempted millions of high-profile users from some or all of its rules, permitting numerous violations of the Company's Code of Conduct. Internal documents reveal how the Company's favoritism towards such high-profile users is widespread and that Facebook was "not actually doing what we say we do publicly."

7.      On each of the next four days, *The Wall Street Journal* published an additional installment of "The Facebook Files," each of which detailed a distinct problem with Facebook's platforms and extensively cited internal Facebook documents leaked by the whistleblower. On September 14, 2021, *The Wall Street Journal* reported that, despite the Company publicly downplaying the harmful effects of Instagram on young users, Facebook's own research demonstrates that Facebook "make[s] body image issues worse for one in three teen girls" many of whom "blame Instagram for increases in the rate of anxiety and depression" and have linked suicidal thoughts and eating disorders to their experiences on Instagram.

8.      The September 15, 2021 installment detailed how Facebook's 2018 change to its algorithm that controls what content a user will see led to the spread of content that is objectionable and harmful to users. Internally, Facebook employees described the algorithm change as having

"unhealthy side effects" on important content, like news and politics, and led to "[m]isinformation, toxicity, and violent content" becoming "inordinately prevalent."

9. On September 16, 2021, *The Wall Street Journal* revealed that Facebook has weak and ineffective responses to the use of its platforms by drug cartels and human traffickers as a facilitator of their criminal enterprises and that content violating the Company's domestic servitude policy routinely makes its way on to Facebook's platforms without detection and removal.

10. The September 17, 2021 installment revealed that, even for topics on which Facebook committed itself to representing a specific viewpoint, the Company was unable or unwilling to manage content on its platforms in line with its own representations.

11. On September 28, 2021, the day after Facebook announced that it had paused its development of a version of Instagram specifically targeted at children, *The Wall Street Journal* published an article, citing internal Company documents, that detailed Facebook's significant efforts to monetize use of the Company's products by pre-teens ages 10 to 12. Those documents show that Facebook focused on "tweens" because they represented "a valuable but untapped audience."

12. In the wake of *The Wall Street Journal* reports, on October 3, 2021, the Facebook whistleblower revealed her identity as former Facebook project manager, Frances Haugen, during a bombshell televised interview on the CBS News program, *60 Minutes*. During the interview, Ms. Haugen revealed that Facebook repeatedly "has shown it chooses profit over safety," concluding that "I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous."

13. The following day, on October 4, 2021, CBS News published an article which included the eight whistleblower complaints against Facebook that Ms. Haugen has filed with the SEC, alleging that Facebook has repeatedly misled the public and investors on several issues.

14. On October 21, 2021, after the market closed, *The Wall Street Journal* published an article, citing internal Company documents, that raised significant concerns about the accuracy and reliability of some of Facebook's publicly reported user metrics. Those documents show that

the use of duplicate accounts by some users is "very prevalent" which could render Facebook's ratio of daily active users inherently "less trustable."

15. Then, on October 22, 2021, after the end of the Class Period, it was first reported by *The Washington Post* that a second Facebook whistleblower had come forward and filed a complaint with the SEC, based on allegations similar to those made by Ms. Haugen.

16. From the date of the first article published by *The Wall Street Journal* on September 13, 2021 to *The Wall Street Journal* article published on October 21, 2021 that raised concerns about the accuracy and reliability of the Company's user metrics, Facebook's stock price declined by $54.08 per share, or over 14%, representing a decline of more than $150 billion in Facebook's total market capitalization.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). Facebook maintains its headquarters in Menlo Park, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

19. Plaintiff is a public pension fund organized for the benefit of public employees throughout the state of Ohio who are not covered by another state or local retirement system. As of December 31, 2020, Plaintiff managed assets of approximately $125 billion on behalf of more

than 1.1 million active members, retirees, and beneficiaries. As indicated in the certification submitted herewith, Plaintiff purchased shares of Facebook Class A common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

20. Defendant Facebook operates the world's largest family of social networking sites, which are accessed by more than 3.5 billion users. Incorporated in Delaware, the Company maintains its corporate headquarters at 1601 Willow Road, Menlo Park, California. Facebook Class A common stock currently trades on NASDAQ under ticker symbol "FB" but the Company's stock is expected to begin trading under its new ticker symbol, "MVRS," on December 1, 2021.[1] As of October 20, 2021, Facebook had over 2.3 billion shares of Class A common stock outstanding, owned by hundreds or thousands of investors.

21. Defendant Mark Zuckerberg ("Zuckerberg") is the founder, Chairman and Chief Executive Officer of Facebook, which he founded in 2004.

22. Defendant David M. Wehner ("Wehner") has served as Facebook's Chief Financial Officer since June 2014.

23. Defendant Nick Clegg ("Clegg") has served as Facebook's Vice President of Global Affairs and Communications since October 2018.

24. Defendants Zuckerberg, Wehner, and Clegg are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Facebook, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause

---

[1] On October 28, 2021, Facebook, Inc. changed its corporate name to Meta Platforms, Inc., pursuant to an amended and restated certificate of incorporation filed with the Delaware Secretary of State on October 28, 2021. For ease of reference, this complaint continues to refer to the Company as Facebook.

them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. BACKGROUND

25. Based in Menlo Park, California, Facebook operates the world's largest family of social networking sites, allowing its more than three billion users to connect with friends and family by sharing status updates, personal photos and videos, and other items of interest. The Company's products include its flagship social network, Facebook, as well as Instagram, a photo and video sharing app, and messaging apps, Facebook Messenger and WhatsApp.

26. The Company uses a feature called News Feed, a constantly updated, personally customized scroll of photos and links to news stories, to push content to users of Facebook's flagship social network. Facebook also uses a similar feature for Instagram, called Instagram Feed. These feeds are the primary mechanisms through which users are exposed to content on the social networks and Facebook uses a proprietary algorithm to control what content appears in each user's feed. The Company generates revenue by selling that user attention to advertisers that post ads on Facebook and/or Instagram, which accounted for nearly all of Facebook's $86 billion in revenue in 2020.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

27. The Class Period begins on April 29, 2021, the first trading day after Facebook held its first quarter 2021 earnings call. During the call, which began after the market closed on April 28, 2021, Defendant Zuckerberg stated that "[f]or the last several years, we focused a lot on content moderation and privacy work, and I view customer support as the next pillar of the trust and safety work for our services." During the call, an analyst questioned Facebook's executives about the Company's algorithmic amplification, which could lead to more controversial content being pushed to users' News Feeds. In response, Defendant Zuckerberg downplayed those concerns, stating that Facebook had practices in place that are "quite robust" and assured investors that "we

don't want extremist content or any of that stuff on our services, so if anything to the contrary of trying to promote that, we go out of our way to try to reduce that." Defendant Wehner further assured investors that "more than anyone else in the industry we invest on the safety and security side to sort of keep bad content off the site before it gets ranked and put into what people see." Defendant Wehner also stated that Facebook has "the most robust set of content policies out there" and "we really do more than anyone else in the industry on the safety and security front to prevent things like misinformation and bad content going into the system in the first place."

28. On April 29, 2021, Facebook filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2021. The Form 10-Q was signed by Defendant Wehner and contained certifications by Defendants Zuckerberg and Wehner that attested to the purported accuracy and completeness of the Form 10-Q. In the 10-Q, Facebook represented that "[w]e believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets." In addition, Facebook touted its continued investment in certain "company priorities," including, among other things, "continue making progress on the major social issues facing the internet and our company, including privacy, safety, and security" and "communicate more transparently about what we're doing and the role our services play in the world."

29. On May 26, 2021, Facebook held its annual meeting of shareholders. During the meeting, in response to a shareholder's question about the Company's policies on censorship, Defendant Clegg stated that "[w]e always strive to enforce our policies evenly without regard to the political affiliation of those affected," and while Facebook supports free expression, "of course, that doesn't mean that politicians can just say things that clearly cause harm and our policies on hate speech, incitement and so on apply to everyone regardless of their position of power." Defendant Clegg further emphasized that "[s]o . . . we're very clear, we remove content that poses specific harm to people, content intended to intimidate, exclude or silence views." Similarly, in response to another shareholder's question about Facebook's plan to manage the proliferation of "fake news" on its platform, Defendant Clegg stated that "remember, we really are committed to fighting wherever we can the spread of false information on Facebook" and "[w]e remove content

that violates our Community Standards . . . and we reduce distribution of stories, which are marked as false. And we . . . try to inform people, so that they can decide for themselves what to read, trust, and share." During the meeting, Defendant Zuckerberg assured investors that "for the last several years, our team that has been focused on kind of trust and safety overall, has been more focused on content moderation, so making sure that we can identify harmful content and take it down."

30. On July 29, 2021, Facebook filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2021. The Form 10-Q was signed by Defendant Wehner and contained certifications by Defendants Zuckerberg and Wehner that attested to the purported accuracy and completeness of the Form 10-Q. In the 10-Q, Facebook represented that "[w]e believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets." In addition, Facebook touted its continued investment in certain "company priorities," including, among other things, "continue making progress on the major social issues facing the internet and our company, including privacy, safety, and security" and "communicate more transparently about what we're doing and the role our services play in the world."

31. Throughout the Class Period, Facebook also made numerous false and misleading statements in its Code of Conduct regarding the Company's commitment to user safety. For instance, Facebook's Code of Conduct, which the Company posted to its website during the Class Period, stated that "[o]ur reach and influence require that we commit and hold ourselves accountable to a high standard, ensuring that we build products and programs that have a positive impact, keep people safe and serve everyone." The Code of Conduct also stated that one of Facebook's five core principles is to "keep people safe and protect privacy" and emphasized that "we are committed to protecting our communities from harm."

32. In its Code of Conduct, Facebook also described its purported mandate to "innovate responsibly by making every effort to anticipate and mitigate potential harms in all that we build" and emphasized that "Facebook is committed to maximizing the positive impact we have on people and society through all that we build." As part of that mandate, Facebook stated it "[c]onsider[s]

a broad range of potential impacts on people, communities and society, looking across different dimensions of responsibility, such as inclusion, safety, privacy and others" and that it "[r]aise[s] and address[es] potential harms early and often throughout the product development process." Facebook also stated that it "[w]ork[s] quickly to identify and remove harmful content from Facebook platforms, such as hate speech, harassment, child exploitation, threats of violence and terrorism," and emphasized that "[s]afety is one of our Responsible Innovation Dimensions."

33. Throughout the Class Period, Facebook also made public statements on its website regarding the Company's commitment to user safety and the measures that it takes to limit the spread of harmful content and misinformation on its platforms. For instance, Facebook's website stated that the Company is "committed to protecting your voice and helping you connect and share safely" and "[t]hat's why we have Community Standards that specify what's allowed on our apps, and we remove anything that breaks these rules." On its website, Facebook also stated that it "remove[s] hate speech, harassment, threats of violence and other content that has the potential to silence others or cause harm," including "proactively detect[ing] 95% of hate speech on Facebook that we remove before anyone reports it to us." Facebook's website further stated that the Company "work[s] to limit the spread of misinformation," including "[c]ombating COVID-19 [m]isinformation," by "taking aggressive steps to stop misinformation and harmful content from spreading."

34. The statements set forth above in ¶¶27-33 were materially false and misleading. In truth, Defendants knew that Facebook's platforms foster division and spread harmful content, facilitate illegal activity and violent extremism, and cause significant harm to children, but lacked the will or ability to correct those issues. Defendants also knew that certain of the Company's user metrics were unreliable and artificially inflated and that the number of duplicate accounts created by a single user accounted for a larger portion of Facebook's active users.

## VI. THE TRUTH EMERGES

35. The truth about Facebook's misconduct began to emerge on September 13, 2021, when *The Wall Street Journal* published the first of a series of articles, which have become known in the media as "The Facebook Files," citing internal Company documents obtained from a

whistleblower that show that Facebook knows its platforms are riddled with flaws that cause harm to users, but lacks the will or ability to correct them. Specifically, on September 13, 2021, *The Wall Street Journal* reported that, contrary to Facebook's public assurances that the Company applies its standards of behavior equally to all users, Facebook has built a system, known as "cross-check" or "XCheck," that has exempted millions of high-profile users from some or all of its rules. According to the article, an internal review conducted by Facebook employees in 2019 found the Company's favoritism to such high-profile users to be both widespread and "not publicly defensible," concluding that "[w]e are not actually doing what we say we do publicly" because "[u]nlike the rest of our community, these people can violate our standards without any consequences." The article further revealed that Facebook has misled the public and its own Oversight Board, a body that Facebook created to purportedly ensure the accountability of the Company's enforcement processes, regarding its XCheck system. Notably, in June 2021, Facebook told the Oversight Board that its systems for high-profile users was only used in "a small number of decisions." However, internal documents show that XCheck grew to include at least 5.8 million users in 2020, but Facebook "review[s] less than 10% of XChecked content." As a result of these disclosures, Facebook's stock price declined by $2.18 per share, from $378.69 per share to $376.51 per share.

36. On September 14, 2021, *The Wall Street Journal* revealed that, despite Facebook publicly downplaying the negative effects of Instagram use among teens, the Company's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app. Facebook's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Facebook researchers concluded that "[w]e make body issues worse for one in three teen girls" and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Facebook's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:21-cv-08812

37. On September 15, 2021, *The Wall Street Journal* published an article detailing how an algorithm change that Facebook introduced in 2018 to control what appears in each user's News Feed promotes content that is objectionable and harmful to some users. In an internal report, Facebook data scientists concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Facebook data scientists concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Facebook employees also discussed the Company's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Facebook's business. Facebook found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped the Company sell more of the digital ads that generate most of its revenue. As a result of these disclosures, Facebook's stock price declined by $2.61 per share, from $376.53 per share to $373.92 per share.

38. On September 16, 2021, *The Wall Street Journal* revealed that Facebook has weak and ineffective responses to drug cartels and human traffickers that use the Company's platforms to facilitate their illegal activities. The article reported that in January 2021, a Facebook investigator flagged that a drug cartel was using Facebook to recruit, train, and pay hit men, but those pages remained active for months and the Company failed to take swift and effective action to prohibit the cartel from making future posts. Internal documents show that Facebook employees had raised red flags about how the Company's platforms are used in some developing countries, but its response in many instances is inadequate or non-existent. Indeed, an internal Company report from March 2021 found that bad actors, including some foreign countries at risk for conflict, were frequently on Facebook promoting violence, exacerbating ethnic divides, and delegitimizing social institutions, concluding that the Company's "[c]urrent mitigation strategies are not enough." Internal records also show that Facebook struggled to put effective policies into place to curtail behavior tied to human trafficking, with one Facebook employee writing in an internal report that "[w]e have found content violating our domestic servitude policy that should have been detected

automatically" by a software tool called the Civic Integrity Detection pipeline, which Facebook deactivated at the end of 2020. As a result of these disclosures, Facebook's stock price declined by $0.86 per share, from $373.92 per share to $373.06 per share.

39. On September 17, 2021, *The Wall Street Journal* published an article revealing conclusively that Facebook lacked the ability or willingness to manage the content on its platforms, even with respect to topics on which the Company had committed to advancing a particular message. In that article, *The Wall Street Journal* focused on repeated public commitments made by Facebook and Zuckerberg regarding the use of the Company's platforms to communicate health guidance related to the COVID-19 pandemic. According to the internal documents, however, the Company completely failed in its purported efforts to manage such messaging and content. As a result of these disclosures, Facebook's stock price declined by $8.34 per share, from $373.06 per share to $364.72 per share.

40. On September 28, 2021, the day after it was announced that Facebook would pause its development of a version of Instagram for children, known as Instagram Kids, *The Wall Street Journal* published an article, citing internal Facebook documents, that detailed the Company's significant efforts to attract pre-teens to its site, including Facebook's "big bets" on designing products that would appeal to children ages 10 through 12. Those documents show that Facebook had formed a team to study pre-teens, set a three-year goal to create more products for them and commissioned research about the long-term business opportunities that pre-teens presented to Facebook. According to one internal document from 2020, the reason that Facebook "care[s] about tweens" is because "[t]hey are a valuable but untapped audience." Facebook's willingness to target vulnerable children further demonstrates just how desperate Facebook had become in the face of declining user growth and engagement. As a result of these disclosures, Facebook's stock price declined by $12.93 per share, from $353.58 per share to $340.65 per share.

41. On October 3, 2021, the Facebook whistleblower revealed her identity during a televised interview on the CBS News program, *60 Minutes*. During the interview, Frances Haugen, a data scientist and former project manager at Facebook, revealed that "[t]he thing I saw at Facebook over and over again was there were conflicts of interest between what was good for

the public and what was good for Facebook. And Facebook, over and over again, chose to optimize for its own interests, like making more money" and repeatedly "has shown it chooses profit over safety." Ms. Haugen stated that Facebook's algorithm optimizes for content that generates engagement, including more content that is angry, divisive, and polarizing because "they'll get more views." Ms. Haugen reported that "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click less ads, [and] they'll make less money." Ms. Haugen, who previously worked at other big technology companies, stated that things were "substantially worse at Facebook." She also asserted that Facebook facilitated the January 6, 2021 deadly riot at the White House, some of which was coordinated through Facebook's platform, because the Company lacked the safety measures and financial incentive to thwart the spread of harmful content. In describing her role as a member of Facebook's Civic Integrity Unit, which worked on risks related to the spread of misinformation in connection with political elections but which the Company dissolved weeks after the 2020 U.S. Presidential election, Ms. Haugen stated that "I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous."

42. On October 4, 2021, CBS News published an article revealing publicly for the first time the eight whistleblower complaints against Facebook that Ms. Haugen had previously filed with the SEC. The complaints allege that Facebook repeatedly misled the public and investors on several issues, including, among other things, that: Facebook knew its platforms perpetuated misinformation and violent extremism and promoted global division, but did little to stop it; Facebook failed to adopt adequate countermeasures to combat the promotion of human trafficking; Facebook routinely gave preferential treatment to certain high-profile users; and Facebook had inflated its advertising reach and user base in important demographics. As a result of the October 3 and October 4 disclosures, Facebook's stock price declined by $16.78 per share, from $343.01 per share to $326.23 per share.

43. On October 21, 2021, after the market closed, *The Wall Street Journal* published an article that raised concerns about the accuracy and reliability of some of Facebook's user metrics. Specifically, Facebook's internal research concluded that the Company undercounts new

users with multiple accounts, with one internal presentation finding single users with multiple accounts, or SUMA, to be "very prevalent" among new accounts. In an internal memo from May 2021, a Facebook employee found that the number of U.S. Facebook users who are in their twenties and active at least once per month on the site often exceeds the total population of Americans their age, which "brings out an elephant in the room: SUMA," adding that this issue could render Facebook's ratio of daily active users "less trustable." The article further reported that the issue of duplicate Facebook accounts could have a significant impact on large advertisers that pay for ads to target a specific demographic based on Facebook's system that gives those advertisers an estimate of how many users a given ad campaign could reach. As a result of these disclosures, Facebook's stock price declined by $17.27 per share, from $341.88 per share to $324.61 per share.

44. Then, on October 22, 2021, after the end of the Class Period, *The Washington Post* reported that a second Facebook whistleblower had come forward and filed a complaint with the SEC, raising allegations similar to those made by the first Facebook whistleblower.

45. From the date of the first article published by *The Wall Street Journal* on September 13, 2021 to the October 21, 2021 article published by *The Wall Street Journal* that raised concerns about the accuracy and reliability of the Company's user metrics, Facebook's stock price declined by $54.08 per share, or 14.3%, from $378.69 per share to $324.61 per share, damaging investors.

46. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## VII. LOSS CAUSATION

47. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Facebook common stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Facebook stock fell precipitously as the prior artificial inflation came out of the price over time. As a result of their purchases of Facebook

common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

48.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired the publicly traded Class A common stock of Facebook during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Facebook and their families and affiliates.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of October 20, 2021, there were over 2.3 billion shares of Facebook Class A common stock outstanding, owned by hundreds or thousands of investors.

50.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Facebook common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:21-cv-08812                                                                                          16

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

51.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

52.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

54.     Facebook's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

55.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Facebook who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.     PRESUMPTION OF RELIANCE

56.     At all relevant times, the market for Facebook common stock was an efficient market for the following reasons, among others:

(a)     Facebook common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Facebook filed periodic public reports with the SEC and NASDAQ;

(c)     Facebook regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Facebook was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

57.     As a result of the foregoing, the market for Facebook common stock promptly digested current information regarding Facebook from all publicly available sources and reflected such information in the price of Facebook common stock. Under these circumstances, all purchasers of Facebook common stock during the Class Period suffered similar injury through their purchase of Facebook common stock at artificially inflated prices and the presumption of reliance applies.

58.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Facebook's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of adequate safeguards to protect users from harm caused by Facebook's products, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

59.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

60. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Facebook common stock at artificially inflated prices.

61. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Facebook common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

62. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

63. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Facebook's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

65. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Facebook common stock. Plaintiff and the Class would not have purchased Facebook common stock at the prices they paid, or at all, had they been aware that the market prices for Facebook common stock had been artificially inflated by Defendants' fraudulent course of conduct.

66. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

67. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

68. Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

69. The Individual Defendants acted as controlling persons of Facebook within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Facebook, the Individual Defendants had the power and ability to control the actions of Facebook and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI. PRAYER FOR RELIEF

70. WHEREFORE, Plaintiff prays for judgment as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.    JURY DEMAND

71.    Plaintiff demands a trial by jury.

DATED: November 12, 2021                     Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:      (310) 819-3470

-and-

HANNAH ROSS
(hannah@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
SCOTT R. FOGLIETTA
(scott.foglietta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:      (212) 554-1400
Fax:      (212) 554-1444

*Counsel for Plaintiff Ohio Public Employees
Retirement System*

**OFFICE OF THE ATTORNEY GENERAL
OF THE STATE OF OHIO**
 SHAWN BUSKEN
 (Shawn.Busken@OhioAttorneyGeneral.gov)
 30 East Broad Street
 Columbus, OH 43215
 Tel:      (800) 282-0515

*Additional Counsel for Plaintiff Ohio Public
Employees Retirement System*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:21-cv-08812                                                                       21

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Eric C. Harrell, on behalf of Ohio Public Employees Retirement System ("Ohio PERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the General Counsel of Ohio PERS. I have reviewed the complaint and authorize its filing.

2. Ohio PERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Ohio PERS is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Ohio PERS's transactions in the Meta Platforms, Inc. f/k/a Facebook, Inc. ("Facebook") securities that are the subject of this action are set forth in the chart attached hereto.

5. Ohio PERS has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Ohio PERS will not accept any payment for serving as a representative party on behalf of the Class beyond Ohio PERS's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12 day of November, 2021.

Eric C. Harrell
General Counsel
*Ohio Public Employees Retirement System*

**Ohio Public Employees Retirement System**
**Transactions in Facebook**

| <u>Transaction</u> | <u>Date</u> | <u>Shares</u> | <u>Price</u> |
|---|---|---|---|
| Purchase | 5/27/2021 | 2,022 | 332.7500 |
| Purchase | 7/6/2021 | 135,000 | 352.7800 |
| Purchase | 9/17/2021 | 901 | 364.7200 |
| Purchase | 9/17/2021 | 1,298 | 364.7200 |
| | | | |
| Sale | 5/27/2021 | (67) | 332.7500 |
| Sale | 6/25/2021 | (18,742) | 341.3700 |
| Sale | 6/25/2021 | (1,289) | 341.3700 |
| Sale | 8/13/2021 | (8,897) | 363.1800 |
| Sale | 8/31/2021 | (691) | 379.3800 |
| Sale | 8/31/2021 | (7) | 379.3800 |
| Sale | 10/14/2021 | (11,557) | 328.5300 |
| Sale | 10/21/2021 | (11,445) | 341.8800 |