ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
HADIYA K. DESHMUKH (328118)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
hdeshmukh@rgrdlaw.com
       – and –
DARREN J. ROBBINS (168593)
DANIEL S. DROSMAN (200643)
JASON A. FORGE (181542)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
ddrosman@rgrdlaw.com
jforge@rgrdlaw.com

[Proposed] Lead Counsel for [Proposed] Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 4:21-cv-08812-JST |
|---|---|---|
| Plaintiff, | ) ) ) | CLASS ACTION

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM'S MEMORANDUM OF LAW IN OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS |
| vs.

META PLATFORMS, INC. f/k/a FACEBOOK, INC., et al., | ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) ) | DATE:      March 10, 2022
TIME:      2:00 p.m.
CTRM:    Zoom hearing per ECF No. 43
JUDGE:   Hon. Jon S. Tigar |

4870-4421-1464

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT .....................................................................................................2

        A.      The OPERS-PFA Group Is Not Eligible for Appointment as Lead Plaintiff ..........2

                1.      PFA Obscured Its Actual Financial Interest ................................................3

                        a.      PFA's Loss Chart Is Intentionally Incomplete...............................3

                        b.      PFA's Unexplained Atypical Trading Activity Precludes a Finding that PFA (and the Group) Otherwise Satisfy Rule 23.........................................................................................................4

                2.      PFA's Vulnerable Standing Precludes a Finding of Typicality and Adequacy ...................................................................................7

                3.      The OPERS-PFA Group Is a Lawyer Created "Group" that Exists Solely to Allow OPERS to Claim the Largest Collective Loss and Protect PFA from Its Unique Defenses........................................................13

                        a.      This Lawyer-Created Group Is Destined to Be Dysfunctional.................................................................................14

                        b.      The Group Fails to Establish How it Would Exercise Control Over the Litigation, Leaving the Lawyers Who Created it in Control.................................................................................15

        B.      CalPERS Is the Presumptive Lead Plaintiff............................................................19

        C.      The Remaining Movants Do Not Trigger the Presumption...................................19

III.    CONCLUSION.................................................................................................20

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Aronson v. McKesson HBOC, Inc.*,
  79 F. Supp. 2d 1146 (N.D. Cal. 1999) ...................................................................................14

*Baydale v. Am. Exp. Co.*,
  2009 WL 2603140 (S.D.N.Y. Aug. 14, 2009) .................................................................6, 13

*Bodri v. Gopro, Inc.*,
  2016 WL 1718217 (N.D. Cal. Apr. 28, 2016) .......................................................................13

*Booth v. Strategic Realty Tr., Inc.*,
  2014 WL 342625 (N.D. Cal. Jan. 27, 2014) ..........................................................................14

*Cambridge Ret. Sys. v. Mednax, Inc.*,
  2018 WL 8804814 (S.D. Fla. Dec. 6, 2018) ......................................................................6, 17

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ............................................................................................13, 16

*Eichenholtz v. Verifone Holdings, Inc.*,
  2008 WL 3925289 (N.D. Cal. Aug. 22, 2008) ....................................................13, 17, 18, 19

*Frias v. Dendreon Corp.*,
  835 F. Supp. 2d 1067 (W.D. Wash. 2011) .............................................................................17

*Gross v. AT & T Inc.*,
  2019 WL 3500496 (S.D.N.Y. July 31, 2019) ..................................................................10, 12

*Hill v. Silver Lake Group, L.L.C.*,
  No. 4:20-cv-03766-JSW (N.D. Cal. Dec. 1, 2020) ...............................................................10

*In re Cavanaugh*,
  306 F.3d 726 (9th Cir. 2002) ..................................................................................... *passim*

*In re Cloudera, Inc. Sec. Litig.*,
  2019 WL 6842021 (N.D. Cal. Dec. 16, 2019) .............................................................. *passim*

*In re Enron Corp. Sec. Litig.*,
  206 F.R.D. 427 (S.D. Tex. 2002) .......................................................................1, 15, 16, 19

*In re Gentiva Sec. Litig.*,
  281 F.R.D. 108 (E.D.N.Y. 2012) ..........................................................................................15

*In re Mersho*,
  6 F.4th 891 (2021) ...........................................................................................................2, 3, 13

**Page**

*In re Network Assocs., Inc., Sec. Litig.*,
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ..............................................................................6, 18

*In re Petrobras Sec. Litig.*,
    104 F. Supp. 3d 618 (S.D.N.Y. 2015)..............................................................................15, 16

*In re Stitch Fix, Inc. Sec. Litig.*,
    393 F. Supp. 3d 833 (N.D. Cal. 2019) ....................................................................................16

*In re Telxon Corp. Sec. Litig.*,
    67 F. Supp. 2d 803 (N.D. Ohio 1999).....................................................................................14

*Inchen Huang v. Depomed, Inc.*,
    289 F. Supp. 3d 1050 (N.D. Cal. Dec. 8, 2017)..................................................................10, 14

*Isaacs v. Musk*,
    2018 WL 6182753 (N.D. Cal. Nov. 27, 2018) ....................................................................18, 19

*Knott v. McDonald's Corp.*,
    147 F.3d 1065 (9th Cir. 1998) ....................................................................................................4

*Lundy v. Selene Fin., LP*,
    2017 WL 2652048 (N.D. Cal. June 20, 2017)............................................................................9

*Perlmutter v. Intuitive Surgical, Inc.*,
    2011 WL 566814 (N.D. Cal. Feb. 15, 2011) ..............................................................................4

*Plymouth Cty. Ret. Ass'n v. Array Techs., Inc.*,
    2021 WL 5051649 (S.D.N.Y. Nov. 1, 2021)........................................................................11, 12

*Smajlaj v. Brocade Commc'n Sys. Inc.*,
    2006 WL 7348107 (N.D. Cal. Jan. 12, 2006)......................................................................10, 13

*Steamfitters Loc. 449 Pension Fund v. Cent. Eur. Distribution Corp.*,
    2012 WL 3638629 (D.N.J. Aug. 22, 2012) ..............................................................10, 11, 13

*Theodore v. Purecycle Techs., Inc.*,
    2021 WL 5259840 (M.D. Fla. Aug. 5, 2021) ..........................................................................12

*Tsirekidze v. Syntax- Brillian Corp.*,
    2008 WL 942273 (D. Ariz. Apr. 7, 2008) ..............................................................................19

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2006)..................................................................................................9, 12

**Page**

*Williams v. Block.One*,
    2020 WL 4505569 (S.D.N.Y. Aug. 4, 2020)..........................................................................................4

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4(a)(2)(A).................................................................................................................................4
    §78u-4(a)(2)(A)(iv)...........................................................................................................................3
    §78u-4(a)(3)(B)(iii)..........................................................................................................................13

Federal Rules of Civil Procedure
    Rule 23 ................................................................................................................................ *passim*
    Rule 23(a)......................................................................................................................................2, 3, 9

## I.    INTRODUCTION

The OPERS-PFA Group is trying to reduce the Private Securities Litigation Reform Act of 1995's ("PSLRA") lead-plaintiff process to a game of pin the tail on the donkey.  The California Public Employees' Retirement System ("CalPERS") respectfully contends that the PSLRA does not allow for the appointment of the OPERS-PFA Group as lead plaintiff here because these movants have not explained how one member's losses have been calculated, how one member has standing for other entities' losses, or how their so-called group was created or how it operates.  While the lawyers would surely benefit from this newly created multi-continental alliance between two entities with no prior working relationship, the putative class would certainly suffer.  The erstwhile strangers suffer disqualifying deficiencies that the lawyers seek to cure by presenting a combination of movants, an approach another court warned against years ago: "[T]he purpose of grouping Lead Plaintiffs is not to balance out each other's deficiencies."  *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 457 (S.D. Tex. 2002).

But even if it were permissible to group candidates to balance out each other's deficiencies, and it is not, the OPERS-PFA Group would still fail, as their members' deficiencies do not balance out in combination.  The OPERS-PFA Group's lead plaintiff motion and supporting documentation confirm that:

- PFA obscured its actual financial interest by omitting holdings and transactions of "[o]ther PFA entities" and leaving unexplained its unusual purported "Purchase[s]" (ECF Nos. 22-2, 22-3); and

- PFA is subject to unique Article III standing concerns, which preclude a *prima facie* finding of typicality and adequacy under the Ninth Circuit's "step two" analysis.

Because the OPERS-PFA Group's motion fails to establish its financial interest or make a *prima facie* showing regarding the Rule 23 requirements, it is ineligible for the PSLRA's most adequate plaintiff presumption.  CalPERS has the largest financial interest of any qualified movant that also satisfies the Rule 23 requirements; its motion should be granted and the other competing motions should be denied.

## II.    ARGUMENT

"The 'most capable plaintiff' – and hence the lead plaintiff – is the one who has the greatest financial stake in the outcome of the case, *so long as* he meets the requirements of Rule 23." *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002); *In re Mersho*, 6 F.4th 891, 898-99 (2021).[1]  To identify the presumptively most adequate plaintiff, the Court "must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit."  *Cavanaugh*, 306 F.3d at 729-30; *Mersho*, 6 F.4th at 901 n.3.  It "must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Cavanaugh*, 306 F.3d at 730, 732 (emphasis in original).  The "district court has latitude as to what information it will consider in determining typicality and adequacy," and "[i]f the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23."  *Id.*

Here, the OPERS-PFA Group does not pass muster at step two of the PSLRA's three-step process and is not entitled to the presumption.  *Id.* at 730-31 ("At step two of the process, when the district court makes its initial determination, it must rely on the presumptive lead plaintiff's complaint and sworn certification; there is no adversary process to test the substance of those claims. . . . At the third stage, the process turns adversarial and other plaintiffs may present evidence that disputes the lead plaintiff's prima facie showing of typicality and adequacy."); *Mersho*, 6 F.4th at 899 ("At this step, the process is not adversarial, so the Rule 23 determination should be based on only the movant's pleadings and declarations.").

### A.    The OPERS-PFA Group Is Not Eligible for Appointment as Lead Plaintiff

The OPERS-PFA Group *and* each of its members do not to trigger the PSLRA rebuttable presumption as they failed to timely "provide[] information that satisfies the[] [statutory] requirements," that is, "information . . . in [their] pleadings and declarations" sufficient to

---

[1]    All emphasis is added and all citations and footnotes are omitted unless otherwise indicated.

demonstrate they both possess "the largest financial stake" and satisfy "the Rule 23(a) criteria." *Cavanaugh*, 306 F.3d at 730; *Mersho*, 6 F.4th at 898-900 (same); *In re Cloudera, Inc. Sec. Litig.*, 2019 WL 6842021, at *3 (N.D. Cal. Dec. 16, 2019) ("The Court determines that, although the Boston Group has the largest financial interest in the litigation, it does not meet the adequacy requirement of Rule 23 [and is not the presumptive lead plaintiff].").

### 1. PFA Obscured Its Actual Financial Interest

To conduct the "straightforward" statutory inquiry the Ninth Circuit outlined in *Cavanaugh*, "the district court must calculate each potential lead plaintiff's financial interest in the litigation." 306 F.3d at 729-30 & n.4. PFA's submissions do not enable the Court to do so here.

### a. PFA's Loss Chart Is Intentionally Incomplete

Here, PFA's loss chart admits its incompleteness: "Other PFA entities, which are legally separate from the PFA entities whose losses are stated herein, had holdings in Facebook stock." ECF No. 22-3. Asserting that these other unidentified PFA entities "made no *purchases* during the Class Period" (*id.*), PFA is intentionally vague as to whether these "[o]ther PFA entities" engaged in undisclosed non-purchase transactions (*e.g.*, sales, transfers, etc.), notwithstanding the PSLRA's mandate that the Certification must "set[] forth *all* of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. §78u-4(a)(2)(A)(iv). While such uncertainty might otherwise be attributable to imprecise phraseology rather than an intentional (and disqualifying) omission, here, PFA declined CalPERS' request to provide the missing information by the filing deadline for this opposition. *See* Declaration of Darren J. Robbins in Support of California Public Employees' Retirement System's Memorandum of Law in Opposition to Competing Lead Plaintiff Motions ("Robbins Opp. Decl."), Ex. 1, filed concurrently herewith.

An affirmative decision to withhold select transactions from the Court is disqualifying. First, "'all' means all." *Knott v. McDonald's Corp.*, 147 F.3d 1065, 1067 (9th Cir. 1998). PFA's *ipse dixit* that the other holdings in Facebook stock were not required to be disclosed because they were by "[o]ther PFA entities" different from the four referenced on the Certification and loss chart (*i.e.*, Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier)

(ECF Nos. 22-2, 22-3) lacks any basis in fact or law.[2]  The statute is not ambiguous; *all* PFA transactions in Facebook stock are required to be disclosed.  *See* 15 U.S.C. §78u-4(a)(2)(A).

And second, an intentionally incomplete submission precludes even a *prima facie* finding as to typicality and adequacy.  *See Williams v. Block.One*, 2020 WL 4505569, at \*1 (S.D.N.Y. Aug. 4, 2020) (declining to appoint movant as lead plaintiff that "failed to submit all of the trading data evidencing the two and perhaps three largest claimed losses" because "Court is unwilling to engage in guesswork or rely on their unsupported claims" which were "demonstrably inaccurate or incomplete").  Without the missing transactions, the Court cannot make the determination required of it as to what PFA's actual loss is or whether PFA is typical or adequate, let alone not subject to any unique defenses.  Omitting the missing transactions prevents the Court from ascertaining whether PFA was a net seller/net gainer or determining whether the PFA entities engaged in non-open market transactions of Facebook stock, giving rise to typicality challenges.[3]

          **b.**      **PFA's Unexplained Atypical Trading Activity Precludes a Finding that PFA (and the Group) Otherwise Satisfy Rule 23**

Even if the omitted transactions were disclosed, PFA's purported financial interest is still plagued by unquestionably atypical transactions.  Specifically, the prices at which Høj Risiko PFA Plus "purchase[d]" Facebook stock *all* reflect the ***exact*** opening or closing price of Facebook stock on the particular day of the transaction:

| Date | Shares | Price | Opening or Closing Price |
|------|--------|-------|--------------------------|
| 7/13/2021 | 24,800 | 352.09 | 352.09 |

---

[2]    PFA's own Certification asserts that Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier purchased Facebook stock.  Likewise,  PFA Holding A/S, as the parent company of PFA Pension, Forsikringsaktieselskab, was expressly identified as having a financial interest in the subject matter in controversy in this case.  *See* ECF No. 24.  As such, PFA has not supported its assertion that it may selectively disclose (or hide) transactions by various PFA entities.

[3]    *See, e.g.*, *Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814, at \*9 (N.D. Cal. Feb. 15, 2011) ("Marcus' status as a net seller and a net gainer during the Class Period weighs against Marcus' appointment as the lead plaintiff. Besides demonstrating that he potentially benefitted from Defendants' fraud, Marcus' status as a net seller and a net gainer also weighs against him because it may subject him to unique defenses if he were to be the class representative.").

| Date | Shares | Price | Opening or Closing Price |
|---|---|---|---|
| 7/16/2021 | 29,769 | 344.91 | 344.91 |
| 8/16/2021 | 19,330 | 366.56 | 366.56 |
| 8/18/2021 | 29,178 | 355.45 | 355.45 |
| 8/20/2021 | 58,937 | 359.37 | 359.37 |
| 8/23/2021 | 38,173 | 363.35 | 363.35 |
| 8/24/2021 | 76,813 | 365.51 | 365.51 |
| 8/25/2021 | 76,813 | 368.39 | 368.39 |
| 8/26/2021 | 67,009 | 364.38 | 364.38 |
| 8/30/2021 | 33,503 | 380.66 | 380.66 |
| 8/31/2021 | 10,711 | 379.38 | 379.38 |
| 9/2/2021 | 14,339 | 375.28 | 375.28 |
| 10/14/2021 | 54,756 | 328.53 | 328.53 |

*Compare* ECF No. 22-2 *with* Robbins Opp. Decl., Ex. 2.[4]  This atypical trading pattern is not the product of mere happenstance.  What can easily be confirmed once PFA identifies *all* transactions in Facebook stock for the Court (as the PSLRA requires) is whether or not these were simply transfers from one or more of the "[o]ther PFA entities" to Høj Risiko PFA Plus (which recorded them at the opening or closing price for accounting purposes).  If so, that would explain the vague allusion in PFA's loss chart.  *See* ECF No. 22-3 ("[o]ther PFA entities . . . had holdings in Facebook stock but made no purchases during the Class Period").  PFA has provided no explanation to the Court for the pricing of the vast majority of PFA's claimed transactions or why transactions by the "[o]ther PFA entities" have been entirely omitted.  Given PFA's intentionally incomplete submission, plausible explanations could run the gamut from the transactions being internal "wash" accounting entries or private transactions, to PFA being a net seller/net gainer when all PFA transactions are revealed and considered, to the possibility that some other distinct entity or entities suffered the losses and possess(es) the claims.  This problem – which PFA itself created – prevents the Court from

---

[4]  All but four of the PFA Klima Aktier's "purchase[s]" are also at the exact price that Facebook stock closed at that day.  Every one of the PFA Indeks Global Aktier's "purchase[s]" are at the exact price at which Facebook stock closed.  In short, all of the PFA transactions (except PFA Indeks USA Aktier) are subject to the same irregularity as Høj Risiko PFA Plus.

considering PFA in its "step two" analysis when it "must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Cavanaugh*, 306 F.3d at 730. Comparing PFA's intentionally incomplete and unverifiable claimed losses to the straightforward unquestionable losses of the other movants would make a mockery of the PSLRA's lead-plaintiff procedures and certification mandate. *See id.*

A similar issue arose in *Baydale v. Am. Exp. Co.*, 2009 WL 2603140, at *4 (S.D.N.Y. Aug. 14, 2009), in which a Swedish institution (LFAB) sought appointment as lead plaintiff but, like PFA here, "failed to disclose transactions by other funds managed by LFAB" which "transactions were only disclosed after the Court questioned LFAB at oral argument." *Id.* at *4 n.3. In declining to appoint LFAB as lead plaintiff, the court noted that, among other things, "LFAB refuses to disclose whether LAB, LB, or any other entity owned by LAB had investments in AMEX stock during the class period. While LFAB argues that transactions by co-owned entities are irrelevant, at the very least, those transactions may result in unique defenses or conflicts relevant to the adequacy inquiry." *Id.*

While PFA's apparently incomplete Certification does not comply with the PSLRA and obscures its actual financial interest, the Certification contains enough information to confirm the atypicality of the transactions PFA does disclose. *See, e.g.*, *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1027-28, 1030 (N.D. Cal. 1999) (finding that movant did not satisfy Rule 23 because it "would be encumbered with the unique question whether it acquired its Network shares on better terms than the investing public and not fully in reliance on the market price"); *see also Cambridge Ret. Sys. v. Mednax, Inc.*, 2018 WL 8804814, at *6 (S.D. Fla. Dec. 6, 2018), *report and recommendation adopted by* 2018 WL 6978620 (S.D. Fla. Dec. 21, 2018) ("The Court reviewed the charts submitted by [Bernstein Litowitz's clients] to examine the basis for their loss estimates. The Court's review was rendered needlessly complicated by these entities' failure to use consistent reporting methods and their failure to disclose all relevant information. . . . The net gain from the sale during a class period of shares acquired prior to a class period can be relevant when assessing the amount of alleged losses among competing potential lead plaintiffs."). Because PFA (and thus

the Group) has failed to establish its actual financial interest in the relief sought by the class, the Group is ineligible for consideration as the presumptive lead plaintiff.

**2.      PFA's Vulnerable Standing Precludes a Finding of Typicality and Adequacy**

A review of PFA's Certification, Joint Declaration, loss chart, and brief confirm another problem precluding a "step two" finding that PFA has made a *prima facie* showing of typicality and adequacy: PFA's questionable standing.  *See Cavanaugh*, 306 F.3d at 730.

PFA Pension, Forsikringsaktieselskab, a Danish entity located in Copenhagen, filed the lead plaintiff motion.  *See* ECF No. 22.  The PSLRA Certification PFA Pension submitted was signed by two individuals identified only as "Group CFO and Group CIO of PFA," with PFA having been defined as PFA Pension, Forsikringsaktieselskab.  *See* ECF No. 22-2.  Neither the Certification nor the accompanying Joint Declaration identify the "Group" to which these titles refer, let alone the Group's relation to either PFA Pension, Forsikringsaktieselskab or the OPERS-PFA Group.

Further confusing matters, the Certification purports to attach "PFA's transactions" (*id.* at ¶4), but the attached chart reflects transactions of Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier, not PFA Pension.  *Id.* at 4-5.[5]  Again, there is no explanation of the legal relationship under Danish law, if any, between and among the "Group," PFA Pension (the movant), and Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier (the purported purchasers of Facebook stock), let alone an explanation that would justify the inclusion of those four PFA entities and the intentional exclusion of "[o]ther PFA entities" that admittedly held and almost certainly transacted in Facebook during the Class Period. *Id.*  As such, the Certification fails to provide the Court a reasonable basis to determine how (or even whether) PFA Pension is legally entitled under applicable Danish law to claim as its own losses suffered by Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks

---

[5]   According to PFA's website, PFA Klima Aktier does not exist, but PFA Klima ***Plus*** Aktier does exist.  *See* https://english.pfa.dk/individual/savings/pfa-climate-plus/ (last visited Jan. 10, 2022). Regardless, no explanation was timely provided to the Court of what PFA Klima Aktier or PFA Klima Plus Aktier is.

USA Aktier. *Id.*[6] PFA's own organizational chart makes no mention of the entities whose transactions are attached to PFA's Certification:



*See* https://english.pfa.dk/about-pfa/pfa-overview/organisation/ (last visited Dec. 30, 2021).

Thus, in assessing PFA's submissions at step two, the Court is left to simply guess as to the following critical questions:

- What is the "Group"?

- What is the "Group's" connection to PFA and the OPERS-PFA Group?

- What type of entity is PFA Pension?

- What is the Group's and/or PFA's connection to, and legal relationship with, Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier?

- What are Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier?

- What is the legal authority under Danish law authorizing PFA to claim losses of Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier and/or act on behalf of Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier?

---

[6] PFA's loss chart describes Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier as "entities," yet none are registered as individual legal entities with the Danish Company Register. *See* https://virk.dk/search?q=PFA (last visited Jan. 10, 2022).

- What are the "[o]ther PFA entities" within the same parent/holding company's family that held and/or transacted in Facebook stock during the Class Period?

- If Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier are legally distinct (from PFA and the Group), why were they included but the unidentified "[o]ther PFA entities" were not?

- What is the impact of the undisclosed holdings and transactions of the "[o]ther PFA entities" on PFA's financial interest and typicality/adequacy?

*Cavanaugh*, 306 F.3d at 729-30 (at "step two," court must "determine, based on the information [movant] has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a)").

It is axiomatic that to serve as lead plaintiff, one must have standing to assert claims on behalf of the putative class. *See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2006). "As a general rule, the 'injury-in-fact' requirement means that a plaintiff must have **personally** suffered an injury." *Id.* at 107. And, as this Court has previously recognized, "[t]he plaintiff always bears the burden of proof to establish standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Lundy v. Selene Fin., LP*, 2017 WL 2652048, at *4 (N.D. Cal. June 20, 2017) (Tigar, J.). PFA Pension is a Danish Forsikringsaktieselskab that made its lead plaintiff motion based upon purchases by Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier. It did so with no timely explanation to the Court in its lead plaintiff motion or supporting declarations of the legal relationship under Danish law between PFA Pension and: (1) the actual purchasers of Facebook shares listed in its motion; (2) the "[o]ther PFA entities" whose holdings and transactions were not disclosed to the Court (ECF No. 22-3); or (3) how the purchases by four entities other than PFA Pension give PFA Pension Article III standing or the ability to claim losses associated therewith. Given the omissions in PFA Pension's submissions, a single phrase uttered in a declaration hardly addresses PFA Pension's standing deficiencies.

PFA's submissions make it impossible for the Court to discern how the various PFA entities could be so distinct as to justify disclosing the holdings and transactions of some but not others, yet simultaneously so indistinct as to give PFA Pension standing to assert claims on behalf of Høj Risiko PFA Plus, PFA Klima Aktier, PFA Indeks Global Aktier, and PFA Indeks USA Aktier. Because

PFA's submissions fail to address these incongruities, the Court cannot help but conclude that PFA "undoubtedly has different defenses than the other class members. . . .  The litigation over [PFA]'s standing may prejudice the class at the class certification stage and would, in any case, subject it to highly individualized determinations inapplicable to the rest of the class." *Hill v. Silver Lake Group, L.L.C.*, No. 4:20-cv-03766-JSW, ECF No. 36 at 5-6 (N.D. Cal. Dec. 1, 2020) (Robbins Opp. Decl., Ex. 3 ); *Smajlaj v. Brocade Commc'n Sys. Inc.*, 2006 WL 7348107, at *3 (N.D. Cal. Jan. 12, 2006) ("In sum, there are too many questions surrounding Intrepid's standing, authority, transparency, and structure that may give rise to unique defenses and are atypical of the class as a whole.  Taken together, these concerns lead the Court to conclude that Intrepid will not adequately represent the interests of the plaintiff class.").[7]

Steamfitters Loc. 449 Pension Fund v. Cent. Eur. Distribution Corp.*, 2012 WL 3638629 (D.N.J. Aug. 22, 2012) is analogous.  In that case, an entity called the Prosperity Group sought appointment as lead plaintiff, having purchased over 1.1 million shares of stock and suffered almost $13 million in losses, far more than any other investor. *Id.* at *2.  The Prosperity Group consisted of numerous related investment entities including an investment manager ("PCM") and several managed funds (the "PCM Managed Funds"), each of which also had a wholly-owned subsidiary (the "Subsidiaries"). *Id.*  The court assessed the Prosperity Group's motion and concluded that "the only entities that actually purchased or owned CEDC stock, and thus incurred any losses, are the Subsidiaries." *Id.* at *10-*11.  Because the court determined that PCM and the PCM Managed Funds were all "subject to unique defenses regarding their standing," and recognized that "[t]here is no greater impediment to a Plaintiff's ability to prosecute a case than a lack of standing," the court denied the Prosperity Group's motion despite the fact that the Subsidiaries also sought appointment as lead plaintiff. *Id.* (explaining that "the Court cannot prejudice the class members by subjecting

[7]   *See also Inchen Huang v. Depomed, Inc.*, 289 F. Supp. 3d 1050, 1055 (N.D. Cal. Dec. 8, 2017) (noting that a plaintiff claiming the "largest losses may nonetheless be disqualified from lead plaintiff status if she 'is subject to unique defenses'" and "a competing movant need not prove the defense at this stage of the case, but merely 'show a degree of likelihood that a unique defense might play a significant role at trial'"); *Gross v. AT & T Inc.*, 2019 WL 3500496, at *2 (S.D.N.Y. July 31, 2019) ("KBC's presumptive status will give way if there is a 'non-speculative risk' that a standing challenge from Defendants may be successful.").

them to the time and expense of litigating these unique defenses"). Nor did the fact that the Subsidiaries subsequently clarified their intent to seek appointment as lead plaintiff in a reply brief salvage their candidacy. *Id.* at *12 ("The Prosperity Group does not allege that the Subsidiaries and the Prosperity Group are the same entity, and it seems clear that they are not. The Prosperity Group includes five entities other than the Subsidiaries. The Court cannot assume that the Subsidiaries met the filing deadline simply because the Prosperity Group did."). Ultimately, the court denied the Prosperity Group's motion, instead appointing as lead plaintiff a public pension fund that claimed a loss less than one-tenth the size of the Prosperity Group's loss. *Id.* at *13 ("Because the Subsidiaries are subject to unique defenses regarding untimely filing and lack of certification, their appointment would not be in the class' best interest; the Court must look to the other movant.").

More recently, in *Plymouth Cty. Ret. Ass'n v. Array Techs., Inc.*, 2021 WL 5051649 (S.D.N.Y. Nov. 1, 2021), a court likewise denied lead plaintiff status to a European institution (Erste AM) that, like PFA here, "stated in its lead plaintiff motion that *it* suffered losses on '*its* purchases of Array common shares during the Class Period,'" but "after examining the damages chart accompanying Erste AM's motion, the actual entity that bought and sold Array shares was Erste 566." *Id.* at *2. And, like here, "Erste AM did not explain its relationship to Erste 566" in its motion papers as was its obligation. Instead, the entity waited until its reply brief, "at which point Erste AM summarily explained that it is the 'Austrian management company for [Erste 566] and therefore has standing and is authorized to sue on its fund's behalf as a matter of law.'" *Id.* Based on these facts, as well as the fact that Erste AM initially contended it did not need an assignment, but then revealed that it had obtained one, the court determined that "[t]here is a serious risk that Erste AM will be subject to unique standing defenses regarding the invalidity of the Assignment Declaration for failing to convey a property interest." *Id.* This was so because "Erste AM has not established that the Assignment Declaration was sufficient under Austrian law to confer Erste AM with the requisite property interest under *Huff*." *Id.* And, "[g]iven this uncertainty, the Court finds that there is a non-speculative risk that Erste AM's standing could be successfully challenged." *Id.* (further explaining that "such an explanation may have involved complex issues of foreign law that ultimately militate against Erste AM's appointment"). Also relevant here, the court rejected the

submission of an expert declaration on Austrian law as "untimely since it should have submitted the declaration with its original motion." *Id.* at *3 (citing *Gross*, 2019 WL 3500496, at *2) (noting that "[a]t a minimum, if an issue were material to [the movant's lead plaintiff] motion, [the movant] had the obligation to raise it"); *see also Theodore v. Purecycle Techs., Inc.*, 2021 WL 5259840, at *4 (M.D. Fla. Aug. 5, 2021) ("Erste AM does not state that it bought PureCycle shares. It states that its fund incurred a loss, but does not establish its relationship to this fund, and, indeed, two different funds are listed with no explanation regarding the discrepancy. Erste AM's allegations regarding an assignment from the fund are conclusory and provide no meaningful information. Erste AM thus fails to demonstrate that it has any financial interest in the relief sought in this litigation.").[8]

Based on what is known and publicly available, it is a virtual certainty that, if appointed lead plaintiff, defendants would attempt to exploit PFA's standing defects, which will devolve into a "needless litigation sideshow" "rais[ing] complex and novel issues of law which would require extensive factual and foreign legal analysis." *Baydale*, 2009 WL 2603140, at *3.  As such, only by denying the OPERS-PFA Group's motion can the Court "ensure that the lead plaintiff will not prejudice the class by subjecting the class to the delay, expense, and uncertainty of litigating unique defenses." *Steamfitters*, 2012 WL 3638629, at *10-*11, *13 (declining to appoint entities subject to standing challenges as lead plaintiff and recognizing that "the Court must decide whether standing is a unique defense that is likely to play a major role in litigation, regardless of the outcome" and

---

[8]    In *Gross*, KBC Asset Management NV (which also moved for appointment in this case) sought appointment as lead plaintiff based on the losses suffered by three distinct entities.  2019 WL 3500496, at *2.  In that case, Judge Caproni declined to appoint KBC based on standing concerns, finding that "if an issue were material to KBC's motion, KBC had the obligation to raise it at least tangentially. Instead, KBC made no mention of Belgian law whatsoever and now seeks reconsideration premised almost entirely on previously existing Belgian law—all the while failing to point the Court to any overlooked decisions on the relationship between Belgian law and Article III standing." *Id.* (finding that "the risk that KBC may lack standing to pursue this action under controlling precedent is serious").  Even if the court was willing to accept the late declarations and evidence, the court explained that "the principle that federal law governs Article III standing . . . is elementary" and "Belgian law therefore cannot alter the legal standard by which Article III standing is determined, *i.e.*, the requirement that non-beneficial owners of securities must have a property right in the claims being asserted." *Id.*  "Instead, Belgian law is relevant only to establish the existence of the requisite property right." *Id.*  And, ultimately, the "declarations and other supporting documents provided by KBC continue to show, at a minimum, a non-speculative risk that KBC lacks a property interest in the asserted claims." *Id.* at *3.

finding that court was "not persuaded . . . that the presence of entities that have standing will cure other entities' standing deficiencies"); *Smajlaj*, 2006 WL 7348107, at *2-*3 (same).

### 3. The OPERS-PFA Group Is a Lawyer Created "Group" that Exists Solely to Allow OPERS to Claim the Largest Collective Loss and Protect PFA from Its Unique Defenses

In light of the foregoing disqualifying infirmities, the question facing the Court is whether to permit OPERS (which lacks the largest financial interest on its own) and PFA (which may lack the largest financial interest on its own and definitely lacks typicality and adequacy on its own) to nonetheless band together to achieve the lead plaintiff designation. Respectfully, the answer is no.

While the PSLRA contemplates the appointment of a "person or group of persons" as lead plaintiff (15 U.S.C. §78u-4(a)(3)(B)(iii)), the Ninth Circuit recently recognized that "[m]any district courts have considered the lack of a pre-litigation relationship as part of their adequacy analysis at step two." *Mersho*, 6 F.4th at 901-02 (citing *Cloudera*, 2019 WL 6842021, at *6-*8); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001) (explaining that if a court "were to determine that the movant 'group' with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the members of that 'group' could not be counted on to monitor counsel in a sufficient manner"). Indeed, as this Court has previously recognized, courts have declined to appoint groups of unrelated entities brought together to serve as lead plaintiff. *Bodri v. Gopro, Inc.*, 2016 WL 1718217, at *4 (N.D. Cal. Apr. 28, 2016) (citing *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at *1 (N.D. Cal. Aug. 22, 2008)); *Cloudera*, 2019 WL 6842021, at *6-*8 (finding that a "group" of two unrelated institutional investors represented by Bernstein Litowitz could not be "'the most adequate plaintiffs' where the members were 'unrelated to each other' until introduced by their lawyers").[9] The reason is simple: "[O]ne client will provide more control than a disjointed group concocted by

---

[9] This Court's prior decisions appointing groups of investors as lead plaintiff are distinguishable. In *Depomed*, 289 F. Supp. 3d at 1054, the members of the group were not subject to unique defenses like the OPERS-PFA Group is here, and one of the group members in *Depomed* undeniably suffered the greatest losses, whereas here that has not been established. *Id*. And, unlike here, in *Booth v. Strategic Realty Tr., Inc.*, 2014 WL 342625, at *1 (N.D. Cal. Jan. 27, 2014), the group's motion was unopposed.

plaintiffs' counsel – even if the group consists of institutional investors." *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1152-53 (N.D. Cal. 1999).

### a. This Lawyer-Created Group Is Destined to Be Dysfunctional

Here, the OPERS-PFA Group offers no explanation as to how the putative class could possibly be better off being led by two investors with no familiarity with one another – an ocean (and primary language) apart, no less – jointly serving as lead plaintiff. A single paragraph of their Joint Declaration seeks (but ultimately fails) to explain why OPERS (which filed the complaint by itself) and PFA decided to join together:

> After learning of the complaint filed by Ohio PERS and the steps Ohio PERS and the OAG had taken to protect the interests of the Class, PFA Pension determined that it would be in its and other Class members' best interests to seek appointment as Lead Plaintiff jointly with Ohio PERS. . . . Accordingly, PFA Pension discussed with its counsel, Bernstein Litowiz, PFA Pension's interest in working together with Ohio PERS and the OAG. Similarly, recognizing that PFA Pension was a like-minded institutional investor that incurred a substantial loss on its investments in Facebook stock during the proper Class Period asserted in the *Ohio* Action and that PFA Pension was interested in seeking a leadership role in the action, Ohio PERS agreed that it would be in its and other Class members' best interests for Ohio PERS and PFA Pension to jointly seek appointment as Lead Plaintiff.

ECF No. 22-4 at ¶10. This empty rhetoric provides the Court with no clear rationale for *why* the Group was formed, *why* one institutional investor alone could not more effectively serve as lead plaintiff, or *how* the Group will operate. All the Joint Declaration confirms is that these two (or five or more) investors unfamiliar with one another "share nothing in common *other than* the twin fortuities that (1) they [may have both] suffered losses and (2) they entered into retainer agreements with the same attorney or attorneys." *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 813 (N.D. Ohio 1999) (emphasis in original); *Aronson*, 79 F. Supp. 2d at 1153-54 (holding that an appropriate group is one whose members had "a meaningful relationship preceding the litigation" and were "united by more than the mere happenstance of having bought the same securities"). As such, the Joint Declaration fails to make the evidentiary showing required of a grouping of disparate entities who wish to serve jointly as lead plaintiff. *See Cloudera*, 2019 WL 6842021, at \*6.

In fact, OPERS has been previously denied appointment as lead plaintiff – *twice* – because, like here, it sought appointment as part of lawyer-created groupings in a mega-case like this. *See In*

*re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 621-23 (S.D.N.Y. 2015) ("the representative of the Ohio pension system testified, candidly, that Ohio sought to join with other state pension systems in order to increase its financial interest and therefore its chances of being appointed lead plaintiff"); *Enron*, 206 F.R.D. at 458 (denying motion where group comprised of OPERS and other entities "was artificially created" by counsel).[10]  OPERS' ability to file a complaint on its own means OPERS believed it was capable of prosecuting the case on its own, so logic suggests that the rationale behind the Group's formation was to team OPERS with any other investor to be able to argue the largest financial interest.  *See, e.g.*, *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 119 (E.D.N.Y. 2012) (finding that "the reasons offered for the combination [of two institutional investors] are not particularly compelling, especially in light of the fact that Arkansas Teachers previously brought one of the consolidated actions in its own name, adequately and without any assistance from Metropolitan Water").[11]

**b.    The Group Fails to Establish How it Would Exercise Control Over the Litigation, Leaving the Lawyers Who Created it in Control**

Paragraph 10 of the Joint Declaration is particularly confounding.  *See* ECF No. 22-4 at ¶10 ("After learning of the complaint filed by Ohio PERS and the steps Ohio PERS and the OAG had taken to protect the interests of the Class, PFA Pension determined that it would be in its and other

---

[10]    *Petrobras* and *Enron* were each led by a single, sophisticated pension fund.  The court-appointed *sole* lead plaintiff in *Petrobras* obtained the largest PSLRA recovery in the last decade, and the court-appointed *sole* lead plaintiff in *Enron* obtained the largest PSLRA recovery ever.  Likewise, sole lead plaintiffs obtained the other largest PSLRA recoveries over the past several years: *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658-MAS-LHG (D.N.J.) (2021 largest PSLRA recovery of $1.21 billion); *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040-AKH (S.D.N.Y.) (2020 largest PSLRA recovery of $1.02 billion).

[11]    *Compare* ECF No. 22-4 at ¶12 ("The decision to partner in seeking appointment as Lead Plaintiff was further informed by Ohio PERS's prior experience serving as part of lead plaintiff groups in securities class actions under the PSLRA.") *with In re Petrobras Sec. Litig.*, No. 1:14-cv-09662-JSR, ECF No. 103 at 66:1-17 (S.D.N.Y. Feb. 20, 2015) ("[Ohio OAG Rep]: Your Honor, the Attorney General wants to be involved in this litigation in a management role, as lead plaintiff, and the decision was simple to, after it became known to Ohio that there were other possible movants with large losses, . . . that we decided to ask our counsel to find those partners. [Judge Rakoff]: I think what you are saying is you wanted to be lead counsel or play a role as lead counsel, but you were aware of the possibility that you might not fit the definition of the client having the largest financial interest, and so you wanted to add others so that you would perhaps qualify as having the largest financial interest, is that fair? [Ohio OAG Rep]:  Your Honor, that is correct.") (Robbins Opp. Decl., Ex. 4).

Class members' best interests to seek appointment as Lead Plaintiff jointly with Ohio PERS."). Why, after learning that a U.S.-based pension fund (with the support of a state attorney general's office) filed a case based on its own multi-million dollar loss, would a group of Danish entities (that claims to have suffered losses multiple times greater than OPERS' loss) decide to dilute (or eliminate) its own control by moving jointly with that far-less impacted entity?  The explanation provided – "because it would be in its and other Class members' best interests" – is as disingenuous as it is circular.  *Id.*  The far more plausible explanation is that PFA's counsel were concerned: (1) that OPERS would not possess the largest financial interest alone; and (2) that PFA's susceptibility to unique defenses would disqualify it on its own.  The answer to these concerns was to pair these two (or three, four, or five) entities to increase the likelihood of appointment.  *See, e.g.*, *Enron*, 206 F.R.D. at 457 ("The Court would again point out that the purpose of grouping Lead Plaintiffs is not to balance out each other's deficiencies.").  The fact that counsel was the catalyst for the union of these two previously unaffiliated entities is contrary to the PSLRA.  *Compare* ECF No. 22-4 at ¶¶9-10 *with In re Stitch Fix, Inc. Sec. Litig.*, 393 F. Supp. 3d 833, 835-36 (N.D. Cal. 2019) ("Nothing in the two joint declarations submitted by the group demonstrates that it is the group members, and not the lawyers, who are driving their lead plaintiff application.").[12]

Nor does the Joint Declaration establish how the Group would operate effectively as lead plaintiff.  *See Cendant*, 264 F.3d at 266 (court should consider whether "the way in which a group seeking to become lead plaintiff was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff").  Here, the Joint Declaration does not even establish that the Group has a viable dispute resolution mechanism.  And, with just two members, any dispute between OPERS and PFA would necessarily result in a deadlock.  Despite their professed sophistication, the members of the OPERS-PFA Group failed to timely articulate how they intend to resolve disagreements that arise over the course of protracted litigation, particularly where

---

[12]  *See also Petrobras*, 104 F. Supp. 3d at 621-22 ("Allowing unrelated plaintiffs to band together in order to manufacture a larger financial interest does just the opposite. It ensures that the lawyers, who are invariably the matchmakers behind such marriages of convenience, are the true drivers of the litigation. Moreover, it creates problems of coordination, risks duplication of effort, and reduces the incentive of any individual group member to carry out its lead plaintiff duties to the fullest extent.").

vast discrepancies exist in the amount at stake as well as cultural and language differences.  *See Cloudera*, 2019 WL 6842021, at *7 (finding group inadequate, in part, because it "provided no detail whatsoever about any decisionmaking process"); *Cambridge Ret. Sys.*, 2018 WL 8804814, at *14 ("An example of the problems presented by two institutional investors seeking to be co-lead plaintiffs is how such entities will resolve disputes between themselves or avoid duplication of effort."); *Frias v. Dendreon Corp.*, 835 F. Supp. 2d 1067, 1075 (W.D. Wash. 2011) (rejecting group's proposed "decision-making process" as "flawed" where there was "no provision for breaking the potential ensuing deadlock" when there are an even amount of votes).  These omissions further highlight the Group's *in*adequacy.

Judge Koh's recent *Cloudera* opinion is particularly instructive.  There, the court declined to appoint a lead plaintiff group comprising two institutional investors proffered by Bernstein Litowitz despite a pre-existing relationship and the submission of a joint declaration, because, like here, the declaration failed to provide a credible explanation for the group's formation, noting that "[o]ther than describing one conference call where the funds discussed their 'strategy for prosecuting this action' and their 'interests in prosecuting the case in a collaborative, like-minded manner,' the Boston Group provided no further information about how it would jointly manage the case or resolve disagreements." 2019 WL 6842021, at *7.  Based on the "cursory details" in the joint declaration, Judge Koh found that "the only connection that the two funds have to each other is their counsel." *Id.*  "Nor are they 'organized with any group decisionmaking apparatus.'" *Id.* (quoting *Eichenholtz*, 2008 WL 3925289, at *9). In fact, just like the OPERS-PFA Group here, "the Boston Group has provided no detail whatsoever about any decisionmaking process." *Id.*  Consequently, Judge Koh determined that "the Boston Group has failed to show that it would be an adequate representative of the class as required by Rule 23, which disqualifies the Boston Group from being appointed lead plaintiff." *Id.* at *8; *see also Network Assocs.*, 76 F. Supp. 2d at 1018  (holding that artificial "group" of "unrelated investors with no decisionmaking structure and no connection other than counsel" cannot "qualify as a candidate for lead plaintiff under the PSLRA").

Paragraphs of the joint declaration Judge Koh rejected in *Cloudera* are virtually identical to the "evidence" the OPERS-PFA Group provided here:

| ***Cloudera* Joint Declaration** | ***Meta (f/k/a Facebook)* Joint Declaration** |
|---|---|
| 7.     Boston and Local 338 also decided to jointly seek appointment as Lead Plaintiff because they have shared goals and interests in protecting and maximizing pension fund assets and providing retirement benefits for a variety of government and private sector employees and their beneficiaries. Indeed, Boston and Local 338 share a common commitment to protecting the rights and interests of pension funds and their members, advancing shareholder rights, and promoting strong corporate governance by participating in securities class action litigation. | 13.     The decision to jointly seek appointment as Lead Plaintiff also follows from Ohio PERS's and PFA Pension's roles as fiduciaries, their shared goals and interests in protecting and maximizing pension-fund assets and enhancing the reliability of information disseminated by public companies. Indeed, Ohio PERS, the OAG, and PFA Pension share a common commitment to protecting the rights and interests of pension funds and their members or customers, advancing shareholder rights, and improving corporate governance by participating in securities class action litigation—and believe the misconduct alleged in the Facebook action raises significant corporate governance issues and public policy concerns that have important implications for the institutional investor community as well as the broader public. |
| 11.     Boston and Local 338 are committed to satisfying the fiduciary obligations that we will assume if appointed Lead Plaintiff, including by conferring with counsel regarding litigation strategy and other matters, attending court proceedings, depositions, settlement mediations, and hearings as needed, and reviewing and authorizing the filing of important litigation documents. Through these and other measures, Boston and Local 338 will ensure and hereby reaffirm that the securities class action against Cloudera will be vigorously prosecuted consistent with the lead plaintiff's obligations under the PSLRA and in the best interests of the Class. | 19.     Ohio PERS and PFA Pension are committed to satisfying the fiduciary obligations that they will assume if appointed Lead Plaintiff, including conferring with counsel regarding litigation strategy and other matters, attending court proceedings, depositions, settlement mediations, and hearings as needed, and reviewing and authorizing the filing of important litigation documents. Through these and other measures, Ohio PERS and PFA Pension will ensure and hereby reaffirm that the securities class action against Facebook will be vigorously prosecuted consistent with the Lead Plaintiff's obligations under the PSLRA and in the best interests of the Class. |

*Compare* Robbins Opp. Decl., Ex. 5 *with* ECF No. 22-4.

Similarly, in *Isaacs v. Musk*, 2018 WL 6182753 (N.D. Cal. Nov. 27, 2018), Judge Chen declined to appoint a lead plaintiff group where the joint declaration merely confirmed that the members were "unrelated and were introduced to one another by their lawyers," noting "although the members suggest they will be able to work together well, efficiently, and so forth, there is nothing concrete to back that up," especially considering "the members participated in only one joint call prior to filing the motion for appointment." *Id.* at *3.

Finally, in *Eichenholtz*, former Chief Judge Patel found that a joint declaration did not cure a group's deficiencies where the members of the group claimed, like the OPERS-PFA Group avers here: (i) they "'affirmatively decided that it would be a benefit to ourselves and the Class we seek to represent if we . . . sought appointment as Lead Plaintiff as part of a small, cohesive group'"; (ii) the group members "intend[ed] to communicate regularly"; and (iii) the group would "exercise joint decision-making." 2008 WL 3925289, at *9. Despite these assurances, Judge Patel held that such a "conclusory declaration has little or no substance" and the group failed to demonstrate how it would "tackle the massive coordination and strategic issues that are certain to arise in this litigation." *Id.* In rejecting the group's motion, Judge Patel noted several deficiencies that rendered the group inadequate, including that the group: (1) failed to provide more than conclusory explanations of the

member's relationships to one another; (2) merely stated that they had "'preexisting and professional and personal relationships,'" – which does not apply to the OPERS-PFA Group here; and (3) failed to "clarify how the group will tackle the massive coordination and strategic issues" likely to arise in the litigation. *Id*.

Like the declarations proffered in *Cloudera*, *Isaacs*, and *Eichenholz*, the "cursory details in the instant case do nothing to move the needle toward establishing the [OPERS-PFA] Group's adequacy to serve as a lead plaintiff group." *Cloudera*, 2019 WL 6842021, at *7. In sum, the OPERS-PFA Group is nothing more than two unrelated institutions introduced by their counsel in an effort to achieve the highest possible financial interest figure and insulate one member from serious unique defenses. Its appointment as lead plaintiff would not only allow, but encourage, if not force, lawyers to direct the litigation. Its motion should be denied.

## B.    CalPERS Is the Presumptive Lead Plaintiff

CalPERS not only suffered a substantial, multi-million dollar loss, it also satisfies the Rule 23 requirements. "[O]ther than pointing out its relatively low[er] financial stake in the litigation," it is unlikely that the other movants will make any legitimate argument against CalPERS' appointment. *Tsirekidze v. Syntax- Brillian Corp.*, 2008 WL 942273, at *5 (D. Ariz. Apr. 7, 2008) (appointing pension fund as lead plaintiff despite the fact that it did not suffer the greatest financial interest because it "is the first [movant] to meet [the PSLRA's] standards"); *Enron*, 206 F.R.D. at 458 (appointing one institutional investor as lead plaintiff which "presents itself as a single, organized coordinated organization represented by a competent and resourceful law firm"). Because CalPERS is the only movant that meets all statutory requirements that govern the Court's choice of the presumptive lead plaintiff, CalPERS' motion should be granted.

## C.    The Remaining Movants Do Not Trigger the Presumption

When, as here, the movant claiming the largest financial interest does not satisfy the Rule 23 requirements, the Court repeats the sequential statutory inquiry "considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23." *Cavanaugh*, 306 F.3d at 730. Here, CalPERS is the remaining movant with the next largest loss:

| Remaining Movants | Claimed Loss |
| --- | --- |
| **CalPERS** | **$7.8 million (LIFO); $9.9 million (FIFO)** |
| KBC Asset Management NV | $1.4 million (LIFO) |
| Dr. Rahul Saraf | $760,457 (LIFO); $760,313 (FIFO) |
| Wee Ann Ngian | $10,527 |

*See* ECF Nos. 27, 27-4; 49, 49-3; 46-5, 28-3.

Because the remaining movants claim smaller losses than CalPERS, their motions should be denied. *See Cavanaugh*, 306 F.3d at 732 (court considers other motions "if and only if" the presumptive lead plaintiff is "found inadequate or atypical").

## III.   CONCLUSION

None of the competing movants satisfy the PSLRA's lead plaintiff requirements. As such, their motions should all be denied.

DATED: January 10, 2022

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP

s/ Darren J. Robbins
DARREN J. ROBBINS

DARREN J. ROBBINS
DANIEL S. DROSMAN
JASON A. FORGE
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
HADIYA K. DESHMUKH
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

[Proposed] Lead Counsel for [Proposed] Lead Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 10, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Darren J. Robbins
DARREN J. ROBBINS

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  darrenr@rgrdlaw.com

4870-4421-1464

# Mailing Information for a Case 4:21-cv-08812-JST Ohio Public Employees Retirement System v. Meta Platforms, Inc. f/k/a Facebook, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Hadiya Khan Deshmukh**
  hdeshmukh@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel S. Drosman**
  DanD@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com,DanD@ecf.courtdrive.com,e_file_sf@rgrdlaw.com

- **Charles S. Duggan**
  charles.duggan@davispolk.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer Lauren Joost**
  jjoost@ktmc.com,1759490420@filings.docketbird.com

- **Avi Josefson**
  Avi@blbglaw.com,jose.echegaray@blbglaw.com

- **David Reuven Lev Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,lmix@saxenawhite.com

- **Neal Alan Potischman**
  neal.potischman@dpw.com,ecf.ct.papers@dpw.com,lit.paralegals.mp@davispolk.com,felicia.yu@davispolk.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,WillowR@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Sophia Marie Rios**
  srios@bm.net,jgionnette@bm.net

- **Darren Jay Robbins**
  darrenr@rgrdlaw.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Hannah G Ross**
  Hannah@blbglaw.com

- **James P. Rouhandeh**
  rouhandeh@davispolk.com

- **Jonathan Daniel Uslaner**
  jonathanu@blbglaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)