# EXHIBIT 4

1

f2k2pet1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

In re: Petrobras,                          New York, N.Y.
                                           14 Civ. 9662(JSR)

------------------------------x

                                                February 20, 2015
                                                2:05 p.m.

Before:

                    HON. JED S. RAKOFF,

                                           District Judge


                         APPEARANCES


KESSLER TOPAZ MELTZER CHECK, LLP
      Attorneys for Plaintiff Skagen Danske Group
BY:  NAUMON A. AMJED
     GREGORY M. CASTALDO


BERNSTEIN, LITOWITZ, BERGER & GROSSMANN, LLP
      Attorneys for Plaintiff Skagen Danske Group
BY:  MAX W. BERGER


LABATON SUCHAROW, LLP
      Attorneys for Plaintiffs City of Providence, State of
      Idaho and State of Hawaii
BY:  CHRISTOPHER J. KELLER


POMERANTZ, LLP
      Attorneys for Plaintiff Universities Superannuation
      Scheme Ltd.
BY:  MARC I. GROSS
     JEREMY A. LIEBERMAN
     FRANCIS P. McCONVILLE
     PATRICK V. DAHLSTROM
     JENNIFER PAFITI


                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

2

f2k2pet1

APPEARANCES
(continued)


KAPLAN FOX & KILSHEIMER, LLP
     Attorneys for Plaintiff State Retirement Systems
BY:  FREDERIC S. FOX
     MELINDA D. CAMPBELL
     PAMELA A. MEYER


MOTLEY RICE, LLC
     Attorneys for Plaintiff Union Asset Management
     Handelsbanken
BY:  WILLIAM H. NARWOLD


LEVI KORINSKY, LLP
     Attorneys for Daniela Freitas Silva
BY: NICHOLAS I. PORRITT


STULL, STULL & BRODY
     Attorneys for Plaintiff Strum & Conde
BY:  MICHAEL J. KLEIN


CLEARY GOTTLIEB
     Attorneys for Defendant Petrobras
BY:  MITCHELL A. LOWENTHAL
     KATHERINE S. CURRIE


SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
     Attorneys for Defendant BB Securities, Citigroup, et al.
BY:  JAY B. KASNER
     SCOTT D. MUSOFF

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

f2k2pet1

ALSO PRESENT:

BRIAN ABURANO,
     Deputy Attorney General, State of Hawaii

JOANNA L. GUILFOY,
     Lead Deputy Attorney General, State of Idaho

MICHAEL J. HALL,
     Deputy Attorney General, State of Ohio

BO SPANDING,
     International Fund Administrator, Danske Denmark

PETER DYHR,
     Danske Luxembourg

FRANCES EATON,
     Skagen AS

JEREMY HILL,
     USS London

DANIELA FREITAS SILVA,
     Client Services Officer, EFG CAPITAL INTERNAIONAL CORP.

4

f2k2pet1

(Case called)

MR. AMJED:  Good afternoon, your Honor.  Naumon Amjed, Kessler, Topaz, Meltzer, Check, on behalf of the Skagen Danske Group.

Your Honor, if I may, I would like to introduce the client representatives: Miss Frances Eaton from Skagen; Mr. Bo Spanding from Danske Denmark; and Mr. Peter Dyhr from Danske Luxembourg.

THE COURT:  Welcome.  Because of where you are sitting, we are going to use you as a jury for the next trial.

MR. AMJED:  Thank you, your Honor.

MR. CASTALDO:  Good afternoon, your Honor.  Greg Castaldo, also from the Kessler Topaz firm.

MR. BERGER:  Good afternoon, your Honor.  Max Berger, Bernstein, Litowitz, Berger & Grossmann.

THE COURT:  Good afternoon.

MR. GROSS:  Good afternoon, your Honor.  Marc Gross, of Pomerantz LLP.  With me is my partner Jeremy Lieberman; and with us, also, is Jeremy Hill, the general counsel for the Universities Superannuation Fund Scheme.

THE COURT:  Good afternoon.

MR. LOWENTHAL:  Your Honor, Mitch Lowenthal, Cleary Gottlieb, for Petrobras.  I am here with my colleague --

THE COURT:  You are here as an observer, in effect.

MR. LOWENTHAL:  When given an invitation, your Honor,

5

f2k2pet1

I wouldn't turn it down.

MR. KASNER:  Good afternoon, your Honor.  Jay Kasner and Scott Musoff from Skadden Arps.

MR. DUBBS:  Good afternoon, your Honor.  Thomas Dubbs, along with Fred Fox, for the U.S. States Group; and with us today are Joanna Guilfoy, Deputy Attorney General of the State of Idaho; and also Mr. Aburano, Deputy Attorney General for the State of Hawaii.

THE COURT:  I want to hear from Ohio.

MR. FOX:  Good afternoon, your Honor.  Frederic Fox, Kaplan Fox.  With me are my partner Melinda Campbell and Pamela Mayer; and, from Ohio, we have Michael Hall from the Ohio Attorney General's Office and Julie Becker, who is the general counsel of Ohio.

THE COURT:  Very good.

MR. PORRITT:  Speaking from the jury box, Nicholas Porritt, of Levi Korinsky, on behalf of the movant, Daniela Freitas Silva.  With me is Ms. Silva.

THE COURT:  Good afternoon.

Anyone else here from the plaintiff's side?  Okay.

So, just to set the stage for the record, so to speak, there were five class action complaints filed that have now been consolidated under the heading of In re: Petrobras Securities Litigation; and, on February 6, in a timely fashion, nine candidates filed motions for appointment as lead

6

f2k2pet1

plaintiff. Interestingly, with one exception, they were not the individual plaintiffs named in the five complaints. A cynic might infer that this is evidence that, despite the PSLRA, this is still lawyer-driven litigation, but I would not be so cynical.

The nine who filed motions were the Skagen Danske Group; the State Retirement Systems; the Universities Superannuation Scheme Ltd.; the investors Costa and Silva; the Institutional Investor Group so-called; an individual investor Plinio Kawakubo; so-called Petrobras Plaintiff's Group; the group consisting of Mossey Investments and Jacob Licht; and the individual investor Louis Kennedy, who is the only one of the original individually named plaintiffs who filed a motion to serve as lead plaintiff.

Four of those motions were subsequently withdrawn, but those being the last four I mentioned, and two others indicated that they would only wish their motions to still be considered if it appeared that none of the "big three," for lack of a better term, was likely selected.

So, for initial purposes -- and we will see how it goes -- I think we are looking at the Skagen Danske Group, the State Retirement Systems, and what I will call USS, the Universities Superannuation Scheme Ltd., but we may get to others as well.

Now, with respect to the Skagen Danske Group, how did

7

f2k2pet1

this group come to be formed?

MR. AMJED:  Good afternoon, your Honor.  Should I take the podium?

THE COURT:  Just because there are so many people, it is probably better to speak into the microphone so everyone can hear you.

MR. AMJED:  Okay.

Good afternoon.  Your Honor.  Naumon Amjed from Kessler Topaz Meltzer Check.

Your Honor, the Skagen Danske Group is comprised of three sophisticated institutional investors who collectively manage $80 billion in assets.

In response to your Honor's question about how the group was formed, when the class action lawsuit was filed in this court, we, as counsel for each of the investors in the Skagen Danske Group, alerted them that a class action lawsuit had been filed.  We advised them of their options with respect to seeking appointment as lead plaintiffs in this case.  We advised them as to the merits of the litigation.  And when we were retained by the funds to move for appointment as lead plaintiff in this action --

THE COURT:  Let me go back a second.  There are two law firms here representing the Skagen Danske Group -- Bernstein Litowitz and Kessler Topaz.  Did either of those firms have a prior relationship with any of these three?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

f2k2pet1

MR. AMJED:  Yes, your Honor.  My firm, Kessler Topaz, has had a relationship with all three of the investors, a formal relationship.

THE COURT:  So how did Bernstein Litowitz get involved?

MR. AMJED:  Bernstein Litowitz has served as co-lead counsel under their direction; although not a direct attorney/client relationship, they have served underneath them. So the way that --

THE COURT:  So if I just wanted to appoint a single law firm to serve as lead counsel, assuming I chose the Skagen Danske Group, it would be you.

MR. AMJED:  That is correct, your Honor.  We have a longstanding relationship with each of the three investors. However, given the complexity of this case, your Honor, and given the speed at which the court moves its docket, and given the three investors' prior experience overseeing both my firm and the Bernstein Litowitz firm in various actions, it was the clients' understanding that a case of this magnitude -- which involves a potential fraud lasting approximately a decade; dozens of shell companies across various countries who are engaged in the scheme; an institutional fraud that is so significant that Petrobras still has not been able to tell investors what the actual ramifications of the fraud are -- it was the group's understanding and it was the group's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

f2k2pet1

prerogative to select both my firm and the Bernstein Litowitz firm to act as co-lead counsel collectively.

As your Honor is aware, one of the critical criteria that -- or one of the critical decisions that a lead plaintiff is charged with is selecting lead counsel. My client's collective --

THE COURT: Subject to the approval and order of the court.

MR. AMJED: Absolutely, your Honor, absolutely.

My clients collectively lost approximately $220 million on a LIFO basis. They are very committed to ensuring that this case receive the proper attention that it merits. Given the complexity of this fraud, your Honor, given the amount of data that we will need to analyze -- I have read somewhere that the Brazilian government has collected approximately 100 terabytes of information. To give you some reference, the Library of Congress has about ten terabytes, so it is ten times the information of the Library of Congress.

Again, your Honor moves his docket very quickly, which my clients appreciate -- we want to get our day in court -- but given the magnitude of this case and given the critical decision that they have to appoint counsel that they believe cannot only effectively manage this litigation, but do so efficiently, it was their decision to jointly retain both my firm and the Bernstein Litowitz firm for this litigation and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

f2k2pet1

propose both as co-lead counsel.

As your Honor is aware, the decision to appoint counsel is a critical one.  The two circuit courts that have --

THE COURT:  Did these three entities have a prior relationship of a business nature?

MR. AMJED:  With each other, your Honor?

THE COURT:  Yes.

MR. AMJED:  The Danske Luxembourg fund and the Danske Denmark fund do have a prior relationship.  The two representatives are here and they can detail for you their relationship.  The Skagen fund has been a client of Kessler Topaz for approximately --

THE COURT:  But has no relationship with the other two, other than the fact that they have the same lawyer.

MR. AMJED:  That is correct, your Honor; however --

THE COURT:  So this was glommed together in order to enable you to qualify as having the greatest economic interest, yes?

MR. AMJED:  That is not right, your Honor.

THE COURT:  No?

MR. AMJED:  The clients --

THE COURT:  They came to you or you came to them?

MR. AMJED:  Well, we advised them of the litigation, as we were required to.  We have a monitoring agreement with all three funds, which I am happy to share with the court if it

11
f2k2pet1

so desires.  However, the losses that these three funds suffered are significant.  Skagen's LIFO loss alone is $150 million.

THE COURT:  So why shouldn't I just appoint Skagen, then, as the lead plaintiff?

MR. AMJED:  Your Honor, we have built a relationship with all three of these funds over many years.  We understand the way these funds work.  Each of them are eminently qualified to serve as lead plaintiff on their own; however, they prefer to work in groups, they prefer to collaborate.  They have done that before in other --

THE COURT:  So if a settlement proposal is made and Danske thinks it's a good one and Skagen thinks it's a bad one, how is that resolved?

MR. AMJED:  Your Honor, all three funds have the same ultimate goal, which is to maximize the recovery for the entire class and thereby maximize their own recovery.  We have worked under the leadership of co-lead plaintiffs in other cases.  It is a very collaborative process.  Obviously, there are situations where people disagree on a particular view that needs to happen; however, ultimately the debate and discussion that results from the collaborative process leads to a better result for the entire class.

THE COURT:  The same way that having Democrats and Republicans in Congress always leads to a compromise.

12

f2k2pet1

MR. AMJED:  The only difference, your Honor, I would say, is that the goals here are exactly the same for other clients versus the Democrats and Republicans.

THE COURT:  Now, I think you mention in your papers that you had some sort of joint agreement.  Let me take a look at that, if I have that correctly.

MR. AMJED:  Yes, I have that, your Honor.

May I approach?

(Pause)

THE COURT:  Do you also have a retainer agreement with these firms?

MR. AMJED:  Yes, I do, your Honor.

THE COURT:  If I could take a look at those.

(Pause)

THE COURT:  This agreement says, among other things, that they agree that you may divide fees with other attorneys; not the two firms, but other firms.  Do you have such arrangements in place?

MR. AMJED:  The only other firm involved is a Brazilian firm, your Honor, who would assist us with litigation in Brazil; but, other than the Brazilian firm, there are no other attorneys involved.

THE COURT:  All right.  And you understand that this court would be unlikely to approve the participation of any other U.S. firm.  Even if I agreed to have the two of you

13

F2k2pet1                    Frances Eaton

involved, I would not allow you to enter into arrangements to have some other firm do some of the work and get some of the fees.  Do you understand that?

MR. AMJED:  Absolutely.

THE COURT:  I think we should maybe have the representatives testify, so let's start with the representative from Skagen.

FRANCES EATON,

called as a witness by the Court,

having been duly sworn, testified as follows:

THE COURT:  Tell me, what is your position?

THE WITNESS:  I am manager of business support and compliance at Skagen.

THE COURT:  And what is Skagen?

THE WITNESS:  Skagen is a management company, an independently owned management company, that's been established since 1993.  We are situated in Stavanger, on the west coast of Norway.  We have about 50 billion U.S. dollars that is under management.  We are the management company for the funds that have had a loss in this case.

THE COURT:  You can't wait to get back to Norway because it is a lot warmer there.

THE WITNESS:  Definitely, yes.

THE COURT:  So why in the world do we need three lead plaintiffs here?  As I understand it, Skagen had a very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2k2pet1                         Frances Eaton                              14

substantial investment, so you have got a motive to want to get a big recovery.  It is a sophisticated company.  Why would we need three plaintiffs?

THE WITNESS:  In our previous experience, we have worked together with other lead plaintiffs before, and it is good to get that extra discussion, that extra perspective on the case.  So, in addition to having your lawyers advise you on the legal stuff, it is good to have other investors' viewpoints.

THE COURT:  Does Norway have itself class actions?

THE WITNESS:  No, not in this manner.

THE COURT:  Does Denmark have class actions?

THE WITNESS:  Not that I am aware of, but I am no expert at that.

THE COURT:  And does Luxembourg have class actions?

THE WITNESS:  Again, I am not an expert on that.

THE COURT:  Probably not, though.

THE WITNESS:  I would guess not.

THE COURT:  We can find out later.

So you have some sort of monitoring agreement with, I guess, Kessler Topaz?

THE WITNESS:  That's correct.

THE COURT:  What's the nature of that agreement?

THE WITNESS:  So our custodian sends them our portfolios.  They monitor all our investments in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15
F2k2pet1                    Frances Eaton

portfolios, and they come back and inform us of any class

actions that they consider would be relevant for us.  So we

have that in addition to the monitoring that our custodian

performs itself.

THE COURT:  How did this agreement come about, if you

know?

THE WITNESS:  This agreement dates back to January

2008.

So, as I mentioned, our custodian has its own

monitoring of our portfolios.  But that's more of a passive

thing, that we make sure that we don't miss any claims, any

time limits.

As I mentioned, we started the company in 1993 and,

over the years, we grew.  We became a more substantial investor

and also a more professionalized company, and we wanted to get

more actively into defending our unitholders' rights.  In

November/December 2007, Darren Check, from Kessler Topaz, was

visiting the Swedish Fund Association.  One of my colleagues

heard him speak.  In discussing, they found out that they offer

the monitoring service, and we entering into a monitoring

agreement with them.

THE COURT:  Is the agreement that you don't pay them

for the monitoring, but you do pay them if they bring out a

class action?

THE WITNESS:  The agreement is that they, obviously,

F2k2pet1                      Frances Eaton

monitor for free; and then, if there is a relevant class

action, they will ask us if we would like to pursue it.  So we

decide if we pursue it or not, and it is not exclusive.  So if

we choose for some reason to go with another law firm, we would

be free to do that.  And then we have a separate retainer

agreement with them.  So this monitoring agreement doesn't give

them the right to pursue anything or get any fees.  We enter

into a separate agreement where we have the fee scale that caps

the fees that they can receive.

THE COURT:  The fee scale in this case, how is that

arrived at, the one that is the lead finding?  These were

handed up for in camera review, so I am not going to mark them

as an exhibit, but I think this is the one that pertains to

your company, yes?

THE WITNESS:  Yes, that's right.

THE COURT:  I think you signed it?  Did you sign it?

THE WITNESS:  No, the managing director signs it.

THE COURT:  In any event, do you know how that fee

schedule was arrived at?

THE WITNESS:  Just by discussion between the parties.

THE COURT:  But you weren't involved?

THE WITNESS:  No, not in this.

THE COURT:  Has Skagen served as lead plaintiff in

other cases?

THE WITNESS:  Yes; once before, your Honor, in the

F2k2pet1                        Frances Eaton

Satyam Computer case.

THE COURT:  In that case, what steps did you take to monitor the performance of counsel?

THE WITNESS:  We received all the documents, obviously the form was submitted, and we had conference calls with both the other lead plaintiffs in that case and with the counsel, which was the same counsel as we have today.  We had regular updates of the case and we discussed any questions.  When we usually have a lot of questions, we just direct that directly to the counsel.

THE COURT:  Without telling us any of the substance, were there disagreements between you -- was that also with the Danske Group?

THE WITNESS:  No, it was with a different Danish fund and retirement fund in the U.S.

THE COURT:  Do I understand that one of your member funds purchased a stake in Petrobras Securities after the stock had gone down?

THE WITNESS:  That's correct.

THE COURT:  And so don't you have sort of mixed interests in terms of how this lawsuit will proceed?  Because you both have people who bought high and now have lost money who you want to recover for, but you also have some people who bought at the low point who have an interest, if anything, in seeing the price go up?

18

F2k2pet1                    Frances Eaton

THE WITNESS:  Yes.  I am sure we all have an interest in seeing the price go up; but our main interest in this case is obviously to maximize recovery both on behalf of our unitholders and on behalf of the class; and the analysis of the portfolio team, the portfolio masters, is based on the fundamental value of the company and their belief in it in the long-term, so not directly related to this case.

THE COURT:  Well, but if, for example, you were to enter into a very large settlement that, by the very size of the settlement, led the price of the stock to go even lower, wouldn't that be contrary to your obligations to the group that bought in at the low price?

THE WITNESS:  No, your Honor, I don't believe so.  It is the same fund, so the unitholders are the same.  They are free to trade in and out of the open ended funds whenever they like.  So our duty would be to represent our unitholders to the best of our ability and also the class.

THE COURT:  Now, do I understand -- this may not be a question that you can answer, we may need to get it from counsel, but if you know -- would the judgment that was obtained, if you were to obtain a judgment in this case, be enforceable in Norway?

THE WITNESS:  That's a good question.  We have discussed this a lit bit with our lawyers, and --

MR. AMJED:  I would just caution the witness not to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19
F2k2pet1                    Frances Eaton

disclose any discussions --

THE WITNESS:  Yes.

THE COURT:  Yes.  Don't tell me about what they said.

THE WITNESS:  I won't tell you what they said.

THE COURT:  I couldn't care less anyway.

THE WITNESS:  Okay.  We discussed it.  We discussed it and I understand that, since we have come here voluntarily and have subjected ourselves to this ruling, that that would be sufficient.

THE COURT:  I may have some more questions for you in a few minutes, but I will ask you, if you will, to just resume your seat, because I want to hear from counsel while we are on the subject of enforceability.

So let me hear what counsel has to say about that on that subject and also on the subject of the potential conflict.

I will hear from counsel for objecting plaintiffs, as well.

MR. AMJED:  I will start with the purchases, if that's fine with the court.

In terms of the purchases after the class period, we believe the case law is clear that they are irrelevant.  There is the Dendreon opinion from the Western District of Washington, 2008 WL 418122.  The court there -- if I may read from the opinion -- says, "Courts have repeatedly rejected the argument that a plaintiff's post-class period transactions in a

20

F2K2PETF

defendant company's securities are inconsistent with a claim of fraud or raise questions as to plaintiff's adequacy and typicality."

So, your Honor --

THE COURT:  That's a conclusion, but what's the reason for that?

MR. AMJED:  The reason is because the claims in a class period are based on purchases from misinformation.  When investors purchase after the class period, theoretically the stock is trading at its correct price based on all relevant information, including the revelations of the fraud.  So investors who are purchasing shares after the revelation of the fraud theoretically understand that there could be liability that may be assessed against the company.  The information is in the market and that information has been priced into the security.

THE COURT:  Let's take an extreme situation. Supposing you represented shareholders who lost and shareholders who bought, after the losses were exposed, bought at the lower point, and you were confronted with a settlement that was so large that it would be a wonderful settlement for those who lost, but it would place the company in my hypothetical in danger of going into bankruptcy with the concomitant possibility that the persons who had purchased the shares later on and who would not be recovering from this

21

F2K2PETF

settlement, but who were your investors as well, would lose their investment altogether as unsecured creditors in a bankruptcy.  You don't think than presents a conflict?

MR. AMJED:  Your Honor, that conflict is relevant in any case.  Our duty is to the clients and to the class that we represent.  The three funds that are being proposed to you have stated their commitment to the class and to maximize the recovery for investors.  Persons who are buying after the class period may realize that there is a certain risk associated with those investments.  I don't believe it is a conflict that is disqualifying, and I don't believe it is a conflict that isn't present in any class action lawsuit.

THE COURT:  All right.  Did you want to say something about the enforceability of the judgment in Norway?

MR. AMJED:  Absolutely, your Honor.

THE COURT:  And while you are at it, Denmark and Luxembourg.

MR. AMJED:  I would back up and, just to frame the analysis, state that, as a presumptive lead plaintiff, the case law on who has the burden to establish an advocacy and atypicality, that burden is not upon us to say we are adequate and typical and establish that.  We made a prima facie showing in our pleadings.  The burden is on the challengers.  And the PSLRA is clear that proof is required and the case law under the PSLRA is clear that speculation, innuendo, and inferences

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2K2PETF

are not sufficient with respect to specific res judicata concerns. Courts throughout the country have almost uniformly said, when a lead plaintiff has voluntarily subjected themselves to the jurisdiction of court, the res judicata concerns simply fall out of the analysis. There is the Transocean opinion from Judge Buchwald that we cite in our papers. The Western Union opinion was issued a few months ago. In that case the court --

THE COURT: If the judgment is not enforceable in Norway, hypothetically, then a separate lawsuit could be brought assuming jurisdiction was there in Norway. So why would a defendant want to ever settle with a Norway investor, particularly if they were the lead, given that danger?

MR. AMJED: I think, your Honor, the concern about the nonenforceability of judgment relates more to absent class members when people voluntarily submit themselves to the jurisdiction of the court. The Western Union case, which is cited in our papers, talks about the res judicata arguments and notes that there has not been a specific instance identified, at least in the Western Union case, where that has ever happened. The court dismissed the argument as a boogie man argument that's more fearsome in theory than in reality.

Counsel for Ohio, who is opposing us, has worked with our funds in various cases, in the Satyam case with Skagen, in the SunPower case with Danske Denmark. They understand that

23

F2K2PETF

these plaintiffs are here, they are submitting themselves to the jurisdiction of the court; and I would submit, to the extent they believe that there are res judicata concerns, they should establish that in an opposition brief. They haven't done so. They haven't submitted expert declarations. If they were available -- and these arguments have been raised time and time again in other courts and they haven't been accepted, where the lead plaintiffs have come forward and submitted themselves to the jurisdiction of the court, as the Skagen Danske Group has, your Honor.

THE COURT: While you are on your feet -- and then I want to hear from other counsel if they want to be heard on these issues -- you say in your papers, on the issue that was raised of whether you have Article III standing because you are only investment managers, that you have obtained assignments, but I haven't seen those and, on that, the burden is on you.

MR. AMJED: We have the assignments. I am more than happy to produce them. Your Honor, in our PSLRA certifications, we have certified that we have authority to move on behalf of the funds listed in our certifications. The fact of our standing has not changed since our motion was filed. Throughout the process, our funds have had standing under Article III and under the Huff analysis.

In other cases where the funds have moved, we produced assignments and produced evidence of standing not on the

24

F2K2PETF

initial motion, but during oppositions or reply.  The Longtop case is one where we produced the assignment to the court on opposition.  The court examined the assignment that we produced in Longtop, which is virtually identical to the one we have for Skagen and Danske Denmark.  Danske Luxembourg is organized as an FCP.  FCPs are, under the Vivendi case and under the Western Union case, deemed to have standing under the Prudential exception to the Huff Rule.

THE COURT:  What was the loss of Danske Luxembourg?

MR. AMJED:  I believe it was 20 million LIFO, your Honor.

THE COURT:  So assuming for the sake of argument that you didn't have standing for the other two, that Danske Luxembourg by itself would not be likely to have the largest financial interest, right?

MR. AMJED:  That would be true, but we do have standing.  I have the assignments for the court's review.  The assignments were executed prior to us moving for appointment as lead plaintiff.

And there is one other point I would like to note for the court:

In both the case of Skagen and Danske Denmark, the assignment is merely a confirmation of the statutory authority given to both these entities under the relevant countries.  The Longtop opinion that's cited in our papers, where Danske

25

F2K2PETF

Denmark served as lead plaintiff, in that case the court did a twin analysis.

The first part of the analysis was establishing that the assignment that Danske Denmark received was valid and valid under the Supreme Court case law of Sprint.

The second part of the analysis, the court looked at the evidence that we put forward. Even though we are not required to establish our advocacy, we nevertheless did. Under the evidence that we put forward, the court also concluded that Danske Denmark has an inherent authority to protect the interest of its funds. The assignment therefore, your Honor, is merely a confirmation of the inherent authority that Danske Denmark has with respect to its funds. The same type of authority is also given to Skagen under the law of Norway.

So the assignments are simply an additional safeguard that the funds entered into in order to ensure that there is no question about their standing and no question about their ability to move forward as lead plaintiff.

THE COURT: Maybe I missed it, but I don't recall, did you provide some expert affidavit on the law of Norway or the law of Denmark?

MR. AMJED: We did not provide expert affidavits on the law of Norway; however, the client representative would be able to testify to that fact.

On the law of Denmark, we did in Longtop. It was

26
F2K2PETF

submitted to the court as part of the docket.  Other movants who are challenging us have, I believe, pulled certain pleadings from our lead plaintiff motion in opposition from the Longtop case, specifically the assignment that was submitted on Danske Denmark's behalf.  The expert opinions on the law of Denmark is part of the exhibits that encompass the assignment of the Longtop case.  I am happy to provide that to the court if it desires.

THE COURT:  Let me hear from any other counsel who wants to be heard on these three issues.

MR. LIEBERMAN:  Your Honor, Jeremy Lieberman on behalf of USS.

Your Honor, with respect to res judicata, when it comes to England, there is simply no doubt about the U.K. The case law is clear and we haven't found any Lexis search that, assuming the judgment is not unsound facially, there is no res judicata issue, given the fact that England and the U.S. have similar common law bases and similar continuity in the legal system, and there is really no issue with that.

In the Vivendi action, Judge Holwell, he did in certain European countries -- France is one of them and others -- he did project class representatives and class certification for those European countries.  That was not the case with respect to England.  There was simply no doubt at any stage that England would respect a U.S. judgment.  So we don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

F2K2PETF

think that is an issue.

If your Honor requires any further supplementation on that, we would be happy to provide that; but simply, we submit, your Honor, it is an issue that is not in doubt.

THE COURT:  As to England.

MR. LIEBERMAN:  As to England.

THE COURT:  I think, from prior cases I have had, that it is not in doubt as to England.

MR. LIEBERMAN:  Thank you, your Honor.

Your Honor, with respect to adequacy issues and issues regarding conflict, we have touched upon a possible bankruptcy that's been referenced by the court.  I think that does raise an issue.  If someone did purchase shares after disclosure, it raises the issue with respect to this particular fund because it seems to be, get out of the position before the fraud was disclosed, thereafter it jumps back in after the fraud is disclosed, and it really seems quite anomalous, your Honor, why the fund would be doing it.  I assure you the very competent counsel here would be all over those transaction to make sure that that is a unique defense to Skagen.

THE COURT:  I think what they are saying is the fact that it was in the interest of our members to buy when the stock was low, both as a hedge and also as a prudent investment on what we foresaw as where the company would go in the long-term as a huge oil company, doesn't mean that we don't

28

F2K2PETF

have every wit as strong an interest as any other investor in recovering maximum losses on the portion of our investment where we were defrauded.

So "where is the conflict?" is the argument.

MR. LIEBERMAN:  Your Honor, that is the argument.  We understand certainly there is an argument, bottom line.  Once you made purchases at somewhat curious times, that does raise issues regarding reliance, reliance on the fraud, and certainly is there anything undercutting a fraud on the market presumption.

But, your Honor, touching upon the potential bankruptcy, an issue becomes much more poignant with respect to Skagen with respect to the preferred shares.  All of their losses, your Honor, are on the preferred shares.  Preferred shares in liquidation, which is certainly a possibility here, have a preference, and they have a preference that in liquidation they can be paid in the whole over any common stock shareholder.  That creates a dichotomy here, your Honor, that is not easily addressed.

Particularly here, there is a situation where the company has $4 billion worth of bonds that are technically in default right now because the company hasn't filed financials.  So this isn't some theoretical issue, whether or not the Brazilian government will back the company and allow it to get through any liquidation or prevent it from getting through

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

F2K2PETF

liquidation is a possibility.  But you have a very real prospect here of potential liquidation.  You have Skagen's best bet is, take your money from the preferreds and run and get your judgment satisfied, and there is no need to be in the action anymore.

The only investor that has losses both in common stock and preferreds, that has the largest losses, is USS, your Honor.  They have very evenly distributed their losses.  They have $48 million loss under LIFO for the common stock.  That's the largest of any competing movant.  They similarly have preferred losses of $35 million.  Your Honor, I think that gives an adequate representation for all investors here, and I think --

THE COURT:  In a company of this sort, primarily owned by the State of Brazil, is bankruptcy a realistic, plausible possibility?

MR. LIEBERMAN:  Your Honor, Brazil may decide that that's actually in their best interest, to let the company go through bankruptcy, recoup all the assets they are after, and they will own now not 51 percent of the company, they will own 100 percent.  They hold a large portion of the company's debt.

THE COURT:  This would be under Brazilian bankruptcy law?

MR. LIEBERMAN:  In all likelihood, your Honor.

THE COURT:  Do you know whether it has the same

30

F2K2PETF

provisions that you have just referenced, which are well known in American bankruptcy law?  Does Brazilian bankruptcy law have the same provisions?

MR. LIEBERMAN:  Your Honor, I am no expert in Brazilian bankruptcy law.  We do have attorneys who do have an expertise.  But the situation is that the company has already stated in its public filings in the United States, SEC filings, that there is a preference for preferreds, there is a preference for debtholders, and that has already been on the record, your Honor.  So that creates very acute conflict.

I think it will be hard pressed to find instances where preferred shareholders are actually the ones who are taking over the leadership of the class for common shareholders.  Your Honor, respectfully, we would submit that's the tail wagging the dog.

The main security in most companies, and in this particular company, is the common stock.  That's where all complaints, except for one, all complaints reference the share price decline on the common stock.  One complaint referenced all securities, to their credit, your Honor.  But the issue is, Why is everyone focusing on the common stock?  Your Honor, it is no great secret.  The common stock is the main, fundamental underlying security.  Everything else comes thereafter, your Honor.

And particularly here, the volume of the common stock

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

F2K2PETF

traded four times the amount of the volume of the preferred

shares, and there is more outstanding common stock than

preferred shares.  So when you talk about who has the largest

financial interest in this litigation, I'm not quite sure it is

the one who has a larger preferred loss, because the common

stock is going to yield the greatest result ultimately in any

settlement, and that will be one of the largest financial

interests in the common stock is USS.

So I think that analysis is really somewhat different

here.  Judge Patterson, in the Quantas decision, found that; so

did, your Honor, Judge Lynch.  They found you could not have a

situation where preferred is representing a common stock but

the reverse is all well possible because it is understood that

common stock is the underlying key security.

Skagen is presented with particular weaknesses here.

And how that portends for litigation going forward is really a

question, your Honor, that I don't know if we want to find out,

and I don't think we should take the risk in doing so.

Your Honor, I would like to address some of the

possible testimony raised by Skagen's witnesses, some of those

issues, if possible.

THE COURT:  Sure.  Go ahead.

MR. LIEBERMAN:  If I can present, Judge, just a quick

demonstrative.

Your Honor, Skagen has testified, and it's been

32

F2K2PETF

comparing them to Danske's counsel, that there is a monitoring

agreement in place between Skagen, Danske, and Kessler Topaz.

And your Honor has criticized those agreements as possibly

compromising the independence of the lead plaintiff.  Whether

or not that is actually the case, your Honor, that could be on

a case-by-case-basis analysis.

In this case, I think there is evidence that the

independence may have been compromised.  Let's just take a

look, your Honor.  We have Skagen, the one other litigation

that they got involved with, Satyam, they went as lead

plaintiff with Kessler Topaz and Bernstein Litowitz, your

Honor, a curious arrangement.

Then we have, in Danske, we have six or seven

litigations.  Kessler Topaz again bringing in Bernstein

Litowitz, and in one case they brought in Motley RIce.  Your

Honor, it seems to me there is a very cozy relationship between

these plaintiffs and the law firm.  Kessler Topaz is obviously

the one who has the close relationship.  If they find a loss

and they find a good case, they usually try to get their client

engaged.  They call up other firms that they have good

relationships with -- here Bernstein Litowitz -- and it just

appears, your Honor, why would an independent plaintiff, who is

vigorously watching over a case, why would they let themselves

in each and every time get into litigation not with the same

firm, that's one question, but why with another firm who they

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

F2K2PETF

have no retention with, your Honor?  If the plaintiff was trying to scrutinize that type of relationship, making sure it is controlling everything, why would they just invite additional firms in, your Honor, carte blanche?  So it appears there is no relationship or privity between Skagen, Danske, and counsel supervising this case, Bernstein Litovitz.  I think that raises a fundamental question as to the independence.  It appears, your Honor -- and we don't seem to hear testimony to the contrary -- it appears that this is a case where Skagen or Danske has large losses, they will be advised by Kessler Topaz to get involved and, somewhat automatically, your Honor, another law firm will be invited into the case.  And so, your Honor, I think that contrasts sharply with what's happened with USS.

THE COURT:  You have hit such a raw nerve that Mr. Berger is standing up to speak.  Go ahead.

MR. BERGER:  I just don't want to go down this road with any misimpression.  We were co-lead counsel in Satyam.  We were co-lead counsel in Medtronic.  We had our own clients in those cases.  We were co-lead, but we represented, for example, the State of Mississippi in the Satyam case, and I don't recall who our client was in the Medtronic case.  But we were not directly, if my memory is correct, we were not directly representing Skagen.  They were represented by the Kessler Topaz firm.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

F2K2PETF

MR. LIEBERMAN:  Duly corrected, your Honor.

I think there are still a number of cases where this arrangement still seems to --

THE COURT:  You make some interesting point I want to hear more about in a minute, but my criticism in prior decisions about these monitoring agreements has primarily been directed at a different issue.  The issue is, if a firm is monitoring for free, and it is really doing its job, then it is expending a lot of time and resources without being paid.  Not exactly the most prudent economic plan for any law firm.  So a law firm in that situation, consciously or unconsciously, has a motivation to perceive fraud in situations where maybe it is not so obvious.  Now, they still have to do due diligence before bringing a complaint and so forth, but I don't see how that motivation would be applicable in the Petrobras situation where, at least judging from public announcements in Brazil and elsewhere, the possibility of fraud seems hardly remote.

MR. LIEBERMAN:  Your Honor, it may influence the decision to step forward as lead plaintiff but, your Honor, it certainly can influence decisions in which counsel to choose, and what arrangements with that counsel to accept.  So, your Honor, the question -- really what your Honor -- what I interpret your Honor says is in some instances that could impact a fund's independent judgment; and, your Honor, that's what occurs when you accept the same law firm each time and

35

F2K2PETF

accept not only the law firm, you accept the law firm's proposed co-counsel each time.  Your Honor, as your Honor has noted, that seems to be an arrangement that actually can only harm the class.

Your Honor can prevent that from happening here by only appointing one movant.  The question is, what kind of plaintiff is the type that is consistently choosing two law firms?  In that situation, that can only be wasteful to the class, it can only cause a waste of resources.  Particularly where there is a retainer agreement with one firm and there is no retainer agreement with the other firm, your Honor, quite frankly, it seems to beg a lot of questions.  It seems to be quite a unique relationship.  We haven't seen those types of relationships where a fund is consistently picking one firm and that firm invites another firm, your Honor.  We would submit, your Honor, it does strike at the independence of that plaintiff.  And we do think that does contrast sharply with USS's involvement in this case.

Your Honor, USS, prior to appointing us as lead counsel, required to us come to London for two in-person interviews.  They spent, as Mr. Hill will testify, over 20 hours analyzing our submissions.

But, even more critically, your Honor, USS hired another law firm in the United States to review our submissions and to review our reputation to determine whether or not we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

F2K2PETF

were a satisfactory firm to proceed with the case and whether or not the claim was satisfactory in our presentations regarding that claim. No other fund here, your Honor, or potential lead plaintiff has made those steps.

So, your Honor, we would submit this type of activity by USS, that represents a gold standard in how a movant selects its lead counsel and decides to get involved in a case. And we presented, your Honor -- because the case law does diverge on this point -- we proposed, prior to making the motion, we went to Mr. Hill and we said, Listen, we might, to make your chances better, you might want to join another group here, and they adamantly refused. There is one reason why they refused, your Honor. They wanted to maintain their independence, the ability to maintain and remain the head of this case.

I think, your Honor, that is what the PSLRA -- we don't think there is anything underhanded in these arrangements, your Honor. The plaintiffs are excellent plaintiffs -- Skagen, Danske. The firms are excellent firms. They have high integrity. No question of that.

The question is, PSLRA requires more than just good plaintiffs and good law firms. It requires a head, someone who is going to demonstrate some ability to step forward, reject its counsel's proposal, and tell us what to do.

That's what happened here time and time again. They rejected a group proposal. We submitted a retainer agreement,

37

F2K2PETF

your Honor, submitting a more competitive fee arrangement that's been accepted by Danske, Skagen in other cases, and USS hired its own counsel.  They came back to us and said, You have to lower that fee.  We are not taking it.

So, your Honor, that's the type of plaintiff we have here, who has gone through extraordinary lengths to make sure it is the head of litigation, and not someone else.  That's what the PSLRA requires, and I think that's not apparent in the other submissions.

I think, if your Honor will turn to page 2 of our exhibit, we look at the other competing agreements and, again, we believe there is --

(Counsel confer)

MR. LIEBERMAN:  You have the Ohio Attorney General, your Honor, and two cases mentioned in the declaration, twice going with the same law firm, your Honor, proposed in this case; and you have Hawaii, one case where they have stepped forward, again, going with the same law firm.

So, your Honor, again, the question is, is there a monitoring agreement?  Is there independence here?  Is the fund actually exercising its independence over the law firm or is it vice versa, your Honor?

There is no doubt, Mr. Hill will testify, in our case, with USS at the head and Pomerantz at the tail taking instruction from its plaintiff, I think that's exactly why

38

F2K2PETF

Congress enacted the PSLRA, and we meet those standards by every means; and, your Honor, we submit that we should be appointed accordingly.

(Continued on next page)

THE COURT:  Thank you very much.  Before we go back to counsel for the Skagen group, does any other counsel want to be heard on the issues we just heard.

MR. FOX:  Good afternoon, your Honor.  Frederic Fox of Kaplan Fox.  I am one of the proposed co-lead counsel for the State Retirement Systems Group.  Just to correct something that Mr. Leiberman just said, there is no monitoring agreement for the State of Ohio and the Attorney General's Office or anyone else, and there are representatives here who can testify to that.

THE COURT:  Well, I am going to want to hear from them later in any event.  I might as well flag this for you in advance:  The classic allegation has been made with respect to public pension funds of various states, which may or may not be applicable here and may not be relevant or it may be relevant, in any event is that law firms are selected in part based on campaign contributions that they have made to the Attorney General of the respective states.  So I am going to want to inquire about that shortly.  Sometimes there are monitoring agreements as well, but the more common accusation is the one I just made.

MR. FOX:  Well, that certainly can be addressed by representatives of Ohio if your Honor wish to inquire on that.

The other point that I wanted to raise is that I think

40

F2K6DAN2

there are different securities at issue here.  There are at least three.  There is common stock, there is preferred stock, and there are several debt securities.  I think that one lends, which I am sure the Court will look and focus on, is which plaintiff or group of plaintiffs has the most balanced view based on the purchase of various securities in this case and who is going to be able to withstand all the various attacks that will come about in class certification.

THE COURT:  Is the portfolio of each of the three states that are part of your group a balanced portfolio in the sense you are talking about now, or was it more one way with one and more another way with another?

MR. FOX:  I think there are differing amounts.  When I say "balanced," I am not necessarily saying that is it 50/50 or a third, a third, a third; but I will say that I believe that the State Retirement Systems Group is the only movant that has significant losses in all three of the securities at issue.  In fact, I believe that the Skagen-Danske group has gains in the bonds and I believe USS has gains in the bonds.

THE COURT:  I thought what you meant by "balance" was who had ever heard of Ohio, Idaho and Hawaii having anything in common.

MR. FOX:  Actually in many different levels in the states they do participate.  This is something that the client representatives can explain to you better.  But they certainly

41

F2K6DAN2

do participate in law enforcement levels together, in civil litigation together. So this is one aspect of their relationship. I strongly believe that the State Retirement Systems Group will really be able to withstand any attacks in terms of class certification. For example, Mr. Lieberman's client, he is saying that the common stock drives the bus. That is where we ought to be focused on here is the common stock well. Well, there is tremendous losses in the preferred stock. I suspect that the main reason he is saying that is that his client sold out of all of its preferred stock before the end of the class period.

So I am not here to argue that but somebody might argue down the line that they don't have any losses in the preferred stock. So one could say that he is already prejudged the case and he is going to favor the common sock over the preferred stock because that is what his client has. In reality, there are a lot of losses for the common, there are a lot of losses for the debt, and there are a lot of lesses for the preferred. The State Retirement Systems Group is the only group that has significant losses in all three. The debt securities, both Skagen and USS have a gain. Ohio and Hawaii and Idaho have losses. As I just said USS sold out of the preferred before the end of the class period. And as you heard earlier, Skagen-Danske, there are issues about whether they -- when they purchased after the class period, what were those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

F2K6DAN2

purchases motivated by.  After they knew there was a fraud, they go back in.  Well, somebody could say, Well, the fraud must not have been really material to you.  In their public filings they don't mention the fraud after they go back in.

So I think that I believe that at a minimum, at a bear minimum, the US funds ought to be in this to represent all the interests.  And nobody has pointed out Ohio alone has the highest LIFO loss of any individual movant at $89.6 million, but the Skagen-Danske group is not really three.  It is really more like 19 because when you disaggregate all of the funds who have different investment policies and objectives and so on, there will be depositions of every one of those funds down the line and it is going to get complicated.

THE COURT:  Thank you very much.

MR. FOX:  Thank you.

THE COURT:  We have another taker.

MR. DUBBS:  Good afternoon, your Honor.  Thomas Dubbs from Labaton.  I am co-counsel with Mr. Fox.  The conversation has sort of wandered from Norwegian law and those 31,000 shares that were purchased after the class.  I will not be repetitive of what my colleague has said, but let me go back to the Norwegian law point if I may.

In our brief we cite what I would characterize, and the Court will obviously have to make its own determination, secondary literature from American Law Review articles that is

43

F2K6DAN2

quite strong on the issue of recognition of U.S. judgments in Norway and Demark in particular in the absence of a treaty which there is no such treaty. I would suggest, and I would granted that the issue is debatable, that the independent views of American academics granted in English who have looked at it may be as powerful or more powerful than one might cynically call a lawyer-driven Norwegian law affidavits that might or might not be securable on the time frame that the Court has given us.

THE COURT: Let me make sure I understand the full force of this argument. So let's assume that a judgment of this court against Petrobras obtained by Danske would not be recognized and enforceable in law -- assuming that for the sake of argument -- but Danske still has a strong motive, does it not, to obtain the biggest judgment it can because it still can force its judgment in the United States and it still can force its judgment in Brazil? So the fact that it can't enforce it in Norway doesn't mean it does not have strong motivation.

Now, the defendant theoretically, and their counsel is here and he can speak for himself if he wished to but he is not required to, might say, Well, I am reluctant to enter into a settlement with someone who might be able to bring a separate lawsuit against us in Norway. But that is probably a remote contingency in any event. The settlement wouldn't be Norwegian; it would be with the entire class. So the only

44

F2K6DAN2

thing I can see, but I may be missing the point, is that there is an argument here that might raise a class certification and about the scope of the class and that might exclude them from the scope of the class.  Even if that were to happen, I think it is not unreasonable for this Court even at this stage to make a preliminary judgment as to whether that would likely succeed.  Because if it is just a remote chance of success, then that would not be sufficient I think to bar them if they were otherwise qualified to be lead counsel.  Maybe I am just missing the force of the argument here.

MR. DUBBS:  Let me start with your Honor's last point. I do think that if one gets beyond the point of speculation or something might happen in the future, the question is ripe I believe at plaintiff's stage because under the statute some review of adequacy is appropriate, number one.

THE COURT:  Yes.

MR. DUBBS:  Number two, it is your Honor's second hypothetical which the case law has focused on, namely, putting aside what my friends at the defense side may or may not say, that the courts independently look at the issue of whether if the defendants win and then a Norwegian brings an action against them whether the Norwegian court will say that action is barred.  Now, that will give pause to settlement.  One can say, Well, there are not that many Norwegians in the class. The answer is we don't know how many Norwegians there are in

45

F2K6DAN2

the in class or how many Danes are in the class.  What we do know is the Norwegian fund and the Danish fund have put themselves forward.  We would submit that we have raised a colorable question as to whether the issue if the defendants win whether that win, assuming they won a certified situation, they can use that to block a subsequent action.

Now, if I may turn to the testimony of the representative of Skagen, putting aside the competency issues and putting aside the hearsay issues and all of that, what she said was essentially that Skagen is here and so it would be bound and that is what some the other counsel have said.  That may be true but that is a different argument.  If you show up and submit yourself to jurisdiction and there is res judicata, you may very well be bound under Norwegian law or U.S. law.  That is not the point.  The point is whether the defendants get the insulation that they need if they beat and defeat on the merits a certified class.  The courts have routinely held, particularly with respect to Germany and a number of other jurisdictions, that if they come from a jurisdiction where enforcement by defendant to preclude a subsequent action is a bar that that goes to adequacy.  In most cases notwithstanding their zeal, notwithstanding their other admirable qualities, that is of and in itself sufficient.  So I would say between the secondary literature and indeed what our friend from Skagen has said that that raises a colorable issue.

46

F2K6DAN2

Now, if I may since the conversations wandered --

THE COURT:  Feel free to continue to wander.

MR. DUBBS:  Another issue, and this is I would say a corollary to what my colleague Mr. Fox just said, I would respectfully ask the Court to look carefully at the issue of the preferred stock and the large loss that Idaho has in the preferred stock and I would also like the Court to address the issue of the bonds and the large loss that Hawaii has and secondarily Ohio has as to the bond.

Now, that is important for the following reason, which is if your Honor picks a lead plaintiff that has mainly losses in either the common or to the lesser extent the preferred, there is absolutely no incentive notwithstanding a fiduciary duty -- these are prominent lawyers.  I know them by first name almost all of them -- there is no incentive to bring and advocate for a Section 11 claim on the bonds.  The case law is pretty clear, it's not 100 percent clear, but it is pretty clear that when you have a separate cognizable Section 11 case particularly when it is against the underwriters who are the only defendants with respect to the Section 11 case that that requires separate care in dealing with that.  We have submitted that alternatively that we want to take the whole enchilada as it were.  We think that is something that the Court should seriously consider because the Section 11 case here maybe quantitatively different than the other case.

47

F2K6DAN2

The final point on that, which is dealt with in the briefing and I will not repeat it in oral argument, is that we all know the forum non doctrine is mushy, discretionary, etc. The one thing that is pretty clear is, and this is not to be nativistic or chauvinistic, but the Americans get a tilt on the issue of choice of forum.  So if there is a forum non motion as in this case, which I suspect without previewing what is going to happen, but I think in a case like this as day follows night, there is going to be a forum non motion and that is going to be one issue that is going to be very much in balance.

THE COURT:  Have you submitted your bill yet to defense counsel.

MR. DUBBS:  Having in a prior reincarnation seeing their bills, I think they are perfectly capable of taking care of themselves.

I do think, however, that that should be something that should be considered in the mix particularly if as maybe the case we have a lot of high quality lawyers and zealous plaintiffs.

THE COURT:  Thank you very much.  I think we certainly want to hear now from Skagen counsel.

MR. AMJED:  Thank you, your Honor, if I may start with the res judicata argument that was raised just now.  Counsel noted that in their papers they submitted secondary sources that support their claim.  I would refer the Court to the

48

F2K6DAN2

McKenzie opinion, which is 268 F.R.D. 170, where the court rejected res judicata concerns and noted that "no evidence or expert submissions beyond secondary sources were submitted." So that potential argument based on secondary source has been rejected by Judge Scheindlin in this district.

THE COURT:  She is a lot tougher than I am.  The point your adversary is making was that the secondary sources here may be in this area of what foreign law is maybe unusually reliable.  When I am called upon to determine foreign law, it is often very appropriate, for example, to look at treatises. Because if you rely solely on the expert opinions that are proffered in such situations, you never get anywhere because the two experts will inevitably say that we know what the law of Timbuktu is and by the way we're right and he is wrong.  So they have such glaring motives to interpret any ambiguous state of law in their own way that an academic approach may be more reliable.  That is the argument that was being made.

MR. AMJED:  Your Honor, under the PSLRA, again I go back to the statutory analysis that we need to work under here. It is their burden to prove that.  It is not our burden to disprove it.  The case law that is cited in our opposition papers shows that when a lead plaintiff is voluntarily producing themselves to a Court, res judicata concerns do not come into the calculus.  The Trans Ocean opinion from Judge Buchwald, which is cited in our papers, they are a Danish

49

F2K6DAN2

entity, much likely Denmark, was appointed as the plaintiff and the Court says, "Res judicata concerns have been explicitly rejected when foreign lead plaintiff movants are suing as a result of purchases made on domestic securities markets," which is exactly the situation before this Court.

Your Honor, I heard a lot of argument about we have preferred shares, they have bonds, they have common stock; but what I didn't hear is the analysis under Hevesi. Your Honor, under Hevesi the Second Circuit has made it clear that the lead plaintiff does not need to have standing to represent a class of investors. We have losses on preferred shares and we have losses on common stock and some of our funds have losses on certain bonds. So even if we didn't have losses on all the securities, under Hevesi, which is not cited by either opponent making this argument, it doesn't matter. There is also the overseas shipping case where Judge Scheindlin held that courts had frequently found that stockholders can represent bondholders and bondholders can represent stockholders.

The argument of a theoretical conflict that is raised by USS with respect to preferred shares is not applicable here. The two transcripts they cite, the Fannie Mae transcript and then the Quanta transcript, are completely inapplicable in the situation before the Court. In Fannie Mae, your Honor, at the time Judge Lynch issued the opinion, venue was in conservatorship headed towards receivership. The point of the

50

F2K6DAN2

receivership is to distribute the assets and the preferred

shareholders in Fannie Mae had a liquidation preference of $25

per share.  The Quanta case, in that case the company was in

runoff.  The counsel advocating for keeping the preferred case

and the common case separate, in the transcript produced by USS

in their opposition admitted that he would not be making the

argument if the company was not in runoff.

Here, your Honor, as late as the end of January,

Moody's has continued to maintain an investment grade rating on

the senior unsecured debt of Petrobras.  So not only do they

not establish their arguments under the proof standard required

under the PSLRA, the fact as relevant here established that the

risk of this company going into bankruptcy is completely

theoretical and they even admit that it is not imminent.  Your

Honor, if they are going to seek to rebut the presumption of

adequacy that is afforded to our clients under the PSLRA, they

need to present proof of that.  They cannot throw out arguments

based on secondary sources, hypothetical scenarios that are not

present here and say we have met our burden.  That is

completely insufficient under the PSLRA.

Going through the analysis, your Honor, again this

view that a balanced lead plaintiff needs to be appointed to

represent the class is in a sense asking for the Court to

appoint what it deems a more adequate or better plaintiff.  The

analysis under the PSLRA is sequential.  You start with the

51

F2K6DAN2

movant with the largest financial interest to determine whether that movant has made a prima facie showing of adequacy and typicality.  We have made that showing, and the presumption of adequacy rests with us.  If the other movants want to rebut that presumption, they need to do so; but they not only have not presented any proof, the types of arguments they have made ignore the Second Circuit's holding in Hevesi, they ignore the fact that courts determine that reliance on secondary source is insufficient to meet their presumption -- to rebut the presumption.

Also, your Honor, if I may, counsel for USS produced this chart, which shows the various cases where Danske and Skagen have been involved.  If I could go through it, I would just like to point out for the Court the results in those cases.  In the Satyam case, Skagen was responsible for settling the case for $150 million.  In the Medtronic case, Danske was responsible for settling the that case for $85 million.  In the SunPower case, the case settled for $20 million.  Danske was not appointed by Judge Kaplan in the Bank of New York Mellon case.  The Longtop case went to trial and resulted in a plaintiff's verdict last November before Judge Scheindlin.  The St. Jude case survived a motion to dismiss and Danske is currently engaged in discovery.

So what that shows, your Honor, is that our firm has the history of producing significant results for Danske, which

52

F2K6DAN2

Danske and Skagen have both deemed to merit continued employment of our firm.  The American Italian Pasta case, your Honor, if I may cite to the Court is 2007 WL 927745, and if I could read from that opinion it says, "The existence for prior relationships suggest a reasonable basis for PSLRA selection of class counsel.  PSLRA does not require perspective lead plaintiff to reconsider the representation anew.  It was proper for lead plaintiffs to rely on class counsel's prior successes in deciding new services again."  That is exactly what happened here, your Honor.

With respect to the hypothetical statement made by USS about the retainer being only with our firm, your Honor has the retainer.  It's with our firm.

THE COURT:  Well, on the retainer I have a question I want to put to the Danske representatives.  Finish all your other remarks and then hold that one for a bit.

MR. AMJED:  Thank you, your Honor.

The last point I would like to make again relates to the preferred and common theoretical conflict that has been raised, and one of the statements that was made in USS's brief is that the appointment of preferred shareholder would be unprecedented.  Again, your Honor, that is not the analysis required under Hevesi.  Under Hevesi it is clear that one group of investors can represent other groups investors against a common defendant.  More importantly the reason why I believe

53

F2K6DAN2

there is not more case law on this, beside the two transcripts cited by USS, is the structure of Petrobras is unusual in that the preferred ADS's compromise almost 50 percent of the company's structure between preferred and common ADS's.  We did a poll of the top 20 companies and none of them have more than 1 percent of preferred shares versus common shares.  So it is not a matter of the legal impediment for preferred shareholders to represent common shareholders.  It is just not that common.

Thank you, your Honor.

THE COURT:  As between the two representatives from the two Danske entities, did either or both of you sign the retainer agreements in this case?

MR. SPANDING:  For Danske Invest Management in Denmark.  We didn't.  It was our managing director.

THE COURT:  What about in the case of London.

MR. DYHR:  It's the same.

THE COURT:  Well, nevertheless I would like one of you to take the stand.  Remind me who was has larger interest.

MR. AMJED:  It would be Danske Denmark, your Honor.

THE COURT:  So Danske Luxembourg should not feel neglected.

Please raise your right hand.

 BO SPANDING,

    called as a witness by the Court,

    having been duly sworn, testified as follows:

54

F2K6DAN2

DIRECT EXAMINATION

BY THE COURT:

Q.  Tell me now what is your position.

A.  I am an international fund administrator in investment management in Demark.

Q.  Even though I am questioning you, speak into the microphone.

So are you familiar with this retainer agreement that we saw?

A.  Yes, I am.

Q.  Do you see how it gives a percentage that the Kessler Topaz firm will be seeking if they are successful, different percentages depending on the amount of recovery, but do you know how those were arrived at?

A.  And on how they calculated the percentage?

Q.  Yes?

A.  No, I don't.

Q.  Do you know whether this was something negotiated between Danske Demark and them, or was it simply something that was just presented and accepted?

A.  It was the last one, Kessler Topaz presented this and Danske accepted it.

Q.  And would it have made a difference, if you're in a position to have an opinion, as to whether to retain that firm if you knew that the other firms who were seeking to be lead

55
F2K6DAN2                         Spanding - Direct

counsel had proposed percentages very considerably less?

A.   I don't know whether that would have changed Kessler's percentage.

Q.   Why not?   Every penny that counsel takes is a penny less that your clients receive, yes?

A.   That's correct.

Q.   So it wouldn't it be important?   It wouldn't be the only factor you would consider, but wouldn't it be an important factor to consider?

A.   It would be an important factor, but it also would be the Court that finally decides the percentage given.

Q.   The Court finally decides but surely the Court is at least impacted by what the parties have previously agreed, yes?

A.   Yes.

Q.   Was any, if you know, other firm considered?

A.   No.   Not directly, no.   It was only Kessler Topaz that was interested in this case.

Q.   Now your relationship is with Kessler Topaz; right?

A.   Yeah.

Q.   So what was your understanding of why Bernstein Litowitz was being brought in?

A.   It was due to its very large case with a lot of documents and a tight schedule which made them --

Q.   The documents would presumably be located primarily in Brazil, yes?

F2K6DAN2                      Spanding - Direct

A.  Yes, I suppose.

Q.  They would be presumably in Portuguese?

A.  Yes.

Q.  How many lawyers in Bernstein Litowitz do you think speak Portuguese?

A.  I don't know how many, but I suppose they would have some.

Q.  Wouldn't it be more likely that whoever represented you would have to retain a Brazilian firm to obtain those documents?

A.  That is correct.

THE COURT:  Thank you very much.  You may step down.

(Witness excused)

THE COURT:  I would like to turn to the representatives of the various pension funds.  Oh, I am sorry. Does counsel want to be heard on the retainer issue from Skagen?  Obviously you have not seen the retainer of the other firms, but I will represent to you that they were asking roughly half the percentages that your firm was.

MR. AMJED:  As your Honor knows, the Court sets the ultimate fee paid to counsel.  Your Honor, my firm and the Bernstein Litowitz firm have litigated several of the largest cases in the sub-prime meltdown.  We understand that courts set the fee.  In the Bank of America case, which your Honor is aware, settled for $2.4 billion.  My firm the Bernstein Litowitz firm --

F2K6DAN2                        Spanding - Direct

THE COURT:  I can't understand why after that case you didn't all just retire.

MR. BERGER:  We're having just too much fun, your Honor.

THE COURT:  Especially today.

Go ahead.

MR. AMJED:  So, your Honor, it is clear that the Court sets the fee.  In that case Judge Castel commented and noted that the fee application that was submitted by co-lead counsel in that case, and Kevin Fox was also involved in that case, your Honor, was very responsible.  We take our obligations to serve as lead counsel very seriously.  We understand that there is oversight by the Court.  The clients take comfort in the fact that ultimately the fees they negotiate with us are simply a cap what we can ask the Court.  However, the Court ultimately looks at the fee that is determined and the fact that other plaintiffs might have lower fee agreements is not dispositive of the lead plaintiff question.

THE COURT:  No one is suggesting it is dispositive.  It is perhaps, however, relevant.

MR. AMJED:  It is relevant as many other data points are.  The Ninth Circuit in Cavenaugh discussed relevance of a retainer agreement and fee and noted that it should be limited to determine whether there is a conflict of interest or the fee was so unreasonable as to question the judgment of the lead

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

58
F2K6DAN2                    Spanding - Direct

plaintiffs.  The Court also noted that given that the District Court has discretion to review the fee and ultimately award the fee that in some way creates a lead plaintiff to select the lawyer that they think will be best capable to litigate the case on behalf of the class.  Given the Court's oversight of any potential fee that will be awarded in this case, the retainer agreement, which does set forth fees that are within the range of the awards of the various cases of the various settlement amounts, there is nothing unreasonable about the fee caps in there.  There is nothing to suggest an improper purpose.  There is nothing to suggest a conflict.  Ultimately, your Honor, the Court will be the one to determine our fees. So I don't believe it's fatal in any respect that we don't have lowest fee before the Court.

THE COURT:  Let me ask you this --

MR. BERGER:  I am sorry, your Honor.  May I be heard briefly on this point?

THE COURT:  Sure.

MR. BERGER:  Your Honor, obviously I agree with Mr. Amjed, but I want to just for our purposes I think Mr. Amjed mentioned the fact that this retainer agreement, the percentage provided for there is a cap and the process that would be gone through if this case were successfully resolved in some way is first we would go to the three lead plaintiffs. We're required in the monitoring agreement to keep accurate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

59

F2K6DAN2                        Spanding - Direct

time records.  We would tell the lead plaintiffs what we were hoping to apply for and then they would sign off on that.  It is a cap.  Very often the lead plaintiffs will say that we think it is too much or we think it is perfectly fine or whatever it is.  So that would be the first step.

The second step would then be to submit to your Honor papers for preliminary approval if it is going to be a settlement.  So you would have an initial opportunity to comment on that and then of course after that point, we would be sending out a notice to the entire class.  This class is composed of many sophisticated investors.  It is not unusual for those investors to come in and raise their own objections.

Following that, we would then have our final hearing and the Court would make a determination, and your Honor is not shy about asking a lot of questions about things like this and would insist upon adequate proof.  So my only point that I am making here is that while this is in my view a red herring, there are so many checks and balances that are legitimate checks and balances on this fee process that your Honor and the class is not going to allow a fee to be awarded in this case unless you believe it's reasonable.

So this is not a race to bottom or not basically a situation where the law firms and lead plaintiffs who were appointed, particularly in a case of this magnitude -- this is an extraordinary case.  I mean, the fraud is rampant as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

60
F2K6DAN2                     Spanding - Direct

Mr. Amjed said.  It occurred over at least a decade.  It requires highly sophisticated plaintiffs and counsel to really prosecute the case.  So that is the most important thing.  The fee will be determined through the process, which I have just described.

THE COURT:  So let me ask you this, and this may not go to the appointment of lead counsel, but we might as well flag it:  I have here retainer agreements from two other excellent firms.  Your firm is of course a very excellent firm as are they.  But they have indicated to their respective clients that the cap, and you are right fees only set caps, that they would charge is a percentage that is as I say approximately half of what your caps are.  So if I were to appoint you and co-counsel and your group as counsel for the lead plaintiffs, should I nevertheless start with a presumption that the most I am ever, ever, ever going to award you is half of what the cap you have given to your clients is because I know that there are two other firms out there also more than capable of litigating this case who were prepared to do it with a cap of half of what yours was?

MR. BERGER:  I would respectfully suggest, your Honor, why do that now?

THE COURT:  I am not doing it now.  I am wanting to make you aware of a factor that I may consider at the appropriate time in case you want to get out of it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

61

F2K6DAN2                        Spanding - Direct

MR. BERGER:  I don't think so, your Honor.  Your Honor, this is not a situation where the cheapest should be rewarded.  This is a situation where the best should be rewarded.  I have litigated many cases with the other lead counsel movants in the case and they are very fine firms, but basically your Honor is going to take a look at this case and the result that has been achieved in this case and you may conclude very well that because of the time and energy and financial commitment that has been made by the plaintiffs that the fee that is awarded should be higher than those numbers.

THE COURT:  Well, I hear what you are saying, although I have to quibble with one thing.  It is not my role, in fact I am by law forbidden, determining who is the best of the various lawyers here and that would be a very hard decision because you are all terrific.  What I have to determine is who is the most adequate plaintiff and then their selection of counsel can only be overridden if the counsel is not in the Court's view able to adequately and fairly represent the class.

So, for example, I could not under the PSLRA say the most adequate plaintiff is the Skagen-Danske group, but the best lawyer is the Jones firm or the Smith firm so they are going to represent them.  I cannot do that.  I am glad I can't because that would be a very awkward situation to say the least.  So it is not a question of who is the best lawyers; it is a question of who meets the statutory requirement.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

62

F2K6DAN2                        Spanding - Direct

MR. BERGER:  I understand that, your Honor.  All I was suggesting is not the best lawyers but the best result.  I can assure you that these three proposed lead plaintiffs in this case, and you've heard from two of them now, are highly committed individuals and firms that understand full well not just their fiduciary responsibilities to the class that they would be representing if they are appointed but also part of their fiduciary responsibility to the class is oversight of their counsel.  So that is step one.  And then it doesn't stop there as I said because then the class gets to comment on it and of course the Court is the ultimate arbiter.

MR. FOX:  Your Honor, can I follow up to Mr. Berger?

THE COURT:  Yes.

MR. FOX:  So on the fee issue, I think it is relevant that your Honor look at it to determine who is the most adequate plaintiff because my fee negotiation with my client went directly opposite the way the fee negotiation went between Danske and its lawyers.  It was my client who said, This is what the fee schedule is, and my client being Ohio who was one of the lead plaintiffs in the Bank of America case and I was one of the lead counsel along with Mr. Berger and Mr. Kessler.  There Ohio's fee schedule was the fee that Judge Castel did approve.  So my fee negotiation was, Here's the schedule, and that was the negotiation.  It was directly the opposite.  So it is a question of the adequacy of the lead plaintiff, Who is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

driving the bus?  Is it the lawyer who gives the client the fee agreement and says, This is what we're going to charge, and the client says, Okay, or is it the opposite way around?  That is the only point I would make.

MR. LEIBERMAN:  Your Honor, I think the testimony your Honor by the three funds was very striking in that everyone is saying, including counsel, oh, this is the Court's oversight and so there is no problem here.  That is a very big problem.  PSLRA says it is the plaintiff's oversight.  That is who has to oversee the litigation.  For people in open court to say, I am not so worried about that because your Honor is going to to his job, that strikes against what the PSLRA requires.  So I think we have a very big problem here.

I would also note that you have -- the people who have testified on behalf of Skagen-Danske are not the people that negotiated or signed the retainer agreement.  That raises the question, your Honor, as to whether or not the people with appropriate authority to oversee this action --

THE COURT:  Well, I hear your first point, but the people who are committing to a retention would have to be presumably at a certain level, but the day-to-day oversight might very well be given to someone wearing a different kind of hat.  I don't think that strikes me as so problematic.

MR. LEIBERMAN:  Maybe, your Honor, but here the same person who negotiated the retainers here speak on behalf of

64

F2K6DAN2                        Spanding - Direct

USS.

THE COURT:  We're certainly going to get to them.

MR. LEIBERMAN:  Your Honor, the other point is that I agree it is good certainly Ohio negotiated a good retainer agreement as we agree with our clients.  The question is when Ohio sought co-lead counsel with its potential co-lead plaintiff movant, they did not make sure that the retainer agreement were uniformed between its counsel here for Kaplan Fox and Labaton.  Those are two different firms representing these proposed co-lead plaintiffs.  Then the discrepancy, your Honor, in those retainer agreements that we haven't seen, Hawaii's retainer agreement, that would indicate, your Honor, whether or not Ohio was actually looking at the retainer agreements for all the firms.

THE COURT:  That is a good question and we're going to find out the answer to that question in a couple of minutes.  I think, though, we'll take a 10-minute break and then I think the next up to the stand will be the one of the representatives from Ohio given the introduction that has just occurred.

We'll take a 10-minute break.

(Recess)

65

F2k2pet3                    Michael Hall

THE COURT:  So, may we have a representative from Ohio take the stand, please.

MICHAEL HALL,

    called as a witness by the Court,

    having been duly sworn, testified as follows:

THE COURT:  Mr. Hall, tell us what you do for a living.

THE WITNESS:  I am the director of outside counsel for the Ohio Attorney General's office.  In that role I am responsible for the management and oversight of all outside counsel engaged by the Ohio Attorney General's office on behalf of state clients.

THE COURT:  So how did it come about that you agreed to be proposed co-lead counsel for this litigation?

THE WITNESS:  Your Honor, after the Attorney General decided that this case was significant enough to make a recommendation to OPERS, the Ohio pension system, he decided to recommend to the fund that we pursue the litigation and that the fund approve the ability to seek a strategic partner that had not been identified at that point.  The board for OPERS approved, not only initiating a litigation, but seeking that partner, at which time we instructed Kaplan Fox to determine who would be a likely partner in that effort, whether it be another state through their Attorney General's office or another state pension system.

66

F2k2pet3                    Michael Hall

THE COURT:  So why did you need a strategic partner?

THE WITNESS:  Your Honor, the Attorney General wants to be involved in this litigation in a management role, as lead plaintiff, and the decision was simple to, after it became known to Ohio that there were other possible movants with large losses, based on Ohio's past experience, where Ohio, prior even to this Attorney General, has had a history of partnering with other pension systems and in some cases Attorneys General's office, that we decided to ask our counsel to find those partners.

THE COURT:  I think what you are saying is you wanted to be lead counsel or play a role as lead counsel, but you were aware of the possibility that you might not fit the definition of the client having the largest financial interest, and so you wanted to add others so that you would perhaps qualify as having the largest financial interest, is that fair?

THE WITNESS:  Your Honor, that is correct.

THE COURT:  So had you ever been in such a situation before where you were proposed co-lead plaintiff with Hawaii and/or Idaho.

THE WITNESS:  Your Honor, we have not partnered with Idaho or Hawaii as in under the PSLRA, under security fraud cases.  I will note that the Attorney General's office, as is the case for all Attorneys General's office, do have working relationships on many different levels, both at a prosecutorial

67

F2k2pet3                      Michael Hall

and enforcement, maybe consumer protection enforcement, so we have those relationships with those states.  And then, speaking on behalf of the pension system, the pension systems are viewed -- view each other as sister systems in the respect to legal issues.  Of course there are many legal issues, other than just security frauds, the pension systems compare notes and discuss among themselves.

THE COURT:  What is going to happen, though, if there is a disagreement between the three of you as to either a motion that should be brought or a position that should be taken, or a settlement offer that should be accepted or rejected?  Has there been any discussion as to how you are going to resolve that?

THE WITNESS:  There has been discussion amongst -- at least in past cases, how to handle that.  Traditionally, how that's been handle in prior cases in Ohio's case, that would be to give two examples, Bank of America or AIG would be to allocate those decisions based on the pro rata amount of the loss as far as decisions are concerned.

However, it is then Ohio's experience, and I am speaking not only about the four years I have been in this position but what I have been able to gather from those that preceded me, that those issues have been routinely resolved among the parties, because we all share the same interest in maximizing shareholder recovery and, in appropriate cases,

68

F2k2pet3                    Michael Hall

seeking certain corporate governance reforms.

THE COURT:  I'm not surprised that that would be the case, but one has to contemplate at least the possibility that there might be a disagreement that could not be consensually worked out.  So is the arrangement to have in that circumstance a vote determined by percentage of the loss or something like that reduced to writing.

THE WITNESS:  Your Honor, we do not have that reduced to writing.

THE COURT:  Was it reduced to writing in those other cases you had?

THE WITNESS:  Your Honor, no, it was not.

THE COURT:  So supposing you reached an agreement and you said, oh, we are sorry we couldn't reach agreement, but in the end we win because we have the greatest loss and the other two say, no, no, no, it is a question of one vote apiece and we have two votes, you have one, where will we be?

THE WITNESS:  Your Honor, I have no history of having to resolve that issue either in the four years I have been in the position or the office before that.  The advantage, in my view, of having Attorneys General's office involved in these matters is the ability to have our principals pick up the phone, the respective Attorneys General, and talk to each other and resolve these issues at that level.

THE COURT:  The retainer agreement -- I'm sorry that

69

F2k2pet3                    Michael Hall

it has only been given to me for in camera review because, I have to say, it seems to me a model of what a retainer agreement should look like, and it looks to me like it was probably drafted largely by your office, yes?

THE WITNESS:  Your Honor, that is correct.

THE COURT:  But the one I have only is between your office and the Kaplan Fox firm.  Was a similar one signed with the other proposed counsel?

THE WITNESS:  Your Honor, we do not have a contract with them, no, sir.

THE COURT:  So why should they be representing you?

THE WITNESS:  Your Honor, from Ohio's perspective, we are comfortable with the arrangement of having co-counsel appointed, just as we had in other cases, where Ohio, maybe as in this case, went off and hired a firm to represent them and then instructed that firm to go find other states or partners, whether that included a client who has already had previously engaged a client or not.  So it is not something that Ohio is concerned about.  However, it also, I would say, reflects Ohio's willingness to pursue these matters on its own if necessary.  I think in this case, though, the Attorney General's view was, judging from the severity of the allegations and actions in this case, it only benefited to have a state with their Attorney General and other states with their respective offices represented as well.

70

F2k2pet3                    Michael Hall

THE COURT:  Let me ask counsel, the arrangement with Hawaii and Idaho is the subject of retainer agreements between Labaton and the states?

MR. DUBBS:  That's correct, your Honor, and I will be presenting their retainer agreements to you.

THE COURT:  Let me see one right now if you don't mind.

MR. DUBBS:  Okay.

MR. LIEBERMAN:  Your Honor, I am sabbath observant and the sun is threatening to set.  My partner Marc Gross is going to --

THE COURT:  Yes, sure.  Feel free to leave whenever you would like.  I wish I had that excuse, but I don't.

MR. DUBBS:  May I approach?

THE COURT:  Yes.

MR. DUBBS:  This is Hawaii and this is Idaho.

(Pause)

THE COURT:  So let me ask the witness, have you had a chance to look at these other agreements that your co-proposed lead plaintiffs have with their counsel?

THE WITNESS:  Your Honor, I have not seen Hawaii's.  I have not seen the entirety of the agreement -- I'm sorry, I have not seen Idaho's, I have not seen the entirety of the agreement for Hawaii, but the fee schedule was shared with me a number of days ago.

71

F2k2pet3                    Michael Hall

THE COURT:  So it is not dramatically different but a somewhat different fee schedule from what your fee schedule is. How are you going to resolve that when it comes time for making application for attorney's fees?

THE WITNESS:  Your Honor, this has not been uncommon in Ohio's experience in the PSLRA cases.  In fact, in recent cases where Ohio has been involved in a settlement, there have been different fee agreements; and, in those cases, agreements were reached at the end, at settlement, on what the appropriate amount was to submit to the court.  In most or one of the more recent instances, it was a decision to use the Ohio fee schedule.

THE COURT:  Do you have a monitoring relationship with Kaplan Fox?

THE WITNESS:  Your Honor, the Attorney General's office nor OPERS have a monitoring agreement with Kaplan Fox or any law firm or service.

THE COURT:  To your knowledge, have campaign contributions been made by Kaplan Fox to -- let me withdraw that question.

Ohio's Attorney General is an elected official?

THE WITNESS:  Yes, your Honor.

THE COURT:  Have campaign contributions been made to his election fund or anything like that?

THE WITNESS:  Your Honor, I need to answer that in

72

F2k2pet3                      Michael Hall

two-part.

First of all, in this Attorney General's office I, along with all other attorneys that work for me that are responsible for supervising special counsel, outside counsel, we are screened off from that part of the Attorney General's campaign live. I have purposefully not been involved at all on the campaign, having knowledge of what has or hasn't been given, so I have no knowledge of any law firms' contributions to the Attorney General.

That said, I would note that, under Ohio law, obviously it is against the law in Ohio to award a contract based on a campaign contribution. Second, it is legal in the State of Ohio for a law firm to make a contribution or the individuals in a law firm to make a contribution to the Attorney General as a candidate. There is a limit of $1,000 per individual. And because that's the case and because I don't want to be looking at the campaign contribution rolls to determine who has and who hasn't, I asked the law firms to certify in a separate affidavit, and it is also contained -- there is a provision in the contract that you have there, to certify to the Attorney General's office that they are in compliance with Ohio campaign finance law. If it is found that they contributed in an amount above the $1,000, while that is not an illegal contribution in Ohio, it is a contribution that forbids me from granting, if it comes to my attention, it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73

F2k2pet3                    Michael Hall

forbids me from granting any contracts to that law firm.

THE COURT:  I don't want to pursue this unnecessarily, but just so the record is complete, has Kaplan Fox or its partners contributed more than a thousand dollars to the campaign fund of the Ohio Attorney General?

MR. FOX:  No, your Honor.

THE COURT:  How did Kaplan Fox first come to your attention?

THE WITNESS:  Your Honor, the Attorney General's office has a panel of firms who are all experienced in this area of the law that we approve on an annual basis.  We put out a request for qualifications.  We have them submit that to us on an annual basis, and then we are able to determine once a year these are the individuals, should the Attorney General's office make a recommendation to the Ohio Public Employees Retirement System that we are going to pursue a case, these are the firms that we would use.  So we are familiar with Kaplan Fox.  Kaplan Fox's relationship with the state of Ohio dates back to prior to this Attorney General's office.  My understanding is they have been on this panel since sometime around in 2008, so that's how we are familiar with our outside counsel.  In this case, the firms on that panel are welcome to bring to our attention or we may bring to their attention cases that might be something we would want to make a recommendation to the retirement systems, one of the five retirement systems

74

F2k2pet3                    Michael Hall

in Ohio or all of them, and in this case, Kaplan Fox did bring to our attention Petrobras and the issues surrounding that. We were aware, obviously, from some news reports to some extent, but they did bring it to our attention and then we took that and made a decision after we evaluated it and talked with the firm and other firms to make a recommendation to OPERS.

THE COURT:  Last question, have you discussed, either with the lawyers or with your proposed co-plaintiffs, what the division of authority or responsibility will be as between Kaplan Fox and the Labaton firm?

THE WITNESS:  Your Honor, we have not discussed that, but you will find in the retention agreement -- we have not discussed that to date, but you will find in the retention agreement that, should we be appointed lead plaintiff and both firms are approved by this court as lead counsel, a provision of the contract requires Kaplan Fox to enter into an agreement and notify us of that agreement, give us a copy, so that we are aware of how that allocation of the work is done.

THE COURT:  Very good.  Thank you very much.  You may step down.

(Witness excused)

THE COURT:  Let me hear from the -- it is a tough choice between the beauty of Hawaii's beaches and Idaho's mountains, but let me hear next the representative from Idaho. Besides it is only breakfast time in Hawaii.

75

F2k2pet3                        Joanna Guilfoy

JOANNA GUILFOY,

       called as a witness by the Court,

       having been duly sworn, testified as follows:

          THE COURT:  Ms. Guilfoy, what is your position?

          THE WITNESS:  I am the deputy Attorney General
assigned to the Public Employee Retirement System of Idaho.

          THE COURT:  So how did it come about that you got
involved in this case, not you personally, but the pension
fund, the Public Employee Retirement System.

          THE WITNESS:  Your Honor, PERSI has monitoring
arrangements, three monitoring arrangements.  I believe it was
early January I was contacted by one of those monitoring firms.
They generally alert us if they think there is something
significant that PERSI should consider.  I had some
conversations with that firm and actually at that point had
some questions and wanted to actually bounce it off, get
another perspective.

          So I reached out to one of the other monitoring firms,
got some more information, had more questions, and went back
and got more information, ultimately got a lengthy memo and
analysis of PERSI's losses, at which point I brought it to the
board's attention.

          The board asked for it to be on the agenda for a board
meeting, which was scheduled, I believe, the following week.
It was discussed in executive session, they had more questions,

76
F2k2pet3                    Joanna Guilfoy

which I went back and got answers to; and at that point in time we went back to executive session and they decided that they wanted to pursue lead plaintiff -- named plaintiff status, lead plaintiff status.

THE COURT:  Were you aware that Ohio had already been lined up as a prospective lead plaintiff?

THE WITNESS:  Your Honor, I was not aware of Ohio.  I was aware that there was another public pension fund that Labaton was talking with although, at the time I did not know the name.

THE COURT:  Was Labaton one of the three firms that had monitoring agreements with you?

THE WITNESS:  Yes.

THE COURT:  And was it the one who first brought it to your attention?

THE WITNESS:  It was not.

THE COURT:  So how did you choose between the firm that first brought it to your attention and the one that you then chose or how did you choose generally, forgetting about whether they had a monitoring agreement or not?

THE WITNESS:  Your Honor, this is the first time that the Idaho fund has sought lead plaintiff status, but it was --

THE COURT:  You have my condolences.

THE WITNESS:  Without disclosing, it was done in executive session with the PERSI board, and the PERSI board was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

77
F2k2pet3                    Joanna Guilfoy

determined that they were comfortable with Labaton.

THE COURT:  Was there just one candidate in the end?

THE WITNESS:  No.  They were both.  Two firms were discussed.

THE COURT:  Was there a price difference?

THE WITNESS:  At that point, your Honor, we weren't looking at price.

THE COURT:  So what were you looking at?

THE WITNESS:  Experience, comfortableness working with the firm.

THE COURT:  Without naming it, was the other firm any of the firms that are represented here today?

THE WITNESS:  Yes.

THE COURT:  Have you seen the fee arrangements that Ohio has under its agreement?

THE WITNESS:  Not Ohio.

THE COURT:  So since these were submitted to me in camera, I am not going to show them to you, but under some scenarios, indeed under several scenarios, the cap that you have with the Labaton firm is lower than the cap that Ohio has with the Kaplan firm, although they are both in the same ballpark, so to speak.

So what happens if the two law firms, they have to make an application to this court for legal fees after a settlement or verdict, and they decide that they want to apply

78

F2k2pet3                    Joanna Guilfoy

for the Ohio cap which would be higher than your cap under certain scenarios?  Is that something that PERSI can agree to or you would have to disagree at that point?

THE WITNESS:  Your Honor, I would think we would want to know about that prior to that and would express an opinion, but I do think PERSI would take comfort in knowing that the court would make the ultimate decision on that.

THE COURT:  Well, the court would make the ultimate decision, but isn't the point of your retention agreement to have a binding contract?  The court can award whatever it is going to award, but so far as PERSI is concerned, it cannot exceed X, right?

THE WITNESS:  Your Honor, my understanding, and I did know that there are three separate agreements, and I believe this was stated that if there was discrepancy that ideally the three funds would come together and negotiate or agree on a final agreement.  But ultimately if that could not happen, that would have to go to the court for its decision.  There are three separate agreements at this point in time.

THE COURT:  Maybe I should ask counsel over here for the three.  So if, at the end of the day, Ohio, under its agreement -- I'm sorry, the Kaplan firm, under its agreement with Ohio, says we should be applying to the court for X, and that violates the terms of the agreement with Idaho, what happens then?

79
F2k2pet3                     Joanna Guilfoy

MR. DUBBS:  Well, your Honor, there are a couple of scenarios.  One is that there would be an attempt, as there is in much of this decision-making, to reach consensus and, if necessary, go back to the Idaho board and say, Will you amend the agreement on this point one way or the other?  Now, if the Idaho board says no, then we are left with the issue that we have --

THE COURT:  On what basis could they possibly say yes?  Given their fiduciary duties, they have negotiated a cap.  They get the benefit of the settlement and why in the world should they say, We are going to pay you more than we agreed to pay you just because some other state was foolish enough to agree to something more lucrative?

MR. DUBBS:  Well, they have the discretion to say you did a good job, we are happy with the result and, as a result of that, we will agree to increase your cap.  But the hypothetical is if they say no, for the reasons that your Honor just posited, then we have three separate fee agreements and there will be three separate fee applications.  And if I may be just permitted one quick editorial comment, that is built in to the PSLRA, and unless the court wants homogenized, uniform fee agreements before every lead plaintiff hearing, there are going to be disparate fee agreements.

THE COURT:  That's a good point, however, I will say this --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

80

F2k2pet3                      Joanna Guilfoy

MR. DUBBS:  And they are all pretty close.

THE COURT:  -- that the -- I haven't had a chance to yet review the Hawaii version, but I do think that the Ohio agreement is a model.  I would think that Ohio might want to consider making public, without reference to any particular case, the terms of its agreement with counsel, because it has many, many provisions in it that seem to me to be very consistent with the PSLRA's view that the client should rule, not the lawyer.  So I just gratuitously make that comment in response to your gratuitous comment.

Anything else?

MR. FOX:  Your Honor, one comment on that, which is that I believe since these are caps in whatever agreement they are in, if the situation was that under, for example, the -- for example, the Hawaii fee agreement had a lower cap than the Ohio for a particular -- at a particular moment in the litigation, I can't be certain, but I think that in that situation, the clients would want to speak, and I think it would be correct that the Ohio, the board of PERS would probably think it was a good thing and to agree to the lower cap that is in the Hawaii agreement.

THE COURT:  All right.  Thank you, gentlemen.

The last question, Ms. Guilfoy, what contact have you had so far with your counterparts in Hawaii and Ohio?

THE WITNESS:  Your Honor, I have just met Ohio today,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

81
F2k2pet3                    Joanna Guilfoy

although I know the names of folks from various organizations. The Hawaii DAG and I did share e-mails back and forth over the past week and a half.

THE COURT:  Very good.  Thank you so much.  You may step down.

I am going to have to say to the representative from Hawaii what I said to the representative from Danske Luxembourg:  I am delighted you are here, but I have no questions for you, as it turns out, given the questions I put to others.

So I think it is time to hear from the representative of USS.

JEREMY PAUL HILL,

        called as a witness by the Court,

        having been duly sworn, testified as follows:

THE COURT:  Mr. Hill, tell us a little bit about you.

THE WITNESS:  Your Honor, I am the group general counsel at USS.  USS is the largest pension fund in the UK.  We manage a pot of assets of British pounds 45 billion on behalf of 300,000 members and 450 employer institutions.

THE COURT:  Have you been involved personally in any other prior U.S. class actions?

THE WITNESS:  No, your Honor.

THE COURT:  So how are you going to, if you will, maintain effective control in this case when this is sort of

82

F2k2pet3

new territory?

THE WITNESS:  Yeah.  Your Honor, I believe have two responses to that.  One is, whilst I personally have no experience in U.S. litigation we, as an organization, do have. I know that my colleague, Dr. Summerfield, is well known to many of the attorneys in the room.  The second point to make perhaps, your Honor, is that my job involves for a large part the oversight of outside counsel, much like my colleague from Ohio.  Therefore, I do feel I have the requisite skills, if not previously particularly applied to this particular scenario.

THE COURT:  How did you come to be involved as an organization in this lawsuit?

THE WITNESS:  Your Honor, in January, we were contacted by Pomerantz to alert us to the fact of our -- the size of our potential losses in this claim.  That, first of all, went to a member of my legal staff, who undertook a preliminary analysis working with Pomerantz.  That led to a detailed internal memo produced by the attorney on my staff. That was considered by me and, in line with our internal policy, I discussed that with the chief investment officer, with the head of responsible investment, and with our head of equities.  Collectively our view was that two things in this case made it worthy of pursuing the plaintiff status: that is, the size of our losses, firstly; and, second, the nature of the conduct complained of.

83

F2k2pet3

THE COURT:  Was there a prior relationship with Pomerantz that led them to contact you or was this sort of out of the blue so to speak?

THE WITNESS:  Your Honor, we have relationships with a number of the firms represented in the room today.  Pomerantz we do know because we are currently involved in some litigation in Texas where Pomerantz are acting for us and other investors, so we do have prior knowledge of Pomerantz.

THE COURT:  Do you have a monitoring agreement with them.

THE WITNESS:  No, we have a monitoring agreement with another firm.

THE COURT:  Was Pomerantz selected because they had brought it to your attention or did you shop around, so to speak, or what?

THE WITNESS:  We didn't shop around as such, but we did talk extensively to -- we have a retained independent counsel in the U.S.  That's Keith Johnson of Reinhart who, again, will be known to many people in the room, I suspect.  He is our sounding board.  He has no financial interest in the litigation.  We discussed Pomerantz's analysis, their assessment of losses, their assessment of the strength of the claim with Keith at some length, also discussed with him at a high level some of the practical implications of going for lead plaintiff.  So although we didn't shop around with other firms

84

F2k2pet3

to represent us, we did, if you like, test the case with independent counsel.

THE COURT:  And was this a process over a period of days or moments or months?  Was this -- how extensive was this process?

THE WITNESS:  It was reasonably intense, so it ran from around about the 11th of January through to about a week and a half ago.  And in terms of commitment of time, I would say that the attorney on my staff would have spent about 30 -- that's three zero -- hours on it and I must have spent about 20 hours looking at it.

THE COURT:  Now, you heard Pomerantz counsel making the argument earlier about the importance of common shares, but doesn't that put you in an awkward position with respect to some of the other kinds of investors, preferred shareholders, bondholders and so forth?  What about that?

THE WITNESS:  I take your point, your Honor.  On the preferred shares, our view is that we did suffer losses, first of all.  And, second of all, our contention would be that because of the way in which information came into the market over a longer period than perhaps is currently made in the complaint, then as we sold out of the preferred stock in fact the prices at which we were doing so did suffer in fact through the market responding to things like the internal investigation one of the contractor firms initiated, which was then picked up

85

F2k2pet3

on the FT.  I think there are some pieces in the Brazilian press as well.  So I think it was our view would be it was a longer process of information coming into the market and therefore we did suffer.  So our alignment with the preferred shareholders is there.  I guess, in any event, clearly as a fiduciary company, we would in any event take very seriously our duties to the class in any event.

THE COURT:  It's my understanding from previous cases that this is the case, but I could be wrong, but my understanding is that U.S. judgments are enforceable in England.  Does that accord with your information?

THE WITNESS:  That is my understanding, but I wouldn't put myself forward as an expert on it, but that's certainly my understanding.

THE COURT:  We are in the same boat.

THE WITNESS:  Your excuse is better than mine.

THE COURT:  Thank you so much.  You may step down.

THE WITNESS:  Thank you, your Honor.

THE COURT:  I neglected to ask the witness, but I will just ask counsel for Hawaii and Idaho, has your firm made contributions, first, to the Idaho Attorney General's election campaign, assuming it is an elective office?

MR. DUBBS:  No, your Honor.

THE COURT:  What about Hawaii?

MR. DUBBS:  The same.  We have not made any

86

F2k2pet3

contributions to the Hawaii Attorney General.

THE COURT:  Very good.  Let me hear from any counsel who wishes to be heard on any final matters, and then I will set a schedule for how we are going to resolve this.

MR. DUBBS:  Your Honor, may I be heard on one issue dealing with the record?

THE COURT:  Sure.

MR. DUBBS:  When Ms. Guilfoy was on the stand -- I mean the record will speak for itself.  She answered the question that the court posed about connections or communications with the other people who have been put up with the group, and she responded that she had met one of them today.  I think, based upon the way the question was framed, she interpreted it as face-to-face communication, and I will represent and if the Hawaii gentleman had been put on the stand he would have pointed out that there was a lengthy conference call among all of them.

THE COURT:  When was that?

MR. DUBBS:  A week ago.

THE COURT:  But you put your finger on something maybe you or your co-counsel want to address, which is the state group.  The group of the three pension funds seems, quite clearly, to have been glommed together for purposes of this litigation to make a stab at being the most adequate plaintiff in terms of the financial interest rather than having some kind

87

F2k2pet3

of independent relationship other than the very, very general relationship that all Attorneys General have when they go to conference together, typically in Hawaii of course. So what about that?

MR. DUBBS: I wouldn't necessarily diminish the importance of the role of the Attorneys General and the role particularly in terms of oversight of litigation. The fact that you have an Attorney General at the top of the pyramid who can call his or her counterpart in another state I don't think is something that should be discounted in terms of the management of multinational, complex litigation.

As to the other comment, historically if you look at so-called groups, unquote, you have had a number of groups that in all likelihood came together because of the litigation, the prominence of the litigation, and the notoriety of the litigation and that that is the driver. The lawyers are not the driver, but the lawyers -- I mean one client came to us and said, you know, who else is out there? I think the record is pretty clear on that. So it is not us manipulating it.

So then the question becomes what kind of a relationship do you have to have? Is it insufficient that the cases have such notoriety that it prompts several people to raise their hand and so you know the people who raise their hand get together? Doesn't that work? Because if that doesn't work, then CalPERS and New York City and New York State

88

F2k2pet3

doesn't work and the SEC blessed that, as well as everyone else.  And everyone believes that's the paradigm of how these cases should work.

THE COURT:  Certainly I am of the view that if something is blessed by the SEC, it must be right.

MR. DUBBS:  I probably led with my chin; but, on the other hand, the SEC's position is a chevron type statutory interpretation of what the statute is.  But we all know where your Honor is coming from on that.

THE COURT:  Anyway, I take your more general point.  So actually to bring some order to this, let me hear any final comments, beginning with the Skagen group.  Then we will go in the same order that we have gone before.

Yes.

MR. AMJED:  Thank you, your Honor.  Your Honor, again, I would like to just remind the court that all of the arguments we are hearing ignore the essential question of who has the largest financial interest, have they made a prima facie showing of adequacy and typicality, and is there sufficient proof to rebut the presumption accorded to the Skagen/Danske Group under the PSLRA.  Your Honor, the Skagen/Danske Group have losses of over $220 million.  Skagen on its own has a loss of over $150 million.  The loss is, by far, greater than any other movant before the court.  They have made a showing of typicality and advocacy.  Skagen and Danske Denmark have served

89

F2k2pet3

as lead plaintiffs in other litigation.  They successfully oversaw my firm and Mr. Berger's firm as co-lead counsel. Nothing that has been presented to the court establishes anything close to the proof that's necessary to rebut the presumption of advocacy accorded to Skagen and the Danske group.  Accordingly, I would submit that their appointment is appropriate.  Thank you, your Honor.

THE COURT:  And from the state?

MR. FOX:  Your Honor, I would just add to what I said before, I think one of the counsel for Skagen Danske said under Hevesi bondholders can represent stockholders and stockholders represent bondholders.  I have always understood -- at least this is how Judge Castel interpreted Bank of America -- the lead plaintiff can decide which claims to bring, even though it doesn't possess all the security.  So if the lead plaintiff decided -- doesn't have bonds and decided not to bring a bond claim, the lead plaintiff could do that.  But the law in this district has clearly tilted toward the idea that in order to assert a claim on behalf of a class, you need to have at least that type of security that you are talking about, and many courts in this district have been pretty strict on that.

THE COURT:  All right.  Thank you very much.

MR. DUBBS:  I agree with Mr. Fox, but since the fee agreements were put center stage to a certain extent, let me respond on that.  Number one, to your Honor's inquiry of a half

90

F2k2pet3

an hour, 45 minutes ago, a fee agreement that is tremendously higher than our fee agreements which are different, which I submit is a positive, but they are clustered in the same part of the universe, a high fee agreement, I submit, shows a lack of independence on the part of the potential lead plaintiff and a lack of vigor in supervising outside counsel.  Other than that, I have made the point on the forum non and the bonds.

THE COURT:  USS.

MR. GROSS:  Your Honor, with regard to USS, it has the largest common LIFO losses.  It doesn't have any conflicts with the preferred.  It lost substantial amounts there as well.  It also has debt security.  So it has standing for all of these particular issues.  Skagen and Danske, as far as I recall from the papers, had about $600,000 of losses in the relevant period of time for the common.  Indeed, as your Honor picked up, there was a substantial purchase after the class period, after all of the risk analysis rule was brought out, and I will leave it to my brethren across the bar to make what they will of that.

With regard to why then USS, it is clearly the one who has demonstrated the most independence of counsel.  It has driven counsel.  It refused to take the fee proposal that we had.  It refused to take the aggregation that we had.  It had separate counsel vetting the choice.  Keith Johnson made -- I'm not sure if your Honor recalls, but Keith Johnson ran the Squibb fund.  He was the general counsel there.  So he knows

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

91

F2k2pet3

what's involved in class actions in the United States.  He knows what is an appropriate choice of counsel, and he vetted this particular choice.

What was not mentioned by Mr. Hill was that, yes, they are involved in other litigation with other U.S. firms.  Right now, Royal Bank of Scotland, they have a very reputable firm, not here surprisingly, that are representing them in litigation there.  So they made a choice here to select us.  They have a substantial stake in all the securities, the highest in the common stock.  So I believe that the choice should be made based upon who is most likely to be driving the attorneys, who doesn't have to convene a conference of many different funds, attorneys, etc., to figure out what to do in the case.  It is a streamlined approach and we would propose that would be the best way to do it.

Your Honor has raised the question of political contributions, and I think it is a very touchy area, to say the least, and I would only refer you to an article that appeared in the New York Times I think a month or two ago about NAAG, the acronym National Association of Attorneys General.  There aren't direct contributions to many of these very good Attorneys General, but there is a lot of contributions being made through other conduits, and that article might in some respects sensitize you to the concerns that you may be raising with regard to how political contributions or other lobbying

92

F2k2pet3

contributions are affecting the selection of counsel.

Thank you, your Honor.

THE COURT:  Thank you.

There is one party -- I haven't forgotten you.

MR. PORRITT:  May I speak now your Honor?

THE COURT:  Yes, because your application is to join whoever is selected, correct?

MR. PORRITT:  Correct, your Honor.

For the record, Nicholas Porritt, Levi Korsinsky, on behalf of the individual movant, the sole remaining individual movant, Daniela Freitas Silva.

I will make these comments brief, because I know it is getting late in the afternoon; but, first of all, for my client, as an individual investor, most of the issues we talked about are not at our level.  There is no question of a monitoring agreement, there is no question of political campaign contributions, nothing of that line, your Honor.

So I would point out that there is a substantial individual investor ownership of at least the common stock of Petrobras.  I think 90 percent of the common stock was owned by individual investors.  So individual investors have a meaningful stake and meaningful incentive for the class at least of the common stock.

Secondly, most of the individual investors and certain representatives, true for Ms.  Silva, but I think the court can

93

F2k2pet3

generally accept the truth for most individual investors, their percentage of ownership of Petrobras is likely to be far greater than their individual portfolios than any of the funds here. So although the funds put forward candidates obviously that quantitatively have far higher losses than my client does, for instance qualitatively, each one represents a fraction of less than one percent of the overall portfolios. We have testimony to that effect, that they manage $45 billion worth of assets. Someone loses 100 percent, 50 percent, 25 percent of their own individual portfolio, it gives them an interest in the case that is different from a fund, where this is just merely one tiny fraction of what they own. We submit that that provides -- particularly when it comes down to settlement, less so happens in the managing of sophisticated, complex litigation -- that provides a different perspective which provides a better representation for the class, because these funds actually don't resemble probably the vast majority of the class members that they represent in terms of their attitude toward Petrobras and their attitudes to the loss they have suffered. Some of them are going to be hedged. Some of them, this is only going to be a small fraction of the portfolio. So an individual is going to react very differently and an individual provides a different perspective valuable to representatives representing the class.

THE COURT: That's an important argument and one I

F2k2pet3

want to consider.

One of the problems I have observed in prior litigation, class action litigation, where I have had to determine appropriate adequate attorney's fees has been unnecessary duplication, which I only become aware of, so to speak, at the end, when I am looking over the time sheets. This, first of all, has an impact on the court because one of the things I have to look at is lodestar, even though that's not the ultimate thing I look at. But the amount of hours expended is one of the things I need to look at to determine an adequate fee. And at least one of the retainer agreements here along the same lines talks about if there is an early settlement that the at least suggested fee should be a product of lodestar rather than percentage. But it also leads to delays when I have had cases involving multiple counsel. It has proven more difficult to move the case forward with the deliberate speed that I like to move my cases.

So I wonder whether you wanted to comment on any of those, if you will, logistical problems of have too many firms involved..

MR. PORRITT: One I think is a question of degree. A lawyer's answer. I apologize for that. I think if you are talking about a large group of three, four, five counsel, I think that may present an issue. I think when you are talking a small number of two or three, my firm and myself personally

95

F2k2pet3

have worked, I think, with litigated cases with every firm here, either one or a group of two or three, I think it has worked successfully without any undue duplication of effort. So I certainly understand the concern. I think it is a question of balancing that versus the concern when you have --

THE COURT: I guess my question is this: Would you be comfortable -- assuming arguendo that I am persuaded it is important to have your kind every client as part of the mix, would you be comfortable with the court limiting that role to settlement discussions?

MR. PORRITT: That's an interesting idea. I think so your Honor.

THE COURT: That's where it makes the most difference.

MR. PORRITT: To some degree I agree, your Honor. I think, while differing perspectives are definitely useful, I think your Honor is right in day-to-day managing of complex litigation, the sophistication of general counsel who have done that before with the training will obviously add more, and that's where they will have the greatest value, so certainly yes is the short answer.

THE COURT: Thank you very much.

While I am thinking about it, one of the problems I have had in reviewing attorney's fees from the lodestar basis is the inadequacy of time sheets. I just flag that for everyone in advance. The primary reason I applied to be a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96

F2k2pet3

judge was so that I didn't have to fill out time sheets.  So I know what a pain it is.

But, nevertheless, I have seen recently, for example, time sheets where "8.12 hours, reviewed documents."  That's not going to do it for this court.

I have seen "3.7 hours, discussed strategy."  That's not going to do it.

Defense counsel from the big firms who have the most demanding clients in the world are very familiar with having to put in a great deal of detail.  ".3 hours discussed with so-and-so," ".4 hours looked at documents relating to such and such." That gives the court a way to evaluate whether these are reasonable charges or not.

Now, obviously, in the end, lodestar is usually not the most important factor, but I still have to consider it.  So I just want to flag that for all counsel in advance.

Here is what I suggest we do, because it's important that we get this resolved promptly.  I want to give counsel a brief period to submit anything they want on anything that's come up today.  So by next Wednesday at 5:00 any and all counsel can, if they wish -- you are not required to at all, but if you want to -- can put in a memorandum not to exceed ten double-spaced pages commenting further on any issue that came up today or that you think needs to be flagged.  Don't bother, obviously, repeating things you have already told me.  But if

97

F2k2pet3

there is something you thought you have, this is your opportunity.

And, because of that, I think we also have to give a short period, until next close of business next Friday, to anyone who wants to respond. So if a new allegation is made, then anyone who wants to respond -- no one is required to submit any of this, but if you want to respond to something that's said on Wednesday, you can submit up to a ten-page double-spaced filing by next Friday.

I will undertake to resolve this motion on at least a bottom line order, maybe with opinion to follow thereafter, but at least a bottom line order by the following Wednesday.

So the official written submission would be due on February 25, the response on February 27, and my bottom line order, with opinion to follow, on March 4. At that point I will convene a conference call with the appropriate plaintiffs' counsel and defense counsel to set a scheduling for the rest of the case.

Yes, sir.

MR. BERGER: Excuse me, your Honor. As it stands right now, your Honor has issued an order that an amended complaint has to be filed by February 27.

THE COURT: Right, and I was going to just say that I am going to stay everything until March 4, and that includes the date. We will reset those dates in the conference call on

98

F2k2pet3

March 4.

MR. BERGER:  Thank you, your Honor.

THE COURT:  I appreciate very much all the appearances here today.  This matter is adjourned sub judice.

- - -