# Exhibit B

Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGUES GERVAT, derivatively on behalf of META PLATFORMS, INC. f/k/a FACEBOOK, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARK ZUCKERBERG, DAVID M. WEHNER, NICK CLEGG, PEGGY ALFORD, MARC L. ANDREESSEN, ERSKINE B. BOWLES, SUSAN D. DESMOND-HELLMANN, REED HASTINGS, ANDREW W. HOUSTON, NANCY KILLEFER, ROBERT M. KIMMITT, SHERYL K. SANDBERG, PETER THIEL, and TRACEY T. TRAVIS, <br><br> Defendants, <br><br> and <br><br> META PLATFORMS, INC. f/k/a FACEBOOK, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> DEMAND FOR JURY TRIAL |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**INTRODUCTION**

Plaintiff Hugues Gervat ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Meta Platforms, Inc. f/k/a Facebook, Inc., ("Facebook" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Mark Zuckerberg ("Zuckerberg"), David M. Wehner ("Wehner"), Nick Clegg ("Clegg"), Peggy Alford ("Alford"), Marc L. Andreessen ("Andreessen"), Erskine B. Bowles ("Bowles"), Susan D. Desmond-Hellmann ("Desmond-Hellmann"), Reed Hastings ("Hastings"), Andrew W. Houston ("Houston"), Nancy Killefer ("Killefer"), Robert M. Kimmitt ("Kimmitt"), Sheryl K. Sandberg ("Sandberg"), Peter Thiel ("Thiel"), and Tracey T. Travis ("Travis") (collectively, the "Individual Defendants," and together with Facebook, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Facebook, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), against Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis for violations of Section 14(a) of the Exchange Act, and against Defendants Zuckerberg, Wehner, and Clegg for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Facebook, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Verified Shareholder Derivative Complaint

## NATURE OF THE ACTION

1. This shareholder derivative action seeks to remedy wrongdoing committed by the controlling shareholder, directors, and officers of Facebook from November 3, 2016, through October 21, 2021 (the "Relevant Period").

2. Facebook is Delaware corporation based in Menlo Park, California. The Company's products include one of the most heavily used social media platforms in the world, eponymously named Facebook. The Company's products also include Instagram, an application, or "app" for photo sharing, and Facebook Messenger and WhatsApp, which are two apps that allow users to send each other messages.

3. Facebook primarily generates revenue by selling digital advertisement placements to those purchasers who are interested in advertising to the users of the Company's products. The Company collects data about its users that is of interest to advertisers, and it gives advertisers the ability to tailor their ads to specifically target demographics of their choosing, based on such data.

4. During the Relevant Period, the Individual Defendants caused Facebook to tout to the public that it undertook great efforts to adequately moderate content. The Company represented that such efforts included the prompt removal of content that is illegal and/or harmful, as well as any content that violates or is otherwise contrary to the Company's policies. Facebook further represented that it maintained a commitment to keeping users safe and that it applied its content policies uniformly across its wide-ranging user base.

5. However, statements by a whistleblower and leaked internal Company documents revealed that these representations were not true.

6. The documents and whistleblower statements demonstrate that the Company's policies regarding content moderation, or the lack thereof, resulted, *inter alia*, in the following: (1) causing civil unrest; (2) assisting in the commission of crimes, such as drug and human trafficking, as well as violent extremism; (3) harm Facebook users; and (4) result in uneven policy application, with higher profile users receiving more favorable treatment despite representations that no such skew in treatment would occur. Company personnel were well aware of the foregoing issues prior to their becoming publicly known. Yet, Facebook did not correct the issues. Instead, believing that more greater efforts at moderating content

2

Verified Shareholder Derivative Complaint

would harm Facebook's ability to produce revenue from advertising, the Company decided to avoid addressing the issues. Furthermore, while knowing of the harms posed by its products, Facebook undertook efforts to target its products to the pre-teen demographic, which the Company described as "a valuable but untapped audience" in order to cause pre-teens to engage with Facebook's products more actively (these actions collectively, the "Platform Content Misconduct"). On top of the Platform Content Misconduct, Facebook knew that a significant number of its accounts were duplicates and/or fake, but it improperly counted many of these accounts when measuring user activity. Taken together, the Platform Content Misconduct and the inflated user figures caused the Company to appear more profitable and safe of an investment than it actually was. As a result, the price of the Company's securities became artificially inflated.

7.     On September 13, 2021, the truth began to emerge. The *Wall Street Journal* began publishing a series of articles, which took on the moniker "Facebook Files." These articles revealed the truth concerning the Platform Content Misconduct. The "Facebook Files" relied on certain of Facebook's internal documents, which were obtained from a whistleblower later revealed to be Frances Haugen, a former employee of the Company. Articles in the "Facebook Files" series were published each day through and including September 17, 2021, and they gradually uncovered Facebook's deception as related to the Platform Content Misconduct. Among other things, the articles revealed: (1) Facebook's knowledge of the harm posed to its users by its products, including making "body image issues worse for one in three teen girls"; (2) Facebook's decision to fail to address such issues; (3) Facebook's policies concerning content moderation apply more strictly to some users and less strictly as against others, particularly high-profile users; (4) Facebook's decision in 2018 to alter its algorithm despite knowing that the change would lead more users to view content that was harmful or objectionable; (5) Facebook's apps were being used to enable drug trafficking and human trafficking; and (6) Facebook was unable to moderate content in accordance with its own stated policies. On September 28, 2021, the *Wall Street Journal* published yet another article detailing Facebook's practice of targeting pre-teens as a demographic area for business expansion.

8.     On October 3, 2021, more of the truth emerged. The whistleblower, who had previously

Verified Shareholder Derivative Complaint

been anonymous, revealed her identity in an interview on the television program *60 Minutes*. The whistleblower was Frances Haugen ("Haugen"), a former Facebook project manager, who would become a public figure due to her actions in blowing the whistle on Facebook's issues. In the *60 Minutes* interview, Haugen stated that the Company's actions have "shown it chooses profits over safety." She further stated that "I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous." Following the October 3, 2021 interview, *CBS News* published an article disclosing that Haugen had filed eight whistleblower complaints with the SEC related to the Company having misled the investing public.

9. On October 21, 2021, after the close of markets, the *Wall Street Journal* published yet another article on the Company. This article also relied on internal Company documents. It noted that duplicate accounts were "very prevalent" and that such accounts made the Company's publicly reported user metrics, which included metrics concerning daily active users, "less trustable."

10. On this news, the price of Facebook's stock declined from $341.88 per share at the close of trading on October 21, 2021, to close at $324.61 on October 22, 2021, a decline of $17.27, or more than 5%. From the point when the truth began to emerge on September 13, 2021 until the close of markets on October 22, 2021, the Company's stock declined $54.08, a drop of approximately 14.3%.

11. The Individual Defendants breached their fiduciary duties during the Relevant Period by causing or permitting Facebook to engage in the Platform Content Misconduct.

12. In addition, the Individual Defendants breached their fiduciary duties by personally making and/or causing Facebook to make a series of materially false and misleading statements about the Company. Specifically, they willfully or recklessly made and/or caused Facebook to make to the investing public certain false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Platform Content Misconduct, which included enabling criminal activity, harming users, inconsistently and unevenly applying policies concerning content moderation, and targeting children despite knowing of the harms posed to them by the Company's products; (2) the Company was not seeking to remediate the Platform Content Misconduct, despite being aware of such misconduct; (3) Facebook was disclosing user metrics it knew to be inflated due to duplicate and fake accounts; and (4) the Company

Verified Shareholder Derivative Complaint

failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13. In further breach of their fiduciary duties to the Company, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact.

14. The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

15. During the Relevant Period, while Facebook's stock was trading at artificially inflated prices as a result of the false and misleading statements described herein, the Individual Defendants breached their fiduciary duties by causing Facebook to repurchase its own stock at artificially inflated prices. In addition, two of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales in which they garnered collective proceeds of more than $2.5 billion. With regard to the repurchases, from June 1, 2021 until October 31, 2021, Facebook repurchased approximately 71.27 million shares of its own securities for approximately $24.6 billion. During this time, the Company's stock was only worth $324.61 per share, the price at close on October 22, 2021, and thus the Company overpaid for its own stock by more than $1.4 billion.

16. The misconduct described herein which has subjected Facebook to multiple federal securities fraud class action lawsuits pending in federal district court in California (the "Securities Class Actions") including a suit initiated by the Ohio Attorney General against the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its President of Global Affairs. The misconduct has further subjected Facebook to the need to address the Platform Content Misconduct, undertake internal investigations, and implement adequate internal controls over its financial reporting. Furthermore, the misconduct has caused Facebook to suffer the losses from the waste of corporate assets and suffer the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein. As a result of the foregoing, the Company will have to expend many millions of dollars.

Verified Shareholder Derivative Complaint

17. In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of Facebook, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Facebook's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on Facebook's behalf with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

19. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. Moreover, Facebook is headquartered in this District.

## PARTIES

23. Plaintiff is a current shareholder of Facebook common stock. Plaintiff has continuously held Facebook common stock at all relevant times.

24. Facebook is incorporated in Delaware and maintains principal executive offices at 1601

Verified Shareholder Derivative Complaint

Willow Road, Menlo Park, CA 94025. The Company's shares trade on the Nasdaq Global Select Market under the ticker symbol "FB."

25. Defendant Zuckerberg founded Facebook in 2004 and has served as the Company's CEO since that time. Since 2012, he has also served as the Board's Chairman. According to the Company's Schedule 14A filed with the SEC on April 9, 2021 (the "2021 Proxy Statement"), as of March 31, 2021, Defendant Zuckerberg beneficially owned 2,770,698 shares of the Company's Class A common stock and 359,924,464 shares of the Company's Class B common stock.[1] As of that date he also had voting control over an additional 32,595,276 shares of the Company's Class B common stock. Thus, Defendant Zuckerberg has 57.7% of the Company's total voting power, making him the Company's controlling shareholder. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Zuckerberg received $25,288,265 in total compensation from the Company. For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), he received $23,415,973 in total compensation from the Company. For the fiscal year ended December 31, 2018 (the "2018 Fiscal Year"), he received $22,554,543 in total compensation from the Company. For the fiscal year ended December 31, 2017 (the "2017 Fiscal Year"), he received $8,852,366 in total compensation from the Company. For the fiscal year ended December 31, 2016 (the "2016 Fiscal Year"), he received $5,765,832 in total compensation from the Company. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, he made the following sales of Facebook stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| April 29, 2021 | 68,000 | $326.62 | $22,210,364 |
| April 30, 2021 | 68,000 | $327.17 | $22,247,220 |
| May 3, 2021 | 68,000 | $325.46 | $22,131,008 |
| May 26, 2021 | 52,700 | $327.94 | $17,282,385 |
| May 27, 2021 | 77,300 | $330.36 | $25,536,673 |
| June 2, 2021 | 63,105 | $329.64 | $20,801,679 |
| June 4, 2021 | 77,300 | $329.30 | $25,455,199 |

---

[1] Holders of Class B common stock are entitled to ten votes per share, and holders of Class A common stock are entitled to one vote per share. Generally, Class B common stock automatically converts into Class A common stock if transferred, including through an arms-length sale. Thus Class B common stock is treated the same as Class A common stock for the purpose of calculating the values described herein.

Verified Shareholder Derivative Complaint

| June 8, 2021 | 77,300 | $335.36 | $25,923,173 |
|---|---|---|---|
| June 9, 2021 | 77,300 | $333.42 | $25,773,056 |
| June 10, 2021 | 77,300 | $331.63 | $25,634,689 |
| June 11, 2021 | 77,300 | $331.11 | $25,594,725 |
| June 14, 2021 | 77,300 | $333.69 | $25,794,005 |
| June 15, 2021 | 77,300 | $337.73 | $26,106,838 |
| June 16, 2021 | 77,300 | $333.21 | $25,757,287 |
| June 17, 2021 | 77,300 | $334.32 | $25,842,626 |
| June 21, 2021 | 77,300 | $330.42 | $25,541,234 |
| June 22, 2021 | 77,300 | $336.25 | $25,992,202 |
| June 24, 2021 | 77,300 | $343.48 | $26,551,158 |
| June 25, 2021 | 77,300 | $341.99 | $26,436,058 |
| July 1, 2021 | 77,300 | $350.82 | $27,118,231 |
| July 2, 2021 | 77,300 | $354.68 | $27,416,609 |
| July 6, 2021 | 77,300 | $354.04 | $27,367,369 |
| July 7, 2021 | 77,300 | $353.47 | $27,323,153 |
| July 8, 2021 | 77,300 | $345.64 | $26,717,662 |
| July 9, 2021 | 77,300 | $348.28 | $26,922,121 |
| July 12, 2021 | 77,300 | $352.37 | $27,237,969 |
| July 13, 2021 | 77,300 | $352.31 | $27,233,717 |
| July 14, 2021 | 77,300 | $350.92 | $27,125,806 |
| July 15, 2021 | 77,300 | $344.46 | $26,627,144 |
| July 16, 2021 | 77,300 | $343.15 | $26,525,649 |
| July 19, 2021 | 77,300 | $337.46 | $26,086,044 |
| July 20, 2021 | 77,300 | $339.27 | $26,225,339 |
| July 21, 2021 | 77,300 | $344.19 | $26,605,655 |
| July 22, 2021 | 77,300 | $348.53 | $26,941,446 |
| July 23, 2021 | 6,300 | $366.67 | $2,310,027 |
| July 23, 2021 | 56,000 | $366.76 | $20,538,840 |
| July 23, 2021 | 15,000 | $366.22 | $5,493,300 |
| July 26, 2021 | 77,300 | $371.77 | $28,738,207 |
| July 27, 2021 | 77,300 | $368.96 | $28,520,839 |
| July 28, 2021 | 77,300 | $372.33 | $28,781,418 |
| July 29, 2021 | 77,300 | $361.00 | $27,905,454 |
| July 30, 2021 | 77,300 | $357.20 | $27,611,714 |
| August 2, 2021 | 77,300 | $354.88 | $27,431,992 |
| August 3, 2021 | 77,300 | $350.60 | $27,101,380 |
| August 4, 2021 | 77,300 | $356.21 | $27,534,878 |
| August 5, 2021 | 77,300 | $360.61 | $27,875,153 |
| August 6, 2021 | 77,300 | $363.48 | $28,097,004 |
| August 9, 2021 | 77,300 | $363.33 | $28,085,640 |
| August 10, 2021 | 77,300 | $361.90 | $27,974,715 |
| August 11, 2021 | 77,300 | $360.19 | $27,842,377 |
| August 12, 2021 | 77,300 | $360.41 | $27,860,002 |
| August 13, 2021 | 77,300 | $363.15 | $28,071,881 |
| August 16, 2021 | 77,300 | $362.38 | $28,012,205 |

8

Verified Shareholder Derivative Complaint

| August 17, 2021 | 77,300 | $360.15 | $27,839,672 |
| August 18, 2021 | 77,300 | $357.81 | $27,658,635 |
| August 19, 2021 | 77,300 | $354.77 | $27,423,875 |
| August 20, 2021 | 77,300 | $357.41 | $27,627,715 |
| August 23, 2021 | 77,300 | $362.51 | $28,022,023 |
| August 24, 2021 | 77,300 | $365.35 | $28,241,477 |
| August 25, 2021 | 77,300 | $368.33 | $28,471,831 |
| August 26, 2021 | 77,300 | $366.94 | $28,364,462 |
| August 27, 2021 | 77,300 | $369.60 | $28,570,389 |
| August 30, 2021 | 6,300 | $376.28 | $2,370,582 |
| August 30, 2021 | 71,000 | $376.14 | $26,706,152 |
| August 31, 2021 | 77,300 | $380.74 | $29,431,202 |
| September 1, 2021 | 77,300 | $381.94 | $29,523,730 |
| September 2, 2021 | 77,300 | $377.69 | $29,195,668 |
| September 3, 2021 | 77,300 | $375.28 | $29,009,221 |
| September 7, 2021 | 77,300 | $378.47 | $29,255,499 |
| September 8, 2021 | 77,300 | $377.96 | $29,216,230 |
| September 9, 2021 | 77,300 | $378.31 | $29,243,363 |
| September 10, 2021 | 77,300 | $380.96 | $29,447,898 |
| September 13, 2021 | 77,300 | $377.70 | $29,196,519 |
| September 14, 2021 | 77,300 | $377.21 | $29,158,333 |
| September 15, 2021 | 77,300 | $372.59 | $28,801,052 |
| September 16, 2021 | 77,300 | $371.85 | $28,744,159 |
| September 17, 2021 | 77,300 | $366.49 | $28,329,754 |
| September 20, 2021 | 71,000 | $355.46 | $25,237,731 |
| September 20, 2021 | 6,300 | $354.99 | $2,236,437 |
| September 21, 2021 | 77,300 | $357.95 | $27,669,457 |
| September 22, 2021 | 77,300 | $345.12 | $26,677,853 |
| September 23, 2021 | 77,300 | $346.48 | $26,783,135 |
| September 24, 2021 | 6,300 | $348.95 | $2,198,403 |
| September 24, 2021 | 71,000 | $349.22 | $24,794,904 |
| September 27, 2021 | 77,300 | $351.24 | $27,150,542 |
| September 28, 2021 | 77,300 | $344.17 | $26,604,109 |
| September 29, 2021 | 77,300 | $342.21 | $26,452,987 |
| September 30, 2021 | 77,300 | $340.76 | $26,341,134 |
| October 1, 2021 | 77,300 | $342.11 | $26,445,180 |
| October 4, 2021 | 54,504 | $329.35 | $17,951,110 |
| October 4, 2021 | 4,800 | $329.36 | $1,580,913 |
| October 5, 2021 | 77,300 | $331.28 | $25,607,943 |
| October 6, 2021 | 77,300 | $330.51 | $25,548,345 |
| October 7, 2021 | 75,761 | $333.91 | $25,297,128 |
| October 8, 2021 | 77,193 | $331.45 | $25,585,465 |
| October 11, 2021 | 57,750 | $328.16 | $18,951,066 |
| October 13, 2021 | 52,700 | $325.02 | $17,128,817 |
| October 14, 2021 | 52,900 | $328.73 | $17,389,869 |
| October 15, 2021 | 52,700 | $325.89 | $17,174,350 |

Verified Shareholder Derivative Complaint

| October 18, 2021 | 77,300 | $332.17 | $25,676,431 |
| October 19, 2021 | 77,300 | $339.60 | $26,251,157 |
| October 20, 2021 | 77,300 | $341.67 | $26,411,322 |
| October 21, 2021 | 77,300 | $340.05 | $26,286,019 |

Thus, prior to the exposure of the fraud, he sold 7,318,613 shares of Facebook at artificially inflated prices on inside information, and received approximately $2.57 billion. His insider sales demonstrate his motive in facilitating and participating in the scheme.

26. Defendant Wehner has served as the Company's CFO since June 2014. Defendant Wehner received $16,141,237 in total compensation from the Company for the 2020 Fiscal Year. He received $21,334,036 in total compensation from the Company for the 2019 Fiscal Year. He received $19,686,113 in total compensation from the Company for the 2018 Fiscal Year. He received $22,426,287 in total compensation from the Company for the 2017 Fiscal Year. He received $16,544,275 in total compensation from the Company for the 2016 Fiscal Year. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Wehner made the following sales of Company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| April 29, 2021 | 16,000 | $330.10 | $5,281,600 |
| August 15, 2021 | 1,545 | $363.18 | $561,113 |
| August 18, 2021 | 9,607 | $356.10 | $3,421,052 |

Thus, prior to the exposure of the fraud, he sold 27,152 Company shares at artificially inflated prices on inside information, and received approximately $9.3 million. His insider sales demonstrate his motive in facilitating and participating in the scheme.

27. Defendant Clegg served as the Company's Vice President of Global Affairs and Communications from October 2018 until February 2022. On Wednesday February 6, 2022, Defendant Clegg was promoted to serve as the Company's President of Global Affairs.

28. Defendant Alford has served as a Company director since May 2019. She also serves as a member on the Audit & Risk Oversight Committee and the Privacy Committee. Defendant Alford received $528,053 in total compensation from the Company for the 2020 Fiscal Year, and received $334,317 in total compensation from the Company for the 2019 Fiscal Year.

29. Defendant Andreessen has served as a Company director since June 2008. He also serves

as a member of the Compensation, Nominating & Governance Committee. Defendant Andreessen received $392,245 in total compensation from the Company for the 2020 Fiscal Year. He received $374,873 in total compensation from the Company for the 2019 Fiscal Year. He received $391,194 in total compensation from the Company for the 2018 Fiscal Year. He received $369,151 in total compensation from the Company for the 2017 Fiscal Year, and he received $386,006 in total compensation from the Company for the 2016 Fiscal Year.

30. Defendant Bowles served as a Company director from September 2011 until May 2019. He received $29,167 in total compensation from the Company for the 2019 Fiscal Year. He received $421,194 in total compensation from the Company for the 2018 Fiscal Year. He received $399,151 in total compensation from the Company for the 2017 Fiscal Year. He received $416,006 in total compensation from the Company for the 2016 Fiscal Year.

31. Defendant Desmond-Hellmann served as a Company director from March 2013 until October 2019. She received $397,373 in total compensation from the Company for the 2019 Fiscal Year. She received $428,194 in total compensation from the Company for the 2018 Fiscal Year. She received $369,151 in total compensation from the Company for the 2017 Fiscal Year. She received $386,006 in total compensation from the Company for the 2016 Fiscal Year.

32. Defendant Hastings served as a Company director from June 2011 until May 2019. Defendant Hastings received $20,833 in total compensation from the Company for the 2019 Fiscal Year. He received $371,194 in total compensation from the Company for the 2018 Fiscal Year. He received $349,151 in total compensation from the Company for the 2017 Fiscal Year. He received $346,006 in total compensation from the Company for the 2016 Fiscal Year.

33. Defendant Houston has served as a Company director since February 2020. He also serves as a member of the Compensation, Nominating & Governance Committee. Defendant Houston received $1,646,537 in total compensation from the Company for the 2020 Fiscal Year.

34. Defendant Killefer has served as a Company director since March 2020. She also serves as Chair of the Privacy Committee and a member of the Audit & Risk Oversight Committee. Defendant Killefer received $1,663,290 in total compensation from the Company for the 2020 Fiscal Year.

Verified Shareholder Derivative Complaint

35.     Defendant Kimmitt has served as a Company director since March 2020. He is the Board's Lead Independent Director and is also a member of the Privacy Committee. Defendant Kimmitt received $1,749,309 in total compensation from the Company for the 2020 Fiscal Year.

36.     Defendant Sandberg has served as the Company's Chief Operating Officer ("COO") since March 2008 and has been a director since June 2012. Defendant Sandberg received $24,754,004 in total compensation from the Company for the 2020 Fiscal Year. She received $27,144,147 in total compensation from the Company for the 2019 Fiscal Year. She received $23,728,148 in total compensation from the Company for the 2018 Fiscal Year. She received $25,196,221 in total compensation from the Company for the 2017 Fiscal Year. She received $24,549,457 in total compensation from the Company for the 2016 Fiscal Year.

37.     Defendant Thiel has served as a Company director since April 2005. He also serves as Chair of the Compensation, Nominating & Governance Committee, and has notified the Company that he will not stand for re-election to the Board at the Company's 2022 Annual Meeting of Shareholders. Defendant Thiel received $372,245 in total compensation from the Company for the 2020 Fiscal Year. He received $354,873 in total compensation from the Company for the 2019 Fiscal Year. He received $371,194 in total compensation from the Company for the 2018 Fiscal Year. He received $349,151 in total compensation from the Company for the 2017 Fiscal Year. He received $346,006 in total compensation from the Company for the 2016 Fiscal Year.

38.     Defendant Travis has served as a Company director since March 2020. She also serves as Chair of the Audit & Risk Oversight Committee. Defendant Travis received $1,677,488 in total compensation from the Company for the 2020 Fiscal Year.

## SUBSTANTIVE ALLEGATIONS

### Background

39.     Facebook is incorporated in Delaware and maintains its headquarters in Menlo Park, California. The Company's products include the eponymously named Facebook, which is one of the world's most heavily used social media platforms. The Company's products also include Instagram, an app for sharing photos. Further, the Company also maintains Facebook Messenger and WhatsApp, which

are apps that enable users to send one another messages.

40. The Company generates revenue primarily by selling digital advertisement placements to purchasers who are interested in advertising to users of the Company's products. The Company collects data about its users, which advertisers find useful and which giver advertisers the ability to specifically target demographics of their choosing when purchasing ads. The Company uses the same data to distribute content to users, and its algorithms make determinations as to how and whether users may respond to certain content.

41. During the Relevant Period, the Individual Defendants caused Facebook to tout to the public that it undertook great efforts to adequately moderate content. The Company represented that such efforts included the prompt removal of content that is illegal and/or harmful, as well as any content that violates or is otherwise contrary to the Company's policies. Facebook further represented that it maintained a commitment to keeping users safe and that it applied its content policies uniformly across its wide-ranging user base. In addition, the Company, in reporting on certain user metrics, represented that in the United States and other "developed markets," the prevalence of fake and duplicate accounts, which could distort user metrics, was low.

### False and Misleading Statements

42. On November 3, 2016, Facebook filed a Form 10-Q with the SEC for the quarter ended September 30, 2016 (the "3Q2016 10-Q"). Defendant Wehner signed the 3Q2016 10-Q, which contained certifications, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Zuckerberg and Wehner, attesting to the accuracy of the financial statements contained in the 3Q2016 10-Q, the disclosure of any material changes to Facebook's internal controls, and the disclosure of any fraud committed by Facebook, or its officers or directors.

43. In the 3Q2016 10-Q, the Company represented that the amount of its monthly active users ("MAUs") in the United States and Canada increased from 199 million to 229 million from September 30, 2013 to September 30, 2016. In addition, the 3Q2016 10-Q represented that the number of MAUs in Europe increased from 276 million to 342 million from September 30, 2013 to September 30, 2016.

44. Furthermore, the 3Q2016 10-Q stated that Facebook "believe[s] *the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom* and higher in developing markets such as India and Turkey." (Emphasis added.)

45. On February 2, 2017, Facebook filed its annual report for the 2016 Fiscal Year on Form 10-K with the SEC (the "2016 10-K"). Defendants Zuckerberg, Wehner, Andreessen, Bowles, Desmond-Hellmann, Hastings, Sandberg, and Thiel signed the 2016 10-K, which contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the 2016 10-K's financial statements, the disclosure of any material changes to Facebook's internal controls, and the disclosure of any fraud committed by Facebook, or its officers or directors.

46. In the 2016 10-K, the Company stated that the number of its MAUs in the United States and Canada increased from 201 million to 231 million from December 31, 2013 to December 31, 2016. In addition, the Company stated in the 2016 10-K that the number of MAUs in Europe increased from 282 million to 349 million from December 31, 2013 to December 31, 2016.

47. The 2016 10-K repeated the claim that the Company "believe[s] *the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom* and higher in developing markets such as India and Turkey." (Emphasis added.)

48. On February 1, 2018, the Company filed its annual report for the 2017 Fiscal Year on Form 10-K with the SEC (the "2017 10-K"). Defendants Zuckerberg, Wehner, Andreessen, Bowles, Desmond-Hellmann, Hastings, Sandberg, and Thiel signed the 2017 10-K, which contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the 2017 10-K's financial statements, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by Facebook, or its officers or directors.

49. In the 2017 10-K, the Company stated that the number of its MAUs in the United States and Canada grew from 231 million to 239 million from December 31, 2016 to December 31, 2017. In addition, the 2017 10-K represented that the number of MAUs in Europe grew from 349 million to 370

million from December 31, 2016 to December 31, 2017.

50. Like the 3Q2016 10-K, the 2017 10-K stated that the Company "believe[s] *the percentage of duplicate accounts is meaningfully higher in developing markets* such as India, Indonesia, and the Philippines, *as compared to more developed markets.*" (Emphasis added.)

51. On July 16, 2018, Facebook issued a statement via its website with the title, "Working to Keep Facebook Safe." The statement read as follows, in pertinent part:

> *It has been suggested that turning a blind eye to bad content is in our commercial interests. This is not true.* Creating a safe environment where people from all over the world can share and connect is core to Facebook's long-term success.
>
>       \*        \*        \*
>
> How We Create and Enforce Our Policies
>
> More than 1.4 billion people use Facebook every day from all around the world. They post in dozens of different languages: everything from photos and status updates to live videos. Deciding what stays up and what comes down involves hard judgment calls on complex issues — from bullying and hate speech to terrorism and war crimes. *It's why we developed our Community Standards with input from outside experts* — including academics, NGOs and lawyers from around the world. We hosted three Facebook Forums in Europe in May, where we were able to hear from human rights and free speech advocates, as well as counter-terrorism and child safety experts.
>
> These Community Standards have been publicly available for many years, and this year, for the first time, *we published the more detailed internal guidelines used by our review teams to enforce them.*
>
>       \*        \*        \*
>
> Reviewing reports quickly and accurately is essential to keeping people safe on Facebook. This is why we're doubling the number of people working on our safety and security teams this year to 20,000. This includes over 7,500 content reviewers. *We're also investing heavily in new technology to help deal with problematic content on Facebook more effectively. For example, we now use technology to assist in sending reports to reviewers with the right expertise, to cut out duplicate reports, and to help detect and remove terrorist propaganda and child sexual abuse images before they've even been reported.*

(Emphasis added.)

52. On July 17, 2018, Facebook updated the statement to include the following language, in pertinent part:

> Cross Check
> *We want to make clear that we remove content from Facebook, no matter who posts it, when it violates our standards. There are no special protections for any group — whether on the right or the left. 'Cross Check' — the system described in Dispatches — simply means that some content from certain Pages or Profiles is given a second layer of review*

15
Verified Shareholder Derivative Complaint

*to make sure we've applied our policies correctly.*

***This typically applies to high profile, regularly visited Pages or pieces of content on Facebook so that they are not mistakenly removed or left up.*** Many media organizations' Pages — from Channel 4 to The BBC and The Verge — are cross checked. We may also Cross Check reports on content posted by celebrities, governments, or Pages where we have made mistakes in the past. For example, we have Cross Checked an American civil rights activist's account to avoid mistakenly deleting instances of him raising awareness of hate speech he was encountering.

***To be clear, Cross Checking something on Facebook does not protect the profile, Page or content from being removed. It is simply done to make sure our decision is correct.***

\* \* \*

Minors

***We do not allow people under 13 to have a Facebook account.*** If someone is [sic] reported to us as being under 13, the reviewer will look at the content on their profile (text and photos) to try to ascertain their age. If they believe the person is under 13, the account will be put on a hold and the person will not be able to use Facebook until they provide proof of their age. Since the program, we have been working to update the guidance for reviewers to put a hold on any account they encounter if they have a strong indication it is underage, even if the report was for something else.

(Emphasis added.)

53. On January 31, 2019, the Company filed its annual report for the 2018 Fiscal Year on Form 10-K with the SEC (the "2018 10-K"). Defendants Zuckerberg, Wehner, Andreessen, Bowles, Desmond-Hellmann, Hastings, Sandberg, and Thiel signed the 2018 10-K, which contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the 2018 10-K's financial statements, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by Facebook, or its officers or directors.

54. In the 2018 10-K, the Company stated that the number of its MAUs in the United States and Canada increased from 239 million to 242 million from December 31, 2017 to December 31, 2018. In the 2018 10-K, the Company represented that the number of MAUs in Europe increased from 370 million to 381 million from December 31, 2017 to December 31, 2018.

55. Like earlier SEC filings, the 2018 10-K repeated the claim that the Company "believe[s] ***the percentage of duplicate accounts is meaningfully higher in developing markets*** such as the Philippines and Vietnam, ***as compared to more developed markets.***" (Emphasis added.)

56. The statements referenced in ¶¶ 42–55 were materially false and misleading, and failed to

16

Verified Shareholder Derivative Complaint

disclose material facts necessary to render statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was engaged in the Platform Content Misconduct, which included enabling criminal activity, harming users, inconsistently and unevenly applying policies concerning content moderation, and targeting children despite knowing of the harms posed to them by the Company's products; (2) the Company was not seeking to remediate the Platform Content Misconduct, despite being aware of such misconduct; (3) Facebook was disclosing user metrics it knew to be inflated due to duplicate and fake accounts; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

57. On April 12, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Zuckerberg, Sandberg, Andreessen, Bowles, Desmond-Hellman, Hastings, and Thiel solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act.

58. The 2019 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Alford, Andreessen, Desmond-Hellmann, Sandberg, Thiel, and Zuckerberg to the Board; (2) ratify the appointment of Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm for the 2019 Fiscal Year; (3) approve on an advisory basis the compensation of the Company's named executive officers; (4) choose on a non-binding basis the frequency of future non-binding advisory votes on executive compensation, with the Board supporting a frequency period of every three years; and (5) consider eight proposals by Facebook stockholders, with each proposal seeking to implement certain corporate governance reforms and with each proposal being opposed by Facebook, including one proposal requiring Facebook to "publish a report . . . ***evaluating its strategies and policies on content governance, including the extent to which they address human rights abuses and threats to democracy and freedom of expression, and the reputational, regulatory, and financial risks posed by content governance controversies***." (Emphasis added.)

59. The 2019 Proxy Statement contained the following statement concerning performance-based compensation of the Company's named executive officers:

> *2018 Priorities and Company Performance Percentage.* ***Our First Half 2018 and Second Half 2018 company priorities as approved by the compensation & governance committee***

17

Verified Shareholder Derivative Complaint

*were as follows: grow our user base across all our products*; increase sharing, engagement, and meaningful interactions; continue to achieve revenue growth and significant savings from efficiency; improve product quality; *improve security for our community; improve our brand*; and make progress toward our long-term investments. *None of these priorities were assigned any specific weighting or dollar amount of the target bonus. The compensation & governance committee exercised its discretion in determining the company performance percentage* for our First Half 2018 and Second Half 2018 performance after taking into account our delivery of results in the areas identified by the company priorities, as well as our overall business, engineering, and product development achievements.

*The First Half 2018 company performance* percentage approved by the compensation & governance committee *was 90%. In making this determination, the compensation & governance committee focused on* our performance across all of the areas identified by the company priorities, with a particular focus on *user growth and engagement*, revenue growth, and brand in the First Half 2018, *and also noted our significant investments in safety and security for our community.*

(Emphasis added.)

60.     The 2019 Proxy Statement stated regarding the Company's Code of Conduct that Facebook's "code of conduct provides guidelines for business conduct and applies to members of our board of directors, our executive officers, employees, contractors, consultants, and others working on our behalf." The 2019 Proxy Statement also stated that the Company would "satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our code of conduct by posting such information on our website at the address specified above."

61.     The 2019 Proxy statement stated the following regarding the Board's role in risk oversight:

Our board of directors as a whole has responsibility for overseeing our risk management and believes that a thorough and strategic approach to risk oversight is critical. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by regular reports from our management team, including senior personnel that lead a variety of functions across the business, and from our internal audit department, as well as input from external advisors, as appropriate. These reports are designed to provide timely visibility to the board of directors and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit & risk oversight committee has responsibility for overseeing certain of our major risk exposures, including in the areas of financial and enterprise risk, legal and regulatory compliance, privacy and data use, community safety and security, and cybersecurity, as well as risks in other areas

18

Verified Shareholder Derivative Complaint

as our audit & risk oversight committee deems necessary or appropriate from time to time. Our audit & risk oversight committee also oversees the steps we have taken to monitor or mitigate these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Our board of directors also may exercise direct oversight with respect to these areas in its discretion. In addition, our audit & risk oversight committee oversees our internal audit function. Our compensation & governance committee evaluates risks arising from our corporate governance and compensation policies and practices, as more fully described in "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment," and oversees succession planning for certain key executives other than the CEO. The audit & risk oversight committee and the compensation & governance committee provide reports to the full board of directors regarding these and other matters.

62.     In opposing the shareholder proposal described above that called for a "Content Governance Report," the 2019 Proxy Statement stated as follows:

> We believe that implementing ***the proposal is unnecessary because our current disclosures provide transparency and detail regarding both our policies around content governance and our progress on enforcing those policies.***
>
> ***Our Community Standards help us prevent real world harm and ensure that people feel safe in our community.*** We publicize these standards to help people understand our policies and what type of content is allowed on Facebook (*https://www.facebook.com/communitystandards*). In April 2018, for the first time, we published our internal guidelines that our teams use to enforce our Community Standards (*https://newsroom.fb.com/news/2018/04/comprehensive-community-standards*). In November 2018, our Chairman and CEO, Mark Zuckerberg, published an in-depth note on content governance and enforcement (*https://www.facebook.com/notes/mark-zuckerberg/a-blueprint-for-content-governance-and-enforcement/10156443129621634*).
>
> In May 2018, we released our first-ever Community Standards Enforcement Report to track our progress on enforcing our content policies. In this twice-annual report, we disclose the prevalence of violating content, the amount of content we take action on, and the amount of content we find proactively before people report it (*https://transparency.facebook.com/community-standards-enforcement*). For example, in November 2018, we disclosed that we removed more than 1.2 billion pieces of content for violating our spam policies in the third quarter of 2018. We also disclosed that 99% of terrorist content that we remove, and 96% of the content we remove for nudity, is identified by our systems before anyone reports it. Our broader Transparency Report also includes information on intellectual property infringement, legal and government requests for account data, and internet disruptions (*https://transparency.facebook.com*). We plan to hold conference calls with media after we issue each such report and, by 2020, we expect to publish our enforcement reports quarterly.
>
> We communicate updates and improvements to our Community Standards in our Newsroom, and in 2017, we launched our Hard Questions blog to further enhance transparency and provide detail on how we address complex issues facing our platform (*https://newsroom.fb.com/news/category/hard-questions*). Past posts have covered

19

Verified Shareholder Derivative Complaint

terrorism, hate speech, and our content review process. We continue to invite questions on topics we should address via hardquestions@fb.com.

*We also regularly disclose risks and developments relating to content management matters* in our financial reporting and filings with the SEC, including in the "Risk Factors" section of our quarterly and annual reports filed with the SEC.

In addition, our stockholders rejected a substantially similar proposal at our annual meeting of stockholders in 2018.

*Given the breadth of our previous disclosures concerning our content policies, and our intent to continue to provide transparency around our policies*, our board of directors believes that the preparation of the report contemplated by this proposal is unnecessary and not beneficial to our stockholders. Therefore, our board of directors recommends that our stockholders vote against this proposal.

(Emphasis added.)

63. Defendants Zuckerberg, Sandberg, Andreessen, Bowles, Desmond-Hellman, Hastings, and Thiel caused the 2019 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 59–61. Specifically, they failed to disclose that: (1) though Facebook claimed to take growth in its user base and safety and security improvements in determining performance-based executive compensation, this was untrue because executives received large performance-based awards despite the Platform Content Misconduct and despite that numerous fake and duplicate accounts had inflated MAU growth; (2) though Facebook claimed its officers and directors complied with the Code of Conduct and that waivers of the policy would be disclosed, the Individual Defendants violated the Code of Conduct either without having received waivers or without waivers being publicly disclosed; and (3) the Company's Board and its committees were not properly exercising their risk oversight functions, as evidenced by the wrongdoing described herein, which involved Company directors.

64. The 2019 Proxy Statement was also materially false and misleading with regard to the statement in ¶ 62. Specifically, the Individual Defendants failed to disclose material facts necessary render the statement made not false and misleading, such as, *inter alia*, that: (1) the Company was engaged in the Platform Content Misconduct, which included enabling criminal activity, harming users, inconsistently and unevenly applying policies concerning content moderation, and targeting children despite knowing of the harms posed to them by the Company's products; (2) the Company was not seeking to remediate the Platform Content Misconduct, despite being aware of such misconduct; and (3) the

20

Verified Shareholder Derivative Complaint

Company failed to maintain internal controls.

65. Due to the actions of Defendants Zuckerberg, Sandberg, Andreessen, Bowles, Desmond-Hellman, Hastings, and Thiel in causing the 2019 Proxy Statement to be materially false and misleading, Facebook shareholders voted, *inter alia*, to: (1) elect Defendants Alford, Andreessen, Desmond-Hellmann, Sandberg, Thiel, and Zuckerberg to the Board, allowing them to continue or begin breaching their fiduciary duties to the Company; (2) approve on a non-binding basis the compensation of the Company's named executive officers, including Defendants Zuckerberg, Wehner, and Sandberg; (3) decide on a non-binding basis that future non-binding advisory votes on the compensation of the Company's executives should occur every three years, which reduced the ability of shareholders to raise concerns regarding executives who had breached and/or were breaching their fiduciary duties; and (4) to reject eight shareholder proposals, including one which would have required Facebook to publish a "Content Governance Report" that would have required Facebook to confront the issues central to the Platform Content Misconduct. Thus, due to the 2019 Proxy Statement's false and misleading aspects, the Platform Content Misconduct continued and remained undisclosed until Frances Haugen stepped forwarded.

66. On January 30, 2020, Facebook filed its annual report for the 2019 Fiscal Year on Form 10-K with the SEC (the "2019 10-K"). Defendants Zuckerberg, Wehner, Alford, Andreessen, Sandberg, and Thiel signed the 2019 10-K, which contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the 2019 10-K's financial statements, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by Facebook, or its officers or directors.

67. In the 2019 10-K, the Company stated that the number of its MAUs in the United States and Canada increased from 242 million to 248 million from December 31, 2018 to December 31, 2019. In addition, the 2019 10-K stated that the number of MAUs in Europe increased from 381 million to 394 million from December 31, 2018 to December 31, 2019.

68. The 2019 10-K repeated the claim made in earlier SEC filings that the Company "believe[s] *the percentage of duplicate accounts is meaningfully higher in developing markets* such as

21

Verified Shareholder Derivative Complaint

the Philippines and Vietnam, *as compared to more developed markets.*" (Emphasis added.)

69. The statements referenced in ¶¶ 66–68 were materially false and misleading, and they failed to disclose material facts necessary to render the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Facebook was disclosing user metrics it knew were inflated by duplicate and fake accounts; and (2) Facebook failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

70. On April 10, 2020, the Company filed a proxy statement ("2020 Proxy Statement") with the SEC. Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act.

71. The 2020 Proxy Statement called for Facebook shareholders to vote to, *inter alia*: (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board; (2) ratify the appointment of EY as Facebook's independent registered public accounting firm for the 2020 Fiscal Year; (3) approve a director compensation policy for non-employee directors; and (4) consider eight shareholder proposals, all of which sought to implement certain corporate governance reforms and were opposed by Facebook, including (a) a proposal requiring the Company to add a "human/civil rights" expert to the Board, submitted by shareholders who "believe Facebook requires expert, board level oversight of civil and human rights issues to assess risk and develop strategy to avoid causing or contributing to widespread violations of human or civil rights," (b) a proposal requiring the Company to publish a report on risk related to civil and human rights, given that "[t]argeted advertising associated with civil and human rights violations presents financial, legal and reputational risk" and that "Facebook paid $5 million to settle civil rights lawsuits claiming Facebook's advertising systems excluded people from seeing housing, employment and credit ads based on age, gender and race," and (c) a proposal requiring Facebook to publish a report about child sexual exploitation on Facebook's platforms given that, although "Facebook has hired content moderators, has some policies and partnerships, and has implemented some practices and investments in technology to tackle child sex exploitation through its businesses . . . such activities have not significantly reduced the volume of [Child Sexual Abuse Material

("CSAM")] or children being sexually exploited."

72.     As applicable to first half and second half 2019 executive performance-based compensation, the 2020 Proxy Statement listed the following factors related to "2019 Priorities and Company Performance Percentage":

- ***continue making progress on the major social issues*** facing the Internet and our company
- ***build new experiences that meaningfully improve people's lives*** today and set the stage for even bigger improvements in the future;
- keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs; and
- ***communicate more transparently*** about what we're doing and the role our services play in the world.

(Emphasis added.) Notably, and despite the occurrence of the Platform Content Misconduct, the Compensation, Nominating & Governance Committee approved a company performance percentage of ***110%*** based on these factors.

73.     Regarding the Code of Conduct, the 2020 Proxy Statement stated that the Company's "code of conduct provides guidelines for business conduct and applies to members of our board of directors, our executive officers, employees, contractors, consultants, and others working on our behalf." It also stated that Facebook would "satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our code of conduct by posting such information on our website at the address specified above."

74.     The 2020 Proxy Statement stated the following regarding the Board's role in risk oversight:
Our board of directors as a whole has responsibility for overseeing our risk management and believes that a thorough and strategic approach to risk oversight is critical. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by regular reports from our management team, including senior personnel that lead a variety of functions across the business, and from our internal audit department, as well as input from external advisors, as appropriate. These reports are designed to provide timely visibility to the board of directors and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit & risk oversight committee has responsibility for overseeing certain of our major risk exposures, including

23
Verified Shareholder Derivative Complaint

in the areas of financial and enterprise risk, legal and regulatory compliance, privacy and data use, community safety and security, and cybersecurity, as well as risks in other areas as our audit & risk oversight committee deems necessary or appropriate from time to time. Our audit & risk oversight committee also oversees the steps we have taken to monitor or mitigate these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Our board of directors also may exercise direct oversight with respect to these areas or delegate such oversight to committees in its discretion. For example, the special committee of the board formed in connection with our negotiations with the FTC assisted in oversight of the implementation of the requirements of the consent order we entered into with the FTC, including the oversight of certain risks related to privacy and data use. In addition, our audit & risk oversight committee oversees our internal audit function. Our compensation, nominating & governance committee evaluates risks arising from our corporate governance and compensation policies and practices, as more fully described in the section of this proxy statement entitled "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment," and oversees succession planning for certain key executives other than the CEO. Each of these committees provide reports to the full board of directors regarding these and other matters.

75. In opposing the shareholder proposal detailed above that called for an expert in civil/human rights to be added to the Board, the 2020 Proxy Statement stated: "In September 2019, *we expanded the values that serve as the basis for Facebook's Community Standards to focus on authenticity, safety, privacy, and dignity*. *Our Community Standards are built around our commitment to voice and free expression*, and we look to international human rights standards when making judgments about content on our platform." In addition, the 2020 Proxy Statement further stated as follows:

*In addition, in 2019, we created and institutionalized a Civil Rights Task Force. The Task Force meets monthly for the purpose of surfacing, discussing, and addressing civil rights issues.* Its membership includes senior leaders at Facebook who are issue experts in areas such as content policy, fairness in artificial intelligence, and elections, along with C-suite and other key executives at Facebook. *We are working to onboard strong civil rights expertise to support the work of the Task Force across a range of issues, and to support our company's ongoing civil rights engagement.*

(Emphasis added.)

76. In opposing the shareholder proposal that called for Facebook to issue a report on civil/human rights, the 2020 Proxy Statement stated as follows: "We believe that implementing this proposal is unnecessary because *we have policies and practices addressing civil and human rights risks and issues impacting Facebook's community of global users and made significant progress over the last year on our path forward* around human rights and civil rights leadership."

77. In opposing the shareholder proposal described above that called for Facebook to issue a

24

Verified Shareholder Derivative Complaint

report on child exploitation, the 2020 Proxy Statement stated as follows:

> ***We fundamentally do not allow content or behavior on our services that puts the safety of children at risk.*** Our Community Standards ban child exploitation and to help avoid even the potential for abuse, we take action on certain kinds of nonsexual child nudity content, as well. ***We have industry-leading efforts in a number of areas to address these issues.***
>
> ***For years we have been tackling the issue of child exploitative imagery*** with advanced technologies, industry collaboration through the Technology Coalition, and partnerships with child safety NGOs like the National Center for Missing and Exploited Children (NCMEC), Thorn, the Internet Watch Foundation (IWF), Child Helpline International, ECPAT International, and others. Our work with external experts, including ***the Facebook Safety Advisory Board, which is comprised of independent online safety organizations and experts from around the world, continually informs and improves our policies and enforcement around online safety issues***, especially with regards to children.
>
> *              *              *
>
> ***Given our existing approach to addressing child exploitation, including our proactive detection of harmful content and accounts, our partnerships with law enforcement and NGOs, and our historical and ongoing transparency on this topic, our board of directors believes that the preparation of the report contemplated by this proposal is unnecessary and not beneficial to our stockholders.*** Therefore, our board of directors recommends that our stockholders vote against this proposal.

(Emphasis added.)

78. With regarding to the statements referenced in ¶¶ 72–74, Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis caused the 2020 Proxy Statement to be false and misleading by failing to disclose that: (1) though Facebook touted efforts to make progress on social issues it faced, efforts to build experiences that improve people's lives, and efforts to be transparent with the public in determining the aspects of executive pay that were performance-based, these claims were untrue given that significant performance-based compensation was awarded despite the occurrence of the Platform Content Misconduct; (2) though Facebook claimed its directors and officers complied with the Code of Conduct and that it would disclose waivers of such policy, the Individual Defendants had violated the Code of Conduct and either waivers had not been given waivers or such waivers were not disclosed; and (3) the risk oversight functions of the Board and its committees were not properly being exercised, as evidenced by wrongdoing detailed herein, which involved the Company's directors.

Verified Shareholder Derivative Complaint

79.     In addition, the 2020 Proxy Statement was materially false and misleading, with regard to the statements in ¶¶ 75–77, and failed to disclose material facts necessary to render the statements made not false and misleading, because the 2020 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was engaged in the Platform Content Misconduct, which included enabling criminal activity, harming users, inconsistently and unevenly applying policies concerning content moderation, and targeting children despite knowing of the harms posed to them by the Company's products; (2) the Company was not seeking to remediate the Platform Content Misconduct, despite being aware of such misconduct; and (3) the Company failed to maintain internal controls .

80.     As a result of the false and misleading elements of the 2020 Proxy Statement, which was solicited by Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis, Facebook shareholders voted, *inter alia*, to (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board, which allowed them to continue breaching their fiduciary duties; (2) approve a director compensation policy for non-employee directors, including Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis, who were breaching their fiduciary duties; and (3) reject eight shareholder proposals, including (a) a proposal that would have required the Company to add a "human/civil rights" expert to the Board; (b) a proposal that would have required Facebook to publish a report on risks related to civil and humans right; and (c) a proposal that would have required the Company to issue a report concerning child sexual exploitation on Facebook's platforms. The concerns addressed by these rejected shareholder proposals were all implicated by the Platform Content Misconduct. However, due to the 2020 Proxy Statement's false and misleading elements, these concerns remained unaddressed and undisclosed until Frances Haugen emerged to reveal the truth.

81.     On January 28, 2021, Facebook filed its annual report for the 2020 Fiscal Year on Form 10-K with the SEC (the "2020 10-K"). Defendants Zuckerberg, Wehner, Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis signed the 2020 10-K, which contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the 2020 10-K's financial statements, the disclosure of any material changes to the Company's internal controls, and the disclosure

26
Verified Shareholder Derivative Complaint

of any fraud committed by Facebook, or its officers or directors.

82. In the 2020 10-K, the Company represented that the number of its MAUs in the United States and Canada increased from 248 million to 258 million from December 31, 2019 to December 31, 2020. In addition, the 2020 10-K represented that the number of MAUs in Europe grew from 394 million to 419 million from December 31, 2019 to December 31, 2020.

83. The 2020 10-K repeated the claim made in previous SEC filings that the Company "believe[s] *the percentage of duplicate accounts is meaningfully higher in developing markets* such as the Philippines and Vietnam, *as compared to more developed markets.*" (Emphasis added.)

84. The statements referenced in ¶¶ 81–83 were materially false and misleading, and failed to disclose material facts necessary to render the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Facebook was disclosing user metrics it knew to be inflated due to duplicate and fake accounts; and (2) Facebook failed to maintain internal controls. As a result of the foregoing, bb Facebook's public statements were materially false and misleading at all relevant times.

85. On April 9, 2021, Facebook filed the 2021 Proxy Statement with the SEC. Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act.

86. The 2021 Proxy Statement called for Facebook shareholders to vote to, *inter alia*: (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board; (2) ratify the appointment of EY as Facebook's independent registered public accounting firm for the fiscal year ending December 31, 2021; (3) approve an amendment to the director compensation policy for non-employee directors, which included Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis; and (4) consider six shareholder proposals, all of which aimed to institute corporate governance reforms and were opposed by Facebook, including (a) a proposal that would have required the Company to add a "human/civil rights" expert to the Board, submitted by shareholders who "believe Facebook requires expert, board level oversight of civil and human rights issues to assess risk and develop strategy to avoid causing or contributing to widespread violations of human or civil rights,"

(b) a proposal that would have required the Company to publish a report on platform misuse given that "[w]hat was envisioned as a tool to connect people has been co-opted for dissemination of disinformation and violent extremism, which has led to many instances of human suffering and death" and that "[m]anagement and the board have failed to take effective action to stem these abuses, which has resulted in a series of negative impacts," and (c) a proposal requiring the Company to issue a report about child sexual exploitation on the Company's platforms given the "exponential growth of CSAM is directly tied to the growth of social media and the increasing number of children online."

87.     As applicable to first half and second half 2020 executive performance-based compensation, the 2021 Proxy Statement listed the following factors related to "2020 Priorities and Company Performance Percentage":

*Continue making progress on the major social issues* facing the Internet and our company, *including privacy, safety, and security.*

*Build new experiences that meaningfully improve people's lives* today and set the stage for even bigger improvements in the future.

Keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs.

*Communicate more transparently* about what we're doing and the role our services play in the world.

(Emphasis added.) Notably, and despite the occurrence of the Platform Content Misconduct, the Compensation, Nominating & Governance Committee approved a company performance percentage of *110%* based on these factors.

88.     Regarding Facebook's Code of Conduct, the 2021 Proxy Statement stated that the "code of conduct provides guidelines for business conduct and applies to members of our board of directors, our executive officers, employees, contractors, consultants, and others working on our behalf." Moreover, the 2021 Proxy Statement stated that Facebook would "satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our code of conduct by posting such information on our website at the address specified above."

89.     The 2021 Proxy Statement stated the following regarding the Board's role in risk oversight:
Our board of directors as a whole has responsibility for overseeing our risk management and believes that a thorough and strategic approach to risk oversight is critical. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by regular

Verified Shareholder Derivative Complaint

reports from our management team, including senior personnel that lead a variety of functions across the business, and from our internal audit department, as well as input from external advisors, as appropriate. These reports are designed to provide timely visibility to the board of directors and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit & risk oversight committee has responsibility for overseeing certain of our major risk exposures, including in the areas of financial and enterprise risk, legal and regulatory compliance, environmental sustainability, social responsibility, and cybersecurity, as well as risks in other areas as our audit & risk oversight committee deems necessary or appropriate from time to time. Our audit & risk oversight committee also oversees the steps we have taken to monitor or mitigate these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Our board of directors also may exercise direct oversight with respect to these areas or delegate such oversight to committees in its discretion. In addition, our audit & risk oversight committee oversees our internal audit function. Our privacy committee oversees the risks related to privacy and data use matters, including our compliance with the comprehensive privacy program that we adopted in compliance with our FTC consent order and the steps that we have taken or plan to take to monitor or mitigate such risks. Our compensation, nominating & governance committee evaluates risks arising from our corporate governance and compensation policies and practices, as more fully described in the section of this proxy statement entitled "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment," and oversees succession planning for our board of directors and certain key executives other than the CEO. Each of these committees provide reports to the full board of directors regarding these and other matters.

90.     In opposing the shareholder proposal described above that called for a civil/human rights expert to be added to the Board, the 2021 Proxy Statement said:

*We recognize the need to protect and respect both civil and human rights and we have made, and continue to make, significant progress on both of these fronts* and fight abuse across our services. *We believe that implementing this proposal is unnecessary because of our continued progress in this area and our efforts to fight abuse across our services*, including our recent appointments in our human rights and civil rights leadership.

(Emphasis added.)

91.     This section also stated as follows:

*Our board of directors and its committees also provide oversight around our efforts in many of these areas.* In particular, the charter of our audit & risk oversight committee provides that the audit & risk oversight committee will review with management (i) at least annually, our company's assessment of the major ways in which our services can be used to facilitate harm or undermine public safety or the public interest, including through the sharing of content on our services that violate our policies, as well as the steps we have taken to monitor, mitigate, and prevent such abuse, and (ii) from time to time, such other program, policies, and risk exposures related to social responsibility as the audit & risk oversight committee deems necessary or appropriate. *However, as our board of directors*

29

Verified Shareholder Derivative Complaint

*and its committees also have numerous oversight responsibilities in other areas, our board of directors does not believe that setting aside a board seat for any predetermined profile is a good corporate governance practice and may limit the board's ability to identify and recruit the most qualified candidates who must consider a broad range of issues. Therefore, our board of directors recommends that our shareholders vote against this proposal.*

(Emphasis added.)

92.     In opposing the shareholder proposal described above that called for Facebook to issue report on platform misuse, the 2021 Proxy Statement stated as follows:

*We agree that the amplification of false, divisive, hateful, and inciting content is harmful to our community, and we continue to take steps to address this issue as described below. We believe that implementing this proposal is unnecessary due to our transparency efforts to date, the significant progress we continue to make to address these issues*, and our work to help external researchers assess the impact of our efforts in this area as they relate specifically to the U.S. 2020 elections.

*We work to remove harmful information that violates our policies on our platforms.* This includes information designed to interfere with people's ability to vote, suppress voting, or claims that people will be infected by COVID-19 (or another communicable disease) if they participate in the voting process. Between March 1, 2020 and Election Day on November 3, 2020 (Election Period), we removed more than 265,000 pieces of content on Facebook and Instagram in the U.S. for violating our voter interference policies. *We also remove information that breaks our rules on violence, bullying, and harassment, and the other areas outlined in Facebook's Community Standards. We regularly report on our efforts to remove this harmful information from our platforms through our Community Standards Enforcement Report, which we believe sets the industry standard for transparency.* We update this report on a quarterly basis to more effectively track our progress and demonstrate our continued commitment to making Facebook and Instagram safe and inclusive.

We also partner with more than 80 fact-checkers globally who identify and rate content on our platform every day across more than 60 languages. When we have signals that a piece of content is likely false, we send it to our third-party fact-checkers for review . Our third-party fact-checkers can also find content on their own and ultimately decide what content to review and rate. When claims are debunked by third-party fact-checkers, we reduce their distribution so fewer people see them and we add warning labels with more context for people who may come across them. During the Election Period, we displayed warnings on more than 180 million pieces of content in the U.S. based on the judgment of third-party fact-checkers. Additionally, ads featuring claims debunked by our third-party fact-checkers are rejected. We also work to improve the quality of ads on our platform by requiring advertisers to complete an authorization process before they can run ads covering social issues, elections, and politics in the U.S. During the Election Period we rejected ad submissions 3.3 million times for failure to complete this authorization process.

In addition, we have taken a number of steps to help prioritize News Feed content that is

30

Verified Shareholder Derivative Complaint

more focused on meaningful interactions for our users. ***In 2018, we made a fundamental change to the way content is surfaced in people's News Feed*** to prioritize posts from friends and family. This was based on extensive research that found people derive more meaningful conversations and experiences when they engage with people they know as opposed to passively consuming content.

***This was one of many changes that we have made to News Feed to try and minimize the amount of divisive content that people see. We have reduced clickbait headlines, reduced links to misleading and spam posts, and improved how comments are ranked to show people those that are more relevant and of higher quality. In addition to these measures to reduce the distribution of this type of problematic content, we also remove content when we find that such content violates our Community Standards or one of our other policies, and we give people more information about the posts they see in News Feed, including information about why they are seeing a particular post and notifications with additional context on the source of certain news and other content.*** Additionally, we make recommendations to help people discover new communities and content. We have Recommendation Guidelines, available in our Help Center, to help people better understand the kinds of content we aim to recommend, and provide context on why some types of content are not included in recommendations, and therefore may not be distributed as widely.

We also regularly partner with external researchers in efforts to better understand the impact of platforms like ours on social issues such as the interaction of technology and democracy. As it relates to the U.S. 2020 elections specifically, we launched a new research partnership with nearly 20 external academics to understand the role that Facebook and Instagram played in this election. This research partnership will examine the impact of how people interact with our products, including content shared in News Feed and across Instagram, and the role of features like content ranking systems. Additionally, in February 2020, we announced that we have substantially increased the amount of data we are providing to 60 academic researchers across 17 labs and 30 universities around the world to help support academic research on social media's role in elections and democracy. In February 2021, for the first time, we provided researchers access to targeting information for more than 1.65 million social issue, electoral, and political ads through the Facebook Open Research & Transparency platform. By making the targeting criteria, such as location and interests, selected by advertisers running social issue, electoral, or political ads available for analysis and reporting, we hope to help people better understand the practices used to reach potential voters on Facebook and Instagram.

***Given our efforts and transparency around our actions to counter platform misuse, as well as the significant public debate on this topic to date, our board of directors believes that the preparation of the report contemplated by this proposal is unnecessary and not beneficial to our shareholders.*** Therefore, our board of directors recommends that our shareholders vote against this proposal.

(Emphasis added.)

93. In opposing the shareholder proposal described above that called for Facebook to issue a

31

Verified Shareholder Derivative Complaint

report on child exploitation, the 2021 Proxy Statement said:

> **We have robust policies to help protect against child exploitation** and content or behavior on our platform that puts the safety of children at risk. **We believe we have led the industry in developing new ways to prevent, detect, and respond to abuse**, which are the three key elements in our strategy to combat abuse.

94. The 2021 Proxy Statement continued that "**[g]iven our active approach to addressing child exploitation . . . our ongoing transparency on this topic**, our board of directors believes that **the preparation of the report contemplated by this proposal is unnecessary.** Therefore, our board of directors recommends that our shareholders vote against this proposal." (Emphasis added.)

95. Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis solicited the 2021 Proxy Statement, which was false and misleading. With regard to the statements in ¶¶ 87–89, the Individual Defendants failed to disclose that: (1) though Facebook touted efforts to make progress on social issues it faced, efforts to build experiences that improve people's lives, and efforts to be transparent with the public in determining the aspects of executive pay that were performance-based, these claims were untrue given that significant performance-based compensation was awarded despite the occurrence of the Platform Content Misconduct; (2) though Facebook claimed its directors and officers complied with the Code of Conduct and that it would disclose waivers of such policy, the Individual Defendants had violated the Code of Conduct and either waivers had not been given waivers or such waivers were not disclosed; and (3) the risk oversight functions of the Board and its committees were not properly being exercised, as evidenced by wrongdoing detailed herein, which involved the Company's directors.

96. In addition, the 2021 Proxy Statement was materially false and misleading, with regard to the statements in ¶¶ 90–94, and failed to disclose material facts necessary to render the statements made not false and misleading, because the 2021 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was engaged in the Platform Content Misconduct, which included enabling criminal activity, harming users, inconsistently and unevenly applying policies concerning content moderation, and targeting children despite knowing of the harms posed to them by the Company's products; (2) the Company was not seeking to remediate the Platform Content Misconduct, despite being aware of such

Verified Shareholder Derivative Complaint

misconduct; and (3) the Company failed to maintain internal controls.

97. Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis solicited the 2021 Proxy Statement, which was false and misleading. As a result, Company shareholders voted, *inter alia*, to (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board, allowing them to continue breaching their fiduciary duties; (2) approve an amendment to the director compensation policy for non-employee directors, which included Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis; and (3) reject six shareholder proposals, including (a) a proposal that would have required the Company to add a "human/civil rights" expert to the Board; (b) a proposal that would have required Facebook to issue a report on platform misuse; and (c) a proposal that would have required the Company to publish a report about child sexual exploitation on Facebook's platform. The concerns addressed by these rejected shareholder proposals were all implicated by the Platform Content Misconduct. However, due to the 2021 Proxy Statement's false and misleading aspects, these concerns remained unaddressed and undisclosed until Frances Haugen emerged to reveal the truth.

98. On April 29, 2021, Facebook filed its quarterly report for the quarter ended March 31, 2021 on Form 10-Q with the SEC (the "1Q2021 10-Q"). Defendant Wehner signed the 1Q2021 10-Q, which contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the 1Q2021 10-Q's financial statements contained, the disclosure of any material changes to Facebook's internal controls, and the disclosure of any fraud committed by Facebook, or its officers or directors.

99. The 1Q2021 10-Q repeated the claim made in previous SEC filings that Facebook "believe[s] *the percentage of duplicate accounts is meaningfully higher in developing markets* such as the Philippines and Vietnam, *as compared to more developed markets.*" (Emphasis added.) The 1Q2021 10-Q further reiterated the Company's purported commitment to "continue making progress on the major social issues facing the Internet and our company, including privacy, safety, and security" and to "communicate more transparently about what we're doing and the role our services play in the world."

100. On May 26, 2021, Facebook held its annual meeting of shareholders. At the meeting, a shareholder asked about the Facebook's policies concerning censorship, to which Defendant Clegg

responded: "We always strive to enforce our policies evenly without regard to the political affiliation of those affected[.]" Defendatn Clegg continued that, although the Company supports free expression, "of course, that doesn't mean that politicians can just say things that clearly cause harm and *our policies* on hate speech, incitement and so on *apply to everyone regardless of their position of power.*" (Emphasis added.) He further reiterated: "we're very clear, we remove content that poses specific harm to people, content intended to intimidate, exclude or silence views."

101. In response to a question about the widespread presence of "fake news" on the Company's Facebook platform, Defendant Clegg stated, "remember, we *really are committed to fighting wherever we can the spread of false information* on Facebook" and "*[w]e remove content that violates our Community Standards* . . . and we reduce distribution of stories, which are marked as false. And we . . . try to inform people, so that they can decide for themselves what to read, trust, and share." (Emphasis added.)

102. Also during the same meeting, Defendant Zuckerberg stated that, "for the last several years, *our team that has been focused on kind of trust and safety overall, has been more focused on content moderation, so making sure that we can identify harmful content and take it down.*" (Emphasis added.)

103. On July 29, 2021, the Company filed with the SEC its quarterly report for the second fiscal quarter ended June 30, 2021 on Form 10-Q (the "2Q2021 10-Q"). Defendant Wehner signed the 2Q2021 10-Q, which contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the 2Q2021 10-Q's financial statements, the disclosure of any material changes to Facebook's internal controls, and the disclosure of any fraud committed by Facebook, or its officers or directors.

104. The 2Q2021 10-Q repeated the claim made in earlier SEC filings that Facebook "believe[s] *the percentage of duplicate accounts is meaningfully higher in developing markets* such as the Philippines and Vietnam, *as compared to more developed markets.*" (Emphasis added.) The 2Q2021 10-Q further reiterated the Company's commitment to "continue making progress on the major social issues facing the Internet and our company, including privacy, safety, and security" and to "communicate more transparently about what we're doing and the role our services play in the world."

105. Facebook updated its Code of Conduct on June 7, 2021, which made false and misleading

statements concerning the Company's efforts with regard to user safety. Specifically, the Code of Conduct stated: "Our reach and influence require that we commit and hold ourselves accountable to a high standard, ensuring that we build products and programs that have a positive impact, keep people safe and serve everyone." In addition, the Code of Conduct highlighted the Company's purported commitment to "keep people safe and protect privacy" and stated "we are committed to protecting our communities from harm."

106. The Code of Conduct further touted Facebook's purported commitment to "innovate responsibly by making every effort to anticipate and mitigate potential harms in all that we build" and also stated that "Facebook is committed to maximizing the positive impact we have on people and society through all that we build." Relatedly, the Code of Conduct stated that the Company "[c]onsider[s] [a] broad range of potential impacts on people, communities and society, looking across different dimensions of responsibility, such as inclusion, safety, privacy and others" and that the Company "[r]aise[s] and address[es] potential harms early and often throughout the product development process."

107. The Code of Conduct stated that the Company "[w]ork[s] quickly to identify and remove harmful content from Facebook platforms, such as hate speech, harassment, child exploitation, threats of violence and terrorism," and also stated that "[s]afety is one of our Responsible Innovation Dimensions."

108. During the Relevant Period, the Company posted statements on its website that related to content moderation and user safety. For instance, the Company's website stated that Facebook was "committed to protecting your voice and helping you connect and share safely," which is "why we have Community Standards that specify what's allowed on our apps, and we remove anything that breaks these rules." The website further represented that Facebook "remove[s] hate speech, harassment, threats of violence and other content that has the potential to silence others or cause harm," and that this included "proactively detect[ing] 95% of hate speech on Facebook that we remove before anyone reports it to us." The website also stated that Facebook "[w]orks limit the spread of misinformation," which includes "[c]ombating COVID-19 [m]isinformation" and "taking aggressive steps to stop misinformation and harmful content from spreading."

109. The statements in ¶¶ 98–108 were materially false and misleading, and they failed to disclose material facts necessary to render the statements made not false and misleading. Specifically, the

35

Verified Shareholder Derivative Complaint

Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was engaged in the Platform Content Misconduct, which included enabling criminal activity, harming users, inconsistently and unevenly applying policies concerning content moderation, and targeting children despite knowing of the harms posed to them by the Company's products; (2) the Company was not seeking to remediate the Platform Content Misconduct, despite being aware of such misconduct; (3) Facebook was disclosing user metrics it knew to be inflated due to duplicate and fake accounts; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

110.    On September 13, 2021, the truth began to emerge. The *Wall Street Journal* published the first of the "Facebook Files," which was titled "Facebooks Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt." The article cited Company documents and a then-anonymous whistleblower who would later be revealed as Frances Haugen. In relevant part, the article stated as follows:

> *Mark Zuckerberg has publicly said Facebook Inc. allows its more than three billion users to speak on equal footing with the elites of politics, culture and journalism, and that its standards of behavior apply to everyone, no matter their status or fame.*
>
> *In private, the company has built a system that has exempted high-profile users from some or all of its rules*, according to company documents reviewed by The Wall Street Journal.
>
> The program, known as "cross check" or "XCheck," was initially intended as a quality-control measure for actions taken against high-profile accounts, including celebrities, politicians and journalists. *Today, it shields millions of VIP users from the company's normal enforcement process*, the documents show. *Some users are "whitelisted"—rendered immune from enforcement actions—while others are allowed to post rule-violating material pending Facebook employee reviews that often never come.*
>
>            *          *          *
>
> A 2019 internal review of Facebook's whitelisting practices, marked attorney-client privileged, found *favoritism to those users to be both widespread and "not publicly defensible."*
>
> *"We are not actually doing what we say we do publicly,"* said the confidential review. It called the company's actions "a breach of trust" and added: *"Unlike the rest of our community, these people can violate our standards without any consequences."*
>
>            *          *          *

36

Verified Shareholder Derivative Complaint

*For ordinary users, Facebook dispenses a kind of rough justice in assessing whether posts meet the company's rules* against bullying, sexual content, hate speech and incitement to violence. Sometimes the company's automated systems summarily delete or bury content suspected of rule violations without a human review. At other times, material flagged by those systems or by users is assessed by content moderators employed by outside companies.

       *            *            *

*Users designated for XCheck review, however, are treated more deferentially.* Facebook designed the system to minimize what its employees have described in the documents as "PR fires"—negative media attention that comes from botched enforcement actions taken against VIPs.

If Facebook's systems conclude that one of those accounts might have broken its rules, they don't remove the content—at least not right away, the documents indicate. They route the complaint into a separate system, staffed by better-trained, full-time employees, for additional layers of review.

(Emphasis added).

111. On this news, the price of Facebook's common stock declined $5.17 per share to close at $376.51 per share on September 12, 2021.

112. On September 14, 2021, the *Wall Street Journal* published another article. The article noted that, despite the Company's attempts to discredit the idea that Instagram had a negative effect on teenagers, the Company's own internal data showed that it did have such an effect. Specifically, the Company's own analysis revealed that, especially among teenage girls, substantial mental health problems stemmed from the use of Instagram, and that teenage girls themselves linked their use of the app to suicidal thoughts and eating disorders. Facebook's internal researchers repeatedly found that Instagram harmed large numbers of teenage users. For example, in a internal presentation dating from 2019, the Company's own researchers stated that "[w]e make body issues worse for one in three teen girls" and that "[t]eens blame Instagram for increases in rates of anxiety and depression." Similarly, in a presentation dating from March 2020 that was posted to the Company's internal message board, Facebook's own internal researchers asserted that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse."

113. On September 15, 2021, the *Wall Street Journal* published another article. The article stated that in 2018, Facebook changed the algorithm that controlled which content appeared on users' News Feeds, resulting in some users being shown more objectionable and harmful content. This directly

Verified Shareholder Derivative Complaint

conflicted with the Company's statement in its 2021 Proxy Statement explaining its opposition to the issuance of a platform misuse report. The *Wall Street Journal* article further revealed that in an internal report produced by the Company's own data scientists, the data scientists determined that: "Our approach has had unhealthy side effects on important slices of public content, such as politics and news[.]" One data scientist stated that: "This is an ***increasing liability***." (Emphasis added.) Other memoranda drafted by Facebook data scientists noted that, as a result of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other internal documents from the article showed that the cause for the change in Facebook's algorithm was that Facebook was worried about a decrease in user engagement on its platforms, which threatened the Company's revenue. Incendiary content resulted in greater user engagement, and thus supported revenue.

114. Following the publication of this *Wall Street Journal* article, Facebook's common stock decline to $373.92 per share.

115. On September 16, 2021, the *Wall Street Journal* published another article, which described Facebook's ineffective management of use of its platforms by human traffickers and drug cartels. The article stated that a Facebook investigator discovered in January 2021 that a drug cartel was using Facebook to train, recruit and pay hitmen. Despite this warning, the pages in question remained active for months, and the Company did nothing to remove the posts at issue or prevent the group from making future posts. This outcome was not unusual. According to other documents cited in the article, despite Facebook employees having raised red flags about the use of the Company's platforms in a variety of developing countries, the Company often did little or nothing in response to warnings. One internal document from March 2021 showed a profound prevalence of users, including in countries at risk of conflict, that used Facebook to promote violence, fan ethnic tensions, and undermine social institutions, and that Facebook's "[c]urrent mitigation strategies are not enough." Another internal report on the use of the Facebook platform by human traffickers stated that: "We have found content violating our domestic servitude policy that should have been detected automatically" by software that the Company had deactivated in 2020.

116. On this news, the Facebook's stock price declined to $373.06 per share.

Verified Shareholder Derivative Complaint

117.    On September 17, 2021, the *Wall Street Journal* published an article discussing the Company's inability and/or unwillingness to appropriately moderate content on its platforms, even with respect to topics for which the Company had taken affirmative positions. For instance, despite several public commitments by the Company and by Defendant Zuckerberg personally that Facebook's platforms would be used to communicate accurate guidance concerning public health, and especially concerning COVID-19, Facebook failed to institute policies that were effective at doing so, and failed to institute policies and practices preventing the spread of COVID-19 related disinformation.

118.    On this news, Facebook's stock price declined to $364.72 per share.

119.    On September 28, 2021, just a day after the Company publicly announced that it was pausing the development of its planned app called "Instagram Kids," the *Wall Street Journal* published another article, which related to Facebook's efforts to attract pre-teens to the Company's platforms. The article stated as follows, in relevant part:

> ***Internal Facebook documents reviewed by The Wall Street Journal show the company formed a team to study preteens, set a three-year goal to create more products for them and commissioned strategy papers about the long-term business opportunities presented by these potential users.*** In one presentation, it contemplated whether there might be a way to engage children during play dates.

> ***"Why do we care about tweens?"*** *said one document from 2020.* ***"They are a valuable but untapped audience."***

> \*               \*               \*

> On Monday, ***Adam Mosseri, head of Instagram, said the company would pause the development of a version of the app for children, often referred to as Instagram Kids.*** He said the company wanted time to talk to parents, experts and lawmakers before proceeding. He also contended that underage users would simply lie about their age to access Instagram if a version for children under the age of 13 wasn't available.

> \*               \*               \*

> ***Over the past five years, Facebook has made what it called "big bets" on designing products that would appeal to preteens across its services, according to a document from earlier this year.***

> ***In more than a dozen studies over that period, the documents show, Facebook has tried to understand which products might resonate with children and "tweens" (ages 10 through 12)****, how these young people view competitors' apps and what concerns their parents.

> "With the ubiquity of tablets and phones, ***kids are getting on the internet as young as six years old. We can't ignore this and we have a responsibility to figure it out,***" said a 2018

Verified Shareholder Derivative Complaint

document labeled confidential. "Imagine a Facebook experience designed for youth."

***Earlier this year, a senior researcher at Facebook presented to colleagues a new approach to how the company should think about designing products for children. It provided a blueprint for how to introduce the company's products to younger children.*** Rather than offer just two types of products—those for users 13 and older, and a messenger app for kids—Facebook should tailor its features to six age brackets, said a slide titled "where we've been, and where we're going."

\* \* \*

In a study about household dynamics, a Facebook user-experience researcher found that although teens often inspired their younger relatives to join Instagram, those same teens also often counseled the tweens not to share too frequently, and not to post things they would later regret.

"I don't know how to get a perfect picture like my sister says you need to post," a tween told the researcher.

***"We need to understand if this influence over preteen sharing holds at scale," the researcher wrote in a document posted to Facebook's internal message board early this year. "If it is common that teens are discouraging preteens from sharing, there are obvious implications for creation and the ecosystem both in the near and longer-term*** as preteens are the next generation coming onto the platform." ***The presentation cited concern among teenagers about oversharing as a "myth" about Instagram.***

(Emphasis added.)

120. On this news, Facebook's share price fell further to $340.65 per share.

121. On October 3, 2021, Frances Haugen appeared on *60 Minutes* to reveal her identity as the previously anonymous whistleblower. *CBS* published an article later that same day that included portions of the interview's transcript. The article said, in relevant part:

"The thing I saw at Facebook over and over again was there were conflicts of interest between what was good for the public and what was good for Facebook," Haugen said. "***And Facebook, over and over again, chose to optimize for its own interests, like making more money.***"

\* \* \*

Haugen told 60 Minutes that ***weeks after the 2020 election, Facebook dissolved a department called "Civic Integrity" which worked on risks to elections including misinformation.***

"Like, they basically said, 'Oh good, we made it through the election. There wasn't riots. We can get rid of Civic Integrity now,'" Haugen said. "Fast forward a couple months, we got the insurrection. And ***when they got rid of Civic Integrity, it was the moment where I was like, 'I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous.'***"

\* \* \*

Verified Shareholder Derivative Complaint

*Haugen said Facebook's algorithm optimizes for content that generates engagement. That's led to publishers, "realizing that if they produce more content that is angry and divisive and polarizing, they'll get more views," in her words.*

*"Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money,"* Haugen added.

(Emphasis added.)

122. On October 4, 2021, *CBS News* published an article titled "Whistleblower's SEC Complaint: Facebook Knew Platform Was Used to 'Promote Human Trafficking and Domestic Servitude," disclosing that Frances Haugen had previously filed eight complaints concerning the Platform Content Misconduct with the SEC. The SEC complaints related to the following:

a. The Company knew its platforms were spreading misinformation, but failed to undertake adequate responsive measures. This complaint alleged as follows, in relevant part:

Facebook misled investors and the public about its role perpetuating misinformation and violent extremism relating to the 2020 election and January 6th insurrection.

\* \* \*

Facebook made misstatements and omissions regarding its facilitation of political misinformation, including in testimony before Congress.

\* \* \*

*Facebook only actions less than 1% of Violence and Inciting to Violence (V&I) content on Facebook* – Facebook's strategy of focusing on Content over other solutions lets this content effectively run free[.]

\* \* \*

*Facebook has demonstrated via experiments using brand new test accounts how rapidly Facebook's algorithms can veer people interested in Conservative topics into radical or polarizing ideas and groups/pages*, some demonstrating traits of Coordinated Inauthentic Behavior (CIB) akin to what was seen by the Macedonians in 2016[.]

\* \* \*

*Pages that repeat offend for misinformation are permitted to continue to spread misinformation*[.]

\* \* \*

Facebook has *"whitelisted" political users who violate its terms, leading to the spread of misinformation and violence* on and off the platform.

(Emphasis added.)

b. The Company failed to take adequate steps to combat the use of its platforms by human traffickers. This complaint stated, in relevant part:

Facebook misled investors and the public about its promotion of human trafficking / slaver / servitude.

\* \* \*

*Internal company documents show that Facebook and Instagram were, and are, being*

41

Verified Shareholder Derivative Complaint

*used to promote human trafficking and domestic servitude.* An internal Facebook record created no later than April 2019 states: *"We have observed increasing number of reported content that indicates that the platform is being used to coordinate and promote domestic servitude* . . . real world harm caused by domestic servitude as well as risk to the business due to potential PR fires . . ."

\*          \*          \*

Notably, there was widespread media coverage of an "undercover investigation by BBC News Arabic" in or around October 2019, which found that *"domestic workers are being illegally bought and sold online in a booming black market . . . on Facebook-owned Instagram, where posts have been promoted via algorithm-boosted hashtags, and sales negotiated via private messages."*

\*          \*          \*

*However, even after this news coverage, Facebook's regular SEC filings continually omitted specific references to trafficking, domestic servitude, human slavery, and the Apple App Store escalation.*

In fact, Facebook's failure to solve human trafficking and servitude on its platforms threatened its distribution on the Apple App Store. Moreover, as the enclosed Facebook records show, Facebook's statements about human trafficking were false. For example, *Facebook has confirmed:* [. . .] *[W]e received communication from Apple where the company threatened to pull FB & IG from its App Store due to them identifying content promoting 'domestic servitude'* [. . .] However, due to the underreporting of this behaviour and absence of proactive detection, *newly created and existing content not captured in the IG sweep meant that domestic servitude content remained on the platform.* [. . .] *Was this issue known to Facebook before BBC enquiry and Apple escalation? Yes.* [. . .] *[O]ur platform enables all three stages of the human exploitation lifecycle (recruitment, facilitation, exploitation)*[.]"

(Emphasis added.)

      c.      The Company's XCheck program gave certain users preferential treatment. This complaint said, in relevant part:

Facebook misled investors and the public about equal enforcement of its terms given that high-profile users are "whitelisted" under its "XCheck" program.

\*          \*          \*

*[O]ver the years, many XChecked people & entities have been exempted from enforcement. That means, for a select few members of our community, we are not enforcing our policies and standards.* Unlike the rest of our community, these people can violate our standards without any consequences[.]

\*          \*          \*

We are exempting certain people and businesses from our policies and standards [. . .] *This undermines our fairness and legitimacy efforts; creates legal and compliance risks for the company . . . Based on an initial company-wide audit, this problem is pervasive across the country[.]*

(Emphasis added.)

42

Verified Shareholder Derivative Complaint

d.      The Company misled investors and the public concerning the use of its platforms, and in particular the Facebook platform, in fanning ethnic violence and global division. This complaint stated as follows, in relevant part:

Facebook misled investors and the public about bringing "the world closer together" where it relegates international users and promotes global division and ethnic violence.

\*                    \*                    \*

*Facebook's shareholders proposed having a human/civil rights expert on the board, stating:*

"In September 2020, *a Facebook employee reported Facebook ignored global political manipulation from foreign governments seeking to 'abuse our platform on vast scales to mislead their own citizenry.'* [. . .]

Children's rights organization Plan International found *online attacks against girls globally are most prevalent on Facebook.*

\*                    \*                    \*

*In Myanmar, where violence against the Rohingya 'bears the hallmarks of genocide,' a Facebook commissioned human rights report showed the company 'created an enabling environment.' In Ethiopia, Facebook's platform amplified ethnic tensions and calls for genocide, inciting violence.*

*In rejecting that shareholder proposal, Facebook represented:*

"We recognize the need to protect and respect both civil and human rights and we have made, and continue to make, significant progress on both of these fronts and fight abuse across our services. *We believe that implementing this proposal is unnecessary because of our continued progress in this area and our efforts to fight abuse across our services*. . ."

\*                    \*                    \*

*FIRST, Facebook Lacks Adequate Resources for International Issues.*

\*                    \*                    \*

Global Remit [n.b. budget] "US – 87%, ROW [Rest of World] (India, France, Italy) – 13%.

\*                    \*                    \*

*SECOND, Documents Show that Facebook's Language Capabilities are Inadequate, Leading to Global Misinformation and Ethnic Violence.*

[. . .] Facebook documentation outlines:

[. . .] *[I]n the Afghanistan market, the action rate for Hate Speech is worryingly low at 0.23 per cent[.]*

\*                    \*                    \*

In particular, Facebook's written translations (in limited languages) do not account for regions where significant users cannot read.

\*                    \*                    \*

Nor do they appropriately manage different dialects:

43

Verified Shareholder Derivative Complaint

"Arabic is not one language, truly, rather it is better to consider it a family of languages – many of which are mutually incomprehensible . . . [in other dialects] *they will still misunderstand cultural or contextual content, which is key to problem areas such as Hate Speech and even Terrorism.* [. . .] [A]s every Arabic nation save Western Sahara is on the At-Risk Countries list and *deals with such severe issues as terrorism and sex trafficking--it is surely of the highest importance to put more resources to the task of improving Arabic systems.*"

\*        \*        \*

*THIRD, Documents Confirm That Facebook's Actions and Choices Facilitated Harmful Content and Misinformation Around the World*

\*        \*        \*

"*40% of Sampled Top VPV [View Port Views] Civic Posters in West Bengal Were Fake/Inauthentic.* [. . .] The message comes to dominate the ecosystem with over 35% of members having been recommended a cell group by our algorithms."

\*        \*        \*

"*Hate Speech Classifier[s] for Myanmar/Burmese . . . hate speech text classifier . . . currently being used in production / being maintained? . . . it doesn't look like it's currently in use?*"

(Emphasis added.)

      d.     The Company inflated metrics relating to its advertising reach and key user demographics.

This complaint stated as follows, in relevant part:

For years, Facebook has misled investors and advertisers about shrinking user base in important demographics, declining content production, and the true number of recipients of "Reach & Frequency" advertising[.]

\*        \*        \*

*Facebook has failed to disclose internal data showing a contraction of the user base in important demographics, including American teenagers and young adults. The company has also hidden the extent to which content production per user has been in long-term decline.*

\*        \*        \*

Internal documents show that youth and teens, a crucial demographic for advertisers, are deliberately targeted for Instagram in order to bring their family members onto Facebook platforms:

"Teens shape the household's perception of Instagram. [. . .] Family-first acquisition strategies are proven effective (e.g. TikTok) and warrant exploration on IG [Instagram]."

\*        \*        \*

*Facebook is inflating it's [sic] growth numbers by not disclosing that a higher fraction of teen accounts are "Same User with Multiple Accounts" (SUMAs), or duplicate accounts.* In terms of teen users, records indicate:

"*Over 15% of new teen accounts are existing users creating a SUMA child [secondary] account.*"

*Internal records confirm how teens and young adults in more developed economies are using the platform less.*

"Facebook's teen and young adult DAU [Daily Active Users] has been in decline since 2012/2013. [. . .]"

*"The United States is among the first countries where we observed teen MAP [Monthly Active People] decline, starting in 2012* . . . teens have been taking longer to adopt Facebook . . . One immediately concerning takeaway . . . is a flattening growth trends for cohorts below 18 years[.]"

\*          \*          \*

*Although Facebook has sophisticated algorithms to assess the existence of SUMAs / duplicate accounts, Facebook is well aware that its failure to include SUMA duplicate accounts distorts its Reach & Frequency (R&F) advertising models*:

"Previous analysis have [sic] shown that including SUMA modeling into audience sizes would *reduce overestimation of population in age groups for our top 30 ad markets by 50% when included by itself and by 63% when included in conjunction with age modeling.*"

By delivering too many ads to users that the advertisers did not want to pay for, *Facebook overcharged advertisers on a vast scale*:

"But wont' [sic] this cause the R&F [reach and frequency] to violate their contract? *If the ads is [sic] targeted to 1M accounts with a guarantee of 90%, and we deliver to 900k accounts but only 800k users [due to SUMA], wont' [sic] this make R&F [reach and frequency] pay penalty if we report 800k as coverage?*["]

(Emphasis added.)

123.    On this news, the Company's share price declined to $326.23.

124.    On October 21, 2021, after the close of markets, the *Wall Street Journal* published yet another article about the Company. This article reported that the accuracy and reliability of the Company's publicly reported user figures were undermined by the Company's own internal research. Specifically, Facebook's internal research found that new users that created multiple accounts were often undercounted in Facebook's count of "single users with multiple accounts ("SUMA"). One Company presentation described new SUMA users as, "very prevalent." Further, a Facebook employee's May 2021 internal memorandum noted that Facebook's number of monthly users in the U.S. in their twenties *actually exceeded* the number of people in their twenties in the U.S., a metric which "brings out the elephant in the room: SUMA." The memo stated that this discrepancy could make Facebook's ratio of daily active users

Verified Shareholder Derivative Complaint

"less trustable." The *Wall Street Journal* article noted that the prevalence of duplicate accounts could have a meaningful effect on the Company's advertising revenue, given that prices paid by advertisers are based on the number of members of the target demographic to be reached when advertisers reach out using Facebook.

125. On this news, the price of the Company's stock declined from $341.88 per share, its price at the close of trading on October 21, 2021, to close at $324.61 on October 22, 2021, a decline of $17.27, or approximately 5.1%. From the close of markets on September 10, 2021, the last trading day before the truth began to emerge, to its close on October 22, 2021, Facebook's stock fell $54.08, or approximately 14.3%.

126. On October 22, 2021, the *Washington Post* revealed that another whistleblower had filed a complaint with the SEC, alleging misconduct similar to that which Frances Haugen had alleged.

### Developments After the Relevant Period

127. On December 6, 2021, anonymous plaintiff Jane Doe—"a Rohingya Muslim refugee" residing in Illinois—brought a putative class action against Facebook in the Superior Court of the State of California for the County of San Mateo (the "Rohingya Class Action"). Her complaint claims more than $150 billion in damages related to Facebook's engagement in the Platform Content Misconduct.

128. The Rohingya Class Action claims that the Company, as part of the Platform Content Misconduct, knowingly promulgated and facilitated the dissemination of anti-Rohingya hate speech. The Rohingya Class Action alleges that these actions led to violence against the Rohingya people in Myanmar, resulting in a massacre of "dozens of Rohingya villages" in August 2017. The Rohingya Class Action further alleges that, to this day, the Company is still engaged in this "misinformation campaign" in Myanmar.

129. The Rohingya Class Action was removed to the United States District Court for the Northern District of California on January 5, 2022 and is currently pending before Judge Yvonne Gonzales Rogers.

### REPURCHASES

130. During the Relevant Period, in which the Company made false and misleading statements

Verified Shareholder Derivative Complaint

and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices, which resulted in substantial damage to the Company.

131. According to the 2Q2021 10-Q, between June 1, 2021 and June 30, 2021, inclusive, certain of the Individual Defendants caused Facebook to repurchase 9,289,000 shares of its own common stock at an average price per share of $336.42, for a total cost to Facebook of approximately $3.1 billion. As Facebook's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, the Facebook overpaid by approximately $110 million for these repurchases.

132. According to the Form 10-Q Facebook filed with the SEC on October 26, 2021 (the "3Q2021 10-Q"), between July 1, 2021 and July 31, 2021, inclusive, certain of the Individual Defendants caused Facebook to repurchase 8,586,000 shares of its own common stock at an average price per share of $352.32, for a total cost to Facebook of approximately $3.0 billion. As Facebook's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, Facebook overpaid by approximately $238 million for these repurchases.

133. According to the 3Q2021 10-Q, between August 1, 2021 and August 31, 2021, inclusive, certain of the Individual Defendants caused Facebook to repurchase 9,548,000 shares of its own common stock at an average price per share of $361.87, for a total cost to Facebook of approximately $3.5 billion. As Facebook's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, Facebook overpaid by approximately $356 million for these repurchases.

134. According to the 3Q2021 10-Q, between September 1, 2021 and September 30, 2021, inclusive, certain of the Individual Defendants caused Facebook to repurchase 22,144,000 shares of its own common stock at an average price per share of $356.24, for a total cost to the Company of approximately $7.9 billion. As Facebook's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, Facebook overpaid by approximately $700 million for these repurchases.

135. According to Facebook's Form 10-K filed by the Company on February 3, 2022, between October 1, 2021 and October 31, 2021,[2] inclusive, certain of the Individual Defendants caused Facebook

---

[2] Upon information and belief, at least some of these repurchases happened prior to the close of the market on October 21, 2021.

Verified Shareholder Derivative Complaint

to repurchase 21,703,000 shares of its own common stock at an average price per share of $326.20, for a total cost to Facebook of approximately $7.1 billion. As Facebook's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, Facebook overpaid by approximately $34.5 million for these repurchases.

136.    Thus, in total, from June 1, 2021 until October 31, 2021, Facebook paid approximately $24.6 billion for approximately 71.27 million shares of its own common stock. As Facebook's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, Facebook overpaid by over $1.4 billion.

### DAMAGES TO FACEBOOK

137.    As a direct and proximate result of the Individual Defendants' conduct, Facebook has lost and expended, and will lose and expend, many millions of dollars.

138.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against Facebook and certain of its officers, the Rohingya Class Action filed against Facebook, and any amounts paid to outside lawyers, accountants, and investigators in connection thereto.

139.    Such expenditures also include, but are not limited to, the cost of instituting measures to remediate the Platform Content Misconduct.

140.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants, who breached their fiduciary duties to the Company. This includes bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants, who breached their fiduciary duties to the Company.

141.    Such losses also include, but are not limited to, the Company's overpayment by more than $1.4 billion for repurchases of its own common stock during the Relevant Period, when Facebook's common stock was trading at artificially inflated prices due to the false and misleading statements described herein.

142.    As a direct and proximate result of the Individual Defendants' conduct, Facebook has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague Facebook's stock in the future due to the Company's and their misrepresentations and the

Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

143. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

144. Plaintiff brings this action derivatively and for the Company's benefit to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Facebook, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

145. Facebook is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146. Plaintiff is, and has continuously been at all relevant times, a shareholder of Facebook. Plaintiff will adequately and fairly represent the interests of Facebook in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

147. A pre-suit demand on the Board of Facebook is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis (collectively, the "Director-Defendants"), along with nonparty Tony Xu (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of ten Directors that were on the Board at the time this action was commenced.

148. Demand is excused as to all of the Director-Defendants because each faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause or permit Facebook to engage in the Platform Content Misconduct and to make and/or cause Facebook to make false and misleading statements and omissions of material facts. While the price of Facebook's common stock was artificially inflated by their misconduct, the Director-Defendants further breached their fiduciary duties by causing Facebook to overpay by more than $1.4 billion to repurchase approximately 71.27 million shares of its own common stock between June 1, 2021 and October 31, 2021. As a result, the Director-Defendants are unable to impartially investigate the

Verified Shareholder Derivative Complaint

charges and decide whether to initiate action against themselves and/or the other perpetrators of the scheme.

149. Completely abdicating their fiduciary duties, the Director-Defendants knowingly or recklessly participated in the schemes to cause or permit the Company to engage in the Platform Content Misconduct and to make and/or cause the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were, among other ends, intended to make Facebook appear to be more profitable and attractive to investors than it was in truth. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested. Thus, demand upon them is futile, and excused.

150. Demand on Defendant Zuckerberg is futile for the additional following reasons. Defendant Zuckerberg has served as the Company's CEO since founding the Company in 2004, and has also been Chairman of the Board since 2012. As founder, CEO, and Chairman of the Board, the Company provides Defendant Zuckerberg with his principal occupation. Thus, as the Company admits, he is a non-independent director. Due to his role as CEO and Chairman during the Relevant Period, Defendant Zuckerberg had ultimate responsibility for all of the false and misleading statements and omissions of material fact that were made by or on the Company's behalf, including, *inter alia*, those contained in the 3Q2016 10-Q, 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, 2020 10-K, 1Q2021 10-Q, and 2Q2021 10-Q, each of which he signed and/or signed SOX certifications for. Moreover, he personally made a false and misleading statement at the shareholder meeting held on May 26, 2021. Furthermore, he solicited the 2019, 2020, and 2021 Proxy Statements, each of which contained false and misleading aspects which contributed, *inter alia*, to his reelection to the Board. Moreover, the false and misleading aspects of the 2019 Proxy Statement led Company shareholders to approve Defendant Zuckerberg's compensation on an advisory basis. As Facebook's highest officer and as a trusted Company director, he conducted little, if any, oversight of Facebook's engagement in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His motive in facilitating and participating in the fraud is demonstrated by his insider sales prior to

Verified Shareholder Derivative Complaint

the exposure of the fraud, which yielded approximately $2.6 billion in proceeds. Additionally, Defendant Zuckerberg is a defendant in the Securities Class Actions. As such, Defendant Zuckerberg breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, therefore, excused.

151. Demand on Defendant Sandberg is futile for the additional following reasons. Defendant Sandberg has served as Facebook's COO since March 2008 and has also served as a Company director since June 2012. Thus, the Company provides Defendant Sandberg with her principal occupation, for which she receives substantial compensation. Thus, as Facebook admits, she is a non-independent director. Defendant Sandberg was responsible for many of the false and misleading statements and omissions made by or on behalf of Facebook, including, *inter alia*, those contained in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K, all of which she signed. In addition, she solicited the 2019, 2020, and 2021 Proxy Statements, each of which contained false and misleading aspects which contributed, *inter alia*, to her reelection to the Board. Moreover, the false and misleading aspects of the 2019 Proxy Statement led Facebook shareholders to approve Defendant Sandberg's compensation on an advisory basis. As Facebook's COO and as a trusted director, she conducted little, if any, oversight of Facebook's engagement in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements. In addition, she consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Accordingly, Defendant Sandberg breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and, therefore, excused.

152. Demand on Defendant Alford is futile for the additional following reasons. Defendant Alford has served as a Company director since May 2019, and she serves as a member of the Audit & Risk Oversight and Privacy Committees. Defendant Alford has received and continues to receive significant compensation for her role as a director. This includes over $500,000 for Fiscal Year 2020. Defendant Alford was responsible for many of the false and misleading statements and omissions that were made by or on the Company's behalf, including, *inter alia*, those contained in the 2019 10-K and 2020 10-K, which she signed. In addition, she solicited the 2020 and 2021 Proxy Statements, each of

which contained false and misleading elements that contributed, *inter alia*, to her reelection to the Board and to shareholder approval of the director compensation plan, under which, as to the 2020 Proxy Statement, she received unjust compensation and, as to the 2021 Proxy Statement, an amendment was made thereto. Moreover, she benefitted from the false and misleading elements of the 2019 Proxy Statement, which led to her inaugural election to the Company's Board by Facebook shareholders. As a trusted Company director, she conducted little, if any, oversight of Facebook's engagement in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements. In addition, she consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Alford breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is futile and, therefore, excused.

153. Demand on Defendant Andreessen is futile for the additional follow reasons. Defendant Andreessen has served as a Company director since June 2008, and he also serves as a member of the Compensation, Nominating & Governance Committee. Defendant Andreessen has received and continues to receive significant compensation for his role as a Company director. Defendant Andreessen was responsible for many of the false and misleading statements and omissions that were made by or on the Company's behalf, including, *inter alia*, those contained in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K, each of which he signed. In addition, he solicited the 2019, 2020, and 2021 Proxy Statements, each of which contained false and misleading elements that contributed*, inter alia*, to his reelection to the Board and to shareholder approval of the director compensation plan under which, as to the 2020 Proxy Statement, he received unjust compensation and, as to the 2021 Proxy Statement, an amendment was made thereto. As a trusted Company director, he conducted little, if any, oversight of Facebook's engagement in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements. In addition, he consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Andreessen breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile

Verified Shareholder Derivative Complaint

and, therefore, excused.

154. Demand on Defendant Houston is futile for the additional following reasons. Defendant Houston has served as a Company director since February 2020, and he serves as a member of the Compensation, Nominating & Governance Committee. Defendant Houston has received and continues to receive significant compensation for his role as a director. This includes over $1.5 million in Fiscal Year 2020. Defendant Houston was responsible for many of the false and misleading statements and omissions that were made by or on the Company's behalf, including, *inter alia*, those contained in the 2020 10-K, which he signed. In addition, he solicited the 2020 and 2021 Proxy Statements, each of which contained false and misleading elements which contributed*, inter alia*, to his reelection to the Board as well as to shareholder approval of the director compensation plan under which, as to the 2020 Proxy Statement, he received unjust compensation and, as to the 2021 Proxy Statement, an amendment was made thereto. As a trusted Company director, he conducted little, if any, oversight of Facebook's engagement in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Houston breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, therefore, excused.

155. Demand on Defendant Killefer is futile for the additional following reasons. Defendant Killefer has served as a Company director since March 2020, and she serves as Chair of the Privacy Committee and as a member of the Audit & Risk Oversight Committee. Defendant Killefer has received and continues to receive significant compensation for her role as a director. This includes over $1.6 million in Fiscal Year 2020. Defendant Killefer was responsible for many of the false and misleading statements and omissions that were made by or on the Company's behalf, including, *inter alia*, those contained in the 2020 10-K, which she signed. In addition, she solicited the 2020 and 2021 Proxy Statements, each of which contained false and misleading elements which contributed*, inter alia*, to her reelection to the Board, as well as to shareholder approval of the director compensation plan under which, as to the 2020 Proxy Statement, she received unjust compensation and, as to the 2021 Proxy Statement, an amendment

Verified Shareholder Derivative Complaint

was made thereto. As a trusted Company director, she conducted little, if any, oversight of Facebook's engagement in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements. Furthermore, she consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Killefer breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is futile and, therefore, excused.

156. Demand on Defendant Kimmitt is futile for the additional following reasons. Defendant Kimmitt has served as a Company director since March 2020, and he serves as Lead Independent Director and as a member of the Privacy Committee. Defendant Kimmitt has received and continues to receive significant compensation for his role as a director. This includes over $1.7 million in Fiscal Year 2020. Defendant Kimmitt was responsible for many of the false and misleading statements and omissions that were made by or on the Company's behalf, including, *inter alia*, those contained in the 2020 10-K, which he signed. In addition, he solicited the 2020 and 2021 Proxy Statements, each of which contained false and misleading elements which contributed*, inter alia*, to his reelection to the Board, as well as to shareholder approval of the director compensation plan under which, as to the 2020 Proxy Statement, he received unjust compensation and, as to the 2021 Proxy Statement, an amendment was made thereto. As a trusted Company director, he conducted little, if any, oversight of Facebook's engagement in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kimmitt breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, therefore, excused.

157. Demand on Defendant Thiel is futile for the additional following reasons. Defendant Thiel has served as a Company director since April 2005, and he serves as Chair of the Compensation, Nominating & Governance Committee. Defendant Thiel has received and continues to receive significant compensation for his role as a director. Defendant Thiel was responsible for many of the false and

misleading statements and omissions that were made by or on the Company's behalf, including, *inter alia*, those contained in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K, each of which he signed. In addition, he solicited the 2019, 2020, and 2021 Proxy Statements, each of which contained false and misleading elements which contributed*, inter alia*, to his reelection to the Board as well as to shareholder approval of the director compensation plan under which, as to the 2020 Proxy Statement, he received unjust compensation and, as to the 2021 Proxy Statement, an amendment was made thereto. As a trusted Company director, he conducted little, if any, oversight of Facebook's engagement in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Thiel breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, therefore, excused.

158.    Demand on Defendant Travis is futile for the additional following reasons. Defendant Travis has served as a Company director since March 2020, and she serves as Chair of the Audit & Risk Oversight Committee. Defendant Travis has received and continues to receive significant compensation for her role as a director. This includes over $1.6 million in Fiscal Year 2020. Defendant Travis was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2020 10-K, which she signed. In addition, she solicited the 2020 and 2021 Proxy Statements, each of which contained false and misleading elements which contributed*, inter alia*, to her reelection to the Board, as well as to shareholder approval of the director compensation plan under which, as to the 2020 Proxy Statement, she received unjust compensation and, as to the 2021 Proxy Statement, an amendment was made thereto. As a trusted Company director, she conducted little, if any, oversight of Facebook's in the schemes to engage in the Platform Content Misconduct and to make false and misleading statements. Furthermore, she consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Travis breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or

disinterested. Accordingly, demand upon her is futile and, therefore, excused.

159. Demand on the Board is further futile for the additional following reasons.

160. Defendants Zuckerberg, Sandberg, Andreessen, and Thiel were among the directors that solicited the 2019 Proxy Statement, which contained shareholder proposals calling for general corporate governance reforms. The 2019 Proxy Statement also contained proposals for the adoption of practices that would have directly addressed aspects of the Platform Content Misconduct. For instance, a shareholder proposal in the 2019 Proxy Statement called for a Content Governance Report that would describe Facebook's "strategies and policies on content governance, *including the extent to which they address human rights abuses and threats to democracy and freedom of expression, and the reputational, regulatory, and financial risks posed by content governance controversies*." (Emphasis added.) The inadequacy of Facebook's related strategies and policies, and the extent to which the Company's platforms permitted human rights abuses and threats to democracy and freedom of expression would be a central revelation from the disclosures by Frances Haugen regarding the Platform Content Misconduct. Facebook suffered substantial harm as a result of the Platform Content Misconduct and the disclosure thereof. Thus, the matters addressed by the proposal posed substantial reputational, regulatory, and financial risks at the time the Content Governance Report was proposed. Despite the risks posed to the Company, and while the Platform Content Misconduct was ongoing, Defendants Zuckerberg, Sandberg, Andreessen, and Thiel maintained that a Content Governance Report was unnecessary, by noting, *inter alia*, "*[g]iven the breadth of our previous disclosures concerning our content policies, and our intent to continue to provide transparency around our policies*." Yet, as evidenced by the Platform Content Misconduct and the subsequent whistleblowing, the Company's disclosures concerning content policies were woefully inadequate and the Company was not providing transparency on the topic. For these additional reasons, Defendants Zuckerberg, Sandberg, Andreessen, and Thiel breached their fiduciary duties, violated Section 14(a) of the Exchange Act, and face a substantial likelihood of liability. They are therefore not disinterested and independent, and demand against them is therefore excused as being futile.

161. Each of the nine Director-Defendants solicited the 2020 and 2021 Proxy Statements, which contained shareholder proposals calling for general corporate governance reforms, as well as practices

that would have directly addressed the Platform Content Misconduct or related matters. The 2020 Proxy Statement and the 2021 Proxy Statement contained shareholder proposals calling for an expert on human/civil rights to be added to the Company's Board. They further called for the publication of a report regarding, *inter alia*, the risk of child sexual exploitation posed by Facebook's privacy tools and the limitations and effects of detection strategies and technologies. The 2020 Proxy Statement further contained a shareholder proposal that called for Facebook to prepare a report on the risks facing Facebook that related to civil and human rights. The 2021 Proxy Statement contained a proposal calling for a report on platform misuse—citing the Cambridge Analytica data misuse scandal, posts inciting genocide in Myanmar, the efforts of Russian hackers to affect the 2016 U.S. presidential election, the presence of over 45 million images of child pornography and torture, political advertisements containing lies and disinformation, hate speech calling for violence against immigrants, and Libyan Facebook users' use of Facebook's platforms to purchase weapons and locate and kill adversaries—and the benefits and drawbacks of maintaining on a permanent basis the enhanced actions that were taken during the 2020 U.S. presidential election cycle. The Director-Defendants opposed each of these proposals, and conjured various reasons why the proposals were unnecessary in light of Facebook's existing efforts and ostensible transparency. As would later be revealed by Frances Haugen when she disclosed the Platform Content Misconduct, Facebook's efforts in these areas were terribly inadequate, and Facebook was not being transparent, or even truthful, about its practices in these areas. Thus, each of the Director-Defendants caused or permitted the inclusion of materially false and misleading statements in the 2020 and 2021 Proxy Statements. These materially false and misleading statements caused shareholders to vote down proposals which would have directly addressed aspects of the Platform Content Misconduct. Thus, the Director-Defendants' misconduct caused the Platform Content Misconduct to remain unaddressed and undisclosed, despite attempts by shareholders to implement policies and procedures that would have addressed or disclosed the misconduct. For these reasons, each of the nine Director-Defendants breached their fiduciary duties, violated Section 14(a) of the Exchange Act, faces a substantial likelihood of liability, and is neither disinterested nor independent. Accordingly, demand is excused as to each of them.

162.    Demand in this case is further excused because each the Directors are beholden to and

Verified Shareholder Derivative Complaint

controlled by Defendant Zuckerberg, a primary wrongdoer in the misconduct alleged herein. Defendant Zuckerberg is founder, CEO, Chairman, and a controlling shareholder of the Company, with control over 57.7% of total voting power as of March 31, 2021. In light of this control, the Directors cannot impartially consider a demand against Defendant Zuckerberg, an interested, primary wrongdoer, because they are dependent on him for continued employment with Facebook and the lucrative compensation that goes with that. This is particularly true of Defendant Sandberg who is also an executive at Facebook and receives handsome compensation. Thus, all the Directors are unable to disinterestedly or independently evaluate a demand as a result of the control Defendant Zuckerberg has over them.

163.    In addition, Defendant Zuckerberg directly engaged in insider trading, in violation of federal law. While possessing material non-public information, Defendant Zuckerberg engaged in insider transactions during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein, receiving proceeds in excess of $2.5 billion as a result. Therefore, demand in this case is further excused as to him, as being futile.

164.    The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of Facebook and Facebook shareholders. For instance, Defendants Sandberg and Killefer worked together at McKinsey & Company in 1995 and 1996, and they again worked together at the Department of the Treasury from 1997 to 2000, during a portion of which Defendant Sandberg was working as Chief of Staff and Defendant Killefer was working as Assistant Secretary for Management, CFO, and COO. Furthermore, Defendants Alford and Andreessen overlapped in their tenures at eBay Inc. ("eBay"). From 2008 to 2014, Defendant Andreessen served on eBay's board of directors, during which period Defendant Alford served in a variety of roles at two different subsidiaries of eBay subsidiaries. Defendant Alford also served as CFO and Head of Operations at the Chan Zuckerberg Initiative from 2017 to 2019, which is a philanthropic endeavor of Defendant Zuckerberg. Also, Defendants Zuckerberg, Sandberg, Andreessen, and Thiel have all worked together at Facebook for well over a decade. Specifically, Defendant Zuckerberg founded the Company in 2004, Defendant Thiel joined the Board in 2005, and Defendants Andreessen and Sandberg joined the Company in 2008. These Directors have all served

Verified Shareholder Derivative Complaint

together with Defendant Wehner for approximately a decade, as Defendant Wehner joined the Company in 2012. Companies where Defendants Alford, Andreessen, Houston, and Travis are primarily employed or where they serve on the boards of directors have advertised using Facebook's platforms. Furthermore, PayPal Holdings, Inc. (the primary employer of Defendant Alford) and Dropbox, Inc. (at which Defendant Houston serves as CEO and Board Chairman) have received payments from Facebook for certain services. Even more, two companies with which Defendant Andreessen is affiliated—Coinbase Global, Inc., at which he serves as a director and Andreessen Horowitz, a venture capital firm closely affiliated with Defendant Andreessen—are members, together with the Company, in the Diem Association. The Diem Association seeks to establish and manage a blockchain-based payment system that will be affiliated with Facebook. In addition to all the foregoing, Defendant Kimmitt serves as senior international legal counsel at Wilmer Cutler Pickering Hale and Dorr LLP, a prominent firm that provides legal services to Facebook. These numerous and substantial conflicts of interest precluded the Director-Defendants from adequately monitoring Facebook's operations and internal controls and calling into question each other's and the remaining Individual Defendants' conduct. Thus, demand on the Director-Defendants is futile and therefore excused.

165. During the Relevant Period, Defendants Alford, Killefer, and Travis (as Chair) (collectively, the "Audit Committee Defendants"), served on the Company's Audit & Risk Oversight Committee. Pursuant to the Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, among other things, the Company's financial statements, its program for repurchasing shares, the Company's risk management and assessment functions (including major financial risk and enterprise exposures), major exposures to legal and regulatory compliance risk, "the Company's assessment of the major ways in which its services can be used to facilitate harm or undermine public safety or the public interest," and Facebook's system of internal controls. The Audit Committee Defendants violated the Audit Committee Charter by failing to adequately review the Company's SEC filings, by causing or permitting the Company to repurchase approximately 71.27 million shares of Facebook's common stock at artificially inflated prices, by failing to adequately exercise their risk management function including, without limitation, their responsibility to assess "the major ways in which

[Facebook's] services can be used to facilitate harm or undermine public safety or the public interest," and by failing to ensure that Facebook had an adequate system of internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested. Accordingly, demand is excused as to them.

166. During the Relevant Period, Defendants Andreessen, Houston, and Thiel (as Chair) (collectively, the "Compensation Committee Defendants"), served on the Compensation, Nominating & Governance Committee. Specifically, Defendant Thiel was on the Compensation, Nominating & Governance Committee at the time the 2019 Proxy Statement was solicited, Defendants Andreessen and Thiel were on the Compensation, Nominating & Governance Committee at the time the 2020 Proxy Statement was solicited, and all three of the Compensation Committee Defendants were on the Compensation, Nominating & Governance Committee at the time the 2021 Proxy Statement was solicited. In that capacity, they approved high performance percentages, which translated into bonuses for Company executives, despite the fact that the ongoing Platform Content Misconduct was in contravention of numerous factors that ostensibly were to be considered in the awarding of such compensation. These factors included, without limitation, "making progress on the major social issues" facing Facebook, "build[ing] new experiences that meaningfully improve people's lives today[,]" and "communicat[ing] more transparently about what we're doing[.]" As a result of the foregoing, the Compensation Committee Defendants breached their fiduciary duties and are not disinterested. Accordingly, demand is excused as to them.

167. The Director-Defendants violated the Code of Conduct by engaging in or permitting the schemes to cause Facebook to engage in the Platform Content Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Conduct by failing to act lawfully, honestly, ethically and in the best interests of Facebook. They also failed to promptly report known violations of the Code of Conduct and violations of the law, failed to properly respond to events that undermine the confidentiality, integrity, or availability of data for which Facebook is responsible, failed to design and build products that

Verified Shareholder Derivative Complaint

prioritize safety and privacy, failed to create accurate records, and failed to communicate honestly and transparently. Moreover, Defendant Zuckerberg violated the Code of Conduct by engaging in insider trading. Thus, the Director-Defendants breached and violated the Company's own Code of Conduct and are not disinterested. Accordingly, demand is excused as to them.

168. Facebook has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages it suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

169. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of Facebook shareholders. Accordingly, demand is excused as being futile.

170. The acts complained of herein constitute violations of fiduciary duties owed by Facebook's controlling shareholder, officers, and directors, and these acts are incapable of ratification.

171. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by Facebook against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Facebook, there would be no directors' and officers' insurance protection. Accordingly, the

Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for Facebook to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

172. If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

173. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. As a result, demand upon the Board is excused as being futile.

## FIRST CLAIM
**Against Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis for Violations of Section 14(a) of the Exchange Act**

174. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

176. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

177. Under the direction and watch of the Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis,[3] the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement failed to disclose that: (1) the Company was engaged in the Platform Content Misconduct, which included enabling criminal activity, harming users, inconsistently and unevenly applying policies concerning content moderation, and targeting children despite knowing of the harms posed to them by the Company's products; (2) the Company was not seeking to remediate the Platform Content Misconduct, despite being aware of such misconduct; (3) Facebook was disclosing user metrics it knew to be inflated due to duplicate and fake accounts; and (4) the Company failed to maintain internal controls . As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

178. Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis also caused the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement to be false and misleading by failing to disclose that: (1) though Facebook claimed to consider certain factors in determining the performance-based executive pay, this claim was untrue in light of significant performance-based compensation that was awarded despite the ongoing Platform Content Misconduct and inflation of MAU growth due to numerous duplicate and fake accounts; (2) though Facebook claimed its officers and directors complied with the Code of Conduct and that the Company would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either in the absence of waivers or without such waivers being disclosed; and (3) the risk oversight functions of the Board and its committees were not being adequately exercised, as evidenced by the wrongdoing described herein.

179. In the exercise of reasonable care, the Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis should

---

[3] The claim for violation of Section 14(a) of the Exchange Act against Defendants Bowles, Desmond-Hellman, and Hastings is only as to the statements made in the 2019 Proxy Statement. The claim for violation of Section 14(a) of the Exchange Act against Defendants Alford, Houston, Killefer, Kimmitt, and Travis is only as to the statements made in the 2020 and 2021 Proxy Statement. The claim for violation of Section 14(a) of the Exchange Act against Defendants Andreessen, Sandberg, Thiel, and Zuckerberg is as to the statements made in the 2019, 2020, and 2021 Proxy Statements.

Verified Shareholder Derivative Complaint

have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions in the 2019 Proxy Statement, 2020 Proxy Statement, and the 2021 Proxy Statement were material to Plaintiff in voting on the matters set forth therein, including but not limited to, election of directors.

180. The false and misleading elements of the 2019 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Alford, Andreessen, Desmond-Hellmann, Sandberg, Thiel, and Zuckerberg to the Board, allowing them to continue or begin breaching their fiduciary duties to the Company; (2) approve on a non-binding basis the compensation of the Company's named executive officers, including Defendants Zuckerberg, Wehner, and Sandberg; (3) decide on a non-binding basis that future non-binding advisory votes on the compensation of the Company's executives should occur every three years, which reduced the ability of shareholders to raise concerns regarding executives who had breached and/or were breaching their fiduciary duties; and (4) to reject eight shareholder proposals, including one which would have required Facebook to publish a "Content Governance Report" that would have required Facebook to confront the issues central to the Platform Content Misconduct.

181. The false and misleading elements of the 2020 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board, which allowed them to continue breaching their fiduciary duties; (2) approve a director compensation policy for non-employee directors, including Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis, who were breaching their fiduciary duties; and (3) reject eight shareholder proposals, including (a) a proposal that would have required the Company to add a "human/civil rights" expert to the Board; (b) a proposal that would have required Facebook to publish a report on risks related to civil and humans right; and (c) a proposal that would have required the Company to issue a report concerning child sexual exploitation on Facebook's platforms. The issues addressed by these rejected shareholder proposals were all implicated by the Platform Content Misconduct.

Verified Shareholder Derivative Complaint

182. The false and misleading elements of the 2021 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board, allowing them to continue breaching their fiduciary duties; (2) approve an amendment to the director compensation policy for non-employee directors, which included Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis; and (3) reject six shareholder proposals, including (a) a proposal that would have required the Company to add a "human/civil rights" expert to the Board; (b) a proposal that would have required Facebook to issue a report on platform misuse; and (c) a proposal that would have required the Company to publish a report about child sexual exploitation on Facebook's platform. The concerns addressed by these rejected shareholder proposals were all implicated by the Platform Content Misconduct.

183. The Company was damaged as a result of Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis's material misrepresentations and omissions in the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement.

184. Plaintiff on behalf of Facebook has no adequate remedy at law.

### SECOND CLAIM

#### Against Individual Defendants for Breach of Fiduciary Duties

185. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186. Each Individual Defendant owed to the Facebook the duty to exercise candor, good faith, and loyalty in the management and administration of its business and affairs.

187. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

188. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to Facebook. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Facebook.

189. In breach of their fiduciary duties, the Individual Defendants caused or permitted the

Company to engage in the Platform Content Misconduct

190. In further breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused Facebook to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Platform Content Misconduct, which included enabling criminal activity, harming users, inconsistently and unevenly applying policies concerning content moderation, and targeting children despite knowing of the harms posed to them by the Company's products; (2) the Company was not seeking to remediate the Platform Content Misconduct, despite being aware of such misconduct; (3) Facebook was disclosing user metrics it knew to be inflated due to duplicate and fake accounts; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

191. The Individual Defendants failed to correct and caused Facebook to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein. As a result, the Individual Defendants are personally liable to the Company for breaching their fiduciary duties.

192. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

193. In yet further breach of their fiduciary duties, during the Relevant Period, two of the Individual Defendants engaged in lucrative insider sales, resulting in proceeds of approximately $2.5 billion. Such insider sales were made while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. In addition, in breach of their fiduciary duties, the Individual Defendants caused the Company, to repurchase approximately 71.27 million shares of its own stock for approximately $24.6 billion. Given that, during this time, the Company's stock was only worth $324.61 per share, the price at close on October 22, 2021, the Company overpaid by over $1.4 billion.

194. The Individual Defendants had actual or constructive knowledge that Facebook issued materially false and misleading statements, yet they failed to correct the Company's public statements.

Verified Shareholder Derivative Complaint

The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

195. The Individual Defendants had actual or constructive knowledge that they had caused Facebook to improperly engage in Platform Content Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that Facebook was engaging in the Platform Content Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused Facebook to improperly engage in the Platform Content Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

196. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

197. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Facebook has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198. Plaintiff on behalf of Facebook has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and
Rule 10b-5 of the Exchange Act**

199. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding the Company. Facebook is not only defending claims that it violated Section 10(b) of the

Verified Shareholder Derivative Complaint

Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful schemes perpetrated by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused Facebook to repurchase billions of dollars of its own shares at artificially-inflated prices, damaging the Company.

201. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements and filings with the SEC.

202. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, nonpublic information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Facebook not misleading.

203. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of Facebook, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by the Company. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

204. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

68
Verified Shareholder Derivative Complaint

205. Plaintiff on behalf of Facebook has no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

206. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207. The Individual Defendants, by virtue of their positions with Facebook and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Facebook and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Facebook and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

208. Plaintiff on behalf of Facebook has no adequate remedy at law.

### FIFTH CLAIM
**Against Defendants Zuckerberg, Wehner, and Clegg for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

209. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

210. Facebook, along with Defendants Zuckerberg, Wehner, and Clegg, are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when Facebook is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Zuckerberg's, Wehner's, and Clegg's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or director of the Company.

211. Defendants Zuckerberg, Wehner, and Clegg, because of their positions of control and authority as controlling shareholder, officers, and/or director of Facebook, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Facebook, including the wrongful acts complained of herein and in the Securities Class Actions.

212. Accordingly, Defendants Zuckerberg, Wehner, and Clegg are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

213. As such, Facebook is entitled to receive all appropriate contribution or indemnification from Defendants Zuckerberg, Wehner, and Clegg.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in Facebook's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Facebook, and that Plaintiff is an adequate representative of Facebook;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Facebook;

(c) Determining and awarding to Facebook the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Facebook and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Facebook and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Facebook to nominate at least five candidates for election to the Board; and

70

Verified Shareholder Derivative Complaint

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)  Awarding Facebook restitution from the Individual Defendants, and each of them;

(f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)  Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 25, 2022

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/* Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Hugues Gervat, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of February, 2022.

_____
HUGUES GERVAT