1   **BERNSTEIN LITOWITZ BERGER**
      **& GROSSMANN LLP**
2   JONATHAN D. USLANER (Bar No. 256898)
    (jonathanu@blbglaw.com)
3   CAITLIN BOZMAN (Bar No. 343721)
    (caitlin.bozman@blbglaw.com)
4   2121 Avenue of the Stars, Suite 2575
    Los Angeles, CA 90067
5   Tel: (310) 819-3470

6   *Counsel for Lead Plaintiffs*
    *Ohio Public Employees Retirement System and*
7   *PFA Pension Forsikringsaktieselskab*

8   [Additional Counsel Appear on
    Signature Page]
9

10              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
11                    **SAN JOSE DIVISION**

12

13   IN RE META PLATFORMS, INC.        Lead Case No. 4:21-cv-08812-JST
     SECURITIES LITIGATION
                                        Consolidated Case No. 4:21-cv-08873-JST
14

15                                      **LEAD PLAINTIFFS' CONSOLIDATED**
                                        **AMENDED CLASS ACTION**
16                                      **COMPLAINT FOR VIOLATIONS OF**
                                        **THE FEDERAL SECURITIES LAWS**
17
                                        CLASS ACTION
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  JURISDICTION AND VENUE .........................................................................15

III.  PARTIES ...............................................................................................................16

    A.  Lead Plaintiffs ..........................................................................................16

    B.  Defendants ................................................................................................16

IV.  SUMMARY OF THE FRAUD ..........................................................................18

    A.  Before the Class Period, Meta Notices Material Negative Trends in Its User Base and Engagement that Threaten Its Profitability ...............................................18

    B.  Defendants Make a Series of Misstatements and Omissions Concerning Meta's Content-Moderation Practices, Algorithm, the Impact of its Platforms on Its Users, and the Size of Its User Base ...........................23

        1.  Contrary to Defendants' Public Representations, Meta Exempted Several Million High-Profile Users from Its Content-Moderation Policies, Allowing Them to Violate "Community Standards" with Impunity ...........................23

            a.  Defendants Assure Investors that Meta Applies Its Content Standards Equally to All Users .....................24

            b.  In Truth, Meta's "Cross-Check" and "Whitelisting" Practices Exempted Several Million High-Profile Users from Content Enforcement .........................29

            c.  Meta's Own Oversight Board Excoriated the Company for Misrepresenting and Concealing Cross-Check ...........................34

        2.  Defendants Made Material Misstatements and Omissions Concerning the Fact That Meta's News Feed Algorithm and Content-Moderation Practices Promoted Toxic Content and Misinformation ...........................37

            a.  The News Feed Is Facebook's Primary Content-Delivery Mechanism ...........................37

            b.  Defendants Changed the News Feed Algorithm in 2018, Stating that the Change Prioritized "Meaningful Social Interactions" ...........................38

            c.  Meta Quickly Determines that its 2018 Changes to the News Feed Algorithm Caused Hateful, Toxic Content and Misinformation to Be "Inordinately Prevalent" ...........................39

d.    Defendants Made Numerous False and Misleading Representations Concerning the News Feed Algorithm and Meta's Content Moderation....................................42

e.    Copious Internal Research Documented that the Algorithm Caused Toxic Content to Proliferate, But Meta and Zuckerberg Chose Not to Fix the Problem ...................47

f.    Defendants' Inability and Unwillingness to Effectively Moderate Content Made It Impossible to Achieve Meta's Publicly Stated Objectives to Support COVID-19 Vaccination....................................59

3.    Meta Falsely Touts Its Commitment to Children's Safety and Downplays and Denies the Harms Caused by Its Platforms, Despite Knowing from Extensive Internal Research that Its Platforms Severely Harm Teens, Especially Teen Girls ............................................61

a.    Defendants Launch a Campaign to "Race for Teen Users"....................................62

b.    Meta's Internal Research Demonstrates that Instagram's Negative Impacts on Teens, Especially Teen Girls, Are "Common" And "Severe"....................................64

c.    Defendants Conceal Meta's Internal Research on Teen Mental Health from the Public....................................69

d.    "Winning with Tweens": Meta Works to Attract Even Younger Users Because It Is Losing the "Race for Teens"....................................71

e.    Defendants Falsely Tout Meta's Commitment to Children's Safety, Assure the Public that Meta's Platforms Do Not Harm Children, and Characterize the Research as Inconclusive ....................................72

f.    Meta Doubles Down on Its Efforts to Target Young Users, Its False Assurances, and Its Denials of the Negative Impact of Its Platforms on Children ............................73

4.    Meta Mispresents Its User Growth Metrics Due to the Prevalence of Duplicate or SUMA Accounts Among New Accounts ............................77

a.    User Growth Was a Key Metric for Investors ...............................77

b.    Meta Sold Facebook as a "Real Identity" Platform Where Advertisers Could Reliably Target Key Demographics like Teens and Young Adults ....................................78

c.    Meta Misstates Facebook's User Growth Metrics....................................79

d.    In Truth, Meta Knew that Duplicate Accounts Were Far More Prevalent in New Accounts than Reported, and Teen and Young Adult Use and Engagement Was Actually in Decline ....................................81

C.    Meta Stock Price Declines in Response to the Publication of the Facebook Files and Additional Disclosures Connected to the Fraud ........................................83

    1.    *The Wall Street Journal* Publishes the Facebook Files and Defendants Push Back with Denials ........................................83

        a.    September 13, 2021: the September 13 Facebook File Describes Internal Documents Showing that Meta Allowed Millions of Users to Violate Its Community Standards and Post Harmful Content with Impunity ........................................85

        b.    September 14, 2021: the September 14 Facebook File Showcases How Meta Profited by Making Instagram "Toxic" for Teens, Causing New Congressional Scrutiny ........................................88

        c.    September 15, 2021: the September 15 Facebook File Describes How Meta's Changes to Its News Feed Algorithm and Content Moderation Failures Generated Prevalent Toxic Content ........................................96

    2.    Meta's Stock Price Declines Further in Response to Subsequent Disclosures Connected to the Fraud ........................................99

        a.    September 21-22, 2021: Meta's Oversight Board Calls for More "Transparency" on X-Check, While Senators Grill Meta over How Facebook Harms Teens ........................................99

        b.    September 27-28, 2021: Meta Pauses Instagram Kids, *The Wall Street Journal* Reveals How Meta Planned to Attract Preteens to Its Platforms, and Meta Seeks a Review of X-Check by the Oversight Board ........................................101

        c.    October 3, 2021: the Facebook Files Whistleblower Is Revealed ........................................105

        d.    October 6, 2021: Meta Halts New Product Launches and European Regulators Work with the Whistleblower ........................................110

        e.    October 21, 2021: the Oversight Board Condemns Meta for Withholding Relevant Information About X-Check, Meta Admits that Its Statements to the Oversight Board Were Misleading, and *The Wall Street Journal* Releases New Information About Meta's User Metrics ........................................112

            (1)    The Oversight Board Formally Reviews X-Check ..........112

            (2)    *The Wall Street Journal* Reveals That Up to 56% of New Accounts Are Created by Existing Users ...............113

V.      POST-CLASS PERIOD DEVELOPMENTS ....................................................................115

        A.      Another Whistleblower Corroborates Haugen's Complaints and the Facebook Files ..............................................................................................115

        B.      A News Outlet Consortium Gains Access to the Facebook Papers, Corroborating the Facebook Files and Expanding on the Platforms' Harms ......115

        C.      Analysts React to the Facebook Files and Ensuing Developments ....................116

        D.      Investigations Concerning Meta's Promotion of Instagram to Children and Young Adults Commence as Scrutiny Intensifies ..............................................117

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...........................................................................................................119

        A.      False and Misleading Statements Representing that Meta Applied Its Content-Moderation Policies Consistently to All Users .....................................119

        B.      False and Misleading Statements Concerning Presence and Impact of Misinformation and Harmful Content on Meta's Platforms .............................132

                1.      Defendants' False and Misleading Statements Concerning Meta's Algorithms and Harmful Content on Meta's Platforms .........................132

                2.      Additional False and Misleading Statements Concerning Meta's Ability and Willingness to Moderate Misinformation and Harmful Content on Its Platforms ..............................................................141

        C.      False and Misleading Statements Denying Instagram's Harm to Young Users ...................................................................................................150

        D.      False and Misleading Statements Representing that Meta's Metrics for Counting Users Were Accurate and Reliable .....................................................160

VII.    ADDITIONAL LOSS CAUSATION ALLEGATIONS ............................................163

VIII.   ADDITIONAL SCIENTER ALLEGATIONS .............................................................166

IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ..........................................186

X.      THE PRESUMPTION OF RELIANCE .......................................................................187

XI.     CLASS ACTION ALLEGATIONS ..............................................................................188

XII.    CLAIMS FOR RELIEF .................................................................................................190

        COUNT I ........................................................................................................................190

        COUNT II .......................................................................................................................192

XIII.   PRAYER FOR RELIEF ................................................................................................193

Lead Plaintiffs Ohio Public Employees Retirement System ("OPERS") and PFA Pension, Forsikringsaktieselskab ("PFA Pension") (together, "Lead Plaintiffs"), by and through their counsel, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all persons or entities, except Defendants and other persons and entities excluded below, who purchased or otherwise acquired Meta Platforms, Inc. f/k/a Facebook, Inc. ("Meta" or the "Company") Class A common stock between April 27, 2021, and October 21, 2021, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of (i) transcripts, press releases, news articles, and other public statements issued by or concerning Meta; (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by Meta with the U.S. Securities and Exchange Commission ("SEC"); (iv) Meta's corporate website; and (v) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## I.   **INTRODUCTION**

1.     This case arises from misstatements and omissions by the senior executives of Meta—the most powerful social media company in the world—about the severe harms that its platforms cause, and its decision to prioritize profits over users' safety. Several stunning disclosures in September and October 2021 brought these misrepresentations and omissions to light, outraged the public, and triggered a wave of investigations that remain ongoing.

2.     The disclosures began with the September 2021 publication of the "Facebook Files," a series of bombshell articles by *The Wall Street Journal* that revealed previously secret internal Meta research and communications provided by an anonymous former Meta employee turned whistleblower. These articles started to rip the lid off what the whistleblower described as Meta's "black box" concealing how serious these harms were, what Defendants knew about them,

and how Meta repeatedly allowed these harms to continue to maximize revenue.

3.      The disclosures cascaded into October 2021 when Frances Haugen—a former Meta data scientist who studied these harms—revealed herself as the whistleblower who provided the materials to the *Journal*. Haugen gave a shocking accounting of what she had witnessed at Meta, first on *60 Minutes* and in an interview with the *Journal*, and later in sworn testimony to Congress. Haugen explained that the final straw for her was Meta's December 2, 2020, decision to disband its Civic Integrity Unit—the unit charged with policing how the platform could spread falsehoods, stoke violence, and disseminate toxic content.

4.      Rather than permit Meta to continue to escape accountability for the decisions it was making behind closed doors, Haugen gathered thousands of pages of internal Meta research before she left the Company. Haugen then provided this research to the *Journal*, Congress, and the SEC to expose the brutal truth that Meta, "over and over again, has shown it chooses profit over safety. It is subsidizing . . . its profits with our safety."

5.      Meta is the world's largest social media company, and owns and operates the ubiquitous Facebook and Instagram platforms. Meta makes essentially all its revenue—which totaled a staggering $115 billion in 2021—from advertising. Meta's advertising revenue depends on two fundamental metrics: the size of its user base and users' level of engagement, i.e., how active they are on the platform. As Meta told investors, "The size of our user base and our users' level of engagement are critical to our success," as its advertising revenue was highly dependent on its ability to "continue to increase user access to and engagement with our products."

6.      In the years before the Class Period, Meta's executives observed concerning downward trends in user engagement and growth—trends that, if not arrested and reversed, would have a substantial negative impact on Meta's revenue stream. Meta's users were becoming less engaged with its platforms. As reported by *Forbes* and *The Wall Street Journal*, users "posted a third less content in 2016 than in 2015," and Meta's training videos and internal memos acknowledged that "engagement was broadly declining." This, in turn, impacted the performance of Meta's advertisements significantly. For example, a 2018 study conducted by two social media consulting companies found that the "top 20,000 brands on Facebook . . . suffered more than a 50

percent reduction in engagement."

7.     Meanwhile, Meta struggled mightily to penetrate the teen, young adult, and "tween" markets. This age cohort is particularly important to social media companies because young users create trends, adopt new technologies, and represent a critical untapped source for new growth. Internal Meta research dated February 20, 2020, and titled, "What we know about the continued decline in OGPS," noted that young adults were "less engaged on Facebook than older adults." An internal Meta presentation from November 2020, titled, "Young Adults FB Strategy," reaffirmed this decline in young adult engagement and described it as "a significant risk" to the user and engagement metrics that Meta reported publicly and relied on to drive revenue. Perhaps more alarming, teens were even more apathetic toward Meta's products than young adults; Meta's own study, entitled "Future of YA," indicated that from 2019 to 2021, the number of active teenage users declined sharply, and "sessions, time spent, [and] production [were] all much worse among teens than young adults." These negative trends threatened the Company's ability to charge advertisers a premium for space on Meta's platforms.

8.     In response, Meta undertook several initiatives designed to boost engagement, attract users (particularly young users) and, ultimately, enhance advertising revenue. For example, in 2018, Meta made a fundamental change to its central algorithm—the formula that determines which pieces of content Facebook users view in their News Feed—to increase engagement. Meta also promulgated and purported to rigorously enforce Community Standards, a set of rules about what content was permitted on Facebook, in order to control the spread of harmful content and thus encourage users to engage more. To penetrate the teen and young adult market, Meta heavily invested in Instagram and developed plans to roll out initiatives designed to leverage that platform to attract new users as young as six years old. Meta also promoted itself as a "real identity" platform, i.e., a platform largely free from fake or duplicate accounts, and said that the prevalence of single users with multiple accounts (or "SUMA") was relatively low at 11%.

9.     By outward measures, these initiatives worked. Meta's engagement increased, and its revenues sharply rose—more than doubling from $40.7 billion in 2017 to $86 billion in 2020. Meta's stock price also skyrocketed, rising from $117 to $273 per share in that timeframe.

10.     As the Class Period approached, however, Meta found itself at the center of controversy stemming from the platform's role in the political discord and violence of January 6, 2021. Meta came under intense scrutiny from Congress, regulators, and the investing public, who questioned whether the Company was an instrument of disinformation, toxic content, and other harmful impacts on users. On March 25, 2021, Defendant Zuckerberg was brought to testify before Congress concerning, among other things, the Company's role in spreading misinformation and whether its platforms harmed children. One securities analyst noted that the hearing was part of a "regulatory onslaught" that could force content-moderation changes and additional government regulation—including a break-up of the powerful Company.

11.     These issues were enormously important to Meta, its revenue stream and growth potential, and its investors. For instance, if it were true that Meta consciously allowed misinformation or toxic content to proliferate on its platform, or knowingly allowed its products to harm young users, this would irreparably damage Meta's ability to attract and engage users across the board.

12.     Accordingly, throughout the Class Period, Defendants made a series of statements on multiple subjects designed to assuage concern, deflect the scrutiny Meta faced, and clear the way for the Company to continue its efforts to boost engagement, attract users, and reap enormous profit. These statements propelled Meta's stock price to a Class Period—and all-time—high of over $384 per share on September 1, 2021. As the facts revealed by Haugen would soon show, however, these statements were materially false and misleading.

13.     ***Misstatements and Omissions Concerning the "X-Check" and "Whitelisting" Program, Through Which Meta Exempted Millions of Users from Its Content Policies.*** Meta repeatedly assured the investing public that it applied its Community Standards equally to all users, regardless of the user's status. Meta purportedly "recognizes how important it is for Facebook to be a place where people feel empowered to communicate, and we take our role seriously in keeping abuse off the service." The equal application of Meta's Community Standards was key to attracting new users and supporting engagement: users will join and engage with a social media platform only if they feel that the platform does not permit harmful content and misinformation to

proliferate, and that the platform applies its content rules equally to all users regardless of their celebrity, politics, or other status.

14.   For precisely these reasons, Meta stated unequivocally, "Our Community Standards apply to all content, and we assess everyone under those Standards," and "we remove content from Facebook, no matter who posts it, when it violates our Community Standards." Defendant Nick Clegg (Meta's then-Vice President of Global Affairs) likewise emphasized that "whether you are the Pope, the Queen, or the President of the United States, what we apply to everybody is you cannot use our services to say things which we think can deliberately lead to harm."

15.   Meta had an Oversight Board, an independent body that the Company formed to supposedly review Meta's difficult content-moderation decisions. Meta stated to this Board (and the public) that Meta reviewed certain content decisions using a process that it called X-Check or "cross-check." Meta stated that the review under cross-check was done in only "a small number of decisions." Significantly, Meta further stated that the cross-check review was done only to ensure that the content-moderation decisions were correct under Community Standards, and thus "minimize the risk of errors in enforcement." Meta further stated that cross-check did not change the fact that the Company applied its Community Standards "consistently and fairly."

16.   In truth, Meta did not "apply [its Community Standards] to all content," did not "remove content from Facebook, no matter who posts it, when it violates our Community Standards," and did not treat "the Pope, the Queen, or the President of the United States" like it treated the average user. Further, cross-check was certainly not a mere second-level review used only to "minimize the risk of errors in enforcement" of the Community Standards. Unknown to investors, cross-check was an elaborate mechanism by which Meta simply exempted a massive amount of users—including its most influential users—from its Community Standards, thus allowing them to post content that violated standards with impunity. As investors would learn at the end of the Class Period when *The Wall Street Journal* published internal Meta research and communications, cross-check "shield[ed] millions of VIP users from the company's normal enforcement process," including "whitelisted" users, who were "rendered immune from

enforcement actions," and others who were "allowed to post rule-violating material pending Facebook employee reviews that often never came."

17.     The scope of this program was enormous: Meta maintained 45 global teams that kept and monitored the exempt list. The number of users protected by the program had grown to nearly 6 million prior to the Class Period. The exempted elite included many of the most prominent people in the world, whose content generated a disproportionate amount of views and had an outsized impact on public discourse. Meta's undisclosed program allowed rule-violating content to be viewed more than one hundred billion times.

18.     As reflected in an internal Meta research report titled "Comparing the effects of misinfo from politicians vs ordinary user sources," Meta knew that this whitelisted content had a uniquely harmful effect. Meta's research showed that "[u]nder the political whitelist policy, content posted by whitelisted Pages or Profiles is not subject to our misinformation interventions," and "results indicate the current whitelist policy is protecting content that is especially likely to deceive, and hence to harm, people on our platforms." Accordingly, the report "recommend[ed] ending the whitelist, or at least (1) informing users; [and] (2) reducing distribution"—none of which Meta did.

19.     Given its size and the fact that it was the mechanism that permitted much of Facebook's most controversial (and destructive) content to go viral, Meta's senior executives were intimately familiar with the cross-check and whitelisting program. Indeed, Meta's most senior executives personally participated in the program, often making key decisions about whom to include. An internal Meta September 2020 memo described what the *Journal* called "daily interventions in [the Company's] rule-making and enforcement process by both Facebook's public-policy team and senior executives." Meta employees with responsibility for content moderation raised their concerns internally that "the final judgment about whether a prominent post violates a certain written policy are made by senior executives, sometimes Mark Zuckerberg," but "[i]f our decisions are intended to be an application of a written policy then it's unclear why executives would be consulted."

20.     Meta employees internally recognized that the Company was lying about this

program publicly and that it raised serious ethical concerns. For instance, a 2019 internal Meta audit found that whitelist status, which was sometimes granted without any documented reason, was "<u>pervasive, touching almost every area of the company,</u>" and that the practice was "<u>not publicly defensible.</u>" As the audit stated, "<u>We are not actually doing what we say we do publicly,</u>" and whitelisting "<u>pose[d] numerous legal, compliance, and legitimacy risks for the company and harm to our community</u>."

21.     Knowing that the revelation of these facts would damage its reputation and revenue base, Meta kept the true nature of the program a closely guarded secret from the public and even its own Oversight Board. As detailed herein, multiple times during the Class Period, the Oversight Board called on Meta to provide additional "transparency" about the nature of the cross-check program. Meta consistently provided vague, incomplete, and misleading answers. When the truth about the program was ultimately revealed toward the end of the Class Period (described further below), the Oversight Board excoriated Meta. The Oversight Board found that Meta "<u>has not been fully forthcoming</u> in its response on cross-check," and instead gave "ambiguous, undetailed" responses that provided "<u>no meaningful transparency</u>" and were "<u>not acceptable.</u>" Tellingly, confronted with the information made public from the Facebook Files, Meta itself "admitted" to the Oversight Board that its statements "could come across as <u>misleading</u>."

22.     ***Misstatements and Omissions Concerning the Fact that the News Feed Algorithm and Meta's Content-Moderation Practices Caused Misinformation and Harmful Content to Proliferate.*** In 2018, Meta announced and implemented substantial changes to Facebook's News Feed algorithm, fundamentally changing the process by which the Company determined what content users would view on the platform. Meta repeatedly stated to investors that those algorithm changes simply prioritized "Meaningful Social Interactions" ("MSI"), and did not cause harmful content—e.g., misinformation, hate speech, violent content, and the like—to proliferate. When Defendant Zuckerberg testified before Congress in March 2021, he denied that Meta promoted "divisive, hateful, and conspiratorial content," claiming that the algorithm functioned "to help people have meaningful social interactions." Meta executives also stated publicly that "the idea that FB shows polarizing content because it's good for 'engagement'" was

"ridiculous," and claimed that Meta had implemented the MSI model "*precisely* to minimize polarizing content, clickbait, information bubbles, etc." Meta similarly told investors that it vigorously policed and removed harmful content on its platform, stating that "[t]here are certain types of content we simply don't allow on our services," that the Company went "out of our way to try to reduce" "extremist content or any of that stuff," and that if content was "clearly hateful, we will take that down."

23.     Contrary to these public statements, Meta's own internal research showed that the 2018 changes to its News Feed algorithm caused toxic content to proliferate on its platform so severely that it became, in Meta's own words, "<u>inordinately prevalent</u>" by no later than the fall of 2018. As Meta's researchers documented extensively within the Company (but Meta did not disclose), the algorithm heavily weighted and rewarded certain types of reactions generated by toxic and sharply divisive content. This, in turn, caused toxic content to be promoted and recommended within the News Feed—even when users were not looking for it. For example, prior to the Class Period, Meta's own internal research concluded:

> We have evidence from a variety of sources that hate speech, divisive political speech, and misinformation on Facebook and the family of apps are affecting societies around the world. <u>We also have compelling evidence that our core product mechanics, such as virality, recommendations, and optimizing for engagement, are a significant part of why these types of speech flourish on the platform . . . the net result is that Facebook, taken as a whole, will be actively (if not necessarily consciously) promoting these types of activities. The mechanics of our platform are not neutral</u>.

24.     Moreover, contrary to Defendants' public assurances, Meta's content-moderation practices were grossly deficient at removing such content when it proliferated—as the News Feed algorithm all but assured it would. While Meta outwardly described its content-moderation practices as "robust" and effective, a July 2019 internal research report explained that Meta's content-moderation tools "<u>are currently, for the foreseeable future, and perhaps permanently, not remotely sufficient to address harms on our platform</u>." Internal researchers determined that "<u>we may action as little as 3-5% of hate and ~0.6% of [violence and inciting content] on Facebook</u>," and that "<u>we miss 95% of violating hate speech</u>."

25.     Again, Meta's most senior executives were keenly aware of these facts. Not only was this research widely circulated and discussed within the Company, but Mark Zuckerberg was called to testify before Congress on these very issues. Significantly, he personally made decisions about the algorithm that he knew permitted toxic content to proliferate so that he could maintain high user engagement. For example, in April 2020, Meta data scientists proposed to Zuckerberg that the Company curtail the manner in which the algorithm rewarded "deep reshares," which were reshares in which the viewer of a piece of content is not a friend or a follower of the original poster. The data scientists explained that adjusting the algorithm in this manner would materially reduce the spread of harmful content. Zuckerberg, however, refused to broadly implement the recommended change because doing so would decrease Facebook's prized engagement and, in turn, its revenues. As Meta documented internally at the time: "<u>Mark doesn't think we could go broad</u>" with the change, because he "<u>wouldn't launch if there was a material tradeoff with MSI [meaningful social interaction] impact</u>."

26.     ***Misstatements and Omissions Concerning Instagram's Severe Negative Impact on Teen and Adolescent Well-Being.*** At the same time that Meta allowed its algorithm to promote harmful content, it actively targeted younger and younger users, and worked to convince parents that its platforms were safe. As the public questioned the impact of Meta's platforms, particularly Instagram, on young people's mental and emotional health, Meta took a page from the Big Tobacco playbook by concealing and misrepresenting the findings of its own internal research and misdirecting the public away from those findings. The reason why was clear: internally, Meta recognized that it was struggling mightily to attract and engage young users, and it had tabbed Instagram as its key product for reversing this trend and penetrating what it described in internal strategy documents as the "valuable but untapped audience" of "tweens."

27.     To accomplish this goal, Meta falsely assured investors that "there's little existing research" on the impact of Instagram on teens' well-being, and that the research that *did* exist showed that any impact was "quite small," that these supposed small effects were "bidirectional" (i.e., they were also good), and that any concerns were thus "overblown." Defendants further took great pains to falsely assure the public that Meta was focused on and prioritized children's safety,

telling investors, "We have robust policies to help protect against . . . behavior on our platform that puts the safety of children at risk."

28.    Meta's own internal research told a very different story that was fundamentally at odds with Defendants' public statements. Beginning in 2019, Meta spent 18 months compiling an extensive body of internal research into the impact of Instagram on young people's well-being. Contrary to Defendants' public statements, this research revealed that Instagram had pronounced negative impacts on young people's health. This research described these impacts as a "high reach, high intensity issue" based on Meta's finding that the negative impacts of Instagram on teens were both "common" and "severe." The impacts were far from theoretical. Meta's research determined that, for example, teens in both the United States and United Kingdom experienced feelings of wanting to "hurt themselves" or "kill themselves" that "started on Instagram." This research likewise found that Instagram's harms include "making body image issues worse for 1 in 3 teen girls."

29.    Worse yet, Meta understood that these "severe" negative impacts were effectively inescapable for its young users because they continued to use Instagram even when they recognized that doing so was harmful. Meta's internal research acknowledged that Instagram is "addictive," and as a result, teens "know that what they're seeing is bad for their mental health but feel unable to stop themselves." Meta's internal research documented that Instagram was designed to trigger "dopamine loops" that hooked kids even when the platform made them feel bad. Describing this phenomenon as "problematic use," the internal Meta research concluded that "the highest rates of 'problematic use' peak at age 14."

30.    Again, Defendants carefully kept this information from public view, but it was hardly a secret within Meta. The research was posted to Workplace—an internal forum that Meta employees use to communicate. Meta's highest-ranking executives were well aware of the research. In his congressional testimony, Defendant Zuckerberg was asked whether Meta's platforms harm children, and stated in response, "This is something that we study and care a lot about." The research was, in fact, directly presented to the C-Suite: as the *Journal* reported, it was "reviewed by top Facebook executives, and was cited in a 2020 presentation given to Zuckerberg."

31.     ***Misstatements and Omissions Concerning SUMA Prevalence and User Growth Rates.*** Throughout the Class Period, and in contrast to the reality that Meta was losing ground with young users, Meta painted a false picture about Facebook's user growth and the prevalence of duplicate accounts on its flagship platform. As noted above, Meta earns almost all of its revenue by selling ads, which the Company acknowledged was highly dependent on its ability to "continue to increase user access to and engagement with [its] products." However, attracting new users was no easy task, as Meta had already accumulated one third of the world's population as users. Moreover, as COVID-19 restrictions eased, and people spent less time indoors and online, there was a significant risk that Meta's growth rates would crater.

32.     Thus, investors were particularly impressed when Meta reported strong user growth in the first and second quarters of 2021. Meta reported ten percent year-over-year growth of monthly active users for the first quarter of 2021; in response, analysts remarked on the "robust" growth and predicted that it would continue to "drive accelerating Business Performance." Similarly, for the second quarter of 2021, Facebook reported a seven percent jump in users from the same period in 2020, and analysts continued to recommend investing in the Company because user growth was better than historical levels.

33.     In truth, however, roughly half of Facebook's new users were not real, and thus, its user growth rates were materially overstated. Even though Meta billed Facebook as a "real identity platform" and claimed that duplicate accounts made up only 11% of its worldwide users, unknown to investors, as much as 56% of Facebook's claimed new users were duplicate accounts that belonged to an existing user. An internal Meta report created at the start of the Class Period showed that no less than 32% and as much as 56% of new accounts were duplicate accounts, referred to as SUMA (as noted above, "single user multiple accounts").

34.     Moreover, contrary to Meta's claims of strong user growth, young user growth was plummeting. Internal reports just before the Class Period show that among the key demographic of 13- to 24-year-olds (teens and young adults), use was significantly down. One of eight internal reports showing "steep" declines with teens and young adults, not shared with investors, showed that teen engagement was down 13% for 2019-2021 and was projected to fall off a cliff and decline

1    45% for 2021-2023.

2        35.    ***Meta Loses Over $130 Billion in Market Capitalization in Response to***

3    ***Disclosures Connected to the Fraud.*** The facts summarized above and detailed herein remained

4    hidden from the public until they were revealed piecemeal through a series of disclosures

5    beginning on September 13, 2021, with the *Journal*'s publication of the Facebook Files.

6        36.    The September 13, 2021, article (the "September 13 Facebook File") described

7    Meta's cross-check and whitelisting program and practices, and how Meta allowed millions of

8    exempted users to populate Facebook's News Feed with harmful content viewed billions of times.

9    Despite aggressive, same-day pushback from Meta executives defending the Company, Meta's

10   stock price declined by $2.18 per share on heavy trading volume of over 13 million shares, erasing

11   nearly $5.2 billion of Meta's market capitalization in a single day. The September 13 Facebook

12   File grabbed the attention of Meta's Oversight Board in light of statements Meta made to the Board

13   about cross-check just months earlier. On September 21, 2021, the Oversight Board announced

14   that it would investigate the extent to which Company management had not been truthful about its

15   cross-check and whitelisting practices. Then, on October 21, 2021, the Oversight Board issued a

16   report finding that the Company "has not been fully forthcoming in its responses on cross-check,"

17   and that the Company admitted that its statements concerning the supposedly limited use of cross-

18   check review "could come across as misleading." Each announcement by the Oversight Board was

19   followed by additional significant drops in the value of the Company's common stock.

20       37.    The next Facebook File was published on September 14 (the "September 14

21   Facebook File"). It revealed alarming internal research that Meta conducted—and then

22   suppressed—regarding the damaging impact of Instagram on its young user's mental health,

23   particularly teenage girls. Quoting from internal documents and research, the September 14

24   Facebook File exposed that the Company knew that Instagram's impact on teen mental health was

25   severe, "toxic," and dangerous. That evening, two U.S. Senators and chairs of a powerful

26   subcommittee announced that their subcommittee would review Meta's knowledge of its

27   platforms' negative impact on young users in direct response to that day's Facebook File, stating:

28   "*The Wall Street Journal*'s reporting reveals Facebook's leadership to be focused on a growth-at-

all-costs mindset that valued profits over the health and lives of children and teens."

38.     The third Facebook File (the "September 15 Facebook File") revealed that internal documents detailed how the 2018 change in the News Feed algorithm inordinately promoted violent and divisive content on Facebook, a fact that Meta's top officials—including Defendant Zuckerberg—knew but chose not to correct in order to maximize user engagement. Despite additional Meta pushback, Meta's stock price declined again, falling $2.61 per share on heavy trading volume of nearly 18 million shares, and erasing nearly $6.2 billion of Meta's market capitalization on September 15.

39.     Over the following two days, the *Journal* published more Facebook Files revealing additional facts concerning how Meta failed to take steps to moderate its platforms' content in the face of clear—even deadly—dangers related to human trafficking, criminal enterprises, and new vaccines (the "September 16 Facebook File" and the "September 17 Facebook File"). Overall, over the course of a single week, based on the facts revealed in the Facebook Files, Meta's stock price dropped nearly $14 per share, destroying over $33 billion of shareholder value.

40.     Then, on September 28, 2021, one day after the Company responded to public outcry about Instagram and announced that it would pause its plans for Instagram Kids, the *Journal* published another Facebook File on Instagram's toxicity for young children and teens. That Facebook File disclosed that the Company formed a team to study preteens and even infants, and commissioned strategy papers about the long-term business opportunities presented by these potential underage users. Meta's stock price fell by more than $13 per share, dropping to $340.65 from its previous close of $353.58.

41.     After weeks of speculation, whistleblower Frances Haugen went public with her identity on October 3, 2021. During the course of two interviews—one with *60 Minutes* and another with the *Journal*—Haugen was identified as a former Meta employee with years of experience in the tech industry, who was compelled to reveal the truth about Meta after seeing the preventable toxicity being spread by its platforms. Haugen credibly described her sources of information and provided new facts about what she had witnessed at Meta. Meta's share price fell again, this time by nearly $17 per share, dropping to $326.23 from its previous close of $343.01

42.     On the last day of the Class Period, October 21, 2021, the *Journal* published another Facebook File, revealing additional misrepresentations by Defendants that impacted the very heart of Meta's financial success and a key metric for investors—the Company's ability to add new users. Specifically, the *Journal* reported that Meta's internal research found that single users with multiple accounts were "very prevalent" among new accounts, were three to five times higher than Meta had reported, and that Meta's system for detecting such accounts tended to undercount them—an issue that Meta researchers acknowledged made Facebook's metric of daily active users "less trustable."

43.     The disclosures summarized above had a devastating impact on Meta's investors. As described further herein, during the disclosure period at issue in this case, collectively, Meta's stock fell from an opening price of $381.68 on September 13, 2021, to a closing price of $324.61 per share on October 22, 2021, a nearly $60 per share decline that destroyed more than $130 billion in market capitalization.

44.     Meta continues to face significant blowback from governments and the public over the extensive harm that it caused, knew about, and attempted to hide. In addition to renewed congressional scrutiny announced in the wake of the September 14 Facebook File, on November 18, 2021, a bipartisan coalition of at least nine state attorneys general announced the start of an investigation into how Meta targets young people on Instagram and the harms it may cause. Meta has also faced direct scrutiny over its platforms' roles in the health, and even deaths, of its users. For instance, a British coroner spent years investigating the cause of death of 14-year-old Molly Russell, who killed herself in 2017 after consuming thousands of pieces of content on Instagram related to suicide, self-harm, and depression—content that Meta's algorithm recommended. As reported by *The New York Times*, the U.K. coroner overseeing the case, following an inquest that concluded on September 30, 2022, refused to classify Molly's death as a suicide, ruling instead that "Molly Rose Russell died from an act of self-harm while suffering from depression and the negative effects of online content," which "affected her mental health in a negative way and contributed to her death in a more than minimal way." In a report dated October 13, 2022, the coroner concluded, "The platform operated in such a way using algorithms as to result, in some

circumstances, of binge periods of images, video clips and text some of which were selected and provided without Molly requesting them." Despite acknowledging that some of the content that Meta's algorithm recommended to Molly violated its policies, Meta nevertheless defended its practices as striking the correct balance between free expression and safety.

45.     Meta and its stock price have not recovered from these damaging revelations, and continue to suffer from Defendants' refusal to take accountability for Meta's harm. Meta's stock peaked shortly before the first Facebook File was published—and has been in freefall ever since. Meta is currently trading at approximately $100 per share, its lowest price since early 2019, and just 26% of its Class Period high. As reported by *CNBC*, the stock is "one of the worst performers [of 2022] in the S&P 500," with only four stocks in the S&P 500 having a worse year. Marketing experts interviewed by *CNBC* attributed this decline to Meta losing the race to "win[] the next generation" and the fact that it now "suffers from a lot of criticism and skepticism about whether they are a force for good or evil."

## II.     JURISDICTION AND VENUE

46.     This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

47.     This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

48.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b) and (c). At all relevant times, Meta had its principal executive offices located in this District and conducts substantial business here. In addition, many of the acts alleged herein occurred in this District.

49.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    **PARTIES**

#### A.    **Lead Plaintiffs**

50.    Lead Plaintiff Ohio Public Employees Retirement System ("OPERS") is a public pension fund organized for the benefit of public employees throughout the state of Ohio who are not covered by another state or local retirement system. As of December 31, 2021, OPERS managed assets of approximately $127 billion on behalf of more than 1.2 million active members, retirees, and beneficiaries. As indicated in the certification previously filed with the Court (ECF No. 1 at 23-24), OPERS purchased shares of Meta common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

51.    Lead Plaintiff PFA Pension, Forsikringsaktieselskab ("PFA Pension") is a pension company based in Denmark which serves more than 1.3 million customers. As of December 31, 2021, PFA Pension managed customer funds of approximately $86 billion. As indicated in the certification previously filed with the Court (ECF No. 22-2), PFA Pension purchased shares of Meta common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### B.    **Defendants**

52.    Defendant Meta Platforms, Inc. f/k/a Facebook, Inc. ("Meta") operates the world's largest family of social networking sites. Meta is incorporated under the laws of the State of Delaware, with its principal place of business in Menlo Park, California. Meta Class A common stock currently trades on NASDAQ under ticker symbol "META."

53.    Defendant Mark Zuckerberg ("Zuckerberg") is the founder, Chairman and Chief Executive Officer of Meta, which he founded in 2004 as Facebook. As Meta explained in its most recent Form 10-K, Defendant Zuckerberg "has the ability to control the management and major strategic investments" of the Company. As Chairman and CEO, Defendant Zuckerberg signed and certified each of the Company's periodic SEC filings during the Class Period. He also regularly spoke to investors and securities analysts concerning Meta.

54.    Defendant David M. Wehner ("Wehner") has served as Meta's Chief Financial

Officer since June 2014. Prior to becoming CFO in 2014, Defendant Wehner served as Meta's Vice President of Corporate Financing and Business Planning from 2012-2014. As CFO, Defendant Wehner also signed and certified each of the Company's quarterly SEC filings during the Class Period. He also regularly spoke to investors and securities analysts concerning Meta.

55.    Defendant Nick Clegg ("Clegg") has served as Meta's President of Global Affairs since March 2022. At all relevant times during the Class Period, Defendant Clegg served as Meta's Vice President of Global Affairs. He also regularly spoke to investors and the public concerning Meta.

56.    Defendant Adam Mosseri ("Mosseri") has served as Head of Instagram since October 2018. Prior to that, he served as Meta's Vice President of Product Management and in a variety of other product management roles since joining the Company in July 2008. He also regularly spoke to the public concerning Instagram.

57.    Defendant Guy Rosen ("Rosen") has served as Meta's Chief Information Security Officer since October 2013, including at all relevant times during the Class Period. He also regularly spoke to the public concerning Meta.

58.    Defendant Andy Stone ("Stone") has served as Meta's Policy Communications Director since March 2014, including at all relevant times during the Class Period. He also regularly spoke to the public concerning Meta.

59.    Defendant Antigone Davis ("Davis") has served as Meta's Global Head of Safety since October 2014, including at all relevant times during the Class Period. She also regularly spoke to the public concerning Meta.

60.    Defendant Karina Newton ("Newton") has served as Instagram's Head of Public Policy since at least November 2019, including at all relevant times during the Class Period. She also regularly spoke to the public concerning Instagram.

61.    Defendant Yann LeCun ("LeCun") has served as Meta's Chief Artificial Intelligence scientist since March 2018, including at all relevant times during the Class Period. Prior to becoming the Company's Chief Artificial Intelligence scientist, Defendant LeCun served as Meta's Director of AI Research from 2013-2018.

62.     Defendant Monika Bickert ("Bickert") served as Meta's Vice President of Content Policy at all relevant times during the Class Period. Prior to becoming the Company's Vice President of Content Policy, and since joining Meta in March 2012, Defendant Bickert has served as a Developer of Policy Enforcement and Lead Security Counsel.

63.     Defendant Pavni Diwanji ("Diwanji") served as Meta's Vice President at all relevant times during the Class Period, including as Meta's Vice President of Youth Products.

64.     Defendants Zuckerberg, Wehner, Clegg, Mosseri, Rosen, Stone, Davis, Newton, LeCun, Bickert, and Diwanji are collectively referred to herein as the "Executive Defendants" and, together with Meta, as the "Defendants." The Executive Defendants directly participated in the management of Meta's operations, had direct and supervisory involvement in Meta's day-to-day operations, and had the ability to control and did control Meta's statements to investors. They were involved in drafting, reviewing, publishing, and/or making the Company's statements to investors, including the false and misleading statements and omissions alleged herein.

## IV.     SUMMARY OF THE FRAUD

### A.     Before the Class Period, Meta Notices Material Negative Trends in Its User Base and Engagement that Threaten Its Profitability

65.     Meta is the biggest social media network and one of the largest internet companies in the world. Meta states that it has more than three billion users across its social media platforms. The Company does not charge any of them to use Meta's products. Instead, Meta generates revenue almost entirely through third-party advertising.

66.     As Meta has repeatedly stated, "substantially all" of the Company's revenue is "generated from third parties advertising on Facebook and Instagram." Because Meta makes its money by selling advertising space on its platforms, the Company's "financial performance has been and will continue to be significantly determined by [its] success in adding, retaining, and engaging active users of our products, particularly for Facebook and Instagram." In other words, Meta's ability to generate profit is based almost wholly on: (1) the size of its user base; (2) its users' engagement with content on Meta's platforms; and (3) Meta's ability to recruit and engage key demographic groups, such as teenagers and young adults, that are prized by advertisers.

67.     Meta measures user engagement based on actions such as commenting on, liking, posting emojis on, saving, and sharing content. As Meta explains, post engagement "indicates that [a marketer's] ads are relevant to" its "target audience, which helps [its] ads perform better." Meta knew that advertisers would lose interest in working with Meta if the Company's user base languished or if it experienced "decreases in user engagement." Investors were therefore focused on the Company's growth and engagement metrics.

68.     Beyond the size of the Company's user base and their engagement levels, Meta and its advertisers were particularly focused on the Company's ability to recruit a younger audience to its platforms. Teenagers and young adults are particularly important to social media companies for several reasons. To start, teenagers are normally the early adopters of technology and other trends, as well as key influencers who help trends proliferate into the mainstream. Furthermore, young people's brand loyalty has not yet been established, giving advertisers ripe opportunities to expand their base. And being the first generation to truly grow up in the social media age, teenagers today introduce their family members to new technology and products. The social media companies that can capture the largest audience of young people have a distinct advantage in negotiating advertisement pricing with marketers. It was therefore key for Meta to increase the number of teenagers and young adults on its platforms. As *The Wall Street Journal* would later note, "Expanding its base of young users is vital to the company's more than $100 billion in annual revenue, and [Meta] doesn't want to jeopardize their engagement." Thus, as former Instagram executives told *The Wall Street Journal*, Meta was focused "on winning what they viewed as a race for teen users."

69.     However, in the years before the Class Period, Meta at time struggled to attract and engage users to its platforms, particularly young users.

70.     For example, in early 2018, Meta lost users in the United States and Canada—two of the Company's most valuable markets—for the first time. By the end of 2018, the Company had also lost users in Europe. That year, Meta repeatedly announced that "the rate at which Facebook is growing continues to decline quarter to quarter and year over year." News outlets reported that the Company's "long-term future continues to look less rosy," unless it made major changes.

While the Company's user metrics received a boost in early 2020 as a result of the coronavirus pandemic and restrictions on in-person interaction, by the end of 2020, Meta reported that it had once again lost users in the United States and Canada.

71.     Meta's struggles were not limited to simply recruiting new users to its platforms. Even more concerning for Meta, the users the Company already had were also showing less interest in Meta's products and began to engage less with content they saw on the platforms. As Forbes reported, Facebook users "posted a third less content in 2016 than in 2015." In addition, "user engagement [in 2016] was lower than 2015 levels" by more than 15%. This trend continued in 2018, when a study of the "top 20,000 brands on Facebook [] found that all Pages suffered more than a 50 percent reduction in engagement," despite an increase in the number of posts by the top brands. Internal documents from Meta echoed these concerns, finding that "engagement was broadly declining until 2018H1." This directly threatened the value proposition of Meta to advertisers.

72.     These negative trends in growth and engagement were even more pronounced with the Company's younger users, as Meta struggled to compete with other social media networks in its efforts to attract teens and young adults. Young users were especially disinterested in Meta's flagship platform, Facebook. For the better part of a decade, teenagers and young adults steadily moved away from Facebook to other social media networks. Indeed, Meta bought Instagram in 2012 precisely to compensate for the decline in teen use of Facebook. From 2014 to 2022, the percentage of teenagers on Facebook has declined from 71% of all users to just 32% of all users. Concerned with this downward trend, Meta devoted significant resources to studying young adults and teenagers, and their engagement on its platforms. Numerous internal Meta research reports documented the Company's failures to attract teenagers and young adults to its platforms, and studied potential solutions to the problem.

73.     For example, an internal report titled "Why teens and young adults choose Instagram" explained that "Facebook's teen and young adult DAU [Daily Active Users] has been in decline since 2012/2013. Data science findings indicate that only users 25 and above are increasing their use of Facebook. Teen DAU has plateaued and the Young Adult (18-24) DAU

continues to decline."

74. Several years later, a 2017 internal Meta report titled "Teen Engagement Decline Update" explained that Facebook's struggles with young users were not isolated to just the United States. Instead, engagement was "declining for teens in most Western, and several non-Western countries." The report also offered additional explanations for why teenagers were uninterested in Facebook:

> Engagement has been declining sharply since January, although seasonal trends make it difficult to define specifically when the decline began

> Comments/DAP [i.e., daily active people] is a reasonable metric to use to understand the decline [in teen engagement] . . . because: . . . its decline has been particularly severe . . . .

> Teen comment decline can be mostly attributed to declines in consumption and content quality.

> Consumption and content quality declines for teens may be the result of less teen inventory. . . . [and] US teen teen-friend inventory decreased by 19%.

> Facebook's internal records show that comments/DAP in the US declined 23.3% for teens and -5.3% for adults in the week of 5/4/2017 compared with the week of 2/23/2017.

75. Meta's struggles with young users continued into 2020 and 2021. In November 2020, a report titled "Young Adults FB Strategy" noted that young adults were "less engaged on Facebook than older adults," which presented "a significant risk" to Meta's reported user and engagement metrics. Finally, just before the start of the Class Period, in March 2021, an internal Meta report titled "Overtime Usage Data" reiterated that teen usage was declining in Europe, one of the Company's largest markets:

> Both DAU and engagement are still trending down in Western Europe. . . . The trend is still concerning as DAU and engagement have all dropped below H1 forecast. It is likely that the trend will continue to decline after the seasonal bump. In WE [Western Europe], both DAU and engagement trends started deviating from the forecast since 1/27. Two after that, we see an additional step change down on 2/19 for both DAU and engagement which is more worrisome. The deviation since 1/27 seems to be across all WE countries . . . .

76. Teenage use of Facebook in the United States also declined in 2021. Another report

titled simply "Future of YA" showed especially steep declines in teen use of Facebook in the years preceding the Class Period. This decline was expected to continue through 2023.

> Teens' DAU have declined -13% from 2019-2021 and is projected to drive US DAU decline with -45% from 2021-2023. In comparison, young adults have declined -2% from 2019-2021 and the projection for 2021-2023 is -4%. . . . Besides DAU decline, sessions, time spent, production are all much worse among teens than young adults (worse baseline, worse decline rate).

77.     A languishing and aging user base engaging less and less with its products threatened to materially impact Meta's revenue and profits. Faced with these problematic trends and under immense pressure to reverse them before advertisers jumped ship to other social media networks, Meta made a series of decisions designed to enhance the size of its user base, the levels of engagement on its platforms, and its penetration into the young adult market. Of central relevance here, rather than undertake these initiatives with transparency and honesty, Meta made a series of misstatements and omissions about each and every one.

78.     First, Meta assured its users that they were all subject to the same Community Standards and content-moderation policies. This would, in theory, encourage users to engage freely and on equal footing regardless of fame or status. But contrary to Meta's claims, the Company secretly designed mechanisms that would allow millions of high-profile users, including celebrities and politicians, who posted some of the most widely viewed content on the platform, to violate those rules and disseminate misinformation and harmful content with impunity.

79.     Second, in an effort to reverse declining engagement on Facebook, the Company instituted significant changes to its News Feed algorithm in 2018. At the time, Defendant Zuckerberg said that the goal of these changes was to encourage "meaningful interactions between people" and make "the time you do spend on Facebook" more "valuable." Despite this stated purpose, and contrary to Meta's continuing representations, Meta quickly learned that the changes to its News Feed algorithm also caused misinformation and harmful content to proliferate across its platforms. Moreover, when offered solutions that would have reduced these negative effects, Defendant Zuckerberg himself refused to address this problem because he did not want to risk harming the Company's engagement metrics, which would have, in turn, jeopardized advertising

revenue. As Frances Haugen would eventually explain during an interview with *60 Minutes*, Meta "realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money." Instead, Meta chose to "trad[e] off very small decreases in engagement for huge consequences in misinformation and hate speech and violence."

80.     Third, as Meta gauged the best way to attract young users to its platforms, the Company learned that Instagram, its best hope for penetrating this critical user base, had serious deleterious effects on young users' mental health, particularly teenage girls. Meta's own internal, nonpublic research determined that these impacts were "severe" and "common." Knowing that it could not address these "common" and "severe" negative effects without also negatively impacting the Company's engagement metrics and impeding its efforts to penetrate the teen market, Meta hid its internal research from the public. Significantly, when asked, Meta claimed that there were meaningful benefits to Instagram use, and that any negative impacts were "quite small."

81.     Finally, Meta overstated the user base growth rates of its platforms by underreporting the number of duplicate new accounts. In reality, the rate of duplicate accounts among new users was anywhere from three to five times higher than what Meta reported, and its user growth rates were substantially overstated.

82.     When Frances Haugen identified herself as the whistleblower who had revealed Meta's internal research and other damning information to *The Wall Street Journal*, she explained that "over and over again, [Meta] chose to optimize for its own interests, like making more money," without being honest and transparent about its choices and its knowledge of their harmful consequences. Meta was able to sustain its fraud only because, as Haugen said, "no one can understand [Meta]'s destructive choices better than [Meta], because only [Meta] gets to look under the hood." Meta took advantage of this informational asymmetry to make the false and misleading statements and omissions summarized below.

**B.    Defendants Make a Series of Misstatements and Omissions Concerning Meta's Content-Moderation Practices, Algorithm, the Impact of its Platforms on Its Users, and the Size of Its User Base**

**1.    Contrary to Defendants' Public Representations, Meta Exempted Several Million High-Profile Users from Its Content-Moderation**

**Policies, Allowing Them to Violate "Community Standards" with Impunity**

    a.    **Defendants Assure Investors that Meta Applies Its Content Standards Equally to All Users**

83.    Meta has long presented itself as a platform for connection, dialogue, and community, and has pointed to its content-moderation policies—primarily its Community Standards—as furthering those goals. As the Company explains in its Transparency Center—a central online hub for all of Facebook's content policies—"The Facebook Community Standards outline what is and isn't allowed on Facebook." The Community Standards thereby ostensibly "ensure everyone's voice is valued" and that the platform "include[s] different views and beliefs, especially from people and communities that might otherwise be overlooked or marginalized."

84.    When Defendants announced Meta's 2018 changes to its News Feed algorithm to supposedly prioritize "meaningful social interactions," discussed in more detail below, they claimed that change would further the Company's stated goals of community and equity. Defendant Mosseri began a post announcing the Company's 2018 News Feed changes (in his then-role as Head of News Feed) by stressing that "Facebook was built to bring people closer together and build relationships." Defendant Zuckerberg similarly announced those changes by stating that "[w]e built Facebook to help people stay connected and bring us closer together with the people that matter to us." Later, during a September 13, 2018 interview with Britain's *This Morning* program, Defendant Davis discussed the recent changes to the News Feed and explained that those changes reflected that "We have heard from Mark himself that we are putting people over profits."

85.    The Company's supposed consistent application of its content-moderation policies was central to its purported focus on building personal connections and community. According to Zuckerberg, the 2018 News Feed algorithm changes were needed because "public content" was "crowding out the personal moments that lead us to connect more with each other," and that as a result of the changes "you'll see less public content . . . . <u>And the public content you see more will be held to the same standard—it should encourage meaningful interactions between people</u>."

86.    In April 2018, Meta first made public the guidelines it supposedly used to enforce

its Community Standards. At the time, the Company was reeling and its content-moderation policies were under intense scrutiny. A month earlier, in March 2018, Meta announced that it was suspending data analytics firm Cambridge Analytica from its platform; shortly afterwards, news outlets reported that Cambridge Analytica had been able to improperly harvest more than 50 million users' private information from the platform, without permission. Meta faced investigations and outrage from legislators, regulators, and its user base, both in the United States and around the world.

87. On April 4, 2018, Meta disclosed that the Cambridge Analytica data breach impacted as many as 87 million users, nearly 40 million more than initially disclosed. Defendant Zuckerberg then testified before the U.S. Senate Committee on Commerce, Science, and Transportation and the U.S. Senate Committee on the Judiciary on April 10, 2018, and the U.S. House Committee on Energy & Commerce on April 11, 2018. During those hearings, legislators pressed Zuckerberg for information about the Company's ability and efforts to combat disinformation, among other things. The specter of government intervention loomed large. For example, Sen. Jon Thune, then-Chair of the Senate Commerce Committee, noted that the Cambridge Analytica scandal appeared "to be the result of people exploiting the tools you created to manipulate users' information," and warned that "[i]n the past, many of my colleagues on both sides of the aisle have been willing to defer to tech companies' efforts to regulate themselves. But this may be changing."

88. Less than two weeks later, Meta published its Community Standards enforcement guidelines. In an announcement posted to the Company's Newsroom, Defendant Bickert, Vice President of Global Policy Management, wrote,

> One of the questions we're asked most often is how we decide what's allowed on Facebook. These decisions are among the most important we make because they're central to ensuring that Facebook is both a safe place and a place to freely discuss different points of view. For years, we've had Community Standards that explain what stays up and what comes down. Today we're going one step further and publishing the internal guidelines we use to enforce those standards.

89. In her post, Bickert represented that, although the Community Standards had "evolve[d] over time," "[w]hat has not changed—and will not change—are the underlying

principles of safety, voice and equity on which these standards are based." She elaborated that "equity is such an important principle" because of "the global nature of our service," so "we aim to apply these standards consistently and fairly to all communities and cultures."

90.    In mid-July 2018, a British television show, *Channel 4 Dispatches*, questioned whether the Company had a "shielded review" process through which certain more popular pages were not subject to the same content enforcement. In response, Meta strongly denied that any users or groups received any "special protections." In a July 17, 2018 Newsroom post titled "Working to Keep Facebook Safe," Bickert flatly stated that "we remove content from Facebook, no matter who posts it, when it violates our standards." She identified "the system described in *Dispatches*" as "Cross Check," stating that it does not provide "special protections for any group," and is merely a "second layer of review to make sure we've applied our policies correctly." Bickert stressed that cross-check "does not protect the profile, Page or content from being removed. It is simply done to make sure our decision is correct."

91.    Defendants continued to state up to and throughout the Class Period that Meta applied its content-moderation policies consistently, regardless of whether users were public figures. In Meta's May 2021 written responses to questions from members of Congress, the Company stated that its "harassment policy applies to both public and private individuals" and that "Our Community Standards apply to all content, and we assess everyone under those Standards. When we identify or learn of content that violates our policies, we remove that content regardless of who posted it."

92.    Likewise, during a May 19, 2021, conference call with the public to discuss Facebook's Community Standards Enforcement Report, Defendant Bickert, Facebook's VP of Content Policy, stated without qualification that "our Covid-19 misinformation policies do apply to everybody around the world that includes heads of state and presidents."

93.    And during the Company's May 26, 2021, annual shareholders' meeting, Defendant Clegg stated that "[w]e always strive to enforce our policies evenly without regard to the political affiliation of those affected. . . . [O]ur policies on hate speech, incitement and so on apply to everyone regardless of their position of power. And those rules, our rules are set out in

our Community Standards and they're available publicly and in considerable detail. So we—we're very clear, we remove content that poses specific harm to people, content intended to intimidate, exclude or silence views."

94.     Defendants Clegg and Meta made several additional assurances about the even application of Meta's content-moderation policies in statements surrounding the suspension of former President Donald Trump's accounts. Meta indefinitely suspended Trump's Facebook and Instagram accounts shortly after the political unrest and violence of January 6, 2021, and sought review of the decision from its Oversight Board, an independent body constituted to provide review of Meta's difficult content-moderation decisions. On May 5, 2021, the Oversight Board criticized Meta for instituting an open-ended suspension that was, in the Oversight Board's view, "indeterminate and standardless," and admonished Meta to review its policies to determine a clear and proportionate action. In addition, the Oversight Board issued several recommendations concerning the treatment of "political speech from highly influential users," and urged Facebook to "Produce more information to help users understand and evaluate the process and criteria for applying the newsworthiness allowance, including how it applies to influential accounts. The company should also clearly explain the rationale, standards and processes of the cross check review, and report on the relative error rates of determinations made through cross check compared with ordinary enforcement procedures."

95.     On June 4, 2021, Meta issued a news release written by Defendant Clegg, announcing "new enforcement protocols" for exceptional circumstances, and stated that based on those new protocols, Meta was suspending Trump's accounts for a two-year term. In response to the Oversight Board's recommendations, Clegg provided information about Meta's "newsworthiness allowance" and acknowledged that "we allow certain content that is newsworthy or important to the public interest to remain on our platform—even if it might otherwise violate our Community Standards. We may limit other enforcement consequences, such as demotions, when it is in the public interest to do so." Clegg assured, however, that Meta granted the newsworthiness allowance to only a "small number of posts," would publish the "rare instances when we apply it," and would take content down if "the risk of harm outweighs the public interest."

Clegg also assured that "we will not treat content posted by politicians any differently from content posted by anyone else. Instead we will simply apply our newsworthiness balancing test in the same way to all content."

96.    Clegg further linked Meta's full response to the Oversight Board's recommendations, which addressed Meta's "cross check system." On cross-check, the full response stated:

> We employ an additional review, called our cross check system, to help confirm we are applying our policies correctly for content that will likely be seen by many people. . . . Cross check simply means that we will give some content from certain Pages or Profiles additional review. We often apply this process to ensure our policies are applied correctly for public figures and content on Facebook that will be seen by many people.

97.    The full response also pointed the public to the July 17, 2018 post from Defendant Bickert that likewise described cross-check as a "second layer of review," but assured that "we remove content from Facebook, no matter who posts it, when it violates our standards. There are no special protections for any group." As noted above, Bickert's post also stated that "Cross Checking something on Facebook does not protect the profile, Page or content from being removed. It is simply done to make sure our decision in correct."

98.    Meta's full response to the Oversight Board's recommendations affirmed that "[o]ur Community Standards apply around the world to all types of content and are designed so they can be applied consistently and fairly," and clarified that "we remove content from Facebook, no matter who posts it, when it violates our Community Standards. There is only one exception— and that is for content that receives a newsworthiness allowance." Again, Meta explained that a newsworthiness allowance, like one that Meta had applied to Trump's accounts during his presidency, happens only in "exceptional circumstances," is rare, will be published, and will be reversed if the risk of harm outweighs the public interest. Moreover, Meta refused to implement the Oversight Board's recommendation for more transparency on cross-check, claiming that its "measurement accuracy systems are not designed to review the small number of decisions made through the cross check process."

99.    The suspension of Trump's accounts touched off an intense round of media scrutiny

over Meta's reaction to the Oversight Board's decision and how the Company treats high-profile users. Defendant Clegg made several media appearances to discuss the issue, and in a segment with *CBS News* that aired on June 5, 2021, Clegg affirmed that "<u>Whether you are the Pope, the Queen, or the President of the United States, what we apply to everybody is you cannot use our services to say things which we think can deliberately lead to harm</u>."

        **b.**    **In Truth, Meta's "Cross-Check" and "Whitelisting" Practices Exempted Several Million High-Profile Users from Content Enforcement**

100.    Unfortunately for Meta's investors, Defendants' statements summarized above were materially false and misleading and omitted material facts. Contrary to Defendants' statements that Meta applied its Community Standards equally to all users, Meta had constructed an elaborate mechanism through its "cross-check" (also called "X-Check") and "whitelisting" practices by which it exempted several million users—including its most influential users—from its Community Standards, thus allowing them to violate those standards with impunity.

101.    On September 13, 2021, *The Wall Street Journal* published the first Facebook File. As the *Journal* reported, the internal documents it reviewed:

> Include research reports, online employee discussions and drafts of presentations to senior management, including Mr. Zuckerberg. They aren't the result of idle grumbling, but rather the formal work of teams whose job was to examine the social network and figure out how it could improve.

> They offer perhaps the clearest picture thus far of how broadly Facebook's problems are known inside the company, up to the CEO himself. And when Facebook speaks publicly about many of these issues, to lawmakers, regulators and, in the case of XCheck, its own Oversight Board, it often provides misleading or partial answers, masking how much it knows.

102.    The September 13 Facebook File, titled "Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt.," reported that—contrary to Defendants' public representations—Meta exempted numerous high-profile users from its content enforcement policies and practices, creating "invisible elite tiers within the social network" with frequently harmful effects. The article began:

> Mark Zuckerberg has publicly said Facebook Inc. allows its more than three billion

users to speak on equal footing with the elites of politics, culture and journalism, and that its standards of behavior apply to everyone, no matter their status or fame.

In private, the company has built a system that has exempted high-profile users from some or all of its rules, according to company documents reviewed by the Wall Street Journal.

The program, known as "cross check" or "XCheck," was initially intended as a quality control measure for actions taken against high-profile accounts, including celebrities, politicians and journalists. Today, it shields millions of VIP users from the company's normal enforcement process, the documents show. Some users are "whitelisted"—rendered immune from enforcement actions—while others are allowed to post rule-violating material pending Facebook employee reviews that often never come.

103.    Users on the cross-check list would have potentially violating content "route[d] . . . into a separate system" and that content would stay up pending human review, which frequently occurred late or not at all. According to the internal documents that the *Journal* reviewed, "most of the content flagged by the XCheck system faced no subsequent reviews." By 2020, at least 5.8 million users were on the cross-check list and were carved out from Meta's otherwise applicable content moderation and enforcement practices due to being "newsworthy," "influential or popular," or "PR risky."

104.    Users who were whitelisted were "immune from enforcement actions," and accordingly received no scrutiny or accountability. According to a 2019 internal audit, at least 45 teams around the Company were involved in whitelisting, many of which "chose not to enforce the rules with high-profile accounts at all."

105.    In addition to contradicting Defendants' public statements, the Company's cross-check and whitelisting practices had harmful consequences. As *The Wall Street Journal* reported, "Facebook appeared more concerned with avoiding gaffes than mitigating high-profile abuse." For example, in 2019, a woman accused Brazilian soccer star Neymar da Silva Santos Jr. (popularly known by his first name, Neymar) of rape. Neymar had more than 150 million followers on Meta's Instagram platform; in response to the allegations, he posted a video with his accuser's name and nude photos of her on both Facebook and Instagram, and he accused her of extorting him.

106.    Such "nonconsensual intimate imagery" (or "revenge porn") violated the

Company's content-moderation policies and should have been removed immediately upon detection, and Neymar's accounts should have been deleted. But because Neymar was in the cross-check program, Meta's platforms kept that content up for more than a day. Fifty-six million Facebook and Instagram users saw the video with nude photos of Neymar's accuser, and the video was reposted more than 6,000 times, subjecting her to abuse and harassment. An internal review that Meta later conducted found that "[a]fter escalating the case to leadership, we decided to leave Neymar's accounts active, a departure from our usual 'one strike' profile disable policy." This was not an isolated incident; the *Journal* reported that internal documents it reviewed found that in 2020, "XCheck allowed posts that violated its rules to be viewed at least 16.4 billion times, before later being removed." A 2019 internal audit similarly found that "We currently review less than 10% of XChecked content."

107.    Meta's undisclosed widespread use of cross-check and whitelisting to exempt high-profile users from "Community Standards"—and its harmful consequences—were well known and widely documented throughout Meta, including at its highest levels. Meta's own internal research documented and warned about the Company's cross-check and whitelisting practices for years. For example, a 2019 internal review of Meta's whitelisting practices stressed that "<u>We are not actually doing what we say we do publicly</u>," calling the practices "a breach of trust" because, "[u]nlike the rest of our community, these people can violate our standards without any consequences." The review warned that whitelisting was "not publicly defensible."

108.    An internal research report titled "Comparing the effects of misinfo from politicians vs ordinary user sources" further found that whitelisting had particularly harmful consequences. Specifically, research showed that "[u]nder the political whitelist policy, content posted by whitelisted Pages or Profiles is not subject to our misinformation interventions," and "results indicate the current whitelist policy is protecting content that is especially likely to deceive, and hence to harm, people on our platforms." Accordingly, the report "recommend[ed] ending the whitelist, or at least (1) informing users; [and] (2) reducing distribution."

109.    A December 11, 2020, internal research report, titled "Political Influences on Content Policy," confirms the involvement of Meta's senior management (including Defendant

Zuckerberg specifically, as well as management on the Company's Public Policy team) in making these decisions to exclude particular individuals from the Company's content-moderation policies. Meta's Public Policy team oversees the Company's political activity, including government relations and lobbying efforts. Meta recognizes on its website that "[p]ublic policy decisions can have significant implications for the people that use our services and the future direction of our company."

110. Meta's researchers reported, among other things:

- **Facebook routinely makes exceptions for powerful actors when enforcing content policy**. The standard protocol for enforcement and policy involved consulting Public Policy on any significant changes, and their input regularly protects powerful constituencies. Detailed examples are given below. Briefly:

  1. Misinformation repeat-offender escalations seem to have regularly been influenced by input from Public Policy, exempting publishers on the grounds that they are "sensitive" or likely to retaliate. In the US it appears that interventions have been almost exclusively on behalf of conservative publishers.

  2. We have made one-off carve-outs in misinformation enforcement, apparently due to political pressure.

  3. In India a politician who regularly posted hate speech was exempted by the Indian Public Policy team from normal punishment explicitly for political considerations.

- **Facebook routinely makes decisions about algorithms based on input from Public Policy**.

  1. When significant changes are made to our algorithms (ranking, recommendations) they are usually reviewed by staff from Public Policy. Public Policy typically are interested in the impact on politicians and political media, and they commonly veto launches which have significant negative impacts on politically sensitive actors.

- **Final calls about content policy are routinely made by senior executives**. In multiple cases <u>the final judgment about whether a prominent post violates a certain written policy are made by senior executives, sometimes Mark Zuckerberg. If our decisions are intended to be an application of a written policy then it's unclear why executives would be consulted.</u> If instead there was an unwritten aspect to our policies, namely to protect sensitive constituencies, then it's natural that we would like executives to have final decision-making power.

111. In addition, the *Journal* reported that many "VIP" users and their content were

subject to review at the highest levels of the Company, including by Defendant Zuckerberg: "At times, pulling content from a VIP's account requires approval from senior executives on the communications and public-policy teams, or even from Mr. Zuckerberg or Chief Operating Officer Sheryl Sandberg." A September 2020 memo also described what the *Journal* called "daily interventions in [the Company's] rule-making and enforcement process by both Facebook's public-policy team and senior executives."

112.    Among other instances, Zuckerberg has admitted that he personally made the decision to leave up former President Trump's May 28, 2020, post (discussing protests after George Floyd's death) that "When the looting starts, the shooting starts." Meta's automated systems had scored that post a 90 out of 100, indicating a "high likelihood" it violated the Company's content-moderation policies.

113.    An October 27, 2021, *Associated Press* report described an internal Company research memo dated June 5, 2020, documenting the fallout from Trump's post: "it wasn't until after Trump posted about Floyd's death that the reports of violence and hate speech increased 'rapidly' on Facebook across the country, an internal company analysis of the ex-president's social media post reveals." Moreover,

> [t]he internal analysis shows a five-fold increase in violence reports on Facebook, while complaints of hate speech tripled in the days following Trump's post. Reports of false news on the platform doubled. Reshares of Trump's message generated a "substantial amount of hateful and violent comments," many of which Facebook worked to remove. Some of those comments included calls to "start shooting these thugs" and "f--- the white."

> By June 2, "we can see clearly that the entire country was basically 'on fire,'" a Facebook employee wrote of the increase in hate speech and violence reports in the June 5 memo.

114.    Similar to cross-check, a 2019 internal audit found that whitelist status, which was sometimes granted without any documented reason, was "pervasive, touching almost every area of the company," and "pose[d] numerous legal, compliance, and legitimacy risks for the company and harm to our community."

115.    The gulf between Defendants' public representations that the Company applied its

content-moderation policies evenly, and the reality of cross-check and whitelisting, has caused shock and outrage. For example, law professor Jena Martin—a former senior counsel in the SEC's Division of Enforcement—wrote in a September 21, 2021, article titled "Why Facebook's Mark Zuckerberg may be in hot water with the SEC":

> *The Wall Street Journal* recently revealed that Facebook treats users' posts differently depending on their wealth, privilege and status.
>
> That and other findings based on internal Facebook documents may be troubling enough, but the social network's bigger problem could be the Securities and Exchange Commission.
>
> <u>The documents suggest Facebook presented different, contradictory versions of these policies in public and private. From a securities regulation standpoint, any big lie could potentially defraud investors and invite an investigation—especially when the company involved is Facebook.</u> . . .
>
> [T]here's what securities lawyers call "garden variety fraud" in which a company or executive tells a significant lie—or makes a significant misrepresentation—that misleads investors about some important aspect of the company. The SEC charged Volkswagen with defrauding investors by lying to the public about "the environmental impact of the company's 'clean diesel fleet.'"
>
> <u>This is what Zuckerberg might have done by making public statements that seem to contradict the company's internal documents,</u> as reported by The Wall Street Journal.
>
> <u>The key thing that each of these scenarios have in common is that someone misled investors.</u>

### c.   Meta's Own Oversight Board Excoriated the Company for Misrepresenting and Concealing Cross-Check

116.   On September 21, 2021, following *The Wall Street Journal*'s September 13 Facebook File detailing Meta's cross-check and whitelisting practices, the Company's Oversight Board issued a scathing rebuke to Defendants.

117.   The Oversight Board's missive leaves no question that Defendants' public representations about consistently applying content-moderation policies to all users were false and misled not just the public but also Meta's own Oversight Board. The Oversight Board wrote:

> Last week, new information emerged on Facebook's 'cross-check' system . . . . This information came to light due to the reporting of the Wall Street Journal, and we are grateful to the efforts of journalists who have shed greater light on issues that

are relevant to the Board's mission. These disclosures have drawn renewed attention to the seemingly inconsistent way that the company makes decisions, and why greater transparency and independent oversight of Facebook matter so much for users.

In light of recent developments, we are looking into <u>the degree to which Facebook has been fully forthcoming in its responses in relation to cross-check, including the practice of whitelisting</u>. . . .

At the Oversight Board, we have been asking questions about cross-check for some time. In our decision concerning former US President Donald Trump's accounts, we warned that a lack of clear public information on cross-check and Facebook's 'newsworthiness exception' could contribute to perceptions that Facebook is unduly influenced by political and commercial considerations. . . .

<u>It is crucial that we continue to ask questions on cross-check, and publish the answers for people to see</u>. Transparency is essential for social media platforms. . . . By having clear rules and enforcing them consistently, platforms can give users the confidence that they'll be treated fairly. . . .

Since we published our first decisions in January, we have been shining a light on <u>Facebook's opaque rules</u> and steering the company towards greater transparency . . . .

The Oversight Board stated that it would continue to investigate the extent to which Company management had not been truthful about its cross-check and whitelisting practices, and would be "reporting what we hear from this as part of our first release of quarterly transparency reports which we will publish in October."

118.    On October 11, 2021, the Oversight Board announced that it would be meeting with whistleblower Frances Haugen in the coming weeks, and that "Board members appreciate the chance to discuss Ms. Haugen's experiences and gather information that can help push for greater transparency and accountability from Facebook through our case decisions and recommendations."

119.    The Oversight Board published its first set of transparency reports on October 21, 2021. That set of reports included a "Special report on Facebook's cross-check system," based on "information provided in a briefing by Facebook on cross-check requested by the Board following the disclosures." In its report, the Oversight Board reported its findings that the Company "<u>has not been fully forthcoming in its responses on cross-check</u>. On some occasions, Facebook failed to

provide relevant information to the Board, while in other instances, the information it did provide was incomplete." Indeed, "the company admitted that it should not have said cross-check only applied to a 'small number of decisions.' Facebook . . . recognized its phrasing could come across as misleading."

120.    The Oversight Board further reported, among other things,

- "In May 2021, the Oversight Board published its decision on the suspension of former US President Donald Trump's accounts . . . . While the Board's decision focused on Facebook's cross-check's system, the company did not mention cross-check when it referred this case to the Board, or in the initial case file materials it provided. Given that the referral included a specific policy question about account-level enforcement for political leaders, many of whom the Board now believes were covered by cross-check, it is not acceptable that Facebook did not mention cross-check in the information it initially provided. This was clearly relevant to the Board's deliberations and its ability to make informed recommendations. . . . Facebook's answer was consistent with a 2018 Facebook newsroom article on cross-check (itself a response to a previous media leak) which Facebook cited and hyperlinked in its response. It was on the basis of this information that the Board addressed cross-check in its decision."

- "The Trump decision raised concerns about a lack of transparency around cross-check and the different outcomes which might arise from applying different processes to different users. . . .

  "While the Board did not explicitly support or oppose the idea of cross-check as it was presented by Facebook, the Trump decision included guidance at odds with the cross-check program as described by the Wall Street Journal, particularly the idea that 'the same rules should apply to all users of the platform.' . . .

  "The Board also noted in its Trump decision that there is 'limited public information on cross-check' and that 'the lack of transparency regarding these decision-making processes appears to contribute to perceptions that the company may be unduly influenced by political or commercial considerations.'"

- Concerning information Facebook placed in its "Transparency Center," "The new Transparency Center explanation provided also states that cross-check is for 'high-visibility content,' implying that the program applies to individual pieces of content based on reach, rather than the identity of the account or page. The fact that Facebook provided such an ambiguous, undetailed response to a call for greater transparency is not acceptable. Facebook's answer provides no meaningful transparency on the criteria for accounts or pages being selected for inclusion in cross-check, which was at the heart of the Board's recommendation."

121.    As Kate Klonick, a law professor whom the Company hired to study the Oversight Board's formation and process, told the *Journal*, "Why would they spend so much time and money

setting up the Oversight Board, then lie to it? This is going to completely undercut it."

**2.  Defendants Made Material Misstatements and Omissions Concerning the Fact That Meta's News Feed Algorithm and Content-Moderation Practices Promoted Toxic Content and Misinformation**

**a.  The News Feed Is Facebook's Primary Content-Delivery Mechanism**

122.  The "News Feed," or "Feed," is the primary mechanism through which Facebook users receive content. It is the lifeblood of Meta. As Meta explains in its Help Center, the News Feed "is the constantly updating list of stories in the middle of your home page," including "status updates, photos, videos, links, app activity and likes from people, Pages and groups that you follow on Facebook." Likewise, in an online lesson titled "Distribute Your Content on Facebook: What You Need to Know," the Company states that "News Feed is the first thing people see when they log into Facebook. Its goal is to show people the stories they care about most, every time they visit."

123.  Meta's News Feed algorithm is the computer code that determines which pieces of content appear in which order as a user scrolls through her News Feed. Meta's algorithm and content-moderation policies and decisions accordingly determine which messages and information Meta's platforms highlight and amplify across its massive user base. Accordingly, the News Feed algorithm and the Company's content-moderation practices are critical to users' experiences, and the macro- and micro-level impacts of Meta's platforms. As Meta's Oversight Board explained in its 2021 Annual Report (published in June 2022), "The anodyne term 'content moderation' obscures the truth that content posted and shared on social media can have significant impacts— positive and negative—on people's lives offline and online. While social media has to a large degree fulfilled its early promise of bringing billions together, it has also created new ways for people to inflict harm on others."

124.  News Feed is also the main pathway for advertisers to reach users (and drive Meta's revenue). As *The Wall Street Journal* discussed in the September 15 Facebook File, News Feed "accounts for the majority of time Facebook's nearly three billion users spend on the platform. The company sells that user attention to advertisers, both on Facebook and its sister platform

Instagram, accounting for nearly all of its $86 billion in revenue last year. . . . Significant changes to the algorithm can have major implications for the company, advertisers and publishers."

        **b.    Defendants Changed the News Feed Algorithm in 2018, Stating that the Change Prioritized "Meaningful Social Interactions"**

125.    By the beginning of 2018, Meta faced several crises. As discussed above, following the Cambridge Analytica scandal and other public failures, the Company faced heightened governmental and public scrutiny, while trust in Meta floundered. User engagement—a critical metric and revenue driver for the Company—was waning, and there was a growing sense both within and outside the Company that Meta was slipping toward irrelevance. Internal analysis on "Pre-MSI Trends" found that "engagement was broadly declining until 2018H1." Internal Company documents further showed that engagement metrics like comments, likes, and shares were down substantially through 2017, and "original broadcasts"—user-produced personal content—had also been declining for years.

126.    Against that backdrop, Defendant Zuckerberg announced on January 11, 2018 what he called "a major change to how we build Facebook. I'm changing the goal I give our product teams from focusing on helping you find relevant content to helping you have more meaningful social interactions." According to Zuckerberg, due to this new focus on "meaningful social interactions," or "MSI," "The first changes you'll see will be in News Feed, where you can expect to see more from your friends, family and groups [and] less public content like posts from businesses, brands, and media."

127.    On September 15, 2021, *The Wall Street Journal* published the September 15 Facebook File, in which it reported on the 2018 changes to the News Feed algorithm and what actually motivated them: "The goal of the algorithm change was to reverse the decline in comments, and other forms of engagement, and to encourage more original posting." To do that, "It would reward posts that garnered more comments and emotion emojis, which were viewed as more meaningful than likes."

128.    Specifically, the algorithm changes introduced an internal point system in which certain types of user engagement corresponded with assigned points that in turn were used by the

algorithm to determine which content was elevated in a user's News Feed: among other factors, "likes" were worth one point each; reactions (e.g., emojis) or reshares were worth five; and significant comments, messages, or reshares were worth thirty.

129.    As the *Journal* reported, there was substantial internal skepticism at management's stated reasons for prioritizing MSI. The *Journal* described internal documents and communications in which "Facebook employees . . . discussed the company's other, less publicized motive for making the change: Users had begun to interact less with the platform, a worrisome trend, the documents show." The *Journal* explained that News Feed, and the revenues News Feed engagement drives, are vital to the Company's financial results, and that "the shift to emphasize MSI was one of the biggest" changes to the News Feed algorithm, which would have "major implications for the company, advertisers and publishers."

130.    The 2018 changes to the News Feed algorithm were largely successful in driving user engagement. Although the time that users spent on the platform declined slightly, measures of engagement like comments, likes, and shares increased substantially and with them—as confirmed by August 2018 internal analyses—a highly important metric of "daily active people."

131.    These increases in user engagement were highly profitable for the Company. For 2017, the last year before the algorithm changes to boost "meaningful social interactions," the Company reported annual revenue of $40.7 million that was, as described above, derived almost entirely from advertising. Those advertising-based annual revenues rose steadily after the algorithm changes, reaching $55.8 million in 2018, $70.7 million in 2019, $86 million in 2020, and $118 million in 2021.

   **c.    Meta Quickly Determines that its 2018 Changes to the News Feed Algorithm Caused Hateful, Toxic Content and Misinformation to Be "Inordinately Prevalent"**

132.    Regardless of whether the 2018 changes to Facebook's News Feed algorithm to promote "meaningful social interactions" were intended to improve the platform's content and connections, it quickly became known within Meta—as documented in the Company's internal research and documents—that the algorithm drove the spread of extremely harmful, toxic content and misinformation. In addition, as discussed below, the Company's content-moderation tools and

practices were severely deficient to address Meta's rampant problems with toxic content, with internal research concluding that "we may action as little as 3-5% of hate and ~0.6% of [violence and inciting content] on Facebook." Yet, when presented with steps Meta could take to significantly reduce the spread of such toxic content, Meta repeatedly—including Defendant Zuckerberg himself—refused to implement them.

133.    On September 15, 2021, as part of its series of bombshell revelations in the Facebook Files, *The Wall Street Journal* published an article detailing how, contrary to the Company's public representations, "Internal memos show how a big 2018 change rewarded outrage and that CEO Mark Zuckerberg resisted proposed fixes." The September 15 Facebook File, titled "Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead," detailed the proliferation of toxic content and misinformation that the Facebook News Feed algorithm caused and worsened, as well as internal knowledge of and involvement with those problems at the highest levels.

134.    The September 15 Facebook File included a screenshot from an internal December 2017 Company memo, titled "The story of deriving the Meaningful Social Interactions metric weights (UX Research & Data Science)," which listed the number of "points" that the algorithm would assign to a piece of content when weighing competing content to determine which would be more prevalent in a user's News Feed. A "like" would be assigned only one point; a "Reaction, Reshare without Text" would be assigned five points; a "Non-sig[nificant] Comment, Non-sig Reshare[,] Non-sig Message, Rsvp" would be assigned 15 points; and a "Significant Comment, Significant Reshare, Significant Message" would be assigned 30 points.

135.    As the September 15 Facebook File explained, "Within the company, though, staffers warned the change was having the opposite effect [as stated], the documents show. It was making Facebook's platform an angrier place." Internal research showed that content that expressed (or caused) anger and outrage was far more likely to score higher and was weighted more heavily by the algorithm, and thereby spread more widely. In other words, internal research showed that of the forms of user engagement that the algorithm weighed more heavily, negative engagement—such as angry emojis and hateful comments—were more frequent. As a result,

hateful and toxic content was elevated in users' News Feeds, attracting even more negative engagement, steering the entire platform toward toxicity.

136.    Internal research that whistleblower Haugen reported to the SEC drew a direct line from the 2018 algorithm changes to the proliferation of toxic content on Meta's platforms. In a report titled "We are Responsible for Viral Content," researchers documented internally that "Outrage and misinformation are more likely to be viral," while another report, "Replacing Downstream MSI for Civic and Health," stated that "Feedback and UX research with news publishers and political actors also suggests that share downstream MSI is leading them to post more divisive and sensationalist content in order to gain distribution."

137.    Additional research titled "Does Facebook Reward Outrage? Posts that generate negative reactions get more clicks," similarly found that "the more negative comments a piece of content instigates, the higher likelihood for the link to get more traffic . . . [one] might reach the conclusion that darker, more divisive content is better for business"; and a report, "Case Study: (Controlling for Publisher) Posts with Negatively Charged Comment Threads Fare Better in Feed" concluded that "There's a (visible) general correlation between negative correlation between negative comment sentiment and number of outbound clicks . . . . From a publisher's point of view, this data would seem to encourage posting more content that leads to negatively charged comment threads."

138.    Among other reasons that the algorithm changes led to more toxic content and harm was that, as whistleblower Frances Haugen explained to the SEC citing an October 22, 2020, internal report titled "Filtering out engagement-bait, bullying and excessive comments from MSI Deltoid metric 11/1 onwards," "The 'Meaningful' part of Meaningful Social Interactions is more a flourish than substance—for example, all comments were considered 'meaningful', even if they were hate speech or bullying . . . . All likes were considered 'meaningful' along with all reshares."

139.    An October 26, 2021, *Washington Post* article similarly described the changes to the News Feed algorithm and their effect:

> Facebook programmed the algorithm that decided what people see in their news feeds to use the reaction emoji as signals to push more emotional and provocative content—including content likely to make them angry. . . . Facebook's ranking

algorithm treated emoji reactions as five times more valuable than "likes," internal documents reveal.

Facebook for three years systematically amped up some of the worst of its platform, making it more prominent in users' feeds and spreading it to a much wider audience. The power of the algorithmic promotion undermined the efforts of Facebook's content moderators and integrity teams, who were fighting an uphill battle against toxic and harmful content.

> ### d.   Defendants Made Numerous False and Misleading Representations Concerning the News Feed Algorithm and Meta's Content Moderation

140.    Notwithstanding these facts, before and during the Class Period, Defendants made numerous false and misleading representations stating that Meta's News Feed algorithm and content moderation policies actually decreased harmful content. Just prior to the start of the Class Period, in March 2021, Defendant Yann LeCun, Facebook's Vice President and Chief AI Scientist, touted Facebook's algorithm as prioritizing high-quality interactions, while drastically limiting the spread of toxic content on the platform. On March 11, 2021, when asked by a Twitter user whether "Facebook algorithms encourage false and inflammatory remarks in order to boost engagement," LeCun responded, "No. . . . [S]ome have (falsely) accused FB of [amplification] through content targeting." In another tweet, LeCun described "the idea that FB shows polarizing content because it's good for 'engagement'" as "ridiculous" and proclaimed that Facebook had implemented the MSI model "*precisely* to minimize polarizing content, clickbait, information bubbles, etc."

141.    On March 13, 2021, LeCun touted the extent to which Facebook had purportedly automated the process of removing toxic content, acknowledging that it would be a problem "[i]f FB had done nothing against hate speech, or was still taking it down manually after user flagging," but that "FB actually spent a *lot* of resources fixing the issue." As a result, LeCun announced, "94.7% of hate speech is now taken down by AI preemptively." Five days later, again on Twitter, LeCun denied that "FB prioritized growth over safety," deployed "optimization of engagement that causes the large scale spread of misinformation," and avoided corrective measures that "might reduce profits," stating, "That's a myth."

142.    In the weeks before the Class Period, Zuckerberg was called to testify in front of

Congress. During a March 25, 2021, U.S. House of Representatives hearing titled "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation" (the "March 25 Hearing"), Representative Adam Kinzinger pressed Zuckerberg about whether the Company promoted "divisive, hateful, and conspiratorial content" to maximize user time on Facebook. Zuckerberg responded:

> The way that we view this is that we are trying to help people have meaningful social interactions. People come to social networks to be able to connect with people. If we deliver that value, then it will be natural that people use our services more. But that is very different from setting up algorithms in order to just kind of try to tweak and optimize and get people to spend every last minute on our service, which is not how we designed the company or the services.

143.    In the days and weeks following that testimony, analysts continued to note the impact that any failure to remove harmful content, if true, could have on Meta's business. On April 7, 2021, analyst Argus described the March 25 Hearing as but one prong in a "regulatory onslaught . . . to address issues including online misinformation, alleged bias, and the January 6 attack on the U.S. Capital." Argus noted that Facebook would likely have to remove more than just "unlawful" content [i.e., other harmful content and misinformation] to avoid unfavorable actions by Congress that could include reforming or removing Section 230 of the Communications Decency Act, which shielded Facebook from liability for publishing damaging content.

144.    At the same time, LeCun continued to publicly tout Facebook's algorithm as successful at minimizing toxic content. On April 8, 2021, LeCun appeared on The Robot Brains Podcast, during which he reiterated that "95% of hate speech or so is taken down automatically without anyone seeing it."

145.    On April 27, 2021, the first day of the Class Period, Defendant Bickert testified at a hearing before the Senate Judiciary Committee Subcommittee on Privacy, Technology, and the Law. In discussing Meta's algorithm and its efforts to remove harmful content, Bickert told lawmakers:

> There are certain types of content we simply don't allow on our services. . . .and we've made significant progress identifying and removing content that violates our standards. . . . The reality is that it's not in Facebook's interest—financially or reputationally—to push users towards increasingly extreme content. The company's long-term growth will be best served if people continue to use and value

its products for years to come. If we prioritized trying to keep a person online for a few extra minutes, but in doing so made that person unhappy or angry and less likely to return in the future, it would be self-defeating. Even though troubling content is a very small proportion of the total content people see on our services (hate speech is viewed 7 or 8 times for every 10,000 views of content on Facebook), Facebook's long-term financial self-interest is to continue to reduce it so that advertisers and users have a good experience and continue to use our services.

146.    In short, as the Class Period began, analysts and investors were intensely focused on the issue of whether Meta's algorithm and content-moderation decisions promoted harmful content. The potential for both increased regulation and vast dissatisfaction loomed large.

147.    Faced with increased scrutiny, Defendants continued to make numerous false and misleading statements during the Class Period to reassure investors and the public that Meta's algorithms and content-moderation policies were sound and effective. Defendants expressly pointed to the 2018 News Feed algorithm changes, which supposedly prioritized "meaningful social interactions," as a key reason investors and users should have comfort that the Company was keeping toxic and extremist content at bay.

148.    For example, on Meta's April 28, 2021, earnings call, in response to a direct question about whether Facebook's algorithm sometimes amplified "some of the more controversial content," Defendant Zuckerberg told investors that the Company did not "optimize our systems to increase the amount of time spent in News Feed," and regarding "extremist content or any of that stuff," "we go out of our way to try to reduce that." Defendant Wehner similarly stated on that call that "we really do more than anyone else in the industry on the safety and security front to prevent things like misinformation and bad content going into the system in the first place."

149.    Analysts credited Facebook's purported ability and desire to moderate its content and believed that advertisers and regulators would view the Company favorably because of it. For instance, on the day of the April 28, 2021, earnings call, Morningstar noted that Meta was less likely to face a downturn in advertising revenue from increasing regulations because it had "already begun allocating more resources to remove harmful content and misinformation, and improve overall content quality," had "already become more hands-on in moderating the content distributed on [its] platform[]," and "distributors like Facebook are already doing their best to

oversee and moderate content."

150.    On May 17, 2021, Meta submitted written responses to questions from members of Congress following up on Defendant Zuckerberg's March 2021 congressional testimony. In those responses, the Company claimed that it had "changed the way we approached News Feed rankings to focus not only on serving people the most relevant content, but also on helping them have more meaningful social interactions." Meta also claimed that its policies banning "organizations and individuals that proclaim a violent mission" was effective, as the platform had "banned over 250 white supremacist groups" and "prohibit[ed] QAnon and militia groups from organizing on our platform." Likewise, in response to questions about whether risks of user loss affected content-moderation decisions, including concerning extremist content, the Company told Congress that "[b]illions of people use Facebook and Instagram because they have good experiences; they don't want to see hateful and violent content . . . and we don't want to see it. There is no incentive for us to do anything but remove it."

151.    In its May 19, 2021, Community Standards Enforcement Report for the first quarter of 2021, the Company further stated that "changes we made to reduce problematic content in News Feed" enabled it to "<u>keep the prevalence of hate speech on our platform as low as possible</u>."

152.    In connection with the Company's annual shareholder meeting held on May 26, 2021, shareholders put forward a proposal that was included in the Definitive Proxy for that meeting filed on SEC Form 14A requesting "that the Board prepare a report to assess the benefits and drawbacks to our Company of maintaining or restoring the type of enhanced actions put in place during the 2020 election cycle to reduce the platform's amplification of false and divisive information."

153.    Meta strongly opposed the shareholders' proposal, and made representations to assure shareholders that toxic content and misinformation were not problems that the Company needed to take additional steps to address. In its "Opposing Statement," the Company's Board stated that "implementing this proposal is unnecessary due to our transparency efforts to date, [and] the significant progress we continue to make to address these issues." The Board recommended that shareholders reject the proposal as "unnecessary and not beneficial to our

shareholders," "[g]iven our efforts and transparency around our actions to counter platform misuse." Shareholders accepted the Board's recommendation and reassurance, and the proposal failed overwhelmingly.

154.    Defendants made numerous additional false and misleading statements and omissions concerning Meta's algorithms and content moderation. Among other statements, the Company represented that "[a]dvancements in AI technologies" allowed it to "proactively detect about 97% of hate speech content we remove." In addition, the Company stated that it had "introduced tools that allow us to proactively detect and remove violating content," so "we can now remove bad content more quickly, identify and review more potentially harmful content, and increase the capacity of our review team."

155.    Analysts continued to see Meta's ability to moderate content on its platforms as a key factor in their recommendations and the Company's ability to continue to successfully operate and avoid "extreme regulatory backlash." In a June 30, 2021, report, Argus issued a near and long-term "BUY" and "Over-Weight" recommendation and stated its belief that "Facebook's most perilous near-term risks arise from regulatory investigations and headlines highlighting the spread of misinformation on its sites." Argus further believed that "Facebook is vulnerable to extreme regulatory backlash in the U.S. and around the world related to the spread of misinformation, including election interference; the spread of unlawful content in private groups and encrypted communications, e.g., child pornography, [and] hate speech." Argus explained that "extreme regulatory backlash" included "huge fines" and a "break-up of the company given its social media market power."

156.    During Meta's July 28, 2021, call with investors following the announcement of second quarter results, Zuckerberg touted the company's large investments in AI, describing it as a "foundational improvement," and stated that "it makes ranking better in News Feed and Reels and in ads. And it makes our spam detection, our integrity systems more effective at identifying stuff. Everything just gets better. And this has really been one of the big tailwinds or waves that we've been riding."

157.    The same day, LeCun argued with a Twitter user who had posited that Facebook

"is undermining the foundation of the American democracy by letting truth be flooded with misinformation." LeCun responded, "Social networks are scapegoats for society's ills. Do you have data to back up your claim? . . . You might want to consider the fact that for every person who encounters a conspiracy theory on FB, hundreds actually learn scientifically correct facts. . . . You may claim that FB amplifies ideas you disagree with, but it's simply false."

158.  On July 29, 2021, during a presentation titled "Disinformation & Democracy," in response to an interviewer's question about Meta's role in the spread of disinformation, Defendant Clegg claimed that "the research" has "proven" that the platform was not a cause of polarization and misinformation, because "[y]ou tend to have a more heterogenous and mixed ideological composition of your friends on Facebook than you do if you read the same partisan newspaper or watch the same cable TV or news outlet."

159.  Clegg also vociferously denied that the Company facilitated or worsened hate speech and other toxic content. In response to a question about whether Meta had failed to rein in "very inflammatory content because it makes you money," Clegg suggested that Meta's own research showed that the Company did not promote or incentivize such content. Clegg stated:

> I, I flatly and vigorously reject this idea that Facebook has an incentive to spoon feed people sort of addictive extreme violent unpleasant hateful content. . . . We know from our own research that if you want people to use Facebook for the long term, which we have a Business interest in doing, we're, we're not interested in having someone addicted to using Facebook for 20 extra minutes . . . And that's why we take down as much hate, hateful speech . . . . We, we, we catch the vast majority of it before anyone reports it to us. . . . the idea that we have an incentive to prioritize this, is I think one of the most misleading allegations of, of uh, that the numerous critics that social media has these days.

> **e.     Copious Internal Research Documented that the Algorithm Caused Toxic Content to Proliferate, But Meta and Zuckerberg Chose Not to Fix the Problem**

160.  For years, Meta possessed copious research and data underscoring that, contrary to Defendants' public statements, the algorithm played a central role in spreading toxic content and misinformation and sowing division. Meta chose to prioritize engagement over fixing these problems. Further contradicting its public statements, Meta also possessed significant research

demonstrating that the tools it had to prevent content from entering the system and to remove it when it did, were deeply ineffective.

**i.    Third Parties Warn Meta That the Changes to Its Algorithm May Be Promoting Hateful, Divisive Content**

161.    Meta's internal research showed that as early as 2018, political parties began warning Meta in private communications that the changes to its algorithm may be causing hateful, divisive, and other toxic content to predominate. Meta researchers documented in an internal report titled "Political Party response to the '18 Algorithm change" that "Political parties . . . claim that Facebook's algorithm change in 2018 (MSI) has changed the nature of politics. For the worse. They argue that the emphasis on 'reshareability' systematically rewards provocative, low-quality content."

162.    Additional internal Company documents included warnings from European political parties that Facebook's algorithm may be rewarding toxic, polarizing content. Meta researchers warned internally that this happened to such a degree that, faced with the choice of reaching voters or losing them entirely, parties altered their political messaging—against their preferences—to be more negative and polarizing. In an April 2019 internal report, "Replacing Downstream MSI for Civic and Health," researchers expressly warned that "[o]ne party's social media management team estimates that they have shifted the proportion of their posts from 50/50 positive/negative to 80% negative, explicitly as a function of the change to the algorithm." Internal researchers also reported in "Political Party response to the '18 Algorithm change":

> Political parties across Europe claim that Facebook's algorithm change in 2018 (MSI) has changed the nature of politics. For the worse . . . Many parties . . . worry about the long-term effects on democracy . . . they are trapped in an inescapable cycle of negative campaigning by the incentive structures of the platform . . . evidence around how anger reactions, overall, is weaponized by political figures and creating negative incentives on the platform.

163.    Researchers also wrote, in an internal report on Spanish politics, that parties there "have learnt that harsh attacks on their opponents net the highest engagement," and although "[t]hey claim that they 'try not to,' . . . ultimately 'you use what works.'" Meta researchers reported similar information about political discourse in Taiwan and India.

164.   Similarly, as reported in the September 15 Facebook File, Nina Jankowicz, a scholar of social media and democracy in Central and Eastern Europe, told *The Wall Street Journal* that "she has heard complaints from many political parties in that region that the algorithm change made direct communication with their supporters through Facebook pages more difficult. They now have an incentive, she said, to create posts that rack up comments and shares—often by tapping into anger—to get exposure in users' feeds."

165.   Beginning no later than the fall of 2018, Facebook heard similar concerns from a partner in the private sector. BuzzFeed's chief executive, Jonah Peretti, emailed "a top official at Facebook" in the fall of 2018 warning that "[t]he most divisive content that publishers produced was going viral on the platform," "creating an incentive to produce more of it."

ii.   **Meta's Internal Research Concludes That The Algorithm Is Responsible For Promoting And Spreading Toxic, Harmful Content**

166.   Meta's own internal research demonstrated clearly that its algorithm caused harmful content to proliferate. The *Journal* reported in the September 15 Facebook File that Meta's internal research stated:

> "Our approach has had unhealthy side effects on important slices of public content, such as politics and news," wrote a team of [Meta] data scientists, flagging Mr. Peretti's complaints, in a memo reviewed by the Journal. "This is an increasing liability," one of them wrote in a later memo.

> They concluded that the new algorithm's heavy weighting of reshared material in its News Feed made the angry voices louder. "Misinformation, toxicity, and violent content are inordinately prevalent among reshares," researchers noted in internal memos.

167.   An internal research report titled "What is Collateral damage?" similarly concluded, based on "compelling evidence," that the algorithm was itself responsible for the proliferation of toxic, harmful content on Meta's platforms. Moreover, internal research demonstrated the global reach and substantial harm that flowed from Meta's "core product mechanics." According to that report:

> We have evidence from a variety of sources that hate speech, divisive political speech, and misinformation on Facebook and the family of apps are affecting societies around the world. We also have compelling evidence that our core product mechanics, such as virality, recommendations, and optimizing for engagement, are

a significant part of why these types of speech flourish on the platform . . . the net result is that Facebook, taken as a whole, will be actively (if not necessarily consciously) promoting these types of activities. The mechanics of our platform are not neutral.

### iii.   Meta Prioritizes Engagement Over Fixes To Reduce Toxic Content

168.    The Company's internal documents and communications show not only widespread awareness and concern about the News Feed algorithm's role in promoting and spreading toxic content, but also that senior Company executives rejected proposed fixes to reduce toxic content. Frances Haugen explained to *The Wall Street Journal*, as reported on October 3, 2021, that driving engagement was a major focus for Meta, and key internal policy decisions were focused on maximizing and maintaining engagement even at the expense of safety.

Ms. Haugen said the company seemed unwilling to accept initiatives to prove safety if that would make it harder to attract and engage users, discouraging her and other employees.

"What did we do? We built a giant machine that optimizes for engagement, whether or not it is real," read a presentation from the Connections Integrity team, an umbrella group tasked with "shaping a healthy public content ecosystem," in the fall of 2019. The presentation described viral misinformation and societal violence as among the results.

169.    Haugen similarly told *60 Minutes* in her interview that aired on October 3, 2021, that "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money." Haugen explained to *60 Minutes* that senior management therefore refused to change internal policies, and attempts to sound alarms internally had failed: "You know what's going on inside of Facebook and you know no one else knows." She added, "I knew what my future looked like if I continued to stay at Facebook, which is person after person has tackled this inside of Facebook and ground themselves to the ground."

### a.  Meta Employees Raise Concerns Internally

170.    As Haugen alluded to, Meta employees raised substantial concerns internally. On October 4, 2019, data scientist Jeff Allen left the Company. He issued a lengthy report that day

titled "How Communities Are Exploited On Our Platforms: A Final Look At The 'Troll Farm' Pages." In his report, Allen discussed the problem of "troll farms," which had been an issue going back to 2016, but that the Company had still failed to adequately address:

> In 2016, a group of Pages burst forth into the American political scene. The owners of the Pages did not speak English particularly well, or Spanish, or any other language commonly spoken in America. They did not have any real understanding of American politics. And their primary interest in entering the American political publishing scene was to make a fast buck and cause chaos. Regardless, they were able to become a significant fraction of all civic discourse on our platform leading into the 2016 election.
>
> It is profoundly strange that <u>people who do not speak the local language, do not understand US politics, and fundamentally do not care about US politics, were able to become one of the loudest voices in the civic space on FB</u>.
>
> In the three years since, . . . . <u>we have not fundamentally changed the way our platform operates to make it resilient against these actors</u>.

171.    Likewise, when researcher Mary Beth Hunzaker left the Company in August 2020, she wrote in a "badge post"—a Company term for a farewell post on Meta's internal communications platform—that "I've seen promising interventions from integrity product teams, with strong research and data support, <u>be prematurely stifled or severely constrained by key decision makers</u>—often based on fears of public and policy stakeholder responses. . . . While the Recommendations Integrity team has made impressive strides in cleaning up our recs, FB has been hesitant to outright ban/filter conspiracy like QAnon until just last week. . . . We were willing to act only *after* things had spiraled into a dire state."

**b.   Meta Knows That "Downstream MSI" and "Deep Reshares" Are Causing Toxic Content And Misinformation To Spread**

172.    Two overlapping reported reasons that the 2018 algorithm changes boosted particular content and drove the toxic nature of content and discourse on Meta's platforms are referred to as "downstream MSI" or "deep reshares." With "downstream MSI," a post is more likely to appear in a user's News Feed if the algorithm determines that the content is more likely to generate shares or comments as it moves down a chain of reshares. "Deep reshares," in turn, are reshares in which the viewer of a piece of content is not a friend or a follower of the original poster.

As a product of the weight the algorithm affords downstream MSI, content that goes viral through deep reshares is therefore far more likely to reach a large userbase well beyond the original poster's own network. Because negative and provocative content is more likely to elicit user engagement, toxic content and misinformation end up being broadcast far more broadly.

173.    The October 2019 "troll farm" report by Jeff Allen focused on this particular problem among others. He explained:

> So, the largest religious oriented Pages are run by non-religious people, the largest African American oriented Page is run by people who probably have never met one, and inauthentic Pages seem to largely be winning in our public content distribution channels. How did we get here?
>
> It is important to note that 75% of their reach is non-direct. This means that a big majority of their ability to reach our users comes from the structure of our platform and our ranking algorithms, rather than user choice. Instead of users choosing to receive content from these actors, it is our platform that is choosing to give them an enormous reach.

174.    In her interview with *60 Minutes* that aired on October 3, 2021, whistleblower Haugen described an experiment that the Company conducted internally that proved how deep reshares and downstream MSI caused toxic content and misinformation to spread to users even when the users did not express any interest in such content. Haugen explained, "they've taken brand new accounts, so no friends, and all they've done is follow Donald Trump, Melania Trump, Fox News, and like a local news source. And then all they did is click on the first ten things that Facebook showed them—where Facebook suggested a group, they joined that group . . . So they're not doing any conscious action here, just one time go in—and within a week you see QAnon, and in two weeks you see things about white genocide."

175.    An October 22, 2021, *New York Times* article described the same or very similar internal research:

> In July 2019, a company researcher studying polarization made a startling discovery: A test account she had made for a "conservative mom" in North Carolina received conspiracy theory content recommendations within a week of joining the social network.
>
> The internal research, titled "Carol's Journey to QAnon," detailed how the Facebook account for an imaginary woman named Carol Smith had followed pages for Fox News and Sinclair Broadcasting. Within days, Facebook had recommended pages and groups related to QAnon, the conspiracy theory that falsely claimed Mr.

Trump was facing down a shadowy cabal of Democratic pedophiles.

By the end of three weeks, Carol Smith's Facebook account feed had devolved further. It "became a constant flow of misleading, polarizing and low-quality content," the researcher wrote.

The researcher further found that "Carol Smith's" Facebook feed had become "a barrage of extreme, conspiratorial, and graphic content."

176.   Internal researchers consistently reported that reducing deep reshares and downstream MSI would significantly increase platform integrity. A November 6, 2019 report on a "Max Reshare Depth Experiment" found that "[a] ranking change which reduces ranking based on max reshare depth produces significant wins on a variety of integrity measures and could potentially be a net win in terms of moving the integrity-engagement frontier outward. Observed reductions in integrity harms" included declines in "misinformation, N&P [nudity & pornography], violence, disturbing, and bullying."

177.   Researchers found in a report titled "Fighting high harm misinfo with deep reshare damping" that "[a]n effective, content-agnostic approach to mitigate the harms posed by high-harm misinfo (e.g. civic or health) would be to dampen virality within these topics by hard demoting all deep reshares where the viewer is not a friend or follower of the original poster . . . it is easily scalable."

178.   Despite years of internal warnings, the extent of reshares and downstream MSI persisted. Haugen informed the SEC that "Facebook's failure to limit reshares is incredibly risky because under one percent of users drive half of all the user impressions [called 'VPVs'] on reshare posts." Haugen cited an internal research report, "Quantifying the Concentration of Reshares and their VPVs Among Users," that studied the 28 days from February 22-March 21, 2021, and found:

- 2.82 B users were active on Facebook.
- 978 M users created at least one reshare post (34.6%).
- 37 M users (1.3%) created half of all reshare posts.
- 21 M users (0.7%) created reshares accounting for half of all VPVs on reshare posts (within three days).

### c. Defendants Reject and Abandon Fixes Because They Would Reduce Engagement

179.     Notably, Defendants rejected and abandoned revisions and updates to the algorithm and to Meta's content-moderation policies even when those changes had proven effective at reducing toxic content and its harms. In April 2020, a data scientist at the Company proposed reducing deep reshares, which internal data and analyses showed was an effective measure to reduce the amount and spread of false content on the platform. Although Meta made that change in the spring of 2020 for civic and health information, Defendant Zuckerberg rejected his integrity team's proposal to expand the change to other types of content. According to the *Journal*,

> Data scientists on that integrity team—whose job is to improve the quality and trustworthiness of content on the platform—worked on a number of potential changes to curb the tendency of the overhauled algorithm to reward outrage and lies. <u>Mr. Zuckerberg resisted some of the proposed fixes, the documents show, because he was worried they might hurt the company's other objective—making users engage more with Facebook</u>.

> Anna Stepanov, who led a team addressing those issues, presented Mr. Zuckerberg with several proposed changes meant to address the proliferation of false and divisive content on the platform, according to an April 2020 internal memo she wrote . . . One such change would have taken away a boost the algorithm gave to content most likely to be reshared by long chains of users.

> "<u>Mark doesn't think we could go broad</u>" with the change, she wrote to colleagues after the meeting. Mr. Zuckerberg said he was open to testing the approach, she said, but "<u>We wouldn't launch if there was a material tradeoff with MSI impact</u>."

180.     Haugen similarly reported to the SEC that "CEO Mark Zuckerberg rejected this intervention that could have reduced the risk of violence in the 2020 election." Haugen cited a document titled "Mark Feedback on Soft Action Proposal + Deck presented to Mark," which stated that "Mark doesn't think we could go broad" with "Downstream model depreciation . . . We wouldn't launch [the proposed intervention] if there was a material tradeoff with MSI impact."

181.     Defendants knew of other moderation and enforcement measures that could effectively reduce toxic content on Meta's platforms, but refused to implement them beyond isolated instances. Prior to the November 3, 2020, election, the Company had instituted certain safety systems in an effort to ensure that misinformation and polarizing content did not affect the

results of the election. As then-head of product safety and integrity (and current Chief Information Security Officer) Defendant Guy Rosen explained in internal communications on August 30, 2019, the Company (including its Civic Integrity team) implemented an "Integrity Lockdown for US2020," which was the product of a "comprehensive product risk analysis" and was "one of the company's top priorities to get right." Accordingly, Rosen wrote, "Mark [Zuckerberg] yesterday supported our proposal to go into an integrity-wide lockdown starting in mid-September and lasting through mid-December," which would "advance both our (1) ability to quickly react to unfolding events as well as (2) improve our preventative defenses."

182.    The new integrity systems included a "Crisis Assessment Dashboard," or "CAD," which a December 9, 2020, internal report titled "2020 Crisis Pillar Detection Product Lookback" described as "provid[ing] users with the ability to detect, assess and monitor integrity and civic harm risks within known events in near real-time." As researchers explained, such a tool was needed in part because "[i]n early H2 2020, we realized how important real-time data infra capabilities were necessary to address emerging risks as they happened."

183.    An internal September 29, 2020, report by the Civic Integrity team, "Announcing the Civic Targeting Risk Scores (CTRS)," similarly documented the introduction of "Civic Targeting Risk Scores," which would be used to focus on "'populations at risk' in anticipation of the US 2020 election, with a particular emphasis on misinformation and voter disenfranchisement." That strategy was designed to focus on "the particular conditions under which exposure to political content on platform might exacerbate the risk of harm. For example, whether this content was narrowcasted to a particular group of users (e.g. conspiracy theories circulating among high risk people and not broadly outside of them)." Among other things, the Civic Integrity team recommended utilizing "Platform Awareness Scores" that the Company's Digital Literacy team built to predict "the set of abilities that allow users to understand, navigate, and participate online in a safe manner" and thereby reduce "significant risks to users."

184.    Rather than extend such apparently effective measures beyond the November 2020 election, however, the Company returned to its prior content-moderation policies and the toxic content and misinformation they fed. According to whistleblower Haugen, "as soon as the election

was over, they turned [the safety systems] back off or they changed the settings back to what they were before, to prioritize growth over safety."

185.   Moreover, following the November 2020 election, that December, the Company dissolved its 300-person Civic Integrity section (in which Haugen worked), which had been charged with combating political misinformation. Haugen explained to *60 Minutes*, "They told us, 'We're dissolving Civic Integrity.' Like, they basically said, 'Oh good, we made it through the election. There wasn't riots. We can get rid of Civic Integrity now.' Fast forward a couple months, we got the insurrection." Haugen similarly told the Journal that "she was dismayed when Facebook publicly played down its connection to the [January 6] violence despite widespread internal concern that its platforms were enabling dangerous social movements."

186.   Internal documents from the time further show widespread concern after the November election that content policy was being driven by internal policy and public-relations sensitivity, rather than safety and integrity concerns. A December 11, 2020, internal research report, "Political Influences on Content Policy," warned:

1. Facebook's decision-making on content policy is routinely influenced by political considerations.

2. The Communications and Public Policy teams are routinely asked for input on decisions regarding (a) enforcing existing content policy, (b) drafting new policy, and (c) designing algorithms. Those teams often block changes when they see that they could harm powerful political actors.

3. The influence of the Public Policy team is a common topic of complaint inside the Integrity org, and Directors working in integrity have publicly stated they think our process [should] be changed to exclude them.

4. We can and should set up a firewall between content-policy and other parts of the company.

187.   Similarly, following the political violence of January 6, 2021, employees expressed anger and frustration on Meta's internal messaging board. When Company executives including Defendant Zuckerberg and Chief Technology Officer Mike Schroepfer made public and internal statements condemning the events of January 6, responses from employees (including internal messaging that Schroepfer responded to) included:

- <u>Leadership overrides research-based policy decisions to better serve people like the groups inciting violence today. Rank-and-file workers have done their part to identify changes to improve our platforms but have been actively held back</u>.

- This is not a new problem. We have been watching . . . <u>wishy-washy actions of company leadership</u>, for years now. We have been reading the [farewell] posts from trusted, experienced, and loved colleagues who write that <u>they simply cannot conscience working for a company that does not do more to mitigate the negative effects on its platform</u>.

- <u>All due respect, but haven't we had enough time to figure out how to manage discourse without enabling violence</u>? We've been fueling this fire for a long time, and we shouldn't be surprised it's now out of control.

        **iv.**    **Meta Knew From Internal Research That Its Existing Content Moderation Practices Were Severely Deficient and Ineffective**

188.    As Meta documented the fact that its algorithm promoted a wide range of harmful content, Meta's own contemporaneous internal research also documented in stark detail how Meta's content-moderation practices were grossly deficient to fix the problem that its algorithm created. While Defendants touted these measures to the public as robust and effective, Meta's own internal analysis showed the opposite was true. For example, a July 2019 internal research report, titled "Demoting On Integrity Signals Is Not Enough," explained that the "integrity signals" used to facilitate content moderation "<u>are currently, for the foreseeable future, and perhaps permanently, not remotely sufficient to address harms on our platform</u> . . . . if we are serious about addressing them, we will need to change the way we develop and deploy product changes." As the researcher explained, "<u>we do not and possibly never will have a model that captures even a majority of integrity harms</u>, particularly in sensitive areas" such as hate speech, misinformation, and "toxicity/divisiveness."

189.    As the "Integrity Signals" research report discussed, for hate speech—"one of the 'big three' community integrity problems on Facebook (along with Nudity & Pornography and Graphic Violence)," due to inconsistent standards and application, "<u>we only take action against approximately 2% of the hate speech on the platform</u>. Recent estimates suggest that unless there is a major change in strategy, it will be very difficult to improve this beyond 10-20% in the short-medium term."

190.    The same report noted that, regarding misinformation, "content is often not caught until after it has gotten a lot of distribution, and many things are never caught." And for "toxicity/divisiveness," the research showed that although "divisive content (particularly divisive political content) is one of the biggest problems facing the platform," the Company could not and would not adequately identify or moderate such content: "Though a launch candidate was prepared in mid-2018, it was blocked from launching because of policy concerns in the lead-up to the election." As a consequence, "we can get a decent sense of whether a launch is increasing hate speech, or misinformation, or other harms," but "we <u>don't</u> have a way of effectively demoting this content in a targeted way . . . , and even if we did, we often <u>won't</u> be able to launch them based on policy concerns."

191.    Additional internal research further showed that the Company was not effectively enforcing its content-moderation policies to minimize or eliminate toxic content and misinformation, and internal processes to do so had failed. For example, an August 2020 internal report titled "Serial misinfo and hate offenders" found that "Multiple offenders for Hate are frequently also multiple offenders for misinformation . . . We may be repeatedly applying authenticity verifications to some or many of these accounts to no effect . . . <u>99% of these user accounts remain active, and some of them have passed dozens of authenticity checks.</u>" An October 25, 2021, *Bloomberg* article titled "Facebook Privately Worried About Hate Speech Spawning Violence" reported on that internal report:

> Facebook already knows which people and groups are most likely to spread prejudice, but those same users often manage to evade enforcement action, the records show. Many users in the U.S. who are serial hate-speech offenders also regularly share misinformation, and <u>99% of them remain active on the site</u>, according to one internal report dated August 2020. They often join like-minded groups that promote lies and bias but are rarely reported for breaking the rules by their fellow group members.

192.    In addition, users were primarily responsible for identifying much of the harmful content that Meta actually took action on—not the Company's own artificial intelligence, as Defendants claimed. An internal "Afghanistan Hate Speech analysis" showed that in Afghanistan, there were 10,500 reported incidents of hate speech per week, and "99.8 per cent of the total Hate

Speech [take] downs are down by human reviewers . . . and only 0.2 per cent is taken down by automation. While Hate Speech is consistently ranked as one of the top abuse categories in the Afghanistan market, the action rate for Hate Speech is worryingly low at 0.23 per cent."

193.   Another internal analysis of "Hate Speech break-down by detection source" found that "[f]rom the perspective of the detection source, 98 per cent of the Hate Speech contents are reported reactively (i.e. by our community) and only two per cent are caught proactively (i.e. by classifiers and other proactive tools)." And a report from March 2021 titled "Problematic Non-violating Narratives" found that "we may action as little as 3-5% of hate and ~0.6% of [violence and inciting content] on Facebook." Other employees concluded that "we're deleting less than 5% of all of the hate speech posted to Facebook. This is actually an optimistic estimate—previous (and more rigorous) iterations of this estimation exercise have put it closer to 3%, and on V&I [i.e., violence and inciting content] we're deleting somewhere around 0.6% . . . we miss 95% of violating hate speech."

> **f.    Defendants' Inability and Unwillingness to Effectively Moderate Content Made It Impossible to Achieve Meta's Publicly Stated Objectives to Support COVID-19 Vaccination**

194.   In March 2021, Defendant Zuckerberg announced that Meta was launching a campaign to get 50 million people vaccinated. In support of that goal, Zuckerberg announced that Facebook would include (1) "a tool that shows you when and where you can get vaccinated," which would be "in the Covid Information Center, which we'll show people right in their News Feed"; (2) "bringing the Covid Information Center to Instagram"; and (3) working with health authorities and governments to . . . help people register for vaccines."

195.   The Company also assured investors during the Class Period that it applied its content-moderation policies consistently and effectively to reduce COVID-related misinformation. On May 19, 2021, during a conference call to discuss Meta's Community Standards Enforcement Report for the first quarter of 2021, Defendant Bickert claimed that "our COVID-19 misinformation policies do apply to everybody around the world that includes heads of state and presidents." Similarly, in Meta's May 2021 written responses to Congress, the Company represented that it was "taking significant steps to fight the spread of misinformation,"

including using "machine learning models to find potentially violating COVID-19 and vaccine content."

196.    Despite those efforts and assurances, however, Meta's inability and unwillingness to control the information promoted by its algorithm made it impossible for Meta to achieve its publicly stated position.

197.    As *The Wall Street Journal* reported on September 17, 2021, one contemporaneous internal memorandum reported that "roughly 41% of comments on English-language vaccine-related posts risked discouraging vaccinations," and "[u]sers were seeing comments on vaccine-related posts 775 million times a day, . . . and Facebook researchers worried the large proportion of negative comments could influence perceptions of the vaccines' safety." The authors of that memo warned that even authoritative sources of vaccine information, such as the World Health Organization and UNICEF, were becoming "cesspools of anti-vaccine comments" due to the "anti-vaccine commenters that swarm their pages" with what the Company internally called "barrier to vaccination" content.

198.    Internal research also found that "Vaccine Hesitancy is Twice as Prevalent in English Vaccine Comments compared to English Vaccine Posts," which researchers said was "a huge problem and we need to fix it." Internal research dated February 9, 2021, and titled "Identifying and Comparing Pro- and Anti-COVID-19 Vaccine Comments" found that for COVID-related posts, "anti-vax attitudes appeared in a majority of comments and occupied high-visibility positions in comment threads," which was "alarming."

199.    Another internal report referenced by the *Journal* titled, "Vaccine Hesitancy in Comments: C19D Lockdown Update," showed that Meta knew that COVID-19 vaccine misinformation was "rampant" and researchers admitted that Meta's ability to detect misinformation in comments was "bad in English and basically non-existent elsewhere." The same report also indicated that as many as 40% of all vaccine related comments were anti-vaccine, and reported that health organizations "like UNICEF and WHO will not use the free ad spend we're providing to help them promote pro-vaccine content, because they don't want to encourage the anti-vaccine commenters that swarm their pages." Additional internal research from the time titled

"Identifying and Comparing Pro- and AntiCOVID-19 Vaccine Comments, later published by online by *Gizmodo*, showed that as much as 60% of comments regarding COVID-19 vaccines were anti-vax, and researchers acknowledged that Meta had "no idea about the scale of the [COVID-19 vaccine hesitancy] problem when it comes to comments."

200.    The *Journal* further reported that, given the differences between senior executives' public statements about Meta's work to encourage vaccination and the Company's internal research, "Facebook officials have become concerned that Mr. Zuckerberg or Chief Operating Officer Sheryl Sandberg may face questions from lawmakers about how their past public statements on these issues square with the company's internal assessments."

201.    Moreover, internal research found that a very small number of users were able to use the Company's platforms to spread misinformation broadly, including COVID-related misinformation. As *The Wall Street Journal* reported, Meta's internal research "found that a small number of 'big whales' were behind many antivaccine posts and groups on the platform. Out of nearly 150,000 posters in Facebook Groups disabled for Covid misinformation, 5% were producing half of all posts, and around 1,400 users were responsible for inviting half the groups' new members." Meta researchers further wrote in May 2021 that "[w]e found, like many problems at FB, this is a head-heavy problem with a relatively few number of actors creating a large percentage of the content and growth."

> **3.    Meta Falsely Touts Its Commitment to Children's Safety and Downplays and Denies the Harms Caused by Its Platforms, Despite Knowing from Extensive Internal Research that Its Platforms Severely Harm Teens, Especially Teen Girls**

202.    During the Class Period, Defendants reassured the public that Meta's platforms, notably Instagram, did not cause harm to younger users. Defendants told investors that any negative effects from Meta's platforms are "quite small" and were offset by positive effects. Defendants stated that "there's little existing research," said the "external research" was inconclusive, and Meta was "not aware of a consensus among studies or experts." Defendants also took pains to assure the public that Meta was focused on and prioritized children's safety, telling investors, "We have robust policies to help protect against . . . content or behavior on our platform

that puts the safety of children at risk."

203.    In truth, as detailed below, Defendants had years' worth of internal research that all said the same thing: Meta's platforms, and in particular Instagram, caused harm to teens that was "common," "severe," "significant," and even "worse" for teen girls. These harms include "making body image issues worse for 1 in 3 teenage girls" and increasing rates of self-injurious and suicidal thoughts and behaviors. Meta's internal research also explicitly recognized that Instagram is more harmful to teens' mental health and well-being than any other social media app. The same research showed that Meta's platforms are addictive, leading younger users to "feel unable to stop themselves" from using them, even when they "know that what they're seeing is bad for their mental health."

204.    Instead of "protect[ing]" the safety of young users, Meta concealed and misrepresented its internal research from the public while simultaneously campaigning to increase the number of children using its platforms in pursuit of more clicks and greater profits.

a.    **Defendants Launch a Campaign to "Race for Teen Users"**

205.    Meta acquired Instagram in 2012 for $1 billion specifically to address the decline Meta had observed in the number of teens using Facebook. Meta then intentionally designed Instagram to appeal to children. For example, Meta made photos the focus of the app, and added filters and other features that made it easy for users to touch up or edit people's faces. Instagram quickly became a virtual gathering place for teens, where they would post their best photos, vie for "likes" and comments, and evaluate each other and themselves compared to others (i.e., "social comparison").

206.    However, as detailed in Section IV.A above, Facebook's teen user base plummeted between 2015 and 2018, prompting Meta to launch a campaign to attract younger users to its platforms. In 2016, Meta directed its employees to "focus on winning what they viewed as a race for teen users," according to former Instagram executives interviewed by *The Wall Street Journal*.

207.    In an attempt to win that race, in 2017, Meta launched "Messenger Kids," an app that it designed for users aged 6 through 12. A 2017 internal Meta presentation about the app, first made public by *The Wall Street Journal* on September 28, 2021, warned that "signing up for social

media is a given" for tweens, and that Meta simply could not compete with Snapchat and TikTok. As reflected in internal Meta documents reviewed by *The Wall Street Journal*, Meta's hope was that "Messenger Kids" would lead to children adopting other Meta platforms. For example, a Meta internal report titled "Exploring playdates as a growth lever for Messenger Kids," published by the *Journal*, asked "how we can leverage playdates to increase growth/retention and active threads." Similarly, a 2018 Meta internal document labeled "confidential," and described by *The Wall Street Journal* on September 28, 2021, urged readers to "Imagine a Facebook experience designed for youth," noting that "kids are getting on the internet as young as six years old."

208.    Despite its efforts, Meta still could not keep up. For instance, in December 2020, Defendant Mosseri described TikTok as "an incredibly formidable competitor, probably the most formidable competitor we've ever seen." Mosseri acknowledged that Instagram was "playing catch-up in a lot of ways," including by introducing its copycat "Reels" feature, in an attempt to recreate TikTok's success with short-video content. In a similar move, Snapchat launched "Spotlight," which reportedly attracted 100 million users within just two months of its launch. Instagram's "Reels," however, lagged significantly behind TikTok in user engagement, and some users criticized the feature based on its "cluttered newsfeed," "awkward integration," and "poor editing assistance." Indeed, Meta's own research confirmed that "Engagement Trends" among teens had dropped significantly, in part because teens were spending two to three times more time on TikTok than on Instagram.

209.    By the beginning of the Class Period, analysts likewise understood the significant threat that competitors like TikTok and Snapchat posed to Meta's. Evercore ISI, for instance, noted in an April 2021 analyst report that "[f]ierce competition from players like . . . Snap and TikTok results in slower than expected Ad Revenue growth," and that "Facebook is unable to capitalize on currently undermonetized assets," including Reels. Morningstar analysts likewise warned that Meta "will continually have to fight to capture a user's time and engagement," and highlighted as a "Risk & Uncertainty" that companies like TikTok were "luring users away from Facebook and its apps."

**b.    Meta's Internal Research Demonstrates that Instagram's Negative Impacts on Teens, Especially Teen Girls, Are "Common" And "Severe"**

210.    To evaluate how to best grow and retain its base of young users, Meta conducted extensive internal research over the course of years to study the impact of its platforms on children. These internal studies revealed that Meta's platforms had negative impacts on teens, and in particular teen girls, that were "common" and "severe"— not "quite small" or "overblown," as Meta falsely told investors. As noted above, Defendants, however, knew that younger users were key to the profitability of Meta's platforms and were concerned about how their youth engagement compared to competing apps. Thus, Defendants chose to conceal Meta's internal research from investors.

211.    As *The Wall Street Journal* reported in the September 14 Facebook File, Meta's internal researchers conducted a "Teen Mental Health Deep Dive" in five presentations over the course of 18 months—from 2019 to early 2021—to enable Meta's "product and outreach teams" to target teen users more effectively. The *Journal* reported that Meta's research concluded that "some of the problems were specific to Instagram, and not social media more broadly," which was "especially true concerning so-called social comparison," i.e., negatively comparing oneself to others. Worse yet, the *Journal* noted, Meta's internal documents revealed that the features identified as most harmful to teens, including body and lifestyle, remained a heavy focus of the platform and constituted Instagram's core product.

212.    The September 14 Facebook File quoted findings from numerous internal Meta documents concerning the Company's research into teen mental health. For instance, an internal Meta slide from 2019 that summarized the findings of Meta's research about teen girls stated, "We make body image issues worse for one in three teen girls." Meta's 2019 research also found that 14% of boys in the U.S. reported that Instagram made them feel worse about themselves. Another slide detailed the findings of Meta's 2019 research, reproduced in part below, which showed the multifarious nature of Instagram's harm to teen users, with the following percentages of teens in the U.K. and U.S. having reported that particular issues they felt "started on Instagram":



213.    The data also showed that "[o]ne in five teens say that Instagram makes them feel worse about themselves," including 21% of U.S. teen girls and 25% of U.K. teen girls reporting that Instagram made them feel "much worse" or "somewhat worse" about themselves.

214.    The same internal presentation from 2019 observed that "[y]oung people are acutely aware that Instagram can be bad for their mental health, yet are compelled to spend time on the app for fear of missing out on cultural trends." Other internal Meta presentations similarly noted that teen users regularly reported wanting to spend less time on Instagram, but lacked the self-control to do so. As an Instagram research manager put it, "<u>Teens told us that they don't like the amount of time they spend on the app but feel like they have to be present. They often feel 'addicted' and know that what they're seeing is bad for their mental health but feel unable to stop themselves</u>."

215.    This phenomenon results from the fact that Meta designs its products, including Instagram, to be engaging and to encourage as many users as possible to stay on the platform for as long as possible, resulting in what Meta refers to as "problematic use." Meta's algorithms lead to addiction in children and young adults by creating—as Ms. Haugen described it at a February 7, 2022, roundtable— "little dopamine loops." A user's brain experiences pleasure, or a "dopamine hit," from the platforms, for example, by obtaining "likes" for posts. Then, the user immediately

seeks to obtain that feeling again, for example, by posting new content and obtaining more likes.

216.    The result is a vicious cycle that leads children and young adults to become addicted to Meta's platforms. As Ms. Haugen explained during an interview with *The Daily Show* host, Trevor Noah on February 10, 2022, "Facebook's internal research says that the highest rates of 'problematic use' peak at age 14." Thus, even when tweens and teens recognize that Meta's platforms make them feel bad about themselves, they continue to use them—because that is exactly what Meta has designed its platforms to do.

217.    The full set of documents detailing Meta's "deep dive" research—made public by the *Journal* on September 29, 2021—further confirmed that the alarming results of Meta's internal research starkly contradicted Defendants' public statements. One presentation in the series, dated October 10, 2019, explained that "Content on IG makes teens feel very bad." Indeed, "Teens blame Instagram for increases in rates of anxiety and depression among teens," which "reaction was unprompted and consistent across all groups." The study also found that social comparison, which is "closely related to body image," "exacerbates problems teens are dealing with." In addition, Meta's internal researchers found that social comparison impacted "female anxieties" more than men precisely because social comparison is so "closely related to body image."

218.    In Meta's own words, "Appearance-based comparison on Instagram is common and can have significant implications for individuals." Meta again concluded internally that Instagram was worse than any other platform, stating, "<u>Teen girls perceive Instagram as the 'worst' social media app in terms of body and appearance comparison</u>."

219.    A November 2019 internal Meta study titled "Mental Health Findings" corroborated Meta's findings that the harms to children caused by Instagram were common and severe. The study found that "<u>1 in 3 teen girls blame Instagram for making their body image issues and problematic social media use worse</u>." According to the same internal study, 17% of teen girl Instagram users said the platform makes "Eating issues" such as anorexia and bulimia worse, and 13.5% of teen girls said Instagram made thoughts of "<u>Suicide and Self Injury worse</u>."

220.    Meta's internal research also expressly recognized the importance and far-reaching effect of Instagram's harmful impacts on teen girls' body image. The November 2019 internal

study noted, "Social Comparison is a high reach, high intensity issue." Meta further recognized that social comparison and related body image issues were the two "highest among issues IG should care about" "for teens." The same study acknowledged, "Negative social comparison and related issues with body image are especially crucial to tackle given the high ranking among teens."

221.     As detailed in the September 14 Facebook File, Meta's internal research on teen mental health continued throughout 2020 and into early 2021. "Facebook's deep dive into teen girl body-image issues in 2020" revealed that "'Social comparison is worse on Instagram'" than on other social media platforms, including TikTok and Snapchat, because "Instagram focuses heavily on the body and lifestyle." Meta researchers repeatedly found that Instagram is harmful for a sizable percentage of young users—a problem that most notably affected teenage girls. As an internal Meta slide from March 2020 stated, "'Thirty-two percent of teen girls said that when they felt bad about their bodies, Instagram made them feel worse.'" In a focus group study conducted by Meta, one teen reported that when using Instagram, she "felt like [she] had to fight to be considered pretty or even visible." Similarly, another teen told Meta researchers, "I feel like I am too big and not pretty enough. It makes me feel insecure about my body even though I know I am skinny." Meta's researchers also identified the over-sexualization of girls on its platforms as something that negatively impacts the mental health and well-being of its users.

222.     In addition to Instagram's outsized impact on teen girls, Meta's 2020 research on body image found that 40% of teen boys experience negative social comparison. One such user told Meta's researchers that he felt "on the edge a lot of the time" because of his interactions on Meta's platforms. Meta's 2020 research ultimately concluded that "[a]spects of Instagram," including the pressure that it creates to look perfect and the addictive nature of the platform, "exacerbate each other to create a perfect storm," which, according to Meta's research, can send teens spiraling toward eating disorders, an unhealthy sense of their own bodies, and depression.

223.     In March and April 2020, Meta conducted a 100,000-person social comparison survey in nine countries and concluded, "Social comparison is common," and "1 in 4 people think that Instagram makes social comparison worse." The study also found that social comparison is "worse for women," "negative comparison is more common for women in many parts of the

world," and "[i]t's more common among teens than non-teens [], especially teen girls."

224.    Meta's researchers echoed similar findings in a March 26, 2020, slide presentation, which was posted to Facebook's internal message board and later made public by *The Wall Street Journal* in full on September 29, 2021, titled, "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the U.S." Meta's researchers again found that "[f]requent social comparison is a key driver of subjective well-being and teens say IG makes this problem worse." The study also found that "[s]ocial comparison is worse on Instagram," compared to other apps. Specifically, in response to the question, "Is Instagram better/worse than Snap, Twitter, or Tiktok?," Meta's researchers concluded, "Instagram is seen as having the highest impact," including on body comparison. The study observed that Instagram's "Explore" feature is particularly harmful, noting "tons of body image triggers, intimidating."

225.    In stark contrast to Defendants' statements to investors, Meta again concluded internally that the negative impact of Instagram was anything but "quite small." Meta's researchers reported that "66% of teen girls on IG experience negative social comparison," and "32% of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Further, Meta noted, "Mental health outcomes related to this can be severe."

226.    Similarly, an internal Meta research report dated February 1, 2021, noted at least three times that "appearance-based comparison on Instagram is common" and found that it can have "significant implications" for individuals. Specifically, in a section called "Research Insights," Meta concluded, "Appearance-based social comparison on IG is common, affecting 1/3 of people on IG and nearly half of teen girls." The same research report found that the issue of appearance-based social comparison had severe negative effects on teens. Meta's researchers stated, "Negative forms of social comparison, particularly appearance-based comparison, can worsen body image problems, eating disorders, anxiety and loneliness. This is a high-reach, high-intensity problem . . . ."

227.    Elsewhere in the same internal report, Meta concluded that it was important to "focus" on the negative effects of Instagram on health and well-being specifically because those effects are "worse for teens, particularly girls," and because "many people" have pre-existing body

dissatisfaction that Instagram exacerbates. Meta reiterated, "A substantial proportion of people report body image concerns," and the impact on teen girls "reinforces the idea that we should focus our efforts on teens and younger adults."

c.     **Defendants Conceal Meta's Internal Research on Teen Mental Health from the Public**

228.    As reported by *The Wall Street Journal* in the September 14 Facebook File, Meta's "deep dive" research into teen mental health discussed above "has been reviewed by top Facebook executives, and was cited in a 2020 presentation given to Zuckerberg." Further, all of Meta's internal research was posted internally on "Workplace," otherwise known as "Facebook for Facebook," Meta's proprietary company intranet portal (i.e., Meta's equivalent of SharePoint), which Meta describes as an "all-in-one business communication platform . . . that securely combines chat, video, groups and your intranet with the work tools you already use. Think Facebook, but for your company." As such, Meta employees could see these research reports, but the public could not.

229.    With teen engagement already plummeting, Defendants knew that publishing the alarming results of Meta's internal research would risk further shrinking its base of younger users. This risk was amplified by Meta's finding that Instagram posted a uniquely severe threat to teen mental health and well-being, making it more likely that its teen users would migrate to a less harmful platform. And based on the then-existing scrutiny from regulators, academics, and other members of the public, Defendants knew that if they disclosed the findings of the research, Meta would face immense pressure. Accordingly, Defendants concealed the research.

230.    For example, in the September 14 Facebook File, *The Wall Street Journal* reported that in January 2020, Meta invited Jonathan Haidt, a social psychologist at New York University's Stern School of Business, to Instagram's headquarters in Menlo Park, California. During his visit, Defendant Mosseri and his Instagram staff briefed Professor Haidt on Instagram's "efforts to combat bullying and reduce social pressure on the platform." According to Professor Haidt, "It was not suggested to me that they had internal research showing a problem."

231.    Meta has also repeatedly refused to provide its internal data to academic

institutions. The Cybersecurity for Democracy organization at New York University, for instance, conducted research into the Company's polarizing effects, but expressly acknowledged, "Our findings are limited by the lack of data provided by Facebook, which makes public information about engagement — reactions, shares, and comments — but not impressions — how many people actually saw a piece of content, spent time reading it, and so on." These NYU researchers further acknowledged that "[w]ithout greater transparency and access to data, [certain] research questions are out of reach." When Meta does provide access to its data, it nevertheless places stringent limitations on that access. For instance, Meta has partnered with Harvard's Institute for Quantitative Social Science to supposedly provide access to Meta's internal data, but through this partnership, Meta provides only a limited dataset and requires individual researchers to apply for access and execute an agreement directly with the Company. As one researcher put it, this process is a "black box" and "is not an open, scientific process" and thus "empowers [Meta] administrators to cherry-pick research projects that favor their perspective."

232.    Another reason that Meta concealed its internal research from the public was because Meta's own researchers had found that concerns about the impact of Meta's platforms on the health of younger users was a primary reason why children were not using those platforms. For example, Meta's March 2021 review "on FB and IG YA/Teens Aging Up and Engagement Trends" specifically identified such concerns as a "key barrier to engagement based on quantitative and qualitative findings." As Meta's researchers concluded, "YA have a wide range of negative associations with Facebook including primary concerns, impact to their wellbeing. . ."

233.    Indeed, as Meta recognized—but did not disclose—making changes that would effectively combat Instagram's harm to teens could result in teens not using Instagram at all. For example, in a slide deck posted on Meta's internal message board the same month, March 2021, researchers recommended reducing exposure to celebrity content, beauty, and relationships to address teen health. As a current Facebook employee succinctly observed in the comments, "Isn't that what IG is mostly about?" The current employee asked rhetorically, as for viewing "the (very photogenic) life of the top 0.1%," Instagram's researchers noted a similar tension and resistance to their findings, telling *The Wall Street Journal*, "We're standing directly between people and

their bonuses."

        **d.**    **"Winning with Tweens": Meta Works to Attract Even Younger Users Because It Is Losing the "Race for Teens"**

234.     Rather than reduce youth exposure to its platforms given the significant harms that were known internally, Meta continued a robust effort to attract even younger users. Meta's internal documents again make clear that Defendants were not concerned with protecting children's safety as they falsely told the public; they were concerned only with "tapping" that young user base. As Meta bluntly put it in a February 2020 slide presentation titled "Tweens Competitive Audit," "Why do we care about tweens? They are a valuable but untapped audience." The same presentation explained that according to Meta, "Our ultimate goal is messaging primacy with US Tweens (TAM [total addressable market] = 12M), which may also lead to winning with Tweens (TAM 26M)."

235.     By early 2021, Meta's reach was extending even younger. For example, in a Meta internal memorandum called "Youth Privacy: Defining five groups to guide age-appropriate design" first made public by *The Wall Street Journal* on September 28, 2021, Meta analyzed which of its products would resonate with children in age groups as young as zero to four. A document posted to Meta's internal message board in 2021 heralded that "preteens are the next generation coming onto the platform."

236.     Meta's platforms nonetheless continued to lag behind other trendier apps, and Defendants became increasingly concerned. For example, as first made public by *The Wall Street Journal* on September 29, 2021, in March 2021, Meta reported on an extensive review that it had conducted for Facebook Chief Product Officer Chris Cox "on FB and IG YA/Teens Aging Up and Engagement Trends." The study found that the frequency with which teens were posting on Instagram had dropped significantly, and that teens were spending two to three times more time on TikTok than Instagram.

237.     Meta's researchers noted internally that Meta had placed a "suite of big bets for Teens on IG and Young Adults on FB." Yet, there was "headroom for growth" with respect to teen engagement given how much more time teens were spending on TikTok, combined with the fact

that only 14% of teens in the U.S. were using Instagram as their primary messaging app. Instagram's "Teen Health Scorecard" reported "Moderate declines in retention, sessions & messaging. <u>Worrying concerns for both Consumption & Production</u>."

238.    Facebook's "Health Scorecard" reported even worse news, noting, "Saturation among Teens (13-17) remains low, and acquisition amongst Teens is down YoY." Similarly, the same report documented "concerning YoY weakness (especially among teens)" with respect to messaging on Facebook. Meta concluded that it needed to "further[] invest[] in our age up strategy" in continued pursuit of its goals to grow and retain young users.

239.    To further this goal, Meta conducted the "Teen Mental Health Deep Dive" study and an "Exploratory Study in the U.S." on "Teen Girls Body Image and Social Comparison on Instagram," as noted above. The stated purpose of this research was to "build meaningful and impactful campaigns in this space" and "inform product teams how best to support teens in this space"— i.e., to grow and maintain teen use of the platform. Consistent with this purpose, after Meta's "Teen Girls Body Image and Social Comparison on Instagram" study concluded that Instagram made 32% of teen girls feel bad about their bodies and had "severe" mental health outcomes, the "key take-away" that Meta reported was "what this means for product development."

e.    **Defendants Falsely Tout Meta's Commitment to Children's Safety, Assure the Public that Meta's Platforms Do Not Harm Children, and Characterize the Research as Inconclusive**

240.    As the Class Period approached, on March 18, 2021, in an internal company post obtained by Buzzfeed News, Meta announced that it was specifically developing a version of Instagram for children under 13—referred to as "Instagram Kids."

241.    While actively targeting children and in the face of increasing public concern, Defendants falsely mischaracterized Meta's internal research. For example, on March 25, 2021, Defendant Zuckerberg testified before the U.S. House of Representatives' Subcommittee on Communications and Technology. When asked about the impact of Instagram on teens and mental health, Defendant Zuckerberg told Congress, "The research that we've seen is that using social

apps to connect with other people can have positive mental-health benefits." Representative Debbie Lesko specifically asked Zuckerberg, "Do you believe that your platform harms children?" In response, Zuckerberg falsely stated, "Congresswoman, I don't believe so. This is something that we study and care a lot about."

242.    Senator Cathy McMorris Rodgers asked Defendant Zuckerberg, "Do you agree too much time in front of screens, passively consuming content, is harmful to children's mental health?" Defendant Zuckerberg misleadingly answered, "I don't think that the research is conclusive on that." When Senator Rodgers pressed Defendant Zuckerberg on that point, he falsely stated that "overall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits"— i.e., the exact opposite of what Meta's own internal research had shown. In response to Senator Rodgers's concerns about "passively consuming content," Defendant Zuckerberg falsely stated that it "isn't necessarily negative. It just isn't as positive, as connecting."

243.    During the hearing, Senator Rodgers also asked Defendant Zuckerberg point blank, "Has Facebook conducted any internal research as to the effect your products are having on the mental health of our children?" Defendant Zuckerberg acknowledged that "this is something that we try to study," and eventually admitted, "I believe the answer is yes." But Defendant Zuckerberg nowhere disclosed what Meta's internal research had revealed about the harms its platforms caused to children's mental health.

   **f. Meta Doubles Down on Its Efforts to Target Young Users, Its False Assurances, and Its Denials of the Negative Impact of Its Platforms on Children**

244.    In the ensuing months, Defendants continued to conceal their research from the public and issued a series of false and misleading statements and omissions designed to convince investors that Meta ensured that its platforms were safe for young users. For instance, on May 11, 2021, a Twitter user asked Defendant Mosseri, "do you believe social media is good for children under 13?" Mosseri falsely responded, "This is *the* question. <u>The reality is there's little existing research, which means there will be strong differing opinions</u>." In truth, Defendants had extensive internal research conducted over the course of years showing that the negative impacts of

Instagram on young users were "common" and "severe."

245.    Then, on May 19, 2021, Defendants issued Meta's Community Standards Enforcement Report for the first quarter of 2021. In that report, Meta falsely stated, "We remove content that encourages suicide or self-injury on Facebook and Instagram." In truth, Meta's internal research discussed above demonstrated that 13.5% of teen girls said Instagram made thoughts of "Suicide and Self Injury worse"; in other words, research showed that Instagram as a platform made suicidal thoughts worse for a significant portion of its users.

246.    On May 24, 2021, Defendant Mosseri did an interview with *The Information*, during which he referred to "external research" and misleadingly suggested that Meta's internal research on well-being was inconclusive. Mosseri misleadingly stated that Meta "tried to measure the effect of hiding likes on people's actual wellbeing," but that "[w]ellbeing is hard to measure," "more of like a judgment call," and "a bit subjective." Mosseri also pointed to confounding factors including "real-world outcomes like longevity or success in the workplace" as limiting Meta's ability to conduct research. But in reality, Meta already had conducted extensive internal research, which concluded that Meta's platforms, and Instagram in particular, were causing serious harm to teens' mental health and well-being.

247.    On May 26, 2021, Instagram formally announced Project Daisy, a campaign to hide the "likes" on Instagram. Meta marketed Project Daisy as designed to protect children. Defendants again expressly referred to external research, but nowhere acknowledged that Meta had any internal research. Meta stated, "We've been working closely with third-party experts to better understand how to empower people, build self-awareness and shape a more positive experience on Instagram. . . .We're also funding more external research about people's experiences on Instagram, and how we can improve our policies and products to support our community."

248.    Defendants hailed Project Daisy as "Giving People More Control on Instagram and Facebook," touting it as evidence of Meta's commitment to the safety of teen users. For example, Justin Osofsky, Instagram's Chief Operating Officer, told *The New York Times* early in the program's development that Project Daisy shows that "we are willing to question and analyze some of the most core aspects of the service when you think about the next decade of Instagram."

In the same article, Defendant Mosseri asserted, "[W]e create a lot of good in the world."

249.    In reality, Meta's internal research showed that Project Daisy did not do anything to protect children. As first reported in the February 14 Facebook File, a slide that Facebook presented to Defendant Zuckerberg in 2020 concluded with respect to Project Daisy, "We didn't observe movements in overall well-being measures." However, Defendant Zuckerberg and other senior Meta executives concluded that rolling out the program "could make them look good." As Meta executives wrote in a discussion about how to present their research to Defendant Zuckerberg, "A Daisy launch would be received by the press and parents as a strong positive indication that Instagram cares about its users, especially taken alongside other press-positive launches."

250.    Defendants' strategy worked. For example, on May 26, 2021, the same day that Instagram announced the rollout of Project Daisy, *Good Morning America* hosted Defendant Mosseri and explicitly tied the rollout to an improved experience for teen users, juxtaposing Mosseri with an image of a teen girl looking happy while using a social media app on her phone.

251.    Defendants continued to obscure Meta's internal research when asked by reporters about the mental health effects of Instagram on a call at or around May 26, 2021. In response to reporters' questions, Defendant Mosseri did not disclose the results of Meta's internal research. Instead, he misdirected by misleadingly pointing to external research, and he falsely stated that Instagram's effects on teen well-being were "<u>quite small</u>." Specifically, Defendant Mosseri represented that the research showed that "<u>It's facts stated the bi-directional, so small effects positive and small effects negative but it's quite small</u>." Mosseri again emphasized, "There's a lot of good that comes with what we do."

252.    As a result, reporters echoed Defendant Mosseri's comments, as in a May 26, 2021, *Wall Street Journal* article which reported that Mosseri "said concerns about Facebook's overall impact on its users' well-being are likely <u>overblown, but said Instagram was committed to studying it</u>."

253.    Defendant Mosseri's statements were materially false and misleading and omitted material facts. It was, at minimum, misleading for Mosseri to state that research showed that

Instagram's impact on young user's health was "quite small" and "bi-directional," and that concerns were "overblown," while concealing the fact that Meta's own internal research showed that the negative impact on its users' well-being was "widespread," "common" and "severe." It was similarly misleading for Mosseri to state that Instagram was "committed" to studying the issue when it already had done so, and its research demonstrated the material negative impacts noted above.

254.    Days later in June 2021, at an event for Instagram influencer JoJo Siwa, Ms. Siwa, then 18 years old, disclosed that she had been an active Instagram user for almost a decade. This was a clear violation of both Meta's terms of service and federal law under the Children's Online Privacy Protection Act. Rather than confronting the issue, Defendant Mosseri replied simply, "I don't want to hear it," embodying Meta's typical approach of turning a blind eye to serious safety concerns raised by its conduct.

255.    On August 4, 2021, Senators Richard Blumenthal and Marsha Blackburn, Chair and Ranking Member of the Senate Commerce, Science, and Transportation Subcommittee on Consumer Protection, Product Safety, and Data Security, sent Defendant Zuckerberg a letter requesting that he release Meta's internal research on the impact of its platforms on youth mental health. The Senators' letter stated that, given the announcement of Messenger Kids in 2017 and the March 2021 leak revealing Meta's tentative plans for "Instagram Kids," "We have grave concerns about this apparent effort to ensnare children into social media platforms at earlier and earlier ages."

256.    In this letter, Senators Blumenthal and Blackburn asked Defendant Zuckerberg directly whether, among other things, the Company had ever "conducted research on the effect of its platforms and products on children's and teens' mental health and well-being," and asked Meta to "describe the nature of this research." The senators also inquired whether Meta's "research ever found that its platforms and products can have a negative effect on children's and teens' mental health or well-being, such as increased suicidal thoughts, heightened anxiety, unhealthy usage patterns, negative self-image, or other indications of lower well-being." Additionally, the senators' letter asked Defendant Zuckerberg if Meta had "ever found that child or teenage users engage in

usage patterns that would indicate addictive or unhealthy usage of its platforms or products."

257.    In response to these pointed, yet simple, questions, Meta sent the senators a six-page letter that did not include Meta's own studies. Instead, Meta misleadingly indicated that results were inconclusive, telling the senators, "We are not aware of a consensus among studies or experts about how much screen time is 'too much.'" In a subsequent email to *The Wall Street Journal* published on September 14, 2021, Senator Blumenthal elaborated, "Facebook's answers were so evasive—failing to even respond to all our questions—that they really raise questions about what Facebook might be hiding. Facebook seems to be taking a page from the textbook of Big Tobacco—targeting teens with potentially dangerous products while masking the science in public."

### 4.    Meta Mispresents Its User Growth Metrics Due to the Prevalence of Duplicate or SUMA Accounts Among New Accounts

#### a.    User Growth Was a Key Metric for Investors

258.    Meta's business depends in great part on the number of users that it can attract. In quarterly financial reports filed with the SEC during the Class Period, Meta told investors, "[t]he size of our user base and our users' level of engagement are critical to our success."

259.    However, because Facebook had grown so large, adding new users became more difficult over time. At the start of the Class Period, Meta reported that Facebook had 2.85 billion users—more than a third of the world's population. With that level of market penetration, the Company acknowledged that new users would come at a premium and, in general, user growth rates would naturally decline over time. Moreover, Facebook experienced unprecedented growth rates during 2020 due to the global pandemic as people spent much more time inside and online. As the pandemic abated in 2021, growth rates slowed and analysts were concerned that lower year-over-year growth rates would be a drag on the stock. Analyst Wedbush wrote in July 2021, "[e]ngagement and users remain top of mind for investors with the [pandemic] reopening continuing and likely impacts to engagement overall." Thus, investors and analysts paid close attention to user growth metrics and looked for any signs of slowing growth and market saturation.

260.    In the months leading up to the Class Period, investors tied the Company's performance to Meta's reported growth in users and engagement. For example, Tigress Financial

Partners reiterated its "Strong Buy" rating and noted that Meta's record results were driven by "ongoing increases in new users and user engagements." Similarly, Argus issued a "Buy" and "Overweight" recommendation, reasoning that the "drivers of strong revenue growth - user additions and average revenue per user - remain robust, and we think that continued strength in these indicators would be a positive for FB shares." Deutsche Bank and Jefferies both noted slowing user growth as a potential risk to the Company's valuation.

> **b.    Meta Sold Facebook as a "Real Identity" Platform Where Advertisers Could Reliably Target Key Demographics like Teens and Young Adults**

261.    For years, Meta positioned Facebook as a "real identity platform," an authentic site where advertisers could generally count on Facebook's user characteristics and metrics as real. Consistent with that approach, Facebook's Terms of Service did not allow users to create multiple, duplicate accounts—referred to internally as SUMA (single users with multiple accounts)—and prohibited fake accounts.

262.    Moreover, Facebook's value proposition to advertisers, which supposedly set it apart from other social media platforms, was the so-called "targetability" of its ads. That is, Meta promised advertisers better returns on its investments through ads that could target certain demographics, including teens and young adults. Thus, Meta's ability to charge a premium for adds depended on the "potential reach" of those ads, which was essentially the size and engagement of a given demographic. The attractiveness of Facebook as an advertising platform, and thus Meta's ability to earn revenue, therefore depended on the level of use and engagement, including the prevalence of SUMA or duplicate accounts among key demographics like teens and young adults.

263.    By the start of the Class Period, Meta executives were embroiled in litigation over the way in which the Company presented advertising metrics. In 2018, advertisers brought a class action against Meta claiming that Meta failed to disclose the existence of SUMA and fake accounts in the metrics Meta provided to advertisers about the potential reach of ads placed on Facebook. Thus, Meta executives were acutely aware that any misleading user metrics with respect to SUMA could negatively impact Facebook's attractiveness as an advertising platform, lead to lower

revenue, and damage the Company. In April 2021, internal Meta emails produced in the advertisers' class action became public. In the emails, Meta's senior advertising executive Carolyn Everson acknowledged that "SUMA is going to go down horribly . . . if we overstated how many actual real people we have in certain demos, there is no question that impacted [advertisers'] budget allocations. We have to prepare for the worst here."

### c.   Meta Misstates Facebook's User Growth Metrics

264.   Meta estimated and disclosed the percentage of SUMA accounts that made up the Company's reported users. Facebook measures and reports users and engagement primarily through two metrics: Daily Active Users ("DAUs") and Monthly Active Users ("MAUs"). DAUs represent the number of users who used Facebook at least once per day, and MAUs were the number of users who used Facebook at least once per month. For instance, in the fourth quarter of 2020, just before the Class Period, Meta's reported DAUs and MAUs were 1.93 billion and 2.93 billion, respectively. The ratio of DAU to MAU for the reporting period, or approximately 66% in this example, is Facebook's "engagement rate" and provides an approximation of the percentage of active Facebook users who logged on to their accounts at least once per day.

265.   Meta stated in each of its quarterly financial reports during the Class Period that "[w]e regularly evaluate our Facebook metrics to estimate the number of 'duplicate' and 'false' accounts among our MAUs. A duplicate account is one that a user maintains in addition to his or her principal account." As Defendant Wehner explained during a 2018 earnings call, "the Facebook MAU number does count multiple accounts for a single user [SUMA] when such accounts exist, and we estimate those represent approximately 10% of our Facebook MAUs." In other words, Meta sought to convince the market that it can rely on the user metrics for Facebook as an accurate measure of the numbers of people who use the platform and will see advertisements. In addition, Meta has told investors that it expends considerable effort to determine the percentage of duplicate accounts, and because the reported prevalence of duplicate accounts is relatively low, investors and advertisers can get a sense of the "real" numbers of users and how they are growing.

266.   With that backdrop, in April and July 2021, Meta announced its financial results for the first and second quarters of 2021, in which it misled investors about its true user growth

metrics. For instance, on April 28, 2021, Meta stated that Facebook DAUs for March of 2021 were 1.88 billion, an increase of 8% from March 2020, and MAUs were 2.85 billion, a year-over-year increase of 10%. On that day's afterhours earnings call to discuss the results, Defendant Wehner repeated these figures and boasted that "our global community continued to grow even as we lapped elevated user growth in the first quarter of last year related to the pandemic." Wehner was referring to then-record growth in 2020 stemming from people suddenly spending more time indoors and online due to the global COVID-19 pandemic. Although Meta reported that duplicate accounts, or SUMA, represented 11% of MAU in the fourth quarter of 2020, the Company made no mention of the fact that for new accounts, that number was as much as 3 to 5 times higher, dramatically inflating their reported growth estimates. Nor did the Company disclose that its user and engagement metrics for teens and young adults, a key demographic for advertisers, were actually shrinking.

267.     Analysts were impressed with Facebook's growth story and continued to recommend the stock to investors. Morningstar reported that Meta's year-over-year 48% quarterly revenue growth was due to higher prices and an increase in user count, and noted that engagement had returned to historical levels as pandemic restrictions eased. Argus noted that user growth "remained robust," and helped drive strong revenue growth. BofA Securities reported Meta's strong first quarter results and noted that user growth was largely in-line with expectations. Tigress Financial observed that "advertising growth, increasing users, and growing user engagement . . . will continue to drive accelerating Business Performance," specifically calling out Facebook's impressive 10% growth in MAUs.

268.     The next quarter, Meta once again announced impressive year-over-year growth numbers for Facebook despite easing pandemic restrictions, but again failed to disclose that the duplicate rate for new accounts was far higher than Meta reported it to be, and that use metrics in key demographics were actually down. Specifically, on July 28, 2021, Meta claimed for the second quarter of 2021 that DAUs for June 2021 were 1.91 billion, up 7% from the previous year, and MAUs for the period were 2.90 billion, also up 7% from the previous year. Again, Meta repeated that its duplicate rate for the fourth quarter of 2020 was 11%, but provided no information about

the true prevalence of duplicates or SUMA in new accounts. During the earnings call, when discussing Facebook's purported growth, Wehner again emphasized that "our global community continued to grow even as we lapped elevated user growth in the second quarter of last year related to the pandemic."

269.    Analysts were again buoyed by the reported growth. For example, Truist noted only a "slight" slowdown in growth, and that "users continue to engage across all of FB's apps and platforms even as many economies re-open." Argus noted that reported continued growth as a factor in the Company's reported strong quarterly performance, noting that MAU growth was better than historical growth prior to the pandemic.

**d.      In Truth, Meta Knew that Duplicate Accounts Were Far More Prevalent in New Accounts than Reported, and Teen and Young Adult Use and Engagement Was Actually in Decline**

270.    Meta's first- and second-quarter 2021 disclosures regarding the growth in Facebook's users were deeply misleading because the true duplicate rate for new users was three to five times higher than Meta's reported 11% duplicate rate represented. As reported by *The Wall Street Journal* on September 21, 2021, in an article titled "How Many Users Does Facebook Have? The Company Struggles to Figure It Out," an internal Meta presentation from the spring of 2021 showed that SUMA accounts were "very prevalent" among new accounts. The internal presentation, which was based on a sample of 5,000 new accounts, showed that at least 32% and as many as 56% were opened by existing users—in other words, SUMA accounts were three to five times more prevalent in new accounts than the 11% that Meta reported. The presentation also stated that Meta's system for detecting SUMA accounts tended to undercount them, showing that Meta knew that the reported worldwide 11% estimation likely undercounted the true prevalence of SUMA accounts.

271.    The much higher prevalence of SUMA accounts among new accounts meant that Meta's reported DAU and MAU growth rates were grossly inflated, and falsely made them appear to be in-line with historical growth rates, when in fact they were much lower. For example, Meta's reported 10% year-over-year increase in MAU for the first quarter of 2021 represented an astonishing 250 million new MAUs over that span. Yet, Meta's internal

presentation at the start of the Class Period indicated that 32-56% of these new MAUs were actually SUMA accounts, meaning 80-140 million of the new MAUs did not represent real growth but rather counted existing users. This is far higher than Meta's reported 11% duplicate rate, which suggested that only 27.5 million of the new MAUs were duplicate accounts. Taking away the actual duplicates among the new accounts translates to a true year-over-year growth rate for the first quarter as low as 4%, far lower than 10% reported growth for the period and the 8-13% growth rates Facebook experienced over the prior three years. The numbers for Facebook's reported growth rates for second-quarter 2021 were overinflated by the same proportion. Instead of the reported 7% year-over-year increase, the true growth rate in MAU for the second quarter was as low as 3%, far lower than Facebook's historical growth rates.

272.    In addition to misstating the rate of duplicates in new user accounts, Meta failed to disclose important information about users and engagement in its key teen and young adult demographics, which separately made the Company's strong reported growth rates misleading. For instance, the October 21, 2021, Facebook Files article reported that an internal memo from May 2021 revealed that Facebook's metrics for U.S. young adults was way off. The memo stated that the number of U.S. Facebook monthly active users (MAUs) in their 20s exceeded the total population in that demographic, a blatant impossibility. The memo's author concluded that duplicate accounts were to blame, and therefore questioned the accuracy of Meta's reported engagement statistics. The author wrote, "this brings out the elephant in the room: SUMA," and added that issue could render the ratio of daily active users (i.e., the engagement rate) "less trustable."

273.    Moreover, at least eight internal Meta reports showed "steep" declines in use and engagement by teens and young adults. As detailed in one of Haugen's whistleblower complaints filed with the SEC, the internal reports showed that Facebook knew that teen and young adult engagement had been down since 2012. In fact, for the period of 2019-2021, teen DAUs were down by 13% and were projected to decline a whopping 45% from 2021-2023. The numbers for young adults were better than for teens, but they still showed declines for the demographic, and were far worse than the 7-8% year-over-year growth that Meta reported across the entire platform

for the first and second quarters of 2021. In essence, Meta used its overall metrics to hide its abysmal performance with teens and young adults.

274.    Internal reports from just before the Class Period showed that Facebook's problem with teen and young adult engagement was accelerating heading into 2021 and the start of the Class Period. One report from November 2020 concluded that declining young adult engagement represented a "significant risk" to Meta's reported user metrics. Another, from March 2021, noted that teen DAU and engagement were particularly bad across all Western European countries, and that trends started deviating from forecasts in January 2021 and worsened in February. These negative trends, had they been known, would have made Facebook far less attractive to advertisers targeting this key demographic and would have weakened Meta's overall future prospects for attracting advertising revenue.

275.    Indeed, analysts reacted negatively once the truth was revealed. Following the publication of *The Wall Street Journal*'s article on October 21, 2021, analyst Société Générale published a report titled "Facebook: Growing evidence of a slowing user base and increasing investment," and issued a recommendation to "Sell."  In its outlook for user growth, Société Générale noted headwinds from "growing duplicate and fake accounts." With respect to Meta's estimate of 11% duplicates, the report noted that there are "probably more and rising." Finally, the report noted that "the younger generations are becoming better acknowledged and this was one of the core complaints by former Facebook employee Frances Haugen to the SEC. One of her 'leaked' reports showed US teenagers and young adults respectively spent 16% and 5% less time yoy on Facebook. We believe the increasing public scrutiny and acknowledgement of this issue is a catalyst for Facebook share price underperformance."

### C.    Meta Stock Price Declines in Response to the Publication of the Facebook Files and Additional Disclosures Connected to the Fraud

#### 1.    *The Wall Street Journal* Publishes the Facebook Files and Defendants Push Back with Denials

276.    On September 13, 2021, *The Wall Street Journal* published the first of a series of articles collectively titled "The Facebook Files." This kicked off a series of disclosures and ensuing stock price declines that were causally connected to the facts that Defendants misrepresented and

concealed. Over the course of five days, the Facebook Files pulled back the curtain on Meta's internal research and business practices, quoting from confidential internal documents and interviews with former employees that provided new information demonstrating that Defendants knew that Meta's platforms (primarily Facebook and Instagram) were actively harming users and the public at large by, among other things, (a) allowing powerful elite users to make unchecked statements in violation of Meta's touted Community Standards; (b) propagating and widely spreading hate speech, disinformation, and other toxic content, by creating and then refusing to rein in an algorithm that promoted the distribution of such content; and (c) mischaracterizing the research on Instagram's effects on young users when Defendants knew, contrary to their public statements, that it had serious negative impacts on the health of young users.

277.    The Facebook Files were remarkable in that they provided concrete documentation of Facebook's dangers from Meta's own internal research and communications, and from interviews with Meta employees tasked with the removal, prevention, and moderation of harmful content, rather than only from third-party sources. As noted above, according to *The Wall Street Journal* in its initial Facebook File, the sources and information being revealed provided new and persuasive evidence of how Meta's Facebook and Instagram platforms contributed to and exacerbated these problems, and how Meta's top executives knew this:

> The documents include research reports, online employee discussions and drafts of presentations to senior management, including Mr. Zuckerberg. They aren't the result of idle grumbling, but rather the formal work of teams whose job was to examine the social network and figure out how it could improve.
>
> They offer perhaps the clearest picture thus far of how broadly Facebook's problems are known inside the company, up to the CEO himself. And when Facebook speaks publicly about many of these issues, to lawmakers, regulators and, in the case of XCheck, its own Oversight Board, it often provides misleading or partial answers, masking how much it knows.

278.    As explained further below, the Facebook Files' initial impact was muted by Facebook's aggressive response to the *Journal*'s well-sourced articles. In both formal public statements and rapid-fire responses posted on Twitter by Meta's communications team and Defendants Clegg, Mosseri, and Zuckerberg, Meta launched an orchestrated and misleading counter-narrative that muddied the disclosures and their impact. This tactic was premeditated. As

later revealed by *The Washington Post* on October 4, 2021, the Company's prior strategy of apologizing and promising change when called out for its errors was replaced with a defiant response through which "the company has deployed a slate of executives to mount a public defense while quibbling with the details of the allegations" from the whistleblower. The article quoted a president of a civil rights non-profit who had been at odds with Meta in the past and noted in the article that "They [Meta] know they aren't accountable, and now they aren't going to be apologizing, either." These concerted efforts worked to blunt the impact of the disclosures.

> a. **September 13, 2021: the September 13 Facebook File Describes Internal Documents Showing that Meta Allowed Millions of Users to Violate Its Community Standards and Post Harmful Content with Impunity**

279. On September 13, 2021, *The Wall Street Journal* posted online the first Facebook Files article, titled "Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt" (the "September 13 Facebook File"). The September 13 Facebook File noted that the article was the first of a forthcoming series of articles that were based, in substantial part, on internal documents that had been recently turned over to the SEC and to Congress by an anonymous former employee seeking whistleblower protection.

280. *The Wall Street Journal* reported that, contrary to Meta's repeated and emphatic public statements—such as "Our Community Standards apply to all content, and we assess everyone under those Standards." Meta did not in fact apply the platforms' rules equally (or in some cases at all) to all users. Instead, the September 13 Facebook File described how Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed that system to grow exponentially such that by 2020, at least 5.8 million users were part of an "invisible elite tier" of protected content distributors.

281. As *The Wall Street Journal* laid out, using internal research and presentations from 2019 through early 2021, the "X-Check" (or "cross check") program "shields millions of VIP users from the company's normal enforcement process." Of those 5.8 million users, many "are 'whitelisted'—rendered immune from enforcement actions—while others are allowed to post rule-violating material pending Facebook employee reviews that often never come." Internal

documents relied upon by *The Wall Street Journal* in the September 13 Facebook File established that Meta's exemptions for "VIPs" applied to a broad and unstructured group that included celebrities, professional athletes, politicians, and "pretty much anyone regularly in the media or who has a substantial online following." In fact, an "internal guide to XCheck eligibility cites qualifications including being 'newsworthy,' 'influential or popular' or 'PR risky.'"

282.   The September 13 Facebook File revealed that not only did X-Check allow violative content to be posted by political leaders and millions of other "high-profile" individuals and groups, but further that Meta had tracked this impact of X-Check and was aware of its reach. Internal reports excerpted by *The Wall Street Journal* demonstrated that X-Check, formerly known as "Shielding," was widespread, applied to millions of users, and had been tracked by Meta for years.

283.   A 2019 internal review and audit of Facebook's X-Check program disclosed in the September 13 Facebook File stated bluntly: "<u>We are not actually doing what we say we do publicly</u>." This 2019 internal audit revealed that Meta "reviewed less than 10% of XChecked content," meaning that the vast majority of flagged content remained on the platform. Moreover, that same internal review revealed that many "select" users were immune from any enforcement— "whitelisted"—such that "[u]nlike the rest of our community, these people can violate our standards without any consequences." That same review clearly stated that "exempting (aka whitelisting) specific people and entities creates numerous legal, compliance, PR risks for the company and harms our community."

284.   As reported by *The Wall Street Journal*, Facebook researchers noted that "High-profile accounts posed greater risks than regular ones, . . . yet were the least policed." Jeff Horwitz, the author of the September 13 Facebook File, explained in a podcast published on *The Wall Street Journal* website later on September 13, 2021:

> The company said they estimate they mess up around 10% of the time. And so the only way to ensure that they didn't make bad enforcement calls against powerful people was to not make any enforcement calls at all. And that became known as white listing. They would exempt people who were considered sensitive for any number of reasons. They were famous, they were athletes, they were powerful or the family members of people who were powerful and they would give those people partial or complete exemption from Facebook's rules.

285.   Meta's liberal use of X-Check and the whitelist was incredibly impactful. An internal December 2020 review of the program described in the September 13 Facebook File revealed that <u>posts routed for X-Check that were later found to have violated Facebook's public Community Standards were viewed at least 16.4 billion times</u>. This incredible figure does not account for the 90% of flagged content that is never removed from the Facebook platform because it is whitelisted or simply not reviewed once flagged. An extrapolation from this figure means that exempted posts that violated the Community Standards remained on the site and were viewed <u>at least 147 billion times</u> as a result of this program.

286.   Horwitz, the author of the September 13 Facebook File, explained the harmful impact of X-Check in greater detail on the podcast posted later that day, describing how soccer star Neymar's posts were routed for X-Check and, as a result, "Facebook didn't take the usual actions of deleting the offending post and then deleting his account. What happened instead was detailed in a document called Mistake Prevention Incidents Investigation." Horwitz revealed that "[t]he Neymar incident appears alongside more than a dozen other incidents that Facebook employees were keeping track of." Horwitz went on to say, based on his investigation, that "in the case of Crosscheck, right, there was no doubt inside the company, this was unacceptable, but that's nonetheless what they built."

287.   At the time, the Oversight Board did not comment on *The Wall Street Journal*'s reporting that Meta had lied to the Board, providing only a written statement that was presented in the September 13 Facebook File that it "has expressed on multiple occasions its concern about the lack of transparency in Facebook's content moderation processes, especially relating to the company's inconsistent management of high-profile accounts."

288.   Meta strongly refuted the veracity of *The Wall Street Journal*'s September 13 Facebook File, and in the process made additional false statements concerning X-Check. In a written statement published in the September 13 Facebook File, Meta spokesman Andy Stone stated that X-Check "was designed for an important reason: to create an additional step so we can accurately enforce policies on content that could require more understanding." Stone also tried to diffuse the damning documents cited in the article, stating that a "lot of this internal material is

outdated information stitched together to create a narrative that glosses over the most important point: Facebook itself identified the issues with cross check and has been working to address them."

289.    Stone, who was soon referred to as Meta's "hatchet man" doing the bidding of Defendant Zuckerberg in the press, including *The New York Post*, continued to conduct aggressive damage control for the Company. He issued a 13-tweet thread less than two hours after the release of the September 13 Facebook File. Stone claimed that Meta had previously discussed the X-Check program in July 2018 in response to a British Channel 4 news program. Quoting liberally from the 2018 statement (that predated the internal documents cited in the article), Stone stated that X-Check "g[a]ve a second layer of review to content from high-Profile Pages or Profiles to ensure correct application of our policies," and assured investors that "[t]here aren't two systems of justice; it's an attempted safeguard against mistakes." Stone concluded his series of posts by noting that changes were "underway at the company," and that Meta had "new teams, new resources and an overhaul of the process that is an existing work-stream."

290.    Stone's statements, which were themselves false and misleading, helped dampen the effect of *The Wall Street Journal*'s reporting on the Company's stock price. Nevertheless, in response to the first article by *The Wall Street Journal* on September 13, 2021, Meta's stock price declined by $2.18 per share, from $378.69 per share on September 10, 2021, to $376.51 per share on September 13, 2021, on heavy trading volume of over 13 million shares, erasing nearly $5.2 billion of Meta market capitalization in a single day.

> **b.    September 14, 2021: the September 14 Facebook File Showcases How Meta Profited by Making Instagram "Toxic" for Teens, Causing New Congressional Scrutiny**

291.    On September 14, 2021, *The Wall Street Journal* released its second Facebook File titled "Facebook Knows Instagram Is Toxic for Many Teen Girls, Company Documents Show" (the "September 14 Facebook File"). The public learned that Meta had conducted and then concealed and mischaracterized internal research regarding the damaging impact of Instagram on the mental health of young users, especially teenage girls.

292.    For example, a March 2020 research slide presentation posted to Meta's internal

message board and described by *The Wall Street Journal* found that "Thirty-two percent of teen girls said that when they felt bad about their bodies, Instagram made them feel worse," and that "comparisons on Instagram can change how young women view and describe themselves." *The Wall Street Journal* described how Meta had conducted studies into Instagram's impact on young users for years, and those studies showed that "Instagram is harmful for a sizable percentage of [young users], most notably teenage girls"—a far cry from Mosseri's representations that the impact of Instagram was "quite small" and, in any event, also positive.

293. Within Meta, the message was clear: "We make body image issues worse for one in three teen girls," according to one 2019 slide. *The Wall Street Journal* presented shocking internal study results showing that among a group of teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram.

294. As reported by *The Wall Street Journal*, Meta commissioned and conducted its own research on the issue during a "teen mental health deep dive," which culminated in five presentations by Company researchers over eighteen months beginning in 2019. Some of the problems identified by Meta "were specific to Instagram, and not social media more broadly," and had never been disclosed to the public. Essentially, these presentations revealed in the September 14 Facebook File concluded that "The features that Instagram identifies as most harmful to teens appear to be at the platform's core."

295. Another "deep dive" into teen girl body-image issues in March 2020 reached similar conclusions, and "warn[ed] that [Instagram's] Explore page, which serves users photos and videos curated by an algorithm, can send users deep into content that can be harmful." *The Wall Street Journal* further reported that the research and its findings were shared with a number of Meta executives and were cited in a presentation to Defendant Zuckerberg.

296. Meta's reason for keeping its internal research secret was clear—any revelation that further reduced teen and child use of Instagram, such as a direct connection between Instagram use and poor mental health—would impact Meta's profits. As *The Wall Street Journal* noted, 2012—the year that Meta acquired Instagram—was "the first time [the Company] had observed a decline in the number of teens using its namesake Facebook product," and Instagram was seen as

Meta's "best bet for growth among teens":

> Expanding its base of young users is vital to the company's more than $100 billion in annual revenue, and it doesn't want to jeopardize their engagement with the platform. . . . "Instagram is well positioned to resonate and win with young people," said a researcher's slide posted internally. Another post said: "There is a path to growth if Instagram can continue their trajectory."

297.    A *Wall Street Journal* podcast posted later that day included an interview with the September 14 Facebook File author Georgia Wells, titled "The Facebook Files, Part 2: 'We Make Body Image Issues Worse.'" During the interview, the host provided more details about Mosseri's May 2021 false statements and noted that, prior to the revelation of the internal Meta research, Instagram CEO Mosseri had not even acknowledged the existence of Meta's internal research when asked by reporters about Instagram's mental health effects in May 2021. At that time, the podcast described Mosseri's previous statements to journalists where he "cited outside research that was more favorable to Instagram" to support his characterization that any known negative impact of Instagram on teens was "quite small:" "Its facts stated the bi-directional, so small effects, positive and small effects negative but it's quite small." However, when asked in connection with *The Wall Street Journal*'s September 14 Facebook File to comment on the internal research discussed therein, Mosseri acknowledged that the issues concerning teen mental health had an "impact on people [that] may be huge"—an admission that flatly contradicted his prior Class Period statements.

298.    Meta launched a coordinated response to neutralize the impact of the September 14 Facebook File. Karina Newton, Instagram's head of public policy, responded to *The Wall Street Journal* investigation in an official Instagram corporate statement on September 14, 2021, titled "Using research to improve your existence." Mosseri linked to Newton's statement on his Twitter feed to ensure wider dissemination. Newton spun the revelation into a positive disclosure, stating, "*The Wall Street Journal* published a story today about internal research we're doing to understand young people's experiences on Instagram. While the story focuses on a limited set of findings and cast them in a negative light, we stand by this research." Newton's lengthy statement, partially excerpted below, asserted that the research demonstrated that social media had either positive

impacts on young people's well-being, had an overall neutral impact, or was inconclusive and that Meta was taking multiple steps to protect its users from harms, which were societal in nature, and not caused by social media:

> It [the research] demonstrates our commitment to understanding complex and difficult issues young people may struggle with, and informs all the work we do to help those experiencing these issues.
>
> . . .
>
> External research into the impact social media has on people is still relatively nascent and evolving, and social media itself is changing rapidly. Some researchers argue that we need more evidence to understand social media's impact on people. Each study has limitations and caveats, so no single study is going to be conclusive. We need to rely on an ever-growing body of multi-method research and expert input.
>
> The research on the effects of social media on people's well-being is mixed, and our own research mirrors external research. . . . According to research by Pew Internet on teens in the US, 81% of teens said that social media makes them feel more connected to their friends. . ..
>
> Our findings were similar. Many said Instagram makes things better or has no effect, but some, particularly those who were already feeling down, said Instagram may make things worse.
>
> . . .
>
> Based on our research and feedback from experts, we've developed features so people can protect themselves from bullying, we've given everyone the option to hide like counts, and we've continued to connect people who may be struggling with local support organizations.

299.    Newton also linked to multiple pieces of research that she claimed supported Meta's position. One, titled "Why scientists don't actually know if social media is bad for you," was an article published by a psychologist at the Oxford Internet Institute. Notably, while citing and disseminating this article as authoritative, nowhere in her statement did Newton disclose that in April 2020, Meta had committed to fund a three-year, £3.3 million (i.e., $4 million) grant to the Reuters Institute for the Study of Journalism at the University of Oxford for a new "Trust in News Project." Moreover, Newton's statement that linked to Oxford research was published just one week after Oxford's September 7 announcement that it would be "[p]artnering with the Facebook Journalism Project to help news organizations" through the jointly created the Oxford News

Marketing Programmed. The Oxford research that Newton linked to stated, in part,

> It's not that social media is good or bad for people. <u>It's that the science of social media and mental health is broken</u>. We need to do research, but we shouldn't be approaching it from the perspective that the world is ending. We need to be curious and open to the possibility of its effects, positive and negative.
>
> . . .
>
> But that doesn't stop people claiming that cyberbullying causes suicides, <u>even though there's no evidence to prove it</u>. You look at reasons why young people take their lives and it's test scores or exams, it's someone close to them taking their own life or it's drug- and alcohol-related. Those are the three main attributable causes. <u>There's no evidence that social media is part of any of them</u>.
>
> Now, I can either adopt <u>false confidence</u> and tell you social media might be a problem (and possibly drop the word 'might' for greater impact – and there's an entire cottage industry that tries to do that) or <u>I can be honest with you and say I don't know because scientists like us can't see over the walls of the social media companies</u>.
>
> <u>The danger for policymakers or parents is that if you pretend that social media is a problem, without having evidence, and you take steps to regulate it, the intervention could end up being really bad for young people</u>.

300.    Another research piece that Newton linked to was a survey conducted by the Pew Research Center stating, in part,

> <u>Roughly eight-in-ten teens ages 13 to 17 (81%) say social media makes them feel more connected to what's going on in their friends' lives, while around two-thirds say these platforms make them feel as if they have people who will support them through tough times. And by relatively substantial margins, teens tend to associate their social media use with positive rather than negative emotions</u>, such as feeling included rather than excluded (71% vs. 25%) or feeling confident rather than insecure (69% vs. 26%).
>
> Young people also believe social media helps teens become more civically minded and exposes them to greater diversity – either through the people they interact with or the viewpoints they come across. Roughly two-thirds of teens say these sites help people their age interact with individuals from diverse backgrounds, find different points of view or show their support for causes or issues. And they see digital environments as important spaces for youth to connect with their friends and interact with others who share similar interests. For example, 60% of teens say they spend time with their friends online on a daily or nearly daily basis, and 77% say they ever spend time in online groups and forums.

301.    Media reported on Meta's counter-offensive. For example, on September 14, the same day as Newton's statement, *Forbes* reported that when they "[a]sked about the *WSJ*'s

reporting, a Facebook spokesperson pointed *Forbes* to a blog post published in response which said the story 'focuses on a limited set of findings and casts them in a negative light,' but the company still stands by the research as it 'demonstrates our commitment to understanding complex and difficult issues young people may struggle with.'" Also on September 14, *The Guardian* reported that "Facebook declined to comment, but sent the *Guardian* a link to a blog post by Instagram's head of public policy, Karina Newton. She said the *WSJ* story had 'focused on a limited set of findings and casts them in a negative light.'"

302.     Although Meta's campaign effectively neutralized the impact of the September 14 Facebook File that day, the seriousness and impact of the disclosure became clearer after market close. Government officials from both major political parties reacted strongly to this news with calls for investigations, the release of internal Meta research, and testimony from top officials. On the evening of September 14, 2021, U.S. Senators Richard Blumenthal and Marsha Blackburn announced that their subcommittee would take additional steps to look into Meta's knowledge of its platforms' negative impact on teenagers and young users in direct response to that day's Facebook File. The senators' remarks were scathing, stating, "It is clear that Facebook is incapable of holding itself accountable," and that "*The Wall Street Journal*'s reporting reveals Facebook's leadership to be focused on a growth-at-all-costs mindset that valued profits over the health and lives of children and teens." Moreover, the senators accused Meta of previously misleading them: "When given the opportunity to come clean to us about their knowledge of Instagram's impact on young users, Facebook provided evasive answers that were misleading and covered up clear evidence of significant harm."

303.     The senators also revealed that their investigation would include *The Wall Street Journal* whistleblower's testimony, stating, "We are in touch with a Facebook whistleblower and will use every resource at our disposal to investigate what Facebook knew and when they knew it – including seeking further documents and pursuing witness testimony. *The Wall Street Journal*'s blockbuster reporting may only be the tip of the iceberg."

304.     The next day, September 15, 2021, Senator Edward J. Markey and Representatives Kathy Castor and Lori Trahan wrote to Defendant Zuckerberg, demanding answers about "recently

revealed internal Facebook research includ[ing] data on the connections between Instagram use and body image problems, suicidal thoughts, and other mental health challenges among teens on the platform." The senator and congresswomen wrote that Meta's internal findings "paint a clear and devastating picture of Instagram as an app that poses significant threats to young people's wellbeing," and added that they were "deeply concerned" that Meta "continues to fail in its obligation to protect young users and has yet to commit to halt its plans to launch new platforms targeting children and teens."

305.   In the same letter, Senator Markey and Representatives Castor and Trahan also questioned whether Zuckerberg's testimony before Congress in March 2021 had been truthful: "Although you have publicly told Congress that 'the research [I have] seen is that using social apps to connect with other people can have positive mental-health benefits,' your own company's research points to disturbing relationships between Instagram use and young people's mental health challenges." They accordingly asked Zuckerberg, "Have you personally reviewed the . . . research regarding your young users' mental health? If yes, when did you do so?" and asked him to provide "copies of all internal research Facebook has conducted regarding the mental health of your children and teen users."

306.   Media coverage of the September 14 Facebook File, podcast, and the resulting congressional scrutiny was robust. For example, on September 15, 2021, digital media platform *Mashable* published an article titled "Facebook has made it easier than ever to profit off teen girls' insecurity," noting that "[t]he *Journal*'s reporting makes clear that children and their caregivers are up against a ruthless business model in which Facebook, the companies that advertise on Instagram, and the influencers who stand to make a fortune from amassing impressionable followers all profit off the vulnerability and insecurity of its teen users." Also on September 15, *NPR* reported that the September 14 Facebook File had triggered regulatory backlash, citing intense bipartisan criticism of Meta and Defendants' misleading statements:

> Lawmakers on Capitol Hill are pressing Facebook to abandon its plans to build a version of its Instagram app for kids and demanding the company share research into how Instagram affects teenage users.
>
> Renewed scrutiny of Facebook's risks to teenagers' well-being was sparked by

a *Wall Street Journal* story published Tuesday that revealed the social media giant's own research has found Instagram, the photo-sharing app it also owns, is particularly harmful to some teenage girls.

. . .

The [letter from Sen. Markey and Reps. Castor and Trahan] cited Zuckerberg's testimony at a March House hearing in which he claimed that research into the impacts of social media on children's mental health is not conclusive.

. . .

The story [in *The Wall Street Journal*] has fueled anger among lawmakers over Facebook's lack of candor when the company was previously questioned about its effects on mental health.

. . .

Sens. Richard Blumenthal, D-Conn., and Marsha Blackburn, R-Tenn., who also have pressed Facebook over child safety and mental health concerns, accused the company of having "provided evasive answers that were misleading and covered up clear evidence of significant harm."

307.    The next day, September 16, 2021, *Business Insider* reported that "[l]awmakers are going after Facebook's development of Instagram for kids, after a report showed it knew the social media app is toxic for teen girls," and noted the likely impact of the September 14 Facebook File, including a freeze on the development of Instagram Kids and probes into Meta's private research:

Lawmakers are renewing their push to make Facebook halt its development of a version of Instagram for children under age 13, after a Wall Street Journal investigation released Tuesday showed the company knew from internal research that the app is harmful to teen girls.

A bipartisan pair of senators leading the Consumer Protection, Product Safety, and Data Security Subcommittee, Sen. Richard Blumenthal and Sen. Marsha Blackburn, said on Tuesday they're launching a probe into Facebook's research and its platforms' negative impact on young people.

Both Republican and Democratic lawmakers are calling on Facebook to stop making Instagram for Kids. They're incensed by an investigation that showed Facebook knew Instagram usage is harming teenage girls. Instagram for Kids has received backlash from parents, child safety groups, and lawmakers since it was revealed in March.

308.    *Vox* similarly reported on September 16 that

a new series of reports from the Wall Street Journal, "The Facebook files," provides damning evidence that Facebook has studied and long known that its products cause

measurable, real-world harm — including on teenagers' mental health — and then stifled that research while denying and downplaying that harm to the public. <u>The revelations, which only strengthen the case that a growing chorus of lawmakers and regulators have been making for breaking up Facebook or otherwise severely limiting its power as a social media giant, could represent a turning point for the company</u>.

. . .

[A] joint statement from Sens. Richard Blumenthal (D-CT) and Marsha Blackburn (R-TN) on Tuesday[ stated,] "*The Wall Street Journal*'s blockbuster reporting may only be the tip of the iceberg."

309.     Analysts also noted the seriousness of these revelations, with analysts at Morningstar later opining on October 5, 2021, that "Instagram's impact on younger girls will likely have the most enduring effect" on the Company. Morningstar remarked that "we wouldn't be surprised to see more control over usage enforced by the firm, parents, lawmakers, or all the above. This would likely reduce user growth and engagement, making the Instagram audience less attractive to advertisers." As discussed below, Meta's stock dropped materially on September 15, 2021, following the September 14 and September 15 Facebook Files and the ensuing congressional scrutiny triggered by them.

            **c.**     **September 15, 2021: the September 15 Facebook File Describes How Meta's Changes to Its News Feed Algorithm and Content Moderation Failures Generated Prevalent Toxic Content**

310.     On September 15, 2021, *The Wall Street Journal* released its third article just as the market opened, "Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead" (the "September 15 Facebook File"). In this article, investors learned that the Company knew that a 2018 change in Meta's News Feed algorithm was inordinately promoting misinformation, violent and divisive content on Facebook, that Meta's content moderation actions were grossly inadequate, and that Meta's top officials chose not to correct these problems in order to drive user engagement.

311.     According to *The Wall Street Journal*, Meta changed its algorithm ostensibly to "strengthen bonds between users and to improve their well-being." But internal documents revealed that Meta employees "<u>warned the change was having the opposite effect</u>, . . . <u>It was making Facebook's platform an angrier place</u>." Researchers at Meta "discovered that publishers

and political parties were reorienting their posts toward outrage and sensationalism. That tactic produced high levels of comments and reactions that translated into success on Facebook" through the marketing of user engagement to advertisers on Facebook and Instagram.

312.    Internal research relied on in the article showed that, contrary to Meta's public assurances, the Company was well aware that its algorithm was making "[m]isinformation, toxicity, and violent content [] inordinately prevalent." Instead of promoting more benign content, which would result in less time spent on the platform by users and less engagement overall, Meta knew that its algorithm promoted and prioritized violent and extremist content that, in turn, led to user engagement.

313.    Once again, internal documents reviewed by *The Wall Street Journal* indicated that "strengthening bonds" between users was not the only reason for the algorithm change. Rather, the change was directed to correct a revenue problem: "Users had begun to interact less with the platform," leading to the algorithm change in 2018.

314.    *The Wall Street Journal* reported that when the Company's integrity team later told Defendant Zuckerberg about "the tendency of the overhauled algorithm to reward outrage and lies[,] Mr. Zuckerberg resisted some of the proposed fixes, the documents show, because he was worried they might hurt the company's other objective—making users engage more with Facebook." While Meta was capable of adjusting its algorithm to demote toxic content, Defendant Zuckerberg and the Company chose to prioritize advertising revenue and profits:

> Later, Facebook data scientists zeroed in on an aspect of the revamped algorithm called "downstream MSI," which made a post more likely to appear in a user's News Feed if the algorithm calculated people were likely to share or comment on it as it passed down the chain of reshares.
>
> Early tests showed how reducing that aspect of the algorithm for civic and health information helped reduce the proliferation of false content. Facebook made the change for those categories in the spring of 2020.
>
> When [Anna] Stepanov, [leader of a Meta integrity team] presented Mr. Zuckerberg with the integrity team's proposal to expand that change beyond civic and health content—and a few countries such as Ethiopia and Myanmar where changes were already being made—Mr. Zuckerberg said he didn't want to pursue it if it reduced user engagement, according to the documents.

315.     Meta issued contemporaneous statements reprinted in the September 15 Facebook File in an attempt to mitigate this disclosure. For example, Defendant Stone, Meta's Policy Communications Director, provided a written statement shifting the blame for the proliferating dangerous rhetoric away from Meta:

> "Is a ranking change the source of the world's divisions? No," said Facebook spokesman Andy Stone in a written statement. "Research shows certain partisan divisions in our society have been growing for many decades, long before platforms like Facebook even existed."

316.     Nevertheless, Meta's stock dropped from $376.53 per share on September 14, 2021, to $373.92 per share on September 15, 2021, on heavy trading volume of nearly 18 million shares. This single-day drop erased nearly $6.2 billion of Meta's market capitalization.

317.     Two additional Facebook Files were published that week, further revealing both the manner in which algorithm promoted toxic content and misinformation, and that Meta lacked the will and ability to control misuse of its platforms, as its content-moderation practices were grossly deficient.

318.     On September 16, 2021, *The Wall Street Journal* revealed that drug cartels and human traffickers used Facebook to facilitate their criminal enterprises, and that content violating the Company's domestic servitude policy routinely makes its way on to Meta's platforms without deletion. Contrary to the Company's assertions that it removed any and all content promoting human trafficking, *The Wall Street Journal* explained that Meta was woefully unprepared to address illegal or dangerous uses of its platform. For example, internal Meta documents indicated that in a number of countries, the Company had "few or no people who speak the dialects needed to identify dangerous or criminal uses of the platform." And even in countries where Meta had the ability to address illegal uses of its platforms, including human trafficking, the Company chose not to take significant enforcement action to not "alienate buyers," or Facebook users who participated in human trafficking. Defendant Stone once again pushed back against the news revealed in the September 16 Facebook File, stating unequivocally in a statement published in the article: "We prohibit human exploitation in no uncertain terms."

319.     Despite Meta's pushback, Meta's stock price dropped from $373.92 per share on

September 15, 2021, to $373.06 per share on September 16, 2021. This single-day drop erased over $2 billion of Meta's market capitalization.

320.    The September 17, 2021, installment of the Facebook Files revealed that, even for topics on which Meta committed itself to representing a specific viewpoint, such as COVID-19 vaccination awareness, the Company was unable or unwilling to moderate content on its platforms in line with its own public representations. In this article, *The Wall Street Journal* detailed public statements made repeatedly by Meta and specifically Defendant Zuckerberg concerning the Company's commitment to sharing health information pertaining to the COVID-19 pandemic with the public. But as the *Journal*'s reporting detailed, "even when [Defendant Zuckerberg] set a goal," the Company could not accomplish it, and found that the content disseminated on its platforms was "hard to control, given how Facebook built and runs its platforms." In response to these revelations, Meta's stock price dropped from $373.06 per share on September 16, 2021, to $364.72 per share on September 17, 2021. This single-day drop erased nearly $20 billion of Meta's market capitalization.

321.    On September 19, 2021, analysts with Wolfe Research observed, "FB stock was weak on the backdrop of WSJ articles resurfacing new concerns on platform safety." In the same report, Wolfe analysts acknowledged, "[t]here is plenty of recent controversy on FB, which admittedly weighed on shares recently (down 4% vs. Nasdaq -1%)."

   **2.    Meta's Stock Price Declines Further in Response to Subsequent Disclosures Connected to the Fraud**

      **a.    September 21-22, 2021: Meta's Oversight Board Calls for More "Transparency" on X-Check, While Senators Grill Meta over How Facebook Harms Teens**

322.    In a scathing statement first made public in the afternoon of September 21, 2021, Meta's Oversight Board excoriated Meta over the Company's stonewalling and withholding of documents concerning X-Check earlier in 2021 (prior to the publication of the Facebook Files):

> At the Oversight Board, we have been asking questions about cross-check for some time. In our decision concerning former US President Donald Trump's accounts, we warned that a lack of clear public information on cross-check and Facebook's "newsworthiness exception" could contribute to perceptions that Facebook is unduly influenced by political and commercial considerations.

323.    The Oversight Board announced that the September 13 Facebook File drew "renewed attention to the seemingly inconsistent way that the company makes decisions, and why greater transparency and independent oversight of Facebook matters so much for users." As a result, the Oversight Board demanded more information about the X-Check system Meta uses to "review content decisions relating to some high-profile users," and called on the social media giant to "commit to transparency" in the wake of the September 13 Facebook File that revealed that millions of high-profile users get special treatment. The Oversight Board wrote:

> In light of recent developments, we are looking into the degree to which Facebook has been fully forthcoming in its responses in relation to cross-check, including the practice of whitelisting.

324.    Media outlets focused heavily on the Oversight Board's action. For example, on September 21, 2021, after the close of trading, *The Washington Post* reported that "Facebook's independent Oversight Board forcefully reiterated demands for more transparency from the company on how it treats high-profile users and politicians who break the platform's rules."

325.    In the wake of the Facebook Files release, on September 22, 2021, at a congressional hearing that was supposed to be about antitrust and competition, a group of senators instead unleashed their skepticism and concerns about Meta's transparency—comparing it to Big Tobacco, suggesting Meta lied to Congress, and accusing the social network of profiting off teens' anxiety and suicidal thoughts. During this previously scheduled hearing, in a focused bipartisan rebuke, Sens. Richard Blumenthal (D-Conn.), Mike Lee (R-Utah), Marsha Blackburn (R-Tenn.), Ted Cruz (R-Tex.), and Josh Hawley (R-Mo.) all drilled into Meta's vice president of privacy and public policy, Steve Satterfield. Senator Lee, the top Republican on the Senate Judiciary antitrust subcommittee, said at the hearing that *The Wall Street Journal* articles showed "stunning lapses" in protecting Facebook users. Senator Blumenthal stated that "The simple fact of the matter is that Facebook has known for years that Instagram is directly involved in an increase in eating disorders, mental health issues and suicidal thoughts, especially for teenage girls." In the face of the senators' withering questions, Satterfield resisted conceding even basic facts about Facebook's business model and failed to promise that Facebook would actually show up to an upcoming September 30 hearing focused on young users.

326.     As reported in the *Washington Post* on September 22, 2021, the remarks showed how *The Wall Street Journal*'s reporting "struck a deep nerve on Capitol Hill, where lawmakers have found rare common ground in the need to boost kids' online safety"—all of which raised the specter of regulatory action.

327.     In response to these events, Meta stock dropped from a close of $357.48 per share on September 21, 2021, to a close of $343.21 per share on September 22, 2021, a drop of $14.27 or nearly 4% on heavy trading volume. These declines reduced Meta's market capitalization by over $34 billion in a single day.

       **b.**     **September 27-28, 2021: Meta Pauses Instagram Kids, *The Wall Street Journal* Reveals How Meta Planned to Attract Preteens to Its Platforms, and Meta Seeks a Review of X-Check by the Oversight Board**

328.     Following the first week of the Facebook Files, Meta continued to push back and paint itself as a victim and not a villain. On September 26, 2021, Meta issued a press release concerning the leaked research on harm to teen girls, titled "What Our Research Really Says About Teen Well-Being and Instagram," suggesting (but ultimately, failing to show) that *The Wall Street Journal* had mischaracterized Meta's internal research.

329.     The following day, on the morning of September 27, 2021, Instagram announced that it would pause all development on Instagram Kids, a version of Instagram being developed to target children under the age of 13. While Defendant Mosseri first told the "Today" show on September 27, 2021, that the pause was not a result of *The Wall Street Journal* reporting, he then conceded that "I think it's impossible to say." Multiple newspapers covered this news, and attributed the announcement to the release of the September 14 Facebook File and its ensuing backlash. For example, on September 28, 2021, the *Washington Post* reported that concerns over Meta's efforts to recruit new teenage users "mounted after the *Journal* disclosed the results of an internal study Facebook conducted to determine how its apps affect users."

330.     Meta's decision to pause, but not end, Instagram Kids was met with skepticism. In a statement issued on September 27, 2021, Democrats in the House and Senate called Facebook's decision to halt development of the Instagram product targeted to kids under 13 "insufficient."

Four lawmakers signed onto the following statement, including Sen. Ed Markey (D-MA) and Rep. Lori Trahan (D-MA): "Facebook has completely forfeited the benefit of the doubt when it comes to protecting young people online and it must completely abandon this project."

331.    Then, after the start of trading on September 28, 2021, *The Wall Street Journal* published another Facebook File titled "Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show." This article revealed for the first time that internal Meta documents reviewed by *The Wall Street Journal* showed, among other things, that the Company formed a team to study preteens and even infants, set a three-year goal to create more products for preteens, and commissioned strategy papers about the long-term business opportunities presented by these potential users. In one presentation, the Company contemplated whether there might be a way to engage children during play dates: "Is there a way to leverage play dates to drive word of hand/growth among kids?"

332.    Later that day before the close of trading, Jeff Horwitz, an author of some of the Facebook Files, including the September 28, 2021, article, posted the article to his Twitter feed and then wrote a thread on "a different read of the preteens story that we just put out, that's a lot more about business than kids." He continued in a Twitter thread condensed below:

> The backdrop for the focus on preteens is data that suggesting a crack in FB's dominance. . . . The kids research (and the VERY longstanding push toward kids products) can definitely be viewed as expansionary. But it's also defensive: rival social media platforms are more attractive to preteens, and FB is worried its next generation of users is being stolen away.

> Facebook's popularity with young users has been declining for nearly a decade, but appears to be entering free-fall -- DAUs for young adults are falling slightly. DAUs for teens are absolutely tanking -- by an expected 45% between 2021 and 2023.

> *****

> Reversing the declines for the Blue app is not considered even a serious possibility. Addressing falling content production by teens on IG is considered a must. The hope is to keep recruiting young users to IG and then manage to nudge them toward FB's platform later on.

333.    In addition to news concerning Meta's attempts to target pre-teens, and its decision after weeks of pressure to halt Instagram Kids, Meta announced that it would allow its Oversight

Board to review the X-Check program and provide recommendations and oversight. Before the start of trading on September 28, 2021, Meta admitted to a lack of transparency concerning its X-Check program and disclosed that it would cooperate with the Oversight Board and seek its recommendations and oversight of the X-Check program:

> We have already implemented one of the board's recommendations related to cross-check from a previous case by describing the system in our Transparency Center. Recently the board has expressed interest in looking more into our cross-check system. This referral goes beyond the briefing we have already provided. We are proactively asking the board for its input through a formal and transparent process.
>
> Holding Facebook accountable for our content policies and processes is exactly why the Oversight Board was established. Over the coming weeks and months, we will continue to brief the board on our cross-check system and engage with them to answer their questions. We welcome their recommendations and the independent oversight they provide.

334.    In response to these events, Meta stock dropped from a close of $353.58 per share on September 27, 2021, to a close of $340.65 per share on September 28, 2021, a drop of $12.93 or nearly 3.66% on heavy trading volume. As a result of this decline, Meta lost nearly $31 billion of market capitalization in a single day.

335.    Meta continued to downplay the increasingly mounting evidence establishing that Instagram harms teen users by re-releasing two of the research presentations discussed in the Facebook Files with "annotations" reflecting Defendants' post hoc commentary in the wake of the Facebook Files. Many of these "annotations" criticized the methodology that Meta's researchers had used. For instance, numerous annotations described the slides' use of "causal language" as "myopic." Other annotations called into question the "criteri[a]" and methods of "assessment" that Meta's researchers had employed and pointed out that certain language "should be clarified." Elsewhere in the presentations, Defendants undermined "slide[s] and the methods employed in the study" as "perceptual in nature and not suitable for inferring how Instagram impacts [reported] changes." Some of Defendants' annotations went even further, outright criticizing Meta researchers for having "inappropriately used" "[t]he word 'effect'" when describing the results of their research.

336.    Analysts and the public, however, were skeptical of Defendants' repeated denials,

leaving Meta with what analysts at Argus Research aptly described as "another public relations black eye." Analysts with Argus flagged that "regulatory issues continue to hound the company, which cannot seem to keep out of the headlines," leaving Meta susceptible to "extreme regulatory backlash" from issues including "the spread of misinformation, including election interference; the spread of unlawful content in private groups and encrypted communications, e.g., child pornography, hate speech; [and] Instagram's impact on teen depression." Analysts with Argus described "[t]he issues covered by the Journal" as "sobering," and highlighted that Defendant "Clegg did not dispute any of the facts of the Journal reporting" Instagram's harm to teenage girls. Argus further commented that "the Journal articles clearly point out management's inconsistent responses to the internal research. Facebook cannot escape the responsibility that its platforms may have . . . in making these problems worse."

337.    Popular media reported similarly skeptical sentiments. As an article published in *CNET* on September 30, 2021, pointed out, the slides published by Meta "were heavily annotated by Facebook to reframe the material," but ultimately, "[t]he research also confirmed the Journal's reporting," which had pulled statistics directly from Meta's internal documents. Similarly, an article in *TechCrunch,* also on September 30, 2021, criticized Defendants' containment efforts as an attempt to "respin Instagram's toxicity for teens." The *TechCrunch* article observed that Meta had published the annotated slides "following days of press commentary couching the Instagram teen girls' mental health revelations as Facebook's 'Big Tobacco moment,'" referencing commentary from U.S. Senator Richard Blumenthal. The *TechCrunch* article summed up Meta's annotated slides as communicating that "Facebook wants you to know that Instagram 'only' makes mental health problems worse for fewer teenage girls than you might have thought."

338.    Meta's counterpunch campaign continued on September 30, 2021, when Meta Head of Safety Defendant Antigone Davis testified on behalf of the Company before the United States Senate Committee on Commerce, Science, and Transportation during a hearing named "Protecting Kids Online: Facebook, Instagram, and Mental Health Harms." During her testimony, Davis made a number of false and misleading statements concerning Meta's internal research and the impact of Instagram on teenage girls, spinning the positives of the disclosed research, falsely

stating, among other things, that "the research showed that many more people, actually more teens, found the Instagram use helpful when they were struggling with these particular issues. Our research is not bombshell research." Davis tried to reframe the research in the *Journal*'s reporting, but senators reminded her the data was from Meta's own studies. The senators also presented Davis with quotes from other internal documents that had been provided by the Facebook Files whistleblower. In response to Davis' assertion that Meta's previously concealed internal research was not a "bombshell," Senator Blumenthal vehemently disagreed, stating: "This research is a bombshell. It is powerful, gripping, riveting evidence that Facebook knows the harmful effects of its site on children and that it has concealed those facts and findings."

339.   In addition to failing to convince the public that *The Wall Street Journal* had mischaracterized Meta's research, Meta's containment efforts backfired with its own employees. As *The New York Times* reported on October 1, 2021, Defendants responded to the Facebook Files by implementing a coordinated campaign attempting to downplay the seriousness of the research. Defendant Zuckerberg, for instance, accused *The Wall Street Journal* of "mischaracteriz[ing] the research into how Instagram affects young people." *The New York Times* reported that these statements angered several Meta employees who had worked on the research. These employees described Defendants' characterizations of their research as unfair, discussed how they were being "embarrassed" by their own employer, and even privately threatened to quit their jobs. One Meta employee remarked on a Company message board, "<u>They are making a mockery of the research</u>." Another Meta employee wrote in a widely distributed internal note that Meta's "<u>policies of covering up this kind of research are creating difficult political, regulatory and legal problems for the company</u>."

       **c.**    **October 3, 2021: the Facebook Files Whistleblower Is Revealed**

340.   On October 3, 2021, the prominent national television program *60 Minutes* aired an interview with the whistleblower who had provided *The Wall Street Journal* with the internal documents referenced in the Facebook Files series. For the first time, the public knew the whistleblower's identity and could assess her credibility: Frances Haugen, a data scientist with a degree in computer engineering and a Harvard master's degree in business who worked for tech

giants over the prior fifteen years, including Google and Pinterest, before being recruited by Meta in 2019. Based on this experience, Haugen stated at the top of the interview that, as compared to other social networks, "it was substantially worse at Facebook than anything I'd seen before."

341.    Haugen described what drove her to raise the alarm about the Company's platform:

> The thing I saw at Facebook over and over again was there were conflicts of interest between what was good for the public and what was good for Facebook. And Facebook, over and over again, chose to optimize for its own interests, like making more money.

342.    Haugen's interviews gave the Facebook Files additional credibility. In addition, Haugen provided new information to the public. For example, Haugen tied Meta's choices concerning its algorithm directly to profits: "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money."

343.    Haugen told *60 Minutes* how she secretly copied tens of thousands of pages of internal research, and provided new facts about that research:

> She says evidence shows that the company is lying to the public about making significant progress against hate, violence and misinformation. One study she found, from this year, says, "we estimate that we may action as little as 3-5% of hate and about 6-tenths of 1% of V & I [violence and incitement] on Facebook despite being the best in the world at it."

344.    In describing her role as a member of Meta's Civic Integrity Unit, which worked on risks related to the spread of misinformation in connection with political elections, Ms. Haugen stated, "I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous."

345.    Haugen also explained more about the feedback loop that Instagram created between the app and teenage users, distilling its impact on teenage girls.

> [Interviewer]: One of the Facebook internal studies that you found talks about how Instagram harms teenage girls. One study says 13.5% of teen girls say Instagram makes thoughts of suicide worse; 17% of teen girls say Instagram makes eating disorders worse.
>
> Frances Haugen: And what's super tragic is Facebook's own research says, as these young women begin to consume this -- this eating disorder content, they get more

and more depressed. And it actually makes them use the app more. And so, they end up in this feedback cycle where they hate their bodies more and more. Facebook's own research says it is not just that Instagram is dangerous for teenagers, that it harms teenagers, it's that it is distinctly worse than other forms of social media.

346.   *60 Minutes* noted that Meta had declined to sit for an interview in response to Haugen's allegations but did provide a written statement aimed at assuring the public that Meta was committed to user safety, and directing blame away from the Company. The Company, once again, tried to transfer blame to others rather than explain why it ignored its own research and employees: "If any research had identified an exact solution to these complex challenges, the tech industry, governments, and society would have solved them a long time ago."

347.   As the *60 Minutes* interview aired, *The Wall Street Journal* released a lengthy podcast interview with Haugen titled "The Facebook Whistleblower Speaks Out" and published an article titled "The Facebook Whistleblower, Frances Haugen, Says She Wants to Fix the Company, Not Harm It." During the podcast, Haugen explained more about her background and role at Meta, noting, "I am a ranking specialist. I'm specifically deep in the algorithms, like the code of how do we choose what content to show people. I know I can make a difference on civic misinformation." Haugen made clear that despite Meta's alternating claims of transparency and ignorance, Meta knows much more about the problems associated with its platforms than the general public and keeps that information to itself:

So here I was inside of Facebook, I thought I was well-informed before I joined Facebook about misinformation. Now I know that the problem is way, way worse than anyone outside knows, and I'm staffed with a team that I have no faith can actually address this problem. I know that no one outside knows these things.

348.   When discussing problems Meta faced in the lead up to the 2020 Election, Haugen crystallized Meta's dilemma: "Facebook wants to make $80 billion a year. Would've made $2 billion less last year, but we'd had a safe democracy." She went on to say that the Company "actually ha[s] numbers saying, guess what? Facebook is trading off very small decreases in engagement for huge consequences in misinformation and hate speech and violence."

349.   In response to Haugen's interviews, Meta stock dropped from a closing price of

$343.01 on October 1, 2021, to a closing price of $326.23 on October 4, 2021, a steep decline of $16.78 or more than 4%. This drop eliminated nearly $40 billion of Meta's market capitalization in a single business day.

350. After market close on October 4, 2021, Frances Haugen's written statement to the U.S. Senate Committee on Commerce, Science and Transportation was released. Haugen explained that "The company's leadership knows ways to make Facebook and Instagram safer and won't make the necessary changes because they have put their immense profits before people." She reiterated that "The core of the issue is that no one can understand [Meta]'s destructive choices better than [Meta], because only [Meta] gets to look under the hood."

351. Also on October 4, 2021, CBS News released the eight whistleblower complaints that Frances Haugen filed with the SEC and discussed in her interviews. These complaints largely mirrored the information previously released in the Facebook Files, and alleged that Facebook:

- "misled investors and the public about equal enforcement of its terms given that high-profile users are 'whitelisted' under its 'XCheck' program;"

- "misled investors and the public about the negative impact of Instagram and Facebook on teenagers' mental and physical health;"

- "misled investors and the public about the negative consequences of its algorithms, which claim to prioritize 'meaningful social interactions' or 'MSI' (e.g., reshares of friends' posts) but which actually promote virality of polarizing misinformation and hate speech;"

- "misled investors and the public about 'transparency' reports boasting proactive removal of over 90% of identified hate speech when internal records show that 'as little as 3-5% of hate speech' is actually removed;"

- "misled investors and the public about its role in perpetuating misinformation and violent extremism relating to the 2020 election and January 6 insurrection;"

- "misled investors and the public about its promotion of human trafficking / slavery / servitude";

- "misled investors and the public about bringing 'the world closer together' where it relegates international users and promotes global division and ethnic violence;" and

- "misled investors and advertisers about shrinking user base in important demographics, declining content production, and the true number of recipients of 'Reach & Frequency' advertising."

352.    The SEC complaints largely covered the same wrongdoing covered in the Facebook Files and Ms. Haugen's October 3 interviews. A small number of publications—mostly tech-focused websites—noted that one of Haugen's SEC complaints also raised questions about the accuracy of Meta's metrics for counting and reporting users, as well as the impact that these unreliable metrics could have on advertising. The true nature of the Company's deception concerning this topic, however, would not be revealed for more than two weeks until October 21, 2021, when *The Wall Street Journal* published a new Facebook Files installment that discussed new internal research and documents revealing that Meta had misrepresented the true number of users among its new accounts—which directly impacted its growth rates.

353.    On the morning of October 5, 2021, Frances Haugen testified before Congress. As *ABC News* reported, just "minutes after her testimony," Meta issued a statement designed to discredit Haugen, stating that she had been at the Company for "less than two years, had no direct reports, never attended a decision-point meeting with C-level executives – and testified more than six times to not working on the subject matter in question."

354.    Breaking his silence, Defendant Zuckerberg took to his Facebook account and claimed that a "false picture of the company" was "being painted." Defendant Zuckerberg attempted to recast the internal documents that *The Wall Street Journal* had publicized:

> At the heart of these accusations is this idea that we prioritize profit over safety and well-being. That's just not true. For example, one move that has been called into question is when we introduced the Meaningful Social Interactions change to News Feed. This change showed fewer viral videos and more content from friends and family — which we did knowing it would mean people spent less time on Facebook, but that research suggested it was the right thing for people's well-being. Is that something a company focused on profits over people would do?

355.    After attempting to spin the content of the internal documents, Defendant Zuckerberg attempted to shift the blame for Meta's fraud to other actors, including Congress.

> We're committed to doing the best work we can, but at some level the right body to assess tradeoffs between social equities is our democratically elected Congress. For example, what is the right age for teens to be able to use internet services? How should internet services verify people's ages? And how should companies balance teens' privacy while giving parents visibility into their activity?

356.    Nevertheless, analysts reported that the Facebook Files and Haugen's testimony were continuing to negatively impact Meta's stock price as the market continued to digest the roll-out of new negative information on multiple topics concerning the fraud. For instance, J.P. Morgan reported on October 7, 2021, that

> FB shares have been pressured since *The Wall Street Journal*'s series of articles dubbed The Facebook Files began the week of September 13. The articles cover a range of issues around FB's treatment of high-profile users, platform toxicity for teen girls, negative impact of FB algorithms, user safety, vaccine misinformation, & efforts to attract pre-teens. And in the last few days, the FB whistleblower appeared on 60 Minutes & testified before a Senate Subcommittee.

357.    Similarly, Truist reported on October 8, 2021, that "[w]e've been fielding investor questions about how the ongoing and much-publicized inquiry into Facebook's practices (fueled by the whistleblower's revelations to the *WSJ* initially then to Congress) is likely to impact the company's growth prospects, outlook and the stock short and longer-term."

### d.    October 6, 2021: Meta Halts New Product Launches and European Regulators Work with the Whistleblower

358.    In the afternoon of October 6, 2021, *The Wall Street Journal* reported in an article titled "Facebook Slows New Products for 'Reputational Reviews'" that, just days after Meta paused Instagram Kids, Meta had delayed the rollout of new products in light of news stories and congressional hearings related to the trove of internal documents revealed in the Facebook Files in order to survey whether those products may harm young users:

> "I've spent a lot of time reflecting on the kinds of experiences I want my kids and others to have online, and it's very important to me that everything we build is safe and good for kids," [Zuckerberg] wrote.
>
> This follows Facebook's announcement last week that it would pause plans for its Instagram Kids product after lawmakers and others voiced concerns about the photo-sharing platform's effects on young people's mental health. Facebook has announced features for existing services, such as Facebook Gaming, in recent days.

359.    The slowdown of new product launches, initiated by Defendant Zuckerberg, was widely covered in the media by publications such as *Business Insider*, *The Hill*, *Reuters*, and *U.S. News & World Report*. *The Wall Street Journal* article also noted how Meta had started "tightening

the reins on what information is shared internally over the past few weeks," and that "a team within the company is examining all in-house research that could potentially damage Facebook's image if made public."

360.    That same day, after market close on October 6, 2021, *The New York Times* reported on the international impact of Frances Haugen's testimony in an article titled "Facebook Hearing Strengthens Calls for Regulation in Europe." *The New York Times* interviewed several top European legislators who were working directly with Ms. Haugen to achieve tougher oversight over Meta. Christel Schaldermouse, a Danish member of the European Parliament "who is playing a leading role in drafting the Digital Services Act," a proposed legislation that includes transparency requitements and disclosure rules, said that Ms. Haugen "asked [her] to insist on regulating the platforms," and Ms. Schaldermouse agreed to do so. Another lawmaker, Alexandra Geese, a lawmaker in the European Parliament from Germany, remarked that Haugen's testimony showed that "any trust there could be in the company has been destroyed" such that "we now know we need to regulate because the company will not stop breaking things. And breaking things means breaking people and democracies."

361.    In response to these events, Meta common stock price dropped from a close of $333.64 per share on October 6, 2021, to a close of $329.22 per share on October 7, 2021, a drop of $4.42 on heavy trading volume. Meta's stock price decline resulted in another $10.5 billion loss of market capitalization in a single day.

362.    In a report published on October 8, 2021, analysts with Truist described the "criticisms of the company" as "very valid" and summarized Frances Haugen's testimony as revealing that "Facebook was harming children, sowing division and undermining democracy in pursuit of breakneck growth and 'astronomical profits.'" Truist analysts also noted that Meta "allegedly hid from the public and government officials internal research that illuminated the harms of Facebook products"—allegations it described as "heavy charges, which Congress is taking seriously, in fact so seriously that <u>for the first time in a long time, we see clear consensus between democrats and republicans to try to curb the power of Big Tech</u>."

363.    On October 13, 2021, *The New York Times* reported that Defendants had deployed

new efforts to curb the fallout from "The Facebook Files"—not by taking accountability—but by further reducing transparency in an effort to prevent future leaks. As *The New York Times* reported, Defendants restricted employees' permissions, prohibiting employees who do not work on its "integrity" teams from accessing portions of Meta's internal Workplace site relating to "integrity" work. Many Meta employees have expressed significant disappointment in Meta for further reducing its transparency, describing the move as "counterproductive" and "disheartening."

364.    Also on October 13, 2021, Tigress Financial Partners issued an analyst report in which analysts attributed the ongoing declines in Meta's stock price to Haugen's revelations about Meta, stating that Haugen

> leaked internal documents to the Wall Street Journal and Congress before appearing on 60 Minutes, saying that the company's news search algorithm amplifies 'angry content' and focuses on profit over truth and accuracy. This has sent the stock down over 15% from its recent all-time high of $384 in early September.

**e.     October 21, 2021: the Oversight Board Condemns Meta for Withholding Relevant Information About X-Check, Meta Admits that Its Statements to the Oversight Board Were Misleading, and *The Wall Street Journal* Releases New Information About Meta's User Metrics**

(1)    The Oversight Board Formally Reviews X-Check

365.    On October 21, 2021, before the market opened, Meta's Oversight Board released its Quarterly Transparency Reports. In those reports, the Oversight Board said that the Company's failure to be transparent about the X-Check system was "not acceptable." The Oversight Board agreed to take Meta up on its request to review the policy and issue guidance on how Meta should deal with content violations by prominent users.

366.    This first quarterly transparency report covered the period from October 2020 to the end of June 2021. During that time, the Oversight Board was reviewing Meta's decision to ban former President Donald Trump from the platform:

> When Facebook referred the case related to former US President Trump to the board, it did not mention the cross-check system," the board wrote in its report. "Given that the referral included a specific policy question about account-level enforcement for political leaders, many of whom the board believes were covered by crosscheck, this omission is not acceptable.

367.    The Oversight Board continued, stating in its report that Meta "has not been fully

forthcoming" about how it lets millions of prominent users escape the content moderation rules it applies to everyone else through its cross-check program. "The fact that Facebook provided such an ambiguous, undetailed response to a call for greater transparency is not acceptable," the Oversight Board wrote in its report. The Oversight Board noted that "the team within Facebook tasked with providing information has not been fully forthcoming on cross-check. On some occasions, Facebook failed to provide relevant information to the Board, while in other instances, the information it did provide was incomplete."

368.    Notably, the Oversight Board revealed that "Facebook admitted it should not have said that cross-check only applied to a 'small number of decisions'" and "recognized its phrasing could come across as misleading." Later that same day, Thomas Hughes, the director of the Oversight Board, stated in an interview with NPR that Meta's description of the program as "small" "was not appropriate," noting that nearly 6 million users "is not small."

369.    The Board noted that "the credibility of the Oversight Board, our working relationship with Facebook, and our ability to render sound judgments on cases all depend on being able to trust that information provided to us by Facebook is accurate, comprehensive, and paints a full picture of the topic at hand." The Board agreed "to review the company's cross-check system and make recommendations on how it can be changed." The Board further stated that it would engage with whistleblowers and other "former Facebook employees who have come forward in recent months."

(2)    *The Wall Street Journal* Reveals That Up to 56% of New Accounts Are Created by Existing Users

370.    Shortly after the market closed on October 21, 2021, *The Wall Street Journal* published an article titled "How Many Users Does Facebook Have? The Company Struggles to Figure it Out." Contrary to Meta's claims that the number of fake or duplicate accounts on its platforms was very small, *The Wall Street Journal* revealed that, according to an internal Meta presentation from Spring 2021, "the phenomenon of single users with multiple accounts" was "'very prevalent' among new accounts." According to *The Wall Street Journal*, this presentation explained that "of roughly 5,000 recent sign-ups on the service indicated that at least 32% and as

many as 56% were opened by existing users." Furthermore, *The Wall Street Journal* reported that

the presentation indicated that Meta's "system for detecting such accounts also tends to undercount

them."

371.   Additionally, *The Wall Street Journal*'s reporting revealed that an internal Meta

memo from May 2021 "said that <u>the number of U.S. Facebook users who are in their 20s and</u>

<u>active at least once a month often exceeds the total population of Americans their age.</u>" That same

memo noted: "This brings out an elephant in the room: SUMA." The author of the internal Meta

memo also explained that Meta's active user numbers were thus "<u>less trustable</u>." As *The Wall*

*Street Journal* explained,

> At issue is the reliability of information that helps inform some big advertisers'
> spending decisions. While Facebook says it doesn't bill advertisers based on its
> estimates of an ad's target audience, some advertisers look at those estimates when
> planning where to allocate their budgets—especially big brands that have turned to
> Facebook to reach large audiences as broadcast and cable television viewership
> have declined.

372.   Once again, *The Wall Street Journal* offered Meta the opportunity to give a

statement. Spokesman Joe Osborne said: "It's not a revelation that we study duplicate accounts,

and this snapshot of information doesn't tell the full story." Osborne continued to mislead the

public, however, falsely claiming that "Nothing in this story changes the estimate of duplicate

accounts we disclose in our public filings, which includes new users, or that we provide context

on in our ad products, ad interfaces, in our help centers, and in other places." But internal

documents, as reported by *The Wall Street Journal*, contradicted his statement, and showed that

the Company has known for years that removing duplicate accounts from its advertising estimates

could have significant impact on its largest advertisers.

> Facebook researchers in the documents quantified the potential impact for
> advertisers if duplicate users were removed from the audiences it estimated would
> be reached in a certain kind of ad campaign called "reach and frequency." In such
> a campaign, favored by big brands to help raise awareness of their offerings, an
> advertiser selects an audience based on certain attributes. Facebook's system gives
> an estimate of how many such people the campaign could reach.

> Reach-and-frequency campaigns aimed at bigger audiences of 10 million or more
> people a week could take a hit if they were corrected to remove duplication,

according to a comment on a 2018 document. The median reduction in weekly reach for such campaigns would be about 2.2%, and in some cases 5% to 10%, the comment said.

373.    Analysts quickly understood the importance of this report and the impact it could have on Meta's revenue, profits, and relationships with advertisers. For instance, Société Générale noted "an increase in duplicate and fake accounts" as one of the "key downside risks" associated with Meta.

374.    Following the Oversight Board's rebuke, Meta's admission, and *The Wall Street Journal*'s revelations about Meta's misleading user levels, Meta stock price dropped from a closing price of $341.88 per share on October 21, 2021, to a closing price of $324.12 per share on October 22, 2021, a steep decline of $17.27 or more than 5% on extremely heavy trading volume. This stock price decline resulted in a loss of $40 billion from Meta's market capitalization.

## V.    POST-CLASS PERIOD DEVELOPMENTS

### A.    Another Whistleblower Corroborates Haugen's Complaints and the Facebook Files

375.    On the afternoon of October 22, 2021, *The Washington Post* reported that another Meta whistleblower filed a complaint with the SEC that alleged that Meta's top leadership failed to warn investors about serious problems at the Company resulting from its desire for growth and profits over combatting hate speech, misinformation, and other threats to the public. The whistleblower was a member of Meta's Integrity Team, and the whistleblower's affidavit viewed by *The Washington Post* was signed under the penalty of perjury.

### B.    A News Outlet Consortium Gains Access to the Facebook Papers, Corroborating the Facebook Files and Expanding on the Platforms' Harms

376.    While *The Wall Street Journal* had exclusive access to the internal Meta documents that Frances Haugen copied and took with her before leaving the Company when it rolled out the Facebook Files discussed herein, Ms. Haugen broadened access to these documents in mid-October 2021. At that time, Haugen provided redacted copies of some subset of the 11,000 documents to an initial group of journalists from 17 media outlets, a group that expanded slightly

over time. The journalists agreed to work together in reviewing these documents, and began publishing their findings on Monday, October 25. The consortium published dozens of articles, referred to loosely as the Facebook Papers, over a matter of weeks, many of which corroborated and expanded on the information first disclosed in the Facebook Files.

377.   For example, one article published by *Bloomberg* on October 25, 2021, titled "Facebook, Alarmed by Teen Usage Drop, Left Investors in the Dark," described a March 2022 report prepared for Chief Product Officer Chris Cox. That report, together with other documents released by Haugen, "paint a stark picture of the years-long decline in growth metrics for key user groups, like teens and young adults in the U.S., on the flagship Facebook app." According to *Bloomberg*, the internal reports showed:

- Young people are spending less time on the service.

- Fewer teens are signing up.

- Many new teen accounts are duplicates, rather than unique new users.

- Users across age groups are creating fewer posts.

- Despite detailed research, employees don't fully understand why these trends are happening or why product changes have failed to reverse them.

378.   Despite this internal report's determination, *Bloomberg* reported that "Facebook executives have been markedly less forthcoming about those concerns in public" and, as a result of that and other positive revenue increases, "the declines among teens and young adults on Facebook have been almost invisible to outsiders." Indeed, *Bloomberg* emphasized how Facebook concealed this information previously because "Facebook doesn't break down its user numbers by age group, and it has evaded questions from Wall Street analysts about the main app's popularity with young people."

### C.   Analysts React to the Facebook Files and Ensuing Developments

379.   Analysts expressed concern about the continuing barrage of negative press coverage focused on the disclosures summarized above. For instance, on October 25, 2021, analysts with Guggenheim described Meta's 3Q21 earnings call, scheduled for the following day,

as "its Most Impactful Earnings Call." Guggenheim analysts forecasted that during the earnings call, "[t]he company will address multiple questions that will likely impact investor sentiment," including questions about the "wide-ranging criticism of company policies" and "the necessary steps and costs to maximize positive consumer and advertisers' experiences."

380.     The next day, on October 26, 2021, analysts with William O'Neil issued a "Remove Buy Recommendation" for Meta, and attributed Meta's poor stock performance to the disclosures alleged in Part IV.C, noting that "[s]ince mid-September, [Meta] stock has been under pressure after Frances Haugen, a whistleblower, shared documents that suggested that Facebook is aware that its apps and services are harmful to its users." On the same day, analysts with Invest Heroes likewise observed that "Facebook continues to be surrounded by scandals," flagging "moderation of hateful content," the decision to "disengage[]" content moderation tools "following the U.S. elections," and "lists of VIP users" as issues that "trigger[] the political risk for Facebook." Invest Heroes analysts thus warned about the risk of "policy restrictions for Facebook and possible fines" as potential government responses. Similarly, on November 15, 2021, analysts with HSBC described the revelations as among Meta's recent "significant regulatory events," and discussed U.S. Senate Commerce Committee Chair Maria Cantwell's recent call to Defendant Zuckerberg to preserve all documents related to Ms. Haugen's testimony, noting that Haugen's testimony "raises significant concerns about whether Facebook has misled the public, federal regulators, and this committee."

### D.     Investigations Concerning Meta's Promotion of Instagram to Children and Young Adults Commence as Scrutiny Intensifies

381.     On November 18, 2021, a bipartisan coalition of at least nine state attorneys general announced the start of an investigation into how Meta targets young people on Instagram and the potential harms it may cause. Massachusetts Attorney General Maura Healey announced that "attorneys general across the country are examining whether the company violated state consumer protection laws and put the public at risk." This investigation was a direct result of the disclosures at issue here, with the press release announcing the investigation stating, "Today's announcement follows recent reports revealing that Meta's own internal research shows that using Instagram is

associated with increased risks of physical and mental health harms on young people, including depression, eating disorders, and even suicide."

382.    That same day, Senator Blumenthal, Chair of the Senate Commerce, Science, and Transportation Subcommittee on Consumer Protection, Product Safety, and Data Security, issued a statement in response to the Attorney General investigation tying it to the ongoing congressional investigation:

> Combined with our Congressional scrutiny, this investigation will shine a bright light on Instagram's profiting from harm to kids. Facebook can no longer hide or conceal facts that parents need and deserve to know. Mark Zuckerberg must make a choice: either Facebook comes clean on its own, or this bipartisan group of state attorneys general will show the world even more ugly truths.

383.    On February 9, 2022, U.S. Senators Amy Klobuchar (D-MN) and Cynthia Lummis (R-WY) introduced bipartisan legislation to address negative impacts of social media in the wake of the Facebook Files. The Nudging Users to Drive Good Experiences on Social Media (Social Media NUDGE) Act, if passed, would establish studies to examine and recommend interventions to reduce addiction and the amplification of harmful content on social media platforms. Following the initial study, the legislation would hold platforms accountable for following through on recommendations. Sen. Klobuchar, citing internal Meta research, stated, "For too long, tech companies have said 'Trust us, we've got this.' But we know that social media platforms have repeatedly put profits over people, with algorithms pushing dangerous content that hooks users and spreads misinformation."

384.    Most recently, after years of investigation concerning the death of a 14-year-old girl named Molly Russell, a British coroner ruled in September 2022 that the child "died from an act of self-harm while suffering from depression and the negative effects of online content." In 2017, Ms. Russell killed herself after she viewed thousands of pieces of content pushed onto her by Meta's algorithm related to suicide, self-harm, and depression. As *The New York Times* recently reported, the coroner concluded that this content "affected her mental health in a negative way and contributed to her death in a more than minimal way." Rather than rule her death a suicide, the coroner found that Meta's algorithms played a role in Molly's decision to kill herself, noting that

this content was shown to Molly even when she did not seek it out. "The platform operated in such a way using algorithms as to result, in some circumstances, of binge periods of images, video clips and text some of which were selected and provided without Molly requesting them." While Meta maintained that its practices properly balanced free expression and safety, it has since acknowledged that its algorithms recommended content to Molly that violated its rules and policies.

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

385.   Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions, which were disseminated to investors through calls, public filings, press releases, other Company statements, and news and media outlets. With some exceptions, Defendants' materially false and misleading statements and omissions fall into four principal categories: (1) representations Meta applied its Community Standards and content-moderation policies consistently across its users; (2) representations concerning Meta's algorithm and that Meta effectively minimized the presence, spread, and impact of misinformation and harmful content on its platforms, including by virtue of its algorithm and content moderation decisions; (3) representations concerning the impact of Meta's Instagram platform on younger users and Meta's research into that subject; and (4) representations concerning Meta's user growth rates and the prevalence of duplicate users on its accounts.

### A.   False and Misleading Statements Representing that Meta Applied Its Content-Moderation Policies Consistently to All Users

386.   Throughout the Class Period, Meta publicized its "Community Standards" on the Company website. These standards purported to "outline what is and isn't allowed on Facebook." On the Facebook Community Standards page of the Company's website, Meta stated that these Community Standards applied "to everyone, all around the world, and to all types of content."

387.   The statements identified in ¶386 above were materially false and misleading, and omitted material facts. It was materially false for the Company to state that these Community Standards applied "to everyone, all around the world, and to all types of content." In truth, Meta's

purported Community Standards did not apply to all its users. Contrary to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

388.    Furthermore, it was misleading for Meta to describe its content rules as "Community Standards," which left investors with the impression that those standards applied to all users and all content, without disclosing that millions of users were not subject to these rules. In truth, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules" and allowed them to "violate [Meta's] standard without any consequences" and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

389.    Before the start of the Class Period, on January 7, 2021, Defendant Zuckerberg announced via his Facebook profile that former President Donald J. Trump would be banned from Facebook and Instagram "indefinitely and for at least the next two weeks." Meta referred the propriety of this indefinite suspension to its newly created Oversight Board on January 21, 2021. While Meta did not mention the X-Check system to the Oversight Board when it referred the Trump ban, the Company did disclose the existence of X-Check to the Oversight Board when asked a direct question about whether Mr. Trump's page or account had been subject to ordinary content moderation processes. A brief, and misleading, discussion of X-Check ensued when, on May 5, 2021, following an over three-month review, Meta's Oversight Board issued a decision upholding Meta's indefinite ban. As part of that ruling, the Oversight Board recounted that in response to questions that the Oversight Board had asked Meta, the Company:

> [T]old the Board it applies a "cross check" system to some "high profile" accounts to "minimize the risk of errors in enforcement." For these accounts, Facebook sends

content found to violate its Community Standards for additional internal review. After this escalation, Facebook decides if the content is violating. Facebook told the Board that "it has never had a general rule that is more permissive for content posted by political leaders."

390.    Meta made similar misstatements to Congress in May 2021. After Defendant Zuckerberg testified before Congress in March 2021, members of Congress issued follow-up questions concerning the topics discussed. These questions were directed to Defendant Zuckerberg. On May 17, 2021, Defendants Zuckerberg and Meta submitted written responses to the questions directed to Defendant Zuckerberg (the "May 2021 Responses to Congress"). In the May 2021 Responses to Congress, Meta included the following statement concerning Meta's harassment policy:

> Our harassment policy applies to both public and private individuals and includes behavior like repeatedly contacting a single user despite that person's clear desire and action to prevent that contact . . . It also applies to calls for death, serious disease, disability, or physical harm aimed at an individual or group of individuals in a message thread.

391.    Defendants' statements identified in ¶¶389-90 above were materially false and misleading and omitted material facts. It was materially false and misleading for Meta to state that it applied the "cross check" system to some "high profile" accounts simply to "minimize the risk of errors in enforcement." In truth, the cross check system was a mechanism by which Meta exempted high profile users from its Community Standards and content moderation policies, thus allowing them to post rule-violating content with impunity. Indeed, contrary to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

392.    Moreover, it was materially false and misleading for Defendant Zuckerberg and the Company to state that Meta has "never had a general rule that is more permissive for content posted by political leaders," and that its "harassment policy applies to both public and private individuals"

1    without disclosing that these policies were not applied to all public individuals and political

2    leaders, and Meta did have a practice that was more permissive for content posted by political

3    leaders. Indeed: (i) Meta purposely "built a system that has exempted high-profile users from some

4    or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and

5    (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of

6    Meta's Community Standards and content moderation rules, thus allowing those users to harass

7    other Meta platform users and spread misinformation, hate speech, incitement, and other harmful

8    content.

9        393.    In the May 2021 Responses to Congress, Defendants Zuckerberg and Meta also

10   stated that "[w]e strive to enforce our policies consistently, without regard to religious or political

11   affiliation. Our Community Standards apply to all content, and we assess everyone under those

12   Standards. When we identify or learn of content that violates our policies, we remove that content

13   regardless of who posted it." Meta reiterated this notion throughout the May 2021 Responses to

14   Congress, stating: "We do not tolerate race-based attacks or harassment on our platform, and we

15   do not permit bullying." Meta noted that its "Community Standards consist of over twenty policies,

16   including policies on Hate Speech and Bullying & Harassment, developed to help make Facebook

17   and Instagram safe." Meta represented that when "we find content that violates our Community

18   Standards, including those prohibiting hate speech and bullying, we remove it from Facebook."

19       394.    Defendants' statements identified in ¶393 above were materially false and

20   misleading, and omitted material facts. It was materially false and misleading for Defendant

21   Zuckerberg and the Company to state that its Community Standards applied to all content and that

22   the Company removed content that violates those standards "regardless of who posted it." Contrary

23   to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile

24   users from some or all of its rules," and allowed them to "violate [Meta's] standard without any

25   consequences," and (ii) the X-Check and whitelisting system shielded at least 5.8 million users

26   from enforcement of Meta's Community Standards and content moderation rules, thus allowing

27   those users to harass other Meta platform users and spread misinformation, hate speech,

28   incitement, and other harmful content.

395.    For the same reasons, it was materially false and misleading for Meta to state that "[w]e strive to enforce our policies consistently. . .." In truth, Meta did not strive to apply its Community Standards consistently to all users, for all the reasons noted directly above. Indeed, Meta had constructed a wide-ranging apparatus to exempt millions of its most high-profile users from those policies and standards.

396.    On May 19, 2021, Meta hosted a conference call to discuss its Community Standards Enforcement Report for the first quarter of 2021. During the call, Defendant Bickert, Head of Global Policy Management at Meta said: "So our COVID-19 misinformation policies do apply to everybody around the world that includes heads of state and presidents."

397.    On May 26, 2021, Meta held its Annual Shareholders Meeting. During the meeting, Meta opposed a proxy proposal that would have required Meta to take additional steps to address hate speech and violent content on its platform. During the meeting, a Meta spokesperson told shareholders that "our position on each proposal has already been set forth in the proxy statement." In that proxy statement, which Meta incorporated by reference during the Annual Shareholders Meeting, Meta stated that the actions sought in that proposal were not necessary in part because the Company "remove[s] information that breaks our rules on violence, bullying, and harassment, and the other areas outlined in Facebook's Community Standards." Meta also made additional statements in its proxy statement concerning changes it made to reduce hate speech and violent content:

> This was one of many changes that we have made to News Feed to try and minimize the amount of divisive content that people see. We have reduced clickbait headlines, reduced links to misleading and spam posts, and improved how comments are ranked to show people those that are more relevant and of higher quality. In addition to these measures to reduce the distribution of this type of problematic content, we also remove content when we find that such content violates our Community Standards or one of our other policies, and we give people more information about the posts they see in News Feed, including information about why they are seeing a particular post and notifications with additional context on the source of certain news and other content.

398.    Defendants' statements identified in ¶¶396-97 above were materially false and misleading, and omitted material facts. It was materially false and misleading for the Company to state that: (a) its COVID-19 misinformation policies applied to "everybody around the world that

includes heads of state and presidents"; (b) it removes "information that breaks our rules on violence, bullying, and harassment"; and (c) it removes "content when we find that such content violates our Community Standards or one of our other policies." In truth, Meta's Community Standards and content moderation policies did not apply to a significant number of its users, and content that violated its Community Standards was often left unchecked. Contrary to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences," and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

399.     During the Annual Shareholders Meeting, Defendant Clegg reiterated the Company's statements that its Community Standards applied to every user:

> We always strive to enforce our policies evenly without regard to the political affiliation of those affected . . . Now, of course, that doesn't mean the politicians can just say things that clearly cause harm and our policies on hate speech, incitement and so on apply to everyone regardless of their position of power. And those rules, our rules are set out in our Community Standards and they're available publicly and in considerable detail. So we – we're very clear, we remove content that poses specific harm to people, content intended to intimidate, exclude or silence views.

400.     The statements identified in ¶399 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Clegg to state that Meta's policies "apply to everyone regardless of their position of power," and that to emphasize that it was "very clear" that "we remove content that poses specific harm to people, content intended to intimidate, exclude or silence views." It was also materially false and misleading for Clegg to state Meta "strive[d]" to enforce its policies evenly. In truth, Meta did not apply its policies to all users "regardless of their position of power," did not necessarily "remove content" that violated its Community Standards, and did not even strive to apply these policies "evenly." Contrary to these statements: (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any

consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

401.   In May 2021, Meta's Oversight Board issued various recommendations to Meta concerning the treatment of "political speech from highly influential users," in connection with the Company's ban of former President Donald J. Trump. Among these recommendations, the Oversight Board stated:

> In regard to cross check review, Facebook should clearly explain the rationale, standards, and processes of review, including the criteria to determine which pages and accounts are selected for inclusion. Facebook should report on the relative error rates and thematic consistency of determinations made through the cross check process compared with ordinary enforcement procedures.

402.   On June 4, 2021, Defendant Clegg authored a news release on Meta's Newsroom webpage, responding to the Oversight Board's recommendations and announcing a two-year suspension of former president Trump. Clegg acknowledged that the Company sometimes granted "newsworthiness allowances" under which it allowed "certain content that is newsworthy or important to the public interest to remain on our platform—even if it might otherwise violate our Community Standards. We may limit other enforcement consequences, such as demotions, when it is in the public interest to do so."  Defendant Clegg also stated, however, that newsworthiness allowances were only given to a "small number of posts," that the Company would publish the "rare instances when we apply it," and would take content down if "the risk of harm outweighs the public interest." Clegg also assured investors that Meta would "not treat content posted by politicians any differently from content posted by anyone else. Instead, we will simply apply our newsworthiness balancing test in the same way to all content."

403.   Defendants' statements identified ¶¶401-02 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Clegg to claim that newsworthiness allowances were granted to only a "small number of posts," that the Company did "not treat content posted by politicians any differently from content posted by

anyone else," and that the "newsworthiness test" applied to "all content." In truth, content posted by millions of users, including politicians, were subject to a completely different set of rules than the rest of Meta's community. Further, membership in this select group was not based on the "newsworthiness" of the material posted, but rather on whether poster of the content had been whitelisted. Indeed, contrary to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences," and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content. On October 21, 2021, Meta's own Oversight Board criticized the Company for not being "fully forthcoming on cross-check." According to the Oversight Board, Meta "admitted it should not have said that cross-check only applied to a 'small number of decisions,'" and "recognized its phrasing could come across as misleading."

404.   Defendant Clegg's June 4, 2021, statement also included a link to Meta's full response to the Oversight Board's recommendations. Meta's full response included the following statement concerning X-Check:

> We employ an additional review, called our cross check system, to help confirm we are applying our policies correctly for content that will likely be seen by many people. . . . Cross check simply means that we will give some content from certain Pages or Profiles additional review. We often apply this process to ensure our policies are applied correctly for public figures and content on Facebook that will be seen by many people.

405.   Defendants' statement identified ¶404 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Meta to claim that X-Check was simply an "additional review" designed to "help confirm" that Meta applied its policies correctly, when it was a vehicle that allowed users to post rule-violating content with impunity. Contrary to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences," and (ii) the X-Check and whitelisting system shielded at least 5.8 million users

from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

406.    Meta's full response also stated that "[o]ur Community Standards apply around the world to all types of content and are designed so they can be applied consistently and fairly" and clarified that "[w]e want to make clear that we remove content from Facebook, no matter who posts it, when it violates our Community Standards. There is only one exception—and that is for content that receives a newsworthiness allowance." Meta's response reiterated that newsworthiness allowances were only granted in "exceptional circumstances." The Company's full response also directed readers to a July 2018 post from Facebook's then-VP of Global Policy Management, which stated that the Company "remove[d] content from Facebook, no matter who posts it, when it violates our standards. There are no special protections for any group."

407.    Defendants' statements identified ¶406 above were materially false, misleading, and omitted material facts. It was materially false and misleading for Meta to claim that: (a) its Community Standards applied to "all types of content and are designed so they can be applied consistently and fairly"; (b) the only exception to the Company's Community Standards was for "content that receives a newsworthiness allowance"; and (c) the Company removed content that violates its standards "no matter who posts it" and that there were "no special protections for any group." In truth, Meta had constructed a wide-ranging X-check and whitelisting program through which content posted by millions of users was not subject to the Community Standards. And, in light of this massive program, it was false to state that "newsworthiness" was the "only exception" to the Company's Community Standards. Contrary to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

408.    Meta's full response to the Oversight Board also addressed the specific

recommendations made by the Oversight Board. One of the Oversight Board's recommendations to the Company proposed that Meta should "report on the relative error rates and thematic consistency of determinations made through the cross check process compared with ordinary enforcement procedures." Meta refused to implement this recommendation, claiming that "it is not feasible to track this information" and that its "measurement accuracy systems are not designed to review the small number of decisions made through the cross check process."

409.   Defendants' statements identified in ¶408 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Meta to state that X-Check was used only in a "small number of decisions," as Meta itself later admitted to its Oversight Board. Contrary to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

410.   It was further materially false and misleading for the Company to state that Meta could not measure accuracy for the "the small number of decisions made through the cross-check process." Contrary to the Company's statement, Meta did track decisions made through X-Check. As the internal research later disclosed through the Facebook Files demonstrated, Defendants knew that at least 5.8 million users were shielded from enforcement of Meta's rules, and 45 global teams at Meta monitored the program. The users shielded by the program included some of the platforms most high-profile users, who posted widely-viewed content. Indeed, on October 21, 2021, Meta's own Oversight Board criticized the Company for not being "fully forthcoming in its responses on cross-check," and the Company acknowledged that its representation that X-Check applied to a "small number of decisions" could be misleading.

411.   On June 5, 2021, Defendant Clegg made the following statement to CBS News after Meta banned former President Donald J. Trump from its platform: "Whether you are the Pope, or the Queen, or the President of the United States, what we apply to everybody is you

cannot use our services to say things which we think deliberately can lead to harm."

412.    Defendants' statement identified in ¶411 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Clegg to represent that Meta applied its Community Standards and misinformation policies equally to all users. Contrary to this statement: (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

413.    Throughout the Class Period, Meta made statements that the Company was able to, and in fact did, stop its platforms from being used to facilitate and promote human trafficking. On June 10, 2021, Meta issued a statement to CBS news, claiming:

> Sex trafficking and child exploitation are abhorrent and we don't allow them on Facebook. We have policies and technology to prevent these types of abuses and take down any content that violates our rules. . . . We also work with safety groups, anti-trafficking organizations and other technology companies to address this and we report all apparent instances of child sexual exploitation to the National Center for Missing and Exploited Children.

414.    Defendants' statement identified in ¶413 above was materially false and misleading, and omitted material facts. It was materially misleading for Meta to claim that it "take[s] down any content that violates" the Company's rules prohibiting sex trafficking and child exploitation on its platforms, when, in truth, Meta failed to "fix[] systems that allowed" traffickers to operate despite extensive information concerning their activities and opportunities to remove that content. Indeed, as *The Wall Street Journal* reported, after a Meta team spent more than one year investigating human trafficking in the Middle East, an internal document warned the Company to be cautious with statements against human trafficking in order to not "alienate buyers" who used Meta's platforms. As *The Wall Street Journal* reported and Meta's internal documents noted, Meta was often more concerned with retaining users and "placating authoritarian governments" than it was with preventing human trafficking on its platforms.

415.   Moreover, the statement set forth above was materially false and misleading because it failed to disclose that Meta knowingly allowed millions of users to post harmful content on its platforms due to their status. Contrary to the Company's statements, (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

416.   On August 18, 2021, Zuckerberg appeared on Good Morning America to address concerns about misinformation surrounding COVID-19 vaccines. Host Gayle King asked Zuckerberg about the prevalence of misinformation on Facebook, asking, "I get that you all have taken down 18 million pieces of misinformation, but . . . how much misinformation have people viewed and shared? Do you have that number?" In response, Zuckerberg stated: "<u>Well, if we see harmful misinformation on the platform, then we take it down. It's against our policies</u>. So the 18 million number that I shared is the number of pieces of content that we've seen on the platform that we take down . . . that's the best number that we have in terms of what we have seen and what our systems have been able to detect."

417.   Defendants' statements identified in ¶416 above were materially misleading and omitted material facts. It was materially misleading for Defendant Zuckerberg to state that "if [Meta] see[s] harmful misinformation on the platform, then we take it down," because "It's against our policies," without disclosing that, in truth: (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

418.   Even as *The Wall Street Journal* reported that Meta exempted high-profile users from some or all of its platform rules, Meta continued to mislead investors. In a statement

published with the *Journal*'s report on September 13, 2021, Meta spokesman Andy Stone stated that X-Check "<u>was designed for an important reason: to create an additional step so we can accurately enforce policies on content that could require more understanding</u>." Stone also stated that a "<u>lot of this internal material is outdated information stitched together to create a narrative that glosses over the most important point: Facebook itself identified the issues with cross check and has been working to address them</u>."

419.    Less than two hours after that *Journal* report was published, Stone issued a series of Twitter posts, falsely claiming that the Company had fully and accurately explained the X-Check program to users on July 17, 2018 in a corporate response to a news story on cross check aired by Britain's *Channel 4 Dispatches* show, titled "Working to Keep Facebook Safe." Stone stated in his Twitter comments that X-Check "was designed for an important reason: to create an additional step <u>so we can accurately enforce policies on content that could require more understanding</u>." Stone further stated that X-Check simply "g[a]ve a second layer of review to content from high-Profile Pages or Profiles <u>to ensure correct application of our policies</u>" and assured investors that "<u>[t]here aren't two systems of justice</u>; it's an attempted safeguard against mistakes." Moreover, the July 17, 2018 response, now incorporated by reference and republished by Defendant Stone on September 13, 2021, made additional false claims concerning the X-Check program. For example, in that post, Meta stated:

> <u>We want to make clear that we remove content from Facebook, no matter who posts it, when it violates our standards. There are no special protections for any group</u>— whether on the right or the left. 'Cross Check'—the system described in *Dispatches*—simply means that some content from certain Pages or Profiles is given a second layer of review to make sure we've applied our policies correctly. . . . <u>To be clear, cross checking something on Facebook does not protect the profile, Page or content from being removed. It is simply done to make sure our decision is correct</u>.

420.    Defendants' statements identified in ¶¶418-19 above were materially false, misleading, and omitted material facts. It was materially false and misleading for Stone to claim that: (a) the Company had fully disclosed relevant facts concerning the X-Check program; (b) that there weren't "two systems of justice"; (c) Meta "remove[s] content from Facebook, no matter who posts it, when it violated our standards; and (d) that X-Check operated solely to enable Meta

to "accurately enforce policies on content that could require more understanding" and "to make sure our decision is correct." Contrary to these statements: (i) Meta purposely "built a system that has exempted high-profile users from some or all of its rules," and allowed them to "violate [Meta's] standard without any consequences"; and (ii) the X-Check and whitelisting system shielded at least 5.8 million users from enforcement of Meta's Community Standards and content moderation rules, thus allowing those users to harass other Meta platform users and spread misinformation, hate speech, incitement, and other harmful content.

**B.    False and Misleading Statements Concerning Presence and Impact of Misinformation and Harmful Content on Meta's Platforms**

421.    Throughout the Class Period, Meta made materially false and misleading statements and omissions concerning: (1) the changes to, and impact of, its algorithms on users' experiences; and (2) the nature and efficacy of its content moderation policies and decisions. After implementing significant changes to its algorithms in 2018, Meta claimed that its algorithms prioritized "meaningful social interactions" or "MSI," and that the changes the Company made to its algorithms would help Meta detect and prevent the spread of toxic content on its platforms. In truth, Meta's algorithms largely prioritized and promoted misinformation, hate speech, and other divisive and violent content. Further, Meta's responses when confronted with such content were grossly deficient and ineffective.

**1.    Defendants' False and Misleading Statements Concerning Meta's Algorithms and Harmful Content on Meta's Platforms**

422.    On April 27, 2021, the first day of the Class Period, Defendant Bickert testified at a hearing before the Senate Judiciary Committee Subcommittee on Privacy, Technology, and the Law. While discussing Meta's efforts to remove harmful content, Defendant Bickert stated:

> There are certain types of content we simply don't allow on our services. . . .and we've made significant progress identifying and removing content that violates our standards. . . . The reality is that it's not in Facebook's interest—financially or reputationally—to push users towards increasingly extreme content. The company's long-term growth will be best served if people continue to use and value its products for years to come. If we prioritized trying to keep a person online for a few extra minutes, but in doing so made that person unhappy or angry and less likely to return in the future, it would be self-defeating. Even though troubling content is a very small proportion of the total content people see on our services

(hate speech is viewed 7 or 8 times for every 10,000 views of content on Facebook), Facebook's long-term financial self-interest is to continue to reduce it so that advertisers and users have a good experience and continue to use our services.

423.    Defendants' statements identified in ¶422 were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Bickert to represent that there were "certain types of content" that Meta "simply" did not allow on its platforms, that the Company had "made significant progress identifying and removing content that violates" its standards, and that it wasn't in Meta's "interest" to "push users towards increasingly extreme content." Contrary to Meta's statements, (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) Meta's own "core product mechanics," including its algorithm, were a "significant part" of why hate speech and misinformation "flourish on the platform"; (iii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems and practices were "not remotely sufficient" to address the harms caused by the algorithm; (iv) in fact, the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; (v) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform; and (vi) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation and harmful content on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

424.    On April 28, 2021, Meta hosted its Q1 2021 earnings call after market close. During the call, Meta was asked whether Facebook's algorithm amplified "some of the more controversial content" on the platform. Defendant Zuckerberg replied, stating: "Overall, I think that the narrative that you are pointing to is dramatically overstated by critics. We do not optimize our systems to increase the amount of time spent in News Feed . . . But you should start by trying to build something that's more valuable, not by trying to increase the time that people are spending,"

Zuckerberg continued: "So we've done that for years, and I think it's yielded good results . . . I actually think <u>that our practices here are quite robust</u>. <u>And we don't want [] extremist content or any of that stuff on our services . . . we go out of our way to try to reduce that</u>."

425.    Defendants' statements identified in ¶424 were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Zuckerberg to represent that concerns about the algorithm were "dramatically overstated," that Meta's content moderation practices were "quite robust," and that Meta went "out of our way to try to reduce" "extremist content." Contrary to Meta's statements, (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) Meta's own "core product mechanics," including its algorithm, were a "significant part" of why hate speech and misinformation "flourish on the platform"; (iii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems and practices were "not remotely sufficient" to address the harms caused by the algorithm; (iv) in fact, the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; (v) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform; and (vi) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation and harmful content on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

426.    Defendant Wehner echoed Defendant Zuckerberg's statement on the call, saying that: "<u>I think more than anyone else in the industry, we invest on the safety and security side to sort of keep bad content off the site before it gets ranked and put into what people see</u>. So we've got [] over 35,000 people on the safety and security side. <u>We've got the most robust set of content policies out there</u>. We do a quarterly call, public call around our content review process and procedures. So, I think that on the front before it even gets into the algorithm, I think <u>we really do more than anyone else in the industry on the safety and security front to prevent things like</u>

misinformation and bad content going into the system in the first place." These statements were also materially misleading, and omitted material facts, for the same reasons noted directly above.

427.    Defendants Zuckerberg and Meta's May 2021 Responses to Congress, which include the answers to the questions Congress directed to Defendant Zuckerberg, included the following statement concerning the change Meta made to its algorithm in 2018:

> In fact, back in 2018, we announced a big shift in this direction knowing that people would spend less time on Facebook. Notably, we changed the way we approached News Feed rankings to focus not only on serving people the most relevant content, but also on helping them have more meaningful social interactions . . . We recognized that this shift would lead to people spending less time on Facebook . . . and we saw a loss of billions of dollars in the company's market cap. But we view this change as a success because it improved the experience of our users.

428.    The May 2021 Responses to Congress also stated that "as part of" the algorithm process, the Company had "reduce[d] the distribution of many types of content - meaning that content appears lower in a person's News Feed - for a variety of reasons, including because the content is sensational, misleading, gratuitously solicits engagement, or is found to be false by our independent fact-checking partners."

429.    In the May 2021 Responses to Congress, Defendants Zuckerberg and Meta also asserted that:

> We're taking significant steps to fight the spread of misinformation . . . Our machine learning models to find potentially violating COVID-19 and vaccine content are trained to surface content in 19 languages using a data set of known violating content originally written in each of the 19 languages . . .

430.    Meta further claimed: "Under our Misinformation and Harm policy, we remove misinformation that contributes to the risk of imminent violence or physical harm." Finally, Meta also made representations regarding its ability to remove misinformation and other content that violated its Community Standards:

> In addition to our content review teams, to enforce our Community Standards, we have introduced tools that allow us to proactively detect and remove violating content using advances in technology, including artificial intelligence, machine learning, and computer vision . . . These advances in technology mean that we can now remove bad content more quickly, identify and review more potentially harmful content, and increase the capacity of our review team.

431.    Defendants' statements from the May 2021 Responses to Congress identified in ¶¶426-30, were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants Zuckerberg and Meta to represent that the News Feed algorithm reduced "distribution" of sensational or misleading content, because, in truth,: (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) internal Meta documents made clear that the Company's changes to its algorithm had "unhealthy side effects on important slices of public content, such as politics and news"; (iii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iv) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (v) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

432.    For the same reasons, it was similarly false and misleading for Defendants Zuckerberg and Meta to state that the algorithm changes "improved the experience of our users."

433.    It was further materially misleading for Defendants Zuckerberg and Meta to state that they were "taking significant steps to fight the spread of misinformation" without disclosing that, in truth: (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful and toxic content, making them "inordinately prevalent"; (ii) internal Meta documents made clear that the Company's changes to its algorithm had "unhealthy side effects on important slices of public content, such as politics and news"; (iii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iv) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (v) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation on the platform, he refused to adopt the recommendations if changes to the

algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

434.   Additionally, the statements representing that the Company used "artificial intelligence, machine learning, and computer vision" and had "introduced tools . . . to proactively detect and remove" misinformation and toxic content were materially misleading. In fact, Meta's content detection and removal abilities, including its artificial intelligence tools, were woefully ineffective. For example, internal analysis conducted by Meta concluded that "98 per cent of the Hate Speech contents are reported reactively (i.e. by our community)" rather than detected by any of Meta's tools, including artificial intelligence. Moreover, in truth: (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iii) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (iv) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

435.   On July 28, 2021, Meta held its earnings call for the second quarter of 2021. During the call, Defendant Zuckerberg made the following statement concerning the Company's ability to identify harmful content, which was purportedly improved significantly by the Company's investment in artificial intelligence:

> But basically, we have a very large investment in AI and we built out this platform that then all of our products use. So when we make foundational improvements, it makes ranking better in News Feed and in Reels and in ads, and it makes our spam detection and our integrity systems more effective at identifying stuff. Everything just gets better. And this has really been one of the big tailwinds or waves that we've been riding.

436.   The statements identified in ¶435 above were materially misleading and omitted material facts. It was materially misleading for Defendant Zuckerberg to tout Meta's "foundational

improvements," such as its artificial intelligence investment, and to claim that those improvements made "spam detection" and "integrity systems" more effective, without disclosing that Meta's content removal abilities were woefully ineffective, including because of the way that Meta's platforms were designed on a base level. For example, contrary to the statement touting Meta's artificial intelligence capabilities, internal analysis conducted by Meta concluded that "98 per cent of the Hate Speech contents are reported reactively (i.e. by our community)" rather than by any of Meta's tools, including artificial intelligence. Moreover, in truth: (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) internal Meta documents made clear that the Company's changes to its algorithm had "unhealthy side effects on important slices of public content, such as politics and news"; (iii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iv) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (v) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

437.    Also, on July 28, 2021, LeCun refuted a Twitter user's assertion that Facebook "is undermining the foundation of the American democracy by letting truth be flooded with misinformation," responding, "Social networks are scapegoats for society's ills. Do you have data to back up your claim? . . . You might want to consider the fact that for every person who encounters a conspiracy theory on FB, hundreds actually learn scientifically correct facts. . . . You may claim the FB amplifies ideas you disagree with, but it's simply false."

438.    Defendants' statements identified in ¶437 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant LeCun to state that it was "simply false" that Facebook amplified misinformation without disclosing that (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful

and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) internal Meta documents made clear that the Company's changes to its algorithm had "unhealthy side effects on important slices of public content, such as politics and news"; (iii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iv) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (v) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

439.    On July 29, 2021, during an interview with Freedom House, a pro-democracy organization, Defendant Clegg was asked: "Nick, some people say you're really not interested in ending the, the controversy and the um, the very inflammatory content because it makes you money. So what's the greater interest for Facebook? Is it money, or is it democracy?" Clegg stated:

> I, I, flatly and vigorously reject this idea that Facebook has an incentive to spoon feed people sort of addictive extreme violent unpleasant hateful content. Why on earth would we want to do that? If we were to do that, people would not continue to use Facebook in five years' time, 10 years' time, 15 years' time. We know from our own research that if you want people to use Facebook for the long term, which we have a business interest in doing, we're, we're not interested in having someone addicted to using Facebook for 20 extra minutes we want this, this social media experience to be a wholesome meaningful one for the next 20 years . . . And that's why we take down as much hate, hateful speech . . . We, we, we catch the vast majority of it before anyone reports it to us . . . the idea that we have an incentive to prioritize this, is I think one of the most misleading allegations of, of uh, that the numerous critics that social media has these days.

440.    Defendants' statements identified in ¶439 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Clegg to state that it catches the "vast majority" of hate speech "before anyone reports it." Internal analysis conducted by Meta concluded that "98 per cent of the Hate Speech contents are reported reactively (i.e. by our community)" rather than by any of Meta's tools, including artificial

intelligence. Indeed, Meta's ability to "catch" hate speech and other harmful content was grossly overstated by the Company, as its own algorithm enable such speech to proliferate, and it removed only a tiny fraction of hate speech on Facebook. Contrary to Meta's statements, (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) internal Meta documents made clear that the Company's changes to its algorithm had "unhealthy side effects on important slices of public content, such as politics and news"; (iii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iv) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (v) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

441.    It was also materially misleading to state that Meta had no "incentive" to tolerate the proliferation of hate speech and other harmful content, without disclosing that, in fact, Meta had an incentive to tolerate such content in order to increase and maintain engagement. Indeed, as noted directly above, when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of harmful content on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement, thereby prioritizing engagement over the reduction of misinformation and harmful content.

442.    During the Freedom House Interview, the host posed the following question to Defendant Clegg: "There are people who study the issue of disinformation, who say that Facebook itself hasn't studied it closely enough, that you [inaudible] don't understand yet exactly how it is that it spread so far and so fast. Valid criticism?" Clegg responded by representing that external research regarding misinformation was inconclusive:

. . . The idea that there is always a causal link between social media and polarization is not true . . . the research, and again this is what all independent researchers since

you quite rightly laid such emphasis on them, have shown that oddly enough because most people on Facebook have a range of friends who you know stretch from childhood friends to you know work uh colleagues, to people they played sports with. You tend to have a more heterogeneous and mixed ideological composition of your friends on Facebook than you do if you read the same partisan newspaper or watch the same cable TV or news outlet. So social media is not as narrow in terms of its ideological diet. This is what independent researchers have, have, have proven that is often asserted.

443.     Defendants' statements identified in ¶442 above were materially false and misleading, and omitted material facts. It was materially misleading for Defendant Clegg to state that independent research showed that social media tends not to spread disinformation because people "tend to have a more heterogeneous and mixed ideological composition" of friends on Facebook, without disclosing that the Company's own research demonstrated that: (i) the Company's algorithm amplified, rather than reduced, misinformation as well as harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) internal Meta documents made clear that the Company's changes to its algorithm had "unhealthy side effects on important slices of public content, such as politics and news"; (iii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iv) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (v) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of misinformation on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement on the platform, thereby prioritizing engagement over the reduction of misinformation and harmful content.

## 2.     Additional False and Misleading Statements Concerning Meta's Ability and Willingness to Moderate Misinformation and Harmful Content on Its Platforms

444.     Throughout the Class Period, Defendants made additional false and misleading statements and omissions regarding Meta's ability and willingness to enforce its Community Standards prohibiting toxic content and misinformation.

445.     In the May 2021 Responses to Congress, providing answers to the questions addressed to Defendant Zuckerberg, Defendants Zuckerberg and Meta stated:

---

1
2
3
4
5
6
7

<u>Our Dangerous Organizations and Individuals policy prohibits content calling for or advocating violence, and we ban organizations and individuals that proclaim a violent mission. We believe this policy has long been the broadest and most aggressive in the industry</u>. In August 2020, we expanded this policy further to address militarized social movements and violence-inducing conspiracy networks, such as QAnon. And in October of last year, we began removing any Facebook Pages, Groups, or Instagram accounts representing QAnon, regardless of whether they contained violent content. To date, we've banned over 250 white supremacist groups and have been enforcing our rules that prohibit QAnon and militia groups from organizing on our platform. <u>We have also continued to enforce our ban on hate groups</u>, including the Proud Boys and many others.

8
9
10
11
12
13
14
15

446.    The statements identified in ¶445 above were materially misleading and omitted material facts. It was materially misleading to emphasize the purported efficacy of the Company's responses to hate groups and groups that advocated violence without disclosing that (i) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; (ii) Meta's own "core product mechanics," including its algorithms, were a "significant part" of why hate speech and misinformation "flourish on the platform"; and (iii) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

16
17
18
19

447.    Defendants Zuckerberg and Meta made additional false and misleading statements in the May 2021 Responses to Congress. In response to questions about its 2020 Annual Report and the Company's disclosures around the risk of user loss and content moderation, the Company said the following regarding extremist content:

20
21
22
23
24

Billions of people use Facebook and Instagram because they have good experiences; they don't want to see hateful and violent content, our advertisers don't want to see it, and we don't want to see it. <u>There is no incentive for us to do anything but remove it . . . We remove language that incites or facilitates violence, and we ban groups that proclaim a hateful and violent mission from having a presence on our apps</u>. We also remove content that represents, praises, or supports those groups . . .

25
26

[W]e have been enforcing our rules that prohibit QAnon and militia groups from organizing on our platform. We have also continued to enforce our ban on hate groups, including the Proud Boys and many others.

27
28

We also recognize the importance of keeping violent and hateful content out of Groups and have taken <u>strong and decisive actions</u> to work towards that goal . . .

448.    Defendants' statements identified in ¶447 above were materially false and

misleading, and omitted material facts. It was materially false and misleading for Defendants Zuckerberg and Meta to state that Meta removed "language that incites or facilitates violence," and banned "groups that proclaim a hateful and violent mission." Contrary to Defendants' statements, (i) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; (ii) Meta's own "core product mechanics," including its algorithms, were a "significant part" of why hate speech and misinformation "flourish on the platform"; and (iii) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

449.    It was further materially misleading for Defendants Zuckerberg and Meta to state that the Company took "strong and decisive" actions to remove toxic content without disclosing that (i) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; (ii) Meta's own "core product mechanics," including its algorithms, were a "significant part" of why hate speech and misinformation "flourish on the platform"; and (iii) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

450.    On May 19, 2021, Meta published its Community Standards Enforcement Report for the First Quarter of 2021. The report included the following statement regarding Meta's ability to detect and remove harmful content on its platforms:

> We evaluate the effectiveness of our enforcement by trying to keep the prevalence of hate speech on our platform as low as possible, while minimizing mistakes in the content that we remove. This improvement in prevalence on Facebook is due to changes we made to reduce problematic content in News Feed.
>
> Advancements in AI technologies have allowed us to remove more hate speech from Facebook over time, and find more of it before users report it to us . . . Today we proactively detect about 97% of hate speech content we remove.

451.    That day, Meta also hosted a conference call to discuss its Community Standards Enforcement Report for the first quarter of 2021. During the call, Guy Rosen, Meta's Vice President of Integrity, stated: "[H]ate speech prevalence on Facebook continues to decrease, as a downward trend three quarters in a row. When we first reported this number in Q3 of last year, it was between .10 to .11 percent. In Q4, it fell to between .07 to .08 percent and in this most recent

quarter, Q1, <u>it is now between .05 to .06 percent. This improvement and prevalence on Facebook is due to changes we continue to make to reduce problematic content in newsfeed</u>."

452.    Defendants' statements identified in ¶¶450-51 above were materially misleading and omitted material facts. It was materially misleading for Meta to state that (a) Meta proactively aimed to keep the rate of hate speech on its platform "as low as possible"; (b) the Company detected "about 97% of hate speech content"; and (c) that Meta "hate speech prevalence" on Facebook was less than one tenth of one percent "due to changes" to News Feed, without disclosing that, in truth, (i) the Company's algorithm amplified, rather than reduced, harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iii) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; (iv) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of harmful content on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement; and (v) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

453.    Moreover, it was materially misleading for Defendants to state that "Advancements in AI technologies" allowed Meta to "proactively detect about 97% of hate speech content we remove." In truth, internal analysis conducted by Meta concluded that "98 per cent of the Hate Speech contents are reported reactively (i.e. by our community)" rather than by any of Meta's tools, including artificial intelligence.

454.    On May 26, 2021, Defendants held their Annual Shareholders Meeting. During the meeting, Defendants opposed a proxy proposal that would have required Meta to take additional steps to address hate speech and violent content on its platform. During the meeting, a Meta spokesperson told shareholders that "our position on each proposal has already been set forth in the proxy statement." In that proxy statement, which Meta incorporated by reference during the Annual Shareholders Meeting, the Board stated that the proposal was "unnecessary and not

beneficial" to shareholders "[g]iven our efforts and transparency around our actions to counter platform misuse." The Board said that the Company "remove[s] information that breaks our rules on violence, bullying, and harassment, and the other areas outlined in Facebook's Community Standards." Meta also made additional statements concerning changes it made to reduce hate speech and violent content:

> This was one of many changes that we have made to News Feed to try and minimize the amount of divisive content that people see. We have reduced clickbait headlines, reduced links to misleading and spam posts, and improved how comments are ranked to show people those that are more relevant and of higher quality. In addition to these measures to reduce the distribution of this type of problematic content, we also remove content when we find that such content violates our Community Standards or one of our other policies, and we give people more information about the posts they see in News Feed, including information about why they are seeing a particular post and notifications with additional context on the source of certain news and other content.

455.     Defendants' statements identified in ¶454 above were materially false, misleading, and omitted material facts. It was materially false and misleading for Defendants to state that the changes to News Feed were aimed at "minimiz[ing] the amount of divisive content that people see," and that they "remove content when we find that such content violates our Community Standards or one of our other policies" Contrary to Meta's statements, (i) Meta's algorithms promoted divisive content; (ii) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (iii) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

456.     It was further materially misleading for Meta to state that the Company had made changes to "minimize" divisive content without disclosing that (i) Meta's algorithms promoted divisive content, allowing it to "flourish" and become "inordinately prevalent"; (ii) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (iii) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

457.     Later during the May 26, 2021, Annual Shareholders Meeting, an analyst asked when Meta was "going to become more user-focused specifically when users submit concerns about their account's marketing overload, et cetera?" Defendant Zuckerberg responded, stating:

"Sure, I can talk about this. As I mentioned upfront, customer support is going to be an increasing focus for us. And for the last several years, our team that has been focused on kind of trust and safety overall, has been more focused on content moderation, so making sure that we can identify harmful content and take it down and also working on making sure that we continue improving privacy and supporting and providing world-class controls there."

458.    Defendants' statements identified in ¶457 above were materially misleading and omitted material facts. It was materially misleading for Defendant Zuckerberg to state that the Company was "focused" on "trust and safety overall" without disclosing that (i) the Company's algorithm amplified, rather than reduced, harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iii) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; (iv) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of harmful content on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement; and (v) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

459.    On May 26, 2021, Meta published an article on its website titled *Taking Action Against People Who Repeatedly Share Misinformation*. In this article, Meta announced that it was "launching new ways to inform people if they're interacting with content that's been rated by a fact-checker as well as taking stronger action against people who repeatedly share misinformation on Facebook." The Company went on: "Whether it's false or misleading content about COVID-19 and vaccines, climate change, elections or other topics, we're making sure fewer people see misinformation on our apps." Meta stated that since "launching our fact-checking program in late 2016, our focus has been on reducing viral misinformation. We've taken stronger action against Pages, Groups, Instagram accounts and domains sharing misinformation and now, we're expanding some of these efforts to include penalties for individual Facebook accounts too."

460.    Defendants' statements identified in ¶459 above were materially misleading and

omitted material facts. It was materially misleading for Meta to state that it was "making sure fewer people" saw misinformation on its apps and that it had "taken stronger action" against accounts sharing misinformation, without disclosing that, in truth, (i) the Company's algorithm amplified, rather than reduced, harmful and toxic content, allowing them to "flourish" and making them "inordinately prevalent"; (ii) after the 2018 News Feed algorithm changes, internal research showed that Meta's systems were "not remotely sufficient" to address the harms of the algorithms; and (iii) when Defendant Zuckerberg was presented with proposals to address the algorithm's negative side-effects and reduce the spread of harmful content on the platform, he refused to adopt the recommendations if changes to the algorithm would decrease levels of user engagement.

461.   On August 18, 2021, Meta released its Community Standards Enforcement Report for the second quarter of 2021. In its report, Meta stated that it had "removed 31.5 million pieces of hate speech content from Facebook, compared to 25.2 million in Q1, and 9.8 million from Instagram, up from 6.3 million in Q1. This is due to continued improvement in our proactive detection. Our investments in AI enable us to detect more kinds of hate speech violations on Facebook and Instagram." On the website where Meta published this report, the Company also stated that the "[p]revalence of hate speech has decreased for three quarters in a row since we first began reporting it. This is due to improvements in proactively detecting hate speech and ranking changes in News Feed."

462.   Defendants' statements identified in ¶461 above were materially misleading and omitted material facts. It was materially misleading for Defendants to state that Meta "removed 31.5 million pieces of hate speech content from Facebook" and that the prevalence of hate speech had decreased due to "AI" and "improvements in proactively detaching hate speech," without disclosing that Meta's content detection and removal abilities, including its artificial intelligence tools, were woefully ineffective. For example, internal analysis conducted by Meta concluded that "98 per cent of the Hate Speech contents are reported reactively (i.e. by our community)" rather than detected by any of Meta's tools, including artificial intelligence. Moreover, in truth: (i) Meta's algorithms promoted divisive content and allowed it to flourish on Meta's platforms; (ii) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting

content] on Facebook"; and (iii) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

463.    On August 18, 2021, Defendant Zuckerberg appeared on Good Morning America to address concerns about misinformation surrounding COVID-19 vaccines. Host Gayle King asked Zuckerberg about the prevalence of misinformation on Facebook, asking, "I get that you all have taken down 18 million pieces of misinformation, but . . . how much misinformation have people viewed and shared? Do you have that number?" In response, Zuckerberg concealed that Meta's algorithms promoted such content, and that its content moderation practices were severely deficient, stating: "Well, if we see harmful misinformation on the platform, then we take it down. It's against our policies. So the 18 million number that I shared is the number of pieces of content that we've seen on the platform that we take down . . . that's the best number that we have in terms of what we have seen and what our systems have been able to detect."

464.    Defendants' statements identified in ¶463 above were materially misleading and omitted material facts. It was materially misleading for Defendant Zuckerberg to state that "if [Meta] see[s] harmful misinformation on the platform, then we take it down," because it was "against our policies," without disclosing that, in truth Meta's algorithms promoted divisive content, allowing it to "flourish" and become "inordinately prevalent," and that Meta's content interventions were severely deficient.

465.    After *The Wall Street Journal* began to publish the *Facebook Files*, Meta issued a series of statements intended to quell market concern and mitigate the negative impact of the reporting on the Company and its stock price. On Saturday, September 18, 2021, Defendant Clegg posted a statement on Meta's corporate website, titled *What the Wall Street Journal Got Wrong*. Defendant Clegg claimed that the *Journal*'s reporting "contained deliberate mischaracterizations of what we are trying to do, and conferred egregiously false motives to Facebook's leadership and employees." Clegg went on to deny the idea that Meta had buried internal research:

> At the heart of this series is an allegation that is just plain false: that Facebook conducts research and then systematically and willfully ignores it if the findings are inconvenient for the company. This impugns the motives and hard work of thousands of researchers, policy experts and engineers at Facebook who strive to improve the quality of our products, and to understand their wider (positive and

negative) impact. It's a claim which could only be made by cherry-picking selective quotes from individual pieces of leaked material in a way that presents complex and nuanced issues as if there is only ever one right answer.

466.   On October 2, 2021, *The New York Times* published an article titled *Whistle-Blower to Accuse Facebook of Contributing to Jan. 6 Riot, Memo Says*. This article quoted an internal memo authored by Defendant Clegg on October 1, 2021, and sent to Meta employees, in which he stated: "I want to be absolutely clear: we work to limit, not expand hate speech, and we have clear policies prohibiting content that incites violence. We do not profit from polarization, in fact, just the opposite. We do not allow dangerous organizations, including militarized social movements or violence-inducing conspiracy networks, to organize on our platforms. And we remove content that praises or supports hate groups, terrorist organizations and criminal groups."

467.   On October 5, 2021, after Frances Haugen testified before Congress, Defendant Zuckerberg addressed her testimony. Speaking publicly for the first time since *The Wall Street Journal* began reporting on Defendants' fraud, Defendant Zuckerberg issued a statement on his public Facebook account claiming that a "false picture of the company" was "being painted." Zuckerberg continued:

> At the heart of these accusations is this idea that we prioritize profit over safety and well-being. That's just not true. For example, one move that has been called into question is when we introduced the Meaningful Social Interactions change to News Feed. This change showed fewer viral videos and more content from friends and family — which we did knowing it would mean people spent less time on Facebook, but that research suggested it was the right thing for people's well-being. Is that something a company focused on profits over people would do?

> The argument that we deliberately push content that makes people angry for profit is deeply illogical. We make money from ads, and advertisers consistently tell us they don't want their ads next to harmful or angry content. And I don't know any tech company that sets out to build products that make people angry or depressed. The moral, business and product incentives all point in the opposite direction.

468.   Defendants' statements identified in ¶¶465-67 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants to represent that Meta (a) did not "systematically and willfully" ignore its internal research; (b) did not "profit from polarization"; and (c) removed "content that praises or supports hate groups, terrorist organizations and criminal groups." Contrary to Defendants' statements, (i) Meta

possessed extensive research showing that its algorithms promoted divisive content and allowed it to flourish on Meta's platforms; (ii) the Company took action against "as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook"; and (iii) 99% of users identified as repeat offenders of Meta's hate speech policies were allowed to remain active on the platform.

469.    Further, it was, at minimum, materially misleading to assert that Meta did not "prioritize profit over safety and well-being," when in truth, Meta designed its algorithms with specific incentives built into the system that operated to drive engagement (and profit) at the expense of safety. For instance, when Defendant Zuckerberg was presented with proposals to reduce the spread of misinformation on the platform, he refused to adopt the recommendations if changes to the News Feed algorithm would decrease levels of user engagement, thereby prioritizing engagement over the reduction of misinformation and harmful content. As Frances Haugen explained during an interview with the *Journal*, Meta was "trading off very small decreases in engagement for huge consequences in misinformation and hate speech and violence."

### C.    False and Misleading Statements Denying Instagram's Harm to Young Users

470.    Throughout the Class Period, Defendants made false and misleading statements and omissions concerning the effects that Meta's platforms, particularly Instagram, had on young users, and what Meta's internal research showed about these effects.

471.    On May 11, 2021, a Twitter user asked Defendant Mosseri, "[D]o you believe social media is good for children under 13?" Mosseri responded, "This is *the* question. The reality is there's little existing research, which means there will be strong differing opinions."

472.    Defendants' statements identified in ¶471 above were materially false and misleading, and omitted material facts. It was false and misleading for Defendant Mosseri to state that "the reality" was that there was "little existing research" regarding whether social media was good for children under the age of thirteen, while concealing that Meta had conducted extensive research on the impact of social media on young people, and this research showed that Instagram had significant negative impacts on young users' well-being. Meta's non-public internal research showed, among other things, that "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative

effects caused by Instagram included (i) exacerbating body image issues for one in three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls.

473.    On May 19, 2021, Defendants issued Meta's Community Standards Enforcement Report for the first quarter of 2021. In that report, Meta stated, "We remove content that encourages suicide or self-injury on Facebook and Instagram."

474.    Defendants' statement identified in ¶473 above was materially misleading and omitted material facts. Specifically, it was materially misleading for Meta to claim that it "remove[d] content that encourages suicide or self-injury" without disclosing that internal Meta research indicated that 13.5% of teen girls said Instagram usage (and thus, exposure to content on the platform), made thoughts of "Suicide and Self Injury worse."

475.    On May 24, 2021, Defendant Mosseri was interviewed on *The Information*. During that interview, Mosseri referred to "external research" and suggested that Meta's internal research on well-being was inconclusive, stating that Meta "tried to measure the effect of hiding likes on people's actual wellbeing," but that "[w]ellbeing is hard to measure," "more of like a judgment call," and "a bit subjective." Defendant Mosseri also stated that Meta's ability to conduct research on this topic was limited by "real-world outcomes like longevity or success in the workplace."

476.    Defendants' statements identified in ¶475 above were materially misleading and omitted material facts. It was materially misleading for Defendant Mosseri to state that the Company "tried to measure" the well-being, and to represent that it was "hard to measure" and "subjective," without disclosing that Meta's non-public internal research showed that "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included: (i) exacerbating body image issues for one in three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls.

477.    On May 26, 2021, Defendants introduced "Project Daisy" in an announcement

called "Giving People More Control on Instagram and Facebook." In that announcement, Meta referenced external research it used, stating, "<u>We've been working closely with third-party experts to better understand how to empower people, build self-awareness and shape a more positive experience on Instagram</u>. . . . We're also funding more external research about people's experiences on Instagram, and how we can improve our policies and products to support our community."

478.    Defendants' statements identified in ¶477 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants to represent that Project Daisy was part of an effort to "shape a more positive experience on Instagram." Contrary to Defendants' statement, by December 2020, Meta had concluded that the measures proposed for Project Daisy did not result in any improvement to "overall well-being measures." Despite this, Meta continued to tout Project Daisy as part of its commitment to children's well-being because the program "could make them look good" in the public eye and, as research presented to Defendant Zuckerberg indicated, "A Daisy launch would be received by the press and parents as a strong positive indication that Instagram cares about its users, especially taken alongside other press-positive launches."

479.    On May 26, 2021, *The Wall Street Journal* published an article titled "Facebook, Instagram to Allow Users to Hide 'Likes.'" The *Journal* reported that Mosseri "<u>said that concerns about Facebook's overall impact on its users' well-being are likely overblown, but said that Instagram was committed to studying it</u>." As reported by the *Journal*, Mosseri further stated, "<u>We're going to continue to try and work with external academics and researchers</u>."

480.    Defendants' statements identified in ¶479 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Mosseri to claim that concerns about "Facebook's overall impact on its users' wellbeing [were] likely overblown." Contrary to Defendants' statement, Meta's non-public internal research showed that "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included: (i) exacerbating body image issues for one in three teen girls; (ii) negative social

comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls.

481.   It was further materially misleading for Defendant Mosseri to state that "Instagram was committed to studying it," and that "[w]e're going to continue try and work with external academics and researchers," without disclosing that Meta itself had conducted extensive internal research on this issue, and this research demonstrated that Instagram caused common and severe harms to young users.

482.   On May 26, 2021, Defendant Mosseri was interviewed by several journalists. Discussing the impact of Instagram on the mental health of teenage girls, Mosseri downplayed the negative effects of the platform, referencing external research and saying it showed the impact of Instagram was insignificant. Of the findings of the research, Mosseri stated that: "It's facts stated the bi-directional, so small effects positive and small effects negative but it's quite small." Defendant Mosseri reiterated, "There's a lot of good that comes with what we do."

483.   Defendants' statements identified in ¶482 above were materially false and misleading, and omitted material facts. It was misleading for Defendant Mosseri to cite external research in stating that the negative effects of Instagram on teenage girls were "quite small" and that Instagram causes "a lot of good," without disclosing that Meta had conducted extensive internal research on this issue, and this research demonstrated that Instagram caused common and severe harms to young users. Contrary to Defendants' statement, Meta's non-public internal research showed that "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included (i) exacerbating body image issues for one in three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls.

484.   On May 26, 2021, Defendants held their Annual Shareholders Meeting. During the meeting, Meta opposed a proxy proposal which would have required Meta to take additional

actions to address child exploitation on its platforms. During the meeting, a Meta spokesperson told shareholders that "our position on each proposal has already been set forth in the proxy statement." In that proxy statement, which Meta incorporated by reference during the Annual Shareholders Meeting, Meta stated that no such action was necessary because the Company had "<u>robust policies to help protect against child exploitation and content or behavior on our platform that puts the safety of children at risk</u>."

485.    Defendants' statement identified in ¶484 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants to state that no additional measures to protect children were necessary because of Meta's "robust policies to help protect against . . . content . . . that puts the safety of children at risk," without disclosing that Meta's research demonstrated that Instagram had significant harmful impacts on young users' health. Contrary to Meta's statements, Meta's non-public internal research showed that "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included (i) exacerbating body image issues for one in three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls. Moreover, as noted above, Meta's internal research showed that the mechanics of Instagram operated to addict young people to the platform, such that they wouldn't stop using it even when they were experiencing harmful impacts.

486.    On July 27, 2021, Meta issued an announcement titled "Giving Young People a Safer, More Private Experience on Instagram." In this announcement, Meta claimed to prioritize the safety and privacy of young users, stating, "<u>We want young people to enjoy using Instagram while making sure we never compromise on their privacy and safety</u>. We'll continue listening to young people, parents, lawmakers and other experts to build an Instagram that works for young people and is trusted by parents."

487.    Defendants' statement identified in ¶486 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants to

represent that Meta "never compromise[d]" the "privacy and safety" of young users without disclosing that Meta's own research demonstrated that Instagram had significant harmful impacts on young users' health. Indeed, contrary to Defendants' statement, young users' safety was compromised for years on Instagram. Meta's non-public internal research showed that, in truth, "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included: (i) exacerbating body image issues for one in three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls. Moreover, as noted above, Meta's internal research showed that the mechanics of Instagram operated to addict young people to the platform, such that they wouldn't stop using it even when they were experiencing harmful impacts.

488.   On July 27, 2021, Meta published a blog post titled "How Do We Know Someone Is Old Enough to Use Our Apps?" In it, Meta's then-VP of Youth Products, Pavni Diwanji, claimed that Meta had "convened a group of experts in the fields of online safety, child development and children's media to share their expertise, research and guidance." This resulted in a "comprehensive plan" by Meta to address child safety and well-being. Meta described itself as "fortunate to draw from multiple industry experts, organizations and bodies of research here," and stressed that Meta is "committed to working with experts and the broader industry" regarding the safety of young users.

489.   Defendants' statements identified in ¶488 above were materially misleading and omitted material facts. It was materially misleading for Defendant Diwanji and Meta to tout the Company's work with "industry experts, organizations and bodies of research" without disclosing that Meta had conducted extensive internal research regarding safety issues affecting young users, and that research demonstrated that Instagram had severe negative impacts on young users' well being. Meta's non-public internal research showed that "Content on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included: (i) exacerbating body image issues for one in

three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls.

490.    On August 4, 2021, Senators Richard Blumenthal and Marsha Blackburn wrote a letter to Defendant Zuckerberg, demanding that Meta release internal research regarding the impact of its platforms on the mental health and well-being of teenagers. The letter specifically asked Defendant Zuckerberg if "Facebook research ever found that its platforms and products can have a negative effect on children's and teens' mental health or well-being." In response, Defendants Zuckerberg and Meta claimed that it was "not aware of a consensus among studies of experts about how much screen time is 'too much.'"

491.    Defendants' statement identified in ¶490 above was materially misleading and omitted material facts. It was materially misleading for Zuckerberg and Meta to state that it was "not aware of a consensus among studies of experts about how much screen time is 'too much,'" without disclosing that Meta's non-public internal research demonstrated that Instagram had severe negative impacts on young users' mental health and well-being, including that "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included (i) exacerbating body image issues for one in three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls.

492.    Even as *The Wall Street Journal* reported in the Facebook Files that Meta had extensively documented Instagram's negative impacts on young users, Meta continued to issue false and misleading statements designed to calm investors and negate the impact on Meta's stock. After *The Wall Street Journal* published the September 14, 2021, *Facebook Files* article, Karina Newton, Instagram's Head of Public Policy, published an official blog on Meta's website responding to the *Journal*'s article. Newton stated: "while the [September 14 Facebook File] focuses on a limited set of findings and cast them in a negative light, we stand by this research." Instagram's blog continued, stating: "social media isn't inherently good or bad for people."

Newton's full statement, excerpted in greater detail above at ¶298, contained a number of assertions representing that Meta's research into Instagram's impacts on young users was unreliable, incomplete, and in any event showed many strong positive impacts.

493.    On September 26, 2021, Meta published an article on the Company's Newsroom website. In that article, Meta attempted to rebut the claims made in the *Journal*'s article concerning teenage girls and the internal Meta documents. Meta claimed that "among those same girls who said they were struggling with body image issues, 22% said that using Instagram made them feel better about their body image issues and 45.5% said that Instagram didn't make it either better or worse (no impact)."

494.    Defendants' statements identified in ¶¶492-93 above were materially false, misleading, and omitted material facts. It was materially false and misleading for Defendants to claim that Instagram was not "inherently good or bad for people" and that Instagram made body image issues "better" for teenage girls. Contrary to Defendants' statements, Meta's non-public internal research showed that "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included (i) exacerbating body image issues for one in three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls. Moreover, as noted above, Meta's internal research showed that the mechanics of Instagram operated to addict young people to the platform, such that they wouldn't stop using it even when they were experiencing harmful impacts.

495.    On September 30, 2021, Meta Head of Safety Antigone Davis testified on behalf of the Company before the United States Senate Committee on Commerce, Science, and Transportation during a hearing named "Protecting Kids Online: Facebook, Instagram, and Mental Health Harms." During her testimony, Davis made a number of false and misleading statements concerning Meta's internal research and the impact of Instagram on teenage girls. For example, Davis claimed that

> [t]he research shows that many teens, that Instagram is helping them with hard issues that are so common to being a teen. In fact, one of the main slides referenced

in the article includes a survey of 12 difficult and serious issues like loneliness, anxiety, sadness, and eating disorders. We asked teens who told us that they were struggling with these issues, whether Instagram was making things better, worse, or having no effect. <u>On 11 of the 12 issues, teen girls who said they struggled with those issues were more likely to say that Instagram was affirmatively helping them not making it worse.</u>

496.    During her testimony, Davis continued to make false and misleading statements suggesting that Instagram was beneficial to teenage girls' mental health. Davis testified, "I think what's been lost in this report is that in fact <u>with this research we found that more teen girls actually find Instagram helpful. Teen girls who are suffering from these issues find Instagram helpful than not</u>."

497.    Senator Ben Ray Luján posed the following question to Davis while she testified: "Yes or no, does Facebook have internal research indicating that Instagram harms teens, particularly harming perceptions of body image, which disproportionately affects girls?" Davis falsely responded, "<u>What our research showed was that for people who are struggling with these issues, that actually more of them found their engagement on Instagram helpful than harmful.</u> And in fact, of the 12 issues that we looked at, 11 of those were the case for young girls, and 12 of 12 for teen boys."

498.    Later, Senator Lummis referred to the March 2021 Congressional hearing regarding the impact of social media on children's mental health. During that hearing, Defendant Zuckerberg stated, "The research that we've seen is that using social apps to connect with other people can have positive mental health benefits." Davis reiterated this notion, stating that "<u>the research showed that many more people, actually more teens, found the Instagram use helpful when they were struggling with these particular issues.</u> Our research is not bombshell research. It's research that is [inaudible]. It's a similar research out of Harvard, out of Pew, out of Berkeley. That doesn't mean we don't take it seriously. We do this research to improve our product, to make our products better for young people, to provide them with a positive experience. <u>Right now, young people tell us, eight out of 10, tell us that they have a neutral or positive experience on our app.</u> We want that to be 10 out of 10. If there's someone struggling on our platforms, we want to build product changes to improve their experience and help support them."

499.    Defendants' statements identified in ¶¶495-98 above were materially false, misleading, and omitted material facts. It was materially false and misleading for Meta to represent that Instagram was beneficial to teenagers' mental health. Meta's internal research showed precisely the opposite. Contrary to Defendants' statements, Meta's non-public internal research showed that "[c]ontent on [Instagram] makes teens feel very bad" and negative effects of Instagram on teenage girls were both "common" and "severe." The negative effects caused by Instagram included (i) exacerbating body image issues for one in three teen girls; (ii) negative social comparison by two thirds of teen girls using Instagram; (iii) worsening effects of eating disorders for almost one in five teenage girls; and (iv) increased rates of self-injury and suicide in teenage girls.

500.    During her testimony, Davis also claimed that Instagram was not addictive, stating, "So I disagree with calling our product addictive... one of the things actually that we've done to actually to try to address that, is to make people aware of how much time they're spending. There's a dashboard where they can see it. They can actually set a reminder to let them know that they've been on so that they'll get off. In addition, we're looking at something called take a break, which would prompt somebody when they've been on to take a break."

501.    Defendants' statements identified in ¶500 above were materially false, misleading, and omitted material facts. It was materially false and misleading for Meta to represent that Instagram was not addictive. Contrary to Defendants' statement, internal Meta documents indicated that teens "often feel 'addicted' and know that what they're seeing is bad for their mental health but feel unable to stop themselves." As Haugen explained, Meta designed Instagram to be addictive through the use of "dopamine loops."

502.    Indeed, several of the Senators who were present for Ms. Davis' testimony later noted that Ms. Davis had tried to "minimize the information" in Meta's internal documents and "minimize the knowledge" that Meta had of the harmful effects of Instagram on teens. For example, during Frances Haugen's testimony on October 5, 2021, Senators repeatedly noted that Davis' testimony was inaccurate or evasive. For instance, Senator Blumenthal stated concerning Defendant Davis' testimony: "Last Thursday, the message from Ms. Antigone Davis, Facebook's

Global Head of Safety was simple, 'This research is not a bombshell.' and she repeated the line, not a bombshell. Well, this research is the very definition of a bombshell. Facebook and big tech are facing a big tobacco moment, a moment of reckoning, the parallel is striking." Later, Senator Blackburn noted Defendant Davis' attempts to downplay Meta's knowledge and internal research: "Now, as the Chairman mentioned, last week we heard from Mrs. Davis who heads global safety for Facebook. And it was surprising to us that what she tried to do was to minimize the information that was in these documents, to minimize the research and to minimize the knowledge that Facebook had."

### D. False and Misleading Statements Representing that Meta's Metrics for Counting Users Were Accurate and Reliable

503. Throughout the Class Period, Meta made false and misleading statements and omissions concerning its user growth rates and the prevalence of duplicate accounts, known as SUMA, on its platform.

504. On April 29, 2021, Meta released its Form 10-Q for the first quarter of 2021, which was signed by Defendants Zuckerberg and Wehner. In its quarterly filing, Meta made the following statements regarding the increase in active users on Facebook: (i) "Facebook daily active users (DAUs) were 1.88 billion on average for March 2021, an increase of 8% year-over-year"; (ii) "Facebook monthly active users (MAUs) were 2.85 billion as of March 31, 2021, an increase of 10% year-over-year"; (iii) "Family daily active people (DAP) was 2.72 billion on average for March 2021, an increase of 15% year-over-year"; (iv) "Family monthly active people (MAP) was 3.45 billion as of March 31, 2021, an increase of 15% year-over-year"; and (v) "Worldwide DAUs increased 8% to 1.88 billion on average during March 2021 from 1.73 billion during March 2020."

505. Defendants' statements identified in ¶504 above were materially false and misleading and omitted material facts. Specifically, the growth rates reported by Meta were artificially inflated. Meta's internal research indicated that the rate of single users with multiple accounts was "very prevalent" among newly created accounts. In particular, Meta's research stated that between 32% and 56% of new accounts were created by existing users—which was multiples greater than the 11% estimate that Meta disclosed. Because the prevalence of duplicate accounts

among new users was three to five times higher than publicly disclosed, Meta's DAU growth rates noted above were really 4-6%, meaning the reported 8% DAU growth was inflated by 25-50%. Meta's MAU growth rates were really 4-7%, meaning the reported 10% MAU growth was inflated by 30-60%.

506.    Defendants' Form 10-Q also included the following statement regarding Meta's estimate of the prevalence of SUMA or duplicate accounts:

> Duplicate and false accounts are very difficult to measure at our scale, and <u>it is possible that the actual number of duplicate and false accounts may vary significantly from our estimates.</u>

> In the fourth quarter of 2020, we estimated that duplicate accounts may have represented approximately 11% of our worldwide MAUs. <u>We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets.</u>

507.    Defendants' statements identified in ¶506 above were materially misleading and omitted material facts. It was materially misleading for Meta to represent that it was "possible" that the number of duplicate accounts "<u>may</u> vary significantly", without disclosing that Meta's internal research demonstrated that the rate of single users with multiple accounts <u>did</u> vary significantly from the 11% figure, and was in fact "very prevalent," among newly-created accounts. Specifically, Meta's research stated that between 32% and 56% of new accounts were created by existing users, vastly in excess of the 11% Meta disclosed. Defendants' statement was further misleading because it singled out "meaningfully higher" rates of duplicate accounts in the subgroup of users from "developing markets such as the Philippines and Vietnam," without disclosing that the prevalence of duplicate accounts in the much more significant cohort of new user accounts was three to five times higher than the disclosed rate of 11%.

508.    On July 29, 2021, Meta released its Form 10-Q for the second quarter of 2021. In its quarterly statement, Meta made the following statements regarding the increase in active users on Facebook: (i) "Facebook daily active users (DAUs) were 1.91 billion on average for June 2021, <u>an increase of 7% year-over-year</u>"; (ii) "Facebook monthly active users (MAUs) were 2.90 billion as of June 30, 2021, <u>an increase of 7% year-over-year</u>"; (iii) "Family daily active people (DAP)

was 2.76 billion on average for June 2021, <u>an increase of 12% year-over-year</u>"; (iv) "Family monthly active people (MAP) was 3.51 billion as of June 30, 2021, <u>an increase of 12% year-over-year</u>"; and (v) "Worldwide DAUs <u>increased 7%</u> to 1.91 billion on average during June 2021 from 1.79 billion during June 2020."

509.    Defendants' statements identified ¶508 above were materially false and misleading and omitted material facts. Specifically, the growth rates reported by Meta were artificially inflated. Meta's internal research indicated that the rate of single users with multiple accounts was "very prevalent" among newly created accounts. In particular, Meta's research stated that between 32% and 56% of new accounts were created by existing users—which was multiples greater than the 11% estimate that Meta disclosed. Because the prevalence of duplicate accounts among new users was three to five times higher than publicly disclosed, Meta's DAU and MAU growth rates were really 3-5%, and the reported DAU and MAU growth rates of 7% were inflated by 29-57%.

510.    Defendants' Form 10-Q also included the following statement regarding Meta's estimate of the prevalence of SUMA or duplicate accounts:

> Duplicate and false accounts are very difficult to measure at our scale, and <u>it is possible that the actual number of duplicate and false accounts may vary significantly from our estimates.</u>

> In the fourth quarter of 2020, we estimated that duplicate accounts may have represented approximately 11% of our worldwide MAUs. <u>We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets.</u>

511.    Defendants' statements identified ¶510 above were materially misleading and omitted material facts. It was materially misleading for Meta to represent that it was "possible" that the number of duplicate accounts "<u>may</u> vary significantly", without disclosing that Meta's internal research demonstrated that the rate of single users with multiple accounts <u>did</u> vary significantly from the 11% figure, and was in fact "very prevalent," among newly created accounts. Specifically, Meta's research stated that between 32% and 56% of new accounts were created by existing users, vastly in excess of the 11% Meta disclosed. Defendants' statement was further misleading because it singled out "meaningfully higher" rates of duplicate accounts in the subgroup of users from "developing markets such as the Philippines and Vietnam," without

disclosing that the prevalence of duplicate accounts in the much more significant cohort of new user accounts was three to five times higher than the disclosed rate of 11%.

## VII.   ADDITIONAL LOSS CAUSATION ALLEGATIONS

512.   The fraud alleged herein was the proximate cause of the economic loss suffered by Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (i.e., stock price declines) described herein. *See*, *e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

513.   During the Class Period, Plaintiffs and the Class members purchased or otherwise acquired Meta common stock at artificially inflated prices, and were damaged thereby when the price of Meta common stock declined in response to the partial disclosures. Throughout the Class Period, the price of Meta common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Meta common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which disclosures are described more fully above in Section IV.C. Throughout the disclosure period, Defendants mitigated Meta's stock price declines by making additional false assurances concerning the alleged fraud, as described herein.

514.   As the result of the disclosures described herein, Meta common stock declined from a Class Period high of $384.33 per share to a closing price of $324.61 per share on October 22, 2021, a decline of 15.5%. From the date of the first article published by *The Wall Street Journal* on September 13, 2021, to the final disclosures on October 21, 2021, Meta's stock price declined by $54.08 per share, or over 14%, representing a total decline of more than $130 billion in Meta's market capitalization, as reflected below:

| Date* | Disclosure Summary | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change | Trading Volume | Approximate Market Cap Loss |
|---|---|---|---|---|---|---|
| 9/13/21 (9/13/21) | *The Wall Street Journal* publishes the September 13 | $376.51 | - $2.18 | 0.25% | 13,026,275 | $5.2 billion |

| | Facebook File. ¶¶279-90. | | | | | |
|---|---|---|---|---|---|---|
| 9/14/21 (9/15/21) | After *The Wall Street Journal* publishes the September 14 Facebook File, U.S. Senators announce that the Senate would reconvene to look into Instagram's negative impact on teenagers and young users. ¶¶291-316. | $373.92 | - $2.61 | 0.89% | 17,940,297 | $6.2 billion |
| 9/15/21 (9/15/21) | *The Wall Street Journal* publishes the September 15 Facebook File. ¶¶310-16. | $373.92 | - $2.61 | 0.89% | 17,940,297 | $6.2 billion |
| 9/16/21 (9/16/21) | *The Wall Street Journal* publishes the September 16 Facebook File. ¶¶318-19. | $373.06 | - $0.86 | -0.15% | 11,394,217 | $2.1 billion |
| 9/17/21 (9/17/21) | *The Wall Street Journal* publishes the September 17 Facebook File. ¶320. | $364.72 | - $8.34 | -0.88% | 26,298,966 | $20 billion |
| 9/21/21 (9/22/21) | Meta's Oversight Board Launches a review of the Company's X-Check system following the September 13 Facebook File. ¶¶322-27. | $343.21 | -$14.27 | 1.07% | 43,692,859 | $34 billion |
| 9/27/21 & 9/28/21 | Facebook pauses Instagram Kids | $340.65 | -$12.93 | -1.99% | 21,710,286 | $31 billion |

| | | | | | | |
|---|---|---|---|---|---|---|
| (9/28/21) | and *The Wall Street Journal* publishes a Facebook File, citing internal documents revealing that Meta intentionally targeted its platforms to preteens despite its purported ban on users younger than 13. ¶¶328-334. | | | | | |
| 10/3/21 (10/4/21) | On Sunday, October 3, 2021, the identity of the Facebook whistleblower, Frances Haugen, is revealed when she gives two in-depth interviews with *60 Minutes* and *The Wall Street Journal* in advance of her congressional testimony. ¶¶340-57. | $326.23 | -$16.78 | -1.21% | 42,884,975 | $40 billion |
| 10/6/21 (10/7/21) | Facebook Slows Launch of New Products Amid "Reputational Reviews" In The Wake of The Facebook Files. ¶¶358-61. | $329.22 | -$4.42 | 0.90% | 28,307,456 | $11 billion |
| 10/21/21 (10/22/21) | *The Wall Street Journal* publishes another Facebook File, citing internal Company documents | $324.61 | -$17.27 | 0.00% | 35,224,543 | $41 billion |

| | raising serious concerns about the accuracy and reliability of Meta's publicly reported user growth metrics. In addition, *The Wall Street Journal* and other media report that Meta's Oversight Board will investigate Meta's X-Check system, while revealing that Meta admits that its prior characterization of X-Check applying to a "small number of decisions" was misleading. ¶¶365-74. | | | | | |
|---|---|---|---|---|---|---|

*Date(s) of stock price decline(s) in parentheses.*

515.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the existing artificial inflation of the price of Meta common stock. It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

516.    Numerous facts establish that Defendants acted with scienter when they misled investors about the subjects recounted above. These facts, as set forth above and summarized below, demonstrate that Defendants acted with scienter in making the materially false and

misleading statements and omissions alleged herein.

\* \* \*

517. ***First***, Meta's extensive internal research yielded contemporaneous data and information that contradicted Defendants' false and misleading statements. Defendants concealed this internal research and misled investors concerning the very issues addressed in the research.

518. ***Misrepresentations About Meta's "X-Check" and "Whitelisting" Practices***. Meta also conducted internal research on the effects of its "cross-check" and "whitelisting" practices, in which Meta exempted millions of users from its Community Standards.

519. The first article in the *Journal*'s exposé, published on September 13, 2021, also confirmed that Meta's internal research documented in detail the Company's cross-check and whitelisting practices. As the *Journal* reported, the internal documents that it reviewed,

> [i]nclude research reports, online employee discussions and drafts of presentations to senior management, including Mr. Zuckerberg. They aren't the result of idle grumbling, but rather the formal work of teams whose job was to examine the social network and figure out how it could improve. They offer perhaps the clearest picture thus far of how broadly Facebook's problems are known inside the company, up to the CEO himself. And when Facebook speaks publicly about many of these issues, to lawmakers, regulators and, in the case of XCheck, its own Oversight Board, it often provides misleading or partial answers, masking how much it knows.

520. As one example, 2019 internal Meta audit found that whitelist status, which was sometimes granted without any documented reason, was "<u>pervasive, touching almost every area of the company</u>" and "pose[d] numerous legal, compliance, and legitimacy risks for the company and harm to our community."

521. An internal Meta research report titled "Comparing the effects of misinfo from politicians vs ordinary user sources" further found that whitelisting had particularly harmful consequences. Specifically, research showed that "[u]nder the political whitelist policy, content posted by whitelisted Pages or Profiles is not subject to our misinformation interventions," and "results indicate the current whitelist policy is protecting content that is especially likely to deceive, and hence to harm, people on our platforms." Accordingly, the report "recommend[ed] ending the whitelist, or at least (1) informing users; [and] (2) reducing distribution."

522.    Worse yet, Meta's internal research pointed out that Defendants' public statements about "X-Check" and "whitelisting" were false. For example, a 2019 internal review of Meta's whitelisting practices stressed, "We are not actually doing what we say we do publicly." The same review described Meta's "X-Check" program and "whitelisting" practices as "a breach of trust," highlighting that "[u]nlike the rest of our community, these people," i.e., users in the "X-Check" program, "can violate our standards without any consequences." The review concluded that Meta's conduct with respect to these users was "not publicly defensible."

523.    ***Misrepresentations About the News Feed Algorithm and the Prevalence of Toxic Content on Meta's Platforms***. In January 2018, Meta overhauled the proprietary algorithm that controls how content is ranked in Facebook's News Feed, purportedly to prioritize posts that reflected "meaningful social interactions." Just six months later, during the summer of 2018, Meta's data scientists warned that major issues with the algorithm had emerged. Throughout 2018, surveys of Facebook users repeatedly highlighted that many users felt the quality of their feeds had decreased since Meta implemented its new algorithm. Meta data scientists continued this research and in April 2019, reported that the algorithm was driving political divisiveness and "outrage bait," highlighting that "[e]ngagement on positive and policy posts has severely reduced, leaving parties increasingly reliant on inflammatory posts and direct attacks on their competitors."

524.    Instead of limiting toxic content, Meta's algorithm amplified it. As noted above, Meta's research uncovered "compelling evidence that our core product mechanics, such as virality, recommendations, and optimizing for engagement, are a significant part of why these types of speech flourish on the platform . . . the net result is that Facebook, taken as a whole, will be actively (if not necessarily consciously) promoting these types of activities." This internal research similarly concluded, "Misinformation, toxicity, and violent content are inordinately prevalent" on Meta's platforms.

525.    Extensive research conducted by Meta also contemporaneously documented an abundance of algorithm and content-moderation failures that likewise caused toxic content to pervade Meta's platforms. As whistleblower Haugen testified before Congress, "Facebook's own research, says they cannot adequately identify dangerous content. And as a result, those dangerous

algorithms that they admit are picking up the extreme sentiments, the division."

526.    Meta researchers documented and broadly summarized these failures in a July 2019 internal Meta research report, titled "Demoting On Integrity Signals Is Not Enough." The July 2019 report explained that the "integrity signals"—which Meta used to facilitate content moderation—"are <u>currently, for the foreseeable future, and perhaps permanently, not remotely sufficient to address harms on our platform</u> . . . ." The July 2019 report underscored that "we do not and possibly never will have a model that captures even a majority of integrity harms, particularly in sensitive areas" such as hate speech, misinformation, and "toxicity/divisiveness." For this content, the report observed, "[W]e can get a decent sense of whether a launch is increasing hate speech, or misinformation, or other harms," but "<u>we don't have a way of effectively demoting this content</u> in a targeted way . . . , and even if we did, we often won't be able to launch them based on policy concerns." The July 2019 report and additional internal Meta research, detailed below, contradicted Defendants' false and misleading statements concerning its algorithm and touting Meta's purported success in controlling the spread of toxic content on its platforms.

527.    Hate speech, per Meta's July 2019 report, is "one of the 'big three' community integrity problems on Facebook (along with Nudity & Pornography and Graphic Violence)," due to inconsistent standards and application. The July 2019 report found that "<u>we only take action against approximately 2% of the hate speech on the platform</u>."

528.    Additional internal Meta research likewise confirmed that Meta's content-moderation efforts suffered fatal flaws, allowing hate speech to permeate Meta platforms. For instance, one report found that globally, "[f]rom the perspective of the detection source, 98 per cent of the Hate Speech contents are reported reactively (i.e. by our community) and only two per cent are caught proactively (i.e. by classifiers and other proactive tools)."

529.    A report from March 2021 found that "<u>we may action as little as 3-5% of hate and ~0.6% of [violence and inciting content] on Facebook</u>." Other employees concluded that "<u>we're deleting less than 5% of all of the hate speech posted to Facebook. This is actually an optimistic</u> estimate—previous (and more rigorous) iterations of this estimation exercise have put it closer to 3%, and <u>on V&I we're deleting somewhere around 0.6% . . . we miss 95% of violating hate</u>

speech."

530.    Regarding misinformation, the July 2019 report revealed that "content is often not caught until after it has gotten a lot of distribution, and many things are never caught." Whistleblower Haugen confirmed the report's findings in her October 3, 2021, interview with *60 Minutes*. She described an experiment that the Company conducted internally that proved how toxic content and misinformation spread to users even when the users did not express any interest in such content. She explained, "they've taken brand new accounts, so no friends, and all they've done is follow Donald Trump, Melania Trump, Fox News, and like a local news source. And then all they did is click on the first ten things that Facebook showed them—where Facebook suggested a group, they joined that group . . . So they're not doing any conscious action here, just one time go in—and within a week you see QAnon, and in two weeks you see things about white genocide."

531.    An October 22, 2021, article in *The New York Times* described the same or substantially similar internal research. In July 2019, a Meta researcher studying polarization discovered that a test account that she had made for a "conservative mom" in North Carolina received conspiracy theory content recommendations within one week of joining the social network. The internal research, titled "Carol's Journey to QAnon," detailed how the Facebook account for an imaginary woman named Carol Smith had followed pages for Fox News and Sinclair Broadcasting. Within days, Facebook's algorithms had recommended pages and groups related to QAnon, the conspiracy theory movement that falsely claimed Mr. Trump was facing down a shadowy cabal of Democratic pedophiles. By the end of three weeks, Carol Smith's Facebook account Feed had devolved further—it "became a constant flow of misleading, polarizing and low-quality content," the Meta researcher wrote.

532.    As to "toxicity/divisiveness," Meta's July 2019 report documented that Meta's algorithm drove politically polarizing content to the top of users' News Feed. The July 2019 report showed that although "divisive content (particularly divisive political content) is one of the biggest problems facing the platform," the Company could not and would not adequately identify or moderate such content, and its attempts to do so had failed miserably—"Though a launch candidate was prepared in mid-2018, it was blocked from launching because of policy concerns in the lead-

up to the election."

533.     As noted, above, internal Meta researchers reported that reducing "deep reshares" and downstream MSI would significantly increase platform integrity, but Defendant Zuckerberg personally rejected these recommendations. Specifically, in April 2020, a data scientist at Meta proposed reducing deep reshares as an effective measure to reduce the amount and spread of false content on the platform. Although Facebook made that change in the spring of 2020 for civic and health information, Defendant Zuckerberg rejected a proposal by Facebook's integrity team to expand the change to other types of content. According to the *Journal*, "Mr. Zuckerberg said he didn't want to pursue it if it reduced user engagement." And whistleblower Haugen told the SEC that "CEO Mark Zuckerberg rejected this intervention that could have reduced the risk of violence in the 2020 election." Haugen cited a document titled "Mark Feedback on Soft Action Proposal + Deck presented to Mark," which stated that "Mark doesn't think we could go broad" with "Downstream model depreciation . . . We wouldn't launch [the proposed intervention to reduce misinformation] if there was a material tradeoff with MSI impact."

534.     ***Misrepresentations About Meta's Harm to Teens***. As reported by *The Wall Street Journal* on September 14, 2021, Meta conducted extensive, "deep dive" research, which revealed that Meta's social media platforms are harmful to teens' mental health. This research was "reviewed by top Facebook executives, and was cited in a 2020 presentation given to Zuckerberg." Moreover, all of Meta's internal research was posted and made available on "Workplace," i.e., Facebook's internal employee platform, meaning that any Facebook employee—but no member of the public—could access this research.

535.     Contrary to Defendants' false and misleading statements, Meta's internal research demonstrated that Meta's platforms pose a serious risk to the mental health and well-being of its younger users. This research is summarized in detail above at ¶¶210-27. As just one example, Meta's March 2021 review "on FB and IG YA/Teens Aging Up and Engagement Trends" identified the harmful impact of Meta platforms on the mental health and well-being of younger users as a "key barrier to engagement based on quantitative and qualitative findings." As Meta's researchers concluded, "YA have a wide range of negative associations with Facebook including

primary concerns, impact to their wellbeing . . . ." Meta's research also demonstrated that Instagram's harm to teens was severe, with one study showing that among teens who reported suicidal thoughts, <u>13% of British users and 6% of American users traced the desire to kill themselves to Instagram</u>.

536.    Facebook employees internally acknowledged that Meta was well aware of and, in fact, actively benefitted from, the harmful effects of social comparison on Instagram, observing that "[p]eople use Instagram *because* it's a competition." Meta's researchers likewise noted Defendants' resistance to implementing changes based on their research findings, telling *The Wall Street Journal*, "We're standing directly between people and their bonuses." Instead of taking meaningful remedial action, Defendants rolled out "Project Daisy," which had been pitched directly to Defendant Zuckerberg as a way to make Meta look good by appearing to address the issue. In connection with presenting research findings to Zuckerberg, Meta executives wrote, "A Daisy launch would be received by press and parents as a strong indication that Instagram cares about its users, especially when taken alongside other press-positive launches."

537.    ***Misrepresentations About SUMA on Facebook***. Meta's internal research also revealed significant discrepancies in Meta's reported and actual user and user growth metrics. For instance, in the spring of 2021, Meta conducted internal research showing that at least 32%—and as many as 56%—of all new accounts on Facebook were created by users that already had an account, i.e., were duplicate accounts or SUMAs. That figure was <u>as much as five times Meta's reported 11% figure</u> of duplicate Monthly Active Users (MAUs) for all of Facebook at the time. The same research also showed that Meta undercounts accounts created by existing users.

538.    Similarly, in May 2021, another internal memo at Meta stated that the number of U.S. Facebook MAUs in their 20s often was more than the total population of that American demographic, identifying Single Users with Multiple Accounts (SUMA) as the issue. Another report stated that Facebook's records indicated that "over 15% of new teen accounts are existing users creating a SUMA child account."

539.    Corroborating these reports, Meta knew that teen and young adults, a key demographic for advertising and growth, were using Facebook less and their user and engagement

metrics had been in decline for years. An internal report showed that "Facebook's teen and young adult DAU [Daily Active Users] has been in decline since 2012/2013. Data science findings indicate that only users 25 and above are increasing their use of Facebook. The Teen DAU has plateaued and the Young Adult (18-24) DAU continues to decline."

\*       \*       \*

540.    **Second**, as alleged above, the Individual Defendants were aware of and actively involved in Meta's internal research, as well as the aspects of Meta's business operations that were harming users. As *The Washington Post* has reported, Defendant Zuckerberg in particular "has maintained a reputation as a hands-on manager who goes deep on product and policy decisions, particularly when they involve critical trade-offs between preserving speech and protecting users from harm – or between safety and growth."

541.    As whistleblower Haugen testified, Meta's harmful effects "for children, for public safety, for democracy" are the direct result of "[t]he choices being made by Facebook's leadership"—"deliberate choices Facebook has made." The Individual Defendants not only had access to contemporaneous data and information that contradicted their false and misleading statements and omissions, but they also had actual knowledge of this information. Importantly, although Defendants have been evasive in response to the disclosures at the end of the Class Period, they have not denied their involvement in and knowledge of Meta's research into and handling of these critical issues.

542.    **Misrepresentations About Meta's "X-Check" and "Whitelisting" Practices**. The Executive Defendants personally were involved in Meta's "cross-check" and "whitelisting" practices, exempting certain users from Meta's Community Standards. For instance, a December 11, 2020, internal Meta research report, titled "Political Influences on Content Policy," confirmed that senior management was involved in making decisions to exclude particular individuals from the Company's content-moderation policies. Among other things, Meta researchers observed,

> Final calls about content policy are routinely made by senior executives. In multiple cases the final judgment about whether a prominent post violates a certain written policy are made by senior executives, sometimes Mark Zuckerberg. If our decisions are intended to be an application of a written policy then it's unclear why executives would be consulted. If instead there was an unwritten aspect to our policies, namely

to protect sensitive constituencies, then it's natural that we would like executives to have final decision-making power.

543.    In addition, the *Journal* reported that many VIP users and their content were subject to review at the highest levels of the Company, including by Defendant Zuckerberg: "At times, pulling content from a VIP's account requires approval from senior executives on the communications and public-policy teams, or even from Mr. Zuckerberg or Chief Operating Officer Sheryl Sandberg, according to people familiar with the matter." A September 2020 memo also described what the Journal called "daily interventions in [the Company's] rule-making and enforcement process by both Facebook's public-policy team and senior executives."

544.    Defendant Zuckerberg also has publicly admitted his involvement in Meta's cross-check and whitelisting practices. For instance, Zuckerberg acknowledged that he personally made the decision to leave up former President Trump's May 28, 2020, post (discussing protests after George Floyd's death) that "When the looting starts, the shooting starts." Facebook's automated systems had scored Trump's post at a 90 out of 100, indicating a "high likelihood" that it violated the Company's content-moderation policies. Under Facebook's systems, a post with a score of 90 normally would have been removed immediately, but Trump's post remained on the platform due to Defendant Zuckerberg's decision.

545.    In a June 2020 internal video call with more than 25,000 Meta employees, Zuckerberg himself gave an extensive account of the hands-on "process" through which he reviewed and decided not to delete Trump's post:

> The policy team saw it, started working across the East Coast and the London teams to pull together an analysis that would be in my inbox when I woke up in the morning. So I could see, basically, the analysis of the post and the policies that beared on the recommendation. And I got that when I woke up around 7:30 in the morning . . . .
>
> So then after basically getting that, I spent the rest of the day talking to the team and talking to different people and getting different people's opinions, including calling a diverse set of folks across the company and factoring in, you know, a lot of different people's opinions went into the initial policy analysis. . . . I spent a lot of time trying to wrestle with, "What are the best possible arguments for why this would be incitement to violence?" . . .
>
> But then after that period, basically, I couldn't get there [i.e., make the decision to remove Trump's post]. I couldn't get to that even with my personal feelings about

the content and even knowing that a lot of employees would disagree with this. During the call, Zuckerberg also acknowledged that "after the decision had basically been made about how we should handle the content, the president called me. And I used that opportunity to make sure that he understood directly how I felt about the content." With respect to Meta's approach to decision-making on questionable content more broadly, Zuckerberg told Meta's employees that "we do incorporate a wide diversity of perspectives," "[a]nd a bunch of them I also generally seek out directly myself . . . ." In response to an employee question about "which execs are involved" in Meta's decision-making process, Zuckerberg named Defendant Nick Clegg, among other Meta executives.

546.    Clegg had personal knowledge of Meta's "X-Check" program and "whitelisting" practices. In addition to all the facts set forth above concerning his direct involvement with this program, Clegg's role as Meta's President of Global Affairs specifically requires him to be familiar with how Meta handles content posted to its platforms by politicians and other political actors. In that role, Clegg is responsible for "ensuring that [Meta] ha[s] the right policies to both reflect [its] responsibilities and to support the building of innovative new products" and reports directly to Defendant Zuckerberg. In an interview with CNN, Clegg stated, "[M]y responsibility in the company is to deal with these very difficult policies. You know, I oversee that amongst other things, the company's policies and everything about how elections are conduct on our platform, how hate speech rules work." And as Zuckerberg has described it, Clegg's role entails "lead[ing] our company on all our policy matters, including how we interact with governments as they consider adopting new policies and regulations, as well as how we make the case publicly for our products and our work."

547.    ***Misrepresentations About Toxic Content on Meta Platforms***. Defendant Zuckerberg spearheaded the 2018 effort to overhaul Facebook's News Feed algorithm, purportedly to prioritize "meaningful social interaction," as part of his 2018 personal challenge to fix Facebook. When announcing these changes, Zuckerberg openly acknowledged his active role in overhauling the News Feed algorithm, stating, "I'm changing the goal I give our product teams from focusing on helping you find relevant content to helping you have more meaningful social

interactions." Zuckerberg thus admitted to having a central role in developing and implementing the 2018 changes to the News Feed algorithm.

548.    Numerous Meta employees have confirmed Zuckerberg's extensive involvement in various aspects of the Company's operations, including the 2018 changes to Facebook's News Feed algorithm. For instance, in an interview with *The Washington Post*, a former Facebook executive reported that Zuckerberg "is extremely inquisitive about <u>anything that impacts how content gets ranked in the feed</u> – because that's the secret sauce, that's the way this whole thing keeps spinning and working and making profits." The executive reported that within the Company, "[p]eople felt, <u>it was Mark's thing</u>, so he needs it to be successful. It needs to work." Similarly, Brian Boland, a former vice president of partnerships and marketing, told *The Washington Post*, "The specter of Zuckerberg looms in everything the company does. It is entirely driven by him."

549.    As *The Wall Street Journal* ultimately revealed, Facebook's News Feed algorithm heavily skewed News Feed to promote misinformation, toxicity, and violent content. Defendants had extensive knowledge about these flaws, but often lacked the will or the ability to address them. As whistleblower Haugen testified, "<u>The company's leadership knows how to make Facebook and Instagram safer but won't make the necessary changes because they have put their astronomical profits before people</u>."

550.    Meta convened a civic integrity division to manually track down the toxic content that the platform was promoting and spreading, according to Lars Backstrom, a Facebook vice president of engineering. Defendant Zuckerberg directly oversaw Meta's "civic integrity" efforts. As reported by *The Washington Post*, members of Meta's civic integrity division shared that Zuckerberg routinely scrutinized their work because the division's "very existence is fundamentally opposed to the goals of the company, the goals of Mark Zuckerberg," which "made it so we had to justify our existence" to him. After he quit, the former head of Meta's civic integrity unit tweeted about "the trust deficit" that Zuckerberg had created, noting that "the FB family may now better prosper under distributed leadership."

551.    Following the January 6, 2021, insurrection, internal Meta documents obtained by *CNN* and quoted in an article dated October 24, 2021, showed that Meta employees internally

acknowledged that Defendant Zuckerberg and Chief Technology Officer Mike Schroepfer played an active role in content moderation, stating, "<u>Leadership overrides research-based policy decisions</u> to better serve people like the groups inciting violence today. <u>Rank-and-file workers have done their part to identify changes to improve our platforms but have been actively held back</u>." *The Washington Post* reported that Meta employees likewise expressed frustration that

> This is not a new problem. We have been watching this behavior from politicians like Trump, and the—at best—<u>wishy-washy actions of company leadership</u>, for years now. We have been reading the [farewell] posts from trusted, experienced, and loved colleagues who write that they simply cannot conscience working for a company that does not do more to mitigate the negative effects on its platform.

552.    Other Meta internal documents and communications likewise show that Defendant Zuckerberg and other senior Meta executives personally rejected proposed fixes to reduce the spread of toxic content on Meta platforms. For instance, as noted above, in April 2020, Zuckerberg was presented with a proposal by the integrity team to reduce deep reshares, and he rejected a broad implementation, as set forth in the document entitled "<u>Mark Feedback on Soft Action Proposal + Deck presented to Mark</u>."

553.    As Ms. Haugen told the SEC, "CEO Mark Zuckerberg rejected this intervention that could have reduced the risk of violence in the 2020 election." In her congressional testimony, Ms. Haugen further explained that the documents she had submitted to Congress "outlin[e] Mark Zuckerberg was directly presented with a list of 'soft interventions'" and that Zuckerberg had "chose[n] to not remove downstream MSI in April of 2020," "even just isolated in at-risk countries, that's countries at risk of violence, if it had <u>any</u> impact on the overall MSI metric."

554.    ***Misrepresentations About Meta's Harm to Teens***. Defendant Zuckerberg publicly admitted that Meta had studied the impact of its platforms on teens' well-being, making clear that Zuckerberg personally was aware of Meta's internal research. For example, on March 25, 2021, Zuckerberg testified before the United States House of Representatives' Subcommittee on Communications and Technology. When Representative Lesko asked Zuckerberg whether "your platform harms children," Zuckerberg answered, "I don't believe so," citing as support for his purported belief the fact that "<u>[t]his is something that we study and care a lot about</u>."

555.    Likewise, when Senator Rodgers asked Zuckerberg whether "too much time in front of screens, passively consuming content, is harmful to children's mental health," Zuckerberg again cited to Meta's research, stating, "I don't think that the research is conclusive on that," and that "overall, the research that we have seen is that using social apps . . . can have positive mental health benefits and well-being benefits." Senator Rodgers then asked Zuckerberg, point blank, whether Facebook has "conducted any internal research as to the effect your products are having on the mental health of our children." In response, Zuckerberg acknowledged that "this is something that we try to study," and when pushed for a yes-or-no answer, admitted, "I believe the answer is yes."

556.    In her testimony before Congress, whistleblower Haugen also revealed that Meta has deep and widespread institutional knowledge of the mechanism by which its algorithm directs teens to harmful content. As Ms. Haugen testified,

> Facebook knows that their engagement-based ranking, the way that they pick the content in Instagram for young users, for all users, amplifies preferences. And they have done something called a proactive incident response where they take things that they've heard, for example, can you be led by the algorithms to anorexia content? And they have literally recreated that experiment themselves and confirmed, yes, this happens to people. So, Facebook knows that they are leading young users to anorexia content.

\*     \*     \*

557.    ***Third***, Defendants' false and misleading statements concerned some of the most widespread and critical issues facing the Company—issues about which Defendants undoubtedly were well informed. As noted above, Defendant Zuckerberg in particular "has maintained a reputation as a hands-on manager who goes deep on product and policy decisions." Moreover, he has repeatedly shown that "his capacity for micromanagement is vast." For instance, two Facebook employees interviewed by *The Washington Post* reported that Zuckerberg personally chose the colors and layout of the Company's "I got vaccinated" frames for Facebook users' profile pictures. Zuckerberg's heavy involvement in even the minutiae of Meta's operations makes clear that important issues at the Company did not escape his notice.

558.    Relatedly, Defendants' false and misleading statements concerned issues that were

a key focus for Meta, its Oversight Board, the public, academics, researchers, regulators, and even the U.S. Congress. But when Meta was asked about these critical issues, it withheld information, engaged in misdirection, or flatly lied. Given the importance of these issues, their widespread nature, and the lengths to which Defendants went to obscure them in the face of ongoing scrutiny, it is highly likely that Meta's executives were well aware of the concealed facts, including the Company's extensive internal research.

559.    ***Misrepresentations About Meta's "X-Check" and "Whitelisting" Practices***. As reported by *The Wall Street Journal*, the cross-check program is a massive apparatus within the Company that "shields millions of VIP users," including extremely high-profile users of Meta's platforms, "from the company's normal enforcement process." Meta allowed that system to grow exponentially such that by 2020, at least <u>5.8 million users</u> had joined the ranks of Meta's "invisible elite tier" of protected content distributors. As of 2019, at least <u>45 teams</u> within the Company were involved in whitelisting and often "chose not to enforce the rules with high-profile accounts at all."

560.    Meta's internal research noted that as a result of the X-Check program and whitelisting practices, "Facebook routinely makes exceptions for powerful actors." Meta's own research described these issues as "<u>pervasive, touching almost every area of the company</u>" and flagged as problematic the fact that these practices "pose numerous legal, compliance, and legitimacy risks for the company and harm to our community."

561.    Given its significance, Meta's Oversight Board repeatedly asked for information about the program. The findings issued by the Oversight Board made clear that Defendants had not been honest, strongly suggesting that Defendants had intentionally obscured important information about "X-Check" and "whitelisting" in order to spin a favorable (but false) public narrative concerning these practices. In a written statement from a spokesperson from the Board observed in a written statement, Meta "has not been fully forthcoming in its responses on cross-check" and pointed out that there is "limited public information on cross-check" and a "lack of transparency regarding these decision-making processes." Significantly, the Board highlighted that Meta's own concessions supported its conclusion. For instance, the Board reported that "the company <u>admitted that it should not have said cross-check only applied to a 'small number of</u>

decisions.'" The Board also highlighted that "Facebook . . . [had] recognized its phrasing could come across as misleading."

562.   The Board also revealed that Defendants obstructed its investigation efforts by repeatedly misleading the Board: "Facebook failed to provide relevant information to the Board, while in other instances, the information it did provide was incomplete." For instance, when "the Oversight Board published its decision on the suspension of former President Donald Trump's accounts," Meta "did not mention cross-check when it referred this case to the board," even though the Board's decision ultimately "focused on Facebook's cross-check system." The Board noted that this information "was clearly relevant to the Board's deliberations and its ability to make informed recommendations" and concluded that "it is not acceptable that Facebook did not mention cross-check in the information it initially provide."

563.   As another example, the Oversight Board criticized information that Defendants had placed in Facebook's "Transparency Center," which "state[d] that cross-check is for 'high-visibility content,' implying that the program applies to individual pieces of content based on reach, rather than the identity of the account or page. The Board concluded, "The fact that Facebook provided such an ambiguous, undetailed response to a call for greater transparency is not acceptable. Facebook's answer provides no meaningful transparency on the criteria for accounts or pages being selected for inclusion in cross-check, which was at the heart of the Board's recommendation."

564.   Vivek Ramaswamy is a political commentator and entrepreneur with extensive experience in the technology and healthcare sectors, who currently serves as the Executive Chairman of Strive Asset Management. He has published commentary on the technology industry and its role in public life in outlets including *The Wall Street Journal* and *National Review*. As Ramaswamy aptly wrote in the *New York Post* on September 20, 2021, "Even worse than the existence of the X-Check program was Facebook's dishonesty about it, reflecting the state of mind of a company that knew it was doing something wrong—and still did it anyway."

565.   As whistleblower Haugen testified, Facebook "has no oversight – even from its own Oversight Board, which is as blind as the public." A spokesperson from the Board "has

expressed on multiple occasions its concern about the lack of transparency in Facebook's content moderation processes, especially relating to the company's inconsistent management of high-profile accounts."

566. ***Misrepresentations About Toxic Content on Meta's Platforms***. News Feed is one of the most important aspects of Meta's platforms. News Feed is the individually personalized live stream of content that shows on the homepage for Facebook and Instagram users. As reported by the *Journal*, News Feed accounts for the majority of time that Facebook's nearly three billion users spend on the platform. News Feed's ability to keep users engaged with Meta's platforms is the key to Meta's profitability, as highlighted in the *Journal*, because Meta sells users' attention to advertisers, which accounts for almost all of the Company's revenue. Because the algorithm controls what appears in each user's News Feed, changes to the algorithm have major implications for Meta's ability to generate advertising revenue. Meta's 2018 changes to the algorithm were among the most significant, meaning that these changes very likely were heavily scrutinized by top Meta executives, including the Individual Defendants.

567. Beyond their relevance to Meta's profitability, the issues with News Feed received considerable public attention and scrutiny. For instance, the spread of harmful content and misinformation on Meta platforms was a key issue raised by Congress during the March 25, 2021, hearing, as reflected in the title of the hearing: "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation." To prepare for his testimony at this hearing, Zuckerberg had to evaluate how Meta handles (i) misinformation about COVID-19 and vaccinations, (ii) misinformation about elections and the democratic process, (iii) hate speech and violent content, and (iv) content in "Groups" that violates Facebook's Community Standards, including QAnon and other extremist and/or militarized social movements. Significantly, because the hearing took place in March 2021, i.e., before the start of the Class Period, Zuckerberg already had conducted this investigation into the spread of toxic content on Facebook when he made false and misleading statements during the Class Period.[1]

---

[1] The only alternative inferences are (1) Zuckerberg in fact did not conduct a deep dive into the

568.     Defendants also received private communications about the spread of toxic content on Facebook from other very high-profile individuals and organizations. Some of these communications went directly to Meta's top executives, and even if they did not, such communications undoubtedly would have garnered attention from Meta's top executives. For instance, in the fall of 2018, BuzzFeed's chief executive, Jonah Peretti, emailed "a top official at Facebook" to warn them that "[t]he most divisive content that publishers produced was going viral on the platform," thereby "creating an incentive to produce more of it." A team of Meta's data scientists flagged Mr. Peretti's warning in an internal memo, writing, "Our approach has had unhealthy side effects on important slices of public content, such as politics and news." In a later memo, a Facebook data scientist similarly noted, "This is an increasing liability."

569.     As another example, European political parties contacted Defendants to warn them that Facebook's algorithm rewarded toxic, polarizing content. Like BuzzFeed content producers, political parties altered their content to be more negative and polarizing in order to reach more Facebook users. As Meta's researchers internally noted, "One party's social media management team estimates that they have shifted the proportion of their posts from 50/50 positive/negative to 80% negative, explicitly as a function of the change to the algorithm." Facebook researchers further noted in internal memoranda,

> Political parties across Europe claim that Facebook's algorithm change in 2018 (MSI) has changed the nature of politics. For the worse . . . Many parties . . . worry about the long-term effects on democracy . . . they are trapped in an inescapable cycle of negative campaigning by the incentive structures of the platform . . . evidence around how anger reactions, overall, is weaponized by political figures and creating negative incentives on the platform.

570.     Meta researchers similarly noted that political parties in Spain "have learnt that harsh attacks on their opponents net the highest engagement" on Facebook, and although "[t]hey claim that they 'try not to'" resort to such tactics, "ultimately, 'you use what works.'"

topic about which Congress had called him to testify, or (2) Zuckerberg deliberately structured his investigation such that it would not uncover issues relevant to his testimony before Congress. Neither inference negates or undercuts scienter, however, because either would evince a reckless disregard of underlying facts that contradicted Zuckerberg's false and misleading statements during the Class Period.

571.   ***Misrepresentations About Meta's Harm to Teens***. As to teen mental health, Meta's own internal research underscored the importance of these issues, repeatedly stating that the negative impacts of its platforms on teens' mental health and well-being were a "focus," "important," and "crucial to tackle." For instance, Meta's internal study from November 2019 noted, "Social Comparison is a high reach, high intensity issue." The study further recognized that social comparison and related body image issues were two of the "highest among issues IG should care about" "for teens." The same study acknowledged, "Negative social comparison and related issues with body image are especially crucial to tackle given the high ranking among teens."

572.   Similarly, in Meta's internal report from February 1, 2021, Meta concluded that it was important to "focus" on the negative effects of Instagram on health and well-being specifically because those effects are "worse for teens, particularly girls," and because "many people" have pre-existing body dissatisfaction that Instagram exacerbates. The report reiterated, "A substantial proportion of people report body image concerns," and the impact on teen girls "reinforces the idea that we should focus our efforts on teens and younger adults." Given the critical importance of these issues, it is no wonder why they were the focus of Congress as well.

*   *   *

573.   ***Fourth***, Defendants' desire to maximize Meta's profitability provided a powerful incentive for Defendants to make the false and misleading statements challenged herein. Defendants knew that Meta's conduct, though harmful, was very profitable for the Company because it drove up user engagement, which, in turn, increased Meta's ability to generate advertising revenue. Because Meta generates nearly all of its revenue from advertising, its ability to drive user engagement is singularly critical to the Company's success. As whistleblower Haugen put it during her interview with *60 Minutes*, "Facebook has realized that if they change the [platform] to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money."

574.   This motive was particularly powerful because it was coupled with Defendants' strong desire to ensure that Meta avoided the harmful consequences that disclosure of the concealed information would cause. Defendants' false and misleading statements concerned

critical issues that eventually left the Company with substantial reputational harm. As numerous members of Congress highlighted, these critical issues threatened the health and safety of Meta's users. Defendants knew that if it were to become public, the alarming information that they were concealing would cause significant harm to Meta's profitability.

575.     Analysts likewise expressed concern over these issues. For instance, analysts with Argus flagged that "regulatory issues continue to hound the company, which cannot seem to keep out of the headlines," leaving Meta susceptible to "extreme regulatory backlash." Analysts with Argus described "[t]he issues covered by the *Journal*" as "sobering" and highlighted that Defendant "Clegg did not dispute any of the facts of the *Journal* reporting" Instagram's harm to teenage girls. They further commented that "the *Journal* articles clearly point out management's inconsistent responses to the internal research. Facebook cannot escape the responsibility that its platforms may have . . . in making these problems worse."

576.     ***Misrepresentations About Toxic Content on Meta Platforms***. Defendants redesigned Facebook's News Feed algorithm in a manner that caused it to amplify toxic content and refused to take action to meaningfully address that problem because Defendants knew that toxic content drove up user engagement. Meta itself has acknowledged in public filings that as user engagement increases, so too does Meta's ability to generate advertising revenue. Meta's internal documents showed that in the leadup to 2018, when the Company changed the News Feed algorithm to promote "meaningful social interactions," user engagement was in drastic decline. Engagement metrics, including comments, likes, and shares, were down substantially through 2017, and "original broadcasts," i.e., user-produced personal content, had also been declining for years.

577.     The 2018 changes to the News Feed algorithm were largely successful in driving user engagement. Although the time that users spent on the platform declined slightly, measures of engagement, including comments, likes, and shares, increased substantially and with them—as confirmed by August 2018 internal analyses—the highly important metric of "daily active people." These increases in user engagement were highly profitable for the Company. In 2017, the last year before the algorithm changes to boost "meaningful social interactions," the Company reported

annual revenue of $40.7 billion. After the algorithm changes, annual revenues rose steadily, reaching $55.8 billion in 2018, $70.7 billion in 2019, $86.0 billion in 2020, and $118.0 billion in 2021.

578.    These increases in engagement and advertising revenue resulted in significant part from the proliferation of toxic content on Meta's platforms. As Ms. Haugen recounted, the "meaningful social interaction" metric was merely an "engagement-based ranking that didn't care if you bullied someone or committed hate speech in the comments. That was meaningful." But by the start of the Class Period, the spread of toxic content on Meta's platforms already had triggered serious questioning from investors and regulators. Accordingly, throughout the Class Period, Defendants were engaged in damage control, which they achieved in part through the false and misleading statements alleged herein.

579.    ***Misrepresentations About Meta's Harm to Teens***. Defendants knew that younger users were a source of significant profit for Meta and thus were intently focused on "winning with tweens," i.e., driving up teen and young adult engagement with Meta platforms. As Ms. Haugen testified,

> Facebook understands that if they want to continue to grow, they have to find new users. They have to make sure that the next generation is just as engaged with Instagram as the current one. And the way they'll do that is by making sure that children establish habits before they have good self-regulation. . . . By hooking kids.

580.    Meta's internal documents show that Defendants recognized the importance of attracting and retaining younger users. For instance, in a February 2020 slide presentation titled "Tweens Competitive Audit," Meta recognized that "we care about tweens" because "[t]hey are a valuable but untapped audience." The same presentation highlighted that Meta's "ultimate goal is messaging primacy with US Tweens (TAM = 12M), which may also lead to winning with Tweens (TAM 26M)." Defendant Mosseri also openly acknowledged that teens and tweens are critical to Instagram's and Meta's success. For instance, Mosseri tweeted an entire video "focus[ing] on young people" and "some of the trends" in their social media use. Mosseri explained that "teens" and "young people" are a focus for Instagram because they are one of "the two groups that push

forward culture the most."

581.     Defendants were further motivated to hide Meta's internal research on the negative impact of its platforms on teens and younger users because they knew that disclosing the truth would harm Meta's profitability by reducing the number of younger users on its platforms. As described above, Meta's March 2021 review "on FB and IG YA/Teens Aging Up and Engagement Trends" identified the harmful impact of Meta platforms on the mental health and well-being of younger users as a "key barrier to engagement based on quantitative and qualitative findings." Meta's researchers concluded that "YA have a wide range of negative associations with Facebook including primary concerns, impact to their wellbeing," but were met with resistance to this finding, telling *The Wall Street Journal*, "We're standing directly between people and their bonuses."

582.     ***Misrepresentations About SUMA on Facebook***. Defendants knew that disclosure of inflated user metrics due to SUMA would negatively impact advertising audience size and would lead to lower revenue. For instance, in an internal email disclosed in a lawsuit brought by advertisers, Facebook's senior advertising executive Carolyn Everson acknowledged that "SUMA is going to go down horribly . . . if we overstated how many actual real people we have in certain demos, there is no question that impacted [advertisers'] budget allocations. We have to prepare for the worst here." Meta highlighted the importance of its advertising revenue in its Q1 and Q2 2021 10Ks, stating, "The size of our user base and our users' level of engagement are critical to our success. Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products, particularly for Facebook and Instagram."

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

583.     The PSLRA's statutory safe harbor or the bespeaks-caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions pleaded in this Complaint.

584.     None of the statements complained of herein was a forward-looking statement. Instead, each was a historical statement or statement of purportedly current facts and conditions

existing at the time or prior to when each statement was made, or a statement rendered materially misleading for omitting existing facts.

585.    To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were insufficient to insulate them from liability for their materially false and misleading statements.

586.    To the extent the statutory safe harbor otherwise would apply to any materially false and misleading statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew that the particular forward-looking statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Meta who knew that the statement was materially false or misleading when made.

587.    Moreover, to the extent that Meta or the other Defendants issued any disclosures purporting to warn or caution investors of certain "risks," those disclosures were also materially false or misleading because they did not disclose that the risks that were the subject of the warnings had materialized, or that Meta and the other Defendants had actual knowledge of undisclosed material adverse facts that rendered the purportedly cautionary disclosures materially false or misleading.

## X.    **THE PRESUMPTION OF RELIANCE**

588.    At all relevant times, the market for Meta's Class A common stock was an efficient market for the following reasons, among others:

    a.    Meta Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b.    As a regulated issuer, Meta filed periodic public reports with the SEC;

    c.    Meta regularly and publicly communicated with investors via established

market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d.   Meta was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

e.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Meta securities; and

f.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Meta Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

589.   As a result of the foregoing, the market for Meta's Class A common stock reasonably promptly digested current information regarding Meta from all publicly available sources and reflected such information in the price of Meta Class A common stock. All purchasers of Meta Class A common stock during the Class Period suffered similar injury through their purchase of Meta Class A common stock at artificially inflated prices, and a presumption of reliance applies.

590.   A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XI.   CLASS ACTION ALLEGATIONS

591.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Meta Class A common stock between April 27, 2021, and October 21, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

592.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Meta shares were actively traded on the NASDAQ. As of October 20, 2021, there were over 2.3 billion shares of Meta common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Class members who purchased Meta common stock may be identified from records maintained by Meta or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

593.     Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

594.     Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Lead Plaintiffs have no interests that conflict with the interests of the Class.

595.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are: (a) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (b) whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein; (c) whether Defendants'

misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and (d) the proper way to measure damages.

596.    A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small such that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS FOR RELIEF

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

597.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

598.    This Count is asserted on behalf of all members of the Class against Defendants Meta, Zuckerberg, Wehner, Clegg, Mosseri, Rosen, Stone, Davis, Newton, LeCun, Bickert, and Diwanji for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

599.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and the other purchasers of the Company's Class A common stock in an effort to maintain artificially high market prices for Meta securities.

600.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Meta Class A common stock, which were intended to, and did, (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, (i) how Meta applied its Community Standards content-moderation policies; (ii) whether Meta effectively addressed the presence, spread, and impact of misinformation and harmful content on its platforms, including by virtue of its algorithms; (iii) the negative effects that Meta's Instagram platform had on younger users, and in particular, teenage girls, and its research concerning that subject; and (iv) the accuracy and reliability of Meta's reported user growth rates; (b) artificially inflate and maintain the market price of Meta Class A common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase Meta Class A common stock at artificially inflated prices and suffer losses as a result of the disclosures detailed herein.

601.    Defendants Meta, Zuckerberg, Wehner, Clegg, Mosseri, Rosen, Stone, Davis, Newton, LeCun, Bickert, and Diwanji are liable for the materially false and misleading statements they made during the Class Period, as alleged above.

602.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Meta Class A common stock, were either known to Defendants or were so obvious that Defendants should have been aware of them.

603.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Meta Class A common stock, which inflation was removed from its price in response to the disclosures detailed herein.

604.    Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired Meta's

Class A common stock or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Meta's Class A common stock and that the ultimate disclosure of the information detailed herein would cause the price of Meta's Class A common stock to decline.

605.    Defendants' numerous false and misleading statements and omissions artificially inflated the price of Meta Class A common stock. That artificial inflation was removed in response to information revealed in a series of partial disclosures, set forth above. The alleged fraud and these disclosures were a substantial factor in causing investors' economic loss.

606.    None of these revelations was sufficient on its own to fully remove the inflation from the price of the Company's Class A common stock. Moreover, as explained above, the impact of the disclosures alleged herein was tempered by Defendants' continual reassuring statements and failure to fully disclose the truth.

607.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's Class A common stock during the Class Period.

608.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendants Zuckerberg, Wehner, Clegg, Mosseri, Rosen, Stone, Davis, Newton, LeCun, Bickert, and Diwanji)**

609.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

610.    This count is asserted on behalf of all members of the Class against Defendants Zuckerberg, Wehner, Clegg, Mosseri, Rosen, Stone, Davis, Newton, LeCun, Bickert, and Diwanji for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

611.    The Executive Defendants acted as controlling persons of Meta within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

612.    By reasons of their high-level positions of control and authority as the Company's

most senior officers, the Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Meta during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

613.   Each of the Executive Defendants spoke to investors or the public on behalf of the Company during the Class Period. Therefore, each of the Executive Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Meta during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

614.   As set forth above, Meta violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

615.   By virtue of their positions as controlling persons of Meta and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Meta Class A common stock. As detailed above, during the respective times, these Executive Defendants served as officers, directors, and/or senior personnel of Meta.

616.   As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Meta Class A common stock.

## XIII.   PRAYER FOR RELIEF

617.   WHEREFORE, Lead Plaintiffs pray for judgment as follows:

a.   Determining that this action is a proper class action under Rule 23 of the

Federal Rules of Civil Procedure;

  b.  Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

  c.  Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

  d.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

Dated: October 28, 2022     Respectfully submitted,

          **BERNSTEIN LITOWITZ BERGER**
          **& GROSSMANN LLP**

          */s/ John Rizio-Hamilton*
          John Rizio-Hamilton (*pro hac vice*)
          (johnr@blbglaw.com)

          Hannah Ross (*pro hac vice*)
          (hannah@blbglaw.com)
          Jeroen van Kwawegen (*pro hac vice*)
          (jeroen@blbglaw.com)
          Lauren Ormsbee (*pro hac vice*)
          (lauren@blbglaw.com)
          Rebecca Boon (*pro hac vice*)
          (rebecca.boon@blbglaw.com)
          Adam Hollander (*pro hac vice*)
          (adam.hollander@blbglaw.com)
          John Esmay (*pro hac vice*)
          (john.esmay@blbglaw.com)
          Mathews de Carvalho (*pro hac vice*)
          (mathews.decarvalho@blbglaw.com)
          1251 Avenue of the Americas
          New York, NY 10020
          Tel: (212) 554-1400
          Fax: (212) 554-1444

          -and-

          Jonathan D. Uslaner (Bar No. 256898)
          (jonathanu@blbglaw.com)
          Caitlin Bozman (Bar No. 343721)
          (caitlin.bozman@blbglaw.com)
          2121 Avenue of the Stars, Suite 2575

Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs*
*Ohio Public Employees Retirement System and*
*PFA Pension Forsikringsaktieselskab*

**OFFICE OF THE ATTORNEY GENERAL
  OF THE STATE OF OHIO**

SHAWN BUSKEN
(Shawn.Busken@OhioAttorneyGeneral.gov)
30 East Broad Street
Columbus, OH 43215
Tel: (800) 282-0515

*Additional Counsel for Lead Plaintiff Ohio Public*
*Employees Retirement System*