**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
CAITLIN C. BOZMAN (Bar No. 343721)
(caitlin.bozman@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs*
*Ohio Public Employees Retirement System and*
*PFA Pension Forsikringsaktieselskab*

[Additional Counsel Appear on
Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PLATFORMS, INC. SECURITIES LITIGATION | Lead Case No. 4:21-cv-08812-JST |
| | Consolidated Case No. 4:21-cv-08873-JST |
| | **LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| | <u>CLASS ACTION</u> |
| | Date: August 17, 2023 Time: 2:00 PM Courtroom: 6 |

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF ISSUES TO BE DECIDED ..................................................... 1

II.  INTRODUCTION ........................................................................................... 1

III. STATEMENT OF FACTS ............................................................................... 4

    A.   Misstatements And Omissions About "X-Check" And "Whitelisting" ................. 4

    B.   Misstatements And Omissions About The Algorithm And Content
        Moderation ........................................................................................... 6

    C.   Misstatements And Omissions About Harm To Young Users ............................. 8

    D.   Misstatements And Omissions About Growth Metrics And SUMA ................... 10

IV.  ARGUMENT .............................................................................................. 11

    A.   Claims About Meta's X-Check And Whitelisting Programs ............................... 11

        1.   The Complaint Sufficiently Alleges Falsity ............................................. 11

        2.   The Complaint Alleges A Strong Inference of Scienter ........................... 14

        3.   The Complaint Adequately Alleges Loss Causation ............................... 16

    B.   Claims About The Algorithm And Content Moderation ..................................... 19

        1.   The Complaint Sufficiently Alleges Falsity ............................................. 19

        2.   The Complaint Alleges A Strong Inference of Scienter ........................... 24

        3.   The Complaint Adequately Alleges Loss Causation ............................... 27

    C.   Claims About Meta's Platforms' Harm To Children ........................................... 28

        1.   The Complaint Sufficiently Alleges Falsity ............................................. 28

        2.   The Complaint Alleges A Strong Inference of Scienter ........................... 33

        3.   The Complaint Adequately Alleges Loss Causation ............................... 35

    D.   Claims About Facebook's Growth Metrics And SUMA ..................................... 37

        1.   The Complaint Sufficiently Alleges Falsity ............................................. 37

        2.   The Complaint Alleges A Strong Inference Of Scienter ........................... 39

        3.   The Complaint Adequately Alleges Loss Causation ............................... 40

    E.   The Complaint States Control Person Claims Against Each Defendant ............. 40

V.     CONCLUSION ............................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abadilla v. Precigen, Inc.*,
  2022 WL 1750033 (N.D. Cal. May 31, 2022) ........................................................27

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)...............................................................................................13

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .................................................................................34

*In re Bofi Holding, Inc. Sec. Litig.*,
  2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ..................................................13, 14

*City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr. v. RH, Inc.*,
  302 F. Supp. 3d 1028 (N.D. Cal. 2018) ...............................................14, 23, 24, 35

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) .................................................................................35

*In re Columbia Secs. Litig.*,
  747 F. Supp. 237 (S.D.N.Y. 1990) .........................................................................31

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) .................................................................................31

*Cooper v. Thoratec Corp.*,
  2018 WL 2117337 (N.D. Cal. May 8, 2018) ..........................................................17

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ...............................................................................22

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ...................................................................15, 27, 40

*Desta v. Wins Fin. Hldgs. Inc.*,
  2018 WL 1136525 (C.D. Cal. Feb. 28, 2018)..........................................................37

*Di Donato v. Insys Theraoeutics Inc.*,
  2017 WL 3268797 (D. Ariz. Aug. 1, 2017).............................................................31

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) ..............................................................23, 38

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ........................................................27

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    2023 WL 2532061 (9th Cir. Mar. 16, 2023)..........................................................21, 24

*Hefler v. Wells Fargo & Co.*,
    2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .......................................................21, 40

*Homyk v. ChemoCentryx, Inc.*,
    No. 4:21-cv-03343-JST (N.D. Cal. Feb. 23, 2023)......................................................22

*Huynh v. Quora, Inc.*,
    2020 WL 7408230 (N.D. Cal. June 1, 2020) ...............................................................21

*In re Intel Corp. Sec. Litig.*,
    2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)..............................................................31

*Karimi v. Deutsche Bank AG*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022)..................................................................13, 21

*Kyung Cho v. UCBH Hldgs., Inc.*,
    890 F. Supp. 2d 1190 (N.D. Cal. 2012) .....................................................................40

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .....................................................................................18

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) .............................................................18

*In re Merit Med. Sys., Inc. Sec. Litig.*,
    2021 WL 1192133 (N.D. Cal. Mar. 29, 2021).............................................................36

*Mineworkers Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ...............................................................17, 18, 37, 40

*In re Novatel Wireless Sec. Litig.*,
    830 F. Supp. 2d 996 (S.D. Cal. 2011).........................................................................17

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .............................................................................31, 33

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ...................................................................................35

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)...................................................................................................32

*In re Omnivision Techs., Inc.*,
    2005 WL 1867717 (N.D. Cal. July 29, 2005).......................................................26, 35

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020) .......................................................................13

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ........................................................38

*In re QuantumScape Sec. Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ...............................................22, 32

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) .....................................................25, 34, 39

*Retail Wholesale & Dept. Store Union Loc. 338 Ret. Fund v. Hewlett Packard
  Co.*,
  845 F.3d 1268 (9th Cir. 2017) .........................................................21

*In re Rigel Pharms. Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ..........................................................35

*Sanchez v. Decision Diagnostics Corp.*,
  2022 WL 18142518 (N.D. Cal. Dec. 5, 2022) ...........................................31

*Sanders v. Realreal, Inc.*,
  2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ...........................................35

*Scheller v. Nutanix, Inc.*,
  2020 WL 5500422 (N.D. Cal. Sept. 11, 2020) .......................................26, 35

*SEC v. Rana Research, Inc.*,
  8 F.3d 1358 (9th Cir. 1993) ...........................................................31

*Shenwick v. Twitter*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................... passim

*In re Silicon Graphics Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ..........................................................14

*In re Silver Wheaton Corp. Sec. Litig.*,
  2016 WL 3226004 (C.D. Cal. June 6, 2016) .............................................16

*In re Snap Inc. Sec. Litig.*,
  2018 WL 2972528 (C.D. Cal. June 7, 2018) ............................................38

*In re Splunk Inc. Sec. Litig.*,
  592 F. Supp. 3d 919 (N.D. Cal. 2022) .................................................29

*In re Tesla, Inc. Sec. Litig.*,
  2022 WL 7374936 (N.D. Cal. Oct. 13, 2022)........................................18, 28, 37

*In re Tesla, Inc. Sec. Litig.*,
  477 F. Supp. 3d 903 (N.D. Cal. Apr. 15, 2020).........................................31

*In re Toyota Motor Corp. Sec. Litig.*,
  2011 WL 2675395 (C.D. Cal. July 7, 2011) ....................................................25

*In re Twitter, Inc. Sec. Litig.*,
  2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ..............................................17, 30

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)............................................................22

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ..........................................................27

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009)............................................................18

*Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ......................................................31

*Wessel v. Buhler*,
  473 F.2d 279 (9th Cir. 1971) ........................................................................32

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) .........................................................................23

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005) ..........................................................15

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs hereby oppose Defendants' motion to dismiss (ECF No. 110, "MTD").[1]

## **I.   STATEMENT OF ISSUES TO BE DECIDED**

Whether the Complaint alleges facts that, considered holistically, state claims under § 10(b) and § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a).

## **II.   INTRODUCTION**

This case concerns Defendants' deliberate efforts to conceal severe harms caused by Facebook and Instagram. Prior to the Class Period, Meta faced declining engagement, tepid growth and intense public scrutiny brought about by numerous scandals – all of which threatened its revenue. In response, Meta and its senior executives made a series of statements designed to assuage concerns about Meta's platforms and their effects, and to reignite user engagement and growth. Based on the sworn testimony of a whistleblower, Frances Haugen, and a raft of internal documents, the Complaint pleads in extraordinary detail that these reassuring statements were false and misleading – and that Meta's most senior executives knew it.

After Cambridge Analytica, Meta published "Community Standards," which "outline what is and isn't allowed on Facebook." Defendants stated that Meta applied these standards equally to all users, regardless of their influence or power. ¶¶83-121, 386-420. When questions arose about Meta's X-Check program, Meta said that it was simply a mechanism to ensure that the rules had been applied properly and fairly. In reality, X-Check and "whitelisting" exempted millions of Meta's most powerful users from its content rules – allowing them to distribute toxic, viral content with impunity. Meta implemented these practices through 45 global teams, and its most senior executives, including Defendant Zuckerberg, were intimately involved with them. Meta's own internal documents stated, "We are not actually doing what we say we do publicly," and described "daily interventions" by Meta's leadership. In the wake of the disclosures detailed in the Complaint, Meta was forced to admit that its statements about X-Check "could" be "misleading." Meta's own Oversight Board went further, finding a complete lack of meaningful "transparency," and that

---

[1] Unless otherwise noted, citations to "¶_" are to the Complaint (ECF No. 97); emphasis is added; and internal citations, alterations, and quotations are omitted. References to Ex. __ refer to the Declaration of John Rizio-Hamilton filed in support of this opposition.

Meta's "statements and [its] public-facing content policies are misleading." Ex. A at 29.

Defendants also falsely assured investors that Meta's News Feed algorithm did not amplify toxic content, and that Meta was effective at proactively finding and removing content that violated its rules. ¶¶122-201, 421-69. But internal documents and whistleblower testimony show that Zuckerberg oversaw changes to the algorithm that caused toxic content to become "inordinately prevalent" and "flourish." Meta's researchers found that "98 per cent of the Hate Speech contents are reported reactively," Meta took action on as little as "~0.6%" of violence and inciting content, and its content moderation practices were "not remotely sufficient to address harms on our platform." Zuckerberg rejected proposed fixes because they would decrease engagement and revenue.

At the same time, Defendants tried to quell mounting public concern by falsely reassuring investors that Instagram, which Meta acquired in a last-ditch effort to recapture the critical youth market, was safe for young people. ¶¶202-57, 470-502. "[T]aking a page from the textbook of Big Tobacco," Meta downplayed and outright denied that Instagram harmed children, stating that the "little existing research" showed that its effects were "quite small" and "bidirectional" (i.e., also positive) and concerns were "overblown." In truth, Meta had years of "deep dive" research demonstrating that Instagram inflicts "common" and "severe" harm on young users, including "making body image issues worse for 1 in 3 teen girls," and causing teens to want to "hurt themselves" or "kill themselves" – feelings that "started on Instagram."

While misleading the public on these key issues, Meta reported artificially inflated user growth rates to reinforce the illusion of a healthy empire. ¶¶258-75, 503-11. In the first and second quarters of 2021, Meta reported growth rates of 7% to 10%, which pleasantly surprised analysts. Again however, Meta concealed an ugly truth: its research showed that nearly half of its purportedly "new" accounts were not new at all, and instead were duplicate accounts created by existing users. In the U.S. alone, the supposed number of Facebook users in their 20s exceeded the total population of that demographic – a clear impossibility.

Investors first learned about these facts in September 2021, when a series of disclosures stunned the country and sent Meta's stock price into a tailspin. ¶¶276-374, 512-15. First, *The Wall*

*Street Journal* (the "*WSJ*") published a series of blockbuster articles, "The Facebook Files," which revealed internal Meta documents and other facts provided by an unidentified whistleblower. Next, the whistleblower, Frances Haugen, appeared on *60 Minutes* and testified before Congress. She revealed herself to be an experienced data scientist who worked in Meta's "Civic Integrity Unit," and demonstrated that Meta knew about the severe harms caused by its platforms, and simply chose to prioritize profits. As Haugen explained, "[T]here were conflicts of interest between what was good for the public and what was good for Facebook. And Facebook, over and over again, chose to optimize for its own interests, like making more money." As a result of the disclosures detailed in the Complaint, Meta's stock price fell more than 14%, destroying $130 billion of market value.

In response, Defendants argue that Plaintiffs fail to allege a single actionable misstatement or omission, principally because their statements are too vague and aspirational. Defendants mischaracterize and ignore their own words. These statements are not general expressions of corporate values set forth in a "code of conduct." As summarized herein, they are highly specific assurances about Meta's products and practices – often made in direct response to questions, widespread concerns, and increasing regulatory scrutiny, including in congressional testimony.

Defendants also argue that their misleading statements about Instagram's impact on children are inactionable because they were not made in a public context. However, these statements were made through some of the most prominent instruments of public discourse, including the *WSJ* and Twitter. It strains credulity for Meta, the largest social media company on the planet, to argue that statements made on social media somehow "do not count." Regardless, as discussed *infra* at 31, Ninth Circuit law makes clear that such statements are actionable.

Defendants next contend that the Complaint does not allege scienter. According to them, the most compelling inference is that each Defendant was completely ignorant of all the facts that Meta internally documented – including in multi-year "deep dives" – about the most key issues facing the Company. The Complaint pleads a litany of facts giving rise to an inference of scienter, including that (i) many of the key documents were presented to Defendants, or describe their knowledge of the facts reported and actions they took on these issues; (ii) the internal documents were analyses or studies directed by Meta executives and made available to Defendants;

(iii) Defendants repeatedly stated, including under oath, that they knew about the facts at issue; (iv) these facts concern the most critical issues facing Meta, and were the subject of intense public and internal scrutiny; and (v) Meta profited from the misconduct described herein. ¶¶516-82.

Finally, Defendants challenge loss causation, principally arguing that the Court must conclude as a matter of law that the concealed information was already known. Setting aside that the law is clear that this "truth on the market" defense is premature, numerous facts preclude finding that the facts were known as a matter of law, including that (i) the information emanated from internal documents that were only made public by a whistleblower; (ii) the information was the subject of bombshell *WSJ* articles and a *60 Minutes* report, demonstrating that it was anything but "old news"; (iii) the revelation of this information triggered a congressional investigation; and (iv) citing "new information" reported by the *WSJ*, Meta's Oversight Board launched an investigation and concluded that Meta misled the public. Defendants also contend that certain of the stock price declines are not big enough, but this is a question of calculating the amount of damages – not pleading loss causation. Defendants' motion should be denied.

### III.   STATEMENT OF FACTS

Prior to the Class Period, Meta's engagement was in decline, and it was under fire for its role in the events of January 6, 2021. ¶¶6-11, 65-76. During the Class Period, Defendants made misleading statements on multiple subjects to assuage concerns, deflect scrutiny, and clear the way for Meta to boost engagement, attract users, and reap enormous profits. ¶¶12, 77-82, 385-511.

### A.   Misstatements And Omissions About "X-Check" And "Whitelisting"

Defendants told investors, Congress, and the Oversight Board that Meta applied its Community Standards equally to all users. They stated that Meta applied the Standards to "everyone, all around the world, and to all types of content," and to "everyone regardless of their position of power." ¶¶386, 393, 399, 406, 411, 419. Meta further represented that it removed harmful content "no matter who posts it." ¶97. As Clegg told *CBS*, "[W]hether you are the Pope, the Queen, or the President of the United States, what we apply to everybody is you cannot use our services to say things which we think can deliberately lead to harm." ¶411.

Shortly after January 6, 2021, Meta indefinitely suspended President Trump's accounts and

sought review of the decision from its Oversight Board. ¶94. On May 5, the Board directed Meta to "clearly explain the rationale, standards and processes" of X-Check. *Id.* In response, Defendants made materially false and misleading statements about X-Check, its size, nature, purpose, and application. ¶¶402-19. Clegg stated that Meta's X-Check review was done in only a "small number of decisions"; that the purpose of X-Check was "to help confirm we are applying our policies correctly"; and that X-Check "simply means that we will give some content from certain Pages or Profiles additional review." ¶404. Stone similarly represented that X-Check "was designed . . . so we can accurately enforce policies on content that could require more understanding." ¶¶288, 418; *see* ¶389 (purpose "to minimize the risk of errors in enforcement"). Clegg acknowledged that "we allow certain content that is newsworthy . . . to remain on our platform – even if it might otherwise violate our Community Standards." ¶95. But he insisted that Meta applied this "newsworthiness allowance" equally to its users, to only a "small number of posts," would disclose the "rare instances when we apply it," and would take content down if "the risk of harm outweighs the public interest." *Id.*; ¶406 (allowance applied in "exceptional circumstances" and to "all types of content").

Disclosures on September 13, 21, 28, and October 21, 2021 revealed that Defendants' statements were false and misleading. ¶¶279-90, 322-27, 365-69. Meta did not apply the Community Standards equally to all, and did not remove harmful content regardless of who posted it. Instead, Meta used "X-Check" to "shield millions of VIP users from the company's normal enforcement process." ¶¶16-17, 100-03. Meta kept a "whitelist" of users who were "immune from enforcement actions" or "allowed to post rule-violating material pending Facebook employee reviews that often never came." ¶¶102, 104-08. Inclusion on Meta's whitelist was determined by a user's political or other influence; it had nothing to do with "newsworthiness." ¶¶110, 117, 281-285.

This program was enormous: Meta had 45 global teams that maintained the exempt list, which included nearly 6 million people. ¶17, 102-04. Because VIP content generated a disproportionate amount of views and had an outsized impact on public discourse, the whitelist exempted the most harmful and viral content on Meta's platform. ¶18. A Meta audit found that whitelisting was "pervasive, touching almost every area of the company," "not publicly defensible," and that "[w]e are not actually doing what we say we do publicly." ¶¶107, 114. Another Meta memo

documented "<u>daily interventions in [Meta's] rule-making and enforcement process by both Facebook's public-policy team and senior executives</u>." ¶111.

On September 21, 2021, the Oversight Board demanded more information about X-Check and that Meta "commit to transparency." ¶323. The Board excoriated Meta over its stonewalling and for withholding documents concerning X-Check earlier in 2021. ¶322. In response, on September 28, Meta announced that it would allow the Board to review the X-Check program, admitted to a lack of transparency concerning X-Check, and disclosed that it would cooperate with the Board and seek its recommendations and oversight. ¶333.

Then, on October 21, 2021, the Board released a report stating that Meta "has not been fully forthcoming in its responses on cross-check," and that it gave "ambiguous, undetailed" responses that provided "no meaningful transparency" and were "not acceptable." ¶¶119-20. Confronted with the Facebook Files, Meta itself "admitted that it should not have said cross-check only applied to a small number of decisions," and that "its phrasing could come across as misleading." ¶119.

The Oversight Board reiterated its concerns about Meta's lack of transparency in a report issued on December 6, 2022. Ex. A. The Report concluded that "Meta has repeatedly told the Board and the public that the same set of policies apply to all users. Such statements and the public-facing content policies are misleading . . . ." *Id*. at 29-30. It also expressed the Board's "concern[] about the limited information Meta has provided the public and its users about this program," and "Meta's failure to disclose to the Board key information about this program . . . ." *Id*. at 34.

**B.     Misstatements And Omissions About The Algorithm And Content Moderation**

In 2018, as part of its effort to address declining user engagement, Meta changed the News Feed algorithm to assign points to certain types of content and elevate high-scoring content in News Feed. ¶¶127-28. When Zuckerberg testified before Congress in March 2021, he denied that the algorithm promoted "divisive, hateful, and conspiratorial content." ¶142.

Throughout the Class Period, Defendants misled investors about Meta's algorithm and content moderation practices. First, Meta assured investors that the algorithm did not amplify, and even reduced harmful content. *E.g.*, ¶¶424, 428-29, 437. On April 28, 2021, in response to a question about whether the algorithm amplified "some of the more controversial content" to

increase engagement, Zuckerberg denied it, saying as to "extremist content or any of that stuff," "we go out of our way to try to reduce that." ¶424. On July 28, LeCun stated that the "claim that FB amplifies ideas you disagree with" was "simply false." ¶437.

Second, Defendants represented that Meta (i) was effective at removing and banning harmful content (*e.g.*, ¶¶430, 435, 439, 445, 447, 454, 463); and (ii) proactively detected and removed hate speech from its platforms (*e.g.*, ¶¶450-51, 461). With respect to effectiveness, on August 18, 2021, Zuckerberg stated, "if we see harmful misinformation on the platform, then we take it down. It's against our policies." ¶463. As to proactivity, on May 19, Meta stated, "Today we proactively detect about 97% of hate speech content we remove." ¶450. On July 29, Clegg likewise stated, "we catch the vast majority of it before anyone reports it to us." ¶439.

Third, Defendants said that Meta did not profit from harmful content and had no incentive to promote it on its platforms. *E.g.*, ¶¶422, 439. For instance, on July 29, 2021, Clegg emphatically stated, "I flatly and vigorously reject this idea that Facebook has an incentive to spoon feed people sort of addictive extreme violent unpleasant hateful content." ¶439. On October 5, Zuckerberg declared that the "idea that we prioritize profit over safety and well-being" is "just not true." ¶467.

Facts made public in the September 15, 16, and 17 Facebook Files, and during interviews with Haugen on October 3, revealed that these statements were false and misleading. ¶¶310-20. First, contrary to Defendants' statements that the algorithm did not amplify harmful content, Meta's own internal research showed that the 2018 changes to the algorithm caused toxic content on Meta's platform to be "inordinately prevalent." ¶166. Internal documents further made clear that Meta's algorithm changes had "unhealthy side effects on important slices of public content, such as politics and news." *Id.* Indeed, Meta's research discussed "compelling evidence that our core product mechanics," including its algorithm, were a "significant part" of why hate speech and misinformation "flourish on the platform." ¶167.

Second, Meta's internal research found that its content-moderation tools were not effective in removing or banning harmful content. Those tools were "currently, for the foreseeable future, and perhaps permanently, not remotely sufficient to address harms on our platform." ¶188. Meta similarly observed that "we do not and possibly never will have a model that captures even a

majority of integrity harms." *Id.* In fact, Meta took action against "<u>as little as 3-5% of hate and</u> <u>~0.6% of V&I [violence and inciting content] on Facebook</u>," and "<u>miss[ed] 95% of violating hate</u> <u>speech</u>." ¶193; *see* ¶189 ("we only take action against approximately 2% of the hate speech"). A staggering 99% of users identified as repeat offenders of Meta's hate speech policies remained active. ¶191. As to Meta's claim that it was proactively detecting hate speech, it concluded that "<u>98</u> <u>per cent of the Hate Speech contents are reported reactively (i.e. by our community)</u>." ¶193.

<u>Third</u>, Meta was incentivized to and did profit from the proliferation of harmful content. When Zuckerberg was presented with proposals to change the algorithm to reduce the spread of harmful content, he refused to implement broad changes because they would decrease engagement and revenue. ¶179. As Haugen told *60 Minutes*, "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money." ¶342. Haugen further told the *WSJ* that Meta was "trading off very small decreases in engagement for huge consequences in misinformation and hate speech and violence." ¶348.

## C.   Misstatements And Omissions About Harm To Young Users

Prior to the Class Period, Meta's teen user base plummeted, and it increasingly lost younger users to competitors. ¶¶69-72, 207-09. This trend posed "a significant risk" to Meta's profitability. ¶75. As Meta publicly acknowledged, younger users are vital to social media companies because they create trends, adopt new technologies, and represent a critical untapped source for new growth. ¶¶7, 68, 580. In a "race for teen users," Meta covertly launched a years-long "deep dive" research project into how to attract younger and younger users and keep them engaged. ¶¶72-77.

During the same period, Meta faced increasing scrutiny from regulators and the public about its platforms' effects on young users. For instance, at a March 25, 2021, congressional hearing, Zuckerberg was asked point blank, "Do you believe that your platform harms children?" ¶241. He testified, "I don't believe so. This is something we study and care about a lot." *Id.* Zuckerberg further testified (falsely) that "overall, the research we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits." ¶242.

Faced with this growing public concern, Defendants downplayed or outright denied that Meta's platforms harm young users. For instance, in response to pointed questions, Defendants said

that "there's little existing research" into Instagram's effect on children's well-being, and that the scant research available showed that any effects were "quite small" and "bidirectional" (i.e., also positive). ¶¶471, 479, 482. Defendants similarly insisted that any concerns were "<u>overblown</u>." ¶252. When asked about Meta's own research, Defendants suggested that it was inconclusive; Meta "tried to measure" well-being, but it was "subjective," "hard to measure," and "more of like a judgment call." ¶475. Defendants touted Meta's "robust policies" to protect children, and that it "never compromise[d]" their "privacy and safety." ¶¶484, 486.

These statements were materially false and misleading, and omitted material facts. As investors came to learn on September 14 and 28, and October 3, 2021, Meta's internal research showed that Instagram inflicts "<u>common</u>" and "<u>severe</u>" harm on teen and child users, including "<u>making body image issues worse for 1 in 3 teen girls</u>," "<u>increas[ing] rates of anxiety and depression</u>," and causing teens to want to "<u>hurt themselves</u>" or "<u>kill themselves</u>" – feelings that "<u>started on Instagram</u>." ¶¶203, 210-27. Teen girls identified "<u>Instagram as the 'worst' social media app</u> in terms of body and appearance comparison," which, according to Meta's own research, both causes and exacerbates mental health issues. ¶¶211, 218. Worse yet, teens become so "<u>addicted</u>" to Meta's platforms that when they "<u>know that what they're seeing is bad for their mental health</u>," they "<u>feel unable to stop themselves</u>." ¶214. Internal documents revealed that Meta employees reported these findings to the Company's top executives, including Zuckerberg. ¶¶210-27.

Although Meta's research identified these issues as "<u>high reach, high intensity</u>," Defendants did not address them and concealed Meta's research findings. ¶220. Meta's documents show that Defendants' sole concern was optics – for instance, despite publicly touting "Project Daisy" as "shap[ing] a more positive experience on Instagram," Defendants privately acknowledged that it did not affect "overall well-being," and did it because it "could make them look good." ¶¶247-49.

Even after the September 14 Facebook File, Defendants continued to misrepresent Meta's research findings on teen safety, including during congressional testimony. On September 30, 2021, Congress held a hearing to investigate "Facebook, Instagram, and Mental Health Harms." ¶495. Davis falsely testified that Meta's platforms were not "addictive," and that Instagram was "affirmatively helping [teens], not making it worse." ¶¶492-93, 495-98, 500. When asked whether

"Facebook ha[s] internal research indicating that Instagram harms teens, particularly harming perceptions of body image, which disproportionately affect girls," Davis falsely testified, "What our research showed was that for people who are struggling with these issues, that actually more of them found their engagement on Instagram helpful than harmful." ¶497.

As Haugen explained on October 3, 2021, Meta purposefully designed Instagram to become addictive so that children, including teen girls, "use the app more," and "end up in this feedback cycle where they hate their bodies more and more." ¶345. Haugen further explained, "<u>Facebook's own research says it is not just that Instagram is dangerous for teenagers, that it harms teenagers, it's that it is distinctly worse than other forms of social media</u>." *Id.*

### D.    Misstatements And Omissions About Growth Metrics And SUMA

Meta earns nearly all its revenue by selling advertising space, which, in turn, depends on its growth in users and engagement. ¶31. Investors tied Meta's performance to this reported growth, including the prevalence of single users with multiple accounts ("SUMA") among teens and young adults. ¶¶260-61, 267. SUMA was particularly important to investors because Meta said it was a "real identity platform." ¶261.

As the pandemic abated in 2021, growth rates slowed and analysts grew concerned that lower year-over-year growth rates would be a drag on Meta's stock. ¶259. Thus, investors were encouraged when Meta reported strong user growth in the first and second quarters of 2021. ¶¶266-67. On April 28, 2021, Meta stated that Daily Active Users ("DAUs") for March 2021 were 1.88 billion, an increase of 8% from March 2020, and Monthly Active Users ("MAUs") were 2.85 billion – a year-over-year increase of 10%. ¶266. On July 28, 2021, Meta stated that DAUs and MAUs were up 7% from the previous year. ¶268. Analysts took note of this "robust" growth. ¶¶267-69.

The October 21 Facebook File revealed that Meta materially overstated its growth rates because roughly half of Facebook's "new" users were actually duplicate accounts. ¶¶270-71. A Meta report created at the start of the Class Period showed between 32% and 56% of new accounts were SUMA. *Id.* SUMA was "<u>very prevalent among new accounts</u>," and Meta's "system for detecting such accounts also tends to undercount them." ¶370. A May 2021 Meta memo revealed that its active user numbers were "<u>less trustable</u>." ¶371. Another internal analysis showed that the

number of U.S. Facebook users in their 20s exceeded the total population of that demographic, a blatant impossibility. ¶272. At least eight Meta reports showed "steep" declines in use and engagement by teens and young adults, contrary to reported growth. ¶273. In fact, teen engagement was down 13% for 2019-2021, and was projected to decline 45% for 2021-2023. ¶¶273-74.

## IV.   ARGUMENT

### A.   Claims About Meta's X-Check And Whitelisting Programs

#### 1.   The Complaint Sufficiently Alleges Falsity

Defendants principally contend that their statements about X-Check and whitelisting are not actionable because they are mere "statements of adherence to corporate policies." MTD 14. As summarized directly below, this argument mischaracterizes Defendants' statements and the gravamen of Plaintiffs' claims. The Complaint alleges that (i) Meta made specific statements that it applied its content policies equally to all, when, in fact it had built a massive, undisclosed apparatus that exempted high-profile users from those policies; and (ii) when questioned about X-Check, Meta mischaracterized the program itself.

The statements at issue are specific assertions about how Meta applied its policies and their scope; and the size, nature and purpose of a specific program made in response to public concerns. The below statements address how Meta applied its Community Standards and their scope:

- Meta's May 2021 Responses to Congress said, "Our Community Standards apply to all content, and we assess everyone under those Standards. When we identify or learn of content that violates our policies, we remove that content regardless of who posted it." ¶393.
- On May 26, 2021, Clegg represented, "[O]ur policies on hate speech, incitement and so on apply to everyone regardless of their position of power." ¶399.
- On June 4, 2021, Clegg told the Oversight Board, "Our Community Standards apply around the world to all types of content and are designed so they can be applied consistently and fairly" and "[w]e want to make clear that we remove content from Facebook, no matter who posts it, when it violates our Community Standards." ¶406.
- On August 18, 2021, Zuckerberg told *Good Morning America*, "Well, if we see harmful misinformation on the platform, then we take it down. It's against our policies." ¶416.

Contrary to Defendants' statements that they applied the Community Standards equally and "consistently and fairly" to everyone, (i) Meta purposefully "built a system that has exempted high-profile users from some or all of its rules," allowing them to "violate [policies] without any consequences" (¶¶102, 107); and (ii) X-Check and whitelisting shielded at least 5.8 million users

from the Community Standards, allowing them to spread harmful content (*e.g.*, ¶281). Indeed, the

December 6 Board Report specifically concluded that Meta engaged in the "<u>unequal treatment of</u>

<u>users</u>" because X-Check "grants certain users greater protection than others," and that "[c]ontent

<u>policies presented as globally applicable . . . are misleading</u>." Ex. A at 4, 35.

Further, in response to questions about X-Check, Defendants misstated the <u>size, nature, and</u>

<u>purpose of the program</u>. For instance, on June 4, 2021, Clegg told the Oversight Board that:

- "We employ an additional review, called our cross check system, to help confirm we are applying our policies correctly. . . . Cross check simply means that we will give some content from certain Pages or Profiles additional review." ¶404.

- The X-Check review was done in only "a small number of decisions." ¶408.

- "[N]ewsworthiness allowances" were only given to a "small number of posts," Meta would publish the "rare instances when we apply it," it would take content down if "the risk of harm outweighs the public interest," and it applied "in the same way to all content." ¶402.

- On September 13, 2021, Stone stated of X-Check, that "There aren't two systems of justice; it's an attempted safeguard against mistakes." ¶¶418-19.

Concrete, contradictory facts demonstrate that these statements were false or misleading:

(i) X-Check was not a review to ensure that polices were applied correctly, but rather, a mechanism

by which content posted by millions was exempted from the rules; (ii) membership in this select

group was not based on "newsworthiness," but rather, whether the user was whitelisted; and (iii) the

so-called "newsworthiness" exception did <u>not</u> apply to everyone. ¶¶100-15, 403. As the Oversight

Board found, Meta "admitted it should not have said that cross-check only applied to a 'small

number of decisions,'" and "recognized its phrasing could come across as misleading." *Id.* The

December 6 Board Report found that "Meta's stated rationale for the [whitelisting] system contrast

strikingly with how the system operates." Ex. A at 26.

In short, Defendants' statements that Meta applied its content standards equally and their

description of X-Check and the newsworthiness allowance were false. At minimum, they were

misleading because they created "the impression of a state of affairs that differs in a material way

from the one that actually exists." *Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal.

2017) (Tigar, J.).

Defendants' statements are materially different than generic assurances about abstract

commitments or "general compliance" with policies. *See* MTD 14-15. It is one thing to challenge

1   a company's commitment to a policy against hate speech; it is quite another to challenge a

2   company's specific assertion that it applied anti-hate-speech policies to all users, when, in truth, it

3   exempted millions of users from that policy. The former challenges a vague aspiration; the latter

4   challenges the specific fact of whether the company actually applied the policy as it stated. *See*

5   *Karimi v. Deutsche Bank AG*, 607 F. Supp. 3d 381, 396 (S.D.N.Y. 2022) (policy statement

6   actionable where "undermined by . . . pervasive practice of exempting ultra-rich and politically

7   connected" individuals); *In re Bofi Hldg., Inc. Sec. Litig.*, 2016 WL 5390533, at *9 (S.D. Cal. Sept.

8   27, 2016) (statements about "adhere[nce] to" policies "neither aspirational nor general").

9        These misstatements were highly material. The *WSJ* published a blockbuster investigative

10   report about X-Check. ¶¶279-90. The Oversight Board excoriated Meta and asked to meet with

11   Haugen, whom *60 Minutes* interviewed. ¶¶116-21, 340-46. Congress questioned Meta about X-

12   Check (¶91); the media repeatedly interviewed Defendants about it (¶¶90, 99); and the program

13   allowed profoundly harmful content to go viral (¶¶166-67).

14        Defendants next contend that "Meta publicly discussed its X-Check program on numerous

15   occasions." MTD 15. This argument fails. This is a truth-on-the-market defense, which cannot be

16   resolved in Defendants' favor now. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455,

17   481-82 (2013) (whether "news of the [truth] credibly entered the market and dissipated the effects

18   of [prior] misstatements . . . is a matter for trial"); *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367,

19   385 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021).

20        Further, a host of facts show that the defense cannot be embraced as a matter of law. To

21   start, these "disclosures" were false and misleading. X-Check was not a "second layer of review"

22   to look for "mistakes"; it was a system that deliberately allowed powerful users to violate Meta's

23   policies. ¶¶419-20. Further, the Oversight Board, the media, Congress, and others reacted to the

24   whistleblower revelations in 2021 with shock and outrage, demonstrating that they did not know

25   the truth about X-Check beforehand. Indeed, the Board cited the "new information" that "came to

26   light due to the reporting of the Wall Street Journal" as a reason for investigating X-Check. ¶117.

27   It found that Meta has not been transparent about X-Check – even with the Board. ¶¶119-20.

28        Defendants contend that the Complaint has no examples of X-Check "exempt[ing] high-

profile users" or allowing them to violate the Standards. MTD 15. To start, this argument fails because the Complaint alleges that this is how the program operated on a grand scale. Further, Neymar is a specific supporting example: he was in X-Check, violated the Standards, and "[Meta] decided to leave Neymar's accounts active." ¶¶105-06. The Oversight Board found that "the only consequence [to Neymar] was content removal, and that the normal penalty would have been account disabling." Ex. A, at 30. The Board also cited Neymar as an example of how "Meta characterizes cross-check as a program to protect vulnerable and important voices, [but] it appears to be more directly structured and calibrated to satisfy business concerns." *Id*. at 29.

Defendants' contention that Meta's own internal documents should not be credited (MTD 16) defies logic. It is extraordinary for a complaint to quote internal documents and whistleblower testimony, surpassing the level of detail required by the PSLRA. Unlike in Defendants' cited cases, the Complaint includes numerous specific details, sourced from internal documents that were publicly disclosed and reported, which more than satisfy the requirement that a complaint "contain at least some specifics from [internal] reports as well as such facts as may indicate their reliability." *In re Silicon Graphics Sec. Litig*., 183 F.3d 970, 985 (9th Cir. 1999); *see* ¶¶100-15.

As for Defendants' remaining arguments, the inference they urge – that the "pervasive" whitelisting program abruptly stopped prior to the Class Period (MTD 16) – is wildly implausible, and is inconsistent with Meta's admission, made public in the December 6 Board Report, that "it does have a system that blocks some enforcement actions," i.e., "whitelisting." Ex. A at 22. Meta's purported warnings about its goals (MTD 17) are irrelevant, boilerplate, and did not disclose the truth. Defendants' factual arguments are, at best, premature at this stage.

### 2. The Complaint Alleges A Strong Inference of Scienter

The Defendants who made alleged misstatements about X-Check and whitelisting are Meta, Zuckerberg, Clegg, Bickert, and Stone. The Complaint amply alleges scienter for each of them.

<u>First</u>, Zuckerberg, Clegg, Bickert, and Stone were personally involved in X-Check and made key decisions about it. ¶¶542-46. *See City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1044-45 (N.D. Cal. 2018) (being "highly involved" with subject matter of misstatements supports scienter). Contrary to Defendants' assertions that the Complaint

lacks allegations of their personal knowledge (MTD 18), a Meta research report revealed that decisions to exclude users from Meta's policies were made by Zuckerberg and management on the Public Policy team, which includes Bickert (¶62) and Stone (¶58). ¶¶109-10. The *WSJ* similarly reported that "VIP" users and their content were subject to review at the highest levels, including by Zuckerberg. ¶111. The September 13 Facebook File described the X-Check documents it reviewed as including "drafts of presentations to senior management, including Mr. Zuckerberg." ¶101. Another Meta memo described "daily interventions in [Meta's] rule-making and enforcement process by both Facebook's public-policy team and senior executives." ¶¶111, 543; *see also* ¶106.

Contrary to Defendants' argument that certain documents "are insufficient to plead scienter" because they "date back to 2019 and 2020" (MTD 18), the "class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts." *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) (crediting "facts relating to scienter dating from before the proposed class period").

Second, Zuckerberg, Clegg, Bickert, and Stone touted their personal involvement in X-Check and professed to be knowledgeable about it. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (scienter where defendants "personally directed" practices); *Shenwick*, 282 F. Supp. at 1147 ("an assertion that Defendants were unaware of an alleged issue can be directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]").

*Zuckerberg.* On a June 2020 internal video call, Zuckerberg gave an account of the hands-on "process" through which he reviewed and decided not to delete Trump's May 28, 2020 post, despite a "high likelihood" that it violated Meta's policies. ¶¶120, 545. Zuckerberg touted his involvement in decision-making on such content, stating, "[W]e do incorporate a wide diversity of perspectives," "[a]nd a bunch of them I also generally seek out directly myself." ¶545.

*Clegg.* Zuckerberg named Clegg in response to an employee question about "which execs are involved" in the decision-making process. ¶¶545-46. Clegg told *CNN*, "[M]y responsibility in the company is to deal with these very difficult policies. You know, I oversee that amongst other things, the company's policies and everything about . . . how hate speech rules work." ¶546. Further, Clegg provided misleading descriptions of X-Check on investor calls. ¶404. Plainly, the

Complaint does not rely merely on Clegg's executive position for scienter. MTD 19.

***Bickert.*** A member of the Policy team (¶62), Bickert touted her knowledge of X-Check and her personal involvement in "how <u>we decide</u> what's allowed on Facebook" – "among the most important [decisions] <u>we make</u>" – in response to questions. ¶¶88, 90 ("[O]ur decision.").

***Stone.*** As Meta's "hatchet man," Stone aggressively disputed the September 13 Facebook File. ¶¶288-90. Stone provided a false description of X-Check in a statement published in the article, and asserted, "Facebook itself identified the issues with cross check and has been working to address them." ¶288; *see also* ¶289 (13-tweet thread).

<u>Third</u>, the true facts concerning X-Check and whitelisting were widely studied and communicated throughout Meta. ¶¶518-22. Contrary to Defendants' argument that the program was too small to be noticed (MTD 19), a Meta audit found that whitelisting was "<u>pervasive, touching almost every area of the company</u>," and "not publicly defensible." ¶¶107, 114. At least 45 teams around the world were involved in whitelisting, many of which "chose not to enforce the rules with high-profile accounts at all." ¶104. An internal review of Meta's whitelisting practices found, "<u>We are not actually doing what we say we do publicly.</u>" ¶¶107-08.

<u>Fourth</u>, Meta's own Oversight Board repeatedly called for "transparency" about X-Check and whitelisting, and Meta misled it. ¶¶116-20. *See In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *12 (C.D. Cal. June 6, 2016) (hiding information from auditors proves scienter). Defendants argue that Meta disclosed the truth (MTD 18), but the Board found the opposite.

<u>Fifth</u>, contrary to Defendants' argument (MTD 19), Defendants were motivated to hide the truth because they knew that its disclosure would damage Meta's reputation and revenue base. ¶¶573-75. Thus, they misled the public and even Meta's own Oversight Board.

<u>Finally</u>, given that Meta's content enforcement practices concerned its core product and were closely monitored, it would be implausible to infer that Defendants were unaware of such a large, elaborate, and intensely scrutinized program. *See Shenwick*, 282 F. Supp. 3d at 1145 (scienter where issues were "integral to [the company's] success").

### 3.   The Complaint Adequately Alleges Loss Causation

The loss causation inquiry "requires no more than the familiar test for proximate cause,"

and "there are an infinite variety of ways for a tort to cause a loss." *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *In re Twitter, Inc. Sec. Litig*., 2020 WL 4187915, at *14 (N.D. Cal. Apr. 17, 2020) (Tigar, J.). Plaintiffs need only allege a "causal connection" between the alleged fraud and the drop in stock price; they need not plead that the disclosure revealed any fraud. *First Solar*, 881 F.3d at 752. The Complaint easily meets this standard.

Plaintiffs adequately allege that the disclosures on September 13, 21, and 28 and October 21, 2021, revealed information about X-Check that proximately caused Meta's stock price to decline. The disclosures revealed that Meta purposely exempted VIP users from its content policies, the Oversight Board's decision to investigate X-Check, and that Meta had misled the Board about X-Check. ¶¶279-90, 322-27, 333-39, 365-69, 514.

Defendants argue that the September 13 Facebook File did not reveal anything "new." This argument is legally and factually wrong because truth-on-the-market arguments are premature, and the information released was "new." *Supra*, at 13. The September 13 Facebook File revealed how Meta exempted numerous VIP users from its content enforcement policies. ¶¶101-12, 279-87. Less than two hours after the article, Stone issued a 13-tweet thread where he disputed its accuracy and made new misrepresentations. ¶¶288-90.

Defendants' assertion that the September 13 price drop of $2.18 per share is insufficient fails for several reasons. First, disclosures may be "partial," where each provides a "fuller disclosure of the relevant truth." *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1020-21 (S.D. Cal. 2011). Defendants can prolong disclosure of the truth by denying the information divulged in prior disclosures, making further misstatements, or otherwise refuting the disclosure's validity. *Cooper v. Thoratec Corp.*, 2018 WL 2117337, at *6 (N.D. Cal. May 8, 2018). That is exactly what happened on September 13 – Stone immediately refuted the article's validity and made further misstatements, which tempered the stock price reaction. ¶¶288-90.

<u>Second</u>, Defendants' suggestion that there is some absolute requirement of how much a stock price must drop to plead loss causation is legally incorrect. A court in this district recently

1    rejected this exact argument on a *Daubert* motion, and distinguished each of the three cases on

2    which Defendants rely. *See In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *13 & n.11 (N.D.

3    Cal. Oct. 13, 2022) (distinguishing *REMEC*, *Eng*, and *Metzler*).

4        <u>Third</u>, Defendants ignore that there are multiple disclosures related to X-Check, including

5    on September 21 and 28, and October 21. Taken together, these disclosures caused a significant

6    price decline of nearly 13%. ¶¶327, 334, 374. Courts in this Circuit recognize the "leakage model"

7    of loss causation, where the truth gradually "leaks out" in a series of partial disclosures. *See Tesla*,

8    2022 WL 7374936, at *8. Notably, Defendants raise no specific challenge related to the September

9    28 disclosure. Finally, debates about the size of a stock drop "confuse causation with damages." *In*

10   *re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("Liability

11   obviously does not hinge on how much damage.").

12       Defendants challenge as not "new" (i) the September 21 demand by the Oversight Board

13   for more transparency with respect to X-Check and initiation of a review (¶¶116-17, 322-24); and

14   (ii) the October 21 Board Report findings that Meta "has not been fully forthcoming on cross-

15   check" (¶367), and that its previous statements were misleading. These disclosures revealed

16   information about Meta's deception concerning X-Check. Ultimately, all that is required is a

17   "causal connection" between the fraud and the stock price decline, which the Complaint amply

18   alleges.

19       Finally, Defendants' reliance on *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014) is

20   misplaced because (i) *Loos* was decided prior to *First Solar*, which decisively resolved any question

21   and held that only proximate cause – not revelation of the fraud – is required; and (ii) *Loos* relied

22   upon the very cases that *First Solar* confined to their facts in adopting the simple proximate cause

23   rule. 881 F.3d at 753. Following *First Solar*, courts have held that the announcement of an

24   investigation can demonstrate loss causation. *See, e.g.*, *In re Mattel, Inc. Sec. Litig.*, 2021 WL

25   1259405, at *11-13 (C.D. Cal. Jan. 26, 2021). Here, there is much more, including the disclosure

26   of Meta's own documents and the Oversight Board's December 2022 report confirming the severity

27   of Meta's prior misstatements (thus satisfying *Loos* even if it were the currently prevailing law).

28

### B.    Claims About The Algorithm And Content Moderation

#### 1.    The Complaint Sufficiently Alleges Falsity

Plaintiffs allege numerous actionable false and materially misleading statements about the News Feed algorithm and Meta's content moderation practices. <u>First</u>, Meta assured investors that the algorithm did not amplify and even reduced harmful content:

- On April 28, 2021, when asked whether Meta's algorithm sometimes amplified "some of the more controversial content," Zuckerberg stated that regarding, "extremist content or any of that stuff," "we go out of our way to try to reduce that." ¶424.
- The May 2021 Responses to Congress stated that "as part of" the algorithm process, the Company had "reduce[d] the distribution of many types of content." ¶428. The same Responses asserted that "We're taking significant steps to fight the spread of misinformation . . . ." ¶429.
- On July 28, 2021, LeCun stated that the "claim that FB amplifies ideas you disagree with" was "simply false." ¶437.

These statements are false and misleading and omitted material facts because, in truth, Meta's internal research found "compelling evidence" that <u>by design</u>, the algorithm amplified harmful content, causing it to be "inordinately prevalent" and "flourish" on the platform. ¶¶166-67; *see Shenwick*, 282 F. Supp. 3d at 1133-34, 1138 (misleading to create an "impression of a state of affairs that differs in a material way from the one that actually exists," or to "tout positive information" without "disclosing adverse information that cuts against [it]").

<u>Second</u>, Meta represented that (i) its practices were effective at removing and banning harmful content; and (ii) it proactively detected and removed hate speech from its platforms. For instance, with respect to <u>effectiveness</u>, Defendants stated:

- On April 27, 2021, Bickert testified, "[W]e've made significant progress identifying and removing content that violates our standards." ¶422.
- On May 19, 2021, Rosen stated, "[H]ate speech prevalence on Facebook continues to decrease, as a downward trend three quarters in a row. When we first reported this number in Q3 of last year, it was between .10 to .11 percent. . . . in this most recent quarter, Q1, it is now between .05 to .06 percent. This improvement and prevalence on Facebook is due to changes we continue to make to reduce problematic content in newsfeed." ¶451.
- On August 18, 2021, Zuckerberg stated "if we see harmful misinformation on the platform, then we take it down. It's against our policies." ¶463.

Contrary to these statements, Meta knew that it was <u>severely deficient</u> at removing harmful content. The algorithm <u>caused</u> violating content to become "inordinately prevalent" and "flourish."

Further, Meta's research found that its content-moderation tools were "currently, for the foreseeable future, and perhaps permanently, <u>not remotely sufficient to address harms on our platform</u>." ¶188. Meta took action against "<u>as little as 3-5% of hate and ~0.6% of V&I [violence and inciting content] on Facebook</u>" and "<u>miss[ed] 95% of violating hate speech</u>" – an "optimistic estimate." ¶193. In fact, 99% of "repeat offenders" of Meta's hate speech policies remained active. ¶191; *see Shenwick*, 282 F. Supp. 3d at 1133-34, 1138 (misleading to "tout positive information" without "disclosing adverse information that cuts against [it]").

 Defendants also made statements about Meta's proactivity in removing harmful content:

- On May 19, 2021, Meta stated, "Today, we proactively detect about 97% of hate speech content we remove." ¶450.
- On July 29, 2021, Clegg stated with respect to hateful speech, "[W]e catch the vast majority of it before anyone reports it to us." ¶439.
- On August 18, 2021, Meta stated that the "[p]revalence of hate speech has decreased for three quarters in a row since we first began reporting it. This is due to improvements in proactively detecting hate speech and ranking changes in News Feed." ¶461.

 Contrary to these statements, Meta was decidedly <u>not proactive</u> in detecting hate speech. Meta's internal research specifically found that "<u>98 per cent of the Hate Speech contents are reported reactively (i.e., by our community)</u>," rather than detected by automated tools. ¶¶191-93; *see Shenwick*, 282 F. Supp. 3d at 1133-34, 1138.

 <u>Third</u>, Defendants stated that Meta had no incentive to proliferate harmful content:

- On April 27, 2021, Bickert testified, "The reality is that it's not in Facebook's interest—financially or reputationally—to push users towards increasingly extreme content." ¶422.
- On July 29, 2021, in response to a direct question about whether Facebook was "really not interested in ending the . . . very inflammatory content because it makes you money," Clegg stated, "I, I, flatly and vigorously reject this idea that Facebook has an incentive to spoon feed people sort of addictive extreme violent unpleasant hateful content." ¶439. Clegg reiterated, "[T]he idea that we have an incentive to prioritize this" is "one of the most misleading allegations." *Id.*
- On October 5, 2021, Zuckerberg represented that the "idea that we prioritize profit over safety and well-being" is "just not true." ¶467.

 In truth, Meta profited from the proliferation of harmful content. ¶160-87. Meta's algorithms drove engagement (and profit) by amplifying extreme and inflammatory content. *Id.* Zuckerberg chose not to fix the algorithm because doing so would decrease revenue. ¶180. As

Haugen explained, Meta was "trading off very small decreases in engagement for huge consequences in misinformation and hate speech, and violence." ¶348.

**News Feed Algorithm.** Defendants wrongly contend that their false and misleading statements about the algorithm are "highly general." MTD 21. Their statements responded to specific questions, were grounded in metrics, and included definitive statements about toxic content on Meta's platforms. *See Karimi*, 607 F. Supp. 3d at 394 (statements that systems "minimize risks" are "reasonably understood to rest on a factual basis that justifies them as accurate"). Statements like "we reduce harmful content" and "we do not amplify harmful content" are "capable of objective verification." *Compare Huynh v. Quora, Inc.*, 2020 WL 7408230, at *10 (N.D. Cal. June 1, 2020) (statement that "Quora has implemented safeguards to protect the information we collect" is "not puffery" under Rule 9(b)), *with Retail Wholesale & Dept. Store Union Loc. 338 Ret. Fund v. Hewlett Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (MTD 21) ("want[ing] to be a company known for its ethical leadership"). Statements touting the efficacy of practices while omitting data seriously undermining those claims are actionable. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 2023 WL 2532061, at *22 (9th Cir. Mar. 16, 2023) (statements "contravened the unflattering facts in [defendant's] possession"); *Shenwick*, 282 F. Supp. 3d at 1138.

The same is true of Defendants' statements that "we do not profit from polarization." Such statements are objectively verifiable: Meta either did or did not profit from polarization. As alleged, Meta said that it did not, even though it did. *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) (Tigar, J.) (sustaining statement that strategy was "not in [defendants'] interest," No. 4:16-cv-05479-JST, ECF Nos. 205, 208).

Defendants' argument that their statements are non-actionable "subjective assessments" (MTD 21) mischaracterizes what they said. The statements that Meta's algorithm reduced harmful content (¶¶424, 428) and that Facebook did not "amplif[y] ideas you disagree with" (¶437) are materially different than a statement about "what content it wants on its apps." MTD 21. Similarly, the statement that "we do not profit from polarization" (¶466) is materially different than a statement about "what is in its financial or reputational interest" generally (MTD 21). Meta absolutely profited from polarization and amplified inflammatory content – because its algorithm

rewarded such controversy <u>by design</u>. *E.g.*, ¶135. Bickert's statement that it was not in Facebook's interest "to push users towards increasingly extreme content" (¶422) squarely contradicts Meta's data, and more fundamentally, what the algorithm was specifically designed to (and did) do. ¶167 ("our core product mechanics . . . are a significant part of why [hate speech and misinformation] flourish on the platform"); *see In re Van der Moolen Hldg. N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (statements about "cause of [] financial success" actionable), *with In re Cutera Sec. Litig.*, 610 F.3d 1103, 111 (9th Cir. 2010) (MTD 21) ("our employee relations are good").

Defendants wrongly contend that their statements are non-actionable opinions. MTD 22. Defendants' factual statements expressed certainty about (i) what the algorithm did; and (ii) what Defendants' incentives were. *See In re QuantumScape Sec. Litig.*, 580 F. Supp. 3d 714, 738-39 (N.D. Cal. 2022) (statements that defendant "has addressed" problems not opinions). Even if the statements were opinions, they are actionable because they gave investors the false impression that Meta actually reduced the spread of harmful content and kept it off its platforms when its research showed the opposite. *See Homyk v. ChemoCentryx, Inc.*, No. 4:21-cv-03343-JST (N.D. Cal. Feb. 23, 2023) (ECF No. 61) (opinion that drug "dramatically reduced" negative side effects actionable).

Defendants' arguments about the falsity of the algorithm statements (MTD 22) take them out of context, mischaracterize the portions they quote, and ignore Plaintiffs' allegations. Defendants' statements that the algorithm "improved the experience of our users" (¶427) and reduced "distribution" of toxic content (¶428) are false and materially misleading because (i) the algorithm amplified toxic content and made it "inordinately prevalent"; (ii) Meta's changes to its algorithm had "unhealthy side effects on important slices of public content"; (iii) Meta's systems were "not remotely sufficient" to address the harms of the algorithms; (iv) Meta took action against "as little as 3-5% of hate and ~0.6% of V&I on Facebook"; and (v) Zuckerberg rejected proposals that would change the algorithm to reduce the spread of misinformation if those changes reduced user engagement (¶431). *See Shenwick*, 282 F. Supp. 3d at 1139-40 (statements touting "improvements" in user engagement actionable where data showed adverse trends).[2]

---

[2] Defendants also contend in a footnote (MTD 22 n.4) that two statements are not actionable because they were not filed with the SEC. There is no such requirement, as discussed *infra* at 31.

Defendants mischaracterize Plaintiffs' allegations as "disagreement with Meta's management decisions." MTD 23. Defendants made false statements that contradicted specific internal facts and research. *See, e.g.*, ¶¶141, 144-45, 161-65, 167, 188. A securities claim (not "mismanagement") lies where known facts contradict "affirmative statements." *RH*, 302 F. Supp. 3d at 1041 n.8. Nor do Plaintiffs contend that Meta was required to disclose "evolving alleged internal observations." MTD 23. Defendants were, however, required to refrain from making material misstatements. Defendants' cited authority is inapt because the statements there were not misleading. *See In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1013 (N.D. Cal. 2020) (no allegations that "Facebook misrepresented its efforts"); *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) (statements that project was "not there yet" not misleading).

***Content-Moderation Practices.*** Defendants first contend that these statements are merely "general commitments to certain policies and preventative actions." MTD 24. Yet again, this argument mischaracterizes what Defendants said. Meta told investors that its policies were effective at (i) removing harmful content; and (ii) proactively detecting harmful content, when they had data demonstrating that the opposite was true. Again, there is a material difference between expressing a vague commitment to policies and affirmatively misrepresenting the efficacy of practices.

Defendants next contend that the Complaint does not allege why their content-moderation statements were false and misleading. MTD 24. They are false because Meta (i) was severely deficient in removing harmful content, which was "inordinately prevalent" (¶¶179-87); and (ii) did not proactively detect such content, and in fact, "98 per cent of the Hate Speech contents are reported reactively" (¶¶192-93). It was, at minimum, materially misleading to tout the efficacy and proactivity of their content moderation practices when they had access to analyses demonstrating that they were "not remotely sufficient." ¶¶24, 188; *see Shenwick*, 282 F. Supp. 3d at 1138-40.

Defendants' factual contentions that Meta banned some content or tried to do so (MTD 25) may be swiftly rejected at this stage. Defendants' statements were, at minimum, materially misleading because the vast majority of toxic content on Meta's platforms was left up, and was actually amplified by the algorithm. ¶¶167, 193; *see Shenwick*, 282 F. Supp. 3d at 1138. Contrary to Defendants' assertion that the documents lack "context" to show that Meta's practices were

severely deficient (MTD 25), this is precisely what the documents say. In any event, Defendants are not entitled to contrary factual inferences on the pleadings. *See, e.g.*, *id.* n.24 (rejecting defendants' improper "dispute over the inferences to be drawn").

Finally, Defendants' purported "warnings" (MTD 25) were inadequate and boilerplate because the warned-of risks had already come to pass and were known internally. ¶¶160-78; *see Glazer*, 2023 WL 2532061, at *22 ("boilerplate language describing *hypothetical* risks" insufficient when "company *already* had information suggesting" risk was present) (emphasis in original).

### 2.    The Complaint Alleges A Strong Inference of Scienter

The Defendants who made alleged false and misleading statements and omissions about the algorithm and harmful content are Meta, Zuckerberg, Clegg, LeCun, Rosen, Bickert, and Wehner. As summarized below, Plaintiffs allege a strong inference of scienter for each Defendant.

<u>First</u>, the primary speakers on this subject were involved in the algorithm changes and knew of their impacts. *See RH*, 302 F. Supp. 3d at 1044-45; *Shenwick*, 282 F. Supp. 3d at 1147.

***Zuckerberg.*** Zuckerberg personally oversaw the 2018 algorithm changes that resulted in the problems at issue (¶¶547-51), and made decisions about the algorithm, which he knew permitted toxic content to proliferate, in order to maintain higher user engagement. ¶¶179-80, 552-53. In April 2020, Meta scientists proposed to Zuckerberg that Meta change the way the algorithm rewarded "deep reshares" to reduce the spread of harmful content. ¶552. Zuckerberg refused to implement this change broadly because it might decrease engagement and revenue. ¶553. As Meta documented internally, "Mark doesn't think we could go broad" with the change, because he "<u>wouldn't launch if there was a material tradeoff with MSI [meaningful social interaction] impact</u>." ¶¶25, 179-80; *see* ¶187. Contrary to Defendants' arguments (MTD 26-27), these allegations show that Meta did <u>not</u> take broad steps to reduce misinformation, and that Zuckerberg <u>was</u> aware of what was in the documents. *See* ¶¶179-80 ("<u>Mark Feedback</u> on Soft Action Proposal + <u>Deck presented to Mark</u>").

***Clegg.*** Clegg was responsible for overseeing Meta's policies about "how hate speech rules work." ¶546. He also gave detailed responses to questions about these topics, professing to know what Meta's internal research had "shown" and what its incentives were. ¶¶158-59, 439, 442, 466.

***LeCun.*** As Facebook's VP and Chief AI Scientist (¶61), LeCun explained AI and the

algorithm to investors and analysts, including in response to questions. ¶¶140-41, 144. LeCun also issued emphatic denials in response to questions about these precise topics, stating, for instance, "[Y]ou may claim that FB amplifies ideas you disagree with, but <u>it's simply false</u>. ¶437.

**Rosen.** Meta's Chief Information Security Officer (¶57), Rosen led Meta's Product Safety and Integrity team when it conducted a "comprehensive product risk analysis" of the amplification of harmful content on Facebook. ¶¶181-83. He presented to Zuckerberg what he described as "our proposal to go into an integrity-wide lockdown," and relayed Zuckerberg's reaction internally. ¶181. He also spoke during Community Standard Enforcement conference calls about Meta's content-moderation policies and the prevalence of hate speech across its platforms. ¶451.

**Bickert.** Meta's VP of Content Policy (¶62), Bickert testified about Meta's algorithm and purported efforts to remove harmful content, professing to be knowledgeable. *See* ¶145 (testifying about "content we simply don't allow on our services . . . and we've made significant progress identifying and removing content that violates our standards."). She further testified about specific metrics that she cited (falsely) to downplay the issue of harmful content, stating, "[T]roubling content is a very small proportion of the total content people see on our services (hate speech is viewed 7 or 8 times for every 19,000 views of content on Facebook)." ¶145.

**Wehner.** As Meta's CFO (¶54), Wehner knew or recklessly disregarded "major" changes made to the News Feed, i.e., the "the main pathway for advertisers to reach users," and how those changes were making Meta money. *See* ¶¶124-26. Wehner also professed to be intimately familiar with Meta's content moderation policies. ¶148.

<u>Second</u>, the effects of Meta's algorithm changes prompted intense public scrutiny and would not have been overlooked at Meta. *See Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014) (scienter where issue was "the focus of both public and government inquiries"); *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011) (government scrutiny "would almost certainly have brought the matter to upper management's attention"; media attention made it "unlikely that management would not have been informed of the issues involved"). Defendants cannot claim this topic was the subject of "extensive public discussion" (MTD 4), yet claim ignorance about it. For years, public and private third parties contacted Meta about the spread of

harmful content on its platforms. In 2018, Buzzfeed's CEO told "a top official" at Meta that toxic content was "going viral" and "creating an incentive to produce more of it." ¶165. Political parties expressed concern to Meta that changes to its algorithms caused harmful content to proliferate. ¶161. In March 2021, Congress held a hearing titled "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation," which Zuckerberg prepared for by researching how Meta handles misinformation, hate speech, and other violent content. ¶¶566-67.

Third, Meta extensively documented and communicated internally about the true impact of its algorithm. ¶¶523-33. *See In re Omnivision Techs., Inc.*, 2005 WL 1867717, at *4 (N.D. Cal. July 29, 2005) ("preferable way . . . to show scienter is by putting forth contemporaneous reports or data which contradict the allegedly misleading statements"). Meta knew that its algorithm caused toxic content to spread because it studied this very issue, uncovering "compelling evidence that <u>our core product mechanics</u> . . . are a <u>significant part of why these types of speech flourish on the platform</u>." ¶524. The same study concluded, "Misinformation, toxicity, and violent content are <u>inordinately prevalent</u>" on Meta's platforms. *Id.* And Meta knew that its tools to address the spread of such content were "<u>not remotely sufficient</u>." ¶188. One report lamented, "[W]e don't have a way of effectively demoting this content in a targeted way . . . and even if we did, we often won't be able to launch them based on policy concerns." ¶526; *see* ¶188 ("[W]e do not and possibly never will have a model that captures even a majority of integrity harms."). A March 2021 report found that Meta acted on as "little as <u>3-5% of hate and ~0.6% of [violence and inciting content] on Facebook</u>." ¶529. Stunningly, 99% of repeat offenders of hate speech policies remained active, and "<u>98 per cent of the Hate Speech contents are reported reactively (i.e., by our community)</u>." ¶¶191, 193.

Fourth, Defendants were motivated to amplify toxic content because they profited from it. Defendants knew that toxic content increased engagement, which boosted advertising revenue. *See* ¶¶576-78; *Scheller v. Nutanix, Inc.*, 2020 WL 5500422, at *10 (N.D. Cal. Sept. 11, 2020) (scienter where company's "revenue growth [was] dependent" on topic of misstatements). Defendants, including Zuckerberg, repeatedly chose profits over safety, including when he overruled his own data scientists. ¶179. These motive allegations bolster scienter.

Finally, as Meta stated, the News Feed "is the first thing people see when they log in[]"

(¶122), and its algorithm is Meta's primary content and ad delivery tool. *See Shenwick*, 282 F. Supp. 3d at 1145 ("core operations" supports scienter where topic is "so integral" to success).

Defendants' remaining arguments fail. Zuckerberg did much more than "participate[] in meetings where certain documents were referenced," and the Complaint does not rely merely on his role. MTD 26. Defendants' cited authority involves either vague allegations that bear no resemblance to the detailed facts described above, or supports Plaintiffs. *See Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *13 (N.D. Cal. Nov. 14, 2016) (meeting participation was "merely routine corporate activity"); *Abadilla v. Precigen, Inc.*, 2022 WL 1750033, at *7 (N.D. Cal. May 31, 2022) (vague claim that defendants were "well aware" of certain information insufficient); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) (no "specific information that was either received or communicated by any Individual Defendant"); *Daou*, 411 F.3d at 1022 (scienter <u>established</u> for defendants who "personally directed" business decisions and public statements).

### 3.    The Complaint Adequately Alleges Loss Causation

The September 15 Facebook File, titled "Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead," detailed the proliferation of toxic content and misinformation that the algorithm both caused and worsened, as well as internal knowledge of those problems at the highest levels. The September 15 Facebook File included descriptions and screenshots of internal memos, research, and communications, which directly connected the 2018 algorithm changes to the proliferation of toxic content, and showed that Meta knew that its algorithm was making "[m]isinformation, toxicity, and violent content [] inordinately prevalent." *Supra*, 20; ¶¶133-35, 166-67, 310-14. In response, Meta tried to shift the blame for the proliferating toxic content. ¶315.

On September 16 and 17, two additional Facebook Files revealed new information about systemic failures concerning Meta's inability (and refusal) to control toxic content. ¶¶316-20. The September 16 Facebook File revealed that drug cartels and human traffickers used Facebook to facilitate their criminal enterprises, and that content violating Meta's domestic servitude policy routinely evades deletion. ¶318. The September 17 Facebook File revealed Meta research showing that it knew COVID-19 vaccine misinformation was "rampant," and that Meta's ability to detect misinformation in comments was "bad in English and basically non-existent elsewhere." ¶199.

On October 3, 2021, in interviews with *60 Minutes* and the *WSJ*, Haugen was revealed to be a credible witness to Defendants' wrongdoing, as a scientist in the Civic Integrity Unit who was "deep in the algorithms." ¶¶340-48. She provided firsthand knowledge of how Meta executives chose not to reduce toxic content because "if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money." ¶¶168-69. Each event caused swift drops in Meta's stock price. ¶¶316, 319-20, 327, 334, 349, 361, 374, 512-15.

Defendants contend that the information revealed in these disclosures was not "new," citing prior public interest in Meta's content moderation efforts. MTD 28-29. Truth-on-the-market arguments are not appropriate on the pleadings. *See supra*, 17. Moreover, the information released was clearly new. Raising questions about the effects of the algorithm is materially different than knowing that Zuckerberg rejected fixes to prioritize advertising revenue. Further, the facts at issue came from a whistleblower and previously concealed internal documents, and in blockbuster stories in the *WSJ* and *60 Minutes*. The revelation of this new information triggered congressional hearings.

Defendants also argue that the September 15, 2021 price drop of $2.61 per share in response to the first <u>partial</u> disclosure is too "de minimis" to allege loss causation. MTD 29. As discussed (*supra*, 17-18), this argument fails because (i) Defendants' immediate attempts to deflect culpability for the spread of toxicity on Meta's platforms tempered the price reaction (¶315); (ii) there is no absolute requirement for how much a stock must drop to plead loss causation (*Tesla*, 2022 WL 7374936, at *13 & n.11); (iii) Defendants ignore the disclosures on September 16 and 17, and October 3, which, taken together, caused a large price decline in Meta's stock of more than 5% (¶¶318-20, 349; *see Tesla*, 2022 WL 7374936, at *8 ("leakage model" of loss causation)); and (iv) debates about the size of the stock price decline go to the amount of damages, not loss causation.

## C.   Claims About Meta's Platforms' Harm To Children

### 1.   The Complaint Sufficiently Alleges Falsity

Defendants unpersuasively argue that the Complaint fails to allege that their statements about Instagram's effects on young users were false or misleading. MTD 31-32.

<u>First</u>, Defendants falsely represented that Meta's social media platforms were not bad for, and were, in fact, good for teens and children:

- On May 26, 2021, Mosseri stated that research had revealed that the effects of Instagram on children were "bi-directional, so small effects positive and small effects negative but it's quite small," and emphasized, "There's a lot of good that comes with what we do." ¶482. Consequently, the *WSJ* reported that Mosseri "said concerns about Facebook's overall impact on its users' well-being are likely overblown, but said Instagram was committed to studying it." ¶479.
- In response to the September 14 Facebook File, Newton stated that "social media isn't inherently good or bad for people," and that Meta's research showed that "22% [of girls struggling with body image issues] said that using Instagram made them feel better." ¶492.
- On September 30, 2021, Davis testified that "the research showed" "Instagram is helping them with hard issues that are so common to being a teen," ¶495, and "more teens, found the Instagram use helpful when they were struggling with these particular issues." ¶498.

Statements that concerns were "overblown" and that effects on teens were mixed or beneficial were materially false and misleading because Meta's research said the exact opposite: "Content on [Instagram] makes teens feel very bad" and negative effects of Instagram on teens were "common" and "severe." ¶¶210-27. These statements were also misleading because they touted positive information while concealing this research, including that Instagram "mak[es] body image worse for 1 in 3 teen girls," "increas[es] rates of anxiety and depression," and causes teens to want to "hurt themselves" or "kill themselves" – feelings that "started on Instagram." ¶¶203, 210-17. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 932 (N.D. Cal. 2022) (Tigar, J.) (misleading to "tout positive information" without "disclosing adverse information that cuts against [it]").

Second, Defendants misled investors about the extent and scope of Meta's internal research, including by repeatedly referencing external research to distract from its own:

- On May 11, 2021, when asked whether "social media is good for children under 13," Mosseri responded, "The reality is there's little existing research." ¶471.
- On May 24, 2021, Mosseri discussed "external research" on wellbeing, and said that Meta "tried to measure the effect of hiding likes on people's actual wellbeing," but "[w]ellbeing is hard to measure," "more of like a judgment call," and "a bit subjective." ¶475.
- On May 26, 2021, the *WSJ* reported that Mosseri said that "Instagram was committed to studying [Facebook's overall impact on its users' well-being]," and "We're going to continue to try and work with external academics and researchers." ¶479.
- On August 4, 2021, in response to Congress, Zuckerberg claimed that he was "not aware of a consensus among studies of experts about how much screen time is 'too much.'" ¶490.

These statements were misleading because they omitted material facts – Meta's extensive research on how its platforms impact children yielded ample evidence of and conclusions about

their negative effects. ¶¶210-27. By concealing Meta's research, Defendants' statements "conveyed [the] false or misleading impression" that Meta had no significant internal research, and that existing research was inconclusive. *Twitter*, 2020 WL 4187915, at *7.

<u>Third</u>, Defendants touted Meta's "robust" practices to guard children's safety:

- On May 19, 2021, Meta's Community Standards Enforcement Report stated, "We remove content that encourages suicide or self-injury on Facebook and Instagram." ¶473.
- On May 26, 2021, in response to a proxy, Meta stated that no additional measures were necessary because it had "robust policies to help protect against child exploitation and content or behavior on our platform that puts the safety of children at risk." ¶484.
- On July 27, 2021, Meta issued a press release in which it assured the public that the Company was "making sure we never compromise on their privacy and safety." ¶486.

These statements were misleading because they omitted material facts, i.e., that Meta had documented "common" and "severe" harm suffered by Instagram's teen users. Meta's assurance that it "remove[s] content that encourages suicide or self-injury" was misleading because Defendants knew, but concealed, Meta's finding that 13.5% of teen girls said that Instagram made thoughts of "Suicide and Self Injury worse." ¶474. Tragically, after a lengthy investigation, a British coroner concluded that Meta's algorithms contributed "in a more than minimal way" to the death by self-harm of a 14-year old girl. ¶384. It was also materially false and misleading for Defendants to state that no additional measures to protect children were necessary without disclosing that Meta's research found that Instagram's harm to teens was ongoing, unabated, and "crucial to tackle." ¶220. These statements "conveyed [the] false or misleading impression" that Meta was not aware of (and certainly was not perpetuating) harm to children. *Twitter*, 2020 WL 4187915, at *7.

<u>Fourth</u>, Defendants misled investors by hailing "Project Daisy" as capable of "shap[ing] a more positive experience on Instagram." ¶477. In truth, Meta knew that Project Daisy did <u>not</u> improve "well-being," and deployed it to "make them look good" to "the press and parents." ¶478.

<u>Finally</u>, Defendants falsely refuted accusations that Meta's platforms were addictive. Davis testified, "I disagree with calling our product addictive." ¶500. This was materially misleading because Meta's own research revealed that teens "often feel 'addicted.'" ¶501. Haugen confirmed that Meta purposefully designed its platforms to increase revenue by fostering addiction. ¶¶215-16.

Defendants' other challenges fail. <u>First</u>, Defendants wrongly contend that statements made

in blog posts, tweets, or other supposedly "non-public conversations" are not actionable. MTD 29-30. Courts widely hold that statements like those at issue are actionable because they were "public[ly] disseminat[ed]" in a way that would "influence the investing public." *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362-63 (9th Cir. 1993) (the test "is as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors"); *see Sanchez v. Decision Diagnostics Corp.*, 2022 WL 18142518, *13 (N.D. Cal. Dec. 5, 2022) (actionable statements in "posts on various websites"); *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 922-27 (N.D. Cal. Apr. 15, 2020) (actionable statements on CEO's "personal Twitter account"); *Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at *17-18 (N.D. Cal. Jan. 4, 2017) (actionable statements on vehicles' "compliance stickers"); *In re Columbia Secs. Litig.*, 747 F. Supp. 237, 245 (S.D.N.Y. 1990) (actionable statements "paraphrased in *The New York Times* article"). Moreover, the question of whether a statement was "directed toward . . . the investing public" is "peculiarly one[] for the trier of fact." *Volkswagen*, 2017 WL 66281, at *18.

Defendants' cited cases are distinguishable. In *Intel*, the court acknowledged that "there is no rule that only market-related documents . . . can contain actionable misstatements . . . ." *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *11 & n.14 (N.D. Cal. Mar. 29, 2019). *Insys* dealt with statements disseminated solely in a 2015 article published by a tiny news organization that had existed for less than three years. *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *16 (D. Ariz. Aug. 1, 2017). Defendants' statements were published on Instagram's CEO's Twitter account (¶471), a major tech publication (¶475), and in an official blog on Meta's website (¶492). These statements received national attention.

Further, conversations with journalists are not "non-public." "[D]efendants may be directly liable under 10b-5 for providing false or misleading information to third-party securities analysts." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997). Statements that "originated from the defendants" are "actionable even if they are not exact quotations." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004). Contrary to Defendants' argument (MTD 30), Mosseri's May 26, 2021, statement about Instagram's supposedly "bi-directional" and "small effects" was reported on by the *WSJ* that day. ¶252 ("reporters echoed Defendant Mosseri's

comments" "in a May 26, 2021 *Wall Street Journal* article which reported that Mosseri 'said concerns about Facebook's overall impact on its users' well-being are likely overblown, but said Instagram is committed to studying it'"). *Wessel v. Buhler* is unavailing because there, the statements were not "publicly disseminated in any way," and "[t]here was no evidence that <u>any</u> investor ever saw the statements until after the litigation began." 473 F.2d 279, 282 (9th Cir. 1971).

<u>Second</u>, Defendants wrongly contend that certain statements are non-actionable opinions. MTD 30. Statements such as Mosseri's that "there's little existing research" and that negative effects are "quite small" describe the amount and findings of existing research, and thus are verifiable statements of fact, not opinions. *See QuantumScape*, 580 F. Supp. 3d at 739 (what "data demonstrate[es]" and "testing showed" "not opinions"). Even if they were opinions, they would be actionable because Defendants knew that they contradicted the results of Meta's internal research. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015) (opinion misleading if it does not "fairly align[] with the information in the [speaker's] possession"). Mosseri did not "persist in his [honest] views" after The Facebook Files. MTD 30. Rather, when asked to comment on the September 14 Facebook File, Mosseri admitted that the issues concerning teen mental health had an "<u>impact on people [that] may be huge</u>." ¶297.

<u>Third</u>, Defendants wrongly contend that statements about Meta's "commitment to children's safety or health" are not actionable. MTD 30-31. Defendants' statements are not generic commitments to safety, but rather, specific representations about what actions Meta purported to take, including "remov[ing] content that encourages suicide or self-injury" (¶473), and launching Project Daisy "to empower people, build self-awareness and shape a more positive experience on Instagram" (¶477). These statements are actionable for the reasons discussed above. *Supra*, at 30.

<u>Fourth</u>, Defendants argue that Mosseri's statement about whether "social media is good for children under 13" is not false or misleading because none of Meta's research addressed "*pre-teen* users" who "are not even allowed to join Instagram." MTD 31. But Meta's "deep dive" research on teen mental health is inextricably linked with its "Tweens Competitive Audit" and extensive efforts to develop new "Kids" apps. ¶¶234-35; *see* ¶207 ("how to leverage playdates"). Moreover, Defendants used "teens," "tweens," "children," and "YA" interchangeably (*e.g.*, ¶¶234-39); they

knew that "kids are getting on the internet as young as six years old" (¶¶240, 254); and Zuckerberg testified that "we study" whether Meta's "platform harms children" (¶241).

**Fifth**, Defendants dispute Meta's research to argue that Mosseri's statement that effects were "bi-directional" and "quite small" is not false or misleading. MTD 31. This effort fails. Such factual disputes are inappropriate for determination now. Further, as alleged, Mosseri touted that Instagram's negative effects were "quite small," when Meta's research had explicitly described those negative effects as "common," "significant," and "severe." *Supra*, 29; ¶¶203, 210-27; *see Shenwick*, 282 F. Supp. 3d at 1138 (misleading to "tout positive information" without "disclosing adverse information that cuts against [it]"). As for the internal research Defendants cite, they take it out of context and ignore that it concluded, point blank, that Instagram's "common" and "severe" harm to teens is a "high reach, high intensity issue." ¶¶225-26. Defendants cite Pew's research (MTD 31), but those findings related to social media broadly, and as Meta's research concluded, some "problems were specific to Instagram, and not social media more broadly." ¶211. Meta's research found that "[t]een girls perceive Instagram as the worst social media app" (¶218), and feelings of self-harm and suicidality "started on Instagram" (¶¶212-13).

**Finally**, Defendants wrongly contend that "Instagram's impact on teen health has nothing to do with child exploitation," and that the Complaint lacks "allegations that bear on Meta's policies to address child exploitation as a whole." MTD 32. Defendants knew about and profited from Instagram's harm to children (¶¶203, 214, 222), while falsely stating that Meta kept children safe (¶¶484, 486). The Complaint also contains specific allegations about Meta's purported sex trafficking and child exploitation policies, and willful ignorance of policy violations that jeopardized child safety. ¶¶413-15; ¶254 (Mosseri: "I don't want to hear" about 8-year-old user); *supra*, at 30.

### 2.   The Complaint Alleges A Strong Inference of Scienter

Meta, Mosseri, Zuckerberg, Diwanji, Newton, and Davis made false statements about harm to children. Plaintiffs adequately allege scienter for each.

**First**, Defendants were aware of Meta's "contemporaneous reports or data" on the harmful impact of its platforms on teen mental health. *Oracle Corp.*, 380 F.3d at 1230. Meta's research was presented to Zuckerberg (¶524), and made available to all Meta employees (¶534).

Second, each Defendant publicly acknowledged that they were aware of Meta's research, and purported to speak knowledgeably about it. *See Shenwick*, 282 F. Supp. 3d at 1147.

**Zuckerberg.** Just one month before the Class Period, Zuckerberg testified before Congress. ¶554. When asked directly whether Meta's "platform harms children," he asserted, "This is something that we study and care a lot about." In response to other questions about Meta's platforms' effect on children's health, Zuckerberg testified about "the research that we've seen" and again acknowledged, "[T]his is something we try to study." ¶555.

**Mosseri.** Instagram's CEO, Mosseri repeatedly spoke falsely about research into the impact of Instagram on children's health, claiming there was "little existing research" (¶244), that it was inconclusive (¶246), deflected questions by pointing to external research, falsely claimed that Instagram's impact on teen well-being was "quite small" (¶251), and asserted that Instagram was committed to studying the issue. ¶252.

**Newton.** Instagram's Head of Public Policy, Newton purported to know the full extent of Meta's research, claiming that the *WSJ* "focuse[d] on a limited set of findings and cast them in a negative light," and that Meta "stand[s] by this research." ¶492.

**Davis.** Davis testified extensively at a congressional hearing, "Protecting Kids Online: Facebook, Instagram, and Mental Health Harms," about what the "research shows." ¶¶495-96.

**Diwanji.** As VP of Youth Products, Diwanji was aware of Meta's research on child safety and well-being, and described Meta's supposed "comprehensive plan" to address it. ¶488.

Third, these issues were "of such prominence" at Meta "that it would be absurd to suggest that management was without knowledge of the matter." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008). Meta commissioned a multi-year "deep dive" research precisely because young users are so critical to it. ¶¶255-57. Meta's research stated that these issues were a "focus," "important," and "crucial to tackle" because, as Mosseri explained, young people are one of "the two groups that push forward culture the most." ¶¶571-72, 580; *see Reese*, 747 F.3d at 571 (scienter strengthened where representations were "the focus of both public and government inquiries"). Moreover, Congress raised these issues to Meta. ¶¶241-43.

Fourth, Defendants had a powerful motive to conceal Meta's damning research: Meta

deliberately fostered "problematic use" among teens to boost engagement and advertising revenue. ¶581; *see Nutanix*, 2020 WL 5500422, at *10 ("revenue growth [was] dependent" on topic of misstatements). In the face of mounting regulatory scrutiny, Defendants knew that disclosing Meta's research would reduce its ability to exploit its "addicted" teen user base. As one researcher said, "[W]e're standing directly between people and their bonuses." ¶233.

Defendants contend that Plaintiffs fail to allege that Zuckerberg reviewed any relevant documents and that his "alleged familiarity with Project Daisy" fails to show scienter. MTD 32. But as alleged, Meta's "deep dive" into teen mental health impacts of Instagram was cited in a 2020 presentation to Zuckerberg (¶228), and Meta knew that Project Daisy did not do anything to protect children, but Zuckerberg rolled it out to "make them look good" (¶478).

Defendants also argue that allegations that internal documents were posted on Workplace do not support scienter (MTD 33), but defendants' access to information is routinely credited at this stage. *See RH*, 302 F. Supp. 3d at 1044-45; *Omnivision*, 2005 WL 1867717, at *4. *Sanders* is inapt because only employees with no connection to the defendants had "clear access" to internal reports. *Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *15 (N.D. Cal. Mar. 31, 2021). Unlike in *Align Technology*, here, Instagram's impact on teens was "disclosed" to Defendants. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017).

Plaintiffs also do not rely on generalized allegations of "flagship product" or "motive." Rather, the Complaint pleads a host of facts, discussed above, which together support a strong inference of scienter. Defendants' authority is inapposite. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (core operations doctrine alone insufficient); *In re Rigel Pharms. Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (desire for "good financing" alone insufficient).

### 3.    The Complaint Adequately Alleges Loss Causation

Partial disclosures on September 14 and 28, and October 3 revealed new information about Meta's harm to young users. ¶¶291-301, 328-32, 345. The September 14 Facebook File exposed that Defendants knew from Meta's research that Instagram had severe, "toxic," and dangerous effects on teens. ¶¶291-97. That night, Congress announced investigations, and indicated that Zuckerberg had misled them. ¶¶302-08. Analysts remarked that these issues "will likely have the

most enduring effect" on Meta (¶309), and Meta's stock price dropped, even though Meta immediately disputed the accuracy of the September 14 Facebook File (¶¶298-301).

One day after Meta announced that it was pausing "Instagram Kids," the September 28 Facebook File disclosed new research that Meta actively studied preteens and infants, set a three-year goal to create products for preteens, and commissioned research into the opportunities presented by children. ¶331. The news caused Meta's stock to fall more than $13. ¶¶329-32, 334, 514. On October 3, Haugen identified herself as a credible source of the previously-disclosed information, while revealing new facts about "Facebook's own research" findings "that Instagram is dangerous for teenagers, that it harms teenagers, [and] that it is distinctly worse than other forms of social media." Meta's stock dropped $16.78 per share. ¶514.

Defendants' challenges to these allegations (MTD 33-34) echo those made elsewhere in their brief, and similarly fail. Defendants again make premature truth-on-the-market arguments based on ongoing scrutiny of Meta's impact on teens. *Supra*, at 17. Defendants next wrongly contend that the reaction to and commentary about the September 14 Facebook File was not "new." MTD 34. Born out of an immediate reaction to the September 14 Facebook File – itself an indication of the "newness" of the information – Congress called for investigations, disclosure of internal Meta research, and testimony from top officials, which revealed new information about Defendants' deception. Two senators stated that Zuckerberg and others had "provided evasive answers that were misleading and covered up clear evidence of significant harm." ¶¶302-08. These facts clearly "indicat[e] the drop in [Meta's] stock price was causally related to" Defendants' prior misstatements. *In re Merit Med. Sys., Inc. Sec. Litig.*, 2021 WL 1192133, at *12 (N.D. Cal. Mar. 29, 2021). Defendants' cited cases differ because no new information about the alleged fraud was revealed when the investigations were announced. MTD 34.

Defendants argue that the stock price decline following the September 14 Facebook File and announcement of renewed congressional scrutiny is "insufficient to plead loss causation." MTD 34. This argument again fails because (i) Defendants made additional false statements that inflated Meta's stock price and diluted the impact of the disclosures (¶¶298-301); (ii) disclosures on September 27 and 28, and October 3 together caused a highly significant drop in Meta's stock price

of nearly 8% (¶¶334, 349; *see Tesla*, 2022 WL 7374936, at *8); and (iii) there is no requirement for how much a stock must drop to plead loss causation (*id.* at *13 & n.11).

Defendants ignore (and thus concede) that the new information in the September 28 Facebook File caused Meta's stock price to fall $12.93 per share. Their argument that the September 27 pause of Instagram Kids did not fact-by-fact reveal the falsity of a misstatement fails. The pause was <u>because</u> of the September 14 Facebook File and renewed scrutiny, as commentators noted and Mosseri could not deny. ¶329. This provides the "causal connection" under *First Solar*. Finally, "whether [disclosures] presented previously undisclosed information to the market and caused further decline in the company's stock price are factual questions" that cannot be resolved now. *Desta v. Wins Fin. Hldgs. Inc.*, 2018 WL 1136525, at *7, *9 (C.D. Cal. Feb. 28, 2018).

### D.   Claims About Facebook's Growth Metrics And SUMA

#### 1.   The Complaint Sufficiently Alleges Falsity

Meta reported favorable user growth rates of between 7% and 10% for the first and second quarters of 2021. ¶508. Unknown to investors, between 32% and 56% of "new" accounts used to calculate these rates were duplicates (i.e., SUMA). This was multiples greater than the 11% estimate that Meta disclosed, and caused the growth rates to be materially inflated:

| Reported Metric | Reported New Users | Reported Growth Rate | Actual New Users (32-56% duplicates) | Actual Growth Rate (32-56% duplicates) |
|---|---|---|---|---|
| March 2021 MAU | 260 million | 10% | 110-180 million | 4-7% |
| March 2021 DAU | 140 million | 8% | 60-100 million | 3-6% |
| June 2021 MAU | 190 million | 7% | 80-130 million | 3-5% |
| June 2021 DAU | 120 million | 7% | 50-80 million | 3-5% |

Meta also told investors that "it is possible that the actual number of duplicate and false accounts may vary significantly from our estimates," and that "the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam." ¶¶506, 510. It was misleading for Meta to (i) represent that it was "possible" that the number of duplicates "<u>may</u> vary significantly," without disclosing that the rate of SUMA <u>did</u> vary significantly from 11% and was "<u>very prevalent</u>" among new accounts; and (ii) single out "meaningfully higher" rates of duplicates in <u>subgroups</u> without disclosing that SUMA in the much more significant cohort of new

user accounts was 3-5 times higher than 11%. ¶507.

In *Shenwick*, this Court found that Twitter's claims about MAU and engagement growth were actionably misleading because plaintiff alleged that "Twitter reported positive MAU growth, that Twitter was simultaneously experiencing adverse DAU trends, and that those DAU trends made MAU growth implausible." 282 F. Supp. 3d at 1137-40. Similarly, here, Meta reported positive growth; Meta knew that approximately <u>half</u> of new accounts were not real, and that it was experiencing adverse trends in young user growth; and those omitted facts made the reported growth metrics artificially inflated and related statements misleading. ¶¶267, 269-74; *see also In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, *6 (C.D. Cal. June 7, 2018).

Defendants contend that "Meta had no duty to disclose an estimate of duplicate accounts among *new* accounts." MTD 35. The Complaint does not allege a standalone disclosure duty; it alleges that the statements Defendants made, such as growth rates, were false and misleading, and omitted material facts. "[O]nce defendants choose to tout positive information to the market about user engagement," they must "do so in a manner that wouldn't mislead investors about this adverse information." *Shenwick*, 282 F. Supp. 3d at 1140; *see Snap*, 2018 WL 2972528, at *6.

In *Facebook* (MTD 35), the omissions theories failed because there were no misstatements about the omitted information. 477 F. Supp. 3d at 1026-27 ("simply using a new methodology to count accounts is not misleading," and this change did not constitute an "admission" of falsity). Here, omitting the high percentage of SUMA in new user accounts rendered Defendants' statements false and misleading. In *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.* (MTD 35), the court concluded that "a more fulsome report" was unnecessary because the report at issue was "factually accurate." 759 F.3d 1051, 1061 (9th Cir. 2014). Here, the growth rates were false.

Defendants contend that Meta's finding that 32% to 56% of new accounts were duplicates is irrelevant because there is no allegation that "Meta extrapolated from these alleged figures that the *same* percentage applied to *all* new accounts." MTD 36. The bottom line is that Defendants' own study showed markedly higher rates of SUMA among new users, and the growth rates that Meta reports <u>are</u> extrapolated from these analyses. ¶265. "[D]ebates over the accuracy of Plaintiff's numbers are not appropriate at the motion to dismiss phase." *Shenwick*, 282 F. Supp. 3d at 1138.

Defendants wrongly contend that Plaintiffs fail to allege that the overall 11% reported duplicate account figure was false, and that none of their statements are misleading because Meta disclosed that the number of duplicate accounts could be different than 11%. MTD 36. In all events, Meta's reported growth rates were falsely inflated. Further, the failure to disclose the immense concentration of duplicate accounts among new users – the sole source of Meta's growth (¶¶258-60) – was so material that it renders the overall 11% rate misleading. *Shenwick*, 282 F. Supp. 3d at 1136-38. It was also misleading for Defendants to tell investors that the percentage <u>could be</u> different when they knew that the percentage <u>was</u> different for new accounts.

### 2. The Complaint Alleges A Strong Inference Of Scienter

The Defendants who made the false and misleading statements about SUMA were Meta, Zuckerberg and Wehner. The Complaint adequately alleges scienter for each of them.

***Zuckerberg.*** Growth rates among young users were a focus for Zuckerberg, who personally affirmed that Meta "regularly evaluate[s] our Facebook metrics to estimate the number of 'duplicate' and 'false' accounts among our MAUs," and made detailed statements about duplicate accounts, and higher rates of SUMA among selected subgroups. ¶¶265-66, 506, 510.

***Wehner.*** Wehner also affirmed that Meta "regularly evaluated" SUMA, along with detailed statements about the prevalence of duplicate accounts. *Id*. He personally explained to investors how the estimate of duplicate accounts impacts Facebook's reported user metrics, and he boasted that user growth had (surprisingly) outpaced record growth during the pandemic. ¶¶265-66.

Multiple other facts support a strong inference of scienter. <u>First</u>, the detailed nature of Defendants' disclosures – specific MAU and DAU metrics, the 11% figure, and the claim that SUMA was higher in specific markets – supports the inference that Defendants had access to information that contradicted their statements. *See Reese*, 747 F.3d at 572.

<u>Second</u>, contrary to Defendants' argument (MTD 37), they admittedly spent significant time and effort evaluating duplicate accounts (¶265); it is thus implausible that Zuckerberg and Wehner did not know about Meta's internal research on this issue (¶¶271-72). Given the importance of this data to Meta, it was at least highly reckless for them to ignore it. *See Reese*, 747 F.3d at 569-70.

<u>Third</u>, the fact that, as Meta said, "[t]he size of our user base and our users' level of

engagement are critical to our success" (¶582) supports a strong inference of scienter with respect to the omitted decline in user growth. *See Shenwick*, 282 F. Supp. 3d at 1145 (scienter alleged because DAU and MAU are fundamental to a social media company's operations).

Finally, Zuckerberg and Wehner were embroiled in litigation with advertisers, and they knew that disclosing that user metrics were inflated due to SUMA would cripple revenue. ¶582 ("SUMA is going to go down horribly," and "there is no question that impacted [advertisers'] budget allocations."). These allegations constitute far more than a "general interest in profits." MTD 37.

### 3. The Complaint Adequately Alleges Loss Causation

On October 21, 2021, the *WSJ* reported that Meta presentations revealed that up to 56% of its reported new accounts were duplicates and that the reported DAU and MAU growth rates were inflated. ¶¶370-72, 503-11. Analysts noted that "an increase in duplicate and fake accounts" was one of Meta's "key downside risks," and Meta's stock price dropped $17.27. ¶¶373-74, 514.

Defendants argue that the October 21 article "did not 'correct' Meta's prior disclosure as to the percentage of SUMA among all users." MTD 37. This rehashing of Defendants' falsity arguments fails on similar grounds. It also contradicts *First Solar* – Plaintiffs "need only show a causal connection between the fraud and the loss," 881 F.3d at 753, which they have done.

### E. The Complaint States Control Person Claims Against Each Defendant

The Complaint amply alleges that each Defendant exercised 'actual power or control' over the primary violator. *Hefler*, 2018 WL 1070116, at *13. *See* ¶¶53-64; 612-13. As detailed above, multiple facts allege control by each Defendant, including: (i) signing SEC filings; (ii) testifying before Congress; (iii) overseeing policies at issue; (iv) making key relevant decisions; and (v) managing teams of researchers. Further, control is an "intensely factual question," and contrary to Defendants' argument (MTD 39), courts routinely find "allegations concerning an individual's title and responsibilities to be sufficient to establish control at the motion to dismiss stage." *Kyung Cho v. UCBH Hldgs., Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012).

### V. CONCLUSION

Defendants' motion should be denied, or alternatively, leave to amend granted. *See Daou*, 411 F.3d at 1013 (dismissal without leave to amend improper unless amendment is clearly futile).

Dated: April 14, 2023                    Respectfully submitted,

                                         **BERNSTEIN LITOWITZ BERGER**
                                         **& GROSSMANN LLP**

                                         */s/ John Rizio-Hamilton*
                                         John Rizio-Hamilton (*pro hac vice*)
                                         (johnr@blbglaw.com)
                                         Hannah Ross (*pro hac vice*)
                                         (hannah@blbglaw.com)
                                         Jeroen van Kwawegen (*pro hac vice*)
                                         (jeroen@blbglaw.com)
                                         Lauren Ormsbee (*pro hac vice*)
                                         (lauren@blbglaw.com)
                                         Rebecca E. Boon (*pro hac vice*)
                                         (rebecca.boon@blbglaw.com)
                                         John Esmay (*pro hac vice*)
                                         (john.esmay@blbglaw.com)
                                         Mathews R. de Carvalho (*pro hac vice*)
                                         (mathews.decarvalho@blbglaw.com)
                                         1251 Avenue of the Americas
                                         New York, NY 10020
                                         Tel: (212) 554-1400
                                         Fax: (212) 554-1444

                                         -and-

                                         Jonathan D. Uslaner (Bar No. 256898)
                                         (jonathanu@blbglaw.com)
                                         Caitlin C. Bozman (Bar No. 343721)
                                         (caitlin.bozman@blbglaw.com)
                                         2121 Avenue of the Stars, Suite 2575
                                         Los Angeles, CA 90067
                                         Tel: (310) 819-3470

                                         *Counsel for Lead Plaintiffs*
                                         *Ohio Public Employees Retirement System and*
                                         *PFA Pension Forsikringsaktieselskab*

                                         **OFFICE OF THE ATTORNEY GENERAL**
                                         **OF THE STATE OF OHIO**

                                         Shawn Busken
                                         (Shawn.Busken@OhioAttorneyGeneral.gov)
                                         30 East Broad Street
                                         Columbus, OH 43215
                                         Tel: (800) 282-0515

                                         *Additional Counsel for Lead Plaintiff Ohio Public*
                                         *Employees Retirement System*