**Pages 1 - 28**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martinez-Olguin, Judge Presiding

IN RE META PLATFORMS, INC.          )
SECURITIES LITIGATION,              )
                                    )
                                    )    **NO. C 21-8812 AMO**
_____ )

                          San Francisco, California
                          Thursday, August 17, 2023

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                          BERNSTEIN, LITOWITZ, BERGER
                          & GROSSMANN LLP
                          1251 Avenue of the Americas - 44th Floor
                          New York, New York  10020
                   BY:  **JOHN RIZIO-HAMILTON**
                        **REBECCA BOON**
                        **HANNAH ROSS**
                        **ATTORNEYS AT LAW**

           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Stenographically Reported By:

Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

**APPEARANCES**:   (CONTINUED)


For Defendants:
                         DAVIS POLK AND WARDWELL LLP
                         450 Lexington Avenue
                         New York, NY 10017
                  BY:    **CHARLES S. DUGGAN**
                         **PAULINA PERLIN**
                         **LUCA MARZORATI**
                         **ATTORNEYS AT LAW**

**Thursday, August 17, 2023**                                        **2:01 p.m.**

                         **P R O C E E D I N G S**

                              ---oOo---

THE CLERK:  Calling case number 21-cv-8812, In re Meta Platforms Incorporated Securities Litigation.

Counsel, please come up to the podium and state your appearances, starting with the plaintiff.

ATTORNEY RIZIO-HAMILTON:  Good afternoon, Your Honor.

My name is John Rizio-Hamilton.  I'm with Bernstein Litowitz Berger and Grossmann.  My firm represents the two co-lead plaintiffs in this case.

And I would also just like to acknowledge our client representatives who are here today.  We have with us in the courtroom Mr. Shawn Busken, who is the Deputy First Assistant Attorney General and Director of Outside Counsel with the office of the Ohio Attorney General.

And joining by Zoom is Mr. Ditlev Hvelplund, the director of governance and business support for co-lead plaintiff PFA.  Mr. Hvelplund will try to be on for the whole time, but it is 11:00 p.m. in Denmark.

And also with me in the courtroom today are my parters, Rebecca Boon and Hannah Ross.

Thank you for having us here today.

THE COURT:  Thank you, counsel.

ATTORNEY DUGGAN:  Good afternoon, Your Honor.

Charles Duggan, Davis Polk and Wardwell, for the defendants.

I'm joined today in the courtroom by Natalie Naugle, in-house counsel with Meta Platforms, Inc., as well as my colleagues Paulina Perlin and Luca Marzorati.

**THE COURT:**  Thank you, counsel.

I realize that we did not post for you all a little bit of guidance that I like to give folks before we have motions hearings.  So you'll get some leniency.

But what I would love for you all to do is essentially plan -- well, let me ask first.  What I've been asking parties to do here, including in securities cases, is just take a few minutes, usually no more than five minutes, to sort of give me an overview of where you think the heart of your case is.

You all did not have forewarning so I will be more indulgent, as you might imagine.

The other thing I will note is I think you've seen on your docket an order asking for a table in the coming week.  So just I want to flag it for you all as a thing that will be tremendously helpful to us.  And to the extent that it's helpful or useful, please feel free to also point me to things.

Let me go ahead, and because it's a motion to dismiss, of course I always start with defense counsel.  You're welcome to open.  And then what I did with one of my last securities cases was essentially give them about five minutes to jump off from,

and then I hear from plaintiff's counsel, and then back to you all.

And then I'll have some questions for you all.  I try to hold them to the end so that you can have some time to get your points across.

So with that, unless you all have anything else, let's go ahead and jump into the motion.

**ATTORNEY DUGGAN:**  Very good, Your Honor.  Thank you.

Your Honor, as you know, this case has its origin in a series of articles published in the *Wall Street Journal* in September and October of 2021 that purported to open a window into Meta's internal communications on a range of issues, some matters of intense public interest.

Some of the materials that were quoted in the news articles expressed critical self-assessments of the company's performance on important issues.  Some disagreed with aspects of the company's policies or practices.  And some expressed views on sensitive topics such as teen health.

They made for good headlines, but they do not support plaintiff's burden in this case which is to plead a strong inference that Meta executives intentionally lied to defraud investors.

And what's fundamentally going on here is this:  Plaintiffs point to highly generalized statements by the defendants touching broad issues of company policy, practices,

beliefs and then juxtapose those with alleged internal expressions of perceived shortcomings, self-criticism, or cautions, and they claim that this makes for fraud. That is a model that courts have repeatedly rejected.

There were four claims of fraud, as you know. I will try to work through them as quickly as I can.

But there is a general and pervasive problem with the complaint that is -- that's fatal to all of them. The inside information on which plaintiffs build their case consists almost entirely of mere fragments of sentences, short extracts from documents presented with minimal or no context. For some statements, it's not even clear what they mean.

But beyond that, many are altogether lacking in the indicia of reliability that would be necessary to plead a case for fraud.

Most are undated. Many of those with dates predate the defendant's statements by months or even years. Almost none are attributed to any identified author or source.

And for almost all of them, there's no well-pled factual allegation as to who received them or reviewed them, much less that any individual defendant had received or reviewed them.

Your Honor, not every document goes up the chain in a large organization such as Meta. It has tens of thousands of employees. And without identifying details as to the sources of the documents, why they were prepared, how they were used,

there's no basis to infer that the selected internal statements cited in the complaint are reliable or that they would have been seen or their contents would have been known to senior management.

They simply cannot support the strong inference that any particular defendant intentionally lied to investors which is what plaintiffs are required to plead to state a claim under the PSLRA.  And that failure required dismissal.

Your Honor, to run through the four claims as quickly as I can.  If --

**THE COURT:**  Let me say this to you.  I think you've actually hit upon some of the things that I was hoping to hear you all speak on.  So please don't feel like you need to -- trust, both of you, that I have pored over your pleadings into some degree one reason being that I have the law clerks want to chart as to immediately sort of drill down into them further.

So don't feel the need to hit everything.  What I ultimately -- if you have some examples and if you want to do some from each, that's fine.

**ATTORNEY DUGGAN:**  Sure, Your Honor.

I do have examples.  Let me point -- you know, one of the -- the first claim of the case is the cross-check claim that Meta somehow misrepresented that it was applying its community standards equally to all account holders or account users.

The first -- two things quickly about that.  The first is Meta actually made quite explicit, beginning in 2008 and throughout the class period, that it had a second review level process that was applied to public figures and content on Facebook that would be seen by many people.

So there was no mystery about the fact that there was a cross-check program and that there was additional review that was provided for certain accounts.

In terms of the statements that the complaint relies upon that lack any indicia of reliability or any basis from which one could extrapolate some kind of fraudulent intent, they cite an internal audit.  This is in paragraph 107 of the complaint where some unnamed employee of the company expresses the view, quote, we are not actually doing what we say we do publicly.  Unlike the rest of our community, these people can violate our standards without any consequences.

This is from 2019, Your Honor.  It's more than a year before the start of the class period.  And it's entirely unclear from this extract what the subject of the conversation even is.

"We're not actually doing what we say we do publicly." It's not clear what public statements are being referred to. It's not clear what is not being done and would need to be done to refer to public statements.  And it's simply too inchoate in expression of concern to base a fraud claim on.

It's also not clear whoever saw this document.  And critically it is not clear what was done in response.  But from the document itself, it says nothing about that.

But in paragraph 418 of the complaint, we note that the company did take a response.  They did take a response.  There is a clear statement that the company had identified this problem prior to the class period, that it was taking measures to address it.  And there's nothing in the complaint that contradicts that representation.

Your Honor, I don't want to exceed the leeway you've given me.  I have other examples from other aspects of the claims, but I want to proceed in the way that you would like me to.

**THE COURT:**  Is there anything else that you would add about scienter?

**ATTORNEY DUGGAN:**  About scienter?

**THE COURT:**  Yes.

**ATTORNEY DUGGAN:**  Well, Your Honor, there's absolutely nothing in the complaint that would support an assertion of scienter.

As I've said, there, first of all, isn't any indication that any of the people who spoke for the company had any understanding of much of the material that is cited in the complaint.

But I will say two things.  One is in respect to various statements about whether the company actually encouraged

negative content on the platform and the statements that were made to the effect that the company did not profit from negative information in circulation on the platform, it's -- the complaint itself establishes that negative content on the platform was regarded by Meta as contrary to its interest, and it details steps that were taken to address what were acknowledged to be side effects of the algorithm that were generating some degree of negative material.

Paragraph -- give me a moment, Your Honor.

(Pause in the proceedings.)

ATTORNEY DUGGAN:  This is in paragraph 423.  It actually acknowledges that these were side effects that were not an intended result of the company's algorithm.

And it's also stated that Mr. Zuckerberg personally approved changes that were designed to limit the effect of the algorithm in promoting certain forms of negative content as to civic and health matters.

So the company is itself taking measures to combat the spread of this information, which is entirely consistent with the notion that its representations that it was doing so were somehow deceptive or false or not true.

THE COURT:  Thank you, counsel.

Please go ahead.

ATTORNEY RIZIO-HAMILTON:  Thank you very much, Your Honor.

In a securities class action such as this one, it is truly exceptional to have the kind of evidence at the pleading stage that we have in our complaint.

This evidence includes multiple years of internal Facebook analyses beginning in 2018 and leading right up to the beginning of the class period on the subject at the heart of this case.

This evidence also includes the firsthand report of a whistleblower, Frances Haugen, who observed the issues at the core of this case herself and in extraordinary detail.

This evidence shows that defendants made a series of misstatements and omissions about several subjects that were critical to Meta's business and its investors.

Now I have a bit of a speech prepared, but I actually think it might be better for me to address some of the issues that Mr. Duggan raised.

The first sort of big picture point he made is that the evidence cited in the complaint is too inchoate to be reliable for the purposes of pleading a securities fraud claim.  That is absolutely not so for many reasons.

At core, defendants are suggesting that we need some sort of formal policy finding that was definitively and specifically handed to the speaking defendants in order to plead a securities fraud case.  And that's really not the standard. Documents like that really don't exist, and it's essentially

impossible for a plaintiff to obtain that kind of evidence during the pendency of the statutorily imposed discovery stay, which is what we're dealing with here.

And that's why, in the *Glazer* decision issued in March of 2023, the Ninth Circuit said that requiring the kind of detail that defendants are saying we must have in this case would transform the PSLRA's formidable pleading requirements into an impossible one.  The PSLRA was designed to eliminate frivolous or sham actions but not actions of substance.

This case is an action of substance.  It is not a frivolous or a sham action.

Now the question is really whether there's sufficient indicia of reliability to credit the documents and draw inferences favorable to us from them.  And there absolutely are.

First of all, you don't have to take my word for it. Let's see how the *Wall Street Journal* described the documents. And this is at paragraph 101 of the complaint.  The *Wall Street Journal* wrote:

> The documents include internal research reports, online employee discussions, and drafts of presentations to senior management, including Mr. Zuckerberg.  They aren't the result of idle roaming but rather the formal work of teams whose job was to examine the social network and figure out how it could improve.

They offer perhaps the clearest picture thus far how broadly Facebook's problems are known inside the company up to the CEO himself.  And when Facebook speaks publicly about many of these issues to lawmakers, regulators, and in the case of X-Check, to its own oversight board, it often provides misleading or partial answers, masking how much it knows.

That's big picture point one.  That's the kind of documentary evidence we've pled in our complaint.

**THE COURT:**  Let me ask you a question there about -- since you're reading from the *Wall Street Journal*, and I had a question for you about some of those internal reports cited in the *Wall Street Journal*.

And could you please speak to how the Court infers scienter from those where there's no information about who the authors were or whether the individual defendants received or read the reports.

**ATTORNEY RIZIO-HAMILTON:**  So there's a few bases for scienter for each branch of the claim, but let me address your particular question.

So the Court looks to the entire complaint to see whether these documents bear sort of indicia of reliability.  How specific they are.  What is said in them.  Were any of them presented to senior management?  Are there other facts that show that senior management was involved in the issues

discussed in the reports?  The court conducts a holistic analysis asking all those questions.

And here there absolutely are numerous facts giving rise to a strong inference of scienter with respect to the speaking defendants.

The documents are one part of it.  The documents themselves talk about presentations to Mark Zuckerberg in April 2020.  There was a presentation to Mark Zuckerberg where his data scientist asks him to make a change to the algorithm to decrease its proclivity to amplify toxic content, and he declined to do it.

And, you know, that document is set forth quite clearly in the complaint.  And I want to give Your Honor the cite for it.

Let's see, that's at paragraphs 179 and -80, 179, 180, and 552 to 553.

Frances Haugen, the whistleblower, testified about that experience with Mr. Zuckerberg and described it in her reports.

And that's sort of big picture point two about the reliability of the documents which is let's consider their source.  They came from inside Meta.  Meta never said, by the way, when the documents were exposed that they weren't Meta's documents, that they were made up.

And the source of those documents is Frances Haugen. She's a Harvard-educated data scientist who has over 15 years of experience working for tech giants like Google.  She was a

member of Meta's civic integrity unit which works on risks related to misinformation on the platform.  She knows what she's talking about.  Her credentials here are set forth in paragraphs 340 to 345 of the complaint.

A third factor I think really weighing strongly in favor of the reliability of these documents is that the depth and breadth of the research cited in the complaint is really just remarkable.  We've cited numerous Meta internal studies conducted over the course of multiple years going right up to the class period.

So the studies that we've cited begin in 2018 and they go right up to the beginning of the class period.  They go through March 2021.  The class period begins in April.  And they all say the same thing over and over again.  So they're extremely consistent about the algorithm and content moderation, about whitelisting and X-Check and about Instagram's harm to young people.  That's a really good example, actually, the research on Instagram's harm to young people.

We cite 18 months' worth of deep-dive research conducted by Meta on one of the most critical issues facing the company.  One study that we cite in paragraph 223 of the complaint even included 100,000 participants across nine countries.

Mr. Zuckerberg, in his Congressional testimony in March of 2021, acknowledged his awareness of the research when he said: This is something that we study and we care about a lot.

He was specifically asked if the platform harms young children, if Instagram harms young children.  He said this is something we study and care about a lot.  So it's not like it escaped his attention, Your Honor.

**THE COURT:**  Counsel, you keep referencing Mr. Zuckerberg --

**ATTORNEY RIZIO-HAMILTON:**  Yes.

**THE COURT:**  -- and as you would expect, I then have to ask what about the others?  Because right at the end --

**ATTORNEY RIZIO-HAMILTON:**  Yeah.

**THE COURT:**  -- I don't -- tell me about the others.

**ATTORNEY RIZIO-HAMILTON:**  Yeah.  So it's not just Mr. Zuckerberg.

Mr. Mosseri, for example, the CEO of Instagram, spoke to the *Wall Street Journal* in May of 2021 about this very research and purported to describe its findings to the *Wall Street Journal*.  And so he was certainly aware that the research was there.

And in fact, Meta's most senior executives were repeatedly questioned by the media, by Congress, and by the company's own oversight board -- and that would include not just Mr. Zuckerberg but Ms. Bickert, it would include Mr. Clegg, and it would include Mr. Mosseri -- about the issues at the heart of the case.

And the Ninth Circuit's decision in *Reese v. Malone* says

quite clearly that when senior executives are scrutinized by Congress and the media, which occurred here on all these issues, not to mention the companies on the oversight board, it would be implausible to infer that the information allegedly concealed or misstated escaped their attention.

And we had that spot on for essentially each and every issue in this case.

Beyond this, Your Honor --

**THE COURT:**  Counsel, I'm going to give you about another minute or two to make a couple last points.

**ATTORNEY RIZIO-HAMILTON:**  Sure.

Beyond this, Your Honor, the documents, in great detail, describe the regular interventions of Mr. Zuckerberg and other senior executives.

One good example -- there are many in the complaint, and the list is on the chart -- but one good example is in paragraphs 110 to 111 of the complaint, there's a December 2020, so just before the class period begins, internal research report.  And we give the title right there.  And it specifically states that Mark Zuckerberg and other senior executives are the ones who made final calls under X-Check and whitelisting about whether to protect a VIP user or not and that they're often influenced by that person's political status.

So, you know, the documents -- we do have examples of

documents going to extremely senior executives.  We have examples of dated documents describing the actions senior executives took.  We have the report of the whistleblower, Frances Haugen.  And we have the description of the documents by the *Wall Street Journal* that makes very clear these are not the idle musings of random employees.  This is the formal work of teams whose work it was to document these issues in the company.

And I cannot stress enough that it's exceptionally rare, if not in fact unprecedented, to have this kind of blow-by-blow internal communication set forth in a securities class action complaint at the pleading stage.

**THE COURT:**  Counsel, would you like to respond?

**ATTORNEY DUGGAN:**  Yeah, if I can address a few points, Your Honor.

Despite the claim that documents went to Mr. Zuckerberg and documents went to certain senior managers, there's no ability demonstrated in this complaint to actually link virtually any of the specific statements that the plaintiffs say are proof of fraud to any of the defendants.

Yes, certainly, did senior people talk about important issues that Meta was addressing during this period?  Sure, they did.  Does that mean that they actually saw the particular documents that are referenced in the complaint or that any contents of those documents were either accepted within the

organization, deemed reliable, or circulated up the chain of command to more senior personnel?

We are not talking here, by the way, about reports.  Not one of the documents that is actually specified -- I shouldn't say not one, but the vast majority of the quote comes on a presentation, a memo.  This bears no resemblance to the information that has been deemed sufficiently reliable in other cases to support an assumption that it was seen and understood by senior personnel in the company.

We are not talking about quarterly revenue reports.  We are not talking about weekly sales flashes.  These are qualitative statements by unidentified personnel about questions of policy, questions of practices.  And none of them on their face can be viewed as having been reviewed by senior management personnel.

I mean, Mr. Rizio-Hamilton refers to the many, many documents that are referenced.  There isn't a single one where the *Wall Street Journal* has said this is a document that actually went to Mr. Zuckerberg.

It's a remarkable juxtaposition to say we have unparalleled access to internal communications within the company, and not to be able to trace them to virtually any of the named defendants, not just Mr. Zuckerberg, but any of the named defendants.

A few other points here.

Mr. Rizio-Hamilton mentioned that Mr. Zuckerberg declined to adopt certain content moderation measures in April 2020. The complaint makes clear he actually adopted some content moderation measures proposed to him in April 2020, the very same paragraph that was cited, paragraph 179. He didn't adopt everything that was presented for his decision, but he adopted some.

There were references to Ms. Haugen and meetings with Mr. Zuckerberg. There's no allegation in the complaint that Ms. Haugen ever met with Mr. Zuckerberg.

So I think that the argument that there's just a tremendous amount of material here doesn't advance the ball at all. You can't stack unreliable materials on top of unreliable materials and suddenly come up with a sense that there's an accurate picture that's been presented of what information was for senior management.

But it's not simply a matter of people having an opportunity to review, Your Honor. It's that these documents are so ill described that one cannot tell when they reference a concern or a problem, whether that concern was addressed, whether a solution was proposed, whether the solution was adopted.

You can't establish a claim of fraud by saying on a certain day a certain person raised a concern, and not tell the full story as to what happened with that concern: Who it went

to, how it was addressed, what decisions are made.

None of -- that line is not traced through this complaint as to any of the issues that are at the center of the case.

If I could say one last point, Your Honor, with respect to teen health.

The document makes very clear -- the complaint makes very clear that senior management in the company was focused on teen health.  And it also makes very clear that they were in possession of information that fully supported the statements that they made and the views that they expressed.

And I would just point you to paragraphs 495, paragraph 300.  It's a true example of defendant's referencing materials that supported their statements with respect to how they viewed the issue of teen health, and more than justify the view that they fully believe what it is that they said.

Plaintiff's burden here again is actually to show that they lied, that they said things that they did not believe. And if you actually look at their statements and the bases that they make for their statements, at least that they quote in their complaint, I think the argument that they must have been lying simply does not hold water.

**THE COURT:**  Thank you, counsel.

**ATTORNEY RIZIO-HAMILTON:**  May I briefly respond to that, Your Honor?

**THE COURT:**  Yes.

**ATTORNEY RIZIO-HAMILTON:**  A few things.  Let me pick up where Mr. Duggan ended.

Our burden is not to show that somebody lied.  It's to show that somebody made a statement that created an impression that differed materially from the actual state of affairs.  That's very different than what Mr. Duggan said.

The case law in the Ninth Circuit in *Berson* says as much.  The case law throughout the Ninth Circuit says that a statement is actionably misleading where it creates an impression that differs in a material way from the actual state of affairs.

Similarly, the case law says that it is materially misleading and actionable to choose to tout positive information to the market while omitting material information that cuts against the positive information you're telling to the market.  That's the *Khoja v. Orexigen* case and numerous others that we cite in our briefing.

So that standard that he's citing just isn't so.

**THE COURT:**  But what I hear you saying is that you still have to allege that they made a material misrepresentation knowing or having the other information, omitting the other information, and what I hear your friend across --

**ATTORNEY RIZIO-HAMILTON:**  The aisle.

**THE COURT:**  Yeah, it's across the table here -- across the table saying is essentially you haven't connected -- you

haven't connected some of these presentations or memos to the individual defendants to show that they --

**ATTORNEY RIZIO-HAMILTON:**  So what we have, first of all, because the memos in certain instances did go to them. The ones cited in 179 and 180 paragraphs of the complaint went to Mr. Zuckerberg.  Other memos reference the actions that they did or didn't take, such as the memos that I've cited in paragraphs 110 and 111.

And critically, Your Honor, they have ready access to all this information.  And that's an important fact weighing in the scienter calculous.

In, for example, the *Nursing Home v. Oracle* case and the *Reese v. Malone* case, the Ninth Circuit held that ready access to adverse internal information was a really significant fact weighing in favor of scienter.  And they coupled it to find an inference of scienter with defendant's statements acknowledging that they were involved in the issues that the misrepresentations concerned.

We absolutely have that here.  You know, we have statements by Mr. Zuckerberg, by Mr. Mosseri, by Mr. Clegg, by Ms. Bickert candidly acknowledging their involvement in the issues that we allege were -- that they misstated and misrepresented, purporting to speak very knowledgeably about these issues, when in fact they had ready access to documents and information that contradicted what they were saying.  And

under those cases, that's more than enough for an inference of scienter.

But there's more.  Again, you know, as I noted, these subjects -- and defendants were specifically asked about these subjects.  They were the subject of intense scrutiny by Congress and the media and the company's own oversight board. It would be implausible to infer that this kind of information just escaped their attention.  That's what the Ninth Circuit said in *Reese*.  The same holds true here.

And Mr. Duggan also mentioned that we didn't really allege sufficiently that the problems weren't correct by the time the class period began.  That's completely not accurate.  We alleged that by the time the class period began, the X-Check and whitelist program was almost 6 million VIP users deep and was administered by 45 teams across the globe.

There's not a single shred of evidence that he's pointed to or that's in the complaint to suggest that between the December 2020 internal memo we cite about X-Check in the beginning of the class period, in April 2021 this massive program simply vanished.

In fact, the company's own oversight board found that the company's statements about it were misleading and that the program continued to exist.

The same is true for the algorithm --

**THE COURT:**  I'm going to pause you just because I feel

like I've opened this back up and I didn't entirely mean to.

**ATTORNEY RIZIO-HAMILTON:**  Okay.

**THE COURT:**  So if you've got one final point to make, say, in a sentence or two.

And then, Mr. Duggan, I'll give you a chance to close since it's your motion we're here on.

**ATTORNEY RIZIO-HAMILTON:**  Okay.

Frances Haugen testified that the problems with the algorithm continued up until the time she left right at the beginning of the class period.  Paragraph 169 of the complaint.

The Instagram research on harm goes right up to when the class period begins.  The research was deep, broad, and the data was fresh at the time the class period began.

**THE COURT:**  Thank you.

**ATTORNEY RIZIO-HAMILTON:**  Thank you.

**ATTORNEY DUGGAN:**  Your Honor, on none of these issues does the complaint actually marshal evidence that would support a conclusion that any of the individual defendants was conscious of making misrepresentations to anyone.

It is not the case that the standard for determining whether or not information is actionable -- or statement is actionable or may not be correct, which is what Mr. Rizio-Hamilton was describing earlier, it equates somehow to a state of mind that would be sufficient to plead scienter, which is what's required here.

The complaint has no allegations, virtually no allegations that would supply any basis to conclude that people acted with a conscious intent to defraud.

The point about access is I would submit essentially an empty point.  We don't even know what these documents are.  In theory, yes, if someone knew that a document existed at the senior level of management, could they command that it be brought to them?  Yes.

But there is no indication that any of the information discussed in almost all of the materials cited in the complaint was ever circulated beyond the initial group of people who discussed it.

And as I've also said, there were many instances of indications that problems were identified, problems were addressed, which is exactly what one would hope to see and expect to see.

A large part of the self-evaluative material here actually reflects the company's internal self-assessments of how they were complying with their standards and meeting the goals that they had set for themselves.

And to suggest that those critical self-evaluative documents are somehow indicative that when the company says "We strive to apply our policy equally, we're deeply concerned about teen health, we are -- we don't profit from negative content on the platform," all of those -- all of those matters,

Your Honor, fall within that -- fall within that issue.

**THE COURT:**  Counsel, I thank you both.  I'll take it under submission.  And I look forward to receiving your chart.

**ATTORNEY RIZIO-HAMILTON:**  Thank you, Your Honor.

**ATTORNEY DUGGAN:**  Thank you, Your Honor.

(Proceedings adjourned at 2:34 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Saturday, August 19, 2023


_____

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter