**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
CAITLIN C. BOZMAN (Bar No. 343721)
(caitlin.bozman@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs*
*Ohio Public Employees Retirement System and*
*PFA Pension Forsikringsaktieselskab*

[Additional Counsel Appear on
Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PLATFORMS, INC. SECURITIES LITIGATION | Lead Case No. 3:21-cv-08812-AMO |
| | Consolidated Case No. 3:21-cv-08873-AMO |
| | **MOTION TO PARTIALLY MODIFY THE PSLRA'S DISCOVERY STAY AND MEMORANDUM IN SUPPORT** |
| | <u>CLASS ACTION</u> |
| | Date: March 7, 2024 Time: 2:00 p.m. Courtroom: 10 |

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

I.   STATEMENT OF ISSUES TO BE DECIDED ................................................................1

II.  INTRODUCTION ..........................................................................................................1

III. STATEMENT OF FACTS ..............................................................................................5

    A.   42 State Attorneys General Sue Meta For Causing And Concealing Harms to Young Users ...................................................................................5

        1.   Defendants Knew That Meta's Own Research Found That Instagram Caused Severe Harm To Young People...................................6

        2.   Notwithstanding Their Knowledge of These Harms, Defendants Repeatedly Refused to Make Changes to Mitigate the Harms .................11

        3.   While Knowing of the Harms Instagram Caused, Defendants Designed the Product to Be Addictive to the Young Brain .....................13

        4.   Defendants Knew That Millions of Children Under 13 Used Meta's Platforms and Suffered Harm – And Defendants Actively Targeted Them ..........................................................................................16

    B.   Arturo Béjar Provides Testimony and Documentary Evidence Futher Confirming Meta's Executives Knew of the Harms Caused by Meta's Platforms ........................................................................................................17

    C.   The Personal Injury Actions, Which Have Already Received Discovery From Defendants Concerning the Same Issues, Recently Survived Motions to Dismiss ......................................................................................19

IV.  ARGUMENT ..............................................................................................................20

    A.   Legal Standard .........................................................................................20

    B.   Lead Plaintiffs' Request Is Sufficiently Particularized...........................22

    C.   Lead Plaintiffs Will Suffer Undue Prejudice If the Stay is Not Modified...........22

V.   CONCLUSION............................................................................................................25

Motion to Partially Modify the pslra's                                                                                i
Discovery Stay and Memorandum in Support
3:21-cv-08812-amo

# TABLE OF AUTHORITIES

**CASES**                                                                                     **Page(s)**

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
   2009 WL 4796169 (S.D.N.Y. Nov. 16, 2009) ............................................................4, 21, 23

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ..............................................................................................24

*In re Delphi Corp. Sec. Litig.*,
   2007 WL 518626 (E.D. Mich. Feb. 15, 2007) .................................................................4, 21, 22

*In re FirstEnergy Corp. Sec. Litig.*,
   2021 WL 2414763 (S.D. Ohio June 14, 2021) .................................................................4, 22, 23

*In re FirstEnergy Corp. Sec. Litig.*,
   229 F.R.D. 541 (N.D. Ohio 2004) .....................................................................................21

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) .............................................................................................25

*In re Lernout & Hauspie Sec. Litig.*,
   214 F. Supp. 2d 100 (D. Mass. 2002) ...............................................................................22

*In re Massey Energy Co. Sec. Litig.*,
   2011 WL 4528509 (S.D. W. Va. Sept. 28, 2011) .........................................................21, 22, 23

*New York State Teachers' Ret. Sys. v. Gen. Motors Co.*,
   2015 WL 1565462 (E.D. Mich. Apr. 8, 2015) ..................................................................22

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 17974627 (N.D. Cal. Nov. 7, 2022) ..................................................................24

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ...........................................................................................23

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) .............................................................................................24

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   220 F.R.D. 246 (D. Md. 2004)......................................................................................21, 23

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)..................................................................................................8

*Seippel v. Sidley, Austin, Brown & Wood LLP*,
   2005 WL 388561 (S.D.N.Y. Feb. 17, 2005)......................................................................23

*In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*,
   No. 4-22-MD-3047 (MDL) (N.D. Cal.) ..........................................................1, 20, 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ....................................................................................23, 24

*Turocy v. El Pollo Loco*,
   2017 WL 2495172 (C.D. Cal. May 10, 2017) ..................................................4, 25

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ...............................................................................24

*In re Wireless Facilities, Inc. Sec. Litig.*,
   2007 WL 966713 (S.D. Cal. May 7, 2007) ...........................................................8

*Zelman v. JDS Uniphase Corp.*,
   376 F. Supp. 2d 956 (N.D. Cal. 2005) ..................................................................8

**STATUTES**

Private Securities Litigation Reform Act of 1995,
   15 U.S.C. §78u-4(b)(3)(B) .................................................................1, 20, 21, 22

### NOTICE OF MOTION AND MOTION
### TO PARTIALLY MODIFY THE PSLRA'S DISCOVERY STAY

PLEASE TAKE NOTICE THAT on March 7, 2024 at 2:00 p.m., or as soon as the matter may be heard by the Court, in the courtroom of the Honorable Araceli Martínez-Olguín, United States District Court for the Northern District of California, Courtroom 10, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Lead Plaintiffs will move for an order partially modifying the automatic stay of discovery imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b)(3)(B), with respect to all documents, electronically stored information, and other materials produced by Defendants to (i) the state attorney general offices that filed suits against Meta in October and November 2023, and (ii) the civil plaintiffs in *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, No. 4-22-MD-3047 (MDL) (N.D. Cal.) and *Social Media Cases*, No. 22. STCV No. 5255 (Cal. Sup. Ct.).  Lead Plaintiffs' Motion is based on this Notice of Motion and Motion to Partially Modify the PSLRA's Discovery Stay, the Memorandum of Points and Authorities in support, the accompanying Declaration of John Rizio-Hamilton, all pleadings and papers in this action, and any oral argument of counsel.

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.       STATEMENT OF ISSUES TO BE DECIDED

Whether the Court should partially modify the discovery stay imposed by the PSLRA to allow Plaintiffs to obtain materials that Defendants have already produced to numerous state attorneys general and private civil plaintiffs.

## II.      INTRODUCTION

This case arises from Defendants' misstatements and omissions concerning severe harms caused by Facebook and Instagram. As detailed in Lead Plaintiffs' Complaint (ECF No. 97), Defendants misled investors about the following subjects: (i) that Meta exempted several million VIP users from its Community Standards through a practice known internally as "whitelisting," allowing them to post viral, rule-violating content; (ii) that Meta's "News Feed" algorithm caused toxic, harmful content to proliferate on its platforms, and Meta's content moderation

practices were grossly deficient; (iii) that Meta possessed years of research demonstrating that Instagram had severe, harmful effects on young users, particularly teenage girls; and (iv) that Meta falsely inflated its user growth metrics.[1]

Many of these allegations are based on the testimony of a whistleblower named Frances Haugen and internal Meta documents that Haugen and Congress released—including documents that went to Meta CEO Mark Zuckerberg and the Head of Instagram, Adam Mosseri, or explicitly discuss their knowledge and the actions they took (or rejected) in response to internal concerns. *See e.g.*, Complaint ¶¶103-14, 125-39, 160-93, 210-28, 232-39, 248-52, 270-75, 292-96, 314, 540-56.  Lead Plaintiffs were able to obtain this information only because it was made public; otherwise, the PSLRA discovery stay has prevented Lead Plaintiffs from seeking internal Meta documents or documents from third parties.

On August 17, 2023, this Court heard oral argument on Defendants' motion to dismiss. Since that argument, several striking developments have occurred that corroborate the allegations in the Complaint and confirm the strength of the claims.  ***First***, beginning in October 2023, forty-two different state attorneys general filed lawsuits against Meta, alleging that Meta repeatedly misled the public concerning the harms caused by Instagram.  The actions are based on years-long investigations and extensive document discovery and testimony obtained by the attorneys general.  The same allegations in the attorney general suits are at the core of Lead Plaintiffs' Complaint.  *See*, *e.g.*, Complaint ¶1 ("This case arises from misstatements and omissions by the senior executives of Meta—the most powerful social media company in the world—about the severe harms that its platforms cause, and its decision to prioritize profits over users' safety.").

As detailed herein, the evidence amassed by the various attorneys general establishes that: (i) both before and during the Class Period, Meta conducted significant research on the effects of its platforms on young users and concluded that Instagram caused severe harms to young people; (ii) Meta's senior executives, including several of the Executive Defendants named in this action, were aware of this research and repeatedly discussed it; (iii) when Meta's

---

[1] Emphasis is added and all terms have the same meaning as in the Complaint.  References to Ex. __ refer to the Declaration of John Rizio-Hamilton filed in support of this motion.

executives and researchers asked Defendant Zuckerberg to make changes to make the platforms safer, he repeatedly refused to do so because making those changes would harm Meta's business interests; (iv) Meta's most senior executives, including Defendant Mosseri, also knew that Instagram was designed to addict young users by exploiting the neurobiology and psychology of their developing brains; and (v) Defendants knew that millions of children under the age of 13 used Meta's platforms and actively targeted and recruited them, notwithstanding their knowledge of the platform's harms and its addictive nature.

*Second*, another whistleblower stepped forward in November 2023, providing additional sworn testimony and documentary evidence that the Executive Defendants were aware of Meta's internal research showing that Instagram caused harm to young users.  That whistleblower, named Arturo Béjar, was a respected data engineer who had direct access to Defendant Zuckerberg and other executives at Meta.  He testified to a Senate Subcommittee last month that Meta's executives "knew [about the harms Meta's platforms were causing] and that they were not acting on it."  He told Defendants Zuckerberg and Mosseri that there was "a critical gap" in how Meta addressed the harms its platforms caused young users, but Defendant Zuckerberg simply ignored that message.  Significantly, Mr. Béjar testified to the attorneys general that Meta purposely misrepresented the frequency with which users viewed harmful content on Meta's platforms.  As he told the Massachusetts attorney general: "Every time that a company spokesperson in the context of harms quotes prevalence statistics I believe that is what they are doing, that they're minimizing the harms that people are experiencing in the product."

*Third*, two significant civil actions filed against multiple social media companies, both of which allege that Meta's platforms caused physical and mental harms to young users, recently survived motions to dismiss (the "Personal Injury" actions).  The Personal Injury actions corroborate Lead Plaintiffs' allegations based on internal Meta documents from before and during the Class Period.  In the federal consolidated action, Judge Yvonne Gonzalez Rogers recently denied in part the motion to dismiss, and that action is now moving forward into full discovery.  In the state consolidated action, Judge Carolyn B. Kuhl also denied in part the motion to dismiss, meaning that action is also proceeding further into discovery.

This action is the only one that has not had the benefit of the discovery on which all these other actions are based—and now they are moving forward apace.  Although discovery has been stayed under the PSLRA while Defendants' motion to dismiss is pending, that stay is not absolute.  The PSLRA permits courts to modify the stay when the discovery sought is particularized and necessary to avoid undue prejudice.  Lead Plaintiffs' request meets these criteria.

First, the request is particularized.  Lead Plaintiffs seek only documents that Meta has already collected and produced in related actions to law enforcement agencies and civil plaintiffs.  Courts "regularly find that specific requests for already-produced discovery satisfy the particularity requirement of the exception to a PSRLA discovery stay."  *In re FirstEnergy Corp. Sec. Litig.*, 2021 WL 2414763, at *4 (S.D. Ohio June 14, 2021).

Second, Lead Plaintiffs are unduly prejudiced without these materials.  Absent the requested information, Lead Plaintiffs will suffer from an information disparity that materially impairs their ability to assess their litigation strategy and puts them at a significant disadvantage relative to other litigants, while those actions move forward against Meta.  Courts have recognized that these circumstances create undue prejudice that justifies modifying the stay.  *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009) ("Courts have found undue prejudice where plaintiffs would be unable to make informed decisions about their litigation strategy in a rapidly shifting landscape because they are the only major interested party without documents forming the core of their proceedings.").

Lead Plaintiffs' Complaint is not the type of "strike suit" that concerned Congress when it enacted the PSLRA discovery stay.  *See In re Delphi Corp. Sec. Litig.*, 2007 WL 518626, at *8 (E.D. Mich. Feb. 15, 2007) (parallel government action showed case was not a "frivolous securities class action").  And because Defendants have previously reviewed and produced each document, there would be no burden in reproducing those documents, further justifying the limited modification of the PSLRA stay sought.  At bottom, "[m]aintaining the discovery stay as to materials already provided to other entities and plaintiffs does not further the policies behind the PLSRA."  *Turocy v. El Pollo Loco*, 2017 WL 2495172, at *2 (C.D. Cal. May 10, 2017).

That is especially so here, where Meta no longer has any true privacy interest in keeping these documents under wraps.  Meta has agreed with nearly all of the attorneys general to publicly file unredacted versions of the complaints quoting many important documents.  The requested documents should be produced.

## III.   STATEMENT OF FACTS

The landscape surrounding Meta and this litigation is rapidly evolving, as a host of related cases—based on the same theory as this case—are surging forward.

### A.   42 State Attorneys General Sue Meta For Causing And Concealing Harms To Young Users

On October 24, 2023, thirty-three state attorney general offices filed a complaint against Meta in the United States District Court for the Northern District of California.[2]  This action alleges that "Meta has repeatedly misled the public about the substantial dangers of its Social Media Platforms"—the precise allegation at the heart of Lead Plaintiffs' Complaint.  *See* Ex. 1 ¶1 (unredacted version of the "Multistate Complaint").  Based on extensive discovery, the claims in the Multistate Complaint center on "the ways in which [Meta's] Platforms exploit and manipulate its most vulnerable consumers: teenagers and children."  *Id*.  That a bipartisan coalition of nearly three dozen state attorney general offices from across the political spectrum joined together to file the Multistate Complaint indicates the strength of the evidence uncovered.

Nine additional state attorneys general filed suits against Meta in various venues based on the same core allegations and discovery.  Almost all of these complaints initially contained heavy redactions that obscured the underlying documents referenced.  Over the past month, certain of these complaints have been unredacted, including the Multistate Complaint and those filed by the attorneys general of Massachusetts (Ex. 2, the "Massachusetts Complaint") and Oklahoma (Ex. 3, the "Oklahoma Complaint").  Each of these complaints cites and quotes

---

[2] The Office of the Attorney General of the State of Ohio ("OAG"), which serves as Additional Counsel for the Ohio Public Employees Retirement System ("OPERS") in this action, is a signatory to the Multistate Complaint.  The OAG has not provided OPERS or Lead Counsel with any of the documents obtained from Meta or third parties, including because of a confidentiality agreement between the attorney general offices and Meta.

internal Meta documents that go straight to the core issues in this case—including the knowledge of speaking Defendants Zuckerberg, Mosseri, Newton, and Davis.

  **1.**  **Defendants Knew That Meta's Own Research Found That Instagram Caused Severe Harm To Young People**

  The evidence cited in the attorney general complaints further demonstrates that Meta's executives, including Defendants Zuckerberg, Mosseri, Newton, and Davis, were aware of extensive research concluding that Meta's platforms were harmful to children both before and during the Class Period.  As Lead Plaintiffs alleged, Defendants understood that the effect that Instagram had on young users was the single most important issue facing Instagram.  Defendant Mosseri wrote in an internal email, "I see <u>social comparison as the existential question Instagram faces within the broader question of whether or not social media is good or bad for people</u>."  Ex. 1 at ¶254.  As the Multistate Complaint noted, "Because of Instagram's 'focus on young people and visual communication,' its emphasis on beauty and fashion content, and a 'marketing look and feel often biasing too polished,' Mosseri reasoned that '<u>social comparison is to Instagram [what] election interference is to Facebook</u>.'"  *Id.*

  Because the Executive Defendants were intensely focused on these issues, they were regularly informed of Meta's latest internal research.  For instance, in April 2019, Meta's Vice President of Product, Choice, and Competition emailed Defendant Zuckerberg to recommend "investments to fund additional engineering staff focused on building well-being 'tools/products to address problematic use' on the Instagram and Facebook platforms because '<u>[c]urrent research (internal and external) tells us that . . . there is increasing scientific evidence (particularly in the US . . .) that the average net effect of [our platforms] on people's well-being' is 'negative</u>.'"  Ex. 2 at ¶181.  The VP also told Defendant Zuckerberg that "<u>according to Meta's research</u>, 'problematic use [i.e., addiction], social comparison and loneliness' were the 'three negative drivers that occur frequently on [our platform] and impact people's well-being.'"  *Id.*  Defendant Zuckerberg appears to have ignored this message.  Thereafter, Meta's Chief Financial Officer "responded that Meta's leadership team declined to fund this initiative."  *Id.* at ¶182.

This warning to Defendant Zuckerberg was not a one-off—it was part of a years' long pattern in which Meta executives would ask Defendant Zuckerberg to invest in well-being initiatives, and Defendant Zuckerberg would either ignore or reject the requests.

In April 2019, Meta's "own researchers <u>directly told Zuckerberg</u> that passive consumption of social media content, including scrolling, browsing, and watching videos, is associated with negative effects on well-being. Due to emerging findings about this association, Meta employees recommended additional funding to study the issue, which was ultimately denied." Ex. 1 at ¶417. Later in 2019, Defendant Mosseri acknowledged that Meta "lack[ed] . . . a roadmap of work that demonstrates we care about well-being," confirming that he was aware of Meta's work and research concerning the subject, as well as Meta's shortcomings in addressing the problems created by its platforms. Ex. 2 at ¶183.

Internal Meta documents also confirm that Defendant Davis knew her sworn testimony to Congress during the Class Period was false and misleading. Davis testified in September 2021 that Meta's "research shows that many teens, that Instagram is helping them with hard issues . . . like loneliness, anxiety, sadness, and eating disorders." Complaint ¶495. But less than one year earlier, Defendant Davis authored a report that "contradict[ed] the representations she made to Congress (and the public)." Ex. 3 at ¶330. Davis found that Instagram had "minimal child safety protections" that were necessary to prevent "Child Sexual Exploitation." *Id.* at ¶331. Davis's report noted that "content" was a significant "[v]ulnerability" for Instagram, "due to the presence of 'inappropriate/harmful content and experiences for minors." *Id.* at ¶332. Defendant Davis's own presentation found that Instagram's "<u>core product features connect to challenging</u> <u>societal issues</u>," including the "<u>objectification of women . . . competitive social comparisons . . .</u> <u>and anxiety/[fear of missing out]</u>." *Id.* at ¶333. The detailed nature of Defendant Davis's own reporting demonstrates her knowledge of the harms caused by Instagram.

In addition, the attorney general complaints confirm that Defendant Zuckerberg had been briefed again on Meta's internal research before he testified to Congress in March 2021, one month before the start of the Class Period. When asked about the impact of Instagram on teens and mental health, Defendant Zuckerberg told Congress, "The research that we've seen is that

using social apps to connect with other people can have positive mental-health benefits." Complaint ¶241.  He was then asked: "Do you believe that your platform harms children?" Zuckerberg falsely stated, "Congresswoman, I don't believe so. This is something that we study and care a lot about."  As the Multistate Complaint explains, however, "Zuckerberg made this statement despite being given talking points on the negative effects of passive consumption on mental health to prepare for the congressional hearing." Ex. 1 at ¶419.  This both corroborates Lead Plaintiffs' claims and undermines Defendants' suggestion that Defendant Zuckerberg was unaware of this research when he testified (*See* ECF No. 110 at 32-33).

To the extent Defendants argue that documents created and reviewed by Defendants before the Class Period are not relevant to their scienter during the Class Period, the law is clear: a class period "function[s] only to define the plaintiff class, not to restrict the universe of relevant or actionable facts," and thus, "facts relating to scienter dating from before the proposed class period" are relevant to the scienter analysis.  *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005).  *See also In re Wireless Facilities, Inc. Sec. Litig.*, 2007 WL 966713, at *8 (S.D. Cal. May 7, 2007) (knowledge before class period relevant because "the knowledge was not lost when the class period began"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Pre-class data is relevant" to show what defendant "should have known during the class period").

And in any event, Defendants' knowledge of the harmful effects of Meta's products continued into the Class Period.  In May 2021, for instance, Defendant Mosseri told a group of journalists that Instagram's effects on teen well-being were "quite small."  Complaint ¶251.  But in truth, and as discussed herein, "Mosseri had been apprised of many of the significant harms teens experienced from using Instagram" by that time.  Ex. 1 at ¶425.  Likewise, Defendant Newton acknowledged internally in May 2021 that it wasn't just "'regulators' or 'critics' who think [I]nstagram is unhealthy for young teens—it's everyone from researchers and academic experts to parents." *Id.*  at ¶428.  According to Newton herself, Instagram's "blue print" was "inherently not designed for an age group that don't [sic] have the same cognitive and emotional skills that older teens do." *Id.*

Weeks before *The Wall Street Journal* published the Facebook Files, an Instagram spokesperson named Stephanie Otway told Mosseri that the forthcoming article "essentially argues that [Instagram's] design is inherently bad for teenage girls (leads to SSI [suicide and self- harm], poor mental health, [and] dysphoria)." Ex. 1 at ¶563.  Otway further told Mosseri that these "arguments [are] based on our own research so [they] are difficult to rebut." *Id.*  Otway noted that she was "mostly worried about the fallout from the article" which would expose "that our own research confirmed what everyone has long suspected[.]" *Id.* Yet, just weeks later, after *The Wall Street Journal* published the Facebook File article concerning the impact of Instagram on young users, Defendants continued to perpetuate Meta's false narrative that Instagram had a positive effect on children. *See, e.g.*, Complaint ¶298.

Also in August 2021, Instagram's Well-being Team reached out to Defendant Clegg, "recommending investment of staff dedicated to addressing the 'currently underinvested' teen well-being areas of 'problematic use, bullying+harassment, connections, [and Suicide and Self-Injury (SSI)]' based on input from 'key experts and policy stakeholders." Ex. 2 at ¶185.

Defendant Clegg "promptly forwarded the ask" to Defendant Zuckerberg, recommending "additional investment to strengthen our position on wellbeing across the company." *Id.* at ¶186. Defendant Clegg told Zuckerberg unambiguously that "we need to do more" and that "[w]e are not on track to succeed for our core well-being topics (problematic use, bullying & harassment, connections, and SSI)." *Id.* at ¶187.  But once again, Zuckerberg refused to invest in necessary safety measures.  Zuckerberg "ignored Clegg's request for months—causing alarm among Meta's leadership." Ex. 1 at ¶623.  "All the while, Meta's leadership continued to espouse the need to invest in well-being"—to no avail. Ex. 2 at ¶188.

In September 2021, the Facebook Files were published—yet by October 2021, Zuckerberg had still not responded to Clegg's message from months prior.  Other executives, including Defendant Mosseri, continued to discuss Clegg's proposal.  In an email to Meta's VP of Product, Mosseri complained, "I'm really worried about this . . . [W]e've been talking about this for a long time but have made little progress." Ex. 1 at ¶624.

Documents uncovered by the attorneys general help illustrate why Meta had made so little progress.  "While Clegg and others worried about public backlash, Zuckerberg was preoccupied with public perception of his hydrofoil, which is an aquatic recreation device." Ex. 3 at ¶215.  On September 20, 2021, the *New York Times* had published an article about Meta's efforts to rehabilitate its image following the release of the Facebook Files and noted that instead of addressing the controversy, Defendant Zuckerberg's recent posts on Facebook and Instagram included video of himself riding what appeared to be an electric surfboard.  The next day, while "Meta's previously undisclosed internal research was a leading headline," Defendant Zuckerberg was "eager" to put out a dismissive statement saying: "Look, it's one thing for journalists to make false claims about my work, but it's crossing a line to say I'm riding an electric surfboard when it's clearly a hydrofoil and I'm pumping that thing with my legs." *Id.* at ¶¶216-17.  As the Oklahoma Complaint described, an "unamused" Defendant Clegg "observed the absurdity of Zuckerberg's inclination" in disbelief:

> Am I missing something here?  On the day a [Meta] rep[resentative] is pulled apart by US Senators on whether we care enough about children on our services, Zuckerberg is going to post about . . . surfboards?  Maybe I've lost my humor about this whole thing, but I really think this would seem to any casual observer to be pretty tone deaf given the gravity of the things we're accused of . . . If I was him, I wouldn't want to be asked "while your company was being accused of aiding and abetting teenage suicide why was your only public pronouncement a post about surfing?" . . . [The Wall Street Journal's reporting about Instagram's mental health impacts] has dramatically consolidated a wider narrative (that we're bad for kids) which had been brewing for some time.  It now makes regulation . . . certain, and in my view makes launching [Instagram] Kids nigh impossible.  I've told [Zuckerberg] and [Sandberg] this already.

*Id.* at ¶218.

Meta's Head of Communications capitulated to Zuckerberg and released the statement, telling Defendant Clegg "I'm really eager to just do whatever he wants at this point.  My spine has been surgically removed." *Id.* at ¶219.  In November 2021, Defendant Clegg followed up on his August request for investment in well-being.  Ex. 1 at ¶626.  Clegg told Defendant Zuckerberg that investment in this space was "important to ensure we have the product roadmaps necessary to stand behind our external narrative of well-being on our apps." *Id.*  "In other words, as Clegg told Zuckerberg, [] Meta's external well-being 'narrative' was inconsistent with Meta's actual financial commitment to that issue." Ex. 3 at ¶227.

After the Class Period, Meta continued to demonstrate its disinterest in solving the known problems caused by its platforms.  In September 2022, one year after the release of the Facebook Files and just one month before Lead Plaintiffs' Complaint was filed, Meta disbanded its Responsible Innovation Team.  As the Massachusetts Complaint explained, "Meta externally claimed [its Responsible Innovation Team] was a central part of its efforts to 'proactively surface and address potential harms to society in all that we build.'"  Ex. 2 at ¶194.

### 2. Notwithstanding Their Knowledge Of These Harms, Defendants Repeatedly Refused To Make Changes To Mitigate The Harms

The attorney general complaints confirm what Lead Plaintiffs alleged: that despite the numerous proposals presented to Defendants, Defendant Zuckerberg refused to make changes to Meta's products because those changes would decrease user time on the platforms.  *See* Complaint ¶233 ("Meta recognized—but did not disclose—making changes that would effectively combat Instagram's harm to teens could result in teens not using Instagram at all").  Two examples of this conduct are described below and further illustrate Defendants' scienter.

*Cosmetic Filters.* Meta's platforms included the option for users to apply filters to their photos.  Filters alter a photo's appearance and can, among other things, "simulate makeup, cosmetic surgery, botox, or clearer skin."  Ex. 2 at ¶225.  Meta's researchers learned that these filters caused "severe harm to young users, especially female users."  *Id.* at ¶226.  After a "PR fire" in October 2019 where Meta was accused of "allowing the promotion of plastic surgery" to children, Meta instituted a temporary ban on these filters. Ex. 1 at ¶¶343-45.  In November 2019, Meta's Vice President of Product Design, Margaret Gould Stewart, emailed Defendants Mosseri and Newton, "asking for support" to make the ban permanent "because of mental health experts' concern about the negative 'impacts that [those filters] were having on mental health and wellbeing, especially for more vulnerable users (youth, women).'"  Ex. 2 at ¶227.  According to the Massachusetts Complaint and Meta's internal documents, this proposal received "unanimous support"—until it reached Defendant Zuckerberg.  *Id.* at ¶228.  Meta's Chief Technology Officer "stated that he 'mentioned this [proposal] to Mark [Zuckerberg]' who 'might want to review before implementing' because Zuckerberg questioned whether these filters actually 'represent[] real harm.'"  *Id.* at ¶228.

In response to Defendant Zuckerberg's pushback, Defendant Newton noted in an internal email that "it's been our strong recommendation from comms, marketing, policy, and engagement with nearly 20 outside experts and academics that we pass this policy" and stated that "outside academics and experts consulted were <u>nearly unanimous on the harm here</u>."  *Id.* at ¶230.   Defendant Newton was thus, by her own admission, aware of this research and Meta's work with numerous experts concerning this issue.   This admission also demonstrates the misleading nature of Newton's statement that "research on the effects of social media on people's well-being is mixed, and our own research mirrors external research."  Complaint ¶298.

Eventually, a meeting was scheduled with Defendant Zuckerberg to discuss this issue in April 2020.  In preparation, Zuckerberg was given a "pre-read" that detailed Meta's consultation with "<u>21 independent experts around the world</u>" who "<u>generally agree that these effects are cause for concern for mental health and wellbeing</u>, especially amongst vulnerable populations (female, youth, those with a history of mental health concerns, etc.)."  Ex. 2 at ¶233.  But crucially, this memo also "noted that continuing the ban may have a 'negative growth impact' on the company." Ex. 1 at ¶354.  The day before the meeting, it was suddenly cancelled.  That day, Zuckerberg "vetoed the proposal" to remove the filters without rescheduling the meeting.  *Id.* at ¶356.  He stated that there was a "clear[] demand" for the filters, and falsely claimed that "he had seen 'no data' suggesting that the filters were harmful."  *Id.* at ¶358.  Gould Stewart contacted Zuckerberg directly, stating "I respect your call on this and I'll support it, <u>but want to just say for the record that I don't think it's the right call given the risks</u>. . . . I just hope that years from now we will look back and feel good about the decision we made here."  *Id.* at ¶361.

***Project Daisy.***  As Lead Plaintiffs allege, during the Class Period, Defendants touted "Project Daisy" as a way to create a "more positive experience on Instagram" for its users. Complaint ¶¶247-50, 477-78.  But by late 2020, Meta had concluded that Project Daisy did not result in any improvement to "overall well-being measures."  *Id.* at ¶¶249, 478.  The attorney general complaints give significant context to Project Daisy and further confirm the falsity of Defendants' statements and their scienter.

Project Daisy was a "campaign to hide the 'likes' on Instagram. *Id.* at ¶247. In 2020, Meta conducted experiments that found that "hiding Like counts [on Instagram posts] led to decreases in negative social comparison." Ex. 1 at ¶240. Meta's researchers proposed implementing this feature across Instagram. *Id.* at ¶240. After assessing Project Daisy's impact on "engagement and revenue—including an estimated 1% negative effect on Meta's advertising revenue—Meta's leadership decided not to" make Project Daisy a default setting. *Id.* at ¶250. Instead of hiding the like counts, which Meta's researchers concluded would reduce Instagram's harm to children, Meta instead required users to "navigate submenus of preferences to affirmatively opt in" to this feature. *Id.* at ¶252. As Defendant Newton noted in April 2021, Meta "continued to get the advice [from experts] that we should have Daisy on by default for teens." *Id.* at ¶262. "Meta employees noted that Daisy 'got stuck in a political war between Fidji Simo, then-Head of Facebook + Adam Mosseri + Mark Zuckerberg.'" *Id.* at ¶264 (cleaned up). The Multistate Complaint thus demonstrates that several of the Executive Defendants were fully informed concerning Project Daisy when Meta announced it. But despite understanding that the opt-in version of Project Daisy, which Meta chose to implement, was utterly ineffective, Meta misleadingly represented Project Daisy as part of an effort to "shape a more positive experience on Instagram." Complaint ¶478. Even after Project Daisy launched in May 2021, Meta employees lobbied to make hiding Likes a default setting for teens. When Instagram's Head of Public Policy approached Defendant Mosseri, he "'quickly' declined this proposal in July 2021, citing concerns that making Daisy a default setting for teens would validate the external 'perception that 'likes' are bad for young people.'" Ex. 1 at ¶274.

### 3. While Knowing of the Harms Instagram Caused, Defendants Designed the Product to Be Addictive to the Young Brain

Just prior to the Class Period, Defendant Zuckerberg testified to Congress that it was a "common misconception that our teams—our goals, or even have goals, of trying to increase the amount of time that people spend," and further stated: "I don't give our News Feed team or our Instagram team goals around increasing the amount of time that people spend." *Id.* at ¶137. Then, during the Class Period, when asked by Senators Blumenthal and Blackburn in August 2021 whether "Facebook research ever found that its platforms and products can have a negative

effect on children's and teens' mental health or well-being," Meta and Zuckerberg claimed that they were "not aware of a consensus among studies of experts about how much screen time is 'too much.'" Complaint ¶490.  And in October 2021, Defendant Davis testified to Congress that Instagram was not addictive, stating: "So I disagree with calling our product addictive . . ." Complaint ¶500.  All of these statements were misleading; in fact, Meta intentionally designed its products to be addictive to young users in order to keep them on Meta's platforms for increasing amounts of time.

Communications prior to the Class Period confirm that Defendant Zuckerberg prioritized user engagement over well-being for years.  Faced with "significant declines in U.S. engagement metrics," employees at Meta in 2017 and 2018 received "clear input from [Meta head of Product] Naomi [Gleit] that <u>US DAP [Daily Active People] is a bigger concern for Mark [Zuckerberg] right now than user experience</u>," and got "a <u>very clear and strong message from Mark</u> that DAP [Daily Active People] (and specifically US DAP [Daily Active People]) is <u>extremely important and we must change the trajectory from the negative one</u>." Ex. 1 at ¶322.  This mandate informed the direction Meta took going forward.

Meta focused on increasing the time young people spent on its platforms.  A "2017 Teens Strategic Focus" described Meta's goal as "increas[ing] U.S. teen time spent" on the platforms. Ex. 2 at ¶167.  Meta's product design team has noted that "the young ones are the best ones. . . . You want to bring people to your service young and early." *Id.* at ¶146.

As alleged in the Complaint, to capture the market for young people, Defendants designed Meta's platforms to be addictive, including through what Frances Haugen described as "little dopamine loops." Complaint ¶215.  This causes users (particularly children and young adults) to experience pleasure, "or a 'dopamine hit,' from the platforms, for example, by obtaining 'likes' for posts." *Id.*  "Then, the user immediately seeks to obtain that feeling again, for example, by posting new content and obtaining more likes." *Id.*  Meta knew full well that numerous aspects of its platforms were designed in a way that was addictive to young users.

For instance, Meta knew that its "constant barrage of notifications is successful in keeping young users returning to its platform at all hours."  Ex. 2 at ¶93.  A November 2019

presentation noted that, because of constant notifications, young users were "'overload[ed],' 'overwhelm[ed],' and compelled to re-open and re-visit the Instagram platform repeatedly throughout the day and at night.'" *Id.* at ¶93. In addition, Meta understood that Instagram's algorithms take teens into "negative spirals & feedback loops that are hard to exit from." Ex. 1 at ¶160. The Multistate Complaint summarizes Meta's efforts in no uncertain terms: "By algorithmically serving content to young users according to variable reward schedules, Meta manipulates dopamine releases in its young users, inducing them to engage repeatedly with its Platforms—much like a gambler at a slot machine." *Id.* at ¶161. Meta's ability to induce young users into this behavior was the result of extensive research into the neurobiology and psychology of young minds.

In June 2020, an extensive Meta study called the "Teen Fundamentals" report was presented "to Instagram's leadership team (including [Defendant] Adam Mosseri)." Ex. 3 at ¶114. This "97-page internal presentation" was designed to "look . . . to biological factors that are relatively consistent across adolescent development and gain valuable unchanging insights to inform product strategy today." *Id.* at ¶100. Meta studied "the teenage brain," which it learned was "especially 'plastic'" or "easy to stimulate," and "predisposed to impulse, peer pressure, and potentially harmful risky behavior," to design Meta's platforms to "encourage teens to continue engaging and keep coming back to [Instagram]." Ex. 1 at ¶¶402-08. The presentation "discussed teen brains' relative immaturity, and teenagers' tendency to be driven by 'emotion, the intrigue of novelty and reward." Ex. 2 at ¶75.

As the Oklahoma Complaint explains, that "presentation confirmed that Instagram was successfully exploiting these vulnerabilities, even when its young consumers voiced their concerns directly to Meta." Ex. 3 at ¶110. The presentation noted that "teen brains are much more sensitive to dopamine," which "keeps them scrolling and scrolling," "even though they want to" stop using Instagram. *Id.* at ¶111. As Meta's presentation stated, "our own product foundation research has shown teens are unhappy with the amount of time they spend on our app." *Id.* at ¶111. With this information, Meta "repeatedly asked how Instagram could become even more irresistible to teens." *Id.* at ¶112. And "[i]n response to the presentation, Instagram's

leadership requested additional research," and "continued to use its research and understanding of Adolescent users' brains to gain a competitive advantage." *Id.* at ¶115.

### 4. Defendants Knew That Millions of Children Under 13 Used Meta's Platforms and Suffered Harm – And Defendants Actively Targeted Them

The attorney general complaints confirm that Defendants were aware that children under the age of 13 were on Meta's platforms. In their motion to dismiss, Defendants made much of the notion that the documents referenced in the Complaint did not "purport to address the effect of social media on *pre-teen* users." ECF No. 110 at 39. Defendants stated: "Indeed, they are not even allowed to join Instagram." That argument was misguided then (*see* Complaint ¶¶207 (Meta research on "how to leverage playdates"); 234-35 ("Tweens Competitive Audit"); 240, 254 ("kids are getting on the internet as young as six years old")), and the attorney general complaints further debunk the claim that Defendants did not study and actively market their products to children on the age of 13, or that Meta's age restrictions were effective.

As early as January 2018, Defendant Zuckerberg "received a report that included information on under-13 users on Instagram," which informed him that Meta "can estimate that there were 4M[illion] people under 13 in 2015 on IG [in the US]. This represents around 30% of all 10-12 year[] old[s] in the US." Ex. 1 at ¶¶657-58.

In February 2020, Meta's Chief Privacy Officer emailed Defendant Mosseri, telling him that "by providing 'a default [age] over 13,' Meta was 'not taking sufficient steps to enforce' its minimum age rules or 'meet its obligations to keep under 13s [under 13 years old] off' its platforms, 'especially given the general understanding that an unknown number of u13s are on FB and especially IG, and lying about their age.'" Ex. 2 at ¶329.

Later that year, in September 2020, an internal email discussed Defendant Antigone Davis's "description of 'age assurance' initiatives where Meta was 'most vulnerable and nee[ded] to step up [its] efforts" demonstrating that she was also aware that children under 13 were using Meta's platforms. *Id.* at ¶340. A Meta strategic advisor "noted that the findings were 'quite worrying' and 'tends to confirm the impression I have that this area of work is often sidelined and Antigone doesn't have the resources or consistent leadership support that she

needs.'"  *Id.*  As Defendant Mosseri told Defendant Zuckerberg in 2020, "Instagram doesn't know the age of many of its users."  Ex. 1 at ¶710.

In fact, not only did Meta refuse to take action to keep children off its platforms; it actively recruited children under 13 and tried to market its products to them.  In November 2020, Instagram's Vice President Co-Head of Product noted that his team was meeting with Defendant Zuckerberg to "highlight data showing why IG Youth could help with the tween market for FACEBOOK."  *Id.* at ¶827.   In 2021, Meta hired a vendor named Answer Lab to "conduct a survey of preteens." *Id.* at ¶693.   "Meta instructed Answer Lab to not inform Meta employees if any of the preteen survey subjects were on Instagram, so that Meta 'as a company won't be made aware of under 13.'"  *Id.*  An internal Meta study from 2021 titled "User Trends" "reveals that Meta has completed studies on the privacy needs of tweens while building products for that target group."  *Id.* at ¶694.  Instagram's Research Director told Defendant Davis in 2021 that "Instagram is investing in experiences targeting youth aged roughly 10- to 12," noting that "research among this population is very sensitive." *Id.*  at ¶774.  Internal documents from that time confirm that Meta was building initiatives for children as young at six years old. *Id.*

### B.   Arturo Béjar Provides Testimony and Documentary Evidence Futher Confirming Meta's Executives Knew of the Harms Caused by Meta's Platforms

Several of the attorney general complaints filed in October 2023 referenced discussions with a new whistleblower. In November 2023, that whistleblower, Arturo Béjar, testified before the Senate Subcommittee on Privacy, Technology, and the Law and provided evidence that he had warned Meta's executives of the harms Instagram caused to young users.

Mr. Béjar first worked as the "senior engineering and product leader at [Meta] responsible for its efforts to keep users safe and supported" from 2009 to 2015.  Ex. 4 at 1 (Written Testimony of Arturo Mr. Béjar before the Subcommittee on Privacy, Technology, and the Law, November 7, 2023).  In this role, he had significant access to Meta's C-suite, and was responsible for "doing strategic product reviews every six months with the Facebook executive team including: Mark Zuckerberg, Sheryl Sandberg, and Chris Cox."  *Id.*  Mr. Béjar helped build tools to help young when they had negative experiences on Instagram.

In 2015, Mr. Béjar left Meta to spend more time with his family, including his teenage daughter. Over the next several years, he watched as his daughter "faced unwanted sexual advances, misogyny, and harassment" on social media and realized that "even though social media services enabled these distressing experiences, the services provided little or no help to her in dealing with them." *Id.* He returned to Meta as a consultant in 2019.

During his second stint with Meta, Mr. Béjar worked on the Well-being Team at Instagram. *Id.* He quickly learned that "[a]lmost all of the work" that he had done was "<u>gone</u>", and the "tools we had built for teenagers to get support when they were getting bullied or harassed," were "no longer available to them." *Id.* It soon became clear to Mr. Béjar that Meta had "developed some very troubling evidence that young teens were experiencing great distress and abuse on the Instagram platform," but "senior management was externally reporting different data that grossly understated the frequency of harm experienced by users." *Id.*

As Mr. Béjar testified to the Senate Subcommittee, he spent a year researching the harms that Meta's platforms were causing. *See* Senate Subcommittee Hearing on Social Media and the Teen Mental Health Crisis, November 7, 2023, available at https://www.judiciary.senate.gov/committee-activity/hearings/social-media-and-the-teen-mental-health-crisis. Mr. Béjar learned, after discussions with management, "that they knew and that they were not acting on it." *Id.* Mr. Béjar shared his findings with "20 or 30 people, including Adam Mosseri, saying, do you have any feedback, anything that's inaccurate in my data." According to Mr. Béjar, "nobody did." *Id.*

Eventually, Mr. Béjar raised these issues directly to Mark Zuckerberg. On October 5, 2021, Frances Haugen testified before Congress. Complaint ¶353. Immediately after she finished testifying, Meta issued a statement disparaging Haugen, and Defendant Zuckerberg broke his weeks-long silence with a misleading Facebook post claiming that a "false picture of the company" was "being painted." *Id.* at ¶354.

That evening, Mr. Béjar emailed Defendant Zuckerberg (along with Defendant Mosseri and other Meta executives) after seeing "the note [Zuckerberg] shared today after the testimony." Béjar email, October 5, 2021, available at

https://www.blumenthal.senate.gov/imo/media/doc/1172023bejardocuments.pdf#page=109.   Mr. Béjar told Zuckerberg that there was a "critical gap in how we as a company approach harm, and how the people we serve experience it."  *Id.*  Mr. Béjar noted that he had raised this issue to Defendant Mosseri and others "in the last couple of weeks"—*i.e.*, the same time that the Facebook Files were released and Defendants made multiple false statements denying and downplaying the revelations.  *Id.*  Mr. Béjar shared with Defendants Zuckerberg and Mosseri troubling findings.  For example, in just the week preceding Mr. Béjar's email, nearly 22% of 13–15-year-old children "said they were the target of bullying"; 40% "said they experienced negative comparison"; and nearly 25% "said they received unwanted advances."  *Id.*  Mr. Béjar asked for funding and support to conduct additional research concerning these harms, stating that "working this way will require a culture shift" at Meta.  As Mr. Béjar told *The Wall Street Journal*, however, while some of the executives on that email acknowledged his message, Mr. Béjar "never heard back from Zuckerberg." Ex. 5 at 16.

Notably, Mr. Béjar was interviewed during the state attorneys general investigations into Meta's practices.  Mr. Béjar told the Massachusetts attorney general, for instance, that Meta's Community Standards Enforcement Reports "vastly under-represented the frequency with which users viewed harmful content on Instagram."  Ex. 2 at ¶292.  Mr. Béjar further "<u>testified under oath that Meta adopted and maintained this strategy to mislead the public.</u>"  *Id.* at ¶293.  When asked whether he was "aware of any instances where the company, in [his] view, deceptively minimized the harms users were experiencing on Meta's platforms," Mr. Béjar testified: "Every time that a company spokesperson in the context of harms quotes prevalence statistics I believe that is what they are doing, that they're minimizing the harms that people are experiencing in the product."  *Id.* at ¶296.

## C.  The Personal Injury Actions, Which Have Already Received Discovery From Defendants Concerning the Same Issues, Recently Survived Motions to Dismiss

As discussed above, two consolidated actions—one proceeding in the Northern District of California, and the other in California state court—against Meta and other social media companies, recently survived motions to dismiss.  Both complaints, brought by the parents of

young social media users and school districts, allege that Meta's platforms caused significant mental and physical harms to young users, and that Meta and its executives concealed those harms from the public.  The allegations in both Personal Injury actions were based on extensive discovery, including documents from Meta and Frances Haugen.

*First*, on October 13, 2023, the Honorable Carolyn B. Kuhl of the Superior Court of the State of California ruled in the *Social Media Cases* litigation that the plaintiffs had sufficiently alleged both negligence and fraudulent concealment claims against Meta.  Judge Kuhl concluded that plaintiffs had adequately alleged that "Meta knew of its platforms' defects, but that Meta nonetheless failed to share this information …."  Ex. 6 at 83 (*Social Media Cases* Opinion).

***Second***, on November 14, 2023, Judge Gonzalez Rogers issued a decision in *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, sustaining in significant part various claims against the defendants in that action, including Meta.  Judge Gonzalez Rogers concluded that plaintiffs had sufficiently alleged that many of Facebook and Instagram's design features caused significant harms to plaintiffs.  *See* Ex. 7 (*In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation* Opinion).

That these two actions consolidating claims by hundreds of plaintiffs—and supported by some of the same discovery Lead Plaintiffs seek—survived motions to dismiss further illustrates that Lead Plaintiffs' claims are not frivolous.  And now that defendants' motion to dismiss has been resolved, Judge Gonzalez Rogers has vacated the discovery stay that she had previously imposed in that matter, which will allow those plaintiffs to pursue additional discovery.  *See* MDL Case Management Order No. 6 at 5 (Ex. 8).  As these cases proceed deeper into discovery, Lead Plaintiffs will fall further behind unless the PSLRA discovery stay is modified.

## IV.    ARGUMENT

### A.    Legal Standard

The PSLRA states that "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss." 15 U.S.C. §78u-4(b)(3)(B).  Congress, however, "expressly provided courts with discretion to allow limited discovery" "upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that

party." *In re Delphi Corp.*, 2007 WL 518626, at *4 (E.D. Mich. Feb. 15, 2007) (quoting 15 U.S.C. § 78u–4(b)(3)(B)).  That is because the discovery stay is intended only "to minimize the incentives for plaintiffs to file frivolous securities class actions in the hope either that the corporate defendants will settle those actions rather than bear the high costs of discovery . . . or that the plaintiffs will find during discovery some sustainable claim not alleged in the complaint."  *Id.* (quoting 15 U.S.C. § 78u-4(b)(3)(B)).  In this case, any concerns of a fishing expedition are non-existent, as illustrated by the fact that (i) 42 state attorneys general have filed lawsuits against Meta concerning many of the same issues, based on detailed evidence developed during a multi-year investigation, (ii) a new whistleblower has produced compelling testimony and evidence corroborating Defendants' scienter, and (iii) multiple courts have recently sustained claims against Meta based on many of the same issues raised in this action.

Courts frequently modify the PSLRA discovery stay and order defendants to reproduce to securities plaintiffs materials previously produced to the government and other civil litigants.  As numerous courts have explained, "maintaining the discovery stay as to materials already provided to government entities does not further the policies behind the PSLRA." *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004).  *See also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 252 (D. Md. 2004) (ordering production of "key documents that have already been produced to government investigators and that soon will be produced to the ERISA plaintiffs"); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009) ("Courts have found undue prejudice where plaintiffs would be unable to make informed decisions about their litigation strategy in a rapidly shifting landscape because they are the only major interested party without documents forming the core of their proceedings.").

In considering motions to modify the PSLRA discovery stay, courts consider whether the discovery sought is (i) particularized, and (ii) necessary to prevent undue prejudice.  *See In re Massey Energy Co. Sec. Litig.*, 2011 WL 4528509, at *4 (S.D. W. Va. Sept. 28, 2011) (quoting 15 U.S.C. § 78u-4(b)(3)(B)).  Lead Plaintiffs meet these requirements.

**B.     Lead Plaintiffs' Request Is Sufficiently Particularized**

The discovery Lead Plaintiffs seek is particularized under 15 U.S.C. § 78u-4(b)(3)(B). Discovery is particularized if it "adequately specif[ies] the target of the requested discovery." *In re Lernout & Hauspie Sec. Litig.*, 214 F. Supp. 2d 100, 108 (D. Mass. 2002).   Lead Plaintiffs seek a readily identifiable universe of documents: namely, those that Defendants have already produced to (i) the state attorneys general, and (ii) the civil plaintiffs in the Personal Injury actions.

Courts "regularly find that specific requests for already-produced discovery satisfy the particularity requirement of the exception to a PSRLA discovery stay." *In re FirstEnergy Corp. Sec. Litig.*, 2021 WL 2414763, at *4 (S.D. Ohio June 14, 2021); *see also New York State Teachers' Ret. Sys. v. Gen. Motors Co.*, 2015 WL 1565462, at *3 (E.D. Mich. Apr. 8, 2015) ("The discovery NYSTRS seeks is particularized. It is limited to materials that have been produced already and which will be produced in the MDL Litigation.").   Moreover, although Lead Plaintiffs do not know the number of documents that Defendants have produced to these parties, the volume of documents does not impact the particularization analysis. *See FirstEnergy* 2021 WL 2414763, at *4 ("particularized discovery requests are warranted, even when they are voluminous").

**C.     Lead Plaintiffs Will Suffer Undue Prejudice If the Stay is Not Modified**

Once the particularity requirement is satisfied, "the Court must then determine whether the requested discovery 'is necessary to . . . prevent undue prejudice to that party.'" *Delphi*, 2007 WL 518626, at *6 (quoting 15 U.S.C. § 78u-4(b)(3)(B)).   Undue prejudice means "improper or unfair detriment" and is frequently described as "something less than irreparable harm." *In re FirstEnergy Corp. Sec. Litig.*, 2021 WL 2414763, at *5 (S.D. Ohio June 14, 2021). Courts often modify or lift the discovery stay when a defendant is involved in "criminal, civil and administrative investigations and actions which are proceeding unabated with the possibility that settlements might occur and/or fines and penalties might be imposed." *Massey*, 2011 WL 4528509, at *6.   That is precisely the situation Lead Plaintiffs find themselves in.

Motion to Partially Modify the pslra's
Discovery Stay and Memorandum in Support
3:21-cv-08812-amo

22

Without the requested documents, Lead Plaintiffs will suffer undue prejudice because they will not be able to intelligently assess their position and form a litigation strategy.  Courts "view these circumstances as unfair and allow the lifting of the statutory discovery stay to prevent undue prejudice to the securities litigation plaintiffs resulting from their not having the information which parties in other proceedings have so that they can develop their litigation strategy and weigh their options." *Id.*  The many other parties litigating against Meta have received significant discovery, which puts Lead Plaintiffs at a significant informational disadvantage.  "Courts have found undue prejudice where plaintiffs would be unable to make informed decisions about their litigation strategy in a rapidly shifting landscape because they are the only major interested party without documents forming the core of their proceedings." *Bank of America*, 2009 WL 4796169, at *2; *see also Seippel v. Sidley, Austin, Brown & Wood LLP*, 2005 WL 388561, at *2 (S.D.N.Y. Feb. 17, 2005) (finding plaintiffs would "be prejudiced if they lack access to documents which have been produced to others" in government investigations and civil suits).  While discovery moves ahead in the related litigations, Lead Plaintiffs will "fall substantially behind" these actions.  *Bank of America*, 2009 WL 4796169, at *3.

Moreover, the strength of Lead Plaintiffs' Complaint supports modifying the stay.  When "a plaintiff's case is clearly far from frivolous, the Court may determine that discovery is necessary." *FirstEnergy*, 2021 WL 2414763, at *5 (internal quotation marks omitted).  *See also Royal Ahold*, 220 F.R.D. at 251 ("the apparent strength of the plaintiffs' case may factor in the court's determination of the necessity of discovery under the PSLRA").  The Complaint, supported by "quotations [and] citations from documentary evidence," fully establishes the elements of a securities fraud action.  *FirstEnergy*, 2021 WL 2414763, at *5.  The Complaint already "makes specific and detailed allegations," which are now further corroborated by extensive discovery cited herein.

Under the Supreme Court's ruling in *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, a "strong inference of scienter" "need not be irrefutable, i.e., of the 'smoking-gun' genre." 551 U.S. 308, 322-24 (2007).  Further, as the Ninth Circuit has explained, scienter evidence need not be direct, as "[s]cienter can be established by direct or circumstantial evidence." *Provenz v.* Miller, 102

F.3d 1478, 1490 (9th Cir. 1996).  The question ultimately is: "When the allegations are <u>accepted</u> <u>as true and taken collectively</u>, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Tellabs*, 551 U.S. at 324.  Courts use "a <u>holistic review</u> of the allegations to determine whether they combine to create a strong inference of intentional conduct or deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012). "Recklessly turning a blind eye to impropriety is equally culpable conduct." *Id.* at 708.

  Lead Plaintiffs' Complaint already relies on numerous credible sources, including Meta's own internal documents and communications, as well as Frances Haugen's testimony, which describe in detail Defendants' knowledge of, and involvement with, the concealed facts. *See e.g.*, Complaint ¶¶103-14, 125-39, 160-93, 210-28, 232-39, 248-52, 270-75, 292-96, 314, 540-56. Moreover, several of the Executive Defendants—including Defendants Zuckerberg and Mosseri—admitted their own knowledge and involvement with these key issues. *See, e.g.*, Complaint ¶241 (Zuckerberg: "This is something that we study and care a lot about"); ¶251 (Mosseri: stating that research showed impact of Instagram on well-being was minimal: "It's facts stated the bi-directional, so small effects positive and small effects negative but it's quite small.").  *See Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("inference that [defendant] did not have access to . . . data is directly contradicted by the fact that she specifically addressed it in her statement").  In short, this is far from the sort of frivolous claim that animated the passage of the discovery stay.

  Indeed, it is highly unusual (particularly because of the PSLRA discovery stay) for a complaint in a securities class action to incorporate dozens of internal documents from a corporate defendant.  As courts have repeatedly acknowledged, the PSLRA does "not require a plaintiff to plead evidence." *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 17974627, at *5 (N.D. Cal. Nov. 7, 2022).  *See also In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002) ("the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence. Defendants' argument that even more detail be required, before there is any discovery, here amounts to requiring plaintiffs to plead evidence.").  But here, Lead Plaintiffs already have pled

extensive evidence, including in the form of Meta's internal documents, to substantiate their valid claims.  "Requiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one. The PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023) (internal quotation marks omitted).

Moreover, there is no burden imposed on Defendants by reproducing documents that they have already produced to the government or other civil litigants.  *See Turocy v. El Pollo Loco,* 2017 WL 2495172, at *2 (C.D. Cal. May 10, 2017) (no burden in defendants reproducing materials "which they have already reviewed and compiled").  In fact, Defendants have already gone through the exercise of reproducing certain of these documents at least once; Meta provided documents to the Personal Injury plaintiffs that it had previously produced to the state attorneys general.  *See* MDL Joint Discovery Letter at 4, No. 4:22-md-03047-YGR, ECF No. 386 (N.D. Cal.) (Ex. 9) (Judge Gonzalez Rogers permitted discovery of, among other things, "certain documents produced during investigations by state attorneys general").

While the various attorney general complaints were initially filed with heavy redactions, Meta has entered into stipulations or agreements with nearly each attorney general, permitting them to file unredacted versions of their complaints.  Meta's interest in maintaining the confidentiality of the documents is thus diminished, further demonstrating that a partial lift of the PSLRA discovery stay is warranted.

## V.      CONCLUSION

For all these reasons, the Court should GRANT Lead Plaintiffs' motion and partially modify the PSLRA's automatic discovery stay to allow Lead Plaintiffs to discover documents and materials which Meta has provided to (i) the state attorney general offices that filed suit against Meta in October and November 2023, and (ii) the civil plaintiffs in *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, No. 4-22-MD-3047 (MDL) (N.D. Cal.) and *Social Media Cases*, No. 22. STCV No. 5255 (Cal. Sup. Ct.).

Dated: December 4, 2023

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton (*pro hac vice*)
(johnr@blbglaw.com)
Hannah Ross (*pro hac vice*)
(hannah@blbglaw.com)
Jeroen van Kwawegen (*pro hac vice*)
(jeroen@blbglaw.com)
Lauren Ormsbee (*pro hac vice*)
(lauren@blbglaw.com)
Rebecca Boon (*pro hac vice*)
(rebecca.boon@blbglaw.com)
John Esmay (*pro hac vice*)
(john.esmay@blbglaw.com)
Mathews de Carvalho (*pro hac vice*)
(mathews.decarvalho@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
Caitlin Bozman (Bar No. 343721)
(caitlin.bozman@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs*
*Ohio Public Employees Retirement System and*
*PFA Pension Forsikringsaktieselskab*

**OFFICE OF THE ATTORNEY GENERAL
  OF THE STATE OF OHIO**

Shawn Busken
(Shawn.Busken@OhioAttorneyGeneral.gov)
30 East Broad Street
Columbus, OH 43215
Tel: (800) 282-0515

*Additional Counsel for Lead Plaintiff Ohio*
*Public Employees Retirement System*