# EXHIBIT 3

IN THE DISTRICT COURT OF OSAGE COUNTY
STATE OF OKLAHOMA

District Court, Osage County, Okla.
FILED

NOV 1 6 2023

JENNIFER BURD, Court Clerk
By_____ Deputy

| | |
|---|---|
| STATE OF OKLAHOMA, *ex rel.*,<br>GENTNER DRUMMOND,<br>ATTORNEY GENERAL OF<br>OKLAHOMA,<br><br>             Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC. f/k/a<br>FACEBOOK, INC., and<br>INSTAGRAM, LLC,<br><br>             Defendants. | **JURY TRIAL DEMANDED**<br><br>Case No. CJ-2023-180<br>Judge Stuart Tate |

**PETITION**

## TABLE OF CONTENTS

SUMMARY OF THE CASE ............................................................................................................1

BACKGROUND .............................................................................................................................3

THE PARTIES ................................................................................................................................9

JURISDICTION AND VENUE ....................................................................................................10

FACTUAL ALLEGATIONS ........................................................................................................13

A. Defendants Engage in Consumer Transactions with Oklahoma Consumers ......................13

   1. Meta Offers Instagram in Exchange for Consumers' Valuable Consideration That Enables Meta to Sell Advertising ..............................................................................................13

   2. Advertising is the Core of Meta's Business ....................................................................16

   3. Meta Prioritizes Acquiring Adolescents and Maximizing Their Time Spent on Instagram ..................................................................................................................................17

B. Meta Operates Instagram in a Manner That is Unfair to Adolescents .................................20

   1. By Meta's Design, Instagram Induces Compulsive Use Among Adolescents .................20

   2. Instagram's "Teen Fundamentals" Study Shows Instagram's Power to Induce Compulsive Use Among Adolescents .......................................................................................21

   3. Instagram Features Induce Compulsive Use .....................................................................24

   4. Instagram Induces Widespread Compulsive Use Among Adolescents ...........................29

   5. Instagram Harms Adolescents by Inducing Compulsive Use ..........................................33

C. Meta Engages in Deceptive Conduct by Omitting and Misrepresenting Material Facts About Instagram ..........................................................................................................................34

   1. Meta Did Not Disclose its Knowledge That Instagram Harms Users, Particularly Girls ...........................................................................................................................................35

   2. Meta Promoted Misleading Metrics About the Incidence of Harm on Instagram ...........49

   3. Meta Deceived Consumers by Promoting "Time Spent" Tools Despite Known Inaccuracies ..............................................................................................................................54

   4. Through Public Misrepresentations, Meta Leads the Public to Believe That Instagram is Safe for Adolescents .............................................................................................57

VIOLATIONS OF LAW ...............................................................................................................67

RELIEF REQUESTED ..................................................................................................................70

The State of Oklahoma, by and through Attorney General Gentner Drummond, ("Plaintiff" or "Attorney General") brings this action pursuant to the Oklahoma Consumer Protection Act, 15 O.S. §§ 751–763 ("OCPA") against Defendants Meta Platforms, Inc. f/k/a Facebook, Inc. and Instagram, LLC (collectively "Defendants" or "Meta") to stop Meta's deceptive and unfair business practices that are fueling a mental health crisis among adolescents in the State of Oklahoma.

## SUMMARY OF THE CASE

1. Meta—through Instagram and Facebook—has created a social media empire to generate enormous profits at the expense of millions of young Americans. Meta develops and continually refines powerful and unprecedented technologies that attract, engage, and ultimately hijack the time and attention of Oklahoma's youth. Meta's social media platforms have had profound and far-reaching effects on the psychological and social well-being of young Oklahomans. For most Oklahoma youth, Meta's social media platforms, and specifically Instagram, are an integral part of growing up, a necessity as they navigate adolescence.

2. Meta's motivation is simple: greed. To maximize its profits, Meta has repeatedly deceived and misled the public about the known and substantial dangers associated with the use of its social media products. Meta has concealed the ways its social media products manipulate and exploit the most vulnerable Oklahoma consumers: kids and teenagers. This was not an accident. Meta has at all times been aware of the widespread risks its social media products pose to the mental and physical health of Oklahoma youth yet it knowingly and repeatedly opted to prioritize profits above users' well-being. In doing so, Meta engaged in, and continues to engage in, unlawful conduct that violates Oklahoma law.

1

3.      As alleged in Section A, Meta's core business revolves around maximizing the amount of time users are actively engaged on its platform. The longer those users stay engaged, the more data they provide to Meta, and the more advertising revenue Meta rakes in.

4.      As alleged in Section B, Meta operates its social media products in an unfair manner. Meta understands that developing adolescent brains are especially vulnerable to manipulation. With that knowledge, Meta engineers and programmers created social media products to exploit those vulnerabilities. Meta's exploitation took several forms including, among others, engagement-maximizing features such as: (a) intermittent dopamine-release recommendation algorithms; (b) "Likes" and features designed to allow users to socially compare themselves to other young users; (c) audiovisual and haptic alerts that incessantly recall young users to Instagram at all times of the day and night; and (d) content-presentation formats, such as "infinite scroll," designed to make it difficult for young users to disengage with Meta's products even when they want to. Meta knows that Instagram induces compulsive use and facilitates addiction, and Meta knows that Instagram harms young users.

5.      As alleged in Section C, Meta deceives consumers. Meta knew that adolescent use of its platforms—particularly Instagram—is associated with serious mental health problems like depression, anxiety, insomnia, and interference with education and daily life. Meta knew these risks to young users because it had all the user engagement data. It had all the research. However, rather than disclose what it knew, Meta published misleading metrics through its Community Standard Enforcement Reports that dramatically understate the actual rates of harm being suffered by young Instagram users.

6.      Not only did Meta knowingly publish inaccurate metrics, it actively concealed its own internal research findings that repeatedly showed the actual harm experienced by users was

2

far higher than Meta's published metrics. Meta further misled consumers and the public at large by claiming (1) that its "Time Spent" tool was an effective way to curb use when it knew the tool provided inaccurate information, (2) that it restricts young users from accessing harmful content, (3) that it does not prioritize the maximization of time spent by users on its platform, (4) that it does not place monetary values on teen users, (5) that it does not restrict access to its internal research that would allow researchers, consumers, and the public in general, to fully understand the risks posed by Meta's platform, and (6) that its platforms, particularly Instagram, are not addictive.

7.      With these allegations in mind, the state of teen mental health in Oklahoma cannot be ignored. In the decade ending in 2021, the percentage of teens who reported having felt so consistently sad or hopeless that they discontinued their usual activities increased by more than 50%.[1] Rates of students who report having contemplated or even attempted suicide are similarly alarming.

8.      Taken individually and together, Meta's actions and omissions constitute both unfair and deceptive trade practices that are prohibited by the OCPA.

## BACKGROUND

9.      "We have a saying. 'Move fast and break things.' The idea is if you never break anything, you're probably not moving fast enough," wrote then-Facebook CEO Mark Zuckerberg ("Zuckerberg") to potential investors just prior to Facebook's 2012 initial public offering.[2] Meta may have removed this saying from its public mission statement, but the motivation behind it is

---

[1] Oklahoma Youth Risk Behavior Survey 10-Year Trend Monitoring Report *(available at* https://oklahoma.gov/content/dam/ok/en/health/health2/aem-documents/family-health/maternal-and-child-health/child-adolescent-health/yrbs/2021/Oklahoma%20YRBS%2010-Year%20Trend%20Monitoring%20Report%202011-2021_FINAL.pdf).
[2] Mark Zuckerberg, Founder's Letter, 2012 *(available at* https://m.facebook.com/nt/screen/?params=%7B%22note_id%22%3A261129471966151%7D&path=%2Fnotes%2F note%2F&refsrc=deprecated&_rdr).

3

emblematic of its pursuit of innovation and profit maximization without regard to the collateral damage it may cause.

10. The Attorney General's investigation of Meta has revealed that it knowingly and repeatedly engaged in unfair and deceptive conduct at the expense of Oklahoma consumers. Meta's conduct was, and continues to be, unlawful.

11. Meta deliberately designed its social media platforms, particularly Instagram, to be an addiction machine targeted at consumers under eighteen years old ("Adolescents").

12. This was not an accident. Meta marshalled vast resources to study and understand Adolescents' psychology and behavior so it could better exploit their developmental vulnerabilities through irresistible design features.

13. Meta did this to capture an ever-increasing amount of Adolescents' time and user data—all to serve Meta's advertising business.

14. Unlike other products that have appealed to Adolescents for generations—like Hershey bars or cans of Coke—Instagram has no single unit of consumption. There is no natural stopping point. Instead, Instagram serves up a bottomless pit of content where users can spend their time limited only by the total hours in a day. And for every second a consumer spends on Meta's platforms, Meta profits.

15. Meta designed its social media products exploit attention, embedding an array of design features that maximize engagement of Adolescents on its platforms, and peppering them with inducements to "log on" and making it psychologically difficult to "log off." These features, including push notifications, automatically playing short-form videos (*i.e.*, videos shorter than 1-minute), infinite scrolling, and ephemeral content, are designed as obstacles to prevent Adolescents from disengaging from the platform.

4

16.    The U.S. Surgeon General recently issued an Advisory acknowledging as much: "You have some of the best designers and product developers in the world who have designed these products to make sure people are maximizing the amount of time they spend on these platforms. And if we tell a child, use the force of your willpower to control how much time you're spending, you're pitting a child against the world's greatest product designers."[3]

17.    Instagram's design features have fueled a dramatic increase in the amount of time Adolescents spend on the platform. Indeed, for many Adolescents, Instagram is viewed as an indispensable part of their identity, a podium from which they can share a carefully cultivated "highlight reel" of who they are and a place where they must constantly be "present."

18.    Adolescents feel addicted to Instagram. They report difficulty controlling their time spent on the application. And they frequently express that they would prefer to spend less time on Instagram but feel powerless to do so. And Meta's internal studies have repeatedly confirmed these feelings.

19.    Researchers warn that compulsive use of social media platforms like Instagram impose a wide range of harms, including increased levels of depression, anxiety, and attention deficit disorders; altered psychological and neurological development; and reduced sleep, to name a few. Additionally, there is an immense opportunity cost when adolescent years are spent glued to Instagram rather than engaged in the physical world and in-person experiences that are critical to development of the adolescent brain.

20.    Meta's business strategy that consciously addicts Adolescents to its social media platform has caused, and is continuing to cause, widespread and significant injury to Adolescents in Oklahoma. This is an unfair practice that violates the OCPA.

---

[3] Allison Gordon & Pamela Brown, *Surgeon General says 13 is 'too early' to join social media,* CNN (Jan. 29, 2023) (*available at* https://www.cnn.com/2023/01/29/health/surgeon-general-social-media/index.html).

21.     But Meta's misconduct does not end there. Meta has also violated the OCPA by deceiving Oklahoma's Adolescents—and, critically, their parents. Meta misled Adolescents and their parents both by concealing the significant risks Instagram presents to Adolescent users, and by making deceptive claims that masked its knowledge of those risks. Meta did so in at least four ways.

22.     First, Meta has long known that Instagram was harmful for users, and especially ruinous for teen girls. Meta did not share that information with consumers and, in fact, took affirmative steps to bury it. Meta's leadership—including Zuckerberg—repeatedly declined employees' requests to fund measures that would reduce known harms. And not only did Meta fail to disclose its knowledge of these harmful effects, it limited internal access to incriminating findings to minimize the risk that this information would become public.

23.     For example, Zuckerberg personally intervened to lift an internal ban on "selfie" filters that mimicked plastic surgery effects, even though Meta's experts overwhelmingly found the filters had devastating effects on teen girls. Zuckerberg did this in spite of the recommendation of Meta's own employees and Meta's own internal research. Meta never disclosed this to the public.

24.     Second, Meta publicizes its "Community Standards Enforcement Reports," to create the façade that Instagram is a safe platform. These reports touted the low "prevalence" of Community Standards violations, a self-created metric that Meta uses as "evidence" that its platform is safe. But the truth is Meta's "prevalence" metric is simply a straw man created to support the false narrative that Instagram is safe while concealing the true extent of the dangers on the platform.

6

25.      For example, in one Community Standards Enforcement Report Meta showcased the low "prevalence" of violative content, estimating that "between 0.05% to 0.06% of views were of content that violated our standards against bullying & harassment [on Instagram]." This statement clearly intended to create the false impression that bullying and harassing content is extremely rare on Instagram—only 5 or 6 in 10,000 pieces of content.

26.      In reality, bullying and harassing content is rampant on Instagram. But most of it just does not violate Instagram's self-defined Community Standards (which consumers would have no reason to know). Meta's internal surveys show that the incidence of bullying and harassing content is alarming, particularly among Adolescents. According to Meta's internal survey from roughly the same time period as the Community Standards Enforcement Report referenced above, Instagram users reported that *within the last seven days*:

- 28.3% of all users witnessed bullying;

- 27.2% of 13-15-year-olds witnessed bullying;

- 29.4% of 16-17-year-olds witnessed bullying;

- 8.1% of all users were the target of bullying;

- 10.8% of 13-15-year-olds were the target of bullying;

- 11.9% of all users received unwanted advances;

- 13.0% of 13-15-year-olds received unwanted advances; and

- 14.1% of 16-17-year-olds received unwanted advances.

27.      While Oklahoma consumers could not have understood that Meta's publicly reported safety metrics were orders of magnitude lower than the actual incidence of harm on Instagram, Meta's leadership certainly did. In a candid October 5, 2021, email titled **"Gap in our understanding of harm and bad experiences,"** Meta's former Director of Engineering Arturo

7

Bejar ("Bejar") rang the alarm bell explicitly and directly to Zuckerberg, former Chief Operating Officer Sheryl Sandberg ("Sandberg"), and Instagram Head Adam Mosseri ("Mosseri"). Bejar wrote:

> I saw the note you shared today after the testimony, and I wanted to bring to your attention what I believe is a critical gap in how we as a company approach harm, and how the people we serve experience it. I've raised this to Chris [Cox], Sheryl [Sandberg], and Adam [Mosseri] in the last couple of weeks.[4]

28.     But Meta's leadership ignored Bejar's email and continues to issue misleading reports to this day.

29.     Bejar provided sworn testimony as part of the investigation by the Attorney General. When asked if he believed "that Mr. Zuckerberg and other company leaders focused on the 'prevalence' metric because it created a distorted picture about the safety of Meta's platforms," Bejar testified "I do."[5] When asked if he thought "Mr. Zuckerberg's public statements about prevalence created a misleading picture of the harmfulness of Meta's platforms," he testified "I do."[6] And when asked if he was aware of any instances where Meta, in his view, downplayed the harms users were experiencing on Meta's platforms, Bejar testified:

> Every time that a Company spokesperson in the context of harms quotes prevalence statistics I believe that is what they are doing, that they're minimizing the harms that people are experiencing in the product.[7]

30.     Third, Meta misled the public through false statements about its commitment to well-being related features. For instance, it touted its "Time Spent" tool as a way for Adolescent users (and their parents) to manage engagement on Instagram and as a demonstration of Meta's commitment to well-being. But when Meta learned the tool delivered inaccurate data to consumers,

---

[4] **Ex. 1**, Bejar Trans., 236:16-290:14.

[5] *Id.*, at 319:21-320:3.

[6] *Id.*, at 200:16-201:13.

[7] *Id.*, at 319:11-17.

Meta neither fixed the problem nor discontinued the tool. Meta prioritized misleading its Adolescent users (and their parents) over suffering a public relations hit.

31.    Fourth, Meta made material misrepresentations to develop trust among consumers and parents that Instagram is a safe place for Adolescents. In various public channels, Meta deceptively represented (1) that it does not prioritize increasing users' time on Instagram; (2) that it protects Adolescents from harmful or inappropriate content on Instagram; (3) that it does not place a monetary value on Adolescents' use of Meta platforms; (4) that it has not changed its internal data and research access policies in response to The Wall Street Journal's 2021 coverage of its internal research findings; (5) that it uses internal research to improve product safety on a regular basis, and (6) that its platforms are not addictive.

32.    In sum, through its acts, omissions, and misrepresentations, Meta carefully created the impression that its social media platforms, and specifically Instagram, are safe places for Adolescents. That impression was false and misleading.

33.    Based on this misconduct, the Attorney General brings this action pursuant to the OCPA and seeks injunctive relief and civil penalties; recovery of attorney fees; and payment of reasonable expenses, including expert and investigation costs.

## THE PARTIES

34.    Plaintiff is the State of Oklahoma. This enforcement action is brought by and through Attorney General Gentner Drummond pursuant to the authority conferred by the OCPA.

35.    Defendant Meta Platforms, Inc. f/k/a Facebook, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.[8]

---

[8] On October 28, 2021, Facebook, Inc. changed its name to Meta Platforms, Inc.

36.    Defendant Instagram, LLC, is a Delaware limited liability company with its principal place of business in Menlo Park, California. Instagram, LLC is a subsidiary of Meta Platforms, Inc.

37.    Defendants Meta Platforms, Inc. and Instagram, LLC acted in concert with one another and as agents and/or principals of one another in relation to the conduct described in this Petition.

38.    All the allegations described in this Petition were part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## JURISDICTION AND VENUE

39.    By this Petition, Plaintiff is asserting causes of action, and seeking remedies, based exclusively on Oklahoma statutory law.

40.    The Petition does not confer diversity jurisdiction upon federal courts pursuant to 28 U.S.C. § 1332, as Oklahoma is not a citizen of any state and this action is not subject to the jurisdictional provision of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Federal question subject matter jurisdiction under 28 U.S.C. § 1331 is not invoked by the Petition. Nowhere does Plaintiff plead, expressly or implicitly, any cause of action or request any remedy that necessarily arises under federal law.

41.    As a court of general jurisdiction, the District Court is authorized to hear this matter.

42.    Although previously conducting business in Oklahoma for years without registering, on January 17, 2019, Meta filed its Certificate of Qualification to register as a foreign

corporation doing business in Oklahoma. In its filing, Meta stated that it intended to conduct business as "Social media" and that it had assets of $80,077,747,700. That same day, the Oklahoma Secretary of State granted Meta a Certificate of Authority to transact business in the State of Oklahoma.[9] On May 15, 2023, in order to continue doing business in Oklahoma, Meta filed an Annual Certificate including "a report of the amount of capital invested in Oklahoma by a foreign corporation."[10] In that filed certificate, Meta stated that the amount of "funds, credits, securities and property" that it "used or employed in the business carried on in the State of Oklahoma" was $610,956.

43.    Meta has entered into millions of individual contracts with individual Oklahomans and Oklahoma businesses to use its platforms.[11]

44.    By 2020, Meta estimated that Instagram, only one of its "Family of Apps" or "FoA," had reached a staggering saturation rate of 80% of Oklahomans under 35 years old. Meta's own documents also show that total daily active users ("DAU") in the State of Oklahoma for Instagram were: (1) more than 800,000 Oklahomans in 2018; (2) more than 900,000 in 2019; (3) more than 1,000,000 in 2020; and (4) more than 1,200,000 in 2021. Instagram is massively popular among young Oklahomans. According to Meta's internal metrics, from July 2020 to June 2021 over 300,000 Oklahoma teens used Instagram monthly. During that time, over 219,000 Oklahoma teens used Instagram daily. Between October 2022 and April 2023, over 296,000 "young adults" (according to Meta's internal definition) in Oklahoma used Instagram daily.

45.    Meta closely monitored its performance, both in terms of numbers of users and time spent on its platforms, in Oklahoma. Meta monitored the following metrics for Instagram usage in

---

[9] **Ex. 2**, Facebook, Inc.'s Certificate of Qualification (Foreign Corporation) and Facebook, Inc.'s Certificate of Authority to Transact Business in Oklahoma.

[10] **Ex. 3**, Facebook, Inc.'s May 15, 2023, Annual Certificate.

[11] **Ex. 4**, Instagram Terms of Use.

Oklahoma: (1) the amount of time daily active teens spent on Instagram per day; (2) teen "penetration" in the state; (3) the ratio of teen daily active users versus monthly active users; (4) teen monthly active user "story participation" rates; (5) the amount of "feed media" daily active teens consumed per day on Instagram; (6) the amount of "stories" that daily active teens consumed per day on Instagram; (7) Instagram market saturation with respect to users under 35; (8) the percentage of Facebook Android monthly active users on Instagram; and (9) the reduction in monthly active users over a two month time period.

46.    Perhaps most strikingly, Meta internally estimated that about 80% of Oklahoma teens were monthly active users of Instagram.

47.    And of course, Meta enriched itself by selling advertisements targeted at users in Oklahoma. According to Meta's public advertising library, Meta regularly targets advertisements to Oklahoma. All manner of Oklahoma entities—from the OKC Thunder, the Tulsa World, QuikTrip, and Hobby Lobby, to smaller entities within Osage County like the Osage County Tourism Department and the Fairfax Community Foundation—advertise on Meta's platforms. To be sure, countless others also advertise on Instagram to reach Oklahoma audiences and expand their businesses in Oklahoma.

48.    In sum, Meta aims its platforms at Oklahomans, collects massive amounts of information on Oklahoma users, studies the impact its platform has on Oklahomans, sells advertising to Oklahomans based on that information, and tracks its performance in Oklahoma— all to further its goal of generating profits for its shareholders.

49.    This Court has personal jurisdiction over each Defendant pursuant to 12 O.S. § 2004 because of their contacts in Oklahoma. As is described more fully below, Defendants (1) entered contracts with millions of Oklahomans and intentionally availed themselves of the

12

Oklahoma market by directing marketing efforts towards Oklahomans; (2) sold the opportunity to advertise to Oklahomans; and (3) monitored their substantial contacts in Oklahoma, so as to render personal jurisdiction over Meta consistent with traditional notions of fair play and substantial justice. The allegations in this Petition establish that Defendants had minimum contacts with Oklahoma and are incorporated by reference herein.

50. Pursuant to 12 O.S. § 137, venue is proper in Osage County because Osage County is a county where the alleged misconduct occurred and where Defendants have conducted or transacted business.

## FACTUAL ALLEGATIONS

### A. Defendants Engage in Consumer Transactions with Oklahoma Consumers

51. The OCPA broadly defines a "consumer transaction" as "the advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented." 15 O.S. § 752(2). The definition includes "*anything* that could be sold or marketed to a consumer." *Horton v. Bank of America, N.A.*, 189 F.Supp.3d 1286, 1293 (N.D. Okla.2016). As described herein, Defendants have engaged, and continue to engage, in conduct that constitutes a "consumer transaction."

### 1. Meta Offers Instagram in Exchange for Consumers' Valuable Consideration That Enables Meta to Sell Advertising

52. Through its mobile application and website, Instagram offers Oklahoma consumers the opportunity to connect with friends, follow accounts, and explore various interests.

53. On Instagram, consumers interact with different "surfaces." Those include: (1) the main "Feed" and "Stories" surfaces, which display content posted by accounts the consumer follows; (2) the "Explore" surface that suggests new content to consumers; (3) the "Reels" surface,

13

focused on short-form videos; and (3) the "Direct Messaging" surface, which allows consumers to send messages to one another.

54.    No two consumers' experiences on Instagram are the same. Rather, Instagram presents a customized display to each consumer based on the interests and preferences they express on Instagram, along with other user data in Meta's possession.

55.    To fully access Instagram, consumers must create an account.

56.    To create an account, consumers enter into a contract with Meta.[12]

57.    By entering that contract, users agree to comply with Instagram's Terms of Use (the "Instagram Terms").[13]

58.    The Instagram Terms state that "The Instagram Platform is one of the Meta Products, provided to you by Meta Platforms, Inc. The Instagram Terms therefore constitute an agreement between you and Meta Platforms, Inc."[14]

59.    Under the Instagram Terms, users do not pay to use Instagram. Rather, in exchange for the right to use Instagram, consumers agree to a host of terms that power Meta's advertising business.

60.    For example, in a section titled "How Our Service Is Funded," the Instagram Terms explain that "[i]nstead of paying to use Instagram, by using the Service covered by these Terms [*i.e.* Instagram], you acknowledge that we can show you ads that businesses and organizations pay us to promote on and off the Meta Company Products. We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you."[15]

---

[12] *See* **Ex. 4**, Instagram Terms of Use.
[13] *Id.*
[14] *Id.*
[15] *Id.*

14

61.     The Instagram Terms also state that Meta "allow[s] advertisers to tell us things like their business goal and the kind of audience they want to see their ads. We then show their ad to people who might be interested. We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Instagram. For example, we provide general demographic and interest information to advertisers to help them better understand their audience."[16]

62.     Under the Instagram Terms Oklahoma consumers "pay" for Instagram by allowing Meta to build its advertising business using consumers' time and attention.

63.     Under the Instagram Terms, consumers "must agree to [Meta's] Privacy Policy to use Instagram." There is no other way for a consumer to use Instagram.

64.     Every consumer must agree that Meta may collect a host of data including, among other things: (1) information about the consumer's activity on Instagram; (2) the messages the consumer sends and receives; (3) the content the consumer posts through Instagram's camera feature and the consumer's camera roll; (4) the consumer's responses to various types of advertisements; and even (5) the hardware and software the consumer is using, GPS data, Bluetooth signals, nearby Wi-Fi access points, and beacons and cell towers.

65.     Meta uses this data to further its advertising business. In particular, it allows advertisers to target consumers that reside in specific locations in Oklahoma. For example, Meta allows advertisers to target Oklahoma consumers located in Oklahoma City and Tulsa simply by choosing from a Meta-created list of "Designated Market Areas," or "DMA." Meta assigns DMA Code 650 to Oklahoma City and DMA Code 671 to Tulsa.[17]

---

[16] *Id.*

[17] *See Designated market areas for ad marketing,* Meta Business Help Center (*available at* https://www.facebook.com/business/help/1501907550136620).

15

66.     Meta's connections to Oklahoma are not limited to Oklahoma City and Tulsa. Meta enables advertisers to focus on any part of Oklahoma, including Osage County, either by targeting specific areas by zip code or by creating custom DMAs simply by dropping a pin on a map and choosing a radius around the pin.[18]

## 2.     Advertising is the Core of Meta's Business

67.     Meta has become one of the largest and most profitable companies in the world by offering highly targeted, data-driven advertising using massive databases of information collected from the consumers who use its platforms.

68.     As Zuckerberg explained, "based on what pages people like, what they click on, and other signals, we create categories . . . and then charge advertisers to show ads to that category. Although advertising to specific groups existed well before the internet, online advertising allows much more precise targeting and therefore more-relevant ads."[19]

69.     On information and belief, Meta charges a premium to businesses for access to the "much more precise" advertising opportunities on its social media platforms.

70.     Consumers are served targeted advertisements during all, or nearly all, sessions on Instagram. And consumers see advertisements almost constantly on Instagram, often several times per minute. The advertisements Meta displays on Instagram are interwoven into most if not all of Instagram's "surfaces." The same is true of Facebook.

71.     Given this business model, Meta is motivated to maximize the time users spend on Instagram and Facebook.

---

[18] Meta's services include a function it calls "Drop a Pin" that allows targeted advertising by identifying a location on a map using a pin and adjusting a slider scale to establish a particular radius around the pinned location to represent the designated market area. *See Use location targeting,* Meta Business Help Center, (*available at* https://www.facebook.com/business/help/365561350785642?id=176276233019487).

[19] *See Understanding Facebook's Business Model,* Mark Zuckerberg, January 24, 2019 (*available at* https://about.fb.com/news/2019/01/understanding-facebooks-business-model/).

16

72.    One incentive is that the more time users spend on Meta's platforms, the more "inventory" Meta can sell. For instance, if a user increases her time spent viewing her Instagram "feed" from one to five hours per day, Meta can deliver roughly five times the number of advertisements to that user. The increase in time spent therefore significantly increases the profits Meta can make off this user.

73.    Second, the more time that same user is engaged on Instagram, the more Meta learns about her. This data is gathered and refined so that she can be more accurately dropped into a particular category and ads shown to her can be more precisely targeted. On information and belief, advertisers will pay more for these ads.

74.    As described more fully below, Meta has succeeded in capturing a breathtaking amount of consumer time, attention, and data—especially on Instagram, and especially from Adolescents.

### 3.    Meta Prioritizes Acquiring Adolescents and Maximizing Their Time Spent on Instagram

75.    In Meta's business model, not all consumers are created equal. Adolescents are Meta's prized demographic.

76.    Meta has pursued increasing Adolescents' time spent on its platforms as one of the company's most important goals. As one Meta analyst wrote in 2016:

> **Lifetime Value (LTV)**
> This number is core to making decisions about your business. Lifetime value is the cumulative total "value" (usually expressed as "profit") you expect from a customer/ user. With this number, we can make better decisions regarding how much to spend on each user. Generally, you do not want to spend more than the LTV of the user.
>
> Short summary is the "young ones are the good ones." You want to bring people to your service young and early.

17

77. For example, as of November 2016, Meta's "overall goal remain[ed] total teen time spent . . . with some specific efforts (Instagram) taking on tighter focused goals like U.S. teen total time spent."

78. This strategy was directed by Zuckerberg, who "decided that the top priority for the company in 2017 is teens."

79. On information and belief, Meta has worked to maximize Adolescents' "time spent" throughout its corporate history. To that end, a product manager within Instagram wrote that he wanted to establish a small team "focused on getting a very clear understanding of our current US DAP and MAP growth situation, opportunities, and challenges because 1) US Teens are our #1 cohort for both long-term growth of [Instagram] and [Facebook]."

80. This is especially true of Instagram, which is central to Meta's strategy to grow its number of Adolescent users.

81. As Meta knows, Instagram is especially appealing to Adolescents and is Meta's most popular application with that demographic. Meta therefore devotes vast resources to increasing Adolescents' engagement on Instagram.

82. Meta's internal studies show that Adolescents have an outsized influence on their entire households' attitudes towards Instagram. As Meta's internal research shows, "[t]eens are household influencers bringing [family] members (parents and younger siblings) to IG [Instagram], as well as shaping what is 'normal' behavior on IG [Instagram]."

83. Even more fundamentally, Meta pursues Adolescents because Meta's advertising customers value that audience.

18

84.     Among other reasons, Meta's advertising partners want to reach Adolescents because they (1) are more likely to be influenced by advertisements; (2) may become lifelong customers; and (3) set trends that the rest of society emulates.

85.     Notably, Meta allows advertisers to target Adolescents on Instagram based on their age and location.

86.     On information and belief, many advertisers pay Meta a premium to serve advertisements to Adolescents, including advertisements to Adolescents in specific geographic markets, such as those in Oklahoma and in Osage County.

87.     Meta is motivated to increase Adolescents' time spent on Instagram not only because it is a meaningful stream of advertising business, but also, because the data that Meta collects from that use is itself highly valuable.

88.     Meta has profited immensely from its business model. Meta reported earning $116.6 billion in revenue in 2022, with $23.2 billion in net income, and Zuckerberg, its CEO, has become one of the wealthiest people in the world.

89.     In addition to financial success, Zuckerberg's role as Meta's CEO and Founder has made him a public figure able to exert significant influence not only over the company, but also over society writ large. In a private email exchange with at least four other billionaires, one of Meta's major investors told Zuckerberg that he believed "Mark Zuckerberg has been cast as *the spokesman* for the Millennial Generation – as the single person who gives voice to the hopes and fears and the unique experiences of this generation, at least in the USA." In a response, Mr. Zuckerberg agreed with that sentiment, stating that he is "the most well-known person of [his] generation."

**B.      Meta Operates Instagram in a Manner That is Unfair to Adolescents**

90.      Meta has engaged in unfair practices by designing and operating its platforms in a manner that addicts Adolescents on massive scale.

**1.      By Meta's Design, Instagram Induces Compulsive Use Among Adolescents**

91.      For generations, companies have marketed products to Adolescents—from bikes to Barbies to baseball cards. Unquestionably, products like those appealed to a young audience, and their creators marketed them accordingly.

92.      Meta could have followed a similar course. It might have offered a version of Instagram that was simply appealing, but not addictive.

93.      Instead, Meta designed Instagram to exploit known vulnerabilities in Adolescents' neurological development, making Instagram biologically difficult—and in some cases nearly impossible—for teens to resist.

94.      As Meta's founding president, Sean Parker, explained in 2018:

The thought process that went into building these applications, Facebook being the first of them … was all about: 'How do we consume as much of your time and conscious attention as possible?' That means that **we need to sort of give you a little dopamine hit every once in a while**, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content and that's going to get you … more likes and comments. It's a social-validation feedback loop … exactly the kind of thing that a hacker like myself would come up with, **because you're exploiting a vulnerability in human psychology**. The inventors, creators—**me, [Meta founder] Mark [Zuckerberg], [Instagram founder] Kevin Systrom on Instagram**, all of these people— **understood this consciously. And we did it anyway.** [20]

95.      On an ongoing basis, Meta pours massive resources into understanding Adolescents' cognitive development and vulnerabilities.

---

[20] *See* Alex Hearn, *'Never get high on your own supply' – why social media bosses don't use social media*, The Guardian (Jan. 23, 2018) (*available at* https://www.theguardian.com/media/2018/jan/23/never-get-high-on-your-own-supply-why-social-media-bosses-dont-use-social-media (emphasis added)).

96.     For example, in the late 2010s, Meta's Consumer Market Research team created a "*very* deep body of work over the course of years/months" studying teens. That group did "enormous work and investment" in "teen foundational research."

97.     But that "very deep body of work" was not enough. In 2020 Meta started the "Teen Ecosystem Understand" project, which was an ongoing effort to study Adolescent users. Led by Instagram's "growth" team, this project sought to deliver insights that would allow Meta to make Instagram increasingly irresistible to Adolescent users.

98.     On information and belief, Meta's Teen Ecosystem Understand and Consumer Market Research projects were two of many initiatives Meta directed to study Adolescents so that it could capture more of their time and attention.

### 2.     Instagram's "Teen Fundamentals" Study Shows Instagram's Power to Induce Compulsive Use Among Adolescents

99.     A May 2020 report by the Teen Ecosystem Understand project illustrates the lengths to which Meta studied, understood, and sought to exploit teens' neurological vulnerabilities.

100.     Titled "Teen Fundamentals," the 97-page internal presentation[21] purports to be a "synthesis of adolescent development concepts, neuroscience as well as nearly 80 studies of our own product research." One of the presentation's stated goal was to "look . . . to biological factors that are relatively consistent across adolescent development and gain valuable unchanging insights to inform product strategy today."

101.     The first section of the internal presentation, titled "Biology," contains several images of brains in various stages of development.

---

[21] Meta employees regularly convey information to one another through slideshows using Microsoft PowerPoint.

102. As part of the "Biology" section, the internal presentation explained that "Unlike the body which functions wholly from day one, the brain essential [sic] spot trains certain areas and functions at a partial capacity before it is wholly developed . . . The teenage brain is about 80% mature. The remaining 20% rests in the frontal cortex...at this time teens are highly dependent on their temporal lobe where emotions, memory and learning, and the reward system reign supreme."

103. According to the report, "teens' decisions are mainly driven by emotion, the intrigue of novelty and reward . . . [making] *teens very vulnerable* at the elevated levels they operate on. *Especially in the absence of a mature frontal cortex to help impose limits on the indulgence* in these."

104. The next section of the Teen Fundamentals slide presentation, titled "Behavior," acknowledged what Meta knew well: "the teenage brain happens to be pretty easy to stimulate."

105. By way of an example, the presentation noted that "*everytime* [sic] *one of our teen users finds something unexpected their brains deliver them a dopamine hit.*"

106. The next slide explained that "*teens are insatiable when it comes to 'feel good' dopamine effects.*"

107. And the following slide highlighted that "*teens brains' [sic] are especially 'plastic'* or keen to learn presenting a unique opportunity that coupled with curiosity can send teens down some interesting rabbit holes . . . ."

108. Suggesting another way that teen brains are "easy to stimulate," the internal presentation notes that "a huge driver for teen behavior is the prospect of reward. This is what makes them predisposed to impulse, peer pressure, and potentially harmful risky behavior like drugs, stunts, and pranks . . ."

22

109.    Building on that theme, the presentation also observed that "approval and acceptance are huge rewards for teens and interactions are the currency on IG [Instagram]. DMs [direct messages], notifications, comments, follows, likes, etc. encourage teens to continue engaging and keep coming back to the app."

110.    The presentation confirmed that Instagram was successfully exploiting these vulnerabilities, even when its young consumers voiced their concerns directly to Meta.

111.    For example, the internal presentation conceded that:

teen brains are much more sensitive to dopamine, one of the reasons that drug addiction is higher for adolescents and keeps them scrolling and scrolling. And due to the immature brain they have a much harder time stopping even though they want to – our own product foundation research has shown teens are unhappy with the amount of time they spend on our app.

112.    But that was not enough for the members of the Instagram "growth" team that authored the presentation. Instead, the presentation repeatedly asked how Instagram could become even more irresistible to teens:

- "So, now that we know this – what is the effect of teen's biology on their behavior? And how does this manifest itself in product usage?"

- "How well does IG [Instagram] cater to [teens' desired] activity? How does it stack up against [its competitors]?"

- "Teen's [sic] insatiable appetite for novelty puts them on a persistent quest to discover new means of stimulation . . . how can your team give teens somewhere new to go or something new to find from the product you work on?"

113.    In the end, the internal presentation succinctly described Meta's future direction: "I want to remind you all once more of the core things that make teens tick. New things, feeling good and reward. We are not quite checking all of these boxes . . . some teens are turning to competitors to supplement for [sic] those needs." It concluded: "we [would] do well to think hard about how we can make IG [Instagram] an app tailored to the teenage mindset."

114. The Teen Fundamentals report was shared with various teams inside Meta, culminating in its presentation to Instagram's leadership team (including Adam Mosseri) in June 2020.

115. In response to the presentation, Instagram's leadership requested additional research, which led to a subsequent report titled "Deepening Rewards to Drive More Meaningful Daily Usage" designed to "unpack" the concept of "rewards." As part of that report, Instagram employees conducted user interviews and "synthesized this data with academic literature to understand how it applies at a psychological level." Through other related projects, Instagram continued to use its research and understanding of Adolescent users' brains to gain a competitive advantage.

### 3. Instagram Features Induce Compulsive Use

116. Leveraging its understanding of "the things that make teens tick," Meta exploited Adolescents' limited capacity for self-control through an array of features, such as push notifications, ephemerality, auto-play, and infinite scroll.

117. Collectively, these and other Instagram features created and exploited obstacles to Adolescents' decision-making, causing them to spend more time on Instagram than they otherwise would.

#### i. Incessant Push Notifications.

118. Meta causes Adolescents to increase their time spent on Instagram by inundating them with notifications. The Instagram mobile application, by default, peppers users (including Adolescents) with frequent alerts or notifications intended to cause users to open the application

119. Echoing Meta's "Teen Fundamentals" research, academics have observed that these notifications impact the brain in similar ways as narcotic stimulants:

24

Although not as intense as [sic] hit of cocaine, positive social stimuli will similarly result in a release of dopamine, reinforcing whatever behavior preceded it . . . Every notification, whether it's a text message, a "like" on Instagram, or a Facebook notification, has the potential to be a positive social stimulus and dopamine influx.[22]

120.    On information and belief, by default Meta notifies Adolescents when another user follows them, likes their content, comments on their content, "tags" them, mentions them, sends them a message, or "goes live" (if the young person follows the user).

121.    As Meta's own research shows, Adolescents have a difficult time resisting these notifications.

122.    In an internal analysis of "Levers for Teen Growth," a member of the "Instagram Growth Data Science Team" noted that Defendants could "[l]everage teens' higher tolerance for notifications to push retention and engagement."

123.    In a November 2019 internal presentation entitled "IG Notification Systems Roadshow," Meta's employees acknowledged that some of its users are "overloaded because they are inherently more susceptible to notification dependency."

124.    Similarly, in an internal presentation titled "State of US Teens 2020"—authored by the "IG [Instagram] Growth Analytics" team—Meta observed that teens "have longer time spent than adults because they tend to have more sessions per day than adults. This may be because US teens are more sensitive to notifications and have more notification-driven sessions than adults."

125.    By dispensing notifications and other "rewards" on a variable or intermittent schedule, Meta increases the addictive nature of Instagram.

        ii.    Ephemeral Nature of Instagram Content

126.    Meta's internal research also showed that Adolescents are developmentally wired

---

[22] *See* Trevor Haynes, *Dopamine, Smartphones & You: A battle for your time*, Blog - Science In The News (Harvard University May 1, 2018) (*available at* https://sitn.hms.harvard.edu/flash/2018/dopamine-smartphones-battle-time/).

to fear "missing out." Meta induces constant engagement by making certain Instagram experiences ephemeral.

127.    Unlike content delivery systems that permit a user to view existing posts on a schedule convenient for the user, ephemeral content is available only on a temporary basis, incentivizing users to engage with it immediately.

128.    For example, Instagram's popular "Stories" surface displays user-created images, videos, and narratives for twenty-four hours, at most, before the content disappears.[23,24]

129.    Similarly, Instagram's "Live" feature gives users the ability to livestream videos to followers or the public during a specific session, after which the stream video is typically no longer available.[25]

130.    In the case of "Live," for instance, an Adolescent's failure to quickly join the live stream when it begins means that the user will miss out on the chance to view the content entirely. Often, Instagram sends users notifications that an account they follow is going live so that users do not "miss out."

131.    Likewise, because "Stories" delete within 24 hours, Adolescents must constantly monitor that surface if they desire to keep up with the accounts they follow.

132.    Meta deploys ephemeral content features because it knows Adolescents' fear of missing out on content will keep them glued to Instagram.

133.    Meta's internal documents acknowledge that Instagram's ephemeral features drive compulsive Instagram use.

---

[23] *See Introducing Instagram Stories* (Aug. 2, 2016) *(available at*
https://about.instagram.com/blog/announcements/introducing-instagram-stories).
[24] *See* Josh Constine, *Instagram Launches "Stories," A Snapchatty Feature for Imperfect Sharing,* TechCrunch (Aug. 2, 2016) *(available at* https://techcrunch.com/2016/08/02/instagram-stories/).
[25] *See Live,* Instagram Help Center *(available at* https://help.instagram.com/272122157758915/?helpref=hc_fnav).

26

134.    For instance, Meta's internal documents acknowledge that Instagram's ephemeral features drive compulsive Instagram use on at least a monthly basis.

135.    Meta's documents noted that "[y]oung people are acutely aware that Instagram can be bad for their mental health, *yet are compelled to spend time on the app for fear of missing out on cultural and social trends*."

136.    Even though it knew ephemerality was fueling out-of-control Instagram usage among Adolescents, Meta pressed forward. Illustrating the mindset within Meta, in 2021 a user experience researcher observed that direct messages on Instagram "were not urgent (especially compared to other apps like Snapchat)" and "consisted mainly of videos and memes from friends which could be watched at [a user's] leisure." The researcher noted that "we need to develop new products that increase the possibilities for time-sensitive interactions on [Instagram] . . . ."

### iii.    Infinite Scroll, Autoplay, and Reels Induce Perpetual Instagram Use

137.    Meta has also implemented tools that induce perpetual, passive Instagram use.

138.    For example, Instagram presents an infinite scroll on several key surfaces. In other words, Instagram partially displays additional content at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation (without seeing the top portion of the next post in their feed).

139.    Instagram teases yet-to-be-fully-viewed content indefinitely—as the user scrolls down the feed, new content is automatically loaded and previewed. This design choice makes it difficult for Adolescents to disengage because there is no natural end point to the display of new information.

140.    Meta also deploys the "auto-play" feature to keep Adolescents on Instagram.

141. Much like infinite scroll, Instagram's "Stories" surface automatically and continuously plays content, encouraging Adolescents to remain on the platform.

142. Meta understands that these are powerful tools. Tellingly, when news broke that a Meta competitor was turning off auto-play for users under 18, Meta's internal researcher team registered surprise. One observed that "[t]urning off autoplay for teens seems like a huge move! Imagine if we turned off infinite scroll for teens." The second responded "Yeah, I was thinking the same thing. Autoplay is HUGE."

143. Meta's popular "Reels" surface has these same characteristics. An internal strategy presentation shows that Reels is "a TikTok competitor for short and entertaining videos" and one of "three big bets" that "Instagram focused on . . . to bring value to teens" in 2020.

144. Videos on Reels automatically and perpetually play as the user swipes the screen up to the next video. The short-form nature of Reels (between 15 to 90 seconds, as of April 2023) makes it difficult for Adolescents to close the app. Other aspects of Reels—including the placement of the like, comment, save, and share buttons on top of the video— reduce or prevent interruption and keep the user constantly viewing the video.

145. Internally, Meta employees recognized that the design of Reels was harmful to Adolescents. As one employee observed in September 2020, "Reels seems to be everything they denounce in the stupid documentary [*i.e.* Netflix's *The Social Dilemma*], and everything we know from our research: passive consumption of an endless feed, without any connection to the content creator. Yay." A Meta mental health researcher responded, "Exactly. Ugh."

146. On information and belief, the above-described Instagram features are but a small sample of the tools Meta has deployed to induce Adolescents to spend more time on Instagram than they otherwise would.

### 4.      Instagram Induces Widespread Compulsive Use Among Adolescents

147.    Because of Meta's design choices, Instagram has already hooked a generation of Adolescents.

148.    Meta knew. Meta's studies repeatedly confirmed that Adolescents used Instagram at alarming rates. They also showed that Adolescents wanted to reduce their time on Instagram and that Instagram's engagement-inducing features simply overpowered them. Meta's studies also showed that compulsive Instagram use had detrimental effects on Adolescents' mental health, sleep, and relationships. But because the compulsive use of Instagram by Adolescents benefitted Meta's bottom line, Meta chose to ignore its own internal recommendations.

149.    For example, in a February 2019 internal presentation titled "Instagram Teen Well-Being Study: US Topline Findings," Meta observed that "App Addiction is Common on IG [Instagram]." The presentation noted that 23% of teenage monthly active users find that they often feel like they "waste too much time on" Instagram.

150.    In September 2019, Meta commissioned a third-party study on Teen Mental Health. That study's first "Topline Headline" was that "Instagram is an inevitable and unavoidable component of teens lives. Teens can't switch off from Instagram even if they want to."

151.    Another "Topline Headline" was that "Teens talk of Instagram in terms of an 'addicts' narrative' spending too much time indulging in a compulsive behavior that they know is negative but feel powerless to resist."

152.    A later slide observed that "Teens are hooked despite how it makes them feel . . . Instagram is addictive, and time-spend on platform is having a negative impact on mental health."

153.    The Teen Mental Health report also found that teens "know they stay up later than they should and miss out on sleep to stay plugged in" to Instagram.

154.    Elsewhere, the report noted that "Adolescents are acutely aware that Instagram is bad for their mental health yet are compelled to spend time on the app for fear of missing out on cultural and social trends."

155.    Relatedly, in an October 2019 discussion regarding mental health research, an employee observed:

> teens told us that they don't like the amount of time they spend on the app...they often feel 'addicted' and know that what they're seeing is bad for their mental health but feel unable to stop themselves. This makes them not feel like they get a break or can't switch off social media. In the survey, about 30% (and even larger proportions of those who are unsatisfied with their lives) said that the amount of time they spend on social media makes them feel worse.

156.    In March 2020, one Instagram employee asked if there were "any recent studies where we explicitly talk about time spent tools and why teens want them." In response, a different employee confirmed that "[t]he feedback, essentially, is that (1) teens feel addicted to IG [Instagram] and feel a pressure to be present, (2) like addicts, they feel that they are unable to stop themselves from being on IG, and (3) the tools we currently have aren't effective at limiting their time on the ap [sic]."

157.    But despite that survey feedback, Meta made sure not to speak about the concept of "addiction" publicly. In that same March 2020 exchange, the two employees discussed a draft public statement regarding "efforts to combat social media addiction."

158.    The first asked: "Do we want to call it addiction? Maybe not." The second clarified: "(this is internal only)." The first employee responded: "Internal only makes it better. I'm just a little cautious about calling it addiction." The second responded: "Totally agree, we would never want to say that!"

159.    Employees continued to grapple with this issue in September 2020, when Netflix released *The Social Dilemma*, which accused Meta of addicting Adolescents to Instagram.

30

160. The program hit home with some Meta employees. In one exchange among several Instagram employees, Instagram's Director of Data Science stated "[by the way] there is a new Netflix [documentary] basically saying we're creating a world of addicts…" In response, a second employee stated that the documentary "makes me feel like tech plays to humans' inability to have self-control lol."

161. In response, Instagram's Director of Data Science stated, "Yeh that's exactly what the [documentary] says. I think its true [to be honest] . . . I do worry what it does to Adolescents who are still developing their brains and social skills, as well as being more susceptible to mean comments or lack of friends/feedback."

162. A third employee asked if Meta was "creating addicts or facilitating them…. giving existing addicts a really accessible outlet?" The second employee clarified, "a really accessible outlet that optimizes for time spent…[and] keeps people coming back even when it stops being good for them."

163. Instagram's Director of Data Sciences responded, "without the right stimulus, someone might never become an addict. So it's a tricky one. It's like, you'll never become a gambling addict if you don't visit vegas : P"

164. That same day in September 2020, Instagram's Director of Data Science analyzed the scope of the problem, creating charts titled "Number of US Humans who spend a lot of time on IG in a day," and "US Humans that spend a ton of time on IG in a Week."

165. The daily chart showed that in the United States more than 475,000 teens spend 3-4 hours per day on Instagram; more than 235,000 spend 4-5 hours; and more than 300,000 spend 5 or more hours. The weekly chart showed that in the United States more than 1 million teens

31

spend 14-21 hours; more than 420,000 spend 21-28 hours; and 400,000 spend 28 or more hours per week on Instagram.

166. Meta knew that this level of usage was caused by its design. As a Meta Vice President of Product told Instagram's leadership in February 2021, "problematic use . . . [will] require more fundamental changes to our goals, what type of work they incentive [sic], and therefore how core mechanics work (feed design, ranking, sharing, notif[ications])." That message did not receive a response.

167. And Meta knew that Instagram's core mechanics were interfering with a critical part of Adolescents' development: Sleep.

168. For example, in an April 2021 analysis, Meta observed that "peak" hours for messaging were "in the late evenings," with the highest rate of "sessions with message sends" occurring between 9–11pm.

169. That same analysis showed that on weekdays, US teens spent the most time on Instagram between 9–11pm.

170. After reviewing that information, a Meta data scientist commented, "Honestly the only insight I see in these charts is that teens are really into using IG [Instagram] at 11pm when they should probably be sleeping : ( "

171. Internally, Meta understood the specific ways that compulsive use manifested on Instagram.

172. For example, a November 2021 analysis titled "Well-being: Problematic Use" showed that "more reliable proxies for identifying problematic use" included: "'passive' consumption, frequent low-engagement sessions, disproportionate night-time usage, repetitive app checking, and receiving and responding to more push notifications."

32

173. That same analysis also acknowledged that "problematic use" was "more common among teens and people in their 20s." It explained: "this is consistent with Adolescents having problems with self-regulation."

### 5. Instagram Harms Adolescents by Inducing Compulsive Use

174. Defendants have substantially injured Adolescents by designing Instagram to induce compulsive and excessive use, which interferes with important developmental processes and behaviors.

175. These injuries include Adolescents' lack of sleep and related health outcomes, diminished in-person socialization skills, reduced attention, increased hyperactivity, self-control challenges and interruption of various brain development processes.

176. Defendants have also caused Adolescents to experience mental health harms, such as increased levels of depression and anxiety.

177. In addition, Defendants have caused Adolescents to have diminished social capacity and other developmental skills by virtue of the "opportunity cost" associated with devoting significant time to social media, rather than participating in other developmentally important, in-person, life experiences.

178. The United States Surgeon General's May 2023 Advisory, titled "Social Media and Youth Mental Health" (the "Advisory"), describes some of the harms caused by Defendants.[26] As the Advisory explains, "[a] Surgeon General's advisory is a public statement that calls the American people's attention to an urgent public health issue . . . Advisories are reserved for significant public health challenges that require the nation's immediate awareness and action."

---

[26] *See* U.S. Dep't of Health & Hum. Servs., Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 4 (2023) (*available at* https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf).

According to the Surgeon General, Adolescents' social media use is one such significant public health challenge.

179. As the Advisory explains, "[e]xcessive and problematic social media use, such as compulsive or uncontrollable use, has been linked to sleep problems, attention problems, and feelings of exclusion among adolescents."

180. The Advisory also identifies "changes in brain structure," "altered neurological development," "depressive symptoms, suicidal thoughts and behaviors," "attention deficit/hyperactivity disorder (ADHD)" and "depression, anxiety and neuroticism," as additional harms to Adolescents associated with compulsive social media use.[27]

## C.    Meta Engages in Deceptive Conduct by Omitting and Misrepresenting Material Facts About Instagram

181. Under the OCPA, a business engages in deceptive conduct when its acts, representations, or omissions deceive or could reasonably be expected to deceive or mislead a person to their detriment.

182. As an initial matter, Meta failed to disclose Instagram's addictive nature. For years, Meta has led young consumers (and their parents) to believe that Instagram is a safer and less harmful platform than it is.

183. Meta deceived young consumers and their parents by failing to disclose that Instagram is, on balance, harmful to consumers (and especially damaging to girls), by concealing information about some of its most harmful platform features, by promoting misleading metrics about platform safety, and by touting inaccurate and ineffective "well-being" initiatives, among other methods.

---

[27] To be clear, this Petition is focused on harms arising out of compulsive or "problematic" Instagram use, not harms caused by exposure to any particular content on Instagram.

34

1.    **Meta Did Not Disclose its Knowledge That Instagram Harms Users, Particularly Girls**

184.    Meta has long known that the Instagram platform is likely harming a significant portion of its user-base.

185.    For instance, in September and October of 2018, Meta surveyed and interviewed active Instagram users to gauge the association between Instagram and "negative social comparison," (*i.e.*, comparisons that make young users feel worse about themselves). In Meta researchers' own words, the experiment found that "***at least some of this association is causal.***"

186.    Knowing that "[n]egative social comparison is associated with worsened well-being measures across the board," Meta found that for Instagram users, "there is a relationship between tenure and the length of negative [social comparison]." For instance, among Instagram users who have been on the platform for an average of 4.4 years, Meta found that "33% of people hav[e] been feeling worse about themselves on [Instagram] for 'several months to a year.'"

187.    That study also found that Instagram drives negative social comparison, the process whereby a person assesses their own self-worth by how they perceive they stack up against others, for teen girls especially. It observed that, in comparison to men who are at least 25 years old, women are five times more likely and teen girls are eight times more likely to engage in negative social comparison due to Instagram use.

188.    Meta would continue sharpening its internal understanding of the harms experienced by Instagram users over subsequent years. For instance, Meta knew that Instagram caused or contributed to:

- **Addiction.** Meta research from August and September 2019 found that "Instagram is addictive, and time-spend on [the] platform is having a negative impact on mental health." The research observed that teens "have an addicts' narrative about Instagram use . . . they wish they could spend less time caring about it, but they can't help themselves." The research concluded, "[o]n an

35

everyday level, Instagram is a recipe for low level mental anxiety that unchecked can ladder up to something more serious."

- **Body Dissatisfaction**. On March 13, 2020, Meta internally distributed findings from a Meta-sponsored literature review which found that "[s]ubstantial evidence suggests that experiences on Instagram or Facebook make body dissatisfaction worse," and that users "perceived body image as a problem that Instagram worsened the most, more than when they end a relationship or lose a job."

- **Negative Social Comparison**. In March and April of 2020, Meta conducted a survey of 100,000 individuals in the United States and other countries to better understand "social comparison on Instagram." From this survey, Meta found that "[a]bout 1 out of 10 people experience negative social comparison on Instagram *often or always*." It also found that "[a]bout 1 in 4 people think that Instagram makes social comparison worse."

- **Mental Health Harms**. On November 13, 2019, Meta internally published the results of a 22,000-person survey of Instagram users from the United States and several other countries. The survey found that "at least 1 in 2 [Instagram] users had experienced at least one mental health related issue in the last 30 days."

189.   Meta appreciated that Instagram was particularly devastating for girls. Meta's research showed that:

- "Nearly half of teen girls (48%) often or always compare their appearances on [Instagram], and one-third (34%) feel intense pressure to look perfect."

- "*Approximately 70% of teen girls* may see enough "sensitive content"—*i.e.* content that is associated with negative appearance comparison—that they are likely to experience "appearance comparison at least half the time" they are on Instagram.

- "The topics that elicit appearance comparison comprise 1/4 of the content people see on Instagram, and 1/3 for teen girls."

- "For every piece of friend content a teen girl sees, she sees 5x as many pieces of content from top accounts, *i.e.* the accounts that most strongly drive appearance comparison."

- Roughly 1 in 5 pieces of content young girls see on Instagram is focused on makeup, cosmetics, skin care and related topics, which the Company knows are 'associated with more negative appearance comparison."

36

- 68% of teen girls experience negative social comparison, and this issue is *"not an influencer problem, it's an Instagram problem."*

190. Meta also knew that the "Explore" surface, a feature whereby Instagram recommends content to users from accounts that they do not follow, exacerbated some of the harms identified by the above research.

191. On July 22, 2021, Meta internally shared research indicating that Instagram's Explore surface tends to increase users' "exposure to [negative appearance comparison] content beyond the preferences that people have indicated by the choice of accounts they follow." Consequently, "17% of people see substantially more (at least 20 percentage points) [negative appearance comparison] content in Explore than in Feed. It's worse for women and teen girls."

192. In other words, Meta knew that Instagram's algorithms were feeding users more harmful content than the users would have otherwise received if content visibility was only driven by preferences expressed by the users.

193. In mid-2021, Meta undertook an extensive survey of users to "develop a holistic, consistent picture of user bad experiences on Instagram that allows [Meta] to track [its] progress each half [year]."

194. Referred to internally as BEEF ("Bad Experiences and Encounters Framework"), the survey measured users' exposure to certain categories of harmful content on Instagram over a seven-day period and leveraged a subcategory of Instagram users as a control group to "determine causality."

195. As discussed in more detail below, the BEEF survey showed a significant number of Instagram users regularly experienced: (1) negative social comparison-promoting content; (2) self-harm-promoting content; (3) bullying content; (4) unwanted advances; and (5) a collection of other harmful encounters on the platform.

37

196.    Relatedly, on August 27, 2021, an Instagram spokesperson shared an exchange with Head of Instagram Adam Mosseri about a forthcoming article by The Wall Street Journal's Jeff Horwitz "that essentially argues that [Instagram's] design is inherently bad for teenage girls (leads to [suicide and self-harm], poor mental health, dysphoria)." The spokesperson observed that Horwitz's "arguments [are] based on [Meta's] own research so [they] are difficult to rebut" and noted that the article could expose *"that [Meta's] own research confirmed what everyone has long suspected."*

197.    Upon information and belief, Meta has not disclosed the vast majority of its internal research showing the harm Instagram causes its users.

198.    Nor has Meta warned consumers of the risks that Instagram poses to users that are known to Meta internally.

        i.    Meta's Leadership Refused to Remediate Instagram's Known Harms

199.    Although Meta understood that Instagram causes significant harm to users, Meta executives repeatedly declined to fund internal proposals to reduce those harms.

200.    As early as March 2019, Meta employees were aware that a critical mass of "internal and external" research showed that Instagram harms users. Based on that knowledge, Meta employees raised this issue to Meta's senior decision-makers.

201.    On or around March 8, 2019, a team of Meta researchers sent Sheryl Sandberg a report warning that Meta was harmful for users, on balance. The report stated, "there is increasing scientific evidence (particularly in the US) that the average net effect of [Meta] on people's well-being is slightly negative.

202.    The report identified "[t]hree negative drivers that occur frequently on Meta's platforms and impact people's well being." Those drivers were: (1) problematic use (Meta's euphemism for compulsive use); (2) social comparison; and (3) loneliness.

38

203.    The report observed: (1) 58.1% of users experienced varying degrees of problematic use; (2) 45% of users experienced varying degrees of social comparison; and (3) 43% of users experienced varying degrees of loneliness from using Meta's platforms.

204.    The report warned Sandberg that Meta needed new product investment to remedy these harms. It stated: "With no additional investment, we are on a trajectory to deliver exploratory findings (and NO product changes)." "We recommend investing in both the product effort and the [research] effort."

205.    On April 8, 2019, Meta's VP of Product, Choice and Competition escalated this warning by emailing Zuckerberg, Sandberg, and Mosseri. That email reiterated the warning they had previously shared with Sandberg: "there is increasing scientific evidence (particularly in the US) that the average net effect of [Meta] on people's well-being is slightly negative." Like the report that Sandberg received individually, the email to Zuckerberg, Mosseri, and Sandberg implored that "there is a strong need to increase our investment in these areas to make a meaningful shift over the next year and beyond."

206.    Several days later, a member of Meta's finance team—speaking on behalf of Zuckerberg and Sandberg—told the research team that Meta would not fund the recommended investments at the organizational level.

207.    Later that same day, Mosseri clarified that the recommended research would not be funded at the Instagram level either. He explained, "[u]nfortunately I don't see us funding this from Instagram any time soon."

208.    Rather, Meta's executive decision-makers understood that Instagram was, on net, negatively impacting its users. But instead of disclosing that fact or investing in solutions to the problem, Meta continued to prioritize profits at the users' expense.

39

209. Later in 2019, Fidji Simo—then Head of Facebook—told Mosseri that, to improve well-being on Meta's platforms, "we need to increase investment."

210. Mosseri replied, "100% agree. My current take is the biggest problem is: Well-being is the existential question we face, and we lack a . . . roadmap of work that demonstrates we care about well-being."

211. Despite Mosseri's purported concerns, Meta's leadership refused to fund well-being product investments for years.

212. For example, in August 2021, Nick Clegg—Meta's President of Global Affairs—emailed Zuckerberg recommending "additional investment to strengthen our position on wellbeing across the company."

213. Clegg endorsed this investment because politicians worldwide were raising concerns "about the impact of [Meta's] products on Adolescents' mental health." Clegg concluded that while Meta had a "strong program of research," it "need[ed] to do more and we are being held back by a lack of investment on the product side which means that we're not able to make changes and innovations at the pace required."

214. Zuckerberg declined to respond to Clegg's request for months—even after The Wall Street Journal reported on Meta's internal research showing the harm Instagram caused to Adolescents' mental health.

215. As it turns out, Zuckerberg's attention was elsewhere. While Clegg and others worried about public backlash, Zuckerberg was preoccupied with public perception of his hydrofoil, which is an aquatic recreation device.

216. On September 21, 2021, while Meta's previously undisclosed internal research was a leading headline, Meta's Public Affairs team worked to dissuade Zuckerberg from publicly

mocking a different news story that mistakenly referred to Zuckerberg's hydrofoil as an "electric surfboard."

217.    According to a member of the team, Zuckerberg was "eager" to publicly state: "Look, it's one thing for journalists to make false claims about my work, but it's crossing a line to say I'm riding an electric surfboard when it's clearly a hydrofoil and I'm pumping that thing with my legs."

218.    Later in the same conversation, an unamused Clegg observed the absurdity of Zuckerberg's inclination:

> Am I missing something here? On the day a [Meta] rep[resentative] is pulled apart by US Senators on whether we care enough about children on our services, [Zuckerberg] is going to post about . . . surfboards? Maybe I've lost my humor about this whole thing, but I really think this would seem to any casual observer to be pretty tone deaf given the gravity of the things we're accused of . . . If I was him, I wouldn't want to be asked "while your company was being accused of aiding and abetting teenage suicide why was your only public pronouncement a post about surfing?" . . . [The Wall Street Journal's reporting about Instagram's mental health impacts] has dramatically consolidated a wider narrative (that we're bad for kids) which had been brewing for some time. It now makes regulation . . . certain, and in my view makes launching [Instagram] Kids nigh impossible. I've told [Zuckerberg] and [Sandberg] this already.

219.    Zuckerberg ultimately released the statement. As Meta's Head of Communications said, "I'm really eager to just do whatever he wants at this point. My spine has been surgically removed."

220.    Meanwhile, Clegg was concerned that Zuckerberg's mindset was hampering Meta's response to the mental health crisis covered in The Wall Street Journal's reporting. In a contemporaneous discussion with a member of Meta's finance team, Clegg implored, "the WSJ story about [Instagram] and teenage depression and suicide will have a huge impact on regulatory/political pressure on us going forward . . . I'm worried that none of this is – yet – being reflected in [Zuckerberg's] decision making [sic] on [staffing]."

41

221. Clegg was not alone—other members of Meta's senior leadership team were also becoming increasingly alarmed.

222. For instance, following significant media coverage of Meta platforms' harms to young users, Meta's VP of Research emailed Clegg to share, "I feel even more convinced that we need to make more progress on well-being on the product side."

223. Similarly, in an October 2021 exchange about Clegg's well-being recommendation (to which Zuckerberg still had not responded), Mosseri complained, "I'm really worried about this . . . we've been talking about this for a long time but have made little progress."

224. Meta's VP of Product Management agreed with Mosseri, observing that Meta's "biggest gap is getting [Meta's] research into product roadmaps. We got 0 new well-being funding for 2022."

225. Meta's VP of Product Management reiterated the same with other Meta employees: "We've made a lot of progress on research . . . We've not made a lot of progress on getting the research into product."

226. In November 2021, Clegg sent an email following up on his August 2021 correspondence to which Zuckerberg had failed to respond. In the follow-up email, Clegg underscored that product investment is "important to ensure we have the product roadmaps necessary *to stand behind our external narrative* of well-being on our apps."

227. In other words, as Clegg told Zuckerberg, the Meta's external well-being "narrative" was inconsistent with Meta's actual financial commitment to that issue.

228. Zuckerberg, "the only non middle manager at Meta" as another Meta executive described him, was ultimately responsible for this discrepancy as he was the ultimate decision maker for Meta.

42

229.    According to another executive, while "most companies are 'feudal' in their structure—nesting minor fiefdoms," Meta is not. Instead, Meta is "an absolute dictatorship" run by Zuckerberg.

ii.    Meta Limited Internal Access to Documents Showing Instagram's Harms

230.    As described above, Meta never publicly disclosed: (1) the internal research findings showing the harm Instagram caused its users; or (2) Meta's decision-makers' refusal to invest in recommended solutions to known problems.

231.    To the contrary, Meta took affirmative steps to hide its internal research from the public, including from Oklahoma consumers.

232.    As Meta's products, including Instagram, faced growing scrutiny over time, Meta locked down access to internal research findings.

233.    For instance, on August 27, 2021—shortly after Meta learned of The Wall Street Journal's forthcoming article—one Instagram research manager noted that Meta was "locking down access to some of the extra sensitive pieces of work."

234.    The same manager subsequently instructed a research colleague to "make sure that any of our shareable deliverables or insights docs that you own on the mental well-being space are locked down."

235.    Similarly, on October 20, 2021, a senior Meta well-being researcher complained about a new policy requiring Meta's Communications team to review research findings even before they could be shared *internally*.

236.    A colleague sympathized with the senior researcher's grievance and observed that if internal research "needs to be sanitized to share with [internal] people that need to know (i.e., the people in focused, closed groups) then we've got a big problem."

43

237.    The colleague continued, bemoaning the way a Communications team employee had sanitized their research findings before internal circulation. The colleague explained that the communications team "took issue with language describing a finding as applying to a general population instead of just survey responders . . . *The discussion that followed left [a second colleague] feeling that [Meta] wouldn't want us to do that so that [Meta] could more easily dismiss inconvenient findings. This is a huge moral hazard, in my opinion.*"

238.    True to form, Meta also restricted access to the BEEF survey results in the latter half of 2021.

239.    As one Meta employee observed on September 30, 2021, "[t]he results of BEEF . . . are only being shared in private and select groups, to avoid leaks. Sad new world." According to the same employee, Meta narrowed BEEF survey result access to a "66-person secret group."

240.    By 2021, one PhD-level researcher compared Meta's messaging strategy to that of Big Tobacco. After Meta tried to downplay Instagram's role in causing mental health harms in the wake of the Haugen disclosures, the researcher emailed colleagues explaining that:

> Pre-[Meta] I spent a lot of time working on public health and environmental issues, and this sounds eerily similar to what tobacco companies and climate change deniers say. Uncertainty/doubt is a key component of the scientific method, but it can also be weaponized to push back on critics (e.g., ' . . . but this one scientist thinks cigarettes don't cause cancer,' 'we need more research to know for sure whether climate change is man made,' 'evolution is just a theory,' etc etc) . . . [W]hen we use language like this it puts us in very bad company.

241.    On information and belief, Meta's internal culture of secrecy was designed to keep consumers and policymakers in the dark about the harm Meta was causing its users, including Instagram users.

iii.    Meta Did Not Disclose Its Knowledge That Instagram's Cosmetic Surgery Effect Selfie Filters Were Especially Harmful to Adolescents

44

242. The decision-making behind Instagram's cosmetic selfie filters illustrates Meta's culture of deception.

243. Upon information and belief, by 2017, Meta believed that it was losing users and content creators to rival social media platforms, such as Snapchat.

244. Meta staff concluded that "face filters are viewed as the key differentiator to keep [content creators] using Snapchat—in particular very large talent is eager for a simple beauty filter to help them be more comfortable to put their face on camera."

245. Shortly thereafter, Meta worked to integrate augmented reality filter effects into Instagram.

246. For example, an internal Meta presentation dated February 27, 2018, describes the "strategic goal" of integrating augmented reality filter effects into the Instagram platform "to see if [augmented reality] effects can get strong product market fit . . . by tapping into [Instagram's] teens community and cultural moments."

247. That "strategic goal" was intended to benefit "Instagram, Teens, and Partners" in specific ways. For Instagram's part, integrating augmented reality filter effects would "[i]ncrease [c]amera [e]ngagement in order to drive more sharing" and "[b]uild a daily behavior by giving [t]eens reasons to check the camera everyday [sic] though scalable new content."

248. In other words, these camera filters would increase user engagement—and consequently, profit—on Meta platforms.

249. But by 2018, some Meta staff were already wary that augmented reality filters may harm users. They acknowledged a "growing body of research that social media may be driving significant increases in rates of anxiety and depression, esp[ecially] among teenage women."

250. As one Meta staffer explained, "[t]his is a hard issue to navigate because I know there is a lot of competitive pressure and a lot of market demand for filters that go much more directly into the beautification space. And if we test any of these things, they will undoubtedly perform well. But just because people like and want something in the short term doesn't mean it's healthy for them."

251. Consequently, in October 2018, Meta staff commissioned "a researcher and licensed psychologist at Duke who specializes in eating disorders and body image issues among adolescents and adults" to undertake a literature review titled, "Consequences and Implications of Selfie Manipulation on Well-Being."

252. Meta's commissioned study of the existing scientific literature found:

An analysis of the costs and benefits of editing selfies and viewing manipulated photos indicate the risks far outweigh the benefits. Research to date suggests these behaviors exacerbate risk and maintenance of several mental health concerns including body dissatisfaction, eating disorders and body dysmorphic disorder . . . Data also indicates that editing selfies may have a paradoxical effect with regards to social connection. Rather than increasing acceptance, editing photos may actually increase social rejection . . . Rather than bringing people together, selfie manipulation tools risk propagating unrealistic standards of beauty that are cross-culturally harmful and divide more than they unite.

253. Meta's decision-makers disregarded the literature review's warning and implemented cosmetic selfie filters on the Instagram platform. But in mid-October 2019, Meta received harsh public rebuke from "press and mental health experts" who observed that certain selfie filters available on the Instagram platform promoted plastic surgery, raising mental health concerns.

254. Internally, Meta employees referred to this as a "PR fire" that included "negative press coverage, questions from regulators, and growing concern from experts."

255. Based on that public pressure—and approximately eleven months after receiving unequivocal warnings from the literature review that it commissioned—Meta installed a set of *interim* policies banning augmented reality filters that promote cosmetic plastic surgery.

256. After installing these interim policies, Meta devoted significant thought to its long-term position regarding these augmented filters.

257. For example, a subsequent Meta internal presentation notes, "[i]ndependent experts we consulted from around the world . . . generally agree that Cosmetic Surgery Effects raise significant concerns related to mental health and wellbeing, especially for teenage girls." The presentation recommended "continuing the ban and erring on the side of protecting users from potential mental health impacts."

258. In November 2019, Meta staff formally submitted a long-term policy proposal to the decision-makers: "Reject cosmetic effects that change the user's facial structure in a way that's only achievable by cosmetic surgery for the purposes of beautification (in a way that cannot be achieved by makeup)." The proposal clarified, "[t]his *does not apply* to effects that change a user's facial structure for the purpose of turning the user into a character or animal."

259. Meta's decision-makers ignored this recommendation.

260. On November 14, 2019, Andrew Bosworth—then, Meta's VP of Augmented Reality and Virtual Reality—opposed the proposal arguing that maintaining the ban would only "move [users] to other apps which aren't likely to be as restrained."

261. A day later, Instagram's Head of Public Policy questioned Bosworth's perspective. She noted that the "strong recommendation" to "disallow[] effects that mimic plastic surgery" was made after consulting with Meta's communications, marketing, and policy teams—as well as engagement "with nearly 20 outside experts and academics."

47

262. Instagram's Head of Public Policy added, "we're talking about actively encouraging young girls into body dysmorphia . . . the outside academics and experts consulted were nearly unanimous on the harm here."

263. Two days later, a second Meta staffer likewise challenged Bosworth's viewpoint: "[T]he argument that this decision [to prohibit cosmetic surgery selfie filters] might move people into other apps doesn't carry weight with me [i]f it means we're not setting a good example/being a good steward for young people."

264. On March 30, 2020, Sandberg also expressed support for maintaining Meta's ban on cosmetic surgery effect filters: "I really hope we can keep the ban since we already have it … Let's not break something that isn't already broken."

265. Shortly thereafter, the question of "whether [Meta] should continue, modify, or lift the temporary ban on Cosmetic Surgery [augmented reality] Effects" was elevated to Mark Zuckerberg. Zuckerberg, citing his belief that the ban "felt paternalistic," decided to lift the ban.

266. Later that week, a senior Meta staffer memorialized her disagreement with Zuckerberg's decision, stating "I respect your call on this and I'll support it, but want to just say for the record that I don't think it's the right call given the risks . . . I just hope that years from now we will look back and feel good about the decision we made here."

267. In April 2021, several Meta staffers were still reeling from Zuckerberg's decision. Reacting to an article that referred to social media's widespread use of augmented reality filters as "a mass experiment on girls and young women," a Meta staffer remarked, "[t]his makes me so sad to read. Especially knowing how hard we fought to prevent these on [Instagram]."

48

268.    A second Meta staffer replied, "I know, it's pretty dispiriting to think about. And the fact that we have no idea what the long-term effects will be for this generation that has grown up comparing themselves to something that's . . . totally fake."

269.    The first staffer responded: "Given all the continued coverage on the impact of beauty filters on youth, I'd want us to consider age-gating these effects to [under-18] accounts."

270.    Upon information and belief, Meta never age-gated cosmetic selfie filters on its platforms—and the platform feature remains accessible to Adolescents to this day.

271.    Upon information and belief, Meta never publicly disclosed its findings that these effects were harmful to users, a material omission that misled consumers and influenced consumers' decision-making about their use of Instagram.

## 2.    Meta Promoted Misleading Metrics About the Incidence of Harm on Instagram

### i.    Meta's Community Standards Enforcement Reports Vastly Understate the Incidence of Harmful Content and Experience on Instagram

272.    Through public representations, Meta creates the impression that Instagram is a safe platform on which harmful content is rarely encountered.

273.    For example, Meta broadcasts that message through its Community Standard Enforcement Reports ("the Reports"), which Meta publishes quarterly on its online "Transparency Center" and amplifies through press releases.

274.    The Reports describe the percentage of content posted on Instagram that Meta removes for violating Instagram's community standards. Meta often refers to that percentage as its "prevalence" metric.

275.    Through Report-related talking points, Meta directed its employees to tout the "prevalence" metric as "the most important measure of a healthy online community."

49

276.    The Reports create the impression that because Meta aggressively enforces platform community standards—thereby reducing the "prevalence" of community-standards-violating content—Instagram is a safe product that only rarely exposes users (including Adolescents) to harmful content.

277.    But this is a false equivalency intended to at least sow confusion or, at most, outright mislead. As Meta well understands, the "prevalence" of standards-violating content, which is often quite low, is not the same as the *actual* "prevalence" of harmful content, which is rampant on Instagram (to say nothing of the harmful effects of the compulsive use of Instagram that the Defendants have so successfully encouraged).

278.    Notably, Meta drafted the "community standards," and has incentives to design those standards narrowly so that they are rarely violated.

279.    For example, the 2019 third quarter Report touts Meta's "[p]rogress to help keep people safe." Likewise, the 2023 second quarter Report states that "we publish the Community Standards Enforcement Report . . . to more effectively track our progress and demonstrate our continued commitment to making . . . Instagram safe."[28]

280.    These representations—publicly accessible on Meta's online Transparency Center—create the impression that Meta is disclosing all it knows about the safety of Instagram and the risks of potential harm that exists on its platform. In other words, Meta posts these reports to its online Transparency Center so that anyone who visits the site will believe that Adolescents are unlikely to harmed by using Meta's platform.

281.    Indeed, documents show that Meta intended the Reports to create that exact (mis)understanding.

---

[28] *See Community Standard Enforcement Report, Q2 2023 Report,* Meta Transparency Center (Aug. 2023) *(available at* https://transparency.fb.com/data/community-standards-enforcement/).

50

282.    In March 2021, Meta conducted an internal Meta "Company Narrative Audit" that suggested ways the company could improve its standing with the public—and with consumers, more specifically. The audit identified several "narratives" the company should attempt to combat the narratives such as "[Meta] allows hateful and harmful content to proliferate on its platform."

283.    To counteract the narrative, the audit suggests that Meta should publicize that: "Every three months we publish our Community Enforcement Standards Report to track our progress and demonstrate our continued commitment to making Facebook and Instagram safe."

284.    Consistent with this effort, internal communications show that Meta encouraged employees to use the Reports as an external "measure for platform safety" that "illustrate the efforts we are making to keep our platforms safe."

285.    But the impression that the Reports create—that Meta platforms are safe and only rarely display harmful content—is false and misleading.

286.    For example, Meta's 2021 third quarter Report states that on Instagram, "less than 0.05% of views were of content that violated our standards against suicide & self-injury." That representation created the impression that it was very rare for users to experience content relating to suicide and self-injury on Instagram.

287.    But Meta's contemporaneous internal BEEF survey data showed that during 2021, 6.7% of surveyed Instagram users had seen self-harm content within the last seven days. For users between 13–15 years of age, 8.4% had seen content relating to self-harm on Instagram within the last seven days.

288.    Thus, the frequency with which users encounter self-harm-related content on Instagram vastly exceeded the impression Meta created through its Reports.

289. A similar discrepancy may be seen in Meta's measurement of bullying and harassing content.

290. For example, the third quarterly Report of 2021 stated that "we estimate between 0.05% to 0.06% of views were of content that violated our standards against bullying & harassment [on Instagram]." This representation created the impression that it was very rare for users to observe or experience bullying or harassment on Instagram.

291. Again, Meta's contemporaneous internal user survey data told a different story: Among surveyed Instagram users, 28.3% witnessed bullying on the platform within the last seven days and 8.1% were the target of bullying on the platform within the last seven days.

292. Among 13-15-year-olds, 27.2% reported witnessing bullying within seven days. Among users aged 16-17, that figure was 29.4%.

293. When asked whether they had been the target of bullying on Instagram within the last seven days, 10.8% of 13-15-year-olds said yes.

294. Similarly, and contrary to the 2021 third quarter Report's representation that harassment on Instagram was rare, Meta's contemporaneous internal survey showed that 11.9% of all survey respondents said they had received unwanted advances on Instagram within the last seven days.

295. Among 13-15-year-olds, 13.0% reported that they had received unwanted advances within the last seven days. Among 16-17-year-olds, that figure was 14.1%.

296. In other words, contrary to the impression the Reports created, Instagram users in general—and Adolescents in particular—regularly encounter content related to self-harm, bullying, and harassment on Instagram. Through its Reports, Meta affirmatively misrepresented the actual prevalence of such harms.

52

### ii.    Meta's Executive leadership Knew the Reports Misled Consumers

297.    Meta's leadership team understood the discrepancy between Meta's public Reports and Meta's internal survey results.

298.    On October 5, 2021, Bejar—then a contractor for Meta and formerly Meta's Director of Site Engineering—emailed Zuckerberg, Sandberg, Cox, and Mosseri voicing concerns that "there was a critical gap in how [Meta] as a company approach[es] harm."[29]

299.    Bejar proposed that the company shift the focus of its public communications away from the "prevalence" of community standards violations, towards a measure (like the BEEF surveys)[30] that reflected the true scope of harmful content encountered on Instagram.[31]

300.    Meta's senior Leadership did not respond to Bejar. In fact, Zuckerberg, with whom Bejar worked directly for several years, declined to respond to Bejar's email. Bejar has stated that he could "not think of an email that I sent to Mark [Zuckerberg] during my time [at Meta] that he didn't read or respond to."[32]

301.    Undeterred, Meta continued to issue and publicize the Reports—even though Meta's leadership team knew the Reports vastly under-represent the volume of harmful content on Instagram, and despite Bejar's pleas.

302.    During the multistate investigation, Bejar testified that Meta adopted and maintained this strategy to mislead the public.

---

[29] **Ex. 1**, Bejar Trans., at 236:16-290:14.
[30] *Id.*
[31] *Id.*
[32] *Id.*, at 291:7-17.

303.    When asked if he believed "that Mr. Zuckerberg and other company leaders focused on the Prevalence metric because it created a distorted picture about the safety of Meta's platforms," Bejar testified "I do."[33]

304.    When asked if he thought "Mr. Zuckerberg's public statements about prevalence created a misleading picture of the harmfulness of Meta's platforms," Bejar testified "I do."[34]

305.    And when asked if he was "aware of any instances where the company, in [his] view, minimized the harms users were experiencing on Meta's platforms," Bejar testified: "Every time that a company spokesperson in the context of harms quotes Prevalence statistics I believe that is what they are doing, that they're minimizing the harms that people are experiencing in the product."[35]

306.    Meta issued the Reports and made other public representations in order to downplay the harmful experiences that are widespread on Instagram—particularly for Adolescents.

### 3.    Meta Deceived Consumers by Promoting "Time Spent" Tools Despite Known Inaccuracies

307.    For years, Meta has affirmatively deceived consumers by promoting and maintaining inaccurate time-tracking tools on Meta platforms.

308.    On August 1, 2018, Meta announced "new tools to help people manage their time on Facebook and Instagram." The announcement touted platform-specific activity dashboards, daily use reminders, and a push notification-limiting tool engineered "based on collaboration and inspiration from leading mental health experts and organizations, academics, [Meta's] own extensive research and feedback from [Meta's] community."[36]

---

[33] *Id.*, at 200:16-201:13.
[34] *Id.*
[35] *Id.*, at 291:7-17.
[36] *See* Ameet Ranadive and David Ginsberg, *New Tools to Manage Your Time on Facebook and Instagram,* Meta Newsroom (Aug. 1, 2018) (*available at* https://about.fb.com/news/2018/08/manage-your-time/).

309.    In that announcement, Meta acknowledged that it has "a responsibility to help people understand how much time they spend on [Meta] platforms so they can better manage their experience." Meta stated that it hopes "that these tools give people more control over the time they spend on our platforms and also foster conversations between parents and teens about the online habits that are right for them."[37]

310.    Through these public statements and others, Meta led Oklahoma consumers and parents to believe they could rely on Meta's so-called "Time Spent" tools to track and manage the time spent on Instagram in a meaningful, accurate way.

311.    That representation was false. By March 2020, Meta knew that its Time Spent data was materially flawed.

312.    As one Meta staffer observed at the time, "[o]ur [Time Spent] data as currently shown is incorrect. It's not just that Apple / Google have better data. Ours is wrong. Far worse. *We're sharing bad metrics externally* . . . The reason this is relevant is we vouch for these numbers. Any day they're out there is a legal liability."

313.    By the middle of 2020, Instagram's team charged with decommissioning (or at Meta's refers to it, "unshipping") platform features recommended that Meta's Time Spent tools should be removed from Meta's platforms.

314.    But Meta did not follow that recommendation because the "Time Spent" tool was a key part of Meta's message to users that Instagram was a trustworthy platform where the risks of addiction were low.

315.    For instance, when she learned about the effort to remove the Time Spent tools, Instagram's Head of Policy feared that the removal of inaccurate Time Spent tools would strip

---

[37] *Id.*

Meta of its "biggest proof point" on "tech addiction/problematic use." Consequently, she advocated that the Time Spent tools should remain in place, despite their inaccuracy:

> *[T]he time spent dash[board and] end of feed notification is the biggest proof point we have on tech addiction/problematic use* and the tool with the most positive sentiment from our mental health stakeholders—there's no product work we've done in the last four years that comes close and we wouldn't have the credibility we now have in the social comparison/mental health parent space had we not launched this . . . In order to land this unship successfully we would need to land the why, and without doing so we would lose significant credibility with our policy and mental health stakeholders . . . I don't think that's going to land well without having something that addresses the underlying issue around problematic use.

316.    Internal resistance to the removal of Time Spent tools continued in the latter half of 2020, as users spent more time on Meta's platforms during the COVID-19 pandemic. For example, in July 2020, Meta's Product Marketing and Communications teams told colleagues that Meta should not remove the inaccurate Time Spent tools because:

- "Time spent is a bigger concern due to COVID/spending more time online."

- "[Meta] just deprioritized the mental health team, so no new or upcoming [mental health-promoting] features to point to here."

- "[Facebook] launched their v2 time spent tool on iOS in Q2 (Android coming in Q3) and got decent press around the re-launch."

- "Upcoming moments make the market environment sensitive in this area (suicide prevention day (sept), world mental health day (oct)) and there is concern that back-to-school will spark new issues in market perception due to the majority being online/remote learning so time spent online will likely be top-of-mind for many."

317.    In other words, Meta's Product Marketing and Communications teams preferred to maintain the façade of Meta's Time Spent tools because the truth—that Meta was not actually providing any meaningful, accurate tools to help users or parents combat or reduce compulsive use—would undermine Meta's business interests and public "sentiment."

56

318.    By October of 2020, internal momentum to discontinue Meta's inaccurate Time Spent tools was successfully stymied.

319.    In the words of one Meta employee who originally advocated for the removal of inaccurate Time Spent tools: "I don't think we can touch [the Time Spent tool] for months, maybe even more. The regulatory and brand risk from removing our only addiction-related features outweighs . . . the wins around user trust in the data from the few users who use it."

320.    More than a year after recognizing the Time Spent tools' inaccuracy, Meta continued publicly touting the features.

321.    On information and belief, Meta regularly promoted its "Time Spent" tool as an accurate and useful way for users to control their use of Instagram, even when it knew that the "Time Spent" tool delivered inaccurate metrics.

322.    Meta made these representations to build trust with consumers and parents that Meta's Time Spent tool would help users (particularly young users) manage their time on Instagram, even though Meta knew that tool was broken. In this way, Meta won public trust and sentiment by deceiving the public about the utility of its core addiction-mitigation feature.

## 4.    **Through Public Misrepresentations, Meta Leads the Public to Believe That Instagram is Safe for Adolescents**

323.    The Time Spent episode is not the only time Meta has prioritized winning trust over telling the truth. To the contrary, Meta has repeatedly misrepresented facts about its business to convince consumers and their parents that Meta can be trusted to keep Adolescents safe on Instagram.

### i.    Meta Created the False Impression That It Restricts Adolescents from Accessing Harmful Content on Instagram

324.    Through express representations, Meta cultivated the impression that it protects

young users from harmful or inappropriate content on Instagram.

325. For example, in the opening statement to his Congressional testimony in December 2021, Adam Mosseri stated "We've put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 18" on Instagram.

326. Antigone Davis—Meta's Global Head of Safety—made the same representation in prepared remarks to Congress in September 2021.[38]

327. During subsequent questioning from senators, Davis explained that "[w]hen it comes to those between 13 and 17, we consult with experts to ensure that our policies properly account for their presence, for example, by age-gating content."[39] Davis added, Meta does not "allow young people to see certain types of content. And we have age gating around certain types of content."[40]

328. Davis also specifically testified that Meta does not "direct people towards content that promotes eating disorders."[41]

329. But internal documents reveal Meta's knowledge that Adolescents regularly encounter content on Meta's platforms that is not age appropriate—and that Meta's platforms do, in fact, push certain Adolescents toward content that promotes eating disorders.

330. In fact, a report that Davis herself authored less than a year before her testimony contradict the representations she made to Congress (and the public). Titled "Child Safety: State of Play," Davis's October 2020 report contains many alarming findings regarding the lack of protections for young users on Instagram.

---

[38] *See Facebook Head of Safety Testimony on Mental Health Effects: Full Senate Hearing Transcript*, Rev (Sept. 30, 2021) *(available at https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript)*.
[39] *Id.*
[40] *Id.*
[41] *Id.*

331.    For example, according to that report, Instagram had "minimal child safety protections" that were needed to prevent "Child Sexual Exploitation."

332.    On the topic of "Age Assurance/Appropriateness" on Instagram—a key feature of Davis's testimony—Davis's report showed that Instagram's "vulnerabilities" included "U18 enforcement." More specifically, Davis's report noted that Instagram's "age gating relies on either stated age or weak age models; lack[s] checkpoint." The same slide identified "content" as an additional "[v]ulnerability" for Instagram, due to the presence of "inappropriate/harmful content and experiences for minors." This slide concluded that for these topics, "there is work happening in this area but not resourced to move quickly."

333.    A later slide observed Instagram's significant "vulnerabilities" regarding users' well-being. It found that "core product features connect to challenging societal issues" such as the "objectification of women (e.g. [augmented reality] face and body altering filters), competitive social comparisons (e.g. likes and comments) and anxiety/[fear of missing out] (e.g. notifications)." That slide also noted that Instagram was "vulnerable" because it had difficulty "calibrating for content impact on well-being (e.g.[,] eating disorder content and gender-based hate speech)."

334.    Other internal documents demonstrate that Meta did not meaningfully improve Instagram's safety or age-appropriateness by the time Davis testified in September 2021.

335.    For instance, according to Meta's internal findings from October 2021 (just *after* Davis's testimony), only 2% of content that young users encounter on Meta's platforms is "age appropriate" or "the sort of content we would like to promote to teens."

336.    And, in contrast to Davis's testimony, Meta's internal studies show that Instagram disproportionately directs teen girls to negative appearance comparison-promoting content—

59

content that Meta knows promotes eating disorders. For example, a June 2021 internal study shows that on Instagram "approximately 70% of teen girls see 'too much' sensitive content," *i.e.,* content that makes them "often feel worse about themselves." And another June 2021 internal study showed that "roughly 1 in 5 piece pieces of content" teen girls see is "associated with more negative appearance comparison."

337.    As these examples show, through Mosseri and Davis's testimony, Meta affirmatively misled the public about the efficacy of Meta's efforts to protect young users from harmful content and/or to deliver age-appropriate experiences on Instagram. These are material misrepresentations, as reasonable consumers would be less likely to use a platform (or to allow young users in their care to use a platform) that exposes users to age-inappropriate or harmful content.

### ii.    Meta Created the False Impression That It Does Not Prioritize Time Spent

338.    To downplay concerns that Instagram is addictive, Meta has repeatedly created the public impression that it does not prioritize increasing users' time on Instagram. To create that impression, Meta's executives claimed that it does not internally measure success in terms of the time users spend on Meta's platforms or otherwise encourage employees to pursue that goal.

339.    For example, in October 2019, Mark Zuckerberg publicly stated that Meta does not allow Meta "teams [to] set goals around increasing time spent on [Meta's] services."

340.    Similarly, in October 2021, Sheryl Sandberg represented that the company does not "optimize [its] systems to increase amount of time spent" and that Meta "explicitly do[es]n't give [its] team goals around time spent."

341. Meta makes representations like these to garner trust: it wants the public (including consumers and parents) to believe that it does not measure success in terms of time spent to dispel the notion that it intentionally fuels compulsive use of Meta's products.

342. But Meta's representation that it does not set goals based on time spent is false.

343. For instance, on December 28, 2015, Zuckerberg instructed that Meta should aim to increase the time that Instagram users spend on the platform by 10% within the next five years.

344. Similarly, an internal email to Instagram's co-founders lists "emphasis on driving time spent" among the company's "[k]ey [t]hemes" for the first half of 2016.

345. As another example, an internal Meta presentation titled "2017 Teens Strategic Focus" explicitly describes Meta's 2017 "Top-Line Goals" for the first half of 2017, which was "shared with Zuck." The first "Top Line Goal" is to "grow teen time spent."

346. On information and belief, Meta continues to work to increase users' time spent on Instagram even to this day.

347. Thus, by claiming that it did not set goals based on time spent, Meta affirmatively misled the public—including Oklahoma consumers and parents—about Meta's motivations and internal business practices. This is a material misrepresentation, as reasonable consumers (and the parents of Adolescents) would be less likely to trust a platform that works to capture ever-increasing shares of users' time.

### iii. Meta Created False Impressions That It Does Not Place a Monetary Value on Adolescents

348. In a similar vein, Meta deceptively led the public to believe that it does not place a monetary value on Adolescents' use of Meta platforms. Meta created that impression it does not discuss its youngest users in terms of their financial value to the company.

349. For example, during Antigone Davis's September 2021 Congressional testimony, Senator Amy Klobuchar asked Davis for the monetary value that Meta places upon a young user's lifetime use of Meta products.

350. Davis responded, "That's not how we think about building products for young people . . . It's just not the way we think about it."

351. Through Davis's testimony, Meta led the public to believe that it does not place a monetary value on Adolescents' use of Meta's platforms.

352. But Meta's internal correspondence demonstrates that Davis's response to Senator Klobuchar was inaccurate and misleading.

353. For instance, an internal email from September 2018 illustrates that Meta plainly discusses the financial value that Adolescents represent to the company. According to Meta, "*The lifetime value of a 13 [year old] teen is roughly $270 per teen*."

354. Consequently, through Davis's testimony, Meta affirmatively misled the public— including Oklahoma consumers—about whether the company places a monetary value upon young users' lifetime use of Meta's products. This is a material misrepresentation, as reasonable consumers (and especially the parents of Adolescents) would be less likely to trust a platform that calculates the monetary value that the platform may extract from an Adolescent's lifetime engagement.

        iv.    Meta Created the Misleading Impression That It Was Not Restricting Access to Internal Research Findings and that it Used Its Internal research to Improve Produce Safety

355. Through Congressional testimony, Meta deceptively led the public to believe that it had not changed its internal data and research access policies in response to The Wall Street Journal's 2021 coverage of Meta's internal research findings. Meta wanted to create that

impression so consumers and parents would believe that the company's well-being research was widely available internally and that the company had no reason to lock down internal information about Instagram's mental health impacts.

356.    During Davis's September 2021 Congressional testimony, Senator Marsha Blackburn asked Davis "how are you restricting access to data internally? Have your policies changed since The Wall Street Journal articles [by Jeff Horwitz describing the internal Meta research shared by Frances Haugen]?"[42]

357.    Davis succinctly responded, "Senator, not that I am—not that I'm aware of certainly."[43]

358.    Through Davis's testimony, Meta led the public to believe Meta did not change its internal access policies—such as restricting internal access to data and research—following The Wall Street Journal's coverage of the internal Meta research shared by Frances Haugen.

359.    But in fact, as described in detail in Section C.1. ii. above, in reaction to Haugen's public disclosures (which led to Davis's Congressional testimony), Meta methodically locked down internal access to well-being related data and research.

360.    To briefly restate evidence described above, in August 2021—shortly after Meta learned of The Wall Street Journal's forthcoming journalism—one Instagram research manager noted that the company was "locking down access to some of the extra sensitive pieces of work."

---

[42] *See Facebook Head of Safety Testimony on Mental Health Effects: Full Senate Hearing Transcript,* Rev (Sept. 30, 2021) *(available at https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript).*
[43] *Id.*

361.    The same manager subsequently instructed a research colleague to "make sure that any of our shareable deliverables or insights docs that you own on the mental well-being space are locked down."[44]

362.    Consequently, through Davis's testimony, Meta affirmatively misled the public—including Oklahoma consumers—about whether the company internally restricted access to data and research following The Wall Street Journal's coverage of Meta's internal findings. This is a material misrepresentation, as reasonable consumers (and parents of Adolescents) would be less likely to trust a platform that undertakes affirmative steps to shield from disclosure internal information about the platform's "mental well-being" impacts.

363.    Similarly, through Congressional testimony, Meta deceptively led the public to believe that the company regularly uses internal research findings to inform safety-oriented product improvements. Meta created this impression so consumers, parents, and guardians would believe that the company used its troubling internal research findings to improve the safety of its platforms.

364.    During Davis's September 2021 Congressional testimony, Senator Klobuchar asked Davis: "What specific steps did you . . . take in response to your own research [into Instagram users' body image issues] and when?"[45]

365.    Davis responded: "Senator Klobuchar, I don't know that I'll be able to give you exact dates, but what I can tell you is that *this research has fueled numerous product changes.*[46]

366.    Similarly, during Mosseri's December 2021 Congressional testimony, Senator Ted

---

[44] *Id.*

[45] *See Facebook Head of Safety Testimony on Mental Health Effects: Full Senate Hearing Transcript,* Rev (Sept. 30, 2021) *(available at https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript).*

[46] *Id.*

Cruz asked Mosseri: "How did you change your policies as a result of [Meta's internal research into Instagram users' suicidal thoughts] to protect young girls?"[47]

367.    Mosseri responded: "Senator, I appreciate the question. We use research to not only change our policies, but *to change our product on a regular basis*."[48]

368.    Through Davis and Mosseri's Congressional testimony, Meta led the public to believe Meta regularly uses internal research findings to improve product safety.

369.    But in fact, as described in detail in Section C.1.i. above, members of Meta's leadership—including Mosseri—acknowledged the company's failure to translate research findings into meaningful product changes (1) shortly after Davis's testimony; and (2) in the months after Davis's testimony and preceding Mosseri's testimony.

370.    To briefly restate the evidence detailed above, in October 2021—just two months before Mosseri's testimony—a senior Meta employee explicitly told Mosseri that Meta had "*not made a lot of progress on getting the research into product*."

371.    Around the same time, Mosseri complained about Meta's failure to translate research findings into product safety improvements: "I'm really worried about this . . . we've been talking about this for a long time but have made little progress."

372.    And in November 2021—just one month before Mosseri's testimony—another senior Meta employee sent an email to Zuckerberg, Mosseri, and others, underscoring Meta's outstanding need "to ensure we have the product roadmaps necessary to stand behind our external narrative of well-being on our apps."

---

[47] *See* U.S. Senate Committee on Commerce, Science & Transportation, Subcommittee on Consumer Protection, Product Safety, and Data Security, *Protecting Kids Online: Instagram and Reforms for Young Users* (Dec. 8, 2021) *(available at* https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users).
[48] *Id.*

373. Consequently, through Davis and Mosseri's Congressional testimony, Meta affirmatively misled the public—including Oklahoma consumers—about measures the company had taken (or failed to undertake) to translate troubling research findings into meaningful product safety improvements. This is a material misrepresentation, as reasonable consumers, parents, and guardians would be less likely to trust a platform that fails to deploy safety improvements to products that pose a known, mitigatable risk to users.

> v. Meta Created the Impression That Its Products Are Not Addictive Despite Meta's Internal Research Showing the Contrary

374. Through Congressional testimony, Meta deceptively led the public to believe that its platforms are not addictive, despite Meta's own internal research to the contrary.

375. In her September 2021 Congressional testimony, Davis said that Meta does not build its products to be addictive and disputed the addictive nature of Meta's products.[49]

376. Similarly, in Congressional testimony from December 2021, Adam Mosseri said, "I don't believe that research suggests that our products are addictive."[50]

377. Through Davis and Mosseri's testimony, Meta led the public to believe Meta's platforms are not addictive.

378. In fact, as described in detail in Section B above, Meta (1) knew Instagram was addictive; and (2) made decisions that facilitated addiction to Instagram long before Davis and Mosseri's misleading testimony.

---

[49] *See Facebook Head of Safety Testimony on Mental Health Effects: Full Senate Hearing Transcript,* Rev (Sept. 30, 2021) *(available at https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript).*

[50] *See* Taylor Hatmaker, *Instagram's Adam Mossieri Defends the App's Teen Safety Track Record to Congress,* TechCrunch (Dec. 8, 2021) *(available at* https://techcrunch.com/2021/12/08/instagrams-adam-mosseri-senate-hearing-teen-safety/).

379.    To briefly restate evidence described above, by September 2019, Meta knew from internal research that "[t]eens are hooked despite how [Instagram] makes them feel . . . Instagram is addictive, and time-spend on platform is having a negative impact on mental health."

380.    And after observing in May 2020 that "approval and acceptance are huge rewards for teens and interactions are the currency on [Instagram]," Meta deployed engagement-inducing platforms features, such as "[direct messages], notifications, comments, follows, likes, etc. [that] encourage teens to continue engaging and keep coming back to the app."

381.    Consequently, through Davis and Mosseri's Congressional testimony, Meta affirmatively misled the public—including Oklahoma consumers—about the addictive nature of the Instagram platform. This is a material misrepresentation, as reasonable consumers (and parents of Adolescents) would be less likely to trust an addictive platform.

## VIOLATIONS OF LAW

### COUNT I

### OKLAHOMA CONSUMER PROTECTION ACT
### 15 O.S. § 751-763
### (UNFAIRNESS)

382.    Oklahoma re-alleges and incorporates by reference all prior paragraphs of this Petition.

383.    The OCPA prohibits businesses from knowingly engaging in "unfair" trade practices, which are defined as any practice "which offends established public policy" or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." 15 O.S. § 752(14).

384.    Defendants have engaged and continue to engage in "consumer transactions" as that term is defined in the OCPA with hundreds of thousands of Oklahomans.

67

385.    By designing and deploying Instagram in a manner that induces compulsive use, the Defendants have engaged in unfair trade practices prohibited by the OCPA.

386.    Defendants designed and deployed Instagram in a manner that overwhelmed consumers' free and informed choice regarding how much time to spend on the Instagram platform.

387.    Defendants' scheme was particularly unfair as it relates to Adolescent users, who are a highly susceptible class of consumers. Indeed, Defendants designed and deployed Instagram in a manner that intentionally exploited the developmental nature of Adolescents' brains, creating an obstacle to Adolescents' free choice and causing them to spend more time on Instagram than they otherwise would.

388.    By designing and deploying Instagram in a manner that induces compulsive use, Defendants caused or are likely to cause substantial injury to Oklahoma consumers. Specifically, Defendants' unfair conduct has caused or is likely to cause significant harms to the mental health and well-being of Adolescents, who Defendants have caused to spend vastly more time on Instagram than they otherwise would.

389.    Through their conduct, Defendants have likely injured a large number of Oklahomans, including a significant number of Adolescents that have likely suffered profound and severe harms as a result of Defendants' conduct.

390.    Each instance of Defendants' unfair practices constitutes a separate violation of the OCPA.

391.    Insofar as there are positive benefits associated with Defendants' conduct, those benefits do not outweigh the harm arising out of Defendants' conduct.

## COUNT II
### OKLAHOMA CONSUMER PROTECTION ACT

## 15 O.S. § 751-763
## (DECEPTION)

392. Oklahoma re-alleges and incorporates by reference all prior paragraphs of this Petition.

393. Under the OCPA, a business engages in deceptive conduct by, either orally or through a writing, making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person." 15 O.S. § 752(13).

394. Defendants have engaged and continue to engage in "consumer transactions" as that term is defined in the OCPA with hundreds of thousands of Oklahomans.

395. As described in this Petition, Defendants have repeatedly deceived consumers through their words, conduct, silence, and action—in violation of the OCPA.

396. By making express and implied material misrepresentations about Instagram's safety, the incidence of harmful experiences on Instagram, and the efficacy of Instagram's "well-being" related platform features (such as the "Time Spent" tool), the Defendants have engaged in deceptive trade practices that are prohibited by the OCPA.

397. Defendants also engaged in deceptive conduct in violation of the OCPA by failing to disclose the harms associated with Instagram in general and with certain Instagram platform features, which Defendants knew had a harmful effect on consumers' mental health and well-being. Defendants knew the express and implied representations they were making were not true but made these representations anyway to increase consumers' engagement with Instagram.

398. Through their acts, omissions, and misrepresentations, the Defendants downplayed the risks of Instagram use and caused reasonable consumers to believe something that was false, *i.e.,* that Instagram is a safer platform than it is in reality.

69

399.   Each instance of Defendants' deceptive practices constitutes a separate violation of the OCPA.

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court:

A.  Enter judgment against each Defendant in favor of the State of Oklahoma for each violation alleged in this Petition;

B.  Issue a permanent injunction: (i) prohibiting Defendants from using platform features that Defendants know or have reason to believe cause compulsive use among Adolescents; and (ii) requiring Defendants to meaningfully and publicly disclose, on a regular basis, the risks posed by Instagram to Adolescents;

C.  Issue a permanent injunction prohibiting Defendants from engaging in deceptive acts and practices in violation of the OCPA;

D.  Order each Defendant to separately pay civil penalties to the State of Oklahoma not more than $10,000 per violation of the OCPA as provided by 15 O.S. § 761.1;

   1.  Enter judgment finding that each instance in which an Adolescent accessed the Instagram platform in the State of Oklahoma represents a distinct violation of the OCPA;

E.  Enter judgment against Defendants and in favor of the State of Oklahoma for the reasonable costs and expenses of the investigation and prosecution of Defendants' unlawful conduct, including attorney's fees, expert and other witness fees, and costs, as provided by 15 O.S. § 761.1;

F.  Award such other relief as the Courts deems necessary and proper under the circumstances.

70

**GENTNER DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

By:

Robert J. Carlson, OBA #19312
Senior Assistant Attorney General
Caleb J. Smith, OBA #33613
Assistant Attorney General
Oklahoma Office of the Attorney General
15 West 6th Street, Suite 1000
Tulsa, OK  74119
Telephone: 918-581-2885
Email:  Robert.Carlson@oag.ok.gov
Email: Caleb.Smith@oag.ok.gov

-and-

Ethan A. Shaner, OBA #30916
Deputy Attorney General
Oklahoma Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone: (405) 521-3921
Email: Ethan.Shaner@oag.ok.gov

71

## CERTIFCATE OF SERVICE

I do hereby certify that on the 16th day of November 2023, a true, correct and exact copy of the above and foregoing document was served to those parties as listed below *via*:

☐ U.S. Postal Service    ☐ In Person Delivery    ☐ Courier Service    ☒ E-Mail    ☐ Fax

Robert G. McCampbell, OBA No. 10390
Nicholas ("Nick") V. Merkley, OBA No. 20284
GABLEGOTWALS
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, Oklahoma 73102
Tel (405) 235-5500 | Fax (405) 235-2875
Email  RMcCampbell@Gablelaw.com
       NMerkley@Gablelaw.com

**COUNSEL FOR DEFENDANTS,
META PLATFORMS, INC. F/K/A FACEBOOK, INC.
AND INSTAGRAM, LLC**

Robert J. Carlson

72

# EXHIBIT 1

CONFIDENTIAL

--oOo--

CONFIDENTIAL PROCEEDINGS

EXAMINATION UNDER OATH OF ARTURO BÉJAR

Regarding Meta Platforms

Tuesday, May 16, 2023

Palo Alto, California

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5907326

Page 1

CONFIDENTIAL



Page 198

Q. In that way, do you think Mr. Zuckerberg's public statements about prevalence created a        03.09.09
misleading picture of the harmfulness of Meta's platforms?
A. I do.

03:10:09

51 (Pages 198 - 201)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL



03:56:23
Page 234

Page 236

Page 235

03:57:31

THE WITNESS: Frances Haugen's whistleblowing.

BY MR. PHELPS:

Q.  Might this been the same day as Ms. Haugen's testimony before Congress?

A.  I don't know.

Q.  Okay.  Do you know what note -- it says, "I saw the note you shared."  Do you know what note    03:59:50 you were talking about?

A.  Yes.  He posted an internal note where he was talking about all of these issues.

04:00:06

04:00:06

60 (Pages 234 - 237)

CONFIDENTIAL



**Page 238**

Q. Okay. What was your reaction to this note in -- in broad strokes before we get into it in detail?

A. I think it's misleading. And -- and it represented many of the things that I felt were driving the behavior of the company in a way that

**Page 240**

there were really not -- I mean, we'll get into it, but I think I can summarize it by saying, there's a sentence here that says, "We care deeply about issues like safety, well-being, and mental health."

So what is the well-being metric at this point? There is no well-being metric in the company at this point.

What are the safety metrics? If they care about bullying and harassment for teenagers, where are the metrics that tell you the -- and the work based around the percentage of teenagers that are telling you they're experiencing firsthand bullying and harassment? What's the content that's driving that? What are the features that make that better? Right?

"We care." What does it mean, "we care"? What does it mean we care when they talk about mental health, when I'm working on an Instagram team, and they de-prioritized the mental health work in the middle of the pandemic? Right? So what does it mean "they care about mental health"? Does it mean that he cares as a human being, or does the company actually act on these things?

And so, I read this e-mail, and I felt that it was very misleading to employees because

**Page 241**

he -- he talks about claims that don't make any sense. But if we go through them, no, actually, all those claims make a lot of sense. And I believe it's his responsibility as the leader of the company to investigate, address these claims and innovate and make these things better because that company has managed to get most of humanity on its services.

And so, great, you did that, but, like, this is -- this is the work. This is what you need to be really great at in order to provide a safe environment for teenagers, in order to create a safe environment for everybody and respectful environment for everybody.

And so, when I wrote this note, I felt that it embodied all of the gaps that I had been researching in that previous year that I tried to summarize in the e-mail I sent to him and Sheryl and Adam and -- and -- and Chris.

61 (Pages 238 - 241)

CONFIDENTIAL



Page 318

Page 320

Q.  Are you aware of any instances where the company, in your view, minimized the harms users were experiencing on Meta's platforms after you sent those e-mails?    06:12:04

A.  Every time that a company spokesperson in the context of harms quotes prevalence, statistics, I believe that is what they are doing, that they're minimizing the harms that people are experiencing in the product. Be it -- albeit somebody in the    06:12:22 communications team, I think that prevalence is not harm.

These numbers in that e-mail, that's harm. You need prevalence, but it's not reflective of the harm people are experiencing in the product.    06:12:40

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

# EXHIBIT 2

FILED - Oklahoma Secretary of State #2312726928 01/17/2019

01/17/2019   10:29 AM
OKLAHOMA SECRETARY OF STATE



SOS



39542230882

# CERTIFICATE OF QUALIFICATION
## (Foreign Corporation)

CATE

**Filing Fee: Minimum $300.00**

Oklahoma City, Oklahoma 73103
(405) 522-2520

**PLEASE NOTE:**

♦  The filing fee is a MINIMUM of $300.00.  The fee is one-tenth of one percent (1/10 of 1%) or $1.00 per $1,000.00 of the maximum amount of capital invested by such corporation; provided that the minimum fee is $300.00, and no such corporation shall be required to pay a fee on an amount in excess of its authorized capital.

♦  **ATTACHED HERETO** is a certificate issued by an authorized officer of the corporation's jurisdiction of its incorporation attesting to the corporation's organization and good standing under the laws of such jurisdiction.  This certificate is most commonly known as a Certificate of Good Standing, Certificate of Existence, or Certificate of Fact (Texas), and is usually issued by the Secretary of State's office within such jurisdiction.  This certificate **must** be dated within the last sixty (60) days.

I hereby execute the following articles for the purpose of qualifying a foreign corporation to transact business in the state of Oklahoma pursuant to the provisions of Title 18, Section 1130:

1.  Name of the corporation:

Facebook, Inc.

♦  If the legal name is not available for use in the state of Oklahoma, then a Fictitious Name Report must be attached or a resolution made by the authorized representative of the corporation duly adopting a fictitious name that is available for use.  (Title 18, Section 1141)

2.  State or jurisdiction of its formation: DE

3.  Mailing address of its principal place of business, wherever located:

| 1601 Willow Road | Menlo Park | CA | 94025 |
|---|---|---|---|
| Address | City | State | Zip Code |

4.  Registered agent for service of process in the state of Oklahoma **is** the **SECRETARY OF STATE.**

5.  **NAME** and street address of its additional registered agent for service of process in the state of Oklahoma, if any:

♦  The registered agent **shall** be an individual resident of Oklahoma **or** a domestic or qualified foreign corporation, limited liability company, or limited partnership.

| Corporation Service Company | 10300 Greenbriar Place | Oklahoma City | Oklahoma | 73159-7653 |
|---|---|---|---|---|
| Name | Street Address (P.O. BOXES ARE **NOT** ACCEPTABLE) | City | State | Zip Code |

6.  Business the corporation proposes to do in the state of Oklahoma:

♦  This statement must reflect the specific purpose of the corporation in Oklahoma.

Social media

## RECEIVED

JAN 17 2019

OKLAHOMA SECRETARY
OF STATE

(SOS FORM 0013-07/13)

7. The business which the corporation proposes to do in the State of Oklahoma is a business the corporation is authorized to do in the jurisdiction of its incorporation.

◆ This statement requires no response.

8. Assets of said corporation are $ __80,077,747,700__ and liabilities are $ __8,568,041,320__.

◆ The assets and liabilities of said corporation must be as of a date not earlier than six (6) months prior to the filing date of the certificate of qualification.

9. Corporation is organized as: (CHECK ONE)    ☒ Profit    OR    ☐ Not for Profit

10. If organized for profit, the aggregate number of its authorized shares itemized by classes, par value of shares, shares without par value, and series, if any, within any class authorized:

◆ The par value per share is a dollar ($) amount and is also used for the calculation of the total filing fee.

| CLASS | NUMBER OF SHARES | SERIES (If any) | PAR VALUE PER SHARE (Or, if without par value, so state) |
|---|---|---|---|
| Common | 5,000,000,000 | A | 0.0000 |
| Common | 4,141,000,000 | B | 0.0000 |

11. Maximum amount of capital said corporation intends and expects to invest in this state at any time during the current fiscal year: $ __0__.

◆ "Invested capital" is defined as the value of the maximum amount of funds, credits, securities and property of whatever kind existing at any time during the fiscal year in the State of Oklahoma and used or employed by such corporation in its business carried on in this state.

12. E-MAIL address of the primary contact for the registered business:

The certificate of qualification **must** be signed by the president or vice president of said corporation and attested to by its secretary or assistant secretary.

• Signed this __14ᵗʰ__ day of __December__, __2018__ by:

_____
Signature of President or Vice President

Ted Price
_____
Printed Name

Attested to by:
_____
Signature of Secretary or Assistant Secretary

Michael Johnson
_____
Printed Name

(SOS FORM 0013-07/13)



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "FACEBOOK, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TENTH DAY OF JANUARY, A.D. 2019.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "FACEBOOK, INC." WAS INCORPORATED ON THE TWENTY-NINTH DAY OF JULY, A.D. 2004.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

3835815  8300

SR# 20190197586

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202059700

Date: 01-10-19



**OFFICE OF THE SECRETARY OF STATE**

STATE OF OKLAHOMA

# CERTIFICATE OF AUTHORITY

*WHEREAS,* **FACEBOOK, INC.**

*incorporated under the laws of the State of* **DELAWARE** *has filed in the office of the Secretary of State duly authenticated evidence of its incorporation and an application for Certificate of Authority to transact business in this State, as provided by the laws of the State of Oklahoma.*

*NOW THEREFORE, I, the undersigned, Secretary of State of the State of Oklahoma, by virtue of the powers vested in me by law, do hereby issue this Certificate of Authority authorizing said Corporation to transact business in this state.*

*IN TESTIMONY WHEREOF, I hereunto set my hand and cause to be affixed the Great Seal of the State of Oklahoma.*



*Filed in the city of Oklahoma City this* 17th *day of* January, 2019.

*Secretary of State*

# EXHIBIT 3

FILED - Oklahoma Secretary of State #2312726928 05/15/2023

05/15/2023 11:11 AM
OKLAHOMA SECRETARY OF STATE



SOS



59887888002

2020 ANNUAL CERTIFICATE

## LAHOMA SECRETARY OF STATE

FACEBOOK, INC.

CORPORATION KEY:
2312726928
STATE OF DOMICILE:
DELAWARE
STATUS :
OUSTED
ANNIVERSARY DATE:
January 17th

PLEASE READ CAREFULLY. TO EXPEDITE THE FILING OF THIS FORM, DO NOT CHANGE ANY OF THE PRE-PRINTED INFORMATION OR FIGURES. IF ANY INFORMATION CONTAINED IN THIS REPORT HAS BEEN CHANGED, OR THE CORPORATION HAS CEASED DOING BUSINESS IN OKLAHOMA, IT IS IMPORTANT THAT YOU NOTIFY THIS OFFICE IN WRITING TO REQUEST THE APPROPRIATE FORM TO AMEND THE RECORDS OR TO WITHDRAW FROM THE STATE.

1.  THIS FORM is to be used for filing the annual certificate, a report of the amount of capital invested in Oklahoma by a foreign corporation pursuant to 18 O.S., § 1142.A.13. YOU MUST COMPLETE LINES 6 & 8 ON THE REVERSE SIDE OF THIS ORIGINAL FORM TO CORRECTLY DETERMINE THE FILING FEE. ALL BLANKS MUST BE FILLED IN WITH EITHER AN AMOUNT OR THE WORD "NONE".

2.  ATTACH PAYMENT TO THIS CERTIFICATE. You may wish to retain a copy for your files. MAKE ALL CHECKS PAYABLE AND DIRECT ALL CORRESPONDENCE TO:

    OKLAHOMA SECRETARY OF STATE
    421 NW 13TH STREET, SUITE 210
    OKLAHOMA CITY, OK 73103
    (405) 521- 3912

3.  WHO MUST FILE: Any corporation that has NOT paid a fee on its authorized capital. This form MUST be filed each year with the Secretary of State on the anniversary of its qualification (as shown above). It must be signed by the president, vice president, or managing officer of the corporation.
    The PENALTY for failure to file an Annual Certificate required by law is OUSTER of the corporation from doing business in the State of Oklahoma.

4.  PLEASE NOTE that the Annual Certificate is SEPARATE FROM, AND IN ADDITION TO, the Franchise Tax return which must be filed each year with the Oklahoma Tax Commission.

## RECEIVED

MAY 15 2023

OKLAHOMA SECRETARY
OF STATE

**ALL BLANKS MUST BE FILLED IN THE EITHER AN AMOUNT OR THE WORD "NONE"**

1.    0           Total authorized par value capital stock

2.    9,141,000,000    Number of authorized no par value shares

3.    457,050,000,000   No par value shares x $50.00 (Par value assigned by law 18 O.S. § 1142.A.10 for computing the filing fees only

4.    457,050,000,000   Sum of lines 1 and 3.

5.    300,000       Total amount of capital on which the corporation has credit for paying. This is an aggregate amount including the amount paid initially upon qualification and subsequently upon annual certificates. If two or more corporations have merged, the survivor is given credit for the amount of capital upon which the merging corporations have paid fees in Oklahoma, upon filing proof of the merger with the SOS.

6.    610,956       Maximum amount of capital invested by said corporation in the state of Oklahoma. This means the maximum amount of funds, credits, securities and property of whatever kind used or employed in the business carried on in the State of Oklahoma

7.  457,049,700,000   Differences between the total authorized capital and paid on credit. (Line 4 – Line 5)

8.    310,956       Total invested in excess of the amount heretofore paid on. (Line 6 – Line 5).

**FEE CALCULATION INSTRUCTIONS – complete only one.**

9.                If the amount entered on Line 8 is zero or negative, enter and attach the filing fee of $10.00 to this report.

10.   320.96       If the amount entered on Line 8 is greater than zero, compute the fee at 1/10th of 1 per cent ($1.00 per $1,000.00) on this amount plus the $10.00 filing fee.

+$500 ouster penalty
T. Turner 4/25/2023

Facebook, Inc.

_(EXACT NAME OF CORPORATION)_

BY: _____
_(President, Vice President, or Managing Officer)_

Katherine R. Kelly, Secretary
_(Please print name)_

# EXHIBIT 4

 **Help Center**

**Instagram Features**

**Manage Your Account**

**Staying Safe**

**Privacy, Security and Reporting**

**Terms and Policies**

  Community Guidelines

  Privacy Policy

 Terms of Use

  Platform Policy

  Cookies Policy

  Transparency Center

  Community Payments Terms

  Instagram Purchase Protection Policy

Terms and Policies

# Terms of Use                    Copy link

Welcome to Instagram!

These Terms of Use (or "Terms") govern your use of Instagram, except where we expressly state that separate terms (and not these) apply, and provide information about the Instagram Service (the "Service"), outlined below. When you create an Instagram account or use Instagram, you agree to these terms. The Meta Terms of Service do not apply to this Service.

The Instagram Service is one of the Meta Products, provided to you by Meta Platforms, Inc. These Terms of Use therefore constitute an agreement between you and Meta Platforms, Inc.

**ARBITRATION NOTICE: YOU AGREE THAT DISPUTES BETWEEN YOU AND US WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION AND YOU WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION. WE EXPLAIN SOME EXCEPTIONS AND HOW YOU CAN OPT OUT OF ARBITRATION BELOW.**

## The Instagram Service

We agree to provide you with the Instagram Service. The Service includes all of the Instagram products, features, applications, services, technologies, and software that we provide to advance Instagram's mission: To bring you closer to the people and things you love. The Service is made up of the following aspects:

 **Help Center**

different types of accounts and features to help you create, share, grow your presence, and communicate with people on and off Instagram. We also want to strengthen your relationships through shared experiences that you actually care about. So we build systems that try to understand who and what you and others care about, and use that information to help you create, find, join and share in experiences that matter to you. Part of that is highlighting content, features, offers and accounts that you might be interested in, and offering ways for you to experience Instagram, based on things that you and others do on and off Instagram.

- **Fostering a positive, inclusive, and safe environment.**
  We develop and use tools and offer resources to our community members that help to make their experiences positive and inclusive, including when we think they might need help. We also have teams and systems that work to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have-including your information-to try to keep our platform secure. We also may share information about misuse or harmful content with other Meta Companies or law enforcement. Learn more in the **Privacy Policy**.

- **Developing and using technologies that help us consistently serve our growing community.**
  Organizing and analyzing information for our growing community is central to our Service. A big part of our Service is creating and using cutting-edge technologies that help us personalize, protect, and improve our Service on an incredibly large scale for a broad global community. Technologies like artificial intelligence and machine learning give us the power to apply complex processes across our Service. Automated technologies also help us ensure the functionality and integrity of our Service.

 **Help Center**

Instagram is part of the Meta Companies, which share technology, systems, insights, and information-including the information we have about you (learn more in the **Privacy Policy**) in order to provide services that are better, safer, and more secure. We also provide ways to interact across the Meta Company Products that you use, and designed systems to achieve a seamless and consistent experience across the Meta Company Products.

- **Ensuring access to our Service.**
  To operate our global Service, we must store and transfer data across our systems around the world, including outside of your country of residence. The use of this global infrastructure is necessary and essential to provide our Service. This infrastructure may be owned or operated by Meta Platforms, Inc., Meta Platforms Ireland Limited, or their affiliates.

- **Connecting you with brands, products, and services in ways you care about.**
  We use data from Instagram and other Meta Company Products, as well as from third-party partners, to show you ads, offers, and other sponsored content that we believe will be meaningful to you. And we try to make that content as relevant as all your other experiences on Instagram.

- **Research and innovation.**
  We use the information we have to study our Service and collaborate with others on research to make our Service better and contribute to the well-being of our community.

## How Our Service Is Funded

Instead of paying to use Instagram, by using the Service covered by these Terms, you acknowledge that we can show you ads that businesses and

 **Help Center**

show you ads that are more relevant to you.

We show you relevant and useful ads without telling advertisers who you are. We don't sell your personal data. We allow advertisers to tell us things like their business goal and the kind of audience they want to see their ads. We then show their ad to people who might be interested.

We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Instagram. For example, we provide general demographic and interest information to advertisers to help them better understand their audience. We don't share information that directly identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us specific permission. Learn more about how Instagram ads work here.

You may see branded content on Instagram posted by account holders who promote products or services based on a commercial relationship with the business partner mentioned in their content. You can learn more about this here.

## The Privacy Policy

Providing our Service requires collecting and using your information. The Privacy Policy explains how we collect, use, and share information across the Meta Products. It also explains the many ways you can control your information, including in the Instagram Privacy and Security Settings. You must agree to the Privacy Policy to use Instagram.

## Your Commitments

In return for our commitment to provide the Service, we require you to make the below commitments to us.

 **Help Center**

we need you to commit to a few restrictions in order to be part of the Instagram community.

- You must be at least 13 years old.

- You must not be prohibited from receiving any aspect of our Service under applicable laws or engaging in payments related Services if you are on an applicable denied party listing.

- We must not have previously disabled your account for violation of law or any of our policies.

- You must not be a convicted sex offender.

**How You Can't Use Instagram.** Providing a safe and open Service for a broad community requires that we all do our part.

- **You can't impersonate others or provide inaccurate information.**
  You don't have to disclose your identity on Instagram, but you must provide us with accurate and up to date information (including registration information), which may include providing personal data. Also, you may not impersonate someone or something you aren't, and you can't create an account for someone else unless you have their express permission.

- **You can't do anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose.**

- **You can't violate (or help or encourage others to violate) these Terms or our policies, including in particular the Instagram Community Guidelines,** Meta Platform Terms and Developer Policies, **and Music Guidelines.** If you post branded content, you must comply with our Branded Content Policies, which require you to use our branded content tool. Learn how to report conduct or content in our Help Center.

 **Help Center**

... ........ ...........  ..., .........., .......,
or appeals channel, such as by making
fraudulent or groundless reports or appeals.

- **You can't attempt to create accounts or
  access or collect information in unauthorized
  ways.**
  This includes creating accounts or collecting
  information in an automated way without our
  express permission.

- **You can't sell, license, or purchase any
  account or data obtained from us or our
  Service.**
  This includes attempts to buy, sell, or transfer
  any aspect of your account (including your
  username); solicit, collect, or use login
  credentials or badges of other users; or
  request or collect Instagram usernames,
  passwords, or misappropriate access tokens.

- **You can't post someone else's private or
  confidential information without permission
  or do anything that violates someone else's
  rights, including intellectual property rights
  (e.g., copyright infringement, trademark
  infringement, counterfeit, or pirated goods).**
  You may use someone else's works under
  exceptions or limitations to copyright and
  related rights under applicable law. You
  represent you own or have obtained all
  necessary rights to the content you post or
  share. Learn more, including how to report
  content that you think infringes your
  intellectual property rights, here.

- **You can't modify, translate, create derivative
  works of, or reverse engineer our products or
  their components.**

- **You can't use a domain name or URL in your
  username without our prior written consent.**

**Permissions You Give to Us.** As part of our agreement,
you also give us permissions that we need to provide
the Service.

- **We do not claim ownership of your content,
  but you grant us a license to use it.**

 **Help Center**

Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the **Privacy Policy** and visit the Instagram Help Center.

- **Permission to use your username, profile picture, and information about your relationships and actions with accounts, ads, and sponsored content.**
  You give us permission to show your username, profile picture, and information about your actions (such as likes) or relationships (such as follows) next to or in connection with accounts, ads, offers, and other sponsored content that you follow or engage with that are displayed on Meta Products, without any compensation to you. For example, we may show that you liked a sponsored post created by a brand that has paid us to display its ads on Instagram. As with actions on other content and follows of other accounts, actions on sponsored content and follows of sponsored accounts can be seen only by people who have permission to see that content or follow. We will also respect your ad settings. You can learn more here about your ad settings.

- **You agree that we can download and install updates to the Service on your device.**

 **Help Center**

## Additional Rights We Retain

- If you select a username or similar identifier for your account, we may change it if we believe it is appropriate or necessary (for example, if it infringes someone's intellectual property or impersonates another user).

- If you use content covered by intellectual property rights that we have and make available in our Service (for example, images, designs, videos, or sounds we provide that you add to content you create or share), we retain all rights to our content (but not yours).

- You can only use our intellectual property and trademarks or similar marks as expressly permitted by our **Brand Guidelines** or with our prior written permission.

- You must obtain written permission from us or under an open source license to modify, create derivative works of, decompile, or otherwise attempt to extract source code from us.

## Content Removal and Disabling or Terminating Your Account

- We can remove any content or information you share on the Service if we believe that it violates these Terms of Use, our policies (including our **Instagram Community Guidelines**), or we are permitted or required to do so by law. We can refuse to provide or stop providing all or part of the Service to you (including terminating or disabling your access to the Meta Products and Meta Company Products) immediately to protect our community or services, or if you create risk or legal exposure for us, violate these Terms of Use or our policies (including our **Instagram Community Guidelines**), if you repeatedly

 **Help Center**

change the Service, remove or block content or information shared on our Service, or stop providing all or part of the Service if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts on us. If you believe your account has been terminated in error, or you want to disable or permanently delete your account, consult our **Help Center**. When you request to delete content or your account, the deletion process will automatically begin no more than 30 days after your request. It may take up to 90 days to delete content after the deletion process begins. While the deletion process for such content is being undertaken, the content is no longer visible to other users, but remains subject to these Terms of Use and our **Privacy Policy**. After the content is deleted, it may take us up to another 90 days to remove it from backups and disaster recovery systems.

- Content will not be deleted within 90 days of the account deletion or content deletion process beginning in the following situations:

  - where your content has been used by others in accordance with this license and they have not deleted it (in which case this license will continue to apply until that content is deleted); or

  - where deletion within 90 days is not possible due to technical limitations of our systems, in which case, we will complete the deletion as soon as technically feasible; or

  - where deletion would restrict our ability to:

    - investigate or identify illegal activity or violations of our terms and policies (for example, to identify or investigate misuse of our products or systems);

 **Help Center**

~~~~,

- comply with a legal obligation, such as the preservation of evidence; or

- comply with a request of a judicial or administrative authority, law enforcement, or a government agency;

- in which case, the content will be retained for no longer than is necessary for the purposes for which it has been retained (the exact duration will vary on a case-by-case basis).

- If you delete or we disable your account, these Terms shall terminate as an agreement between you and us, but this section and the section below called "Our Agreement and What Happens if We Disagree" will still apply even after your account is terminated, disabled, or deleted.

## Our Agreement and What Happens if We Disagree

**Our Agreement.**

- Your use of music on the Service is also subject to our Music Guidelines, and your use of our API is subject to our Meta Platform Terms and Developer Policies. If you use certain other features or related services, you will be provided with an opportunity to agree to additional terms that will also become a part of our agreement. For example, if you use payment features, you will be asked to agree to the **Community Payment Terms**. If any of those terms conflict with this agreement, those other terms will govern.

- If any aspect of this agreement is unenforceable, the rest will remain in effect.

 **Help Center**

... ....... .... ....... .. .... ..... ....., .. ....
not be a waiver.

- We reserve all rights not expressly granted to you.

**Who Has Rights Under this Agreement.**

- Our past, present, and future affiliates and agents, including Instagram LLC, can invoke our rights under this agreement in the event they become involved in a dispute. Otherwise, this agreement does not give rights to any third parties.

- You cannot transfer your rights or obligations under this agreement without our consent.

- Our rights and obligations can be assigned to others. For example, this could occur if our ownership changes (as in a merger, acquisition, or sale of assets) or by law.

**Who Is Responsible if Something Happens.**

- Our Service is provided "as is," and we can't guarantee it will be safe and secure or will work perfectly all the time. TO THE EXTENT PERMITTED BY LAW, WE ALSO DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT.

- We also don't control what people and others do or say, and we aren't responsible for their (or your) actions or conduct (whether online or offline) or content (including unlawful or objectionable content). We also aren't responsible for services and features offered by other people or companies, even if you access them through our Service.

- Our responsibility for anything that happens on the Service (also called "liability") is limited as much as the law will allow. If there is an issue with our Service, we can't know what all the possible impacts might be. You agree that we won't be responsible ("liable") for any lost

 **Help Center**

or related to these Terms, even if we know they are possible. This includes when we delete your content, information, or account. Our aggregate liability arising out of or relating to these Terms will not exceed the greater of $100 or the amount you have paid us in the past twelve months.

- You agree to defend (at our request), indemnify and hold us harmless from and against any claims, liabilities, damages, losses, and expenses, including without limitation, reasonable attorney's fees and costs, arising out of or in any way connected with these Terms or your use of the Service. You will cooperate as required by us in the defense of any claim. We reserve the right to assume the exclusive defense and control of any matter subject to indemnification by you, and you will not in any event settle any claim without our prior written consent.

**How We Will Handle Disputes.**

- Except as provided below, **you and we agree that any cause of action, legal claim, or dispute between you and us arising out of or related to these Terms or Instagram ("claim(s)") must be resolved by arbitration on an individual basis. Class actions and class arbitrations are not permitted;** you and we may bring a claim only on your own behalf and cannot seek relief that would affect other Instagram users. If there is a final judicial determination that any particular claim (or a request for particular relief) cannot be arbitrated in accordance with this provision's limitations, then only that claim (or only that request for relief) may be brought in court. All other claims (or requests for relief) remain subject to this provision.

- Instead of using arbitration, you or we can bring claims in your local "small claims" court, if the rules of that court will allow it. If you don't bring your claims in small claims court (or if you or we appeal a small claims court judgment to a court of general jurisdiction),

 **Help Center**

arbitrations under its Consumer Arbitration Rules. **You and we expressly waive a trial by jury.**

The following claims don't have to be arbitrated and may be brought in court: disputes related to intellectual property (like copyrights and trademarks), violations of our Platform Policy, or efforts to interfere with the Service or engage with the Service in unauthorized ways (for example, automated ways). In addition, issues relating to the scope and enforceability of the arbitration provision are for a court to decide.

This arbitration provision is governed by the Federal Arbitration Act.

You can opt out of this provision within 30 days of the date that you agreed to these Terms. To opt out, you must send your name, residence address, username, email address or phone number you use for your Instagram account, and a clear statement that you want to opt out of this arbitration agreement, and you must send them here: Meta Platforms, Inc. ATTN: Instagram Arbitration Opt-out, 1601 Willow Rd., Menlo Park, CA 94025.

- Before you commence arbitration of a claim, you must provide us with a written Notice of Dispute that includes your name, residence address, username, email address or phone number you use for your Instagram account, a detailed description of the dispute, and the relief you seek. Any Notice of Dispute you send to us should be mailed to Meta Platforms, Inc., ATTN: Instagram Arbitration Filing, 1601 Willow Rd. Menlo Park, CA 94025. Before we commence arbitration, we will send you a Notice of Dispute to the email address you use with your Instagram account, or other appropriate means. If we are unable to resolve a dispute within thirty (30) days after the Notice of Dispute is received, you or we may commence arbitration.

 **Help Center**

if your claims seek less than $75,000 and you timely provided us with a Notice of Dispute. For all other claims, the costs and fees of arbitration shall be allocated in accordance with the arbitration provider's rules, including rules regarding frivolous or improper claims.

- For any claim that is not arbitrated or resolved in small claims court, you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim.

- The laws of the State of California, to the extent not preempted by or inconsistent with federal law, will govern these Terms and any claim, without regard to conflict of law provisions.

**Unsolicited Material.**

We always appreciate feedback or other suggestions, but may use them without any restrictions or obligation to compensate you for them, and are under no obligation to keep them confidential.

## Updating These Terms

We may change our Service and policies, and we may need to make changes to these Terms so that they accurately reflect our Service and policies. Unless otherwise required by law, we will notify you (for example, through our Service) before we make changes to these Terms and give you an opportunity to review them before they go into effect. Then, if you continue to use the Service, you will be bound by the updated Terms. If you do not want to agree to these or any updated Terms, you can delete your account, here.

Revised: 26 July 2022

 Help Center

Yes                                    No

## Related Articles

Instagram Badges Purchase Terms

Eligibility requirements for Meta Verified businesses

Accessibility

Instagram Purchase Protection Policy

Branded Content Discovery Feature Terms for Brands

Safety Tips

About Us

API

Jobs

Terms

Privacy

from ∞ Meta                                    © 2023 Meta