# Exhibit A

2024 WL 1473942
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

IN RE: GENIUS BRANDS INTERNATIONAL,
INC. SECURITIES LITIGATION,

Ali Alavi; a Legacy Foundation, Lead Plaintiffs;
On Behalf of Themselves and All Others
Similarly Situated, Plaintiffs-Appellants,
v.
Genius Brands International, Inc.; Andy
Heyward; Robert Denton, Defendants-Appellees.

No. 22-55760
|
Argued and Submitted November
6, 2023 Pasadena, California
|
Filed April 5, 2024

Appeal from the United States District Court for the
Central District of California Dale S. Fischer, District Judge,
Presiding, D.C. No. 2:20-cv-07457-DSF-RAO

**Attorneys and Law Firms**

Raymond D. Sulentic (argued), Ex Kano S. Sams, II, and
Robert V. Prongay, Glancy Prongay & Murray LLP, Los
Angeles, California, for Plaintiffs-Appellants.

Michael L. Charlson (argued) and Elizabeth A. Matthews,
Vinson & Elkins LLP, San Francisco, California; Marisa
Antonelli, Vinson & Elkins LLP, New York, New York; for
Defendants-Appellees.

Before: William A. Fletcher and Salvador Mendoza, Jr.,
Circuit Judges, and Karen E. Schreier, [*] District Judge.

**OPINION**

MENDOZA, Circuit Judge:

On the children's show Rainbow Rangers, Rosie Redd, her
fellow Rangers, and their trusty unicorn sidekick Floof use
their superpowers to save Earth from disaster. Our judicial
power is slightly less sweeping, but today we use it to
save portions of a securities-fraud complaint from erroneous
dismissal.

In 2019, Defendant-Appellee Genius Brands International,
Inc. ("Genius"), a children's entertainment company, watched
its shares dip below the NASDAQ's minimum trading
requirement. In the months that followed, Genius scrambled
to rescue its floundering securities. According to Plaintiffs-
Appellants, Ali Alavi and A Legacy Foundation (collectively,
"the shareholders"), Genius's efforts violated Sections 10(b)
and 20(a) of the Securities Exchange Act of 1934 ("Exchange
Act") and implementing Rule 10b-5(a)–(c). They allege
that Genius fraudulently: (1) concealed its relationship with
a stock promoter, PennyStocks.com ("PennyStocks"); (2)
misstated its relationship with Austrian actor, bodybuilder,
and former California Governor Arnold Schwarzenegger;
(3) exaggerated the number of times that Nickelodeon
Jr. aired Genius's show Rainbow Rangers in a week; (4)
misrepresented that Disney or Netflix would acquire Genius;
and (5) overstated its rights to the collected works of famed
comic book author Stan Lee ("the Stan Lee Universe").

**\*2** The district court dismissed the shareholders'
complaint. [1] First, it dismissed the shareholders' Rule
10b-5(b) claim related to PennyStocks ("the PennyStocks
Claim") because the shareholders failed to adequately
allege that Genius's representations about PennyStocks
were misleading. Next, the district court dismissed the
shareholders' Rule 10b-5(b) claims related to
Schwarzenegger, the Rainbow Rangers, and the Disney/
Netflix acquisition (the "Schwarzenegger Claim," "Rainbow
Rangers Claim," and "Disney/Netflix Claim," respectively)
because the shareholders failed to allege loss causation.
Finally, the district court dismissed the shareholders' Rule
10b-5(b) claim related to Stan Lee ("the Stan Lee Claim")
when it dismissed with prejudice the complaint as a whole.

On de novo review, we conclude that the shareholders
adequately pleaded that Genius's representations regarding
PennyStocks were misleading. Additionally, we conclude
that the shareholders adequately pleaded loss causation with
respect to the Rainbow Rangers, Disney/Netflix, and Stan Lee
Claims, but not with respect to the Schwarzenegger Claim.
Accordingly, we affirm in part and reverse in part the district
court's order.

I.

Genius is a small, publicly traded company that licenses
children's entertainment. [2] Its securities trade on the

NASDAQ exchange, which imposes a minimum bid price of $1.00 per share. In 2019, Genius's share price plummeted below $1.00, prompting NASDAQ to warn Genius that it had six months to regain compliance.

Genius used a variety of strategies to buoy the value of its stock and to comply with NASDAQ requirements. First, it retained a securities promotion company, PennyStocks, to promote its securities in exchange for more than 90,000 shares of Genius common stock. In the months that followed, PennyStocks wrote and published several favorable articles about Genius. Genius also touted itself on social media and through press releases and shareholder letters. On March 17, for example, Genius issued a press release stating that Nickelodeon Jr. "ha[d] again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week." On March 19, Genius's stock price rose 25.6%.

Later, on May 7, Genius conducted a direct offering of shares subject to a Securities Purchase Agreement ("SPA"), which stated:

> [Genius] has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of [Genius] to facilitate the sale or resale of any of the Shares, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Shares, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of [Genius], other than, in the case of clauses (ii) and (iii), compensation paid to [Genius's] placement agent in connection with the placement of the Shares.

Genius did not mention in the May 7 SPA that it had compensated PennyStocks or that PennyStocks had published favorable articles on Genius's behalf.

Genius's flurry of business activity caught the media's attention, and the value of its shares fluctuated over the course of June, July, and August 2020. On June 3, *Insider Financial* published an article speculating whether Disney or Netflix would acquire Genius, and Genius's share price surged 42.8%. Activist short sellers, [3] like Citron Research and Hindenburg Research, quickly took notice. On June 4, Citron published a report suggesting that Genius had engaged an undisclosed stock promoter. That day, Genius's share price fell 14.5%. The following day, June 5, Hindenburg released a report (the "Hindenburg Report") revealing that Nickelodeon Jr. aired Rainbow Rangers fewer than twenty-six times per week. That day, Genius's share price tumbled 14.4%, before falling even further over the course of the following week.

**\*3** Undeterred by this bad publicity, Genius continued its efforts to revitalize its stock price. On June 15, Genius tweeted that Schwarzenegger would invest in the company. After the tweet, Genius saw its share price jump 8%. The same day, however, a financial analysis group, Seeking Alpha, reported that Genius had engaged PennyStocks to unlawfully "pump" Genius's stock and predicted that Genius's trading volume would decline to investors' detriment. Over the next two days, June 16 and 17, Genius's share price declined by approximately 14% and 22%, respectively.

On June 21, *Insider Financial* published a second article about Genius, this one suggesting that it was "only a matter of time" before Disney or Netflix acquired Genius. The following day, Genius retweeted the article from its official Twitter (now "X") account. The post quoted the article and included hashtags and dollar signs adjacent to Genius's stock ticker. It was the only third-party article that Genius retweeted during the class period. Ten days later, on July 2, Genius issued a press release indicating that it would announce a "key business development" on July 6. Genius's stock price rose on the heels of this press release. Some speculated online that Genius would announce that Disney or Netflix would acquire Genius. Yet, when July 6 arrived, Genius did not announce a merger with Disney or Netflix.

Instead, Genius announced a partnership with POW! Entertainment, and that Genius and POW! would "[j]ointly own[ ]" the Stan Lee Universe. Following this announcement, Genius's shares tumbled from $3.55 per share to $2.66 per share. The following day, July 7, Genius received a letter from a law firm explaining that the rights that Genius publicly claimed to have in the Stan Lee Universe had been sold to another company, one that was represented by that law firm.

Despite that notice, Genius did not immediately disclose the July 7 letter or the truth regarding its rights to the Stan Lee Universe.

Genius's financial woes continued after its Stan Lee announcement. On August 14, Genius filed a Form 10-Q, indicating that Genius had issued warrants to Schwarzenegger in connection with his work on one of Genius's shows, Superhero Kindergarten. The next day, Genius's shares fell 3.2%. Seven months later, on March 30, 2021, Genius also issued a press release implying that Genius's ownership of the Stan Lee Universe was contested. Genius's shares fell 22.6%.

Fed up with Genius's volatile stock and increasingly erratic approach to publicity, the shareholders filed suit against Genius; its CEO, Andy Heyward; and its CFO, Robert Denton. The shareholders assert three claims: (1) violation of Section 10(b) of the Exchange Act and its implementing rule, Rule 10b-5(b), against all Defendants; (2) violation of Section 10(b) of the Exchange Act and its implementing rules, Rules 10b-5(a) and (c), against all Defendants; and (3) violation of Section 20(a) of the Exchange Act against Heyward and Denton. The shareholders' sprawling complaint invokes at least thirty-eight allegedly false or misleading statements and omissions that relate to several topics. Among others, the complaint alleges that Genius concealed its relationship with PennyStocks, overstated the number of times Nickelodeon Jr. aired Rainbow Rangers per week, misstated the nature of its partnership with Schwarzenegger, misleadingly implied that Disney or Netflix would acquire Genius, and misrepresented its rights to the Stan Lee Universe.

The district court dismissed the shareholders' suit with prejudice for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court began with the shareholders' Rule 10b-5(b) claims, *i.e.*, the shareholders' claims premised on allegedly fraudulent statements and omissions. First, the district court dismissed the PennyStocks Claim for failure to allege falsity because the shareholders did not allege that "anything in the PennyStocks articles themselves was false or misleading," and because PennyStocks had no duty to disclose Genius as the source of its funding. Second, the district court dismissed the Schwarzenegger Claim, determining that the shareholders did not allege a "moment where the truth about these statements was revealed" because the August 14 10-Q was not a corrective disclosure. Third, the district court dismissed the Rainbow Rangers Claim on the grounds that the shareholders "fail[ed] to allege any meaningful increase in the Company's

stock price after the Rainbow Rangers Statements." The district court dismissed the Disney/Netflix Claim on the same grounds: failure to allege an initial price increase. The district court did not provide an analysis of the Stan Lee Claim.

**\*4** The district court then addressed the shareholders' remaining claims, beginning with their scheme liability claims under Rule 10b-5(a) and (c). The district court noted that a plaintiff alleging a violation of Rule 10b-5(a) or (c) must show "the same elements as a Rule 10b-5(b) claim." The district court determined that, because the shareholders "did not establish the elements of their Rule 10b-5(b) claim[s]," they "did not adequately plead a violation of Rule 10b-5(a) and (c)." Next, the district court dismissed the shareholders' Section 20(a) individual liability claims against Denton and Heyward because the shareholders failed to allege scheme liability or scienter. Finally, the district court dismissed with prejudice the complaint as a whole. [4] The shareholders timely appealed.

II.

We have jurisdiction under 28 U.S.C. § 1291. We review a district court's ruling on a Rule 12(b)(6) motion to dismiss de novo, *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008), and we can affirm on any ground supported by the record, *see Foster v. Wilson*, 504 F.3d 1046, 1050 (9th Cir. 2007).

III.

Section 10(b) of the Exchange Act proscribes "manipulative or deceptive" practices in connection with the purchase or sale of registered securities on a national securities exchange. 15 U.S.C. § 78j(b). Implementing Rule 10b-5 is "coextensive" with Section 10(b). *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023). To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission ("falsity"), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation. *In re Bofi Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020). Controlling persons liability under Section 20(a) of the Exchange Act is derivative, such that there is no individual liability where there is no primary violation of securities law. *See City of*

*Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017); 15 U.S.C. § 77o.

Securities fraud complaints, like the shareholders' complaint, are subject to a heightened pleading standard under the Public Securities Litigation Reform Act ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure. *In re Facebook*, 87 F.4th at 947. Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Similarly, under Rule 9, a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). These heightened standards apply "to all elements of a securities fraud action." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). Ultimately, "[a]t the pleading stage, the plaintiff's task is to allege with particularity facts 'plausibly suggesting' that both showings can be made." *In re Bofi Holding*, 977 F.3d at 791 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Here, the shareholders' appeal involves five Claims that implicate the first and sixth elements of a securities fraud action: falsity and causation. We start with falsity and assess whether Genius misled investors when it professed that it had not compensated any entity to solicit its securities, despite having retained PennyStocks to write and disseminate favorable articles about it. We conclude that the shareholders adequately alleged that Genius misled investors regarding PennyStocks. Next, we turn to loss causation and the Schwarzenegger, Rainbow Rangers, Disney/Netflix, and Stan Lee Claims. We conclude that the shareholders adequately pleaded loss causation with respect to the Rainbow Rangers, Disney/Netflix, and Stan Lee Claims, but not with respect to the Schwarzenegger Claim.

### A.

**\*5** We begin with falsity and the PennyStocks Claim. The thrust of the PennyStocks Claim is that Genius misled investors when it represented in its May 7 SPA that it had not hired anyone to solicit its securities, when, in reality, it had compensated PennyStocks to publish favorable articles about Genius. [5] To determine whether a statement or omission

is misleading, "our central inquiry is whether a reasonable investor would have been misled about the nature of his investment." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993). This is an objective inquiry that requires us to assess "whether an investor who had been reasonably diligent in reviewing" the statement or omission at issue "would have been misled." *Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987).

Here, the parties do not clarify whether the PennyStocks Claim is a statement- or omission-based claim. Both parties' briefing seems to treat the PennyStocks Claim as premised on fraudulent statements. But the shareholders' complaint handles the PennyStocks Claim as based on fraudulent omissions. Yet, either way we construe it, we conclude that the district court erred when it dismissed the PennyStocks Claim. Contrary to the district court's suggestion, the shareholders have adequately alleged that Genius misled investors about its stock solicitation and relationship with PennyStocks.

Construing the PennyStocks Claim as premised on a fraudulent statement, we find that Genius's representation in the May 7 SPA that it had not hired anyone to "solicit" purchases of its securities was misleading. When Genius stated that it "ha[d] not ... paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company," it had employed PennyStocks to write and disseminate favorable articles about Genius. The question, therefore, is whether writing and disseminating favorable articles amounts to "solicitation" within the May 7 SPA's meaning. We conclude that it does.

The ordinary tools of contract interpretation help us understand the meaning of the May 7 SPA. The plain meaning of "solicit" is "to make petition," "to urge," or "to entice or lure." Solicit, The Merriam-Webster Dictionary (rev. ed. 2022); *cf.* Solicitation, Black's Law Dictionary (11th ed. 2019) (defining "solicitation" as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition"). In keeping with that definition, a person solicits the sale of a security where she "petition[s]," "entice[s]," "lure[s]" or "urge[s]" another to purchase a security.

Our recent decision in *Pino v. Cardone Capital, LLC*, 55 F.4th 1253 (9th Cir. 2022) is also instructive. The plaintiff in *Pino* filed suit against a real estate management company, alleging that it made misleading statements on social media to encourage people to invest in two of its equity funds. *Id.* at 1255–56. In considering whether the real estate management

company was a statutory seller within the meaning of Section 12(a)(2) of the Securities Act of 1933 ("Securities Act"), the court considered what it means to " 'engage[ ] in solicitation,' *i.e.*, 'solicit[ ] the purchase [of the securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner.' " *Id.* at 1257–58 (third alteration in *Pino*) (quoting *Pinter v. Dahl*, 486 U.S. 622, 643, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)). The court defined "solicitation" broadly, applying it to various mechanisms used to " 'urge or persuade' another to buy a particular security." *Id.* at 1258 (quoting *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022)). And that includes "communications made through diffuse, publicly available means," such "that a person can solicit a purchase, within the meaning of the Securities Act, by promoting the sale of a security in a mass communication." *Id.* at 1258, 1260 (quoting *Wildes*, 25 F.4th at 1346).

**\*6**  With plain meaning and *Pino* in mind, we conclude that PennyStocks solicited the purchase of Genius's securities. According to the complaint, Genius retained PennyStocks "to publish and disseminate favorable information about Genius's shares." Those articles solicited the purchase of Genius's securities because they urged or lured readers into purchasing Genius stock. It plausibly follows that Genius misled investors when it represented in its May 7 SPA that it "ha[d] not ... paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company." A diligent investor would have taken that representation to mean that Genius had not hired anyone to promote its securities, through articles or otherwise. *See Durning*, 815 F.2d at 1268 (noting that whether a statement is misleading is considered from the vantage of a reasonably diligent investor). In reality, Genius had compensated PennyStocks with more than 90,000 shares of Genius common stock and, in return, PennyStocks solicited the purchase of Genius's stock through its articles.

Genius fares no better if we frame the PennyStocks Claim as based on a misleading omission. Ordinarily, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). But an omission of a material fact is unlawful if the omitted fact is "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Put in simpler terms, disclosure is required if, under the circumstances, nondisclosure would render some other corporate statement misleading. *See Retail Wholesale*

*& Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) ("[A] duty to provide information exists only where statements were made which were misleading in light of the context surrounding the statements.").

Here, Genius did not have an affirmative duty to disclose its relationship with PennyStocks. *See* 15 U.S.C. § 77q(b). Thus, if Genius had been silent, it likely would not have misled investors. *Basic*, 485 U.S. at 239 n.17, 108 S.Ct. 978. But Genius was not silent; it affirmatively represented in its May 7 SPA that it had not "paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company." Genius was required to disclose its relationship with PennyStocks so as not to render its statements about solicitation in its May 7 SPA misleading. 17 C.F.R. § 240.10b–5(b).

In short, whether we construe the PennyStocks Claim as statement- or omission-based, a "reasonable investor" would have been misled by Genius's May 7 SPA. *In re VeriFone*, 11 F.3d at 869. A reasonable investor would have taken Genius's statements to mean that Genius had not retained any person or any entity to promote its securities, when Genius had in fact done so. For these reasons, we reverse the district court's decision that the shareholders failed to adequately allege that Genius's May 7 representation regarding solicitation was misleading. [6]

B.

We next consider the Claims implicating loss causation: the Schwarzenegger Claim, Rainbow Rangers Claim, Disney/ Netflix Claim, and Stan Lee Claim. Plaintiffs in securities fraud actions must allege loss causation. *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In a fraud-on-the-market case like this one, loss causation "begins with the allegation that the defendant's misstatements (or other fraudulent conduct) artificially inflated the price at which the plaintiff purchased her shares." *In re Bofi Holding*, 977 F.3d at 789. Next, a plaintiff must allege that "the truth became known." *Id.* (quoting *Dura Pharms.*, 544 U.S. at 347, 125 S.Ct. 1627). Finally, a plaintiff must allege that "the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *Id.* The plaintiff need not show "that a misrepresentation was the *sole* reason" for a price decline, but rather that it was "one substantial cause." *In re Daou Sys.*,

*Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). In the end, "loss causation is simply a variant of proximate cause, [and] the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme*, 881 F.3d at 753 (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)). "[P]laintiffs need only show a 'causal connection' between the fraud and the loss," and they can do so "even when the alleged fraud is not necessarily revealed prior to the economic loss." *Id.* (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119–20 (9th Cir. 2013)).

1.

**\*7** We begin with the Schwarzenegger Claim. The shareholders premise the Schwarzenegger Claim on Genius's June 15 tweet about Schwarzenegger. The shareholders allege that the tweet misled investors into believing that Schwarzenegger was investing in Genius, when, in reality, he was merely developing a new show with Genius, but not investing. The district court dismissed the Schwarzenegger Claim because the shareholders did not allege a "moment where the truth about these statements was revealed." We agree.

To allege loss causation, the plaintiff must plead that "the truth became known." *Dura Pharms.*, 544 U.S. at 347, 125 S.Ct. 1627. "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *In re BofI Holding*, 977 F.3d at 790. A corrective disclosure "occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.' " *Id.* (quoting 15 U.S.C. § 78u-4(e)(1)). It can reveal fraud "in one fell swoop" or through a series of partial disclosures. *Id.* A corrective disclosure also need not "precisely mirror" the misrepresentation. *Id.* (quoting *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)). "It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statement false or misleading." *Id.* In the end, "[a] corrective disclosure can ... come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *Id.*

A corrective disclosure, however, is not the only way a plaintiff can show that "the truth became known." *Dura Pharms.*, 544 U.S. at 347, 125 S.Ct. 1627. Loss causation is a " 'context-dependent' inquiry," and what may reveal fraud in one case may not reveal fraud in another. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (per curiam) (quoting *Lloyd*, 811 F.3d at 1210). As a result, we take "a flexible approach" in evaluating whether some event or occurrence revealed fraud to the market. *In re BofI Holding*, 977 F.3d at 795. Thus, we have considered whether an alleged revelation "contain[s] enough information to significantly undermine" the allegedly fraudulent misrepresentation, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008), such that it "can be reasonably read to reveal" the underlying fraud, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). We have also considered whether the "market understood" the alleged revelation as "a revelation of fraud" and responded accordingly. *Mineworkers' Pension Scheme*, 881 F.3d at 753. Ultimately, we focus on plausibility: "can we plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price?" *In re BofI Holding*, 977 F.3d at 795.

Here, the shareholders contend that Genius's August 14 10-Q revealed that Schwarzenegger had not invested in Genius, and, by extension, that the June 15 tweet was false. The August 14 10-Q, however, cannot "reasonably [be] read to reveal" the truth behind the allegedly misleading tweet because the tweet and the 10-Q speak to different things. *See Metzler*, 540 F.3d at 1063. While the tweet asserted that Schwarzenegger would invest in Genius, the 10-Q indicated that Genius had compensated Schwarzenegger in connection with Superhero Kindergarten. Investing in Genius and developing programming with Genius are not mutually exclusive; Schwarzenegger could have done both. Indeed, he is a man known for his ability to do many things, like act and run a state government. Accordingly, we cannot say that, on the basis of the August 14 10-Q, the "market understood" that the June 15 tweet was false. *See Mineworkers' Pension Scheme*, 881 F.3d at 753. For that reason, the district court properly dismissed the Schwarzenegger Claim.

2.

**\*8** Next, we turn to the Rainbow Rangers Claim, which boils down to a simple alleged misrepresentation. According

to the shareholders, Genius misled investors when it asserted in its March 17 press release that Nickelodeon Jr. aired Rainbow Rangers twenty-six times per week, when, in reality, Nickelodeon Jr. only aired Rainbow Rangers twelve to fourteen times per week. The district court dismissed the Rainbow Rangers Claim on the grounds that the shareholders failed to plead an initial price increase.

In its analysis of the Rainbow Rangers Claim, the district court erred in its recitation and application of our loss causation rules. First, the district court's reasoning impermissibly conflated an initial price increase with initial price inflation. We have held that "loss causation begins with the allegation that the defendant's misstatements (or other fraudulent conduct) artificially *inflated* the price at which the plaintiff purchased her shares." *In re Bofi Holding*, 977 F.3d at 789 (emphasis added). To show that a misstatement inflated the value of a security, the plaintiff must allege that "the price was higher than it would have been had the false statements not been made." *Id.* It bears emphasis that initial price *inflation* and initial price *increase* are not one and the same; a price increase is one way of demonstrating that "the price was higher than it would have been," but it is not the only way. *Id.* To be sure, a plaintiff can plausibly allege that a misstatement artificially inflated a stock's price by demonstrating that the stock's price meaningfully increased on the heels of the misstatement. *See, e.g., In re Gilead*, 536 F.3d at 1052 (determining that the plaintiffs adequately pleaded loss causation in part because they alleged that the company's misstatement increased its stock price by 13.4%). But a plaintiff can also successfully plead that misstatements artificially inflated the value of a security where she can plausibly allege that the stock's price was higher "than it would have been had the false statements not been made." *In re Bofi Holding*, 977 F.3d at 789. For example, a plaintiff could plausibly allege that a misstatement inflated the value of a security where the price remained stable, but it would have gone down if the misstatement had not been made. Similarly, a plaintiff could plausibly allege that a misstatement inflated the value of a security where the price dropped, but that the drop would have been even more significant if the misstatement had not been made. In either case, the plaintiff would plausibly allege that the stock's price was higher "than it would have been had the false statements not been made," even though the misstatements did not increase the stock's price. *Id.*

Take, for example, cases involving corporate crisis management or damage control. If a company's stock is tanking, and one of its senior executives makes a misstatement that pacifies the market and causes the stock price to decrease at a lower rate, that misstatement inflated the stock's price without increasing it. Similarly, if a company is in hot water, and one of its executives makes a misstatement to avoid a price crash and causes the stock price to hold steady, that misstatement also inflated the stock's value without increasing it. In both scenarios, a plaintiff could plausibly show that the misstatement inflated the stock's price because, if the misstatement had not been made, the price would have fallen or continued to fall at a higher rate. *See In re Bofi Holding*, 977 F.3d at 789.

**\*9** This concept is on full display in our recent *In re Facebook* decision. There, social media giant Facebook farmed out "vast amounts" of its users' data to a "sketchy" British consulting firm. *In re Facebook*, 87 F.4th at 942. During the fallout, Facebook assured users that it had changed its ways and that they were in control of their data. *Id.* at 945. The press later revealed that Facebook had an undisclosed practice of allowing certain "whitelisted" third-party applications to obtain users' data. *Id.* at 946. Facebook's stock dropped after that revelation. *Id.* Although the plaintiffs did not plead that Facebook's misleading statement that users controlled their own data increased the value of Facebook's shares, we nevertheless found that their allegations were sufficient to plead loss causation. *Id.* at 954–55. The user-control statements were crisis-management statements aimed at soothing the market and averting a price crash. One would not reasonably expect such a statement to increase the value of Facebook's securities. Rather, Facebook's misstatements seemingly comforted the market temporarily until the truth was more fully revealed and Facebook's stock plummeted. *Id.* at 945–46. In that period, the value of Facebook's stock was inflated above what it would have been if the market had known the truth from the outset.

Second, the district court overlooked that the shareholders *do* allege that Genius's statement about the frequency of the Rainbow Rangers showings increased the price of Genius's stock. The shareholders allege that Genius made the Rainbow Rangers misstatement on March 17, and that Genius's stock price rose 25.6% two days later. They further allege that the Hindenburg Report "reveal[ed] the discrepancy" on June 8, and that Genius's shares fell 14.3% that day and another 26% the following day. Contrary to the district court's conclusion, these facts are sufficient to demonstrate loss causation at the pleading stage. *See In re Bofi Holding*, 977 F.3d at 789.

In an effort to persuade us otherwise, Genius contends that the Hindenburg Report did not reveal the truth to the market because it reflected information that was already public. That argument takes an overly restrictive view of our precedent. We have held that "[a] disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure," like when "the alleged corrective disclosure provide[s] new information to the market that was not yet reflected in the company's stock price." *In re Bofi Holding*, 977 F.3d at 795. Thus, we generally consider whether the pre-existing public information at issue is related to the alleged misrepresentation, and whether it is readily available to the public, easily digestible in its native format, and understandable to a lay person, among other factors. *Id.* (citing *Pub. Emps. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 318–23 (5th Cir. 2014)). This makes sense. After all, securities issuers should not escape liability for misrepresentations merely because they can show that corrective information was publicly available on some webpage tucked in a deep corner of the internet or buried in some unwieldy spreadsheet. *See id.* at 323 (determining that the plaintiffs pleaded adequate facts to show that a news article premised on public Medicare records revealed fraud where the records were "only available to a narrow segment of the public" and "had little to no probative value in [their] native state"). Such information is so hidden that the market cannot access or understand it and react accordingly.

Although the Hindenburg Report was premised on public information—the March 2020 Nickelodeon Jr. broadcast schedule—that information had "little to no probative value in its native state." *Amedisys*, 769 F.3d at 323. The shareholders attached to their complaint several printouts of the webpage on Nickelodeon Jr.'s website that features the broadcast schedule. The printouts covering the week of March 18, 2020, span over twenty-five pages and reflect no fewer than 377 show listings. A shareholder hoping to fact check Genius's March 17 claim that Nickelodeon Jr. aired Rainbow Rangers twenty-six times per week would have no easy time doing so. She would have to go onto Nickelodeon Jr.'s website, find the schedule webpage, sift through hundreds of listings for shows like Bubble Guppies and Team Umizoomi, and tally up the handful of Rainbow Rangers listings.

\*10  We also note that the shareholder's task would be considerably more difficult retrospectively because it appears that the Nickelodeon Jr. schedule webpage is updated daily or every other day. For example, the March 20 schedule shows "[w]hat's on today" and allows users to "view tomorrow's

schedule." The March 21 schedule indicates the same and so on. We question whether a shareholder would have been able to easily access the March 18, 2020, broadcast schedule after March 18, 2020. Indeed, it seems that whoever accessed the March 2020 schedule for the purpose of making the attachment for the complaint had to use a web archive to access the schedule webpage. Put simply, the information contained in the Nickelodeon Jr. broadcast schedule was not in a "readily digestible" form on the Nickelodeon Jr. website and did not become digestible until the Hindenburg Report synthesized it for the marketplace. *In re Bofi Holding*, 977 F.3d at 795 (quoting *Amedisys*, 769 F.3d at 323). For that reason, the shareholders have plausibly alleged that the truth became known through the Hindenburg Report, and, therefore, have adequately pleaded loss causation on the Rainbow Rangers Claim. The district court erred in concluding otherwise.

3.

Next, we turn to the Disney/Netflix Claim. The gravamen of this claim is that Genius misled investors on June 22 when it retweeted a June 21 *Financial Insider* article—the second of two *Financial Insider* articles that month speculating that Disney or Netflix would acquire Genius. The district court dismissed the Disney/Netflix Claim because "the price of the Company's stock did not meaningfully increase" after Genius retweeted the article. We disagree.

As discussed above, a plaintiff need not allege that a defendant's false or misleading statement caused an increase in the stock price. Instead, it suffices to plausibly allege that the stock price was higher than it would have been but for the defendant's statement—whether because the statement increased the stock price, maintained the stock price, or prevented a greater decrease in the stock price. Here, the shareholders adequately alleged that Genius's stock price would have been lower but for Genius's June 22 tweet regarding the Disney or Netflix acquisition. On June 3, *Financial Insider* published an article speculating that Netflix or Disney would buy Genius. The price of Genius's stock jumped 42.8% that day. This price increase was followed by three critical reports by Citron, Hindenburg, and Seeking Alpha, the first of which was released on June 4. Genius's stock price fell 14% on June 4, another 13% on June 5, another 14.3% on June 8, another 26% on June 9, another 14% on June 16, and another 21.7% on June 17. By the time that Genius retweeted the June 21 *Financial Insider* article on June 22, its

stock was trading at less than half of its closing price on June 3, before the three critical reports were issued.

The shareholders allege that the company's June 22 retweet of the June 21 *Financial Insider* article was a successful effort to stanch the bleeding from the unfavorable reports by Citron, Hindenburg, and Seeking Alpha. They allege that the June 22 retweet "served to maintain some of [the] inflation" caused by the June 3 *Financial Insider* article. That is, the shareholders allege that Genius's stock price would have fallen even more if Genius had not retweeted the June 21 *Financial Insider* article, which misleadingly suggested that a buyout by Disney or Netflix was in the works. Considering the enormous price increase that the June 3 article caused, it is plausible that Genius's June 22 retweet maintained its stock price at a higher level "than it would have been" absent the retweet. [7] *In re Bofi Holding*, 977 F.3d at 789.

 **\*11**  Further, the shareholders plausibly allege that the truth became known on July 6 when Genius made an announcement without mentioning a possible buyout by Disney or Netflix. On July 2, ten days after Genius's retweet of the June 21 *Financial Insider* article, Genius issued a press release stating that it would announce a "key business development" on July 6. Based on the two *Financial Insider* articles, and on Genius's June 22 retweet of the second article, investors speculated on Twitter that the "key business development" that Genius planned to announce could be a buyout by Disney or Netflix. On July 6, Genius said nothing about a Disney or Netflix buyout. Instead, Genius announced that it would jointly own the Stan Lee Universe. Genius's stock price fell from $3.55 to $2.66 per share that day. The shareholders allege that the Stan Lee announcement caused investors "to realize" that Genius had misrepresented its prospects of being acquired by Disney or Netflix because "the purported 'key business development' update [on July 6] had nothing to do with a sale to Disney or Netflix."

Those allegations are sufficient to plead loss causation. The July 6 Stan Lee announcement was plainly good, albeit inaccurate, news. After all, it indicated that Genius would jointly own intellectual property that had the potential to be exceptionally profitable. Genius told investors that "Stan was the editor and creative force behind Marvel Comics, which was sold to the Walt Disney Company for $4.4 billion and has since proved to be worth many multiples of that amount." Such news should have produced an increase in Genius's stock price. Instead, Genius's stock price fell sharply on July 6. The shareholders allege that the sharp decline in Genius's

stock price on July 6 indicates that investors understood the announcement as bad news for Genius. We agree.

Standing alone, the Stan Lee announcement was, of course, good news. But the shareholders plausibly allege that the market understood the announcement as bad news because Genius's failure to mention the Disney or Netflix buyout signaled that no such buyout would take place. In other words, they plausibly allege "that the market understood" the Stan Lee announcement on July 6 "to be a revelation" that Genius's June 22 retweet of the second *Financial Insider* article was false or misleading. *Mineworkers' Pension Scheme*, 881 F.3d at 753. In sum, the shareholders plausibly allege that Genius's June 22 retweet of the June 21 *Financial Insider* article "foreseeably caused the [shareholders'] loss." *Id.*

4.

Finally, we turn to the Stan Lee Claim. The general tenor of the Stan Lee Claim is that Genius misled investors on July 6 when it indicated that it would jointly own the Stan Lee Universe, despite another entity owning those rights. Unlike the other Claims at issue, the district court did not provide a particularized explanation for its decision to dismiss the Stan Lee Claim. Rather it disposed of the Stan Lee Claim when it dismissed the complaint as a whole. Genius argues on appeal that, even absent explanation, the district court correctly dismissed the Stan Lee Claim because the shareholders failed to demonstrate loss causation, specifically, that the truth became known. We disagree.

Contrary to Genius's suggestion, the shareholders adequately alleged loss causation with respect to the Stan Lee Claim. The shareholders allege that in June 2020 the value of Genius's stock was dwindling. Amidst that decline, Genius scrambled to rally investor confidence. In that effort, Genius backed itself into a corner on July 2 by specifying that it would make a big announcement on July 6. The market reacted favorably to the promise of a big announcement and Genius's stock rose on July 2. Yet, after the July 6 Stan Lee misstatement, Genius's stock dipped again.

At first blush, it would appear that these allegations are not the stuff of loss causation. After all, it seems implausible that the shareholders would be able to show that the Stan Lee misstatement inflated Genius's stock price when Genius's stock price fell on the heels of the Stan Lee misstatement. *See In re Bofi Holding*, 977 F.3d at 789 (requiring a plaintiff

to demonstrate initial price inflation). But as we explain in greater detail above, price *inflation* and price *increase* are not synonymous and our precedent requires a showing of the former, not the latter. *See id.* The value of a declining stock can nevertheless be inflated for loss causation purposes where, as here, the stock would have declined even more if the misrepresentation had not been made. *Id.*

 **\*12** Applied here, that principle dictates that it is plausible that, on July 6, the value of Genius's stock "was higher than it would have been" if Genius had not made the Stan Lee misstatement. *See In re Bofi Holding,* 977 F.3d at 789. After Genius's July 2 statement, the market anticipated a big announcement on July 6. It is plausible that, if Genius had not made the Stan Lee misstatement on July 6, Genius's stock would have tumbled even more. *See id.* at 791 ("At the pleading stage, the plaintiff's task is to allege with particularity facts 'plausibly suggesting' that [such] showings can be made."). If Genius had not made an announcement on July 6, it seems probable that the market would have been especially disappointed by the lack of an anticipated big announcement and that Genius's stocks would have fallen even further. Viewed in this light, the Stan Lee misstatement artificially inflated Genius's stock value on July 6 even though the overall value declined that day.

The shareholders' allegations are also sufficient to demonstrate the other elements of loss causation as to the Stan Lee Claim. They allege that Genius received a letter from a law firm on July 7 indicating that POW! had already licensed the rights to the Stan Lee Universe. Yet, on that day, Genius did not publicly disclose the letter or the information

it reflected. Instead, the truth of Genius's rights to the Stan Lee Universe—or lack thereof—did not become known until Genius disclaimed its rights over eight months later in a press release issued on March 30, 2021. When the market learned the truth, Genius's shares tumbled 22.6%. Taken together, these allegations are sufficient to allege loss causation at the pleading stage.

\* \* \*

In sum, we conclude that the shareholders plausibly allege that, for their Rule 10b-5(b) Claims, Genius's representations regarding PennyStocks in its May 7 SPA were misleading, and Genius's statements regarding Rainbow Rangers, Disney/Netflix, and Stan Lee caused the shareholders' losses. At the same time, the shareholders have not plausibly alleged their Schwarzenegger Claim has merit. Accordingly, we **AFFIRM** in part and **REVERSE** in part the district court's order dismissing the shareholders' Second Amended Complaint. We **REMAND** to the district court for further proceedings in keeping with this opinion. On remand, the district court shall determine whether the shareholders alleged facts sufficient to show the remaining elements of the PennyStocks, Rainbow Rangers, Disney/Netflix, and Stan Lee Rule 10b-5(b) Claims. Additionally, on remand, the district court shall consider anew whether the shareholders' PennyStocks, Rainbow Rangers, Disney/Netflix, and Stan Lee allegations are sufficient to state a claim under Rule 10b-5(a), Rule 10b-5(c), or Section 20(a).

### All Citations

--- F.4th ----, 2024 WL 1473942

## Footnotes

\*      The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota, sitting by designation.

1      "The complaint," as it is used here and throughout this opinion, refers to the shareholders' Second Amended Complaint.

2      We accept the factual allegations in the complaint as true and view them in the light most favorable to the shareholders. *Weston Fam. P'ship LLLP v. Twitter, Inc.,* 29 F.4th 611, 617 (9th Cir. 2022). We recite only those facts relevant to the disposition of the issues before us.

3      An "activist" refers to an individual or entity that makes "interventions" to "affect share price." Barbara A. Bliss et al., *Negative Activism,* 97 Wash. U. L. Rev. 1333, 1338 (2020). Some activists—the "positive" activists

—strive "to add value for shareholders and increase share prices." *Id.* at 1342–43. Other activists—the "negative" activists—seek to "decrease [a] company's stock price." *Id.* at 1338. An activist short seller fits into that second category. Activist short sellers often take a short position on a target company—*i.e.*, they bet that the value of the company's stock will decrease—and then may publish reports reflecting poorly on the target company. *Id.* at 1348. Short seller reports frequently increase the volatility of a target company's stock "while significantly decreasing share prices." *Id.*

4    The district court also stated in passing that it believed the shareholders' complaint violated Rule 8 of the Federal Rules of Civil Procedure. Because the district court did not dismiss the complaint on Rule 8 grounds, we do not reach the issue. We note, however, that the complaint is not significantly more prolix than complaints that we have found generally adequate in other securities class actions.

5    The district court appears to have misunderstood the gist of the PennyStocks Claim. It dismissed the PennyStocks Claim because the shareholders did not allege that "anything in the PennyStocks articles themselves was false or misleading" and that PennyStocks had no duty to reveal that Genius was funding it. But the PennyStocks Claim does not concern the veracity of the PennyStocks articles or the sources of PennyStocks's funding. Rather, the dispositive question is whether Genius, by representing that it did not hire anyone to solicit its securities, made a misleading statement.

6    Because the district court did not address materiality, we do not do so here. On remand, the district court shall consider whether the shareholders adequately alleged materiality with respect to the PennyStocks Claim.

7    A third-party report's assertions may not, in some circumstances, be attributable to an entity that merely retweets such report. Determining whether a third-party's report is attributable to an entity that retweets that report is highly fact-dependent. Here, Genius only retweeted one third-party report during the class period, the June 21 *Financial Insider* article, making it stand out. And Genius did not simply retweet the article without commentary. Rather, Genius quoted the article and included hashtags and dollar signs adjacent to Genius's stock ticker. Finally, Genius used its official company account to retweet the article, making it more likely that the general public would perceive Genius as adopting the article's assertions. Thus, viewing these facts as a whole and in the light most favorable to the shareholders, we hold that the shareholders have plausibly alleged that the June 21 *Financial Insider* article's assertions are attributable to Genius.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.