# EXHIBIT A

2024 WL 3579322
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

SEB INVESTMENT MANAGEMENT AB, et al., Plaintiffs,

v.

WELLS FARGO & COMPANY, et al., Defendants.

Case No. 22-cv-03811-TLT
|
Signed July 29, 2024

**Attorneys and Law Firms**

Jennifer Lauren Joost, Stacey Marie Kaplan, Kessler Topaz Meltzer and Check LLP, San Francisco, CA, Sharan Nirmul, Pro Hac Vice, Evan R. Hoey, Pro Hac Vice, Gregory Castaldo, Pro Hac Vice, Kessler Topaz Meltzer Check, LLP, Radnor, PA, for Plaintiff SEB Investment Management AB.

Dianne M. Pitre, Lester Rene Hooker, Saxena White P.A., Boca Raton, FL, Bonni S. Jensen, Pro Hac Vice, Robert David Klausner, Pro Hac Vice, Klausner, Kaufman, Jensen & Levinson, Plantation, FL, David R. Kaplan, Saxena White P.A., Solana Beach, CA, Stacey Marie Kaplan, Jennifer Lauren Joost, Kessler Topaz Meltzer & Check, LLP, San Francisco, CA, Sharan Nirmul, Kessler Topaz Meltzer Check, LLP, Radnor, PA, for Plaintiff West Palm Beach Firefighters Pension Fund.

Brendan P. Cullen, Sverker Kristoffer Hogberg, Sullivan & Cromwell LLP, Palo Alto, CA, Christopher Michael Viapiano, Pro Hac Vice, Sullivan and Cromwell LLP, Washington, DC, Leonid Traps, Pro Hac Vice, New York, NY, for Defendants Wells Fargo & Company, Charles W. Scharf, Kleber R. Santos, Carly Sanchez.

## ORDER DENYING MOTION TO DISMISS AMENDED COMPLAINT

ECF No. 122

TRINA L. THOMPSON, United States District Judge

**\*1** Before the Court is Defendants' Motion to Dismiss the Amended Complaint. ECF No. 116. For the foregoing reasons, Defendants' Motion is DENIED.

## I. PROCEDURAL HISTORY

On June 28, 2022, Plaintiff Khosrow Ardalan filed a class-action complaint against Defendants Wells Fargo & Company ("Wells Fargo" or the "Company"), Charles Scharf, Kleber R. Santos, and Carly Sanchez ("Named Defendants"), alleging that all Defendants violated Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act. ECF No. 1.

On October 27, 2022, separate actions brought by Plaintiffs Hugues Gervat and Charles Rogers were deemed related. ECF No. 53. On November 14, 2022, Plaintiff SEB Investment Management AB was appointed lead plaintiff. ECF No. 55.

On January 31, 2023, Plaintiffs SEB Investment and West Palm Beach Firefighters' Pension Fund filed an amended class-action complaint. ECF No. 69. Plaintiffs reasserted the Section 10(b) cause of action against all Defendants, but reasserted the Section

20(a) allegation only against Defendant Scharf. *Id.* On March 30, 2023, cases filed by Asbestos Workers Philadelphia Welfare and Pension Fund and Jose F. Isais were deemed related. ECF No. 99. On August 2, 2023, a case filed by City of Pontiac Reestablished General Employees' Retirement System was deemed related. ECF No. 107.

On August 18, 2023, this Court granted Defendants' first motion to dismiss. ECF No. 112 ("Order"). On September 8, 2023, Plaintiffs filed another amended complaint against Defendants, reasserting the same causes of action supported by new factual allegations. ECF No. 116 ("Amended Complaint" or "Am. Compl."). On October 23, 2023, Defendants filed a Motion to Dismiss. ECF No. 122 ("Motion"). On December 7, 2023, Plaintiffs filed their opposition. ECF No. 129 ("Oppo."). On January 2, 2024, Defendants filed their reply. ECF No. 130 ("Reply"). Oral arguments were heard on January 30, 2024. ECF No. 131.

## II. FACTS

### 1. Wells Fargo's History of Issues with Diversity, Equity, and Inclusion ("DE&I")

In recent years, Wells Fargo has faced myriad complaints and public scrutiny for corporate scandal and alleged discriminatory conduct. Am. Compl. ¶ 2. In 2011, for example, Wells Fargo paid $32M to settle a sex discrimination case brought by 1,200 female financial advisors for unequal pay and promotional bias. *Id.* ¶ 69. In 2012, the Company paid $184M to a class of Black and Hispanic debtors to settle claims of unfair and discriminatory treatment in the home lending division. *Id.* ¶ 70. In 2013, Wells Fargo paid yet another $36M in settlement costs in an action brought by Black financial advisors who alleged segregation in the workforce and disparate treatment compared to their white counterparts. *Id.* ¶ 71. In 2015, the Company entered into a conciliation agreement with the Department of Justice for failure to provide accommodations to disabled employees. *Id.* ¶ 72. Further, in 2019 and 2020, the Company entered a conciliation agreement with the Department of Labor in response to allegations of discrimination against minority job applicants. *Id.* ¶¶ 73–74.

 **\*2**  Resulting from the years of allegations of discrimination, unequal treatment, and other forms of financial scandal, public perception and trust in the Company dwindled, which effected investment prospects. Legal costs were up to $13.6B by the end of 2020. *Id.* ¶ 80. The most significant of government penalties, however, was a $1.95T asset ceiling, placed in 2018 by the Federal Reserve, that followed the notorious fake account scandal. *Id.* ¶ 82. The cap, along with other government enforcement actions and the Company's dwindling reputation, caused significant financial harm. *Id.* ¶¶ 76–84. The inability to grow its assets and appease investors incentivized Wells Fargo to reshape internal controls and risk management practices, to reposition itself in the good graces of the government and ultimately the investing public. *Id.* ¶ 87.

### 2. Wells Fargo's Response to DE&I Issues

In Fall 2019, Wells Fargo hired Chief Executive Officer Charles Scharf to ameliorate regulatory compliance issues, rebuff internal policies and compliance mechanisms, and demonstrate a shift in corporate culture to reposition the Company for financial success. *Id.* ¶ 92. Stemming from prior agreements with the Department of Labor and other class action settlements which surrounded discriminatory pay, lending, treatment, hiring, and promotional practices, Scharf created initiatives to boost diversity and inclusion efforts. *Id.* ¶ 112. For example, Scharf established diversity, equity, and inclusion councils at the business level to implement and oversee strategic efforts to improve diversity and inclusion in Wells Fargo's workforce and beyond. *Id.* ¶ 113. Scharf also personally chaired the Enterprise Diversity & Inclusion Council, which held monthly meetings to organize diversity efforts and "hold people accountable to advancing our diversity and inclusion efforts at all levels." ¶ 112.

As part of this effort, Wells Fargo's March 2020 proxy announced the Diverse Search Requirement. *Id.* ¶ 1. The policy required interview slates to consist of at least 50% diverse candidates for most U.S. positions with compensation above $100K. *Id.* "Diverse" was defined based on race or ethnicity, sex or gender, veteran-status, sexual orientation, and disability. *Id.* Less than three months later, in the wake of social unrest following the murder of George Floyd, Scharf circulated a company-wide memo

stating that the lack of Black employees at Wells Fargo could be attributed to the "very limited pool of Black talent to recruit from." *Id.* ¶ 117. At a subsequent internal Zoom meeting, Scharf further blamed Wells Fargo's inability to reach its diversity goals on the lack of "minority talent." *Id.*

On September 22, 2020, Reuters published a story reporting on Scharf's comments, leading to widespread public scrutiny of Well's Fargo DE&I practices, and requiring the Company to respond. Shortly after the story was published, Scharf sent a message to Wells Fargo employees apologizing for his comments, and highlighted Wells Fargo ongoing DE&I efforts, including the Diverse Search Requirement. *Id.* ¶ 120. Two months later, Wells Fargo hired Defendant Kleber R. Santos as "head of the newly created Diverse Segments, Representation, and Inclusion group," which was established to "create[e] a more diverse and inclusive working environment." *Id.* ¶ 41. Further, at the April 2021 proxy meeting, then-Chairman of the Board, Charles H. Noski, stated that "DE&I was a 'key focus' for the Company's Board and management team" that was discussed at "every one of [their] regularly scheduled meetings." *Id.* He further stated that, "beginning the fall of 2020, the full Board received DE&I updates at each regularly scheduled Board meeting." *Id.* ¶ 307. Further, Wells Fargo spoke publicly about its extensive data collection regarding its diversity hiring practices, including records of every job interview conducted, and the "data lead particularly targeted and dedicated to the [Diverse Segments, Representation, and Inclusion] space." *Id.* ¶¶ 296, 305. Defendant Carly Sanchez, who served as Wells Fargo's Executive Vice President of Talent Acquisition, Affirmative Action/ Equal Employment Opportunity, and Diversity Recruitment, met with the data lead "on a regular ... basis," and regularly updated Scharf and Santos on the Company's DE&I initiatives. ¶ 305–06.

**\*3** These persistent issues also drew the focus of Wells Fargo's investors. In December 2020, following the blowback from Scharf's statements, three institutional investors submitted a proposal for Wells Fargo's hiring processes to "improv[e] workforce diversity ...." *Id.* ¶ 130. After Wells Fargo objected to the proposal and conferred with the shareholders, the proxy was withdrawn in exchange for Wells Fargo's agreement to disclose certain information regarding its Diverse Search Requirement. *Id.* ¶ 135. Further, in 2021 and 2022, institutional shareholders introduced proposals "to conduct racial equity audits" of the Company's "impact on nonwhite stakeholders and communities of color." *Id.* ¶ 138. Wells Fargo opposed both proposals. *Id.* ¶¶ 139–40.

In its public response to these proposals, and as part of larger effort to improve its reputation on diversity issues, Defendants repeatedly spoke publicly about their efforts with the Diverse Search Requirement. Wells Fargo's financial filings and corporate reports consistently highlighted the Requirement, and Defendants Scharf, Santos, and Sanchez regularly discussed it in interview. *See, e.g., id.* ¶ 42.

### 3. Sham Interviews

Despite Defendants' repeated advertisement of its commitment to interviewing diverse candidates in response to public scrutiny over the Company's lack of diversity, Plaintiffs allege that the interviews were meaningless. The pleadings put forth allegations that Wells Fargo conducted widespread "sham interviews" of diverse candidates in which Wells Fargo interviewed diverse candidates that would not be hired. Plaintiffs allege that Wells Fargo sought out diverse candidates to interview for positions that had already been filled, or for which the candidate was not qualified for and could not receive an offer.

The allegations are based on direct and indirect personal accounts from Wells Fargo employees and contractors ("FEs") with knowledge of the sham interviews. For example, the Amended Complaint identifies FE-3, who was a recruiting consultant in the commercial banking division from 2014 to mid-2022. *Id.* ¶ 182. FE-3 indicated that "70-80% of all open positions in commercial banking" involved sham interviews in which diverse candidates were "being used to check a box, and had no real chance to get the jobs they were applying to." *Id.* ¶ 182. FE-3 also described a specific example of her involvement in a sham interview when recruiting for a government institutional position in Texas. Although FE-3 selected three candidates with the "necessary banking and government institutional experience," she also "selected a candidate who had no direct banking experience to comply with the Requirement" because she "could not find enough qualified, diverse candidates." *Id.* ¶ 182.

Further, based on her collaboration with recruiters in other divisions, such as treasury, compliance, risk, and operational risk, she "knew that the practice was going on in other divisions as well." *Id.*

The Amended Complaint also describes the experience of FE-6, a Vice President at Wells Fargo in North Carolina that personally experienced the sham interviews as an interviewee on at least six occasions. *Id.* ¶ 194. After interviewing but failing to receive an offer for various positions, FE-6 reached out to a team member, and "on more than one occasion," learned that the team "already had someone in mind to fill the position when she was interviewed." *Id.* ¶ 195.

Plaintiffs also rely on FE-7, a Vice President in the commercial banking division with a Black colleague that experienced the sham interviews. *Id.* ¶ 197. According to FE-7, Wells Fargo reached out to the colleague about interviewing for a position that it was "having a difficult time filling," but informed the colleague shortly after the interview that the position had been filled by someone else. *Id.* ¶¶ 198–99.

**\*4** Plaintiffs also rely on a variety of named former employers. The Amended Complaint discusses Joseph Bruno, a Senior Vice President in the Wealth and Management Division from Florida, who said that "HR recruiters tell the managers that you have to conduct these interviews [of diverse candidates], even though you have clearly explained that a candidate has already been chosen." *Id.* ¶ 149. In some cases, Bruno was told by his supervisors to conduct interviews with diverse candidates even though someone else was already selected for the position. *Id.* ¶ 150. Bruno provided specific examples of sham interviews he had experienced, such as 2021 interviews for two financial consultant positions on "two top WFA million-dollar teams" that had already been filled. *Id.* ¶ 152. On September 7, 2021, Bruno sent a letter to nearly 250 Wells Fargo employees and executives, including Defendants Scharf and Santos, regarding "the practice of fake interviews encouraged by a senior regional manager, .... Keith Vanderveen." *Id.* ¶ 213. Less than a month later, it was reported that Vanderveen had left the firm "after being out for several weeks on a leave of absence because of "speedbump[s]" that arose from Bruno's email. *Id.* ¶ 215.

Plaintiffs also point to Phillip Miller who, on February 18, 2021, submitted a complaint to Wells Fargo's Board through the Wells Fargo Board Communications email address, alleging that Wells Fargo was considering Black applicants "without any commitment to hire those individuals," and for the sole purpose of "achiev[ing] its DE&I goals." *Id.* ¶ 209. On December 13, 2021, there was a meeting for the Wells Fargo's Governance and Nominating Committee. At the meeting, the Committee was shown a presentation discussing an allegation of racial discrimination made by an individual who believed they had been a token candidate for a job interview. *Id.* ¶ 214. Miller's email was referenced in a report prepared for the board. *Id.* ¶ 214.

In May 2022, the *New York Times* published an article about the practice of holding "sham interviews" with diverse candidates, explaining "seven current or former Wells Fargo employees ... said that they were instructed by their direct bosses or human resources managers in the bank's wealth management unit to interview 'diverse' candidates — even though the decision had already been made to give the job to another candidate." *Id.* ¶ 156. In response, the United States Attorney's Office for the Southern District of New York sent Wells Fargo a criminal subpoena regarding the Diverse Search Requirement. *Id.* ¶ 233. On June 6, 2022, after the Board conferred about the subpoena, Wells Fargo suspended the Diverse Search Requirement. *Id.* ¶¶ 234–36.

### A. False or Misleading Statements

Plaintiffs identify eleven misleading statements made by Defendants regarding Diverse Search Requirement between February 24, 2021 and June 9, 2022 (the "Class Period"). The accused statements are identified below.

### 1. 2020 Annual Report

On February 23, 2021, Wells Fargo published its Annual Report, which contained the following statement: "[t]hroughout 2020, we also announced our expanded commitments to diversity, equity, and inclusion." It further stated that "[i]n the U.S., we are

requiring a diverse slate of candidates — and a diverse interview team — for most roles with total direct compensation of more than $100,000 per year." *Id.* ¶ 262.

### 2. March 2021 Proxy

On March 16, 2021, Wells Fargo published a proxy statement. Under a heading entitled "Improving Diverse Representation and Inclusion within the Company," Defendants stated,

> [w]e are expanding our diversity and inclusion commitments with a focus on hiring, promotions, and turnover, with increased accountability across all of those areas and are taking specific actions in support of these commitments." In particular, Defendants stated, "[i]n the U.S., we are requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of more than $100,000 per year.

*Id.* ¶ 263.

Under a heading entitled "Our Diverse Candidate Sourcing and Interview Guidelines," Defendants stated:

> Consistent with our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity, Wells Fargo has established Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams (referred to as our Diverse Search Requirement). Our Diverse Search Requirement was originally implemented based on our evaluation of the Company's workforce in order to determine how best to improve workforce diversity. Based on our ongoing review, the Company decided to expand the scope of the Diverse Search Requirement in 2020 as part of our overall and continuing efforts to enhance workforce diversity. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities. The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000: At least 50% of interview candidates must be diverse with respect to at least one diversity dimension;"

**\*5** *Id.* ¶ 264.

### 3. 2020 Social Impact and Sustainability Highlights

On April 26, 2021, Plaintiffs published a Social Impact report. In a section entitled "Elevating diversity, equity and inclusion," Defendants stated:

> To be successful, we must continue to create a truly diverse and inclusive workforce that brings a wide range of insights and perspectives to all levels of our company. Our Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension. Further, at least one interviewer on the hiring panel must represent at least one diversity dimension. For these purposes, our definition of diversity includes race/ethnicity, gender, LGBTQ, veterans, and people with disabilities. We're expanding this program internationally.
>
> As of December 31, 2020, the Diverse Search Requirement:
>
> • Applied to approximately 95% of all U.S. roles with total direct compensation greater than $100,000; and

    • Applied to approximately 48% of all active U.S. employees irrespective of their total direct compensation

    • 91% of applicable requisitions had a diverse interview slate [and]

    • 94% of applicable requisitions had a diverse interview team.

*Id.* ¶ 265.

### 4. May 2021 Scharf Testimony

On May 26, 2021, Defendant Scharf testified before the United States Senate Committee on Banking, Housing, and Urban Affairs. In a portion of his testimony entitled "Our Commitment to Diversity, Equity, and Inclusion," Defendant Scharf stated, "for the hiring of many senior roles, we have implemented guidelines that require a diverse slate of candidates (at least 50 percent) and a diverse interview panel." *Id.* ¶ 266.

### 5. 2021 ESG Report

On July 5, 2021, Wells Fargo published a report with an "update on Wells Fargo's DE&I commitments. Defendants stated that Wells Fargo was "requir[ing] diverse candidate slates and interview teams for key roles with total direct compensation of more than $100,000," and that it was requiring "at least 50% of interview candidates to identify with at least one diversity dimension." *Id.* ¶ 267.

### 6. 2021 Sanchez Interview

On October 7, 2021, Sanchez was interviewed for the Talent Acquisition Next Practice Monthly Series. When asked to "talk a little bit about building diverse candidate slates, and increasing opportunities," Sanchez responded:

> [W]e have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates.... [W]e formalized the candidate slate requirement for roles $100K and above. It's probably about a year and a half or two years ago to say that you have to have 50% of the slate--of the candidate slate that will be interviewed needs to be diverse in one dimension or another. Also, the interview team has to be diverse, and so that's very important as well. But I think the core for us and what's key is not to sit back and wait and see who arrives in that candidate pool, but to be constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates. And we'll identify with the recruiters who work hand-in-hand with our diversity sourcing group.... [R]ecruiters can say look, I have a really tough role to fill. I'm having a hard time pipelining that, and so the diversity sourcing group can step in and also do a targeted effort to make sure that they've filled that pipeline adequately and found where they can find diverse groups.

**\*6** *Id.* ¶ 269.

### 7. 2022 Human Rights Impact Assessment and Actions in Response

On February 15, 2022, Wells Fargo published priority recommendations in its Human Rights Impact Assessment. In the section entitled "source of diverse talent," Defendants stated:

> In 2021, we increased our partnerships with colleges, universities, and other organizations spotlighting diverse talent recruitment. For example, by expanding our engagement we increased our hiring of candidates from Historically Black Colleges and Universities and Hispanic-Serving Institutions. We also instituted diverse candidate slates and interview teams on most jobs of over $100,000 in total compensation. We are in the process of eliminating education requirements in certain job categories to increase equity in hiring. Programs such as Glide-Relaunch (an in-house returnship program) and our Career Development Cohort program (an in-house diversity focused program that supports our partnership with the OneTen Coalition) further support our DE&I recruiting efforts.

*Id.* ¶ 273.

### 8. March 2022 Proxy

On March 14, 2022, Wells Fargo published a proxy statement. In a section entitled "Our Approach to Advancing Diversity, Equity, and Inclusion," Wells Fargo stated:

> Our DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas. These include: Diverse Candidates[:] Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams for designated posted positions. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

> We conduct and track targeted outreach efforts to underutilized populations in order to attract well-qualified individuals to apply for open positions and identify placement goals to help focus recruitment strategies toward underrepresented groups.

> We seek to recruit the best and brightest talent with a keen focus on diversity for senior-level roles. [We] pursue this goal by establishing trusted partnerships with candidates, hiring managers, and recruiting consultants.

*Id.* ¶ 274.

### 9. May 2022 Scharf Business Insider Quote

On May 27, 2022, Business Insider published an article addressing reports that Wells Fargo had denied mortgages to Black applicants and held sham job interviews with the following quotation from Santos:

> We researched all the specific hiring-practice allegations the reporter shared prior to the story's publication and we could not corroborate these allegations as factual." Santos further stated, "[i]f we believe that any manager has conducted an interview with a predetermined outcome in mind, we believe we should investigate and punish if we find wrongdoing.

*Id.* ¶ 232.

### 10. 2022 DE&I Report

On June 1, 2022, Defendants published a DE&I report. In a section entitled "Diverse Candidate Slates and Interview Team," Defendants stated:

> For most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically under-represented group with respect to at least one diversity dimension and at least one interviewer on the hiring panel must also represent a historically under-represented group with respect to at least one diversity dimension.

**\*7** *Id.* ¶ 277.

### 11. June 2022 Business Insider Quote

On June 3, 2022, Business Insider published an article discussing Wells Fargo's 2022 DE&I report, which included a comment from Santos that the Diverse Search Requirement "is working." The article also cited statistics provided by Wells Fargo as evidence of the Requirement's success: "In 2019, before the implementation of the rule, 36.9% of hires for people making $100,000 or more were racially or ethnically diverse — Black, Latino, Asian American, Pacific Islander, Native American, or Alaska Native. By 2021, that rose to 42.3% of leaders, according to Wells Fargo." *Id.* ¶ 278.

## III. LEGAL STANDARD

### A. Incorporation-by-Reference Doctrine

In a motion to dismiss, other than considering a complaint in its' entirety, a court considers documents incorporated into the complaint by reference and those of which the court takes judicial notice. *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018).

Incorporation-by-Reference "is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Id.* at 1002. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very same documents that weaken – or doom – their claims." *Id.* A document may be incorporated-by-reference where a complaint extensively – ordinarily, at least more than once – refers to a document or the document forms the basis for the complaint. *Id.* at 1002–03. Simply mentioning a document is insufficient to incorporate the document by reference into the complaint. *Id.* at 1002.

In addition, inferences drawn from documents incorporated into a complaint by reference must be approached with caution. *Id.* at 1003. While the contents of a document incorporated-by-reference are generally viewed as true at the motion to dismiss stage, if the truth of its' contents only serve to dispute facts in a well-pleaded complaint, it is improper to assume their truth. *Id.*

### B. Section 10(b) and Rule 10b-5

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must ... suggest that the claim has at least a plausible chance of success.' " *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*,

556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Rule 9(b) dictates that the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. Proc. 9(b). It is not enough for a plaintiff merely to identify an allegedly fraudulent statement made by defendants. *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Plaintiffs must allege "why the disputed statement was untrue or misleading when made." *Id.* at 1549. Moreover, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). The PSLRA additionally requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission. 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity. *Or. Pub. Emps.*, 774 F.3d at 605.

## IV. DISCUSSION

### A. Incorporation-by-Reference

**\*8** The Court previously held that the articles by *Business Insider* and the *New York Times* could be incorporated-by-reference. Order, at 2. So too here. The articles are referenced and quoted extensively in the amended complaint. *See* Am. Compl. ¶¶ 235, 278, 323, 327–28 (*Business Insider* published June 3, 2022); *Id.* ¶¶ 18–19, 22, 156, 226–27, 233, 275, 291, 319–21, 325–26 (*New York Times* published May 19, 2022); *Id.* ¶¶ 19, 22, 24, 158, 233, 238–39, 291, 328, 332–33 (*New York Times* published June 9, 2022).

In addition, the February 18, 2021 e-mail from Phillip Miller and the September 7, 2021 e-mail from Joseph Bruno is quoted from or extensively referred to throughout the amended complaint. *Id.* ¶¶ 13–14, 16, 18, 209, 214, 217, 283–84, 287 (Miller e-mail); *Id.* ¶¶ 15, 213, 215, 217, 286–88, 290 (Bruno e-mail). The Miller e-mail and the Bruno e-mail are used to support the argument that defendants were put on notice of "sham interviews" and thus support the basis for scienter. The Court finds that the contents of these two e-mails may be incorporated-by-reference into the pleadings.

The December 13, 2021, Governance and Nominating Committee report is also referenced three times to support an inference that defendants had knowledge of Miller's e-mail accusing the practice of "sham interviews," and, ultimately, an inference of scienter. *Id.* ¶¶ 16, 214, 287. Therefore, the Court finds the contents of this document appropriate to be incorporated-by-reference into the amended complaint, insofar as the contents address the scienter argument. The Court, however, limits any inferences drawn from this report to those related to the scienter argument.

Last, a May 24, 2021, Employment Investigation report is referenced three times in the complaint. The pleadings allege that the employment investigation was "self-serving" and "limited to whether Wells Fargo executives were using diverse interviews to achieve their 2020 goals for compensation and bonus targets." *Id.* ¶¶ 14, 284. It is also referenced to the extent that Wells Fargo created a "false impression that [the practice of sham interviewing] was not a credible or serious issue that had long since been brought to the Company's attention." *Id.* ¶ 18. The Court finds the Employment Investigation report to be properly incorporated into the complaint by reference. However, as the truth of the Employment Investigation report would only serve to dispute the factual allegation that the investigation was "self-serving," it would be improper for the Court to assume the truth of the ultimate finding included in the contents of the report. *See Khoja*, 899 F.3d at 1003.

**B. The Section 10(b) and Rule 10b-5 "Strong Inference" of Scienter**

To assert a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [("falsity")]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023) (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014)). Defendants allege Plaintiffs insufficiently plead material misrepresentation and scienter. The Court addresses each below.

**1. Plaintiffs sufficiently plead that Defendants made material misrepresentations.**

**\*9** "A statement is false or misleading if it 'directly contradict[s] what the defendant knew at that time' or 'omits material information.' " *Glazer Cap. Mgmt.*, 63 F.4th at 764 (citing *Khoja*, 899 F.3d at 1008–09). Even if a statement is technically "not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09. When defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (quotation marks and citation omitted). Courts evaluate whether a statement is misleading from the perspective of a "reasonable investor." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). To sufficiently plead material misrepresentation, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Here, Plaintiffs identified eleven statements in which Defendants described the Diverse Search Requirement and advertised its success. As discussed below, Plaintiffs provided sufficient reasoning for why each statement was misleading and sufficiently particularized facts in support of these reasons.

**a. Defendants' statements misleadingly imply that the Diverse
Search Requirement advanced Wells Fargo's DE&I efforts.**

Plaintiffs claim that Defendants' statements describing the Diverse Search Requirement were misleading. Defendants characterized the policy of interviewing 50% diverse candidates as a method of improving diversity and inclusion at Wells Fargo, and a reasonable investor would expect Defendants would implement the policy in a manner that could achieve that goal. Instead, Plaintiffs allege that Wells Fargo conducted interviews with diverse candidates that they had no intention of hiring, and thus it was misleading to advertise the Requirement as a method of improving diversity. For example, Plaintiffs allege that Defendants recruited diverse candidates for interviews even though they were unqualified for the position and certain not to receive an offer. *See, e.g.*, Am. Compl. ¶ 182. Plaintiffs further allege that Defendants solicited interviews from diverse candidates even when another candidate had already been selected purely to meet the 50% requirement. *See, e.g., id.* ¶¶ 150, 195. Interviewing candidates who had no chance of receiving an offer could not accomplish Defendants' stated goal of improving workforce diversity. Further, as described by certain confidential witnesses, this practice can alienate and demean diverse candidates, which also is contrary to Defendants' stated goals of accomplishing equity and inclusion within the workplace. A reasonable investor would expect a policy that is presented as a method of developing DE&I in the workplace to be implemented in a manner that could accomplish that goal. Instead, per Plaintiffs' allegations, Defendants implemented the policy in a way that actively moved away from those goals.

Defendants argue that their statements are not misleading because their accused statements solely promised that 50% of interview candidates would be diverse, without addressing whether those diverse candidates would be hired. Thus, whether the interviews were conducted with the intent to hire the candidates is not relevant to this inquiry. For example, Defendants argue

that Sanchez's statements in her October 2021 interview were not misleading because she spoke about Wells Fargo's success in filling its candidate pools with diverse candidates without addressing whether those diverse candidates could secure jobs after the interview. Motion, at 12.

The Court disagrees. Defendants' arguments ignore the surrounding language in the accused statements, and the greater context in which the statements were made. First, Defendants' statements framed the Diverse Search Requirement as a method for improving work force DE&I. For example, in the March 2021 Proxy, Wells Fargo described the Diverse Search Requirement in a section entitled "Improving Diverse Representation and Inclusion within the Company," and explicitly stated that this policy was implemented "to improve workforce diversity." Am. Compl. ¶ 264, March 2021 Proxy; *see also id.* ¶ 265, 2020 Social Impact and Sustainability Highlights ("Elevating diversity, equity, and inclusion [:] To be successful, we must continue to create a truly diverse and inclusive workforce that brings a wide range of insights and perspectives to all levels of our company. Our Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension."); *id.* ¶ 273, Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response (discussing diverse search requirement in section entitled "Source of Diverse Talent"); *id.* ¶ 274, March 2022 Proxy (after explaining the diverse search requirement, stating "[w]e conduct and track targeted outreach efforts to underutilized populations in order to attract well-qualified individuals to apply for open positions and identify placement goals to help focus recruitment strategies toward underrepresented groups."). In fact, during his October 2021 interview, Sanchez specifically stated that the purpose of the Diverse Search Requirement was to "make sure that the pipeline is filled with great candidates." *Id.* ¶ 269. Defendants misleadingly stated that they implemented a policy requiring a slate of 50% diverse candidates to improve diversity, equity, and inclusion. Taking Plaintiffs' allegations as true, Defendants implemented these policies in a manner that did not align with this goal.

**\*10** Second, Defendants made these statements in the context of pressure from the government, investors, and general public regarding DE&I issues. Prior to making these statements, Wells Fargo had been embroiled in numerous controversies and lawsuits centered around workplace diversity issues for over a decade. Wells Fargo also received heightened public scrutiny after Defendant Scharf publicly blamed its lack of diversity on lack of diverse talent in the job market. Additionally, Wells Fargo received multiple investor proposals seeking increased public disclosures regarding its diversity recruiting practices, and audits of its racial equity practices. Defendants made its statements regarding the Diverse Search Requirement in response to these incidents, and reasonable investor would expect the policy to actually address the underlying issues. [1] As such, Plaintiffs provide sufficient reasons as to why Defendants' statements were misleading.

### b. Plaintiffs provided sufficiently particularized allegations of sham interviews.

Under Rule 10b-5(b), it must be shown that defendants "ma[de] an untrue statement of material fact or fail[ed] to disclose a material fact ... necessary to prevent an investor from being misled under the circumstances of which the statements were made." 17 C.F.R. § 240.10b-5(b).

Plaintiffs allege that Defendants' statements regarding the Diverse Search Requirement were misleading based of the widespread sham interviews. As support for this contention, Plaintiffs cite to various former employees. For example, FE-3 indicated that "70-80% of all open positions in commercial banking" involved sham interviews with diverse candidates, and that this practice occurred in other divisions as well. Am. Compl. ¶ 182. FE-3 also recounted her experience soliciting an interview from an unqualified candidate despite already having three qualified candidates. Additionally, the Amended Complaint discusses FE-6, who claims to have experienced at least six sham interviews. *Id.* ¶ 194. FE-6 arrived at this conclusion after receiving rejections for roles on various teams and learning from team members that they already had someone in mind for the position when she interviewed. *Id.* ¶ 195. Plaintiffs also rely on the account of FE-7, who had a Black colleague that allegedly experienced a sham interview. *Id.* ¶ 197. The colleague concluded that she had experienced such an interview because she was told the Company was having difficulty filling the position when she interviewed, yet the position was filled shortly after. *Id.* ¶ 198. The Amended Complaint also relies on Bruno's statements regarding his general personal experience conducting sham interviews

after encouragement from his superiors. Plaintiffs also described specific examples of Bruno's involvement in sham interviews for a financial analyst position that had already been filled. *Id.* ¶ 149.

Defendants repeat their argument from their original Motion to Dismiss that Plaintiffs have not plead particularized facts showing that the sham interviews were sufficiently widespread to establish falsity. The Amended Complaint, however, provided new allegations expanding the geographical and organizational scope of the sham interviews. *See, e.g.*, Am. Compl. ¶¶ 182, 184 (recruiter assigned to the "entire country" alleging the occurrence of sham interviews in recruiting for treasury positions, compliance risk positions, operational risk positions, and as much as 70-80% of commercial banking positions), *id.* (recruiter alleging the occurrence of a sham interview in South Dakota); *id.* ¶¶ 194–95 (North Carolina-based employee alleging occurrence of a sham interviews). Defendants have neither cited any authority nor provided any argument indicating that allegations across multiple states and divisions are insufficiently widespread to establish falsity. As such, Plaintiffs have sufficiently plead falsity.

### 2. Plaintiffs sufficiently alleged scienter.

**\*11** Plaintiffs must allege that Defendants acted with scienter, a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman,* 840 F.3d at 705 (internal citation and quotation marks omitted). "[D]eliberate recklessness is 'an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*

Under the PSLRA, the pleadings must give rise to a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). A "strong inference" of scienter requires that an inference drawn in favor of plaintiff is not merely plausible, but "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Courts are required to "weigh plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Reese v. Malone*, 747 F.3d 557, 579 (9th Cir. 2014) (quoting *Tellabs*, 551 U.S. at 323–24, 127 S.Ct. 2499). When evaluating the sufficiency of a plaintiff's scienter allegations, courts first "determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (citing *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)). "[I]f no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

Here, the Amended Complaint provides direct and indirect evidence that Defendants knowingly made false statements regarding the Diverse Search Requirement. When viewed holistically, these allegations raise a strong inference of scienter.

### a. Plaintiffs' allegations that Defendants received direct notice of the sham interviews support an inference of scienter.

Plaintiffs allege that individual Defendants were directly informed of the issues with the Diverse Search Recruitment via the individual complaints submitted by Miller and Bruno. In February 2021, Miller submitted a complaint to the Board, including Defendant Scharf, alleging that Wells Fargo was considering Black applicants "without any commitment to hire those individuals." Am. Compl. ¶ 209. Further, in September 2021, Bruno sent a letter to 250 Wells Fargo employees, including Defendants Scharf and Santos, criticizing Vanderveen for pressuring him to conduct sham interviews. *Id.* ¶ 213. Although Defendant Sanchez received neither communication, nor did Defendant Santos receive the Bruno letter, it was highly likely that all named Defendants would be aware of both communications given their roles supervising diversity hiring initiatives.

Defendants argue that these communications do not support a strong inference of scienter because Plaintiffs did not plead particularized facts supporting the conclusion that Defendants actually reviewed them. Defendants' argument raises a fact issue

that is not appropriately addressed at this stage. Plaintiffs are required to "raise a strong inference of fraud, ... [but] do not have to conclusively eliminate all doubt." *In re LDK Solar Sec. Lit.*, 584 F. Supp. 2d 1230, 1255–56 (N.D. Cal. 2008). Plaintiffs' allegations that Scharf and Santos received communications via their individual email addresses, or the Board email address suggest that they were aware of these issues.

**\*12**  Defendants also argue that this Court should not consider these allegations because Plaintiffs copied them from a complaint in a separate litigation and applied them here without additional investigation. As this Court stated in *Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*, a party can rely on allegations made in a separate complaint when they "perform an adequate independent investigation." 2023 WL 4418886, at \*4 (N.D. Cal. May 24, 2023). The party "need not corroborate every fact, [but] must provide an independent basis that goes towards corroborating the allegations such that they are reasonable." *Id.* Here, Plaintiffs' communication with a confidential witness who had personal knowledge of certain issues, in addition to their review of corroborating public information, was "adequate independent investigation." Thus, the Miller and Bruno emails support an inference of scienter.

### b. Plaintiffs' circumstantial allegations of scienter, in combination with their direct notice allegations, raise a strong inference of scienter.

Plaintiffs augmented their scienter allegations with circumstantial evidence, including Wells Fargo's overall focus on workforce diversity and Defendants' involvement in these issues. Considering these allegations, holistically, with the direct complaints, Plaintiffs' allegations raise a strong inference of scienter.

First, a plaintiff sufficiently pleads scienter for corporate executives on a topic by demonstrating that they "had access to and used reports documenting" trends in that topic. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). For example, in *Quality Systems*, the Ninth Circuit held that the plaintiffs had sufficiently plead a strong inference of scienter regarding misleading statements about sales projection. *Id.* The plaintiff's allegations were based, in part, on sales reports that were delivered or accessible to the management team. The fact that the senior executives "habitually monitored" the company's earnings raised a strong inference of scienter. *Id.* Statements from the executives, themselves, about using and having access to this sales information also bolstered this inference. *Id.* Similarly, Wells Fargo maintained extensive records regarding its interview processes and diversity initiatives, including records of every job interview. Amd. Compl. ¶ 220. Sanchez met bi-monthly with recruiters to do a "deep dive into the data on what was working and what was not," and regularly met with the data analyst dedicated to diversity. *Id.* ¶ 223. Sanchez also stated that Defendants Scharf and Santos "were regularly updated on the Company's DE&I initiatives." *Id.* ¶ 306.

Further, Wells Fargo's Board and senior management "regularly reviewed, monitored, and discussed diversity initiatives" using various metrics, which were also used in "regular business reviews to gauge whether the Company was meeting its DE&I goals." *Id.* ¶ 221. In fact, beginning in the fall of 2020, the Board received DE&I updates at each regularly scheduled Board meeting. Defendants Scharf and Santos, as members of the Operating Committee, were "intimately involved in the Company's diverse hiring initiatives throughout the Class Period, including being specifically focused on diverse workforce representation, significantly increasing the number of Black individuals in leadership roles, and holding senior management accountable for progress in improving diverse representation and inclusion initiatives." *Id.* ¶ 222.

Further, there is a strong inference of scienter for issues that receive a significant amount of internal and external attention. *Reese, 747 F.3d at 579*. This inference is bolstered where the defendant has financial or reputational incentives to make misleading statements. *Id.* For example, in *Reese v. Malone*, the Ninth Circuit found that plaintiffs plead a strong inference of scienter regarding defendant's compliance with environmental law, where there had been "significant federal and state government intervention into [defendant's] operations" on this issue, defendant specifically addressed this issue in its annual report, and the CEO requested regular updates. 747 F.3d at 579. The incentive to present compliance with environmental laws further strengthened the inference. Similarly, here, Defendants have been the subject of multiple investigations and lawsuits regarding

diversity issues in its workforce. Amd. Compl. ¶¶ 69–74. Further, its institutional investors explicitly demanded that it take action to address these issues. *Id.* ¶¶ 135–38. As a result, Defendants designated a data analyst to specifically focus on these issues, and regularly solicited progress reports. *See, e.g., id.* ¶¶ 41, 112 120, 296, 305, 307.

**\*13**  Finally, an employee's resignation can support an inference of scienter. *City of Dearborn Heights,* 856 F.3d at 620 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009)). However, to support the inference, the plaintiff must plead that "the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *Id.* Here, Plaintiffs allege that Vanderveen's retirement supports an inference of scienter based on the chronology of events and confidential sources. In February 2021, Miller submitted a complaint to the Board regarding sham interviews. Am. Compl. ¶ 201. In September 2021, Bruno emailed the 250 employees, including Defendants Scharf and Santos, complaining, in part, about Vanderveen's role in the sham interviews. *Id.* ¶ 215. Less than two months later, the Board was given a presentation on an unidentified allegation of a sham interview, which also mentioned Miller's complaint. *Id.* Less than a month after that, AdvisorHub, reported that Vanderveen had been on a leave of absence for the past several weeks and would be retiring. *Id.* AdvisorHub further reported that current and former Wells Fargo managers indicated that Vanderveen may have left because of Bruno's email. *Id.*

When viewed holistically, these allegations support a strong inference of scienter. The employee-submitted complaints, the peculiar timing of Vanderveen's departure, and Defendants' demonstrated focus on diversity issues supports a strong inference of scienter that is "cogent and at least as compelling" as an opposing inference that Defendants remained oblivious. Thus, Defendants' Motion is DENIED as to Plaintiffs' Section 10(b) claim.

### C. Section 20(a)
Section 20(a) of the PSLRA states that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

"In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws ....; and (2) that the defendant exercised actual power or control over the primary violator ...." *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* There is no binding authority establishing whether a plaintiff must meet the 9(b) pleading standard for alleging "actual power or control," and there is a split of authority among district courts in the Ninth Circuit on this issue. *Compare Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012), *with In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at \*19 (N.D. Cal. Jan. 4, 2017). This Court finds that the heightened pleading standard does not apply to allegations of control or power.

Pleadings that include "allegations about an individual's title and duties have been found to be sufficient to establish control." *Mueller v. San Diego Ent. Partners, LLC*, No. 16-cv-2997, 2017 WL 3387732, at \*6 (S.D. Cal. Aug. 7, 2017).

Plaintiffs assert a Section 20(a) claim against Defendant Scharf. As stated above, Plaintiffs have sufficiently plead a primary violation of federal securities law under Section 10(b) against Scharf. Further, Plaintiffs allegations regarding Scharf's role as CEO and President and involvement in Wells Fargo's diversity efforts sufficiently allege this "actual power or control." Thus, Defendants' Motion is DENIED as to Plaintiffs' Section 20(a) claim.

## V. CONCLUSION

Having carefully considered the parties' briefs, oral arguments, relevant legal authority, and for the reasons stated above, Defendants' Motion to Dismiss is **DENIED.**

 **\*14  IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2024 WL 3579322

**Footnotes**

1    Defendants also argue that Santos's quote in the June 2022 Business Insider article stating that "the rule is working" is not misleading because it is not capable of being objectively verified. Motion, at 13. Though it may be difficult to quantity and verify improvements in diversity, the Court need not weigh in on this issue because the statement is misleading regardless of a measured change in diversity. Defendants advertised the Diversity Search Requirement as a method of improving DE&I, and implementation of the Requirement in a manner does not advance this goal is misleading. Pursuant to the Plaintiffs' added allegations, Wells Fargo interviewed diverse candidates with no intent to hire them. Wells Fargo's sole purpose in conducting those interviews was to advertise the Requirement, rather than improve DE&I. Thus, regardless of whether an improvement in diversity Wells Fargo can be measured, advertising this Requirement as a mechanism for achieving this improvement is misleading.

**End of Document**                                                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   15