James P. Rouhandeh (admitted *pro hac vice*)
Charles S. Duggan (admitted *pro hac vice*)
Rory A. Leraris (admitted *pro hac vice*)
Nikolaus J. Williams (admitted *pro hac vice*)
Esther C. Townes (admitted *pro hac vice*)
Paulina Perlin (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: rouhandeh@davispolk.com
        charles.duggan@davispolk.com
        rory.leraris@davispolk.com
        nikolaus.williams@davispolk.com
        esther.townes@davispolk.com
        paulina.perlin@davispolk.com

*Attorneys for Defendants Meta Platforms, Inc.,
Mark Zuckerberg, Nick Clegg, Adam Mosseri,
Guy Rosen, Antigone Davis, Karina Newton,
and Pavni Diwanji*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE META PLATFORMS, INC. SECURITIES LITIGATION<br><br>This document relates to: All Actions | Lead Case No. 3:21-cv-08812-AMO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS LEAD PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: June 18, 2026<br>Time: 2:00 PM<br>Dept.: Courtroom 10 – 19th Floor<br>Judge: Honorable Araceli Martínez-Olguín |

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that on June 18, 2026 at 2:00 PM, or as soon thereafter as the matter may be heard, in Courtroom 10, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, Defendants will and hereby do move the Court for an order dismissing with prejudice the Consolidated Second Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). This motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the Declaration of Rory A. Leraris and accompanying exhibits, the Request for Judicial Notice, other materials in the record, argument of counsel and such other matters as the Court may consider.

**STATEMENT OF ISSUES**

1.      Whether Plaintiffs' claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, should be dismissed for failure to plead that any Defendant made a materially false or misleading statement, with scienter, or that Plaintiffs suffered any loss caused by any such statement.

2.      Whether Plaintiffs' claim under Section 20(a) of the Exchange Act should be dismissed for failure to plead a primary violation of the Exchange Act, or any Defendant's control over a primary violator.

## MEMORANDUM OF POINTS AND AUTHORITIES

### TABLE OF CONTENTS

PAGE

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................... i

STATEMENT OF ISSUES .............................................................................................................. i

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................... ii

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT .....................................................................................................1

BACKGROUND .............................................................................................................................2

ARGUMENT ..................................................................................................................................5

    I.     Claims About Meta's Algorithm Should Be Dismissed (34–37) ...............................6

    II.    Claims Concerning Encryption Should Be Dismissed (1, 2).....................................10

    III.   Claims About Age Verification Should Be Dismissed (5, 22, 23, 32, 33) ................13

    IV.   New Claims About Youth Safety and Wellbeing Should Be Dismissed...................16

         A.     Claims About Project Daisy Should Be Dismissed (7–9, 12–15, 17–18) .................................................................................................................16

         B.     Claims About State of Research Should Be Dismissed Again (4, 16) ..........19

         C.     Claims as to Other Corporate Aspirations Should Be Dismissed (25) ..........22

    V.     Previously Allowed Claims Should Be Dismissed.....................................................23

         A.     Allowed Claims on Youth Safety and Wellbeing Should Be Dismissed.....................................................................................................24

         B.     Allowed Claims on X-Check and Newsworthiness Should Be Dismissed.....................................................................................................30

    VI.   Plaintiffs Do Not Plead Control Person Liability Under Section 20(a).....................32

CONCLUSION..............................................................................................................................32

**TABLE OF AUTHORITIES**

<u>C</u>ASES

<u>P</u>AGE(S)

*In re Am. Apparel, Inc. S'holder Litig.*,

    2013 WL 174119 (C.D. Cal. Jan. 16, 2013) ................................................................ 18

*Azar v. Yelp, Inc.*,

    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ............................................................ 21

*Barnes v. Edison Int'l*,

    2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191

    (9th Cir. Mar. 18, 2022) ................................................................................................ 8

*Borteanu v. Nikola Corp.*,

    2023 WL 1472852 (D. Ariz. Feb. 2, 2023) .............................................................. 16

*Cesario v. Biocept, Inc.*,

    2025 WL 525120 (S.D. Cal. Feb. 18, 2025) ................................................. 6, 10, 13

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,

    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ...................................................................... 5

*In re Cloudera, Inc.*,

    2021 WL 2115303 (N.D. Cal. May 25, 2021) ........................................................... 31

*In re Cutera Sec. Litig.*,

    610 F.3d 1103 (9th Cir. 2010) ....................................................................................17

*In re CytRx Corp. Sec. Litig.*,

    2015 WL 5031232 (C.D. Cal. July 13, 2015) ........................................................... 12

*Eisner v. Meta Platforms, Inc.*,

    2024 WL 3228089 (N.D. Cal. June 28, 2024) ....................................... 11-12, 22, 23

*Eisner v. Meta Platforms, Inc.*,

    2024 WL 4545968 (N.D. Cal. Oct. 22, 2024) .......................................................... 25

*Espy v. J2 Glob., Inc*,

    99 F.4th 527 (9th Cir. 2024) ............................................................................... 22, 32

DEFS.' MOT. TO DISMISS THE CONSOLIDATED SECOND AM. CLASS ACTION COMPL., CASE NO. 3:21-cv-08812-AMO

*In re Facebook, Inc. Sec. Litig.*,

477 F. Supp. 3d 980 (N.D. Cal. 2020), *aff'd in part,*

*rev'd in part and remanded*, 84 F.4th 844 (9th Cir. 2023)...........................................................7

*Fadia v. FireEye, Inc.*,

2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ........................................................................ 28

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,

501 F. Supp. 3d 735 (N.D. Cal. 2020) ..................................................................................... 6

*In re Gilead Scis. Sec. Litig.*,

536 F.3d 1049 (9th Cir. 2008) ............................................................................................. 5-6

*In re Hansen Nat. Corp. Sec. Litig.*,

527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................................ 18

*HRSA-ILA Funds v. Adidas AG*,

745 F. Supp. 3d 1127 (D. Or. 2024), *aff'd*, 2025 WL 3471703 (9th Cir. 2025) ........................ 14

*Janus Cap. Grp., Inc. v. First Derivative Traders*,

564 U.S. 135 (2011) ............................................................................... 5, 9, 12, 27

*Lamontagne v. Tesla, Inc.*,

2024 WL 4353010 (N.D. Cal. Sept. 30, 2024), *aff'd sub nom.*, *Oakland Cnty. Voluntary Emps.'*

*Beneficiary Ass'n v. Tesla Inc.*, 2025 WL 3459471 (9th Cir. Dec. 2, 2025) .............................. 25

*Lipton v. Pathogenesis Corp.*,

284 F.3d 1027 (9th Cir. 2002) ................................................................................................. 9

*Loos v. Immersion Corp.*,

762 F.3d 880 (9th Cir. 2014) ........................................................................................... 10, 23

*In re Lyft Inc. Sec. Litig.*,

484 F. Supp. 3d 758 (N.D. Cal. 2020) ..................................................................................... 8

*McGann v. Ernst & Young*,

102 F.3d 390 (9th Cir. 1996) ................................................................................................... 9

*Merck & Co., Inc. v. Reynolds*,

559 U.S. 633 (2010) ............................................................................................................... 11

iv

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,

   540 F.3d 1049 (9th Cir. 2008) ....................................................................................... 29

*Milliken v. Bank of Am. N.A.*,

   2024 WL 3090484 (N.D. Cal. June 20, 2024), *aff'd*,

   162 F.4th 1030 (9th Cir. 2025) ...................................................................................... 31

*Mir v. Kirchmeyer*,

   2014 WL 12029269 (S.D. Cal. 2014) ............................................................................ 23

*Moreno v. Castlerock Farming & Transp. Inc.*,

   2022 WL 902597 (E.D. Cal. March 28, 2022) ......................................................... 23-24

*In re NVIDIA Corp. Sec. Litig.*,

   768 F.3d 1046 (9th Cir. 2014) ...................................................................................... 19

*In re Okta, Inc. Sec. Litig.*,

   2023 WL 2749193 (N.D. Cal. Mar. 31, 2023) .............................................................. 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,

   575 U.S. 175 (2015) ........................................................................................... 8, 17, 21

*Or. Pub. Emp. Ret. Fund v. Apollo Grp. Inc.*,

   774 F.3d 598 (9th Cir. 2014) .................................................. 5, 13, 19, 22, 23, 29-30

*In re PG&E Corp. Sec. Litig.*,

   806 F. Supp. 3d 962 (N.D. Cal. 2025) ................................................................ 11, 12, 14

*In re Philip Morris Int'l Inc., Sec. Litig.*,

   2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021), *aff'd*

   89 F. 4th 408 (2d Cir. 2023) ......................................................................................... 31

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,

   759 F.3d 1051 (9th Cir. 2014) ........................................................................................ 8

*In re Rigel Pharms., Inc. Sec. Litig.*,

   697 F.3d 869 (9th Cir. 2012) ............................................................................ 7, 18, 21, 31

*Rubke v. Capitol Bancorp Ltd.*,

   551 F.3d 1156 (9th Cir. 2009) ........................................................................................ 5

*Sneed v. Talphera, Inc.*,

   147 F.4th 1123 (9th Cir. 2025) ...................................................................................... *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

   551 U.S. 308 (2007) ..................................................................................... 5, 10, 32

*Total Equity Cap., LLC v. Flurry, Inc.*,

   2016 WL 3093993 (S.D.N.Y. June 1, 2016) ............................................................... 27

*In re Twitter, Inc. Sec. Litig.*,

   506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd sub nom.*, Weston Fam. P'ship LLLP v. Twitter,

   *Inc.*, 29 F.4th 611 (9th Cir. 2022) ....................................................................... 15, 18

*Veal v. LendingClub Corp.*,

   423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................................... 11

*Welgus v. TriNet Grp., Inc.*,

   2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ............................................................ 20

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,

   903 F. Supp. 2d 880 (C.D. Cal. 2012) ...................................................................... 24

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,

   29 F.4th 611 (9th Cir. 2022) ......................................................................... 5, 19, 32

*Zucco Partners, LLC v. Digimarc Corp.*,

   552 F.3d 981 (9th Cir. 2009) .................................................................. 5, 6, 9, 10, 12

STATUTES & RULES

15 U.S.C.A. § 78j(b) ......................................................................................... *passim*

15 U.S.C.A. § 78t(a) ............................................................................................ 6, 32

15 U.S.C.A. § 78u-4 ............................................................................................... 13

17 C.F.R. § 240.10b-5............................................................................................ 21

28 U.S.C. 1658(b) .................................................................................................. 11

Fed. R. Civ. P. 9(b) .................................................................................................. 5

**PRELIMINARY STATEMENT**

In 2021, *The Wall Street Journal* ("*WSJ*") published the "Facebook Files," which characterized Meta documents selected and leaked by a former Meta employee.  Plaintiffs then filed this litigation, trying to transform media buzz into a securities fraud case challenging statements on four topics.  The Court largely denied Plaintiffs' attempt, dismissing claims as to two topics entirely and allowing claims as to 15 of 60 challenged statements to go forward.  The parties then engaged in extensive discovery, with Plaintiffs receiving more than 100,000 documents from Defendants and 11 third parties, as well as each individual Defendant's testimony in lawsuits alleging harms related to youth safety.  Now, after the close of document discovery, Plaintiffs amend their complaint to try to resuscitate statements that this Court dismissed and assert new claims.  Despite extensive discovery, the 505-page Second Amended Complaint ("SAC") only confirms that Plaintiffs have no claim.

The SAC expands Plaintiffs' claims to five categories: (i) previously dismissed and new claims about Meta's algorithm; (ii) new claims about encryption; (iii) new claims about age verification; (iv) dismissed, new, and previously allowed claims about child safety and teen health, including as to Project Daisy and Meta's purported research; and (v) allowed claims about Meta's "X-Check" process and "newsworthiness" policy.

This "kitchen sink" approach fails.  Many of the new claims are time-barred, having been made—and allegedly corrected—more than four years ago.  Plaintiffs also fail to plead core elements of Section 10(b) as to all the statements.  Plaintiffs do not plead an actionable false or misleading statement.  Most are nonactionable corporate aspirations or opinions.  The SAC's factual allegations also do not show that any statement was false or misleading.  Instead, the SAC, including documents incorporated by reference, confirms the statements were *true*.  Plaintiffs also fail to plead facts supporting a strong inference of scienter.  The SAC lacks allegations that any Defendant consciously intended to deceive investors or ignored "obvious" risks of doing so.  Instead, it recycles previously dismissed allegations of generalized profit motives and access to information.  Taken holistically, the more compelling inference is that Defendants believed their statements.  Finally, Plaintiffs fail to plead loss causation.  For some statements, Plaintiffs do not even *try* to allege a corrective disclosure.  For others, alleged disclosures *pre-date* challenged statements.  And for yet others, Plaintiffs rely on

disclosures that *confirm*, rather than correct, the challenged statements.

These failures show that this is not a securities case. It is an attempt to profit from negative publicity and shoehorn tort claims against Meta into a securities lawsuit. Because the SAC cannot plead basic elements of fraud even after extensive discovery, it should be dismissed with prejudice.

## BACKGROUND

On October 28, 2022, Plaintiffs filed a First Amended Complaint ("FAC") that re-packaged the *WSJ's* "Facebook Files" allegations[1] into securities fraud claims with respect to 60 statements on four topics: (i) exceptions to Meta's "Community Standards"; (ii) Meta's algorithm and content moderation efforts; (iii) research into Instagram and teen mental health; and (iv) user metrics. On September 30, 2024, this Court granted in part and denied in part Defendants' motion to dismiss the FAC ("Order"), dismissing claims as to 45 of 60 challenged statements, including all statements related to Meta's algorithm, content moderation, and user metrics. The Court dismissed seven individual defendants, leaving only Meta, Mark Zuckerberg, Nick Clegg, Antigone Davis, and Karina Newton as defendants. *Id.* at 31 n.11. The Court allowed claims as to two statements regarding Meta's X-Check program and 13 statements relating to teen mental health. (*Id.* at 33). The case then proceeded to discovery, and in December 2025, Plaintiffs elected to amend the FAC.

The SAC now challenges 39 statements pertaining to five broad categories: (i) the News Feed algorithm, (ii) encryption, (iii) age verification, (iv) child safety and Instagram's alleged impact on teen health, and (v) Meta's X-Check and "newsworthiness" policies. The SAC also reasserts claims against dismissed Defendants Adam Mosseri, Guy Rosen, and Pavni Diwanji.

***News Feed Algorithm.*** Facebook's "News Feed" algorithm partly determines what content users see. ¶ 390. The SAC alleges that changes to the algorithm "drastically increased the prevalence of toxic content and hate speech on Facebook" and "fueled polarization." ¶ 397. In response, Meta "worked on a number of potential changes to curb the tendency of the overhauled algorithm to reward outrage and lies." ¶ 420. For example, Zuckerberg approved a change to reduce "deep reshares" of certain false information, which "was an effective measure to reduce the amount and spread of false content on the platform." *Id.* These measures aligned with Meta's business incentives to enable the

---

[1] Meta accepts these allegations as true for purposes of this motion, but does not concede their truth.

DEFS.' MOT. TO DISMISS THE CONSOLIDATED SECOND AM. CLASS ACTION COMPL., CASE NO. 3:21-cv-08812-AMO

Company's "successful[] operat[ion]," reduce the risk of "extreme regulatory backlash," and foster positive relationships with "advertisers" and "regulators." ¶¶ 405–06.

On September 15, 2021, the *WSJ* published an article claiming that Meta's algorithm "drove the proliferation of toxic content and misinformation." ¶ 431.  Based on the article and internal Meta documents largely pre-dating the putative class period, Plaintiffs challenge four statements that Meta designed the algorithm to reduce the spread of undesirable content.  The Court previously dismissed all claims based on that theory of fraud because Plaintiffs failed to plead falsity.  Order at 11, 13–18.

***Encryption.***  In 2019, Meta announced that it would adopt end-to-end encryption for all its messaging apps, consistent with "industry standard[s]." ¶¶ 357–58, 366.  On December 1, 2021, Meta announced that it would delay encryption's rollout to "tak[e] time to thoughtfully build and implement" a "private space that's safe and secure." ¶ 633.  Journalists speculated that the delay was due to an "accelerated timeline" that "led to resignations from child safety team members." ¶ 636.  The SAC newly challenges two statements concerning Meta's encryption plans.

***Age Verification.***  Meta bars under-13 users from its apps.  ¶ 338.  In 2019, Meta also ███████ ████████████████████████████████████████████████████████████ *Id.*  Meta removed hundreds of thousands of underage accounts and ██████████████████████████████████████████ █████████████ ¶¶ 603, 679.  Notwithstanding its efforts, Meta publicly acknowledged that "it's difficult to verify age," Ex. 1 at 36:57, and that "young people can—and often do" evade Meta's age detection efforts, Ex. 2 at 2.  The SAC newly challenges five statements concerning Meta's age policy, but does not allege any corrective disclosure concerning this policy or its enforcement.

***Child Safety and Instagram's Alleged Impact on Teens.***  Meta maintains various policies and features designed to enhance safety, including for young users.  *See, e.g.*, ¶¶ 100, 108, 366.  Meta also tests changes intended to improve young user wellbeing, ¶¶ 98, 108, including by studying young users' experiences on its apps, ¶¶ 94, 129, 130–46.  In 2019, Meta undertook several initiatives relating to child safety and teen mental health.  For instance, Meta launched "Project Daisy" to test whether hiding "likes" on Instagram would promote user wellbeing.  ¶¶ 238–39.  Meta ultimately allowed users to hide likes as an option (but not by default).  ¶¶ 238, 698, 709, 729, 731.

On September 14, 2021, the *WSJ* claimed that Meta had "conducted and then concealed and

3

mischaracterized internal research" regarding the impact of Instagram on teens' mental health based on two Meta documents from November 2019 and March 2020. ¶¶ 506–14. Based on the September 14 article and other internal documents, Plaintiffs assert that 17 statements were false and misleading. The Court previously dismissed claims as to three of the statements (and one similar statement) for failure to plead falsity and allowed 13 of them to proceed. Order at 19–20, 33. The SAC also challenges 8 statements on Daisy, one of which was previously dismissed and 7 of which are new.

*X-Check and Newsworthiness Allowance.* Meta publishes "Community Standards" that "outline what is and isn't allowed on Facebook." ¶ 449. As part of its enforcement system, Meta maintains an "X-Check" or "Cross Check" process as a "second layer of review to make sure we've applied our policies correctly." ¶¶ 456, 466. X-Check does not exempt users from the Community Standards. Rather, it is designed to minimize enforcement errors. *See* Ex. 3 at 10–11. Meta also maintains a separate "newsworthiness allowance" that permits "newsworthy" content to remain on Meta's platforms even if it may be deemed to violate the Community Standards. *Id.* at 10-12.

In May 2021, Meta's "Oversight Board"—formed by Meta to advise on application of Meta's policies—gave Meta recommendations for treatment of "political speech from highly influential users." ¶ 460. Meta responded that one recommendation to "report on the relative error rates and thematic consistency of determinations made through the cross-check process" was not feasible because Meta's "measurement accuracy systems" were "not designed to review the small number of decisions made through the cross check process." ¶ 492. Meta told the Oversight Board that it completed "under 10,000 cross-check reviews per day," which was "small" given that Meta "operat[es] at the scale of millions of content decisions a day." Ex. 4 at 8, 13. In June 2021, Clegg published a blog post linking Meta's responses. His post also discussed Meta's separate "newsworthiness" policy, which too applied to a "small number of posts." ¶ 461.

On September 13, 2021, the *WSJ* published an article alleging that X-Check "shield[ed] millions of VIP users from the company's normal enforcement process." ¶ 468. The Oversight Board later opined that "the team within Facebook tasked to provide information ha[d] not been fully forthcoming in its responses [to the Oversight Board] on cross-check." ¶ 623. Based on the article and the Oversight Board's opinion, Plaintiffs allege that two statements purportedly concerning X-

4

Check were misleading.  This Court previously allowed claims on those two statements to proceed, but rejected claims as to all other X-Check statements for failure to show falsity.  Order at 13.

**ARGUMENT**

A Section 10(b) claim requires "(1) a material misrepresentation or omission . . . ; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1130 (9th Cir. 2025) (citations omitted).  Plaintiffs must "meet the higher, exacting pleading standards" of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by "stat[ing] with particularity the circumstances constituting fraud."  *Or. Pub. Emp. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603–04 (9th Cir. 2014) (citations omitted).

A statement is false or misleading only if it "directly contradict[s] what the defendant knew at that time or omit[s] material information."  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (quotations omitted).  Opinions are actionable only if both subjectively and objectively false or misleading.  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009).  "[V]ague, generalized assertions of corporate optimism" are nonactionable.  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012) (citations omitted).

To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted . . . intentionally or with deliberate recklessness."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 319 n.3 (2007) (quotations omitted).  Deliberate recklessness requires "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actors must have been aware of it."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  The "inference of scienter must be more than merely plausible or reasonable"; it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 309.  Only the "maker" of a statement—*i.e.*, "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it"—can be liable under Rule 10b–5(b).  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

Plaintiffs must also plead a "causal connection between the deceptive acts that form the basis

5

for the claim of securities fraud and the injury suffered by the plaintiff." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). Where plaintiffs rely on "corrective disclosures," the disclosure must "reveal new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Cesario v. Biocept, Inc.*, 2025 WL 525120, at *24 (S.D. Cal. 2025). Disclosures must "relate back to the misrepresentation and not to some other negative information about the company." *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 771 (N.D. Cal. 2020) (citation omitted).

Section 20(a) requires a "primary violation" of securities law and a defendant's "actual power or control over the primary violator." *Zucco Partners*, 552 F.3d at 990 (citation omitted).

Plaintiffs fail to plead a Section 10(b) claim or a Section 20(b) claim.

**I.    Claims About Meta's Algorithm Should Be Dismissed (34–37)**

Plaintiffs' claims concerning the algorithm were previously dismissed and should be again. The SAC challenges one new (No. 34) and three dismissed statements (Nos. 35–37):

- No. 34: "***Central to many of the charges by Facebook's critics is the idea that its algorithmic systems actively encourage the sharing of sensational content*** . . . . ***But Facebook's systems are not designed to reward provocative content. In fact, key parts of those systems are designed to do just the opposite.***"
- No. 35: "***Overall, I think that the narrative that you are pointing to is dramatically overstated by critics***. . . . I actually think that our practices here are ***quite robust. And we don't want [] extremist content or any of that stuff on our services . . . we go out of our way to try to reduce that***."
- No. 36: "In fact, back in 2018, we announced a big shift in this direction . . . But we view this change as a success because ***it improved the experience of our users***." "[A]s part of" the algorithm, Meta had "***reduce[d] the distribution of many types of content - meaning that content appears lower in a person's News Feed*** - for a variety of reasons, including ***because the content is sensational, misleading, gratuitously solicits engagement, or is found to be false by our independent fact-checking partners***."
- No. 37: "***I want to be absolutely clear: we work to limit, not expand hate speech*** . . . ."

Plaintiffs claim these statements were false or misleading because "the algorithm amplified misinformation as well as harmful and toxic content." ¶¶ 777, 779, 782, 784. Plaintiffs again fail to plead (i) an actionable false or misleading statement, (ii) scienter, or (iii) a corrective disclosure.

***No Actionable False or Misleading Statement.*** *First*, this Court held that Plaintiffs cannot rely on reports from years prior to show that "statements made in 2021 were false when made." Order at 15. The SAC fails to cure that deficiency. Plaintiffs identify only *one* contemporaneous document

that purportedly undermines the challenged statements—a 2021 email from a former diplomat, who provided her "▮▮▮▮" that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ¶¶ 777, 779, 782, 784.  But Plaintiffs do not plead any basis for her "▮▮▮▮" Nor can her opinion establish falsity, which is "not merely the difference between two permissible judgments." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012).  All other documents cited pre-date the putative class period, often by *more than a year*.  ¶¶ 777, 779, 782, 784.

*Second*, the SAC makes no factual allegations contradicting that "Facebook's systems were not designed to reward provocative content" (No. 34); that Meta "reduce[d] the distribution of many types of content," "including because the content is sensational [or] misleading" (Nos. 35, 36); or that Meta "work[ed] to limit, not expand hate speech" (No. 37).  Instead, the SAC *affirms* these assertions.  For example, it alleges that Meta changed the algorithm to "reduce the amount and spread of false content," ¶ 420, and quotes a Meta deck stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ¶¶ 412, 777, 779, 782, 784.  The same deck states that Meta "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," *id.*, undermining allegations that Meta "*designed*" its systems "to reward provocative content" (No. 34).

The SAC again claims statements were false or misleading because the algorithm had "unhealthy side effects" of amplifying certain content.  ¶¶ 777, 779, 782, 784.  But as before, criticisms that "the algorithm had negative side effects do[] not contradict Defendants' assertion that they work to reduce misinformation or extremist content on their apps, had reduced such content, or that it is not in their interest to push users toward such content."  Order at 15–16.  Plaintiffs again cite criticisms that Meta was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ¶¶ 777, 779, 782, 784.  But, again, falsity is not "merely the difference between two permissible judgments," *Rigel Pharms.*, 697 F.3d at 877, and "[t]he relevant inquiry is not whether Defendants had a 'duty' to do more," *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1013 (N.D. Cal. 2020).  Defendants are not alleged to have promised that the algorithm would have no "unhealthy side effects," or that Meta would "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" to stop them.  ¶¶ 777, 779, 782, 784.

*Third*, Statements 35–37 reflect non-actionable opinions or corporate optimism.  Opinions

7

are actionable only where they contain false or misleading statements of fact, or the speaker does not believe his own opinion or omits certain critical facts about the opinion's basis. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188–90 (2015). This Court already dismissed portions of Statement 36—Zuckerberg's "view[]" that algorithm changes were a "success because it improves the experience of our users"—as an opinion not "capable of objective verification" because Plaintiffs "fail to allege that this statement was false or that Zuckerberg did not believe it to be true." Order at 6–7. Plaintiffs make no new allegations to reverse that conclusion, which equally applies to Statement 35. That Zuckerberg "think[s]" criticisms of Meta are "dramatically overstated" (No. 35) is not "capable of objective verification," and Plaintiffs have not alleged that it is "both subjectively and objectively false or misleading." Order at 6.

Similarly, general statements that unspecified Meta practices are "quite robust" (No. 35); that "we go out of our way to try to reduce" extremist content because "we don't want [] extremist content or any of that stuff on our services" (*id.*); and that "we work to limit, not expand hate speech" (No. 37) are nonactionable aspirations. *Barnes v. Edison Int'l*, 2021 WL 2325060, at *9 (C.D. Cal. 2021) (statements that company "ha[s] long taken substantial steps to reduce the risk of wildfires" nonactionable, even where failure to follow safety protocols and maintain equipment, caused wildfires), *aff'd*, 2022 WL 822191 (9th Cir. 2022); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 770 (N.D. Cal. 2020) (statements concerning "commitment to safety, its safety measures, and the role safety plays in the rideshare market" not actionable). Indeed, this Court dismissed similar statements that Meta "takes 'significant steps' to fight disinformation," and "that it believes it does more than others in the industry on safety and security" to be actionable. Order at 9.

Statements 35–37 are also not actionable because Meta warned that its algorithms could amplify undesirable content; thus "the market already knew" of the allegedly omitted information. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). For example, Clegg acknowledged that "content that provokes strong emotions is invariably going to be shared" on Meta's platforms (No. 34). And Meta warned investors that its apps may "be negatively affected by . . . the use of our products or services to disseminate information that is deemed to be misleading (or intended to manipulate opinions)." Ex. 5 at 19.

8

*Finally*, Statement 37 is also not actionable because it was not made "in a manner reasonably calculated to influence the investing public." *McGann v. Ernst & Young*, 102 F.3d 390, 393 (9th Cir. 1996) (cleaned up). Statement 37 was made in an internal Meta memorandum, ¶ 783, and there are no allegations it was intended to be disclosed publicly or to investors. This Court dismissed a non-public statement on this basis, Order at 13 n.7, and the Court's reasoning applies equally here.

**No Scienter.** Plaintiffs fail to allege with particularity that any individual who allegedly made any of the algorithm statements acted with a strong inference of scienter.

<u>Statement 36</u>. Plaintiffs fail to attribute Statement 36 to any individual, much less allege that they acted with scienter. Accordingly, Statement 36 should be dismissed. *Janus*, 564 U.S. at 142.

<u>Statements 34, 35, 37</u>. The SAC attributes Statements 34 and 37 to Clegg and Statement 35 to Zuckerberg but fails to allege they had actual knowledge of falsity or should have known of any "obvious" "danger of misleading buyers." *Zucco Partners*, 552 F.3d at 991 (citation omitted).

*First*, consistent with this Court's rejection of allegations that Defendants had a profit motive to defraud investors, Order at 28, allegations that Meta planned a "████████████████████████" to address public criticisms and "████████████████████████████," ¶¶ 7, 84, 897–99—*i.e.*, a PR strategy—fail. If anything, they undermine scienter, since Meta allegedly implemented the strategy to correct what it saw as a "*misconception*" about the algorithms. ¶ 869. Allegations that Meta took document security measures to maintain confidentiality, ¶ 902—as many companies do—likewise cannot show scienter. "Ordinary and appropriate corporate objectives" do not show motivation for securities fraud. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).

*Second*, the SAC fails to remedy this Court's prior holding that "simply pleading that Defendants had 'access to internal data' or reports cannot support an inference that Defendants were aware of the research." Order at 29 (citation omitted). While the SAC again alleges that Clegg and Zuckerberg "received research and internal documents showing that Meta's algorithm had significant negative side effects," ¶¶ 813, 868, it does *not* allege that either saw or reviewed these documents, much less agreed with their conclusions. This pleading failure is compounded by Plaintiffs' reliance on documents pre-dating the putative class period. As this Court emphasized, "the PSLRA demands particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the

9

statement was false when made." Order at 26 (quotations omitted).

*Third*, allegations that Clegg or Zuckerberg spoke about how Meta intended its algorithm to work, ¶¶ 776, 778, 783, do not imply that either knew of alleged flaws in its execution from prior years, much less knew his statements were false, or ignored any "obvious" "danger of misleading buyers." *Zucco Partners*, 552 F.3d at 991. And recycled allegations that Zuckerberg "spearheaded" changes to the algorithm in 2018, ¶ 815, reveal nothing about his state of mind three years later.

*Finally*, any inference of fraud is not "at least as compelling as any opposing inference one could draw." *Tellabs*, 551 U.S. at 324 (quotations omitted). Here, the most compelling inference is that Clegg and Zuckerberg believed their statements were true. The SAC alleges that Zuckerberg approved algorithmic changes designed to "reduce the amount and spread of false content." ¶ 420. And Clegg publicly acknowledged that the algorithm *can* promote polarizing content. ¶ 776; *Sneed*, 147 F.4th at 1134 (nonculpable inference stronger than scienter when defendants disclosed allegedly concealed information in other contexts).

***No Loss Causation.*** Plaintiffs fail to plead loss causation because they do not allege a corrective disclosure that "reveal[ed] 'new facts' . . . render[ing] some aspect of the defendant's prior statements false or misleading.'" *Cesario*, 2025 WL 525120, at *24. Plaintiffs assert the alleged fraud was revealed by a September 15 article claiming that "Meta's News Feed algorithm was inordinately promoting misinformation, violent and divisive content on Facebook . . . ." ¶ 530. But such allegations were public before this article, *e.g.*, ¶ 398, and as discussed above, Meta itself warned the algorithm could have such effects. Absent a "revelation of a prior false statement to the market," a disclosure is not corrective. *See Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014).

## II.    Claims Concerning Encryption Should Be Dismissed (1, 2)

The SAC newly challenges two statements about Meta's plans to encrypt its messaging apps:

- No. 1: Meta takes an "***active approach to addressing child exploitation, including our proactive detection of bad actors***."

- No. 2: "***End-to-end encryption is quickly becoming the industry standard for messaging services***"; "***it brings with it the benefits of furthering privacy, safety, and security for users***."

Plaintiffs allege these statements were misleading because, among other things, they did not disclose purported safety challenges posed by encryption. The claims should be dismissed because

DEFS.' MOT. TO DISMISS THE CONSOLIDATED SECOND AM. CLASS ACTION COMPL., CASE NO. 3:21-cv-08812-AMO

(i) they are time-barred and because Plaintiffs fail to plead (ii) an actionable false or misleading statement, (iii) a strong inference of scienter, or (iv) a corrective disclosure.

***Claims Are Time-Barred.***  The newly asserted claims are barred by Section 10(b)'s two-year statute of limitations.  28 U.S.C. 1658(b)(1).  Plaintiffs were on notice of them by December 1, 2021—the date of the allegedly corrective disclosures concerning Meta's encryption statements.  *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 642 (2010) (statute of limitations begins when reasonably diligent plaintiff "should have known the facts constituting the violation").  But Plaintiffs waited until February 2026—over four years later—to assert their claims.  They are time-barred.

***No Actionable False or Misleading Statements.***  Both statements, which tout Meta's "active approach" to addressing child exploitation and the "benefits of furthering privacy, safety, and security for users," are non-actionable statements of corporate optimism.  *See supra* 7–8; *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (statement that "maintaining a transparent, proactive and delivered approach to credit is a driver of long-term value" was not actionable).

The statements are also not false or misleading.  The SAC does not allege that Meta was *not* taking an "active approach to addressing child exploitation" (No. 1) or that encryption was *not* "becoming the industry standard" or "bring[ing] with it the benefits of furthering privacy, safety, and security for users" (No. 2).  To the contrary, the cited Proxy details Meta's efforts to prevent, detect, and report child exploitation material.  Ex. 6 at 75–76.  Plaintiffs allege that Meta's efforts "███████████████████████████████" (emphasis added) because "██████████████████" remained on Meta's platforms.  ¶¶ 664–65.  But allegations that Meta's efforts were imperfect do not undermine statements that Meta made those efforts.  *See* Order at 18; *In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962, 992 (N.D. Cal. 2025) (statement that company had "one of, if not, the most comprehensive management programs in the country" not misleading because company "can have a comprehensive program and strive to improve . . . while still falling short of relevant regulations").  Plaintiffs also allege that Meta failed to disclose that encryption could "████████████████████████████████████████" and that "████████████████████████████████████████████████" ¶ 668.  But Statements 1 and 2 responded to a proposal highlighting *those very risks*.  Ex. 6 at 74–76.  Meta is not required "to reproduce information that is available in the public domain in the Proxy

11

Statement" itself. *Eisner v. Meta Platforms, Inc.*, 2024 WL 3228089, at *5 (N.D. Cal. 2024).

Judge Breyer dismissed securities claims against virtually identical statements in Meta's 2024 proxy based on essentially the same theory of fraud. An investor challenged statements in the Board's opposition to a similar proposal, including that Meta "seeks to prevent child exploitation"; is "constantly working on new features, tools, and technologies to help protect young people online"; and maintains "policies [that] prohibit harmful content, as well as content or behavior that exploits young people," *id.* at *3, because Meta allegedly omitted "the full extent of Meta's child exploitation problem and the failure of Meta's internal controls and enforcement mechanisms to curtail it," *id.* at *5. Judge Breyer held these statements were "not actionable because they are broad affirmations of Meta's policies, aspirational statements, or references to its commitment to safety." *Id.* at *3. He further held the statements were not false or misleading because "Meta does not suggest in its policy statements that its tools to protect children on its platforms are entirely effective, or that Meta is flawless in the execution of its policies." *Id.* at *4. So too here.

***No Scienter.*** Plaintiffs attribute Statements 1 and 2—made in a response "issued" by Meta's Board, ¶ 675—to both Zuckerberg and Davis but fail to allege a strong inference of scienter as to either. To begin, Davis did not "make" the statements under *Janus* because she did not have "ultimate authority" over their contents. *Janus*, 564 U.S. at 142. Allegations that Davis (who never served on the Board) was involved in drafting or editing the statements and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ¶ 675, do not render her the statements' "maker." *Janus*, 564 U.S. at 142 ("One who prepares . . . a statement on behalf of another is not its maker."); *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *6 (C.D. Cal. 2015) (role in drafting statement insufficient for 10(b) liability); *In re PG&E*, 806 F. Supp. 3d at 990 (role in compliance report "does not necessarily entail control over the content of every statement regarding compliance or their delivery").

Plaintiffs also fail to plead that either Davis or Zuckerberg misled investors "intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991. The SAC alleges they ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see e.g.*, ¶ 666, and that Meta's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *see e.g.*, *id.* But as discussed above, that information does not undermine any statement's truth, and mere receipt of information does not show scienter. Order at 29; *see supra* 9. Allegations

12

that Zuckerberg could have implemented "more effective" policies, ¶¶ 801–03, is not securities fraud. That he *did* implement policies suggests he believed his statements were true. *See supra* 10. Allegations that he should have known of encryption's alleged risks as Meta's CEO and Chairman, ¶ 811, also fail; this Court has held that allegations about a Defendant's title do not show scienter. Order at 27, 29. Allegations concerning "ordinary corporate objectives," such as profits, PR, or document security, likewise fail for the reasons above. *Supra* 9.

Finally, Plaintiffs cannot rely on this Court's prior holding that the FAC adequately alleged Davis and Zuckerberg's scienter as to statements concerning teen mental health because they publicly spoke on purported mental health research. The PSLRA requires Plaintiffs to show scienter "with respect to each act or omission," 15 U.S.C.A. § 78u–4, and knowledge of certain teen mental health research is irrelevant to encryption and child safety. Even if it were relevant, the SAC's allegations undermine any finding of scienter as to Zuckerberg or Davis because new documents show the purported research they publicly addressed was consistent with their statements. *Infra* 29.

***No Loss Causation.*** Plaintiffs also fail to allege that announcements of Meta's plans to delay encryption's adoption were corrective disclosures because they fail to "show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Cesario*, 2025 WL 525120, at \*24. Plaintiffs allege as corrective disclosures a Meta blog post explaining Meta's voluntary decision to delay encryption's rollout and *TechCrunch* and *betaNews* articles speculating that the delay resulted from an "accelerated timeline" that "led to resignations from child safety team members." ¶¶ 633, 635–38. But Meta's decision to delay encryption and journalists' speculations as to the reasons for the delay do not bear on the truth of statements about Meta's aspirations to prevent child exploitation or encryption's benefits. If anything, the alleged disclosures *affirm* the challenged statements, showing that Meta *was* taking "an active approach to addressing child exploitation" by delaying encryption, in part, due to Meta's "responsibility to protect our users" and its "need to help protect people from abuse." ¶ 633. Because the disclosures did not "invalidate" either of the statements, they cannot be corrective. *Apollo Grp. Inc.*, 774 F.3d at 608.

## III.   Claims About Age Verification Should Be Dismissed (5, 22, 23, 32, 33)

The SAC challenges five new statements regarding Meta's policy banning under-13 users:

- No. 5: "*We require everyone to be at least 13 years of age to use Facebook and Instagram. When we learn an underage user has created an account, we remove that user*. . . ."
- No. 22: If a user is "*unable to prove they meet our minimum age requirements, we delete their accounts*."
- No. 23: "*Right now the rule is 13*" for joining Instagram.
- No. 32: "*We do not market to 8 to 12 year olds because they are not on Instagram* . . . [I]f we find an account of someone who is under 13, *we remove them*."
- No. 33: "*[W]e don't allow [under-13 users] on our apps*."

Plaintiffs allege the statements are false or misleading because Defendants failed to disclose challenges in enforcing the policy.  These claims (i) are time-barred and fail to plead (ii) an actionable false or misleading statement, (iii) a strong inference of scienter, or (iv) a corrective disclosure.

***Claims Are Time-Barred.***  Again, Plaintiffs' new claims concerning Meta's age policy are time-barred under Section 10(b)'s two-year statute of limitations.  Plaintiffs were on notice of the claims when the statements were made in 2021, and by no later than the end of the putative class period in December 2021, but waited over four years to assert them.  *See supra* 11.

***No Actionable False or Misleading Statements.***  The statements are not false or misleading. The SAC does not dispute that Facebook and Instagram ban under-13 users or that Meta removes underage accounts after learning of them.  Plaintiffs claim the challenged statements were misleading because they omitted "that Meta had a backlog of children under 13 on its platforms, Meta was unable to proactively detect children under 13 on its platforms, and Meta did not implement the technology necessary to effectively remove children under 13 from its platforms, therefore allowing them to stay on Meta's platforms."  ¶¶ 679, 746, 748, 774.  But no reasonable investor would interpret statements reflecting Meta's age *policy* to mean that policy was entirely effective—and Plaintiffs do not allege that Meta ever promised that it was.  *See, e.g.*, *In re PG&E Corp. Sec. Litig.*, 806 F. Supp 3d at 995 (statement that company had "launched" and "implemented" protocol was not misleading even if protocol's implementation was incomplete); *HRSA-ILA Funds v. Adidas AG*, 745 F. Supp. 3d 1127, 1144–45 (D. Or. 2024), *aff'd*, 2025 WL 3471703 (9th Cir. 2025) (stated "zero-tolerance approach" to discrimination not materially misleading despite alleged coverup of discriminatory misconduct).

Plaintiffs also disregard that each of the *full* statements disclosed the allegedly omitted challenges.  *Sneed*, 147 F.4th at 1131 ("[T]o determine whether a sentence in a company blog post could mislead investors, we look[] at the entire blog post.").  Statement 5 disclosed: "One of the

14

greatest challenges our industry faces is ensuring that users below the minimum age do not gain access to services that are not designed for them." "We're committed to making progress with [age verification] technology, but it will take time to get this right." Ex. 7 at 54. Statement 22 disclosed: "[V]erifying someone's age is not as simple as it might sound. While age screens are common in our industry, young people can—and often do—get around them by misrepresenting their age. . . ." Ex. 2. Statement 23 disclosed: "[I]t's difficult to verify age . . . . There's no real way for us to verify age and not get it wrong some of the time." Ex. 1 at 36:57. And Statements 32 and 33 disclosed: "Understanding people's age on the Internet is a complex and industry-wide challenge, . . . . [Age verification] technology isn't perfect . . . ." Ex. 8 at 9.

These statements cannot be misleading when they disclosed the allegedly omitted risks. *Supra* 8. Statement 22, moreover, is mischaracterized. The statement that, if a user is "unable to prove they meet our minimum age requirements, we delete their accounts" (No. 22) refers to "reported accounts that appear to be used by people who are underage," Ex. 2, *not* all users at large.

*No Scienter*. Plaintiffs attribute the statements to Davis (Nos. 32, 33), Diwanji (No. 22), Mosseri (No. 23), and Zuckerberg (No. 5), but fail to allege a strong inference of scienter. Plaintiffs largely rely on allegations this Court has rejected—that Defendants "received and had access to information" about limitations on the effectiveness of Meta's age verification measures, *see* ¶¶ 809, 842, 878–79, and had general corporate motives to engage in fraud. *See supra* 9; Order at 27, 29. Remaining allegations that Defendants spoke on Meta's age policy, "prepared" documents regarding age verification, ¶¶ 808, 859, 863, 874, or played a role in funding or operationalizing this policy, ¶¶ 809, 843, 881, do not create a fraudulent inference. *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 889 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship*, 29 F.4th 611 (legal mandate to monitor privacy did not support inference that defendants should have known of privacy violations). A nonfraudulent inference is more compelling because, as discussed above, each Defendant publicly acknowledged the difficulties of age verification, *Sneed*, 147 F.4th at 1134 (nonculpable inference stronger when defendants disclosed allegedly concealed information), and the "allegedly misleading statements are not flagrantly false," *id.*

*No Loss Causation*. Plaintiffs do not even *try* to allege a corrective disclosure related to age

verification, which alone requires dismissal. *See, e.g.*, *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *37 (D. Ariz. 2023) (no loss causation when statement not linked to corrective disclosure).

**IV.    New Claims About Youth Safety and Wellbeing Should Be Dismissed**

      **A.    Claims About Project Daisy Should Be Dismissed (7–9, 12–15, 17–18)**

Plaintiffs challenge eight statements regarding "Project Daisy" and the purported impact of hiding "Likes" on wellbeing—one previously dismissed statement (No. 7) and eight new ones:

- No. 7: "*We've tried to measure the effect of hiding likes on people's actual wellbeing. Wellbeing is hard to measure. . . . [It's] more of like a judgment call. It's a bit subjective.*"
- No. 8: Hiding likes did not change wellbeing "*in a way we can measure whatsoever*."
- No. 9: "*I can be very confident telling you that economics, the effects on our revenue, was not a deciding factor* when we were at the other end of this."
- No: 12: "*While removal of Likes on Instagram had some impact on user behavior, [Mosseri] said, it was not enough to be concerning*."
- No. 13: "*[T]here's no rigorous research that suggests Likes are bad for people's well-being*," and "how *Likes function doesn't affect people's overall well-being*."
- No. 14: Mosseri "*also dismissed some of the current research pointing to negative impacts of social media use as being overly reliant on methodologies that ask users to self-report their use, rather than measure it directly*."
- No. 15: "[Y]ou can choose to hide like counts on others' posts and on your own posts so people can't see how many likes you get. . . . You might've seen that *we've been testing different options for a while and this update reflects the feedback we've gotten*."
- No. 17: Mosseri said "the company was willing to make the change *even if it proved detrimental to its business interests*" and that "[d]espite concerns that public like counts might be harmful, *surveys of user well-being didn't budge . . . nor did Instagram usage meaningfully change*."
- No. 18: "*Instagram expects a double-digit percentage of users to end up hiding likes*."

Plaintiffs allege Mosseri made these statements in connection with Meta's decision to make hiding likes an optional (not default) setting and misleadingly omitted various information relating to that decision. ¶¶ 686–87, 692–93, 697–98, 708–13, 718–19, 726–27, 730–31. Plaintiffs fail to plead (i) an actionable false or misleading statement, (ii) scienter, or (iii) a corrective disclosure.

      ***No Actionable False or Misleading Statements.*** *First*, Statements 7, 8, 12–14, and 17 are non-actionable as they reflect Mosseri's opinions and characterizations of wellbeing research. This Court previously dismissed Statement 7 because Plaintiffs did not allege that it was "objectively false or that Mosseri did not believe that wellbeing is 'hard to measure' or 'a bit subjective.'" Order at 19–20. This reasoning, which the SAC fails to cure, applies equally to Statements 8, 12–14, and 17.

Whether wellbeing can be measured (No. 8), or whether research is "rigorous," "concerning," "bad," "meaningful," "detrimental," "overly reliant" on certain methodologies, or "suggests" something (Nos. 12–14, 17), are, at most, "mildly optimistic, subjective assessment[s]," *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  Plaintiffs do not allege that Mosseri did not believe his opinions. In fact, Mosseri's full statements explained why he believed them.  For example, Mosseri's stated view that wellbeing research is "overly reliant on methodologies that ask users to self-report their use," ¶ 712, supports his opinion that "there's no rigorous research that suggests Likes are bad for people's well-being" (No. 13).  And in unchallenged portions of Statement 7, Mosseri explained that, because wellbeing is "hard to measure," "[e]ssentially what you end up doing is asking people questions and the answers to those questions correlate with real-world wellbeing outcomes," leading to "judgment call[s]" about how to approximate effects on wellbeing from those answers.  Ex. 9 at 4.  As explained below, the SAC's allegations further show that Mosseri's beliefs "fairly align[ed]" with the information he had when the statements were made.  *Omnicare*, 575 U.S. at 185–89.

*Second*, the statements are not false or misleading.  Plaintiffs allege that Statements 7, 8, 13, 14, 17 were false or misleading because Meta failed to disclose that internal Meta research showed that ████████████████████ which they allege is the ████████████ ████████████.  ¶¶ 687, 693, 711, 713, 727.  But none of the statements even *address* social comparison.  Nor does it follow, as Plaintiffs suggest, *id.*, that reducing social comparison necessarily improves wellbeing.  To the contrary, the internal research the SAC cites shows ████████ ████████████████████ ████████████.  Ex. 10 at -376–77 ████████████████████ (emphasis added).

Likewise, the fact that ████████████████████, ¶ 698, 727, 729, does not contradict Mosseri's statements that impact on revenue was not "a deciding factor" in whether to hide likes (No. 9) or that Meta "was willing" to hide likes even if "detrimental to its business" (No. 17).  To the contrary, the SAC alleges that ████████████████ ████████████████████ ████████████████████

DEFS.' MOT. TO DISMISS THE CONSOLIDATED SECOND AM. CLASS ACTION COMPL., CASE NO. 3:21-cv-08812-AMO

███████████████████████████████████████████████████████████████

████████ ¶¶ 255, 698, 709.  This user feedback also confirms Mosseri's statements that hiding likes as an option, rather than default, "reflects the feedback we've gotten" (No. 15).  As Mosseri further explained in a portion of the article containing Statements 12–14 omitted from the SAC, hiding likes was "pretty polarizing . . . . Some people really liked it and some people really didn't[,]" and those who didn't "were just super annoyed that we took it away[.]"  Ex. 11 at 2–3.  That not everyone agreed with Meta's decision, ¶¶ 719–20, is not securities fraud.  *In re Rigel Pharms.*, 697 F.3d at 877–78.  Similarly, the SAC's allegation that "████████████████████████████████████ ████████████████████████████████████" ¶¶ 698, 709, 729, 731, supports Mosseri's statement that removing likes "had *some* impact on user behavior" (No. 12) (emphasis added).  As does Mosseri's full explanation that, after hiding likes, some "users posted more—signaling that they felt less pressure to perform, perhaps.  But others engaged less."  Ex. 11 at 5.

Mosseri's paraphrased statement that he "expects a double-digit percentage of users to end up hiding like counts" (No. 18) is also not false or misleading.  Plaintiffs rely on a May 19 email, in which Mosseri stated that he was comfortable launching Daisy Controls ██████████████ ████████████████████████████████.  ¶ 731.  But Plaintiffs omit a later email in the same chain ████████████████████████████████████████████████████ ████████████████████████ Ex. 12 at -633, meaning that ████████████████.  Regardless, Plaintiffs do not allege why whether "a double-digit" or "███████████" percentage of users hid likes is material.  To the contrary, it is a "de minimis" difference that is "immaterial as a matter of law."  *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161 (C.D. Cal. 2007); *see also In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *19 (C.D. Cal. 2013) (dismissing statement because "[i]t strains credulity to believe that investors would have changed their views . . . upon learning that the company had presented 3,554 I–9s for inspection rather than the required 3,562").

Finally, Mosseri's statements are not misleading for omitting information about a feature that Meta did *not* adopt, or ████████████████████████████████████ ████████████ ¶ 713.  "[M]entioning a topic does not require . . . disclos[ing] every tangentially related fact."  *In re Twitter Sec. Litig.*, 506 F. Supp. 3d at 886.  Plaintiffs also claim it was misleading

DEFS.' MOT. TO DISMISS THE CONSOLIDATED SECOND AM. CLASS ACTION COMPL., CASE NO. 3:21-cv-08812-AMO

for Mosseri to criticize research as "overly reliant" on self-reports (No. 14) without disclosing that Meta's research ███████████████████████████████ ¶ 713, but that information is *consistent*, not "directly contradict[ory]." *Weston Fam. P'ship*, 29 F.4th at 623.

**No Scienter.** The SAC also fails to plead that Mosseri acted with the "intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014). As discussed, Plaintiffs cannot rely on allegations concerning "ordinary corporate objectives," such as profits, PR, or document security. *See supra* 9. The SAC asserts that Mosseri received or had access to various research ████████ ████████████████████████████ ¶¶ 834–36, but this Court held that allegations "that Defendants had 'access to internal data' or reports cannot support an inference that Defendants were aware of the research." Order at 29; *see also supra* 9. Even if Mosseri "[held] himself out as knowledgeable," was a "primary spokesperson," or was personally involved in Daisy's launch, ¶¶ 833, 835, Plaintiffs do not allege that he reviewed all of those documents, much less agreed with their conclusions and consequently intended to defraud investors. Regardless, the documents that Mosseri allegedly received were consistent with his statements. *See supra* 17–18. Given that Mosseri's public views fairly aligned with internal information he "received," Plaintiffs cannot show scienter. *Sneed*, 147 F.4th at 1134 ("Showing scienter necessarily becomes harder when the allegedly misleading statements are not flagrantly false because in those cases an innocent alternative explanation becomes more likely").

**No Loss Causation.** Plaintiffs, again, do not even *try* to allege a corrective disclosure for the Daisy-related statements. Only the September 14 alleged disclosure mentions Daisy, but it does not correct any statement. To the contrary, it states that Meta "found [Daisy] didn't improve life for teens," Ex. 13 at 14, which *confirms* Mosseri's statements. A disclosure cannot be "corrective" if it supports the challenged statements. *Apollo Grp. Inc.*, 774 F.3d at 608.

### B.    Claims About State of Research Should Be Dismissed Again (4, 16)

Plaintiffs re-challenge two dismissed statements concerning wellbeing research:

- No. 4: A Twitter user asked Mosseri: "[D]o you believe social media is good for children under 13?" and Mosseri responded: "This is *the* question. ***The reality is there's little existing research,*** which means there will be strong differing opinions."
- No. 16: Mosseri said "***that concerns about Facebook's overall impact on its users' well-***

19

***being are likely overblown, but said that Instagram was committed to studying it,"*** and that ***"[w]e're going to continue to try and work with external academics and researchers***."

Plaintiffs allege that Statement 4 was false and misleading because Meta had research showing that social media was "not good" for under 13 users, ¶ 677; and that Statement 16 was misleading because Meta had research showing that Instagram negatively affected teen mental health and had rejected certain "recommendations" from external academics, ¶ 722. The Court previously dismissed these statements because the FAC lacked allegations that Meta had research on children under 13 or the effects of Facebook on wellbeing. Order at 19–20. That reasoning still applies. In addition, Plaintiffs fail to plead a strong inference of scienter or a corrective disclosure.

***No Actionable False or Misleading Statement.*** *First*, the SAC still fails to allege that the statements were false or misleading. The SAC makes clear that there was "little existing research" addressing whether "social media is good for children under 13" (No. 4). After receiving extensive discovery, Plaintiffs identify ██████████████████████████ ████████████████████████████—*after* Statement 4 was made. ¶ 677; *see also* Order at 15 (dismissing statement not alleged to be false "when made").

The SAC's renewed allegations with respect to Statement 16 similarly fail. The Court previously dismissed challenges to this statement because Plaintiffs alleged no facts about research on *Facebook's* effect on wellbeing. Order at 20. Rather than cure this defect, Plaintiffs speculate that the statement's reference to "Facebook" was about *Instagram*. ¶¶ 723–25. But Plaintiffs cannot allege falsity by changing a statement's plain meaning. *See Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *10 (N.D. Cal. 2017) (PSLRA standard not met by "tak[ing] pieces of Defendants' 'admissions' out of context, and urg[ing] the [c]ourt to adopt an implausible inference of falsity"). In any event, "context matters" and reasonable investors are presumed to view, among other things, a statement's "surrounding text." *Sneed*, 147 F.4th at 1131. Here, the article containing Statement 16 discusses *both* the Facebook and Instagram apps separately throughout.

But regardless of whether Mosseri *was* referring to Instagram, Statement 16 was true—the SAC is replete with allegations that Instagram was "committed" to studying user wellbeing and "work[ing] with external academics and researchers," such as Dr. Haidt. ¶¶ 671, 677, 679, 682, 687–90, 693–96, 701, 705–06, 711, 713–17, 720, 723–24, 728, 737, 751, 753, 759, 766, 770. Whether

20

Meta "rejected" recommendations from "external academics and researchers," ¶¶ 700–01, 722, 724, 742–43, does not render misleading statements that Meta "work[ed] closely" with "experts," ¶ 699–700. No Defendant promised that Meta would follow every expert recommendation it received. That would have been impossible, since expert opinions differed. *See, e.g.*, ¶ 226 (███████████████ ███████████████████████████████████); Ex. 14 at -012, -015 (Dr. Haidt ███████████ ██████████████████████████████████████████).

Plaintiffs also do not allege why Mosseri had any duty to disclose all research on teen health when discussing the volume of research on children under 13, or Meta's general "commit[ment]" to studying wellbeing. *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *10 (N.D. Cal. 2018) (Where a defendant "said nothing about" the subject of an omission, "there is no duty to disclose, as [§ 10(b)] does not contain a freestanding completeness requirement.") (quotations omitted). Mosseri's views that criticisms were "likely overblown" did not guarantee that no contrary research existed.

*Second*, neither statement is actionable. A statement of what Instagram is "committed" to doing is textbook optimism. *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193, at *15 (N.D. Cal. 2023) (statements of "commitment" to data security were "vague and generalized corporate commitments, aspirations, or puffery that cannot support liability under Rule 10b–5(b)"); *supra* 7–8, 12. And descriptors like "little" and "likely overblown" are opinions, especially since Mosseri's statements responded to questions on what he "believe[d]." *Omnicare*, 575 U.S. at 186 ("belief" statements not actionable despite investors' "second-guess[ing]"). As discussed, *supra* 17, Plaintiffs do not allege that Mosseri did not believe his opinions, and the SAC's allegations undermine any showing that his beliefs did not "fairly align[]" with information he had when his statements were made. *Omnicare*, 575 U.S. at 185–89. Indeed, documents about Instagram's potential effects suggested that mental health experiences were more nuanced, supporting Mosseri's view that concerns were "likely overblown." *See infra* 26. That others might interpret research differently does not render Mosseri's opinions actionable. *Omnicare*, 575 U.S. at 185; *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d at 877 (allegations that "criticize" defendants' conclusions do not state securities claim).

***No Scienter.*** The Court previously dismissed Mosseri for lack of scienter as to all statements concerning teen mental health, including Statements 4 and 16, Order at 30–31, and the SAC identifies

no reason to reverse that holding. The SAC does not allege that Mosseri did not believe his statements, *supra* 17, and it otherwise lacks "credible allegations of an intent to defraud investors." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 538 (9th Cir. 2024). As discussed above, the SAC alleges that Mosseri ██████████████████████████████████████, ¶ 842, *confirming* his belief that there was "little" such research (No. 4). Similarly, allegations that Mosseri received updates on efforts to study mental health on *Instagram*—even if sufficient to allege scienter, which they are not, *see* Order at 29—say nothing about wellbeing on Facebook and, if anything, confirm his belief that Instagram was "committed" to studying wellbeing (No. 16). *See supra* 19. Finally, once again, allegations concerning profits, PR, and document security fail. *See supra* 9.

**No Loss Causation.** The SAC does not allege any corrective disclosure related to research on social media's impact on children under 13 (No. 4). Nor does it allege any corrective disclosures concerning research about *Facebook's* impact on user wellbeing or suggesting that Meta did not try to work with external academics and researchers (No. 16). Because the SAC does not identify any disclosure that "invalidate[s]" the challenged statements, *Apollo Grp. Inc.*, 774 F.3d at 608, or even "relate[s] back" to them, *Espy*, 99 F.4th at 540, it fails to plead loss causation. *See supra* 5–6.

### C.    Claims as to Other Corporate Aspirations Should Be Dismissed (25)

Plaintiffs newly challenge Mosseri's statement that "We've never allowed anyone to promote or encourage suicide or self-harm [("SSI")] on Instagram, and last year we updated our policies to remove all graphic suicide and self-harm content" (No. 25). Plaintiffs fail to plead (i) an actionable false or misleading statement, (ii) a strong inference of scienter, or (iii) loss causation.

**No Actionable False or Misleading Statement.** Mosseri's general statement describing Meta's "policies" and what they "allow" is a nonactionable statement of corporate policy or aspiration. *Supra* 7–8, 12; *Eisner*, 2024 WL 3228089, at *3 (similar statements non-actionable as "broad policy affirmations or aspirational statements"). It is also not false or misleading. There is no dispute that removing SSI *was* Meta's policy, or that Meta updated its policy to remove "graphic SSI content." The documents quoted in the SAC confirm as much. *See, e.g.*, Ex. 15 at 64 (Meta "actioned" over "5 million" pieces of [suicide and self-injury] content in Q1 2021, up from "2.5 million pieces of [suicide and self-injury] content in Q4 2020"); ¶ 110. Plaintiffs claim Statement 25

22

was misleading because allegedly 13.5% of teen girls experienced thoughts of suicide or self-injury after viewing content on Instagram. ¶ 756. But allegations that some users reported that Instagram usage generally made "thoughts of suicide and self-injury worse," *id.*, do not bear on Meta's policy regarding *content* that promotes or encourages SSI. Plaintiffs also claim that Meta's SSI policy was not perfectly enforced, *id.*, but a reasonable investor would not interpret a statement describing Meta's general policy as a promise of "flawless" enforcement. *Eisner*, 2024 WL 3228089, at *4; *see supra* 8, 11–12. Meta is not alleged to have made such a promise; in fact, it consistently disclosed the opposite. *Supra* 8.

*No Scienter.* Plaintiffs fail to allege Mosseri made Statement 25 with scienter. There are no allegations suggesting Mosseri did not believe Instagram's policy banned content promoting SSI and removed graphic SSI content. Plaintiffs' already-inadequate allegations of scienter are even more attenuated to Statement 25—*i.e.*, that Mosseri "received," "had access to," or was "informed" about documents on various wellbeing-related topics, ¶¶ 827–28, 831, and spoke publicly about whether Instagram is safe for young users, ¶¶ 829–30, 832. These allegations are irrelevant to whether Meta allows SSI content and therefore cannot show that Mosseri made this statement with scienter. Generalized allegations about profits, PR, or document security are likewise insufficient. *Supra* 9.

*No Loss Causation.* Statement 25 must also be dismissed because no alleged corrective disclosure revealed anything that "invalidated" that Instagram's policy banned SSI. *Apollo Grp. Inc.*, 774 F.3d at 608. Setting aside that no alleged disclosure discusses Meta's policy of removing SSI, a disclosure that only details a company's challenges enforcing its policies "does not reveal to the market the pertinent truth of" whether that policy exists. *Loos*, 762 F.3d at 890 n.3; *supra* 10.

## V.    Previously Allowed Claims Should Be Dismissed

The SAC re-pleads previously allowed claims as to 16 statements. Because courts may consider both "previously made" and "new arguments" on a motion to dismiss amended pleadings, *Mir v. Kirchmeyer*, 2014 WL 12029269, at *4 (S.D. Cal. 2014), Defendants respectfully submit that the Court should now dismiss those claims based on new allegations in the SAC and arguments that the Court previously declined to consider on procedural grounds but that are now properly before the Court. *See also Moreno v. Castlerock Farming & Transp. Inc.*, 2022 WL 902597, at *4 (E.D. Cal.

2022) ("This court will follow the practice of other district courts in California and consider newly raised defenses in the successive motion to dismiss on the merits."); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 893 (C.D. Cal. 2012) ("The law is clear in this Circuit that an amended complaint supersedes the original, the latter being treated thereafter as nonexistent," and courts have "permitted defendants moving to dismiss an amended complaint to make arguments previously made and to raise new arguments that were previously available").

### A.    Allowed Claims on Youth Safety and Wellbeing Should Be Dismissed

The SAC re-pleads claims as to 14 statements (Nos. 3, 6, 10, 11, 19–21, 24, 26–31)[2] that concern youth safety and purported wellbeing research on Instagram.  These claims should be dismissed because (i) the statements are nonactionable and new allegations and incorporated documents demonstrate they are not false or misleading; (ii) Plaintiffs have failed to allege that the speaker of the statement acted with scienter; and (iii) many of the statements were made *after* the allegedly corrective disclosure, such that Plaintiffs cannot plead loss causation as to those statements.

### 1.    The Statements Are Not Actionable or False or Misleading

***Statements 3, 6, 10, and 19–21 Are Nonactionable***.  Plaintiffs challenge various statements of corporate aspiration or optimism, including that Meta has "robust policies to help protect against child exploitation and content or behavior on our platform that puts the safety of children at risk" (No. 3); "remove[s] content that encourages suicide or self-injury" (No. 6); has "been working closely with third-party experts to better understand how to empower people, build self-awareness and shape a more positive experience on Instagram" (No. 10); "want[s] young people to enjoy using Instagram while making sure we never compromise on their privacy and safety" (Nos. 19 & 20); "convened a group of experts in the fields of online safety, child development and children's media to share their expertise, research and guidance"; "believes this comprehensive plan" was "the right one for" Meta to address child safety and wellbeing; was "fortunate to draw from multiple industry experts, organizations and bodies of research here"; and was "committed to working with experts and the broader industry to give young people a compelling and safe experience on [its] services" (No. 21).

Generalized statements touting Meta's "robust" policies, aspirations, or commitments are

---

[2] Although Statement 20 is newly challenged, the challenged portion is the same as Statement 19.

nonactionable. *See, e.g.*, *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *9 (N.D. Cal. 2024) (statements that "Tesla cars are 'absurdly safe'" and "we want to get as close to perfection as possible" constitute corporate optimism), *aff'd sub nom.*, *Oakland Cnty. Voluntary Emps.' Beneficiary Ass'n v. Tesla Inc.*, 2025 WL 3459471 (9th Cir. 2025). As discussed above, *supra* 12, Judge Breyer dismissed securities fraud claims against virtually identical statements by Meta, including statements that "[w]e introduced additional ways to enable us to proactively find and remove accounts that may violate our child safety policies"; "[w]e regularly collaborate with a group of external advisors for our youth efforts that includes professionals across online safety, privacy, media literacy, mental health, and child psychology"; and "[w]e want users, including young people, to have a positive experience online." *Eisner v. Meta Platforms, Inc.*, 2024 WL 4545968 (N.D. Cal. 2024). This Court too dismissed several statements on similar grounds, *see* Order at 9, but "decline[d] to engage" in the issue with respect to Statements 3, 6, 10, and 19–21 because it found that Defendants had not presented sufficient analysis as to those statements. Order at 21 n.9. Defendants respectfully submit that the Court's reasoning extends to these statements for the reasons above.

### *Statements 3, 6, 10, 11, 19–21, 24, 26–31 Are Not False or Misleading.*

*Statements 3 & 6.* Consistent with Statement 3, the SAC now affirms that Meta maintained (and enforced) policies against child exploitation. *See, e.g.*, ¶ 366. For example, the SAC concedes that ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████ ¶ 185. Consistent with Statement 6, newly incorporated documents show that Meta maintained (and enforced) its policy of removing SSI, as discussed above. *Supra* 22–23. Whether Meta's enforcement efforts had "████████████" ¶¶ 187, 665 671, 737, does not render a statement of its policy misleading because the statement does not suggest "flawless" execution. *Supra* 12, 23.

*Statements 10, 19–21.* The SAC concedes that Meta consulted industry experts, consistent with these statements. *Supra* 20–21. The SAC claims Meta secretly rejected some expert advice, but Defendants never promised that Meta would adopt all advice. *Id.* Plaintiffs also claim these statements were misleading because Meta "compromised on" users' "privacy and safety," ¶¶ 8, 218,

25

but criticisms that Meta could have done more do not establish that Meta's existing measures "compromised" user safety. *Supra* 7, 11–12. To the extent this Court previously allowed claims as to Statements 10 and 21 based on allegations that Meta touted its efforts to improve wellbeing while knowing that initiatives such as Daisy were ineffective, Order at 22, new allegations that Defendants publicly disclosed that Daisy did *not* improve wellbeing contradict this theory. ¶¶ 726–27.

Statements 11 & 24. Incorporated documents support Mosseri's statements describing the effects of Instagram as "small" and "bi-directional," and opining that "[t]here is a lot of good that comes with what we do." *See, e.g.*, ¶ 706; Ex. 16 at -908 (noting that 82% of U.S. teens surveyed and 79% of UK teens surveyed felt that Instagram made things "better" or had "[n]o effect"); *infra* 26, 29. These documents cure the Court's prior finding that Defendants had not identified specific research suggesting that Instagram also had positive effects. Order at 21. Similarly, the SAC makes no allegations to suggest there was any "consensus" around what amount of screen time may be "too much." To the contrary, newly incorporated documents reveal ongoing debates around the potential impacts of Instagram on teen health. *See* Ex. 14 at -012, -015 (Dr. Haidt ███████████ ███████████████████████████████████████ ).

Statements 26–30. These statements—all but one of which the Court did not previously address, Order at 22—discuss two internal research decks that were the "primary focus" of the *WSJ*'s September 14 article. Ex. 17 at 1; Ex. 8 at 11–12. The newly incorporated decks, which were published by Meta on September 29, 2021, ¶¶ 547, 554, before Statements 26–30 were made, corroborate each statement. For example, one deck reported that 22.10% of teen girl respondents who struggled with body image issues reported that Instagram made body image issues better, and 45.5% reported that Instagram had no impact. Ex. 18 at -174. The same deck showed that teen girls who struggled with 12 "hard life moment" issues were more likely to say that Instagram "[m]ade [the issue] better" than "[w]orse" for 11 issues, and that teen boy respondents were more likely to say the same for all 12 issues. *Id.* The deck reported overall that teens "generally thought that IG made things better or had no impact." *Id.* Similarly, consistent with Statement 30, the second deck at issue stated that about 80% of U.S. and U.K. teen respondents reported that Instagram "ma[d]e them feel" "[m]uch better," "[s]omewhat better," or had "[n]o effect." Ex. 16 at -908. Plaintiffs do not dispute

these positive findings and only allege that the statements failed to disclose other, negative findings. But the already-published decks contained those alleged findings, and a statement cannot be misleading for omitting information that was already disclosed. *Supra* 8-11.

*Statement 31*. Davis's statement that she "disagrees with calling [Meta's] product addictive"—is an opinion similarly supported by incorporated documents. For instance, ███ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████ *See* Ex. 19 at -728. Nor do Plaintiffs allege that Davis did not believe her opinion. To the contrary, Davis explained that she "disagree[d]" with views that Meta's apps were "addictive" because Meta worked "to make people aware of how much time they're spending," including through "a dashboard," an option to "set a reminder to let them know that they've been on so that they'll get off," and a new feature that "would prompt somebody when they've been on to take a break." (No. 31.) Plaintiffs have thus not alleged that Davis's opinion was objectively and subjectively false, rendering it nonactionable. *Supra* 5.

### 2.     Plaintiffs Fail to Plead Scienter

Claims as to all 14 re-challenged statements should be dismissed for failure to plead scienter.

***Unattributed Statements (Nos. 6 & 24).*** Claims as to these statements should be dismissed because Plaintiffs fail to identify an individual who both "made" them and acted with scienter. *Janus*, 564 U.S. at 142. Plaintiffs attribute Statement 6 to Rosen and Newton but fail to allege that either was its "maker." ¶ 685. Allegations that Rosen participated in its preparation or engaged with press on a related topic are insufficient to establish "ultimate authority" over the statement for the reasons discussed above. *Supra* 5, 12. The same is true for allegations that he "linked" to the statement's source. *Total Equity Cap., LLC v. Flurry, Inc.*, 2016 WL 3093993 at *3 (S.D.N.Y. 2016). As to Newton, Plaintiffs cite a single email stating ████████████████████████ ████████████████████████████—¶ 685—*not* that she prepared any statement in the report itself, much less had "ultimately authority" over it. *Janus*, 564 U.S. at 142; *supra* 5, 12. Similarly, Zuckerberg did not sign the letter containing Statement 24, Ex. 20 at 6, and there are otherwise no well-pled allegations establishing that he was the statement's "maker."

DEFS.' MOT. TO DISMISS THE CONSOLIDATED SECOND AM. CLASS ACTION COMPL., CASE NO. 3:21-cv-08812-AMO

██████████ *(No. 26).*  Plaintiffs attribute Statement 26 to ██████████, but do not allege that she acted with scienter.  ¶ 757.  It should be dismissed.

*Diwanji (No. 21), Mosseri (Nos. 10 & 11), and Rosen (No. 6).*  This Court dismissed these individuals because Plaintiffs had not alleged their scienter.  Order at 31 n. 11.  The SAC does not cure those deficiencies.  The Court found the allegation that Diwanji "claimed that Meta had convened experts to develop a comprehensive plan on child safety" insufficient to show she was "aware of Meta's internal research."  Order at 31.  Plaintiffs now allege she had access to documents criticizing Meta's safety efforts and "showing that Meta rejected" some experts' recommendations, but this Court has also held that access to documents is insufficient to show scienter.  Order at 29.

The Court similarly held that Plaintiffs failed to show Mosseri's scienter.  *See supra* 21–23.  Plaintiffs now allege that he "received research, internal documents, and communications," "met with several Meta executives and experts" ██████████, and had ██████████ ██████████ about ██████████ ¶ 827 (emphasis added); *see also* ¶ 133.  But involvement in conversations or "participation in a meeting is merely routine corporate activity—hardly indicative of scienter." *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *13 (N.D. Cal. 2016).  Likewise, discussions that occurred *years* ago say nothing of Mosseri's knowledge when he made his challenged statements in 2021.  *See* Order at 15.  Plaintiffs' allegation that Mosseri sometimes responded to journalists' questions about teen mental health, *e.g.*, ¶ 829, does not suggest he reviewed all the documents he allegedly "received," much less that he agreed with their conclusions or intended to deceive investors.  *Supra* 19, 23.  Allegations that Rosen "received and had access to research" purportedly "showing that Meta did not remove significant content that encouraged suicide or self-injury" and "attended" meetings regarding "Mental Health Review[s]," ¶ 866, likewise do not suffice for the same reasons.

*Newton (Nos. 6, 19, 20).*  This Court previously upheld allegations of Newton's scienter as to Statement 19 (and, by extension, Statement 20) because she allegedly had "publicly and directly addressed the research on Instagram's harm to young users" discussed in the September 14 Facebook Files article.  Order at 30–31; *see also* ¶ 845.  But as discussed above, this research, which is now incorporated, shows many positive findings on teen mental health, *supra* 26–27, negating an

inference of scienter, *Sneed*, 147 F.4th at 1134 ("Showing scienter necessarily becomes harder when the allegedly misleading statements are not flagrantly false because in those cases an innocent alternative explanation becomes more likely"). The Court did not address Newton's scienter with respect to Statement 6, which concerns the removal of SSI content. Plaintiffs allege Newton received documents suggesting that some users experienced thoughts of suicide or self-injury, ¶ 847, but receipt of information alone does not show scienter. *Supra* 9. Nor do some users' thoughts of suicide or self-injury contradict statements that Meta works to remove SSI content. *Supra* 22–23, 25.

**Davis (Nos. 3, 27–31) & Zuckerberg (No. 3, 24).** As established above, *supra* 12, Davis was not the "maker" of any statement in Meta's Proxy, including Statement 3. And newly incorporated documents confirm that Davis and Zuckerberg believed their statements. As shown above, Davis's statements (Nos. 27–31) concerned research that corroborates her statements. *Supra* 26–27. That research was also fully disclosed before she testified, negating any inference of scienter. *Sneed*, 147 F.4th at 1134–35 (nonculpable inference stronger than scienter when defendants disclosed allegedly concealed information). Similarly, Dr. Haidt noted that Zuckerberg was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ¶ 128; Ex. 14 at -006, and was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 14 at -012, -015. At a minimum, as with Newton, the fact that Meta's internal research showed positive findings on teen mental health means that their statements were "not flagrantly false" and therefore "an innocent alternative explanation becomes more likely." *Sneed*, 147 F.4th at 1134.

Finally, generalized allegations of "ordinary corporate objectives," such as pursuing profit and adopting a PR strategy or document security measures, fail for the reasons above. *Supra* 9.

### 3. Plaintiffs Fail to Plead Loss Causation for Statements 11, 24, and 26–31

Claims as to Statements 11, 24, and 26–31 must be dismissed because they post-date the alleged corrective disclosure. This Court held that Plaintiffs "cannot allege a causal connection between" a statement "made after the corrective disclosure about Instagram's impact on teens had already been made public," and the "[alleged economic] loss," and dismissed a claim on that ground. Order at 20 n.8 (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008)); *see also Apollo Grp. Inc.*, 774 F.3d at 608 (statements must be "called into question by

DEFS.' MOT. TO DISMISS THE CONSOLIDATED SECOND AM. CLASS ACTION COMPL., CASE NO. 3:21-cv-08812-AMO

*subsequent* public disclosures") (emphasis added).  The Court's reasoning applies to Statements 11, 24, and 26–31, which all concern research on Instagram's potential effects on teens and were allegedly corrected by the September 14 Facebook File that disclosed purported findings from the same research.  ¶¶ 705, 750, 752, 758, 765, 769.  No statement is alleged to have been public prior to that article.  Two were initially made privately and only publicly disclosed *after* the September 14 article: No. 11 (made by Mosseri in a private interview, ¶ 115, 704) and No. 24 (made in a letter to two senators, ¶ 749).  The other six statements—in a September 26 blog post and during September 30 testimony—were all made after September 14.  ¶¶ 757, 761–64, 768.

### B.      Allowed Claims on X-Check and Newsworthiness Should Be Dismissed

The SAC reasserts two statements about Meta's newsworthy policy and X-check process:

- No. 38: "We grant our newsworthiness allowance to a ***small number of posts*** on our platform. Moving forward, we will begin publishing the ***rare instances when we apply it***. Finally, when we assess content for newsworthiness, we will ***not treat content posted by politicians any differently from content posted by anyone else. Instead, we will simply apply our newsworthiness balancing test in the same way to all content*** . . . ."

- No. 39: "While the [Oversight Board] has requested details about the relative error rates of enforcement decisions made through cross check, we do not have systems in place to make this comparison. Our ***measurement accuracy systems are not designed to review the small number of decisions made through the cross check process.***"

While the Court previously allowed claims as to these statements, it should dismiss them now.  Incorporated documents demonstrate that neither statement was false or misleading.  For similar reasons, Plaintiffs have failed to allege scienter or, with respect to Statement 38, loss causation.

***Statement 38 Not Actionably False or Misleading.***  Plaintiffs claim it was misleading to state that the newsworthiness policy applied to a "small number of posts" because "the X-Check and whitelisting system shielded at least 5.8 million users from enforcement" of the Community Standards.  ¶ 786.  But the newsworthiness policy is distinct from X-Check.  The newsworthiness policy "allow[s] certain content that is newsworthy or important to the public interest to remain on [Meta's] platform – *even if it might otherwise violate [Meta's] Community Standards*." Ex. 3 at 11 (emphasis added).  By contrast, X-Check is *not* an exemption from the Community Standards.  Rather, it is a second layer of review to "confirm" that the Standards are applied correctly.  *Id.*  As a result, the alleged number of users subject to X-Check is irrelevant to the number of posts subject to the newsworthiness policy.  Plaintiffs make conclusory allegations conflating the newsworthiness

policy with X-Check, *see, e.g.*, ¶ 19, but the Court need not credit "conclusory statements, not supported by actual factual allegations," *Milliken v. Bank of Am. N.A.*, 2024 WL 3090484, at *2 (N.D. Cal. 2024) (Martínez-Olguín, J.), *aff'd*, 162 F.4th 1030 (9th Cir. 2025). Because the SAC makes no well-pled factual allegations concerning the number of posts subject to the newsworthiness policy, Plaintiffs cannot show that Statement 38 is false or misleading.

Plaintiffs also fail to plead that Statement 38 is false or misleading insofar as it states that "*[m]oving forward*," Meta "*will begin*" to publish applications of the newsworthiness policy and treat politicians no differently under this policy. "Because the complaint does not allege that Defendants falsely represented their actual . . . plans and expectations, the allegations are insufficient to plead falsity." *In re Rigel Pharms.*, 697 F.3d at 882. Nor have Plaintiffs alleged that Meta did *not* begin publishing applications of the newsworthiness allowance or treating content posted by politicians and others the same after June 2021. The SAC's falsity allegations concern X-Check rather than the newsworthiness allowance. *See* ¶ 786. They also pre-date June 2021 and therefore cannot show what Meta did later. *See, e.g.*, *In re Cloudera, Inc.*, 2021 WL 2115303, at *14 (N.D. Cal. 2021) (statement that company "will further expand" representing "future actions the company will take" not false or misleading based on company's state at the time of the statement). Regardless, though the Court did not address this portion of Statement 38, it dismissed similar statements that "Meta applies its community standards and policies to everyone" and "removes harmful content no matter who posts it" for Plaintiffs' failure to allege falsity, Order at 12–13, and should do the same here.

***Statement 38 Not Made With Scienter.*** Allegations that Clegg acted with scienter fail. Although the Court found Clegg "made detailed statements about cross-check" and was involved in some content policy decisions, Order at 28, it never addressed his scienter as to the newsworthiness policy, which, as discussed, is separate from X-Check. Allegations that Clegg "oversaw Meta's policies concerning X-Check and hate speech" are therefore unrelated to the newsworthiness policy. ¶ 872; *see In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059 at *10–11 (S.D.N.Y. 2021), *aff'd* 89 F.4th 408 (2d Cir. 2023) (dismissing statements about clinical studies where allegations relied on other studies that were "distinct in kind"). Nor, as discussed, can Plaintiffs rely on allegations about profit, PR, or document security. *Supra* 9. While Plaintiffs also attribute Statement

31

38 to Zuckerberg, ¶¶ 820–25, they offer no well-pled allegations in support.  To the contrary, they allege that Clegg "authored" the post containing Statement 38.  ¶ 785.

*No Loss Causation for Statement 38.*  Plaintiffs have not pled loss causation.  The September 13 article alleged to have corrected Statement 38, ¶ 492, did not mention the newsworthiness policy or its size.  *Espy*, 99 F.4th at 540 (corrective disclosure must "relate back to the misrepresentation").

*Statement 39 Not Actionably False or Misleading.*  Plaintiffs allege that it was false or misleading for Meta to state that its "measurement accuracy systems are not designed to review the small number of decisions made through the cross check process" because X-Check and whitelisting covered "5.8 million *users*" (not *decisions*) and because Meta acknowledged to the Oversight Board "that its representation that X-Check applied to a 'small number of decisions' could be misleading." ¶ 789.  But the Oversight Board Transparency Report, in fact, disclosed that Meta made "under *10,000* cross-check reviews" per day, compared to its "*millions* of content decisions a day."  Ex. 4 at 13–14 (emphasis added).  In that context, 10,000 decisions per day *is* small.  *See Sneed*, 147 F.4th at 1131 (statements must be analyzed in context).

*Statement 39 Not Made With Scienter.*  Plaintiffs fail to allege under *Janus* that the "maker" of Statement 39 acted with scienter.  Plaintiffs attribute Statement 39 to Clegg because he authored a blog post linking the document containing Statement 39, ¶ 788, but someone does not "make" the statements in a document merely because they link it, *supra* 27.  Moreover, incorporated documents show that those involved with Statement 39 believed it was true.  As the Oversight Board explained, "Facebook noted that for teams operating at the scale of millions of content decisions a day, *the numbers involved with cross-check seem relatively small*."  Ex. 4 at 8 (emphasis added).  A nonfraudulent inference is more compelling.  *See Tellabs*, 551 U.S. at 324.

**VI.    Plaintiffs Do Not Plead Control Person Liability Under Section 20(a)**

Plaintiffs also fail to state a Section 20(a) claim because the SAC does not state a primary violation under Section 10(b) as set forth above.  *See Weston Fam. P'ship*, 29 F.4th at 623.

**CONCLUSION**

Defendants respectfully request that the Court dismiss the SAC with prejudice.

Dated:  March 30, 2026                    DAVIS POLK & WARDWELL LLP


By:  */s/ Rory A. Leraris*
_____

James P. Rouhandeh (admitted *pro hac vice*)
Charles S. Duggan (admitted *pro hac vice*)
Rory A. Leraris (admitted *pro hac vice*)
Nikolaus J. Williams (admitted *pro hac vice*)
Esther C. Townes (admitted *pro hac vice*)
Paulina Perlin (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 701-5800
        rouhandeh@davispolk.com
        charles.duggan@davispolk.com
        rory.leraris@davispolk.com
        nikolaus.williams@davispolk.com
        esther.townes@davispolk.com
        paulina.perlin@davispolk.com

Neal A. Potischman (SBN 254862)
Julia Leff (SBN 356813)
900 Middlefield Road
Redwood City, CA 94063
Telephone: (650) 752-2000
Facsimile: (650) 752-2111
Email:  neal.potischman@davispolk.com
        julia.leff@davispolk.com

*Attorneys for Defendants Meta Platforms, Inc., Mark Zuckerberg, Nick Clegg, Adam Mosseri, Guy Rosen, Antigone Davis, Karina Newton, and Pavni Diwanji*